# EXHIBIT A

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACEY WOLKING and DARYL WOLKING, W/H | : |
| Plaintiffs, | : Civil Action # |
| vs. | : |
| HENRY LINDNER, M.D., AND YOUNGS APOTHECARY, INC. D/B/A TUNKHANNOCK COMPOUNDING CENTER | : JURY TRIAL DEMANDED |
| Defendants. | : |

## **COMPLAINT**

1.      Federal jurisdiction in this action is predicated upon diversity of citizenship under the statutory authority of 28 U.S.C. § 1332.  The amount in controversy exceeds $75,000.00.

2.      Venue is in the Middle District of Pennsylvania pursuant to 28 U.S.C. § 1391(b) because (1) some or all defendants are residents of this judicial district and/or (2) the acts and omissions that form the subject matter of this action occurred in this judicial district.

3.      For purposes of diversity under 28 U.S.C. § 1332, all defendants are citizens of the Commonwealth of Pennsylvania and all plaintiffs are citizens of the Commonwealth of Virginia.

4.      Plaintiff Stacey Wolking ("Stacey") and Daryl Wolking ("Daryl") are wife and husband, and are adult citizens of the Commonwealth of Virginia, currently residing at 36937 Basswood Court, Purcellville, Virginia 20132.

5.      Defendant Henry Lindner, M.D. ("Dr. Lindner") is an adult citizen of the Commonwealth of Pennsylvania.  At all relevant times, he was a physician licensed to practice medicine in the Commonwealth of Pennsylvania, holding himself out as a practitioner in the areas of endocrinology and infectious disease.  Dr. Lindner maintained a medical practice, office, and place of business at 230 West Tioga Street, Suite 5, Tunkhannock, Pennsylvania 18657.  Plaintiffs are asserting a professional liability claim against this Defendant.  A Certificate of Merit pursuant to and in compliance with Pa.R.C.P. No. 1042.3 regarding this defendant is attached hereto as Exhibit A.

6.      Defendant Youngs Apothecary Inc., doing business as Tunkhannock Compounding Center ("Tunkhannock Compounding Center"), was at all relevant times a corporation or other jural entity organized according to and existing under the laws of the Commonwealth of Pennsylvania, with a license or other authority to sell and dispense prescription medications, with a business address at 230 West Tioga Street, Suite 3, Tunkhannock, Pennsylvania 18657.

7.      At all relevant times, Tunkhannock Compounding Center acted by and through its agents, servants, and/or employees who were acting within the course and scope of their agency and/or employment.

8.      At all relevant times, Tunkhannock Compounding Center was engaged directly or indirectly, though its agents and/or employees, in the care and treatment of

2

Stacey.  Consequently, this Defendant had actual and/or constructive knowledge of the medications provided to Stacey by its pharmacists during the timeframe referenced in this Complaint.  Stacey is asserting a professional liability claim against this Defendant for the negligence of its agents, servants, and/or employees under the theories of *respondeat superior*, vicarious liability, master-servant, agency and right of control. A Certificate of Merit pursuant to and in compliance with Pa.R.C.P. No. 1042.3 regarding this defendant is attached hereto as Exhibit B.

## OPERATIVE FACTS

9.     In 2013, Stacey was fifty-one (51) years old, and she began looking for medical advice and treatment related to chronic fatigue, brain fog, malaise, and similar symptoms.   She  discovered  Dr.  Lindner,  who  advertised  on  a  website, HormoneRestoration.com.

10.     HormoneRestoration.com does not mention whether Dr. Lindner is board certified in any specialty.  It states that he began a residency in psychiatry, but resigned after one year and became a general medical officer and flight surgeon in the United States Air Force.

11.     Stacey met with Dr. Lindner one time in Tunkhannock, Pennsylvania, in and around 2013.  From 2013 through 2022, Stacey was a patient of Dr. Lindner's and was under his medical care, and communicated with him by phone and email.

### I.      Dr. Lindner's Treatment of Stacey for Babesiosis

12.      On June 25, 2021, Dr. Lindner noted in Stacey's medical record that Stacey's persistent achiness, brain fog, headache, nausea, night sweats, abdominal discomfort, and shortness of breath were consistent with "persistent infection with Babesia odocoilei."

