**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| **STACEY WOLKING and DARYL WOLKING,** | : | |
| **Plaintiffs** | : | **CIVIL ACTION NO. 3:23-CV-806** |
| **v.** | : | **(JUDGE MANNION)** |
| **HENRY LINDNER and YOUNGS APOTHECARY, INC., d/b/a TUNKHANNOCK COMPOUNDING CENTER,** | : | |
| **Defendants** | : | |

**MEMORANDUM**

Plaintiffs Stacey Wolking and her husband Daryl Wolking, both of Virginia, sue Defendants Henry Lindner, M.D. and Youngs Apothecary Inc. ("Tunkhannock Compounding Center"), of Pennsylvania. (Doc. 1). Defendant Lindner treated Stacey, and Tunkhannock Compounding Center filled her prescriptions. She alleges that she suffered injuries because of Defendants' negligence. She and her husband also bring a claim of intentional infliction of emotional distress against Defendant Lindner. And they bring loss of consortium claims against both Defendants.

Each Defendant has moved to dismiss Plaintiffs' complaint in part. Defendant Lindner moves to dismiss Plaintiffs' claims of intentional infliction

of emotional distress and their request for punitive damages. (Doc. 8). He also moves to strike "Plaintiffs' allegations of 'reckless,' 'wanton,' 'outrageous,' and 'grossly negligent' conduct" from the complaint. (Doc. 9 at 3). Tunkhannock Compounding Center moves to "dismiss paragraphs 75-77 [of] [P]laintiffs' Complaint and any and all claims for delay damages, interest, and costs" as to itself. (Doc. 11 at 8).

## I.    BACKGROUND[1]

Stacey Wolking struggled with fatigue, brain fog, malaise, and similar symptoms. (Doc. 1 ¶9). She found Dr. Lindner online in 2013, met with him once in Tunkhannock, and (via email correspondence) started treatment which would continue for almost ten years. (Doc. 1 ¶¶9, 11). In 2021, Dr. Lindner diagnosed Stacey with babesiosis, a disease caused by parasites of the *Babesia* species. (Id. ¶¶12–16).[2] He did not confirm this diagnosis with a

---

[1] Because these are motions to dismiss, the complaint's factual allegations are accepted as true. *Bruni v. City of Pittsburgh*, 824 F.3d 353, 360 (3d Cir. 2016).

[2] According to the Complaint, cases of babesiosis are ordinarily caused by the *babesia microti* species, but Dr. Lindner concluded that Stacey's infection was caused by the *babesia odocoilei* species. (Doc. 1 ¶¶12–14). The Complaint alleges that "Dr. Lindner has acknowledged that cases of human infection caused by *babesia odocoilei* are 'unknown to mainstream medicine.'" (Id. ¶14).

blood smear examination or PCR test, and the result of Stacey's only blood test for babesiosis was "indeterminate." (Id. ¶¶16–17).

Dr. Lindner prescribed a combination of antimicrobial medications. (Id. ¶20).[3] A consent form and treatment guide indicated that his planned treatment posed risks including depression, suicidality, gastrointestinal symptoms, anxiety, depression, delirium, and panic attacks. (Id. ¶¶22–25). The treatment also included high doses of corticosteroids, which Dr. Lindner said would help with inflammation from the antimicrobial medications. (Id. ¶29). Between June 2021 and September 2022, Stacey took the prescribed medications; toward the end of that period, Dr. Lindner recommended that she take higher doses. (Id. ¶¶30–31).  Plaintiffs allege that "[a] reasonable physician would rarely, if ever, prescribe 100 milligrams of prednisone (or corticosteroid equivalent) per day to a patient outside of a hospital setting, and even at that high of a dosage, a reasonable physician would begin to taper down the dosage within a few days." (Id. ¶32).

---

[3] It is alleged that "Dr. Lindner knew that some of the medications he prescribed … were not FDA approved for the treatment of babesiosis, or were not routinely recommended by the CDC or the Infectio[u]s Diseases Society of America." (Doc. 1 ¶21).

In August 2022, Dr. Lindner directed Stacey to fill her prescriptions at Tunkhannock Compounding Center instead of at her local pharmacy. (Id. ¶71). In an eight-day period in August, Tunkhannock Compounding Center provided her with the equivalent of 10,600 milligrams of prednisone (in the form of prescriptions of prednisone and dexamethasone), and between September 27 and October 5 it provided her with the equivalent of an additional 8,400 milligrams of prednisone. (Id. ¶¶72–74).

At one point, after Stacey reported taking 137.5 milligrams of prednisone the previous day, Dr. Lindner told her to "take all the pred you need." (Id. ¶31). Stacey reported that she felt like she was dying, and that she was experiencing severe pain, nausea, difficulty sleeping. (Id. ¶¶35–36). Dr. Lindner thereafter "continued to approve Stacey's high corticosteroid doses." (Id. ¶37). Stacey again reported pain and nausea and that she felt like she was dying. (Id. ¶38).

