UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

| | |
|---|---|
| STACEY WOLKING and DARYL WOLKING, W/H<br><br>Plaintiffs,<br><br>vs.<br><br>HENRY LINDNER, M.D., AND YOUNGS APOTHECARY, INC. D/B/A TUNKHANNOCK COMPOUNDING CENTER<br><br>Defendants. | Civil Action # 3:23-CV-00806-MEM |

**MEMORANDUM OF LAW IN SUPPORT OF DISCOVERY REQUESTS**

Plaintiffs offer this memorandum of law in support of their efforts to compel discovery from Tunkhannock Compounding Center ("TCC"). Although the Court has not authorized Plaintiffs to move to compel discovery, Plaintiffs request that the Court convert this memorandum into such a motion, or allow Plaintiffs to so move.

I.     **FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

On April 8, 2024, counsel for Plaintiffs wrote to the Court, seeking its intervention concerning several discovery requests. (Those discovery requests are included in the materials contained in Exhibits A, B, and C to this memorandum.) In response, the Court ordered the parties to submit "supplemental briefs regarding the relevance of Plaintiffs' requested discovery." (Doc. 47 at 3.)

1

## II. QUESTIONS INVOLVED

Are Plaintiffs' requests concerning other patients discoverable under Rule 26?

Suggested answer: Yes. The information sought is relevant in order to evaluate the conflicting testimony of Young and Lindner; in order to investigate TCC's financial motives; in order to assess Young's claimed conduct in fulfillment of her duty of care; and in order to assess TCC's knowledge.

## III. ARGUMENT

This Court has previously noted the broad scope of relevant discovery under Rule 26(b)(1), which courts should interpret in a liberal manner. *Lee-Chima v. Hughes*, No. CV 1:20-2349, 2023 WL 4471516, at *1 (M.D. Pa. July 11, 2023). A discovery request is relevant if there is "any possibility" that it "may be" relevant to the general subject matter of the action. *Lakeview Pharmacy of Racine, Inc. v. Catamaran Corp.*, No. CV 3:15-290, 2019 WL 587296, at *2 (M.D. Pa. Feb. 13, 2019) (quotation marks and citation omitted). Plaintiffs bear the burden of demonstrating that their requests are relevant, before the burden shifts to Defendant to show in specific terms why the request is outside of the broad scope of Rule 26. *Id*.

### A. Plaintiffs' Use of the Requested Discovery

Plaintiffs' requests fall into three general categories, each of which is addressed with particularity in turn:

2

### 1. Lindner's Prescriptions at TCC from 2013 to 2022.

Plaintiffs have requested information about the prescriptions written by Dr. Lindner and filled at TCC between 2013 and 2022. Plaintiffs originally focused on all drug types for the years 2020-2022, the time period in which Dr. Lindner was treating babesiosis patients. *See* Ex. A at 5, Interrogatory #12. For this time period, Plaintiffs requested the total number of such prescriptions, the individual drug types and dosages, and the amount billed and earned by TCC. Once it became clear that Valerie Lindner was her father's first babesiosis patient, and that her corticosteroids were dispensed by TCC before Ms. Wolking's, Plaintiffs specified that they were seeking all corticosteroid prescriptions for Valerie Lindner (although these would be covered by the previous request). *See* Ex. B at 2-3. Plaintiffs again requested information about TCC's revenue due to corticosteroids for 2021 and 2022, which TCC refused to answer. *Id.* at 5. Finally, Plaintiffs expanded their request for information about Dr. Lindner's prescriptions at TCC to include the full time period from 2013 to 2022, in order to further probe TCC's possible financial motives, and TCC objected to this request as well. *See* Ex. C at 2, Item e.

