# EXHIBIT G

Page 18

1  Q.    Are corticosteroids, like prednisone
2  ask dexamethasone, are those compounded at
3  your pharmacy?
4  A.    Yes, but the prescriptions that we had
5  for Stacey Wolking were not compounded
6  prescriptions.
7  Q.    Is that because they were in tablet
8  form, or was it for some other reason?
9  A.    Yes, exactly.  They're already
10 commercially available.  So, we cannot
11 compound prescriptions that are already
12 commercially available.
13 Q.    Even for prescriptions like that that
14 you are not compounding and that are
15 commercially available and are covered by
16 insurance at many other places, your pharmacy
17 does not directly bill the insurance for
18 those prescription either.
19       Do I have that correct?
20 A.    No.
21 Q.    No, I don't have it correct, or, yes,
22 I'm correct?
23 A.    Yes, that is correct.
24 Q.    If I say that at all in imprecisely,

Page 19

1  please correct it.
2        Are you the pharmacist in charge at
3  Tunkhannock Compounding Center?
4  A.    Yes.
5  Q.    Have you been the pharmacist in charge
6  since you bought the pharmacy in 2020?
7  A.    Yes.
8  Q.    I want to ask you some more questions
9  about prednisone and dexamethasone.
10       First of all, do you agree with me
11 that those are both considered
12 corticosteroids?
13 A.    Yes.
14 Q.    Were you taught about corticosteroids
15 as a class of drugs when you were in pharmacy
16 school?
17 A.    Yes.
18 Q.    What were the important things that
19 you remember being taught about them?
20       MR. BENEDETTO:  Objection of
21 form.
22       You can answer, Courtney.
23       THE WITNESS:  Honestly, I can't
24 remember specifically at this time.  It's a

Page 20

1  little while ago.
2  BY MR. LAMB:
3  Q.    I'm going to read you a very simple
4  statement.  I would like you to tell me if
5  you agree or disagree with it.
6        There is no upper limit on prednisone
7  dosing.
8        Do you agree with that statement or
9  disagree with it?
10       MR. BENEDETTO:  Objection of the
11 form.
12       You can answer.
13       THE WITNESS:  I agree.
14 BY MR. LAMB:
15 Q.    You agree that there is no upper limit
16 on prednisone dosing; do I have that right?
17 A.    I agree it's in what I have read
18 recently about prednisone.
19 Q.    Can you tell me where you have read
20 that there is no upper limit on prednisone
21 dosing?
22 A.    In the package insert for prednisone.
23 Q.    Can you describe where that package
24 insert comes from?

Page 21

1        Is there a certain brand name you're
2  buying that has that in the package insert?
3  A.    They're online.  You can find them
4  online.
5  Q.    Can you tell me where I would find it
6  online?
7  A.    I would have to search it myself to
8  find it right now.
9  Q.    Is there a particular brand of
10 prednisone that your pharmacy uses?
11 A.    No.
12 Q.    Meaning that you use multiple
13 company's prednisone?
14 A.    We can.  I don't know which one
15 specifically we would have bought.  I also
16 don't know if it was different brands off the
17 top of my head.  I would have to look at that
18 further.
19 Q.    Just to clarify this point before we
20 move on.
21       You're saying that you have seen a
22 package insert that says there is no upper
23 limit on prednisone dosing?
24 A.    I'm not sure.

### Page 34

1  phone, I guess.
2  BY MR. LAMB:
3  Q.    Is it different if the patient comes
4  to the pharmacy in person?
5  A.    Uh-huh, because they sign if they have
6  any questions or not.
7  Q.    In your view, does counselling involve
8  anything other than asking the patient if
9  they have any questions?
10            MR. BENEDETTO:  Objection to
11 form.
12            THE WITNESS:  Technically, no.
13 BY MR. LAMB:
14 Q.    When you say technically, what do you
15 mean by that?
16 A.    That has always been -- since I worked
17 in retail, that was always the offer to
18 counsel.
19 Q.    Where were you trained on what the
20 legal obligations of a perspective drug
21 review are?
22            MR. BENEDETTO:  Objection of the
23 form.
24            You can answer.