13.      *Babesia odocoilei* is one particular species of the babesia parasite.  An infection caused by a babesia parasite is known as "babesiosis."

14.      Almost all cases of babesiosis in the United States are caused by *babesia microti*, not *babesia odocoilei*.   Dr. Lindner has acknowledged that cases of human infection caused by *babesia odocoilei* are "unknown to mainstream medicine," and difficult to detect by laboratory testing.

15.      It is standard practice for doctors in the United States to diagnose babesiosis using epidemiological risk factors and clinical evidence, and to confirm the diagnosis with a blood smear examination or a polymerase chain reaction (PCR) test.

16.      Dr. Lindner diagnosed Stacey with babesiosis without ever confirming his diagnosis with a blood smear examination or a PCR test.

17.      Stacey has never tested positive for babesiosis.  Stacey took one blood test for babesiosis in September 2021, but the result was "indeterminate."

18.      According to the Centers for Disease Control and Prevention ("CDC"), for non-immunosuppressed people, babesiosis is either asymptomatic or causes an acute illness, which should be confirmed through testing and treated for 7-10 days with antimicrobials, such as azithromycin and atovaquone.

19.     A reasonable physician does not prescribe antimicrobial medications for months or longer without a specifically identified objective rationale, confirmed by testing, because of the risk that the patient will develop antimicrobial resistance and other adverse side effects.

20.     Despite not having a blood smear or PCR test result confirming that Stacey had babesiosis, Dr. Lindner prescribed a combination of antimicrobial medications to Stacey for longer than one year.

21.     Dr. Lindner knew that some of the medications he prescribed, such as tafenoquine, were not FDA approved for the treatment of babesiosis, or were not routinely recommended by the CDC or the Infections Diseases Society of America ("IDSA").

22.     On October 6, 2021, Stacey signed a form with the caption "HormoneRestoration.com, Henry Lindner, MD" and the title, "Consent for the Treatment of Chronic Babesiosis," which Dr. Lindner retained in Stacey's file.

23.     The consent form showed that Dr. Lindner was aware that his treatment program for babesiosis, which included high doses of corticosteroids, posed risks of depression and suicidality for his patients, as well as adverse physical side effects.

24.     On January 17, 2022, Dr. Lindner emailed Stacey a "Babesiosis Treatment Guide" that further described the risks of his treatment program, including gastrointestinal symptoms, anxiety, depression, delirium, and panic attacks.

25.     Dr. Lindner's "Babesiosis Treatment Guide" also stated, "No matter what problems you experience with killing babesia, there is no alternative but to continue to increase the potency of the regimen in order to keep eliminating the parasites."

26.     Stacey relied on Dr. Lindner's diagnosis and treatment advice for babesiosis.

27.     Dr. Lindner convinced Stacey that the harm caused by babesia parasites was worse than the possible side effects she would experience.

28.     Stacey relied on Dr. Lindner's diagnosis and treatment advise for babesiosis in part because Dr. Lindner told Stacey that he had diagnosed babesiosis in his own daughter, and he had developed the treatment program for her.

## II.     Dr. Lindner's Prescription of High Corticosteroid Doses

29.     Dr. Lindner prescribed Stacey and other babesiosis patients high doses of corticosteroids, including prednisone, hydrocortisone, and dexamethasone, which he claimed could address the inflammation patients experienced as a result of the antimicrobial medications.

30.     Between June 2021 and October 2022, Stacey took the medications prescribed by Dr. Lindner and regularly reported her dosages, symptoms, and reactions to Dr. Lindner by email.

31.     In August and September 2022, Dr. Lindner began to recommend that Stacey take higher and higher dosages of corticosteroids.

32.     A reasonable physician would rarely, if ever, prescribe 100 milligrams of prednisone (or corticosteroid equivalent) per day to a patient outside of a hospital setting, and even at that high of a dosage, a reasonable physician would begin to taper down the dosage within a few days.