In late August and September 2022, Stacey tapered her prednisone intake, but Dr. Lindner advised her to resume higher doses. (Id. ¶¶40–42). In response to Stacey's reports of higher dosages, Dr. Linder wrote: "Do not concern yourself with the high amounts you need now. You have no choice but to take these high amounts." (Id. ¶¶43–44). He also told her that "[t]here

is no upper limit on dosing. You just have to take as much as you need." (Id. ¶48). In late September, Stacey reported severe diarrhea and stomachache. (Id. ¶49).

On September 29, Stacey's husband Daryl reported to Dr. Lindner that Stacey had taken prednisone dosages of 910, 1272, and 1526 milligrams the previous three days, and described her as "near comatose." (Id. ¶54). Stacey continued to report various symptoms, and Dr. Lindner wrote to Daryl that "the prolonged high steroid doses are weakening [Stacey's] muscles, bones, and connective tissues." (Id. ¶56, 58). When Daryl reported that Stacey had taken 1,848 milligrams of prednisone on October 3, Dr. Lindner replied, "OK on the pred dose." (Id. ¶59).

On October 7, Stacey was admitted to the Loudoun Hospital Emergency Department in Virginia, "presented with a small bowel perforation," "underwent an exploratory laparotomy surgery with small bowel and sigmoid colon repair, and received an ostomy bag." (Id. ¶62). Daryl reported to Dr. Lindner that Stacey wished to stop treatment. (Id. ¶64). Stacey was admitted to hospice care on October 24, "because she decided to stop taking her medications, and did not want to live in severe pain." (Id. ¶66). On October 25, Dr. Lindner advised Daryl that he should remove

- 5 -

Stacey from the hospital in order to give her more steroids, and explained that steroid withdrawal and babesiosis were causing her malaise. (Id. ¶67). Stacey did not leave the hospital, but she restarted "a maintenance dose" of corticosteroids on October 26, decided to revoke hospice care, and was transferred to the Encompass Health Rehabilitation Hospital of Northern Virginia, where she remained until November 17, 2022. (Id. ¶70).

Plaintiffs allege that Defendants caused Stacey to suffer severe physical and emotional pain and distress and to sustain a host of other injuries. (Id. ¶75–76). They bring claims of (Counts I & V) negligence against both Defendants, (Counts II & III) intentional infliction of emotional distress against Dr. Lindner, and (Counts IV & VI) loss of consortium against both Defendants.

## II.    LEGAL STANDARD

### A. Motion to dismiss

In response to a complaint, a party may move for dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive dismissal, a complaint must make more than "conclusory or 'bare-bones' allegations," and "'threadbare recitals of the elements of the cause of

action, supported by mere conclusory statements, do not suffice.'" *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Instead, the complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

In considering the complaint, the court must apply a "two-part analysis." *Id.* "First," the court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. "Second," the court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a plausible claim to relief." *Id.* at 211.

### B. Motion to strike

A party may move to strike from a pleading "any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "The purpose of a motion to strike is to clean up the pleadings, streamline litigation, and avoid unnecessary forays into immaterial matters." *Zaloga v. Provident Life and Accident Ins. Co.*, 671 F. Supp. 2d 623, 633 (M.D. Pa. 2009).

> Immaterial matter is that which has no essential or important relationship to the claim for relief. Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question. Scandalous matter has been defined

as that which improperly casts a derogatory light on someone, most typically on a party to the action. Scandalous pleading must reflect cruelly upon the defendant's moral character, use repulsive language, or detract from the dignity of the court.

*Id.*

## III.   DISCUSSION

### A. Jurisdiction & Applicable law

Because the parties are citizens of different states and the amount in controversy exceeds $75,000, the court has subject-matter jurisdiction under 28 U.S.C. §1332.

A federal court exercising diversity jurisdiction applies the forum state's choice-of-law rules. *White v. Sonoco, Inc.*, 870 F.3d 257, 263 (3d Cir. 2017). In deciding which state's law applies, "Pennsylvania courts first consider whether a 'true conflict' exists between the two states." *Melmark, Inc. v. Schutt*, 206 A.3d 1096, 1104 (Pa. 2019). The parties here identify no conflict between Pennsylvania and Virginia law; indeed, they agree that Pennsylvania law applies.[4] (Doc. 9 at 6; Doc. 10 at 1).