These requests are permissible under Rule 26 for the following reasons:

### a. To evaluate the conflicting testimony of Lindner and Young.

TCC pharmacists had a duty to question or notify Dr. Lindner about obvious inadequacies on the face of each of Ms. Wolking's corticosteroid prescriptions, *see*

*Riff v. Morgan Pharmacy*, 508 A.2d 1247, 1252 (Pa. Super. Ct. 1986), but Dr. Lindner testified that he did not recall them ever doing so. (Feb. 21, 2024 Lindner Dep. Tr. at 298.) In fact, Dr. Lindner did not remember ever speaking to TCC pharmacists about Ms. Wolking at all. (*Id.* at 286-88, 305.) Of course, Courtney Young has claimed that she did speak to Dr. Lindner about Ms. Wolking, and the relevance of the requested discovery is that it could corroborate either one of them. If TCC was routinely filling large corticosteroid prescriptions long before Ms. Wolking came along, it is more likely that they filled Dr. Lindner's prescriptions for Ms. Wolking automatically, without the required independent investigation.

Dr. Lindner's testimony was that he told Young about how he was treating his daughter, Valerie Lindner, sometime in 2020 or 2021, and that TCC began dispensing large corticosteroids for Valerie Lindner. TCC's understanding of Dr. Lindner's prescribing practices was formed based on conversations about Valerie Lindner, not Ms. Wolking. (Feb. 21, 2024 Lindner Dep. Tr. at 286-88, 305.) Dr. Lindner even told Young that Valerie was taking more than 1,000 milligrams of prednisone per day at times, an obviously dangerous amount. (*Id*. at 288.) In other words, TCC established its practice of filling Dr. Lindner's large corticosteroid prescriptions based upon information about another patient (Valerie Lindner), and possibly others. If the requested discovery shows that there months or years where TCC followed this same practice before it dispensed Ms. Wolking's prescriptions,

4

that would support Dr. Lindner's testimony that TCC did not fulfill its independent duty to Ms. Wolking, because the pharmacy had become so accustomed to filling Dr. Lindner's large corticosteroid prescriptions.

### b. To assess the financial impact of Lindner's prescriptions for TCC.

Whether or not TCC gained financially from doing business with Dr. Lindner is plainly relevant to the motive of TCC pharmacists when they chose to dispense these unusually large corticosteroid prescriptions, instead of challenging Dr. Lindner or refusing to fill them. In order to determine whether a financial motive existed, Plaintiffs need to review data about <u>all</u> of Dr. Lindner's business with TCC from 2013 to 2022 (the period of Ms. Wolking's treatment with Dr. Lindner). This data should not be limited to corticosteroid prescriptions, since a financial motive would relate to Dr. Lindner's overall business with TCC. In other words, even if the corticosteroid prescriptions were a small part of TCC's business, if Dr. Lindner's non-babesiosis patients earn substantial amounts for TCC, the pharmacy would be less likely to challenge Dr. Lindner with respect to the corticosteroid prescriptions, for fear that he would send the rest of his business elsewhere.

Courtney Young has already searched for some of this data, suggesting that it is not unduly burdensome for her to perform, but in her recent 30(b)(6) testimony, her explanation of these searches and their results was vague and confusing. Rather than rely on her inexact testimony, Plaintiffs should have the chance to review the

data themselves. *See Hickman v. Taylor*, 329 U.S. 495, 507 (1947) ("Mutual knowledge of all the relevant facts gathered by both parties is essential to proper litigation. To that end, either party may compel the other to disgorge whatever facts he has in his possession.")

### c. To assess Young's claimed conduct in fulfillment of her duty.

As noted above, the duty of TCC's pharmacists was triggered by what the *Riff* court called "obvious inadequacies appearing on the face of the prescription which created a substantial risk of serious harm to the plaintiff." 508 A.2d at 1252. Inadequacies that could create such a risk would have to include dosages that are so large as to become toxic. In fact, Pennsylvania law requires pharmacists to review prescriptions for "incorrect dosage [and] incorrect duration of treatment." 49 Pa. Code §27.19(b).