### Page 35

1             THE WITNESS:  I can't exactly
2  remember if it was pharmacy school.  I'm sure
3  that it was, but also I remember learning
4  about it specifically from Rite Aid.
5  BY MR. LAMB:
6  Q.    Did you work at Rite Aid?
7  A.    I did.
8  Q.    Did you work at Rite Aid before
9  Tunkhannock Compounding Center?
10 A.    Several years before, not directly
11 before.
12 Q.    I should have asked you that.  Can you
13 briefly describe, between when you graduated
14 from pharmacy school and when you started
15 working at Tunkhannock in 2016, where you
16 worked?
17 A.    After pharmacy school, I worked at
18 Rite Aid up until about 2015, I worked at
19 Rite Aid several places.  In 2015, I worked
20 at a hospital and also a few other per diem
21 places, including a specialty pharmacy,
22 another retail pharmacy, and then I was the
23 pharmacy director at the hospital up until I
24 left in 2020.

### Page 36

1  Q.    Can you tell me the name of that
2  hospital?
3  A.    Tyler Memorial Hospital in
4  Tunkhannock.
5  Q.    You mentioned that, besides Rite Aid,
6  there was one other retail pharmacy.
7        What retail pharmacy is that?
8  A.    It's called Care Site.  They're under
9  Geisinger.
10 Q.    The last question on the standard
11 operating procedures.
12       Did you have any standard operating
13 procedures that dealt with perspective drug
14 reviews?
15 A.    I would have to look up my standard
16 operating procedures if it specifically
17 states that.  I believe it does, but I don't
18 know 100 percent.  I know that a pharmacist
19 must perform that.  I believe that it
20 references that.
21 Q.    Going back to roughly August of 2022,
22 besides yourself, who were the pharmacists
23 that worked at Tunkhannock Compounding Center
24 at that time?

### Page 37

1  A.    Brian Bryk.
2  Q.    Can you spell that for the court
3  reporter?
4  A.    B-R-Y-K.
5  Q.    Any other pharmacists?
6  A.    No.
7  Q.    You were still a practicing pharmacist
8  at that time in addition to being the owner
9  and pharmacist in charge, correct?
10 A.    Yes, I have been the whole time.
11 Q.    You still are a practicing pharmacist
12 today?
13 A.    Yes.
14 Q.    You should probably repeat just the
15 last thing you said.  I think we got stuck on
16 a delay.  We talked over each other.
17 A.    I'm currently a practicing pharmacist
18 at Tunkhannock Compounding Center.
19 Q.    Thank you.  You said you were also
20 practicing as a pharmacist in about August of
21 2022 at Tunkhannock?
22 A.    Yes.
23 Q.    If at that time either you or Brian
24 had a question about dosing for an individual

Page 54

```
 1  they always been conversations dealing with a
 2  specific patient, or have you had general
 3  conversations with him about corticosteroids?
 4           MS. DENAPLES:  Object to the
 5  form.
 6  BY MR. LAMB:
 7  Q.    Go ahead and answer again if you don't
 8  mind.
 9  A.    General conversation.
10  Q.    What did you two talk about when it
11  came to corticosteroids generally?
12  A.    I think that's a little broad.  We
13  would talk about -- can you be a little more
14  specific?
15  Q.    Did you and he ever talk about how
16  much corticosteroid was safe for an
17  individual patient to take?
18           MS. DENAPLES:  Objection of form.
19           THE WITNESS:  No.
20  BY MR. LAMB:
21  Q.    Have you and he ever talked about the
22  issue of someone overdosing on
23  corticosteroids?
24           MR. BENEDETTO:  Objection of the
```

Page 55

```
 1  form.
 2           You can answer, Courtney.
 3           THE WITNESS:  No.
 4  BY MR. LAMB:
 5  Q.    Did he ever offer to give you any sort
 6  of training or education or other information
 7  about corticosteroids?
 8           MS. DENAPLES:  Object to the
 9  form.
10           THE WITNESS:  No.
11  BY MR. LAMB:
12  Q.    Have you ever asked him how much
13  prednisone or dexamethasone would be safe for
14  one of his patients to take?
15           MR. BENEDETTO:  Objection to the
16  form.
17           THE WITNESS:  No.
18  BY MR. LAMB:
19  Q.    I want to talk a little bit about
20  babesiosis.
21        Do you recognize that term?
22  A.    Yes.
23  Q.    What does it mean?
24  A.    Having an infection of the Babesia
```