33.     On August 11, 2022, Stacey wrote to Dr. Lindner and described taking 137.5 milligrams of prednisone the day before.  In Dr. Lindner's reply email, written the same day, he told Stacey to "take all the pred you need."[1]

34.     In the same reply to Stacey on August 11, 2022, Dr. Lindner wrote that his daughter had taken 400 milligrams of prednisone daily for six weeks and suffered some adverse consequences that he considered to be reversible with time.

35.     On August 13, 2022, Stacey wrote to Dr. Lindner, "I'm dying," and reported having taken 190 milligrams and 185 milligrams of prednisone on recent days.  In reply, Dr. Lindner recommended that Stacey begin taking dexamethasone, explaining that "a 4mg Dex tab is like 28mgs of prednisone," and that Stacey should report her dosages using this equation.

36.     On August 14, 2022, Stacey wrote to Dr. Lindner that she had taken 288 milligrams of prednisone the day before.  She wrote that she was having great difficulty sleeping, as well as experiencing severe pain and nausea.

37.     In a reply email on August 15, 2022, Dr. Lindner continued to approve Stacey's high corticosteroid doses, and explained that his daughter had taken even more, while experiencing side effects including osteoporosis, weakened muscles, a puffy face, and protuberant abdomen.

---

[1] Throughout this Complaint, emails are quoted in relevant part, because they are too lengthy to be quoted in full.

38.     On August 16, 2022, Stacey wrote to Dr. Lindner that she had taken 388 milligrams of prednisone the day before and was continuing to experience intense abdominal pain and nausea.  Once again, Stacey wrote, "I am dying."

39.     The same day, on or about August 16, 2022, Dr. Lindner wrote Stacey an additional dexamethasone prescription (as described below).

40.     During the remainder of August 2022 and the beginning of September 2022, Stacey decided to taper her prednisone intake, and she and her husband Daryl updated Dr. Lindner by email.  Dr. Lindner warned Stacey and Daryl at various times in his communications with them about the adverse effects of prednisone withdrawal, including anxiety, brain fog, fatigue, achiness, nausea, and other symptoms.

41.     By September 16, 2022, Stacey was down to between 9 and 13 milligrams of prednisone per day, and intended to continue tapering her corticosteroid doses.

42.     On September 19, 2022, Dr. Lindner advised Stacey by phone that she should re-start the higher corticosteroid doses and the rest of his treatment program for babesiosis.

43.     The next day, September 20, 2022, Stacey reported to Dr. Lindner that she had taken 120 milligrams of prednisone in the past 24 hours.

44.     On September 21, 2022, Stacey reported to Dr. Lindner, "I ended up taking 165mg yesterday!"  Dr. Lindner replied the same day, "Do not concern yourself with the high amounts you need now.  You have no choice but to take these high amounts."

45.     On September 23, 2022, Dr. Lindner wrote to Stacey that she should take the equivalent of 168mgs of prednisone upon waking and 160 milligrams as soon as it felt like it was wearing off.

46.    On September 24, 2022, Stacey reported to Dr. Lindner that she had taken 733 milligrams of prednisone that day, after having taken 426 milligrams of prednisone on Friday.

47.    On September 25, 2022, Stacey wrote to Dr. Lindner that she had taken a total of 775 milligrams of prednisone the day before, and asked, "Is there an amount I should just not let myself go over in a day?"

48.    Dr. Lindner replied to Stacey on September 26, 2022, "There is no upper limit on dosing. You just have to take as much as you need, whatever that Dex/pred dose is."

49.    On September 27, 2022, Stacey wrote to Dr. Lindner that she was experiencing severe diarrhea and a bad stomachache, and that it was hard to eat or take medications. She described her prednisone dosages for the past three days as 775 milligrams , 672 milligrams, and 686 milligrams.

50.    Dr. Lindner's reply to Stacey on September 27, 2022, included "I suspect you're needing even more Dex/pred now than you are taking."

51.    Stacey wrote to Dr. Lindner again on September 27, 2022 and described having taken 1610 milligrams of prednisone in the previous thirty hours.

52.    The same day, on or about September 27, 2022, Dr. Lindner wrote Stacey a new prescription for dexamethasone (as described below).

53.    On September 28, 2022, Dr. Lindner replied to Stacey, approved of her prednisone doses, and added that his daughter had to take 1,200 milligrams per day at times.