---

[4] The choice of law analysis pertains to state *substantive* law. The court applies federal *procedural* law. *See Chamberlain v. Giampapa*, 210 F.3d

*(footnote continued on next page)*

### B. Defendant Lindner's motion

### i. Motion to Strike

Dr. Lindner argues that Plaintiffs' allegations of "reckless," "wanton," "outrageous," and "grossly negligent" conduct should be stricken from the Complaint. (Doc. 9 at 3). He does not explain why such allegations are redundant, immaterial, impertinent, or scandalous.[5]

The court does not find these allegations redundant, immaterial, impertinent, or scandalous. They pertain to Plaintiffs' claims that Dr. Lindner was negligent and intentionally inflicted emotional distress. They do not improperly cast a derogatory light on Dr. Lindner simply because they allege wrongful acts and states of mind which he denies. Of course, though, such characterizations are legal conclusions entitled to no presumption of truth. *See Fowler*, 578 F.3d at 210–11.

Defendant's motion to strike will be denied.

_____

154, 158 (3d Cir. 2000) (citing *Erie R.R. v. Tompkins,* 304 U.S. 64, 78 (1938)) ("A federal court sitting in diversity must apply state substantive law and federal procedural law.").

[5] Dr. Lindner seems to conflate the standard for a motion to strike with that for a motion to dismiss. *See, e.g.*, Doc. 9 at 7 ("Moreover, Plaintiffs have failed to establish any specific acts on the part of Dr. Lindner that rise to the level of *willful, wanton or reckless conduct* …. Therefore, Dr. Lindner respectfully requests that all references to 'reckless,' 'wanton,' 'outrageous,' and 'grossly negligent conduct' must be stricken from the Complaint.").

### ii.  Plaintiffs' request for punitive damages

Dr. Lindner seeks dismissal of Plaintiffs' request for punitive damages. (Doc. 9 at 7).

"Punitive damages may be awarded for conduct that is the result of the health care provider's willful or wanton conduct or reckless indifference to the rights of others." Medical Care Availability and Reduction of Error Act (MCARE) Act, 40 P.S. §1303.505 (a). But "[a] showing of gross negligence is insufficient to support an award of punitive damages." *Id.* §1303.505(b).

"Whether an award of punitive damages is warranted involves a fact-intensive issue inappropriate for resolution at the motion to dismiss stage, where no factual record has yet been developed." *Fiedler v. Stroudsburg Area Sch. Dist.*, 427 F. Supp. 3d 539, 558 (M.D. Pa. 2019). And in any event, the allegations here are sufficient to state a plausible claim of entitlement to punitive damages. Dr. Lindner is alleged to have directed Stacey to consume medication in dosages far exceeding normal limits, over an extended period, and while she reported severe symptoms. From such allegations a reasonable factfinder could infer that he acted with reckless indifference.

Defendant's motion to dismiss Plaintiffs' request for punitive damages will be denied.

### iii.  Intentional Infliction of Emotional Distress

Dr. Lindner also moves to dismiss Plaintiffs' intentional infliction of emotional distress claims (Counts 2 & 3). (Doc. 9 at 7–10).

To be liable for intentional infliction of emotional distress, a defendant's conduct must be "extreme and outrageous." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997); *see also Pavlik v. Lane Ltd./Tabacco Exporters Int'l*, 135 F.3d 876, 890 (3d Cir. 1998) (predicting that the Pennsylvania Supreme Court will recognize the tort of intentional infliction of emotional distress and follow the Second Restatement's formulation, which requires "extreme and outrageous conduct"). Dr. Lindner asserts that Plaintiffs have not alleged acts rising to the level of extreme and outrageous conduct.

To satisfy this element, conduct must be "so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. 2005); *Dobson v. Milton Hershey Sch.*, 356 F. Supp. 3d 428, 439 (M.D. Pa. 2018).

The Pennsylvania Supreme Court has noted that:

> Cases which have found a sufficient basis for a cause of action of intentional infliction of emotional distress have had presented only the most egregious conduct. *See, e.g. Papieves v. Lawrence*, 263 A.3d 118 (Pa. 1970) (defendant, after striking

and killing plaintiff's son with automobile, and after failing to notify authorities or seek medical assistance, buried body in a field where discovered two months later and returned to parents …); *Banyas v. Lower Bucks Hosp.*, 437 A.2d 1236 (Pa. 1981) (defendants intentionally fabricated records to suggest that plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Phila. Eagles Football Club*, 595 F.2d 1265 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from a fatal disease, when physician knew such information was false).

*Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998).[6]

As Plaintiffs point out, other district courts in this circuit have been presented with intentional infliction of emotional distress claims in the medical provider context. For example, the court in *Jones v. CVS Pharmacy, Inc.*, 2022 WL 4536124, at *6 (M.D. Pa. 2022) allowed a claim to survive dismissal where the defendant pharmacists allegedly withheld information about the plaintiff's prescriptions despite their awareness of her serious medical needs. In *Ponzini v. Monroe Cnty.*, 897 F. Supp. 2d 282, 291 (M.D. Pa. 2012) a claim was allowed to proceed where the defendants failed to provide the inmate-plaintiff his medication despite their awareness of its

---

[6] The Pennsylvania Supreme Court in *Hoy* did not explicitly recognize the tort of intentional infliction of emotional distress, but instead assumed *arguendo* that it exists. 720 A.2d at 753 n.10.

necessity.[7] Likewise, the claim in *McDonald-Witherspoon v. City of Phila.*, 2018 WL 4030702, at \*13 (E.D. Pa. 2018) was allowed to proceed where the defendant healthcare provider allegedly "intentionally abdicated its responsibilities for [the inmate-plaintiff's] psychiatric care, disregarded its own warnings concerning medication that posed a danger to suicidal inmates, and willfully gave [the plaintiff] a lethal amount of medication."

Accepting the facts as alleged, that Dr. Lindner directed Stacey to regularly take significantly more than (and at points almost twenty times) the normal limit of prednisone over the course of several months, despite her reports of severe side effects, the court concludes that Plaintiffs have adequately plead extreme and outrageous conduct.

Dr. Lindner next argues that Plaintiffs have not alleged that Daryl Wolking suffered any physical injury, as also required for a claim of intentional infliction of emotional distress. (Doc. 9 at 10). *Rolla v. Westmoreland Health Sys.*, 651 A.2d 160, 163 (Pa. Super. Ct. 1994). But Plaintiffs have alleged that "[a]s a result of" Dr. Lindner's conduct, "Daryl

---

[7] Although it did not dismiss the plaintiff's intentional infliction of emotional distress claim, the court in *Ponzini* noted that it had "serious reservations about the validity of this claim in light of existing state law." 897 F. Supp. 2d at 290.

suffered and will continue to suffer physical manifestations of severe emotional distress, including fatigue, insomnia, and other symptoms." (Doc. 1 ¶92). These allegations are sufficient to survive a motion to dismiss. *Cf. Toney v. Chester Cnty. Hosp.*, 961 A.2d 192, 200 (Pa. Super. Ct. 2008), *aff'd*, 36 A.3d 83 (Pa. 2011) (allegations including nausea, headaches, insomnia satisfied physical harm requirement); *Fargione v. Sweeney*, 2017 WL 4283955, at *5 (E.D. Pa. 2017) (allegations including "stress, nervousness, anxiety, and insomnia" sufficed at motion to dismiss stage).

Dr. Lindner's motion to dismiss Counts 2 and 3 will be denied.

### C. Tunkhannock Compounding Center's motion

Tunkhannock Compounding Center moves to dismiss paragraphs 75–77 of the Complaint, which describe Plaintiffs' damages. It also seeks dismissal of "any and all claims for delay damages, interest, and costs" as to itself. (Doc. 12 at 8). It contends that "Plaintiffs have not plead any facts that support any contentions that Tunkhannock acted in any reckless, wanton, or outrageous manner, or that [P]laintiffs are entitled to interest, delay damages, or costs from Tunkhannock." (Doc. 12 at 3).

Plaintiffs' allegation that Defendants acted with "recklessness, wantonness, outrageous, and carelessness," (Doc. 1 ¶77), which is included

as part of the Complaint's "Damages" section, is not a "claim" subject to dismissal. *See Castell-Velez v. Moroney*, 2021 WL 978814 (M.D. Pa. 2021).

Neither is the Complaint's mention of "interest, costs, and damages for prejudgment delay" in its prayer for relief, (Doc. 1 at 22), a claim subject to dismissal under Rule 12(b)(6). *See Childs v. Fitness Int'l, LLC*, 2023 WL 3594180, at *5 (E.D. Pa. 2023) ("[A] stray comment in a prayer for relief is not a 'claim' to which Rule 12(b)(6) applies."); *Brooks v. State College Area Sch. Dist.*, 2023 WL 87220430, at *8 (M.D. Pa. 2023) ("A motion to dismiss is about a plaintiff's right, not his remedy."); *Onely v. Redner's Markets, Inc.*, 2022 WL 1773606, at *6 (E.D. Pa. 2022) ("[A] Rule 8(a)(3) prayer for relief is not subject to dismissal under Rule 12(b)(6) because, for purposes of the 'sufficiency of the pleading, the demand for judgment is not considered part of the claim.'" (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §1255 (4th ed.))).

Tunkhannock Compounding Center's motion to dismiss will be denied.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Lindner's motion to strike and motion to dismiss will be denied. Defendant Tunkhannock Compounding Center's motion to dismiss will be denied. An appropriate order will follow.


*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 8, 2024**
23-806-01

- 16 -