Here, Young admitted that the prescription she filled for Ms. Wolking in August 2022 may have been the largest dexamethasone prescription she ever filled. (Nov. 15, 2023 Young Dep. Tr. at 78-79.) If the requested discovery confirms that is true, Young's vague recollection of the conversation she claims to have had with Dr. Lindner becomes less excusable. Plaintiffs will argue that Young's largest-ever dexamethasone prescription required her to initiate a conversation with Dr. Lindner in which she should have demanded specific information and questioned him about patient safety. She did not testify to a clear recollection of either of those topics, nor

did she even remember who initiated the conversation or when it occurred.  As noted above, Dr. Lindner did not remember the conversation occurring at all.

The vagary of this testimony takes on new meaning if Young was dispensing the largest amount of a dangerous drug in her career, a moment when a reasonable pharmacist would have been on guard and alert to their duty of care.

### d.  To assess TCC pharmacists' knowledge of the package inserts.

Plaintiffs' counsel asked both pharmacists about reference materials they consulted in order to understand safe dosing of corticosteroids, and the only specific source they named was the package insert provided by the manufacturer.  Although TCC provided the inserts for the manufacturer of the corticosteroids dispensed to Ms. Wolking, the pharmacists' testimony suggests that TCC relied on multiple manufacturers.  (Nov. 15, 2023 Young Dep. Tr. at 21.)  Plaintiffs need to see all corticosteroid manufacturer inserts that were read by the TCC pharmacists before August 2022 in order to evaluate what those pharmacists knew or should have known about safe dosing.  *See* Ex. C at 3, Item l.  It is likely that these inserts collectively provided an adequate warning to the pharmacists that the doses they were dispensing were unreasonable and unsafe.  On the other hand, if any of these package inserts instructed the pharmacists that corticosteroids could be dispensed in any dosage, Plaintiffs need to know that information too.  Knowledge is an essential part of this negligence case, and because the package inserts constitute the

7

pharmacists' only claimed source of knowledge about these drugs, it is essential for Plaintiffs to identify the manufacturers and read the inserts.

### 2. Communications about corticosteroids and babesiosis.

Plaintiffs have also sought communications about corticosteroids and babesiosis that are not limited to Ms. Wolking's case. *See* Ex. A at 10, Requests #7-8; Ex. B at 3-4; Ex. C at 3, Items j-k. The pharmacist's duty described in *Riff* is entirely about communication between the pharmacist and the prescribing physician. Although TCC has suggested that records of such communications do not exist with respect to Ms. Wolking, if these communications exist with respect to previous patients like Valerie Lindner, those communications would be relevant to Plaintiffs' theory that TCC established a pattern and practice based on information about other patients. In addition, such communications would be relevant to the TCC pharmacists' knowledge about babesiosis and the dangerous properties of corticosteroids, both of which would relate to their fulfillment of their legal duty of care, as well as to damages.

It is not clear whether Young has ever searched TCC's communications to determine whether Dr. Lindner sent emails or other communications about corticosteroids and babesiosis. Young testified that she "would have to look," strongly suggesting that she had not done so at the time of her deposition, even

8

though these items were previously requested in discovery. (Nov. 15, 2023 Young Tr. at 51-52.)

In addition to any communications between Dr. Lindner and TCC, similar communications between TCC personnel on these subjects are likewise relevant to TCC's knowledge and fulfillment of its duty. Courtney Young testified that she communicated with TCC's other pharmacist (Brian Bryk) on these subjects (Nov. 15, 2023 Young Dep. Tr. at 86-87), and Plaintiffs deserve to know whether there is any record of those communications.

### 3. Patient profile

A "patient profile" is a source of information about a patient that pharmacists are legally required to maintain and use before dispensing prescriptions. *See* 49 Pa. Code § 27.19 (a, f-g). Courtney Young admitted in her recent 30(b)(6) deposition that such a profile exists for Ms. Wolking. Specifically, a complete patient profile with Ms. Wolking's entire history at TCC would make each additional large corticosteroid prescription even more plainly unreasonable, because such doses are not meant to be used in long-term therapy. Conversely, missing information in the profile would be relevant to TCC's overall negligent conduct. Additionally, pharmacists are required to document in the patient profile any instance where a patient refuses to be counseled about a drug. *See* 49 Pa. Code § 27.19(g)(2). The

absence of such entries in Ms. Wolking's profile would corroborate her testimony that TCC did not warn her about the corticosteroid doses.