Page 56

```
 1  parasite.
 2  Q.    Is it your understanding that the
 3  Babesia parasite can be carried into humans
 4  by tick bites?
 5  A.    Yes.
 6  Q.    When did you first learn about
 7  babesiosis?
 8  A.    I can't say exactly when, but
 9  personally my husband and several other
10  family members are affected by tick-born
11  illnesses.  That's when I would have learned
12  about Lyme disease and other tick-born
13  illnesses.
14  Q.    Have you ever had a family member who
15  was diagnosed with babesiosis?
16  A.    No.
17  Q.    Did you learn about babesiosis in
18  pharmacy school?
19  A.    No.
20  Q.    Did you ever talk to Dr. Lindner about
21  babesiosis?
22  A.    Yes.
23  Q.    Can you describe conversations with
24  Dr. Lindner about babesiosis?
```

Page 57

```
 1  A.    He would often describe how sick his
 2  patients were, including his daughter.
 3  Because we had a relationship and I know of
 4  his daughter, we would ask about his
 5  daughter, how she was doing.  We would talk
 6  about it in regards to that and just how sick
 7  his patients were.
 8  Q.    Did you first learn about babesiosis
 9  from Dr. Lindner?
10  A.    No.
11  Q.    Before Stacey Wolking, did your
12  pharmacy fill prescriptions for other
13  patients who had been diagnosed with
14  babesiosis?
15  A.    I don't know.
16  Q.    Were you aware in August of 2022 that
17  Dr. Lindner had diagnosed Stacey Wolking with
18  babesiosis?
19  A.    Not sure, but I knew that's what he --
20  was part of her treatment plan.  I knew that
21  was part of her treatment plan, but I don't
22  know exactly when it would have been before
23  we filled her prescriptions.  But I guess
24  around August, yes.
```

Page 58

1  Q.     You're saying, before you filled
2  Ms. Wolking's prescriptions, you would have
3  understood what the diagnosis was in her
4  case, correct?
5  A.     Yes, or at least part of it.  I don't
6  know if there were additional diagnoses, but
7  in relationship to the steroids and
8  babesiosis, yes.
9  Q.     As you sit here right now, do you know
10 whether or not she was Tunkhannock
11 Compounding Center's first ever babesiosis
12 patient?
13            MR. BENEDETTO:  Objection to the
14 form.
15            THE WITNESS:  No.
16 BY MR. LAMB:
17 Q.     You don't know?
18 A.     No.
19 Q.     Is that included in your records?
20 Could you find out?  Meaning, do you have the
21 diagnosis of your other patients available in
22 your records?
23 A.     No, that's generally not on
24 prescriptions, the diagnosis code.

Page 59

1  Q.     There is nowhere else that you -- go
2  ahead.
3  A.     At least not historically they're not.
4  Diagnosis codes are not on prescriptions.
5  Q.     There is nowhere else that you
6  preserve the diagnosis codes in your records?
7  A.     No.
8  Q.     Other than talking to Dr. Lindner and
9  having family members who have dealt with
10 tick-borne diseases, did you gather any other
11 information about babesiosis before your
12 pharmacy began treating Stacey Wolking?
13            MR. BENEDETTO:  Objection of
14 form.
15            You can answer, Courtney.
16            THE WITNESS:  Personally, yes,
17 I've read books on it but not for the
18 pharmacy, no.
19 BY MR. LAMB:
20 Q.     What books have you read about it?
21 A.     Stephen Buhner's books on Lyme disease
22 and tick-born illnesses.
23 Q.     Would you mind spelling his last name
24 for the record.

Page 60

1  A.     Sure.  I just have to look it up.
2  It's spelled a little different.
3         The last name is B-U-H-N-E-R.
4  Q.     Did you read any of his books before
5  August of 2022?
6  A.     Yes.
7  Q.     Did you ever look up the Centers For
8  Disease Control and Prevention Guidance on
9  Babesiosis?
10 A.     No.
11 Q.     Did you ever look up whether high
12 corticosteroid dosing was a standard
13 recommended treatment for someone who's been
14 infected with babesiosis?
15 A.     I don't remember.
16 Q.     Would it surprise you to learn that
17 the Centers For Disease Control and
18 Prevention consider corticosteroid treatment
19 to be a risk factor for someone who's
20 infected with babesiosis?
21            MS. DENAPLES:  Object to the
22 form.
23            THE WITNESS:  I'm sorry, could
24 you repeat the question.