54.     On September 29, 2022, Daryl wrote to Dr. Lindner on Stacey's behalf, and described Stacey's last three days of prednisone dosages as 910 milligrams, 1272 milligrams, and 1526 milligrams.  Daryl described Stacey as "near comatose."

55.     On September 30, 2022, Dr. Lindner replied to Daryl and explained that Stacey was the only other babesia patient besides his daughter who "needed" such high prednisone doses.

56.     On October 1, 2022, Stacey wrote to Dr. Lindner that her symptoms continued to include an intense headache, severe stomachache, nausea, heart pounding, constant sweats and chills, swollen feet, face, and hands, and the feeling that she could barely get out bed.  She wrote to Dr. Lindner, "It's too much I'm dying."

57.     On October 3, 2022, Daryl wrote to Dr. Lindner that Stacey had "vomited trying to take pred."  Daryl believed that Stacey would take 1100 milligrams by the end of the day.  Dr. Lindner replied the same day that Stacey should take DHEA to help balance the high corticosteroid doses.

58.     On October 4, 2022, Dr. Lindner wrote to Daryl and acknowledged "that the prolonged high steroid doses are weakening her muscles, bones, and connective tissues."

59.     Also on October 4, 2022, Daryl wrote to Dr. Lindner, "Her total pred yesterday was 1,848 milligrams in 14 doses."  Dr. Lindner's reply the same day included, "OK on the pred dose."

60.     On or about October 5, 2022, Dr. Lindner wrote two dexamethasone prescriptions for Stacey, which (combined) directed her to consume the equivalent of up to 840 milligrams of prednisone per day.

61.     On October 7, 2022, Daryl wrote to Dr. Lindner that he called an ambulance to take Stacey to the hospital, and that he was "listening to her screaming in pain in the CT scan room."

62.     Stacey was admitted to the Emergency Department at Loudon Hospital on October 7, 2022.  She presented with a small bowel perforation and underwent an exploratory laparotomy surgery with small bowel and sigmoid colon repair, and received an ostomy bag.

63.     On October 10, 2022, Stacey told her treatment providers at Loudon Hospital and her family that she felt she had nothing left to live for and wanted to end her suffering that day.  Stacey eventually agreed to accept a steroid taper and other therapies.

64.     Also on October 10, 2022, Daryl wrote to Dr. Lindner, "Yesterday and today have been consumed with [S]tacey's wish to stop treatment.  [S]he's very depressed, has talked about how to go about ending her life."

65.     In a response email on October 10, 2022, Dr. Lindner wrote to Daryl, "I feel terrible that Stacey has had these complications from my attempts to kill the babesia."

66.     Stacey's record from Loudon Hospital states that she was admitted to hospice care on October 24, 2022, because she decided to stop taking her medications, and did not want to live in severe pain.  The record reflects that Daryl and other family members spoke to her about this decision, but she had decided that she did not want to live anymore.

67.     On October 25, 2022, Dr. Lindner advised Daryl by email that he should remove Stacey from the hospital's care in order to give her more steroids, or to try to give her dexamethasone or prednisone tablets himself.  The same day, Dr. Lindner wrote to

Daryl by email that "withdrawal from steroids at such a time would make anyone want to die" and that "[b]abesiosis and steroid withdrawal are the only explanations for her severe malaise at this time."

68.    On October 26, 2022, Dr. Lindner wrote to Daryl that what Stacey was feeling was intolerable, and that "it is understandable that she'd want to die rather than continue to exist in this state.  The doctors there will not understand any of this."  Dr. Lindner once again encouraged Daryl to take Stacey "home or somewhere where you can give her steroids."

69.    Daryl did not remove Stacey from the hospital.  Stacey re-started a maintenance dose of corticosteroids on October 26, 2022, and decided to revoke hospice care.

70.    On October 28, 2022, Stacey was discharged from Loudon Hospital to Encompass Health Rehabilitation Hospital of Northern Virginia, where she remained until November 17, 2022.