Plaintiffs' counsel originally requested all "data . . . concerning or related to Plaintiffs" in their original set of document requests. Then, on April 4, 2024, Plaintiffs' counsel specifically asked counsel for TCC for the patient profile. Counsel for TCC has not responded to that request, nor did they address it in their recent letter to the Court, or in their briefing. This is the continuation of part of a pattern of dilatory conduct throughout the discovery phase of this case, for which the Court has already sanctioned TCC's counsel once. Ms. Wolking's profile is plainly discoverable and should have been turned over months ago.

### B.     Proportionality

To the extent that TCC challenges the proportionality of the information sought to the needs of the case, the Court must make a fact-specific determination according to the following factors: (1) the importance of the issues at stake in the action, (2) the amount in controversy, (3) the parties' relative access to relevant information, (4) the parties' resources, (5) the importance of the discovery in resolving the issues, (6) and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See Lakeview Pharmacy*, 2019 WL 587296, at *2.

All of the information requested above is relevant to two of the central questions in this case: the knowledge of TCCs' pharmacists when they repeatedly dispensed unsafe quantities of corticosteroids to Ms. Wolking, and whether they communicated at all with Dr. Lindner or each other about these prescriptions, or simply followed an established pattern and practice of filling his prescriptions. Plaintiffs cannot access this information and Defendant plainly has the resources to do so, as Young has already described conducting some searches for the information, and she has employed counsel to oppose further production.  To the extent that TCC argues Dr. Lindner could produce the same information, it bears repeating that the information sought relates to the duties of TCC's pharmacists, not Dr. Lindner's duties.  The relevant question is what information TCC possessed, not Dr. Lindner.

The burden and expense of this discovery for TCC, an insured entity with access to its own data, is minimal.  Producing this information is important to resolving the question of TCC's knowledge because the deposition testimony of TCC's own pharmacists with respect to their knowledge was often vague.  It is unclear what searches they have conducted.

Plaintiffs estimate that it would take less than one business day to access the data and communications requested herein.  While sorting and producing that information could take longer, this is still not a case of voluminous discovery.  Young herself testified that corticosteroid prescriptions were not a large aspect of

11

TCC's overall business. The minimal burden involved is appropriate in a case where TCC's negligence nearly killed Ms. Wolking, and has injured her for life.

## IV. TCC Arguments Concerning Admissibility and HIPAA

Although this Court invited TCC to address the ultimate admissibility of the discovery being sought by Plaintiffs, Rule 26(b)(1) makes clear that "[i]nformation within this scope of discovery need not be admissible in evidence to be discoverable." At most, the question whether this discovery is "reasonably calculated" to lead to admissible evidence would be part of this Court's proportionality analysis. *See In re Ex Parte Glob. Energy Horizons Corp.*, 647 F. App'x 83, 86 n.9 (3d Cir. 2016) (explaining that the 2015 amendment to Rule 26 makes the "reasonably calculated" standard part of the proportionality analysis). This discovery is reasonably calculated for the reasons explained above.

With respect to TCC's invocation of HIPAA, the Court rightly identified in its order that any HIPAA concern can be addressed by an order of this Court. *See* 45 C.F.R. §164.512(e)(1)(i). This is equally true when the medical information relates to a deceased person. *See Creely v. Genesis Health Ventures, Inc.*, No. CIV.A.04-CV-0679, 2004 WL 2943661, at *3 (E.D. Pa. Dec. 17, 2004).