Page 61

1  BY MR. LAMB:
2  Q.     Would it surprise you to learn that
3  the Centers For Disease Control and
4  Prevention consider corticosteroid treatment
5  to be a risk factor for someone who's been
6  infected with babesiosis?
7            MS. DENAPLES:  Same objection.
8            THE WITNESS:  Would it surprise
9  me?  Yes and no.  I didn't know that
10 information, but it is not on the cutting
11 edge of information either.
12 BY MR. LAMB:
13 Q.     When you say it is not on the cutting
14 edge of information, what do you mean by it?
15 A.     I guess that information I wouldn't
16 think is -- I don't know how old that
17 information is because I didn't look it up.
18         Would it surprise me?  Yes and no.  I
19 didn't know the information, but I'm not
20 surprised, I guess.
21 Q.     Are you aware that --
22 A.     I guess I don't know how to answer the
23 question.
24 Q.     Are you aware that people that take

Page 78

1  years?
2          MR. BENEDETTO:  Objection of
3  form.
4          THE WITNESS:  Two years
5  full-time, and then before then it was just
6  per diem.  Maybe once a month, maybe twice a
7  month.
8  BY MR. LAMB:
9  Q.    In that time, had you ever filled a
10 prednisone prescription of this quantity?
11         MR. BENEDETTO:  Objection of
12 form.
13         THE WITNESS:  I would have to
14 look back.  I don't believe so.
15 BY MR. LAMB:
16 Q.    It's possible that on August 8, 2022
17 this was the largest prednisone prescription,
18 at least for you, that you ever would have
19 been part of filling?
20        MR. BENEDETTO:  Objection to the
21 form.
22        THE WITNESS:  I don't know.
23 BY MR. LAMB:
24 Q.    Do you agree with me it's possible,

Page 79

1  though, based on what you just said?
2          MR. BENEDETTO:  Same objection.
3          THE WITNESS:  It's possible.
4  BY MR. LAMB:
5  Q.    You're saying that you don't remember
6  whether it was you that called him or him
7  that called you to talk about Stacey Wolking
8  and this prescription?
9  A.    No.
10 Q.    It's also possible that you did not
11 reach out to him initially, but that he
12 reached out to you to talk about Stacey
13 Wolking?
14         MS. DENAPLES:  Object to form.
15         THE WITNESS:  It could have been.
16 I do not remember.  He also could have called
17 on another patient and I might have brought
18 it up.  Again, I do not remember.
19 BY MR. LAMB:
20 Q.    Are there any notes from this
21 conversation about Stacey Wolking and the
22 August 8th prescription, any notes or record,
23 written record, of that conversation of any
24 kind?

Page 80

1  A.    No.
2  Q.    In that conversation, did you and
3  Dr. Lindner talk about any potential side
4  effects that Stacey Wolking could experience
5  or risks to her from that prescription?
6  A.    To me specifically, no.
7  Q.    I'm asking if you and Dr. Lindner
8  talked about that in the conversation?
9  A.    No.
10 Q.    In your initial description of that
11 conversation from a few minutes ago, you
12 talked about your knowledge that Stacey
13 Wolking was getting anti-malerial medications
14 from Dr. Lindner; is that correct?
15 A.    Yes.
16 Q.    Did he explain that to you in this
17 conversation before filling the August 8th
18 prescription?
19 A.    I can't remember.
20 Q.    Do you know whether you talked to
21 Dr. Lindner about Stacey Wolking before this
22 phone conversation you and I have been
23 talking about?
24         MR. BENEDETTO:  Objection of the

Page 81

1  form.
2          THE WITNESS:  I can't remember.
3  BY MR. LAMB:
4  Q.    In your description from a few minutes
5  ago.  You also suggested you're awareness
6  that Stacey Wolking was getting
7  corticosteroids from other pharmacies besides
8  your own; is that correct?
9  A.    I was not aware of that.
10 Q.    I'm mistaken about that?  You were not
11 aware that Stacey Wolking was also getting
12 prescribed corticosteroids from other
13 pharmacies at the same time as yours?
14 A.    No.
15 Q.    Dr. Lindner did not tell you that he
16 was having Stacey fill prescriptions at other
17 pharmacies besides Tunkhannock Compounding
18 Center?
19         MS. DENAPLES:  Objection to form.
20         THE WITNESS:  No.
21 BY MR. LAMB:
22 Q.    A few minutes ago, you used the term
23 on hand to describe -- actually, I don't know
24 what you were describing.