### III.    Tunkhannock Compounding Center

71.    In an email on August 15, 2022, Dr. Lindner directed Stacey to stop filling her corticosteroid prescriptions at her local pharmacy, and instead to use the Tunkhannock Compounding Center, a pharmacy that shares the same address as Dr. Lindner's office.  Dr. Lindner wrote that Stacey's local pharmacy might complain to his medical board about the high corticosteroid doses.

72.     In just eight days in August of 2022, Tunkhannock Compounding Center provided Stacey with the equivalent of 10,600 milligrams of prednisone, something that no reasonable pharmacist would do for a single patient outside of a hospital setting:

a. On or about August 8, 2022, Tunkhannock Compounding Center filled a prescription ordered by Dr. Lindner for Stacey for five hundred 10-milligram prednisone tablets, and the prescription bottle contained the direction for Stacey to "Take up to 10 tablets daily as directed."

b. On or about August 16, 2022, Tunkhannock Compounding Center filled a second prescription ordered by Dr. Lindner for Stacey, this time for two hundred 4-milligram dexamethasone tablets.

73.     Stacey's prescription from August 8, 2022, was characterized as a 30-day supply, and her prescription from August 16, 2022, was characterized as a 50-day supply. Nonetheless, between September 27, 2022, and October 5, 2022, Tunkhannock Compounding Center provided Stacey with the equivalent of an additional 8,400 milligrams of prednisone, something that no reasonable pharmacist would do for a single patient outside of a hospital setting:

a. On September 27, 2022, Tunkhannock Compounding Center filled a prescription ordered by Dr. Lindner for Stacey, again for 4-milligram dexamethasone tablets.  This time the quantity was one hundred tablets, which the receipt characterized as a "50 day supply."  The prescription bottle contained the direction to "Take up to 10 tablets by mouth daily as directed."

b. On or about October 5, 2022, Tunkhannock Compounding Center filled a prescription ordered by Dr. Lindner for Stacey, again for 4-milligram tablets of dexamethasone. This time the quantity was two hundred tablets, and Dr. Lindner's notes state that he advised Stacey to take "Up to 20 tabs PO daily as directed."

74. Combined, Tunkhannock Compounding Center provided Stacey with the equivalent of 19,000 milligrams of prednisone in less than two months, something that no reasonable pharmacist would do for a single patient outside of a hospital setting.

## IV. Damages

75. Defendants caused Stacey to suffer such severe physical and emotional pain and distress that she became suicidal, refused all medical treatments, asked her doctors to allow her to die, and spent approximately two days in hospice care at Loudon Hospital.

76. The care and treatment provided by Defendants and their agents, servants, and/or employees to Stacey was reckless, negligent, wanton, outrageous, and a substantial factor that increased the risk of harm and/or caused the following injuries and their sequela:

a. perforated small intestine;

b. perforated large intestine;

c. bacteroid fragilis bacteremia;

d. peritonitis;

e. sepsis and septic shock;

f. bone marrow suppression and/or failure;

g. leukopenia and thrombocytopenia;

14

h.  acute respiratory failure with hypoxia;

i.  hypothalamic pituitary axis dysfunction;

j.  hypoalbuminemia;

k.  steroid myopathy;

l.  deep vein thrombosis in Stacey's left leg;

m. bone density loss;

n.  hernia of the stomach;

o.  hair loss;

p.  muscle loss;

q.  Post-traumatic Stress Disorder;

r.  past and future medical expenses;

s.  loss of future earnings;

t.  past and future pain and suffering;

u.  past and future loss of life's pleasures;

v.  mental anguish;

w. severe emotional distress;

x.  embarrassment and humiliation;

y.  permanent physical disabilities;

z.  permanent cosmetic disabilities;

aa. scarring and disfigurement;

bb. other physical and mental injuries as described more fully in Stacey's
    medical records and/or recoverable under Pennsylvania law; and

cc. other incidental expenses.

77.     Stacey's injuries, as described herein, were caused solely and wholly by reason of the recklessness, negligence, wantonness, outrageousness, and carelessness of Defendants, and were not caused or contributed thereto by any negligence on Stacey's part.