Courts in this circuit have issued orders authorizing the disclosure of protected health information at the discovery stage in other cases. *See, e.g.*, *Fahs ex rel. Fahs v. Red Lion Area Sch. Dist.*, No. 1:15-CV-1108, 2017 WL 4618274, at *6

(M.D. Pa. Oct. 16, 2017) (noting the importance of both sides in litigation having access to the same information); *Blum v. Positive Physicians Ins. Co.*, No. 220CV05423SRCCLW, 2021 WL 5404882, at *4 (D.N.J. Aug. 17, 2021) ("[I]f the Court orders [the covered facility to] produce the medical records, the facility may do so without running afoul of HIPAA. That situation creates no burden for [the facility], let alone an 'undue burden.'"). If the Court finds that the requested information is discoverable under Rule 26 for the reasons explained above, HIPAA does not create an additional hurdle.[1]

Although TCC argues that Pennsylvania law bars this discovery even if HIPAA does not, TCC failed to articulate the "good cause" legal test used by Pennsylvania courts conducting that analysis. This Court is perfectly capable of ordering the disclosure of the requested discovery under Pennsylvania law, after "weigh[ing] the need for the information sought to be disclosed against the possible harm of disclosure to the person to whom such information pertains, the physician-

---

[1] To the extent that the Court decides to consider the ultimate admissibility of the requested discovery, that question is not answered by HIPAA. "All that 45 C.F.R. § 164.512(e) should be understood to do . . . is to create a procedure for obtaining authority to use medical records in litigation. Whether the records are actually admissible in evidence will depend among other things on whether they are privileged. . . . We do not think HIPAA is rightly understood as an Act of Congress that creates a privilege." *Nw. Mem'l Hosp. v. Ashcroft*, 362 F.3d 923, 925–26 (7th Cir. 2004); *see also Fahs*, 2017 WL 4618274 at *5 (noting that a court order requiring disclosure of protected medical information "does nothing to impede [the opponents'] ability to challenge the admissibility at trial of [the protected] medical information . . . by filing a motion *in limine* at a later date).

patient relationship, and to the treatment services, and may condition disclosure of the information upon any appropriate safeguards." *Creely*, 2004 WL 2943661, at *4.

One of the safeguards the Court could consider would be ordering TCC to produce redacted data in response to some of the requests addressed above. Information concerning dates, dosages, and revenue need not involve any identifying information. "Pennsylvania state privacy laws do not preclude disclosure of . . . redacted medical records." *Roth v. Sunrise Senior Living Mgmt., Inc.*, No. 2:11-CV-4567, 2012 WL 748401, at *2 (E.D. Pa. Mar. 8, 2012). Likewise, under HIPAA, "once identifying information has been redacted, patient privacy concerns dissipate, and HIPAA poses no obstacles to the production of the redacted records." *Beaty v. Delaware Cnty.*, No. CV 21-1617, 2023 WL 5423016, at *2 (E.D. Pa. Mar. 2, 2023) (citation and quotation marks omitted).

Under Pennsylvania law, the information of a deceased person (such as Valerie Lindner) has been held to be discoverable since there is no injury to any ongoing physician-patient relationship or treatment. *Creely*, 2004 WL 2943661, at *4. In addition, the information related to Valerie Lindner should not be redacted because of Dr. Lindner's extensive testimony about her, including the fact that she was his first patient, and that he used her case to educate TCC about his approach to babesiosis and corticosteroids. A court order authorizing the disclosure of her information is therefore appropriate, even if other information is redacted.

## V.     Conclusion

For the reasons set forth herein, Plaintiffs respectfully request that this Court grant Plaintiffs' request to compel discovery, or provide them the opportunity to so move.

**KLINE & SPECTER, P.C.**

BY: *Conor Lamb*
SHANIN SPECTER, ESQUIRE
PA Attorney I.D. No. 40928
CONOR LAMB, ESQUIRE
PA Attorney I.D. No. 304874
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 402-2359
Shanin.Specter@klinespecter.com
Conor.Lamb@klinespecter.com

Date: <u>April 26, 2024</u>

## CERTIFICATE OF SERVICE

I, Conor Lamb, Esquire, hereby certify that I served a true and correct copy of the foregoing Plaintiffs' Memorandum of Law in Support of Discovery Requests via electronic service with the Clerk's E-file system on the 26th day of April, 2024, upon all counsel and parties of record.

*Conor Lamb*
_____
CONOR LAMB, ESQUIRE