Page 82

1  Can you explain to me what you meant
2  when you said Dr. Lindner wanted to have some
3  prednisone on hand?
4  A.    My understanding is that the dose
5  would be dependent on the patient and the
6  patient's condition, how she was doing.  He
7  didn't want her to run out.  They wanted to
8  be able to have enough to fill what she
9  needed for the time being.  The taper would
10 be dependent on the patient and her condition
11 was my understanding.
12 Q.    When you use the term taper, what do
13 you mean by that?
14 A.    Taper means to -- ideally, you want to
15 taper, which means lower the dose slowly of
16 corticosteroids.
17 Q.    From your knowledge of
18 corticosteroids, how soon should a patient
19 begin tapering the dose?
20        MR. BENEDETTO:  Objection of
21 form.
22        THE WITNESS:  It depends on the
23 patient.  Often, in the hospital, they're
24 only there for a short amount of time.  They

Page 83

1  would be tapering after a few days ideally.
2  A lot of times, once they leave the hospital,
3  I wouldn't know what they would be on.  So, I
4  don't know.
5  BY MR. LAMB:
6  Q.    Why is tapering necessary for
7  corticosteroids?
8        MR. BENEDETTO:  Objection to the
9  form.
10       THE WITNESS:  My understanding is
11 that you need - the system needs the steroids
12 in order to function.  So, you have to give
13 the adrenals time to catch up from not having
14 to make them to make them itself.
15 BY MR. LAMB:
16 Q.    Did Dr. Lindner say who was going to
17 decide how much prednisone Stacey Wolking
18 took?
19       MS. DENAPLES:  Object to form.
20       THE WITNESS:  No.
21 BY MR. LAMB:
22 Q.    Are you familiar with the term
23 patient-centered dosing or patient-directive
24 dosing?

Page 84

1  A.    Yes, especially in relationship to
2  hormone replacement therapy.
3  Q.    What do those terms mean to you?
4  A.    For hormone replacement therapy, a lot
5  of it is based on patients' symptoms.
6  Sometimes they'll need something a little
7  higher, a little lower.  Depending on the
8  patient-doctor relationship -- again, a lot
9  of times the pharmacist isn't involved in
10 that exact conversation between the two, but
11 I have an understanding that between the
12 doctor and the patient they -- between
13 patient symptoms, how they're feeling and the
14 doctor's direction, they can change the dose
15 a little bit higher, a little bit lower
16 depending on what's going on.
17       It's easier for them to have --
18 instead of needing something a different
19 dose, something different that day and not be
20 able to get it, it's better for the patient
21 to have on hand what they can utilize so that
22 the treatment doesn't get delayed or the
23 patient doesn't need something they can't
24 get.

Page 85

1  Q.    Is that your understanding of what was
2  happening between Dr. Lindner and Stacey
3  Wolking with respect to this prednisone
4  prescription on August 8, 2022?
5  A.    A little bit, yes.  A lot of times
6  when a prescription says take as directed or
7  use up to this amount as directed, there is
8  an understanding that the doctor will help
9  the patient decide the dose that is needed.
10 That's not uncommon for pharmacies to fill
11 something like that.  I filled them many
12 times in retail settings.
13 Q.    What I'm asking, though, is, did you
14 have that understanding between yourself and
15 Dr. Lindner with respect to Stacey Wolking?
16       MS. DENAPLES:  Object to form.
17       THE WITNESS:  That was my
18 understanding.
19 BY MR. LAMB:
20 Q.    Did you share the contents of your
21 conversations with Dr. Lindner about Stacey
22 Wolking that you testified occurred before
23 the August 8, 2022 prescription, did you
24 share the contents of that conversation with