## COUNT ONE – NEGLIGENCE
## PLAINTIFF STACEY WOLKING v. HENRY LINDNER, M.D.

78.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

79.     The reckless, wanton, outrageous, and negligent acts and omissions of Dr. Lindner, in his medical management, care, and treatment of Stacey, as set forth above, include, but are not limited to, one or more of the following:

a.  Dr. Lindner's failure to follow the standard of care with respect to the treatment of babesiosis;

b.  Dr. Lindner's diagnosis of babesiosis without ever obtaining a positive test result for babesiosis;

c.  Dr. Lindner's diagnosis of a form of babesiosis which he admitted was not recognized by mainstream medicine;

d.  Dr. Lindner's prescription of a combination of antimicrobial medications and high doses of corticosteroids for more than one year;

e.  Dr. Lindner's prescription of medications for purposes that he knew were not approved by the FDA;

f.  Dr. Lindner's prescription of unreasonably high dosages of corticosteroids;

g. Dr. Lindner's repeated statements to Stacey that she should take more corticosteroids, and/or approving of her taking higher doses of corticosteroids, and/or that there was no upper limit on prednisone dosing;

h. Dr. Lindner's instruction to Stacey that she should fill prescriptions at the Tunkhannock Compounding Center so that her local pharmacy would not complain to his medical board.

80.    At all relevant times hereto, Dr. Lindner knew or should have known that he was not properly knowledgeable, skilled, and/or competent to treat Stacey for babesiosis, or to prescribe such unreasonably high doses of corticosteroids, and that doing so put Stacey at great and unreasonable risk of injury.

81.    Treating Stacey for babesiosis and/or prescribing such high doses of corticosteroids under these circumstances was outrageous, grossly negligent, wanton, and/or reckless.

82.    As a direct and proximate result of the reckless, wanton, outrageous, and negligent conduct of Dr. Lindner, as set forth above, with conscious disregard for Stacey's welfare and well-being, Stacey was caused to suffer the injuries and damages set forth above.

## COUNT TWO – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
## PLAINTIFF STACEY WOLKING v. HENRY LINDNER, M.D.

83.    The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

84.     Dr. Lindner's medical treatment of Stacey constitutes extreme and outrageous conduct, which included, but was not limited to, Dr. Lindner's prescription of a combination of medications in dosages that he knew would cause severe emotional distress, including suicidality and depression, and his prescription of corticosteroids in dosages that he knew would cause the severe emotional distress of steroid withdrawal.

85.     Dr. Lindner's extreme and outrageous conduct was reckless, in that he knew that Stacey's severe emotional distress was certain, or substantially certain, to result, and/or he deliberately disregarded a high degree of probability that Stacey's severe emotional distress would follow Dr. Lindner's conduct.

86.     Dr. Lindner's reckless, extreme, and outrageous conduct, done with wanton, conscious disregard for Stacey's welfare, caused Stacey to experience severe emotional distress including but not limited to, one or more of the following:

    a.  Stacey's feeling that she was dying, which she expressed throughout 2022;

    b.  Stacey's desire to die at Loudon Hospital, in October 2022, after which Stacey refused all medications, and asked to be transferred to hospice care;

    c.  Stacey's depression, hallucinations, and sleep disturbances while at Loudon Hospital and Encompass Northern Virginia Rehabilitation Hospital;

    d.  Stacey's desire to die at Encompass Northern Virginia Rehabilitation Hospital in October and November 2022; and

    e.  Post-traumatic Stress Disorder.

87.     As a result of the reckless, extreme, and outrageous conduct of Dr. Lindner as set forth in this Complaint, Stacey suffered and will continue to suffer physical

manifestations of severe emotional distress, including anxiety, depression, fatigue, insomnia, nausea, and other symptoms for which, under the law, she is entitled to recover compensatory and punitive damages.

## COUNT THREE – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### PLAINTIFF DARYL WOLKING v. HENRY LINDNER, M.D.

88.     The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

89.     Dr. Lindner's medical treatment of Stacey, as described above and at times communicated through Daryl, constitutes extreme and outrageous conduct, as do Dr. Lindner's communications with Daryl after Stacey was hospitalized in October 2022, which included, but was not limited to, Dr. Lindner's advice to Daryl that he remove Stacey from Loudon Hospital in order to give her more corticosteroids.