Page 118

1  not a new prescription.  There was a refill
2  on the other prescription.  This was just
3  another fill of the same prescriptions.
4  BY MR. LAMB:
5  Q.     This was a refill of the August 16th
6  prescription?
7  A.     No, I believe the one before that.  I
8  apologize if that's what you said.  I believe
9  it was the 9/27 prescription.
10 Q.     No problem.  Let's look at Exhibit-2
11 again so we're all looking at the same.
12        Are you saying that the October 4th
13 prescription is a refill of the September
14 27th prescription that just occurred one week
15 earlier?
16 A.     Yes.  If you look at the RX number,
17 they're the same number on the very left
18 side.
19 Q.     I see.  Okay.
20 A.     That means they're the same
21 prescription.  There was a refill most likely
22 or a quantity remaining on it and she could
23 have requested that.
24 Q.     Would it be unusual for Tunkhannock

Page 119

1  Compounding Center to refill a prescription
2  containing 40 milligrams of dexamethasone
3  after one week?
4             MR. BENEDETTO:  Objection of
5  form.
6             THE WITNESS:  Not necessarily.
7  During that time and continually, there is a
8  lot of back orders on a prescription.  If we
9  only had a certain amount or could only get a
10 certain amount, we could have sent that and
11 then sent the quantity remaining.
12            Again, I'm not sure why that
13 would have happened.  There is lots -- I can
14 think of lots of reasons why that would
15 happen.
16 BY MR. LAMB:
17 Q.     Just tell me if I'm wrong.  I think
18 I'm understanding what you're saying.
19        Is it because the original
20 prescription here said 300 and she only took
21 100 at first and then took 200 the week
22 later?
23        Is that why this was permissible and
24 they're the same prescription number?

Page 120

1  A.     Possibly.  If you scroll down to the
2  prescription, I can look at it.
3  Q.     When you use the term refill, I think
4  I'm a bit confused.
5  A.     That's okay.  The quantity written was
6  300.  She's allowed 300 per fill, up to and
7  including, and then there is also one refill
8  on the prescription.
9         She's allowed 300 and then, at another
10 refill time, she's allowed another 300.  So,
11 she probably requested 100 and then requested
12 200 after.  She doesn't have to fill a full
13 prescription.
14 Q.     Would October 4th not really be
15 considered a refill then but more continuing
16 to fill the original prescription?
17 A.     Correct.  We call it a refill because
18 it's the same prescription just filled
19 another time, but the quantity on this form
20 is what she received even though she was
21 allowed to get up to 300 as written for the
22 prescription.
23        That means she either requested 100.
24 I'm not sure.  Maybe only 100 was available

Page 121

1  from us to get at the time.  Again, there
2  could be a lot of reasons she would get 100
3  and then 200 a week later.
4         She might have wanted 300 originally.
5  We might have only had a bottle on hand.  We
6  sent her that and ordered the next.  Again,
7  I'm not sure.
8  Q.     To wrap up this part.  You've
9  testified about a conversation that you had
10 with Dr. Lindner about Stacey Wolking before
11 the October 8th prescription was filled.
12        Do you remember any conversations with
13 Dr. Lindner about Stacey Wolking between
14 August 8th and the October 4, 2022
15 prescription?
16 A.     I cannot remember any specific
17 conversations.
18 Q.     Is that also true about communications
19 of other kinds, meaning e-mails, texts,
20 anything of that nature?
21 A.     Correct.
22 Q.     Has your pharmacy ever dispensed this
23 quantity of corticosteroids to a patient in a
24 two-month period other than Stacey Wolking?

Page 130

1  that she had the treatment that she required.
2  BY MR. LAMB:
3  Q.    Just so the record is clear, we're
4  talking about your conversation before the
5  first prescription on August 8th, which was
6  for 5,000 total milligrams of prednisone,
7  correct?
8  A.    Yes.
9  Q.    As far as you know, after August 8th,
10 when Lindner sent another corticosteroid
11 prescription on August 16th, when he sent
12 another one on September 27th, when he sent
13 another one on August 4th, as far as you know
14 sitting here today, you're not sure whether
15 you ever questioned his prescriptions a
16 second time?
17         MR. BENEDETTO:  Objection of
18 form.
19         THE WITNESS:  Can you repeat the
20 question.
21 BY MR. LAMB:
22 Q.    I'm not trying to put words in your
23 mouth.  I just want to make sure your
24 testimony is clear and I understand what you