90.     Dr. Lindner's extreme and outrageous conduct was reckless, in that he knew that Daryl's severe emotional distress was certain, or substantially certain, to result, and/or he deliberately disregarded a high degree of probability that Daryl's severe emotional distress would follow Dr. Lindner's conduct.

91.     Dr. Lindner's reckless, extreme, and outrageous conduct, done with wanton, conscious disregard for Daryl's welfare, caused Daryl to experience severe emotional distress, including but not limited to one or more of the following:

a.     Daryl's presence at the bedside and/or in Stacey's presence throughout 2022, causing him to witness and hear her suffering as a result of the combination and doses of medications that Dr. Lindner was prescribing; and

b. Daryl's presence at the bedside and/or in Stacey's presence at Loudon Hospital in October 2022, where he heard her scream in pain and express her desire to die, and where he witnessed her stop taking all medications and be transferred to hospice care, despite his pleas that she continue to live.

92. As a result of the reckless, extreme, and outrageous conduct of Dr. Lindner as set forth in this Complaint, Daryl suffered and will continue to suffer physical manifestations of severe emotional distress, including fatigue, insomnia, and other symptoms for which, under the law, he is entitled to recover compensatory and punitive damages.

## COUNT FOUR – LOSS OF CONSORTIUM
## PLAINTIFF DARYL WOLKING v. HENRY LINDNER, M.D.

93. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

94. Plaintiff Daryl Wolking has been denied, and will in the future be denied, the companionship, love, affection, comfort, care, society, services, and consortium of his wife, Plaintiff Stacey Wolking.

## COUNT FIVE – NEGLIGENCE
## PLAINTIFF STACEY WOLKING v. YOUNGS APOTHECARY INC.,
## DOING BUSINESS AS TUNKHANNOCK COMPOUNDING CENTER

95. The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

96. Defendant Tunkhannock Compounding Center through its agents, servants, and/or employees provided prescription corticosteroids for the use of Stacey Wolking

which they knew or should have known were excessive, dangerous, inappropriate, and/or improper.

97.    Defendant Tunkhannock Compounding Center through its agents, servants, and/or employees provided prescription corticosteroids for the use of Stacey Wolking in violation of rules, regulations, practices, policies, and/or guidelines in place for the dispensing of prescription corticosteroids by a licensed pharmacy.

98.    Defendant Tunkhannock Compounding Center through its agents, servants, and/or employees failed to exercise due diligence in its professional capacity by failing to contact the prescribing physician, Dr. Lindner, to inquire about the unreasonably high doses of corticosteroids prescribed, and/or failing to take steps to correct any error by the prescribing physician, and/or by failing to refuse to fill the prescriptions for corticosteroids in the unreasonably high doses ordered by Dr. Lindner.

99.    As a direct and proximate result of the negligent conduct of Tunkhannock Compounding Center, and its agents, servants, and/or employees, as set forth above, Stacey was caused to suffer the injuries and damages set forth above.

**COUNT SIX – LOSS OF CONSORTIUM**
**PLAINTIFF DARYL WOLKING v. YOUNGS APOTHECARY INC.,**
**DOING BUSINESS AS TUNKHANNOCK COMPOUNDING CENTER**

100.    The preceding paragraphs of this Complaint are incorporated as though fully set forth herein.

101.    Plaintiff Daryl Wolking has been denied, and will in the future be denied, the companionship, love, affection, comfort, care, society, services, and consortium of his wife, Plaintiff Stacey Wolking.

**WHEREFORE**, Plaintiffs respectfully demand compensatory damages against all Defendants, jointly, severally, or in the alternative, and punitive damages against Dr. Lindner based upon his wanton, willful, and reckless medical malpractice, and his intentional infliction of emotional distress, in an amount in excess of the local arbitration limits, exclusive of interest, costs, and damages for prejudgment delay.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

By:    *Conor Lamb*

        ——————————————————

SHANIN SPECTER, ESQUIRE
PA Attorney I.D. No. 40928
CONOR LAMB, ESQUIRE
PA Attorney I.D. No. 304874
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 402-2359
Shanin.Specter@klinespecter.com
Conor.Lamb@klinespecter.com

*Attorneys for Plaintiffs*

Dated:  May 16, 2023