Page 131

1  do and do not remember.
2         You've testified extensively about
3  talking to Dr. Lindner about Stacey Wolking
4  before August 8, 2022.
5         I just want to make sure your
6  testimony is that, when you received a new
7  prescription for Stacey Wolking on August
8  16th, another one on September 27th, another
9  one on October 4th, all 2022, you don't
10 remember whether you reached out to ask Dr.
11 Lindner about any of those three
12 prescriptions?
13        MR. BENEDETTO:  Objection of
14 form.
15        THE WITNESS:  No, because I
16 understood the course of treatment from the
17 previous conversation.
18 BY MR. LAMB:
19 Q.    Your understanding was not changed at
20 all by the mounting total of corticosteroids
21 with those next three prescriptions?
22        MR. BENEDETTO:  Objection of
23 form.
24        THE WITNESS:  No.

Page 132

1         MR. LAMB:  Counsel, I believe
2  that's all I have.  If either of you have
3  questions, please go right ahead.
4         MS. DENAPLES:  I have no
5  questions.  Thank you Ms. Young.
6         MR. BENEDETTO:  I think we're
7  done.
8         THE VIDEOGRAPHER:  This concludes
9  today's deposition of Courtney Young.  We're
10 going off the record.  The time is 1:21 p.m.
11           - - -
12        (Whereupon, the deposition concluded
13 at 1:21 p.m.)
14           - - -

Page 133

1           C E R T I F I C A T E
2
3       I hereby certify that the proceedings,
4  evidence and objections noted are contained
5  fully and accurately in the notes taken by me
6  on this hearing of the above-captioned case
7  on November 15, 2023, and that this is a
8  correct transcription of same.

                    Kathryn Rose

Page 130

1  that she had the treatment that she required.
2  BY MR. LAMB:
3  Q.    Just so the record is clear, we're
4  talking about your conversation before the
5  first prescription on August 8th, which was
6  for 5,000 total milligrams of prednisone,
7  correct?
8  A.    Yes.
9  Q.    As far as you know, after August 8th,
10 when Lindner sent another corticosteroid
11 prescription on August 16th, when he sent
12 another one on September 27th, when he sent
13 another one on August 4th, as far as you know
14 sitting here today, you're not sure whether
15 you ever questioned his prescriptions a
16 second time?
17        MR. BENEDETTO:  Objection of
18 form.
19        THE WITNESS:  Can you repeat the
20 question.
21 BY MR. LAMB:
22 Q.    I'm not trying to put words in your
23 mouth.  I just want to make sure your
24 testimony is clear and I understand what you

Page 131

1  do and do not remember.
2        You've testified extensively about
3  talking to Dr. Lindner about Stacey Wolking
4  before August 8, 2022.
5        I just want to make sure your
6  testimony is that, when you received a new
7  prescription for Stacey Wolking on August
8  16th, another one on September 27th, another
9  one on October 4th, all 2022, you don't
10 remember whether you reached out to ask Dr.
11 Lindner about any of those three
12 prescriptions?
13        MR. BENEDETTO:  Objection of
14 form.
15        THE WITNESS:  No, because I
16 understood the course of treatment from the
17 previous conversation.
18 BY MR. LAMB:
19 Q.    Your understanding was not changed at
20 all by the mounting total of corticosteroids
21 with those next three prescriptions?
22        MR. BENEDETTO:  Objection of
23 form.
24        THE WITNESS:  No.

Page 132

1        MR. LAMB:  Counsel, I believe
2  that's all I have.  If either of you have
3  questions, please go right ahead.
4        MS. DENAPLES:  I have no
5  questions.  Thank you Ms. Young.
6        MR. BENEDETTO:  I think we're
7  done.
8        THE VIDEOGRAPHER:  This concludes
9  today's deposition of Courtney Young.  We're
10 going off the record.  The time is 1:21 p.m.
11          - - -
12        (Whereupon, the deposition concluded
13 at 1:21 p.m.)
14          - - -

Page 133

1            C E R T I F I C A T E
2
3        I hereby certify that the proceedings,
4  evidence and objections noted are contained
5  fully and accurately in the notes taken by me
6  on this hearing of the above-captioned case
7  on November 15, 2023, and that this is a
8  correct transcription of same.

                    Kathryn Rose