**In the Matter Of:**

*WOLKING v*

*LINDNER*

*COURTNEY YOUNG*

*November 15, 2023*



```
 1            UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
 2

    STACEY WOLKING and        :
 3  DARYL WOLKING, H/W,       :
               Plaintiff,     :
 4      vs.                   :
    HENRY LINDNER, M.D. and   : NO.
 5  YOUNGS APOTHECARY,        : 3:23-cv-
    INC., d/b/a Tunkhannock   : 00806-MEM
 6  Compounding Center,       :
               Defendants.    :
 7


 8                 - - -


 9        WITNESS:  COURTNEY YOUNG


10                 - - -


11          November 15, 2023


12                 - - -


13       Video deposition taken pursuant to

14  notice, beginning at approximately 10:01

15  a.m., before Kathryn Rose, Court

16  Reporter-Notary Public, there being present:

17                 - - -

18

19

20

21

22

23

24
```

## Page 2

```
 1
 2
      APPEARANCES
 3
      KLINE & SPECTER, P.C.
 4    BY:  CONNOR LAMB, ESQUIRE
      1525 Locust Street
 5    Philadelphia, PA 19102
      (215)772-1000
 6    Representing the Plaintiffs
 7    MCCORMICK & PRIORE, P.C.
      BY:  CONRAD BENEDETTO, ESQUIRE
 8     2001 Market Street, Suite 3810
       Philadelphia, PA 19103
 9    (215)972-0161
      Cbenedetto@mccormickpriore.com
10    Representing the
      Tunkhannock Defendants
11
      CIPRIANI & WERNER, P.C.
12    BY:  CIARA L. DENAPLES, Esquire
      415 Wyoming Avenue
13    Scranton, PA 18503
      (570) 347-0600
14    Cdenaples@c-wlaw.com
      Representing Dr. Henry Lindner
15
16
17
18
19
20
21
22
23
24
```

## Page 3

```
 1                   - - -
 2              I N D E X
 3                   - - -
 4    WITNESS      EXAMINATION      PAGE
 5    COURTNEY YOUNG
 6       By Mr. Lamb              6
 7
 8
 9                - - -
10          E X H I B I T S
11                - - -
12
      NUMBER   DESCRIPTION       PAGE
13                              MARKED
14    Young-1  Micromedex-Prednisone  39
15    Young-2  Prescription History;  63
               Bates YA19-22
16
      Young-3  Email; Bates Stamp    105
17             P2-000449
18    Young-4  Interrogatories      108
19
20
21
22
23
24
```

## Page 4

```
 1                LITIGATION SUPPORT INDEX
 2
 3    Direction To Witness Not To Answer
 4
 5             (None)
 6
 7
      Request For Production Of Documents
 8
 9
               (None)
10
11
12        Stipulations
13
14             (None)
15
16
          Questions Marked
17
18
               (None)
19
20
21
22
23
24
```

## Page 5

```
 1
 2                   - - -
 3         THE VIDEOGRAPHER:  We are now on
 4    the record.  My name is Karen Trimby.  I'm a
 5    videographer retained by Lexitas.
 6              This is the video deposition for
 7    the United States District Court for the
 8    Middle District of Pennsylvania.  Today's
 9    date is November 15, 2023, and the video time
10    is 10:01 a.m.
11              This deposition is being held via
12    Zoom in the matter of Wolking v Lindner, et
13    al.  The deponent is Courtney Young.
14              Would all counsel please
15    introduce themselves for the record.
16         MR. LAMB:  Connor lamb of Kline
17    and Specter for the plaintiffs Stacey and
18    Daryl Wolking.
19         MR. BENEDETTO:  Conrad James
20    Benedetto for the defendants Tunkhannock.
21         MS. DENAPLES:  Ciara DeNaples for
22    defendant Dr. Henry Lindner.
23         THE VIDEOGRAPHER:  The court
24    reporter is Kathryn Rose and will now swear
```

Page 6

1  in the witness.
2            - - -
3      COURTNEY YOUNG, after having been duly
4  sworn, was examined and testified as
5  follows...
6            - - -
7      MR. BENEDETTO:  We will read and
8  sign.
9            - - -
10           EXAMINATION
11           - - -
12 BY MR. LAMB:
13 Q.     Good morning, Ms. Young.  My name is
14 Connor lamb.  As I said, I want to thank you
15 for being available for this deposition.  I
16 want to start off with some preliminaries for
17 how things are going to go today.  I'm sure
18 you had a chance to talk to your lawyer about
19 this.
20      Just as an overarching thing, if I ask
21 you any questions at all today that involve
22 something you talked about with your lawyer,
23 I'm not asking you about anything you talked
24 about with Mr. Benedetto or any of your other

Page 7

1  lawyers.  I'm not looking for you to tell me
2  what you told them or what they told you.
3  That's a good thing for you to be aware of
4  overall.
5      I'm going to ask you a series of
6  questions today about your pharmacy's
7  treatment of Stacey Wolking.  If you don't
8  understand any of the questions that I ask, I
9  want you to let me know.  I'm going to either
10 repeat them or rephrase them.  It's important
11 that you understand the questions I'm asking
12 you.
13 Q.     Do you agree to that?
14 A.     Yes.
15 Q.     The same thing if you can't hear me.
16 We're on Zoom.  Obviously, there is all kinds
17 of technical difficulties.  If you don't hear
18 something I say or if I get cut off, let me
19 know, and I'll ask the question all over
20 again.
21      Do you agree to that?
22 A.     Yes.
23 Q.     Great.  Everything that you're saying,
24 that all of us are saying today, is being

Page 8

1  transcribed and typed out by the court
2  reporter.  It's just always important that
3  you answer a yes-no question with the words
4  yes and no.  People naturally tend to start
5  nodding or shaking their head or they might
6  say uh-huh or something like that.  We need
7  the actual words to be reflected in the
8  transcript.
9      Do you understand that?
10 A.     Yes.
11 Q.     Same thing when you're giving any
12 answer at all.  Please just try to make the
13 answer very clear so the court reporter can
14 understand it.  That includes if you're using
15 someone's name that's unfamiliar or maybe a
16 drug name, since you're a pharmacist, you can
17 go ahead and spell it out if it's something
18 you think the court reporter might not have
19 heard before.
20      Do you understand that?
21 A.     Okay, yes.
22 Q.     Another thing is, if I'm asking you a
23 question, lawyers sometimes have a tendency
24 to ask long questions that are confusing or

Page 9

1  compound.  I'll try not to do that.  If I'm
2  asking a question and, because you're the
3  expert here, you're the pharmacist, you
4  already know the answer before I'm done
5  asking it, just wait until I'm done asking
6  the question to answer it because if two
7  people are talking at once, that's also
8  confusing for the court reporter to type.
9      Just try not to start answering my
10 question until I'm finished asking my
11 question.
12      Do you understand that?
13 A.     Yes.
14 Q.     If you don't know the answer to a
15 question that I ask you, please just say that
16 you don't know.  I'm not going to be asking
17 you to speculate or guess about the answer to
18 something.
19      Do you understand that?
20 A.     Yes.
21 Q.     By the same token, people don't always
22 remember or think of the answer to a question
23 at the exact moment that they're asked it.
24 If I ask you something and you don't know or

| Page 10 | Page 12 |
|---|---|

**Page 10**

1  don't remember but later in the deposition
2  the answer flies into your head or you
3  realize you left something out from earlier,
4  we'll go back and revisit that question.
5  That's no problem at all.
6          Do you understand that?
7  A.    Yes.
8  Q.    Do you understand that if this case
9  goes to trial the transcript from this
10 deposition will be available to everybody at
11 trial.  If you say something at the trial
12 that's different than what you say today on
13 the same question, you could be asked to
14 explain that at the trial?
15 A.    Yes.
16 Q.    Do you understand that you swore to
17 tell the truth this morning, and that if you
18 fail to tell the truth in this deposition
19 there could possibly be legal consequences
20 for that?
21 A.    Yes.
22 Q.    Is there anything I've asked you or
23 told you up to this point that you don't
24 understand?

**Page 11**

1  A.    No.
2  Q.    The last thing is -- I think this is
3  clear from what I've already said -- if I ask
4  you a question today and you give me an
5  answer, it's going to be assumed that you
6  understood the question that I asked you.
7          Does that make sense?
8  A.    Yes.
9  Q.    Now, I want to get into some questions
10 about the case.  First, I want to make sure I
11 understand your company Youngs Apothecary,
12 Incorporated, and how it relates to
13 Tunkhannock Compounding Center, your
14 ownership, and all that sort of thing.
15         First off, for yourself, can you
16 confirm for me your date of birth?
17 A.    11/11/1987.
18 Q.    Happy belated birthday.
19         What is your address?
20 A.    104 Pine Ridge Road, Tunkhannock,
21 Pennsylvania.
22 Q.    Are you a graduate of a pharmacy
23 school?
24 A.    Yes.

**Page 12**

1  Q.    Which one and which year did you
2  graduate?
3  A.    Duquesne University School of
4  Pharmacy, May of 2012.
5  Q.    Am I correct that you have a pharmacy
6  license in Pennsylvania that was first issued
7  in 2013 and the number is RP447961.
8  A.    Correct.
9  Q.    Who owns Young Apothecary,
10 Incorporated?
11 A.    I do.
12 Q.    Are you the sole owner?
13 A.    Yes.
14 Q.    Are there any shareholders or anyone
15 else with an ownership interest of any kind?
16 A.    No.
17 Q.    Is anyone else besides you authorized
18 to sign important paperwork on behalf of
19 Youngs Apothecary?
20 A.    No.
21 Q.    Is anyone else besides you authorized
22 to hire or fire an employee of Youngs
23 Apothecary, Incorporated?
24 A.    No.

**Page 13**

1  Q.    Would anyone else besides you be
2  authorized to take out a loan on behalf of
3  Youngs Apothecary, Incorporated?
4  A.    No.
5  Q.    When did you buy the pharmacy that you
6  now own and run?
7  A.    November of 2020.
8  Q.    At that time, was it already called
9  Tunkhannock Compounding Center?
10 A.    Yes.
11 Q.    Who did you buy it from?
12 A.    Carol Sheldon, the pharmacist.
13 Q.    Is that somebody that you knew?
14 A.    Yes.
15 Q.    Did you work there already?
16 A.    I did.
17 Q.    When did you start working at
18 Tunkhannock Compounding Center?
19 A.    I'm not 100 percent sure, but it was
20 in 2016.
21 Q.    What made you decide to buy the
22 pharmacy in 2020?
23 A.    The owner at the time, Carol, was
24 wanting to retire and sell her business.  So,

Page 14

1  I offered to purchase it.
2  Q.    How did you finance your purchase of
3  the pharmacy?
4  A.    Through a loan.
5  Q.    Where did you get the loan from?
6  A.    I am not sure of the company's name.
7  Q.    Do you remember if it was a bank or
8  some other kind of company?
9  A.    It was not a bank.  It was a company.
10 Q.    Do you remember how much it was for?
11 A.    $140,000.
12 Q.    Was there any other source of
13 financing?  Did you put any money down?  Did
14 money come from anywhere else?
15 A.    Myself.
16 Q.    How much did you put into it?
17 A.    Not 100 percent sure.  I would say
18 $10,000 maximum.
19 Q.    Somewhere around $10,000 of your own,
20 plus the $140,000 loan.
21        So, you bought it for about $150,000;
22 is that right?
23 A.    Approximately, yes.
24 Q.    Did anyone else contribute any money,

Page 15

1  or did any money come from anywhere else?
2  A.    No.
3  Q.    What's the current status of that
4  $140,000 loan?
5  A.    It's still in repayment.
6  Q.    Are you paying it on time?
7  A.    Yes.
8  Q.    Once you bought it, why did you keep
9  the Tunkhannock Compounding Center name?
10        MR. BENEDETTO:  Objection of
11 form.
12        You can answer.
13        THE WITNESS:  The business was --
14 the old owner had a corporation similar to
15 how I currently have a corporation.  It was
16 doing business as Tunkhannock Compounding
17 Center.  All of the licensure, for the most
18 part, I believe, is in Tunkhannock
19 Compounding Center.
20        So, it was honestly easier to
21 just do it that way instead of changing
22 everything, all of the signage, all of the
23 customer forms.  It was just easier to keep
24 the name of the pharmacy as that.

Page 16

1  BY MR. LAMB:
2  Q.    As we sit here today, is there
3  anything to Youngs Apothecary, Incorporated,
4  that does not include Tunkhannock Compounding
5  Center?
6  A.    No.
7  Q.    For the rest of this deposition, I
8  will probably just use the name Tunkhannock
9  Compounding Center or Tunkhannock.
10        When I'm doing that, I'm obviously
11 referring to Youngs Apothecary as well
12 because you told me -- is it fair to say that
13 those terms are interchangeable?
14 A.    Yes.
15 Q.    Does Tunkhannock Compounding Center
16 accept health insurance from patients?
17 A.    No, we --
18 Q.    You don't accept -- sorry, go ahead.
19 A.    We do not.  We offer a claim -- form
20 for self-reimbursement, if they choose to do
21 so.
22 Q.    On my end, that got a little garbled
23 by the video.
24        Go ahead and repeat it, if you don't

Page 17

1  mind, Ms. Young.
2  A.    No, we do not take insurance and bill
3  insurance at the pharmacy, but we offer
4  patients a compounded claim form that they
5  can then send to the insurance company for
6  reimbursement themselves, if they choose to
7  do so.
8  Q.    Why don't you take insurance?
9        MR. BENEDETTO:  Objection of
10 form.
11        You can answer.
12        THE WITNESS:  Most of our
13 prescriptions are compounded prescriptions,
14 and most of them are not covered under
15 insurance as much as we found.  So, it was
16 not beneficial for us to pay to bill
17 insurances when the prescriptions were not
18 covered anyway.
19 BY MR. LAMB:
20 Q.    That practice, as you've described it,
21 has that been the same since you started
22 working there; therefore, before you owned
23 it, since you started working there in 2016?
24 A.    Correct.

Page 18

1  Q.    Are corticosteroids, like prednisone
2  ask dexamethasone, are those compounded at
3  your pharmacy?
4  A.    Yes, but the prescriptions that we had
5  for Stacey Wolking were not compounded
6  prescriptions.
7  Q.    Is that because they were in tablet
8  form, or was it for some other reason?
9  A.    Yes, exactly.  They're already
10 commercially available.  So, we cannot
11 compound prescriptions that are already
12 commercially available.
13 Q.    Even for prescriptions like that that
14 you are not compounding and that are
15 commercially available and are covered by
16 insurance at many other places, your pharmacy
17 does not directly bill the insurance for
18 those prescription either.
19        Do I have that correct?
20 A.    No.
21 Q.    No, I don't have it correct, or, yes,
22 I'm correct?
23 A.    Yes, that is correct.
24 Q.    If I say that at all in imprecisely,

Page 19

1  please correct it.
2        Are you the pharmacist in charge at
3  Tunkhannock Compounding Center?
4  A.    Yes.
5  Q.    Have you been the pharmacist in charge
6  since you bought the pharmacy in 2020?
7  A.    Yes.
8  Q.    I want to ask you some more questions
9  about prednisone and dexamethasone.
10        First of all, do you agree with me
11 that those are both considered
12 corticosteroids?
13 A.    Yes.
14 Q.    Were you taught about corticosteroids
15 as a class of drugs when you were in pharmacy
16 school?
17 A.    Yes.
18 Q.    What were the important things that
19 you remember being taught about them?
20        MR. BENEDETTO:  Objection of
21 form.
22        You can answer, Courtney.
23        THE WITNESS:  Honestly, I can't
24 remember specifically at this time.  It's a

Page 20

1  little while ago.
2  BY MR. LAMB:
3  Q.    I'm going to read you a very simple
4  statement.  I would like you to tell me if
5  you agree or disagree with it.
6        There is no upper limit on prednisone
7  dosing.
8        Do you agree with that statement or
9  disagree with it?
10        MR. BENEDETTO:  Objection of the
11 form.
12        You can answer.
13        THE WITNESS:  I agree.
14 BY MR. LAMB:
15 Q.    You agree that there is no upper limit
16 on prednisone dosing; do I have that right?
17 A.    I agree it's in what I have read
18 recently about prednisone.
19 Q.    Can you tell me where you have read
20 that there is no upper limit on prednisone
21 dosing?
22 A.    In the package insert for prednisone.
23 Q.    Can you describe where that package
24 insert comes from?

Page 21

1        Is there a certain brand name you're
2  buying that has that in the package insert?
3  A.    They're online.  You can find them
4  online.
5  Q.    Can you tell me where I would find it
6  online?
7  A.    I would have to search it myself to
8  find it right now.
9  Q.    Is there a particular brand of
10 prednisone that your pharmacy uses?
11 A.    No.
12 Q.    Meaning that you use multiple
13 company's prednisone?
14 A.    We can.  I don't know which one
15 specifically we would have bought.  I also
16 don't know if it was different brands off the
17 top of my head.  I would have to look at that
18 further.
19 Q.    Just to clarify this point before we
20 move on.
21        You're saying that you have seen a
22 package insert that says there is no upper
23 limit on prednisone dosing?
24 A.    I'm not sure.

Page 22

1  Q.    A similar question, maybe just a
2  different way of asking it is, do you think
3  it's possible for a person to overdose on
4  prednisone?
5          MR. BENEDETTO:  Objection to the
6  form.
7          You can answer, Courtney.
8          MS. DENAPLES:  Join in the
9  objection.
10          MR. LAMB:  Courtney, before you
11 answer, for all counsel, I think sometimes we
12 stipulate that an objection by one is deemed
13 to be on behalf of all.  I'm fine with
14 stipulating that for today so that, Ciara,
15 you don't have to join.
16          Is counsel good with that?
17          MR. BENEDETTO:  Agreed.
18          MS. DENAPLES:  I'm good with
19 that.
20          MR. LAMB:  I'll repeat the
21 question.
22 BY MR. LAMB:
23 Q.    My question was, do you believe it's
24 possible to overdose on prednisone?

Page 23

1          MR. BENEDETTO:  Same objection.
2          You can answer, Courtney.
3          THE WITNESS:  Personally, I don't
4  believe so.
5  BY MR. LAMB:
6  Q.    At the same time, taking dexamethasone
7  and prednisone together, would it be fair to
8  describe them as potentially toxic drugs
9  because there are some circumstances in which
10 they could be toxic to a patient?
11          MR. BENEDETTO:  Objection of the
12 form.
13          You can answer, Courtney.
14          THE WITNESS:  Honestly, I'm not
15 sure.  I think it would depend on just the
16 patient and everything else going on in the
17 scenario.  I think it's too broad to just
18 assume that.
19 BY MR. LAMB:
20 Q.    The complaint in this case alleges
21 that Dr. Lindner would encourage his patients
22 to convert a dosage of dexamethasone to the
23 equivalent of a dosage of prednisone for the
24 purposes of reporting to him how much they

Page 24

1  were taking.
2          The conversion he would tell them to
3  use would be 7 to 1, meaning that 1 milligram
4  of dexamethasone would be equivalent of 7
5  milligrams of prednisone.
6          Do you agree with that ratio of drugs
7  of roughly 7 to 1?
8          MS. DENAPLES:  Objection.
9          MR. BENEDETTO:  Objection.
10 Sorry, I didn't hear.
11          THE WITNESS:  I'm not sure.  I
12 would probably refer to the charts that they
13 have.
14          Off the top of my head, I didn't
15 think that that was the ratio, but, again, I
16 would have to look it up and double-check.
17 BY MR. LAMB:
18 Q.    As a pharmacist who's been practicing
19 for 10 years, are you aware of any risks or
20 bad side effects from someone taking
21 dexamethasone or prednisone?
22          MR. BENEDETTO:  Objection of
23 form.
24          THE WITNESS:  Yes.

Page 25

1  BY MR. LAMB:
2  Q.    Is a bowel perforation one of those
3  possible side effects?
4  A.    I would have to look it up in the
5  literature.  It's not something common that I
6  would think of off the top of my head.
7  Q.    What about painful scarring and
8  stretch marks on the skin?
9  A.    That one in particular, I would also
10 have to look it up.  I would think it would
11 be due to weight gain that is common with
12 steroids, but that's an assumption.  I would
13 have to look that up specifically up.
14 Q.    Is weight gain a side effect that you
15 are familiar with from corticosteroids?
16 A.    Yes.
17 Q.    What about facial edema?
18 A.    Yes.
19 Q.    What about the weakening of bones?
20 A.    Yes, for long-term use, yes.
21 Q.    What about muscle weakness and even
22 myopathy?
23 A.    Possibly.  That one I would have to
24 look up, too.  It's not one that comes to my

Page 26

1  mind automatically.
2  Q.    What about heart rhythm disturbances?
3  A.    Same with that one.  I would have to
4  research the literature on that one.  It's
5  not one that just comes to my mind.
6  Q.    Is the knowledge that you have about
7  corticosteroids today similar to the
8  knowledge that you had in August of 2022,
9  just a little over a year ago?
10          MR. BENEDETTO:  Objection.
11          THE WITNESS:  Yes.
12  BY MR. LAMB:
13  Q.    Other than your time in pharmacy
14  school, where did you learn about
15  corticosteroids?
16  A.    It would have just been pharmacy
17  school.
18  Q.    Are you familiar with patients going
19  through corticosteroid withdrawal?
20  A.    I have heard of it, yes.
21  Q.    Do you know what any of the symptoms
22  are during corticosteroid withdrawal?
23  A.    I would have to specifically look them
24  up.  I do not know a lot of them off the top

Page 27

1  of my head.
2  Q.    Do you consider corticosteroid
3  withdrawal to be a negative potential side
4  effect of steroid use?
5          MR. BENEDETTO:  Objection of
6  form.
7          THE WITNESS:  Yes.
8  BY MR. LAMB:
9  Q.    We talked about this a little bit, but
10  I just want to make clear for the record
11  whether we have an answer to this or not.
12          The dexamethasone and prednisone that
13  is at issue in this case and the complaint
14  talks about prescriptions in August,
15  September, and October of 2022 for Stacey
16  Wolking, those specific tablets of
17  dexamethasone and prednisone, do you know
18  whether they were from a certain company or
19  brand that your pharmacy acquired them?
20          MR. BENEDETTO:  Objection.
21          THE WITNESS:  I don't.
22  BY MR. LAMB:
23  Q.    Could you find out?
24  A.    I could.

Page 28

1  Q.    Where would you go to find that out?
2  A.    Our system has record of it, but I
3  would probably just go back to where we
4  ordered the medication because we don't keep
5  it in stock often.  So, I know when we would
6  have ordered it.  That would be how I would
7  find the brand of it.
8  Q.    Are you suggesting that you -- can you
9  explain to me where you order the medication
10  from?
11  A.    Anda, A-N-D-A.
12  Q.    Is that a company that has brands of
13  medication available that you can then buy
14  from?
15  A.    Yes.
16  Q.    In the documents that your lawyer
17  provided, there were some documents about
18  standard operating procedures in the pharmacy
19  and the role of the pharmacist in charge in
20  developing those standard operating
21  procedures.
22          Does that sound familiar to you?
23  A.    Yes.
24  Q.    At Tunkhannock Compounding Center, do

Page 29

1  you have standard operating procedures with
2  respect to specific drugs or classes of
3  drugs?
4  A.    Yes.
5  Q.    Do you have any standard operating
6  procedures with respect to corticosteroids?
7  A.    No.
8  Q.    Are there any standard operating
9  procedures that are meant to catch final
10  mistakes akin to proofreading a document
11  before it goes out the door?
12          In other words, is there any standing
13  operating procedure that makes sure someone's
14  eyes are on the specific words of the
15  prescription right before it goes to a
16  patient?
17          MR. BENEDETTO:  Objection of
18  form.
19          You can answer, Courtney.
20          THE WITNESS:  I would say yes and
21  no.  Again, our pharmacy is more -- mostly
22  what we do is compounding.  A lot of our -- I
23  don't want to say -- let me think.
24          A lot of our standard operating

Page 30

1  procedures are more for compounding.  It's
2  more for calculation errors, double-checking
3  compounding final forms and stuff like that
4  more so than just a prescription going out
5  the door.
6  BY MR. LAMB:
7  Q.    Do you, as the pharmacist in charge,
8  review every prescription before it reaches
9  the patient?
10 A.    No.
11 Q.    For non compounded drugs, like the
12 corticosteroids at issue in this case, is
13 there any standard operating procedure that
14 you can think of that is meant to safeguard
15 the pharmacy giving the patient more of the
16 drug than they should get?
17        MR. BENEDETTO:  Objection of
18 form.
19        THE WITNESS:  No.
20 BY MR. LAMB:
21 Q.    Are you familiar with the concept of a
22 perspective drug review or PDR?
23 A.    Yes.
24 Q.    Can you explain to me, your

Page 31

1  understanding of what that is?
2  A.    A pharmacist has to look at the
3  medication, and every time a pharmacist
4  verifies a medication, has to look at it,
5  look at the patient, look at several factors
6  for it.
7  Q.    Is this process that you're describing
8  for each time the pharmacy fills a
9  prescription for an individual patient?
10 A.    Yes.
11 Q.    Is your understanding that it applies
12 to all patients that you have, whether
13 they're receiving compounded or non
14 compounded drugs?
15 A.    Yes.
16 Q.    Does the PDR involve any duty for the
17 pharmacist to either counsel or warn the
18 patient?
19        MR. BENEDETTO:  Objection of the
20 form.
21        THE WITNESS:  Every patient,
22 every time they receive a medication is
23 offered counsel, whether it's from our
24 pharmacy.  Any pharmacy has to do that.

Page 32

1  BY MR. LAMB:
2  Q.    In what form do you offer counsel to
3  patients?
4  A.    When they get a medication, they're
5  offered that and they sign that when they
6  pick up a medication or when they get it
7  mailed to them, as well.
8  Q.    Does that mean the offered counsel is
9  on paper?
10 A.    I'm not sure.
11 Q.    What were you referring to when you
12 said the patients sign that when they pick up
13 the prescription or it's mailed to them?
14 A.    I know that our system asks if they
15 have any questions and they can say yes or no
16 ask and then sign.
17        Again, it's similar to most retail
18 pharmacies.  I'm not sure if it's available
19 on paper.  I would have to look into that.
20 Q.    Is it something your patients
21 typically fill out online?
22 A.    No.
23 Q.    In what medium are they being asked if
24 they have any questions?  Is a person asking

Page 33

1  them that?
2  A.    Yes, either over the phone or when
3  they pick up a prescription.
4  Q.    The answer to the question of whether
5  they have any questions, how is that
6  recorded?
7  A.    I don't know.
8  Q.    Have you ever done this with one of
9  your patients?
10 A.    Yes.
11 Q.    How did you record their answer?
12 A.    I just counselled them.  I didn't
13 really record the conversation.
14 Q.    Well, if you ask a patient if they
15 have any questions and they say no, is there
16 more counselling that takes place than that?
17 A.    No.
18 Q.    If that happens, if the patient says
19 they don't have any questions, is there
20 anywhere that you record that piece of
21 information in the patient's file?
22        MR. BENEDETTO:  Objection of
23 form.
24        THE WITNESS:  No, not over the

Page 34

1  phone, I guess.
2  BY MR. LAMB:
3  Q.    Is it different if the patient comes
4  to the pharmacy in person?
5  A.    Uh-huh, because they sign if they have
6  any questions or not.
7  Q.    In your view, does counselling involve
8  anything other than asking the patient if
9  they have any questions?
10      MR. BENEDETTO:  Objection to
11  form.
12      THE WITNESS:  Technically, no.
13  BY MR. LAMB:
14  Q.    When you say technically, what do you
15  mean by that?
16  A.    That has always been -- since I worked
17  in retail, that was always the offer to
18  counsel.
19  Q.    Where were you trained on what the
20  legal obligations of a perspective drug
21  review are?
22      MR. BENEDETTO:  Objection of the
23  form.
24      You can answer.

Page 35

1      THE WITNESS:  I can't exactly
2  remember if it was pharmacy school.  I'm sure
3  that it was, but also I remember learning
4  about it specifically from Rite Aid.
5  BY MR. LAMB:
6  Q.    Did you work at Rite Aid?
7  A.    I did.
8  Q.    Did you work at Rite Aid before
9  Tunkhannock Compounding Center?
10  A.    Several years before, not directly
11  before.
12  Q.    I should have asked you that.  Can you
13  briefly describe, between when you graduated
14  from pharmacy school and when you started
15  working at Tunkhannock in 2016, where you
16  worked?
17  A.    After pharmacy school, I worked at
18  Rite Aid up until about 2015, I worked at
19  Rite Aid several places.  In 2015, I worked
20  at a hospital and also a few other per diem
21  places, including a specialty pharmacy,
22  another retail pharmacy, and then I was the
23  pharmacy director at the hospital up until I
24  left in 2020.

Page 36

1  Q.    Can you tell me the name of that
2  hospital?
3  A.    Tyler Memorial Hospital in
4  Tunkhannock.
5  Q.    You mentioned that, besides Rite Aid,
6  there was one other retail pharmacy.
7      What retail pharmacy is that?
8  A.    It's called Care Site.  They're under
9  Geisinger.
10  Q.    The last question on the standard
11  operating procedures.
12      Did you have any standard operating
13  procedures that dealt with perspective drug
14  reviews?
15  A.    I would have to look up my standard
16  operating procedures if it specifically
17  states that.  I believe it does, but I don't
18  know 100 percent.  I know that a pharmacist
19  must perform that.  I believe that it
20  references that.
21  Q.    Going back to roughly August of 2022,
22  besides yourself, who were the pharmacists
23  that worked at Tunkhannock Compounding Center
24  at that time?

Page 37

1  A.    Brian Bryk.
2  Q.    Can you spell that for the court
3  reporter?
4  A.    B-R-Y-K.
5  Q.    Any other pharmacists?
6  A.    No.
7  Q.    You were still a practicing pharmacist
8  at that time in addition to being the owner
9  and pharmacist in charge, correct?
10  A.    Yes, I have been the whole time.
11  Q.    You still are a practicing pharmacist
12  today?
13  A.    Yes.
14  Q.    You should probably repeat just the
15  last thing you said.  I think we got stuck on
16  a delay.  We talked over each other.
17  A.    I'm currently a practicing pharmacist
18  at Tunkhannock Compounding Center.
19  Q.    Thank you.  You said you were also
20  practicing as a pharmacist in about August of
21  2022 at Tunkhannock?
22  A.    Yes.
23  Q.    If at that time either you or Brian
24  had a question about dosing for an individual

Page 38

1 drug, where would you look it up?
2         MR. BENEDETTO:  Objection to the
3 form.
4         You can answer, Courtney.
5         THE WITNESS:  It depends on the
6 drug.  In this case, we would have looked it
7 up -- we had several book references, but in
8 this case we looked up the package inserts
9 for the information.
10 BY MR. LAMB:
11 Q.    But you don't remember what brand
12 those package inserts came from?
13 A.    No, not off the top of my head, no.
14 Q.    Do I understand correctly, though,
15 that you're saying, if you had a question
16 about corticosteroid doses, are you saying
17 the first place you would look would be the
18 package insert?
19         MR. BENEDETTO:  Objection to the
20 form.
21         You can answer.
22         THE WITNESS:  We would start
23 there.  That doesn't mean that that is the
24 final say on anything.  It would depend on

Page 39

1 the information we were trying to find.  If
2 we found it there, yes, that would be enough.
3 BY MR. LAMB:
4 Q.    Have you ever heard of Micromedex?
5 A.    Yes, I've used it in the past in other
6 pharmacies that I've worked at.
7 Q.    What have you used it for?
8 A.    Many different things.
9 Q.    Can you give me an example of
10 something you would use Micromedex for?
11 A.    Dosing information, specific disease
12 information in reference to medications,
13 treatment options.
14 Q.    Do you consider Micromedex to be a
15 reliable source of that kind of information?
16 A.    I do.
17 Q.    I'm going to show you what we'll mark
18 as Exhibit-1 to this deposition.  Right now
19 I'm clicking on sharing my screen so that can
20 you see the document I'm talking about.
21         Do you see a document on your screen
22 that has an American flag on it and towards
23 the top it has prednisone in capital letters?
24 A.    Yes.

Page 40

1 Q.    I'm going to represent to you that
2 this is a page from Micromedex online dealing
3 with the corticosteroid prednisone.
4         Do you see where it says adult dosing?
5 A.    Yes.
6 Q.    Does this page look familiar to you as
7 the type of information that you would
8 normally find on Micromedex?
9 A.    I haven't used Micromedex in several
10 years.  I wouldn't remember.  It looks like
11 something that would come from Micromedex, I
12 guess.  I believe that it would.
13 Q.    Do you see how it says oral route
14 underneath normal dosage?
15 A.    Yes.
16 Q.    Do you, as a pharmacist, know what
17 oral route means?
18 A.    Yes.
19 Q.    What does it mean?
20 A.    You take by mouth.
21 Q.    Could that include tablets of
22 prednisone?
23 A.    Yes, or liquid.
24 Q.    For the first indication that's

Page 41

1 listed, there is adrenal insufficiency.
2         Do you know what that is?
3 A.    Yes.
4 Q.    What is it?
5 A.    When your adrenal glands aren't able
6 to produce specific hormones.  Basically,
7 they don't work very well or at all.
8 Q.    Underneath that, Micromedex discusses
9 both immediate release tablets and delayed
10 release tablets.
11         Do you recognize the distinction
12 between those two things?
13 A.    Yes.
14 Q.    Does your pharmacy offer both
15 immediate release tablets of prednisone and
16 delayed release tablets of prednisone?
17         MR. BENEDETTO:  Objection to the
18 form.
19         THE WITNESS:  We currently don't
20 have that, but we could, yes, offer it if
21 someone was in need of it.
22 BY MR. LAMB:
23 Q.    In the past, is there one of those two
24 that you've used more often?

Page 42

1    MR. BENEDETTO:  Objection of
2  form.
3    THE WITNESS:  In the past, since
4  I've purchased the pharmacy, I believe only
5  the immediate release.
6  BY MR. LAMB:
7  Q.    Do you see that for adrenal
8  insufficiency the initial dose that's
9  recommended for either immediate release
10  tablets or delayed release tablets is 5 to 60
11  milligram orally per day?
12  A.    I see that, yes.
13  Q.    Scrolling down, this is still on page
14  1 of Exhibit-1.
15    Do you see that same 5 to 60 milligram
16  range for the next three conditions that are
17  discussed?
18  A.    Yes.
19  Q.    Do you see it's also included for a
20  fourth condition on that first page, asthma?
21  A.    Uh-huh.
22  Q.    We're marking that as Exhibit-1.  We
23  may come back to it.
24    As the owner of Tunkhannock

Page 43

1  Compounding Center, do you review financial
2  information about your business?
3  A.    Yes.
4  Q.    How often do you look at data about
5  the revenues that Tunkhannock Compounding
6  Center is taking in?
7  A.    At least monthly.
8  Q.    When you look at those monthly, do you
9  look at what types of drugs are producing
10  more or less revenue in comparison to other
11  drugs that you're filling the prescriptions
12  for?
13  A.    No.
14  Q.    In other words, you don't review your
15  financial revenue broken out by the different
16  types of prescriptions that you're filling?
17    MR. BENEDETTO:  Objection to the
18  form.
19    THE WITNESS:  No, not monthly.
20  BY MR. LAMB:
21  Q.    Do you ever do that?
22  A.    No, not broken down like that.
23  Generally, I just look at them as a whole
24  because we compound.  That's mostly what we

Page 44

1  do.  I don't really have to break it down
2  very much.
3  Q.    Do you know whether there are certain
4  drugs that bring in more revenue to
5  Tunkhannock Compounding Center than others?
6  A.    The compounding medications as a whole
7  do, but they take a lot of time to make.
8  It's multifactorial when it comes to the
9  compounded medications, but that's mostly
10  what we do.  So, that's mostly what I make
11  sure the correct merchants come in for those
12  medications.  We don't make as much money on
13  non compounded medications.
14  Q.    Is there a fraction that you could
15  tell me of your business that involves non
16  compounded medications?
17    MR. BENEDETTO:  Objection of the
18  form.
19    THE WITNESS:  I don't know
20  exactly.  Probably less than 10 percent.
21  BY MR. LAMB:
22  Q.    Do you ever look at your revenue
23  broken out by who the prescriber was?
24  A.    No.

Page 45

1  Q.    Do you know which prescriber or group
2  of prescribers produces the most revenue for
3  Tunkhannock Compounding Center?
4  A.    No.
5  Q.    I'd like to talk about your
6  relationship with Dr. Henry Lindner,
7  L-I-N-D-N-E-R.
8    When did you first meet Dr. Lindner?
9  A.    Probably soon after I started working
10  here possibly.  I would think in 2016.
11  Q.    By here, you mean Tunkhannock
12  Compounding Center?
13  A.    Yes.
14  Q.    Do you think you ever met him before
15  you started working there?
16  A.    No.
17  Q.    Do you remember how you first met him?
18  A.    No.
19  Q.    When you started working at
20  Tunkhannock Compounding Center in 2016, was
21  Dr. Lindner already working in the same
22  building as you?
23  A.    Yes.
24  Q.    Tunkhannock Compounding Center uses an

Page 46

1  address of suite 5, and Dr. Lindner uses
2  suite 3 at the same address.
3        Are those two office suites on the
4  same floor?
5  A.    That's actually not correct.
6  Tunkhannock Compounding Center is suite 3.
7  Q.    I had it reversed.  Dr. Lindner is
8  suite 5.
9        Do you agree with that?
10  A.    Probably.  I actually don't know his
11  exact suite number, but I'm sure it's 5 if
12  you say that.
13  Q.    Are your office suites on the same
14  floor?
15  A.    No.
16  Q.    Who is on what floor?
17  A.    I'm actually not sure of the floors.
18  We're on the top level.  If you look at the
19  building, it's kind of the first level you
20  see, and then you go behind the building and
21  it actually goes down.  I don't know if his
22  is technically level 1 or basement level.
23  I'm not sure what they technically qualify it
24  as, but he's below us.

Page 47

1  Q.    If we go back to August of 2022, just
2  a little bit over a year ago, how would you
3  describe your relationship with Dr. Lindner?
4        MR. BENEDETTO:  Objection to the
5  form.
6        THE WITNESS:  If we had any
7  questions on his patients, we would ask him.
8  He will come in sometimes to get supplements,
9  stuff like that.  We would chat with him.  We
10  both live in the same town.  Very
11  professional.
12  BY MR. LAMB:
13  Q.    Did you have any sort of social
14  relationship with him at all?
15  A.    No.
16  Q.    Did you ever see him outside of work?
17  A.    Maybe once at the local carnival.  I
18  don't know if I ended up saying hi to him,
19  but, again, we live in the same small town.
20  Q.    Did you say he would sometimes come
21  into the pharmacy space?
22  A.    Yes, the front end of the pharmacy.
23  He would never come into the actual pharmacy
24  where we compound.

Page 48

1  Q.    How often did he come in?
2        MR. BENEDETTO:  Objection of the
3  form.
4        THE WITNESS:  Maybe once a month,
5  maybe more often if he needed something that
6  he purchased from us but not often.
7  BY MR. LAMB:
8  Q.    Again in the time period around August
9  of 2022 -- we're getting some overhearing
10  from somebody.  I don't know if that's
11  from --
12        MR. BENEDETTO:  Connor, I think
13  that's at Courtney's work.
14        MR. LAMB:  Is there some kind of
15  audio going on there, Courtney?
16        THE WITNESS:  Not that I can hear
17  of.  I apologize.
18        Can you hear someone talking?
19        MR. BENEDETTO:  It sounds like a
20  television or a radio or a person.
21        THE VIDEOGRAPHER:  We are going
22  off the record.  The time is 10:55 a.m.
23             - - -
24        (Whereupon, a discussion was held

Page 49

1  off the record.)
2             - - -
3        THE VIDEOGRAPHER:  We are going
4  back on the record.  The time is 10:56 a.m.
5  BY MR. LAMB:
6  Q.    If we can go back again to the time
7  period around August 2022.
8        You said that Dr. Lindner might come
9  into the pharmacy once a month or so?
10  A.    Correct.
11  Q.    Can you estimate how often you and
12  Dr. Lindner would communicate back then?
13        Just hold please before you answer.
14  We have to find out what's going on.  That's
15  a lot of feedback.
16        THE VIDEOGRAPHER:  We are going
17  off the record.  The time is 10:57 a.m.
18             - - -
19        (Whereupon, a discussion was held
20    off the record.)
21             - - -
22        THE VIDEOGRAPHER:  We are going
23  back on the record.  The time is 11:07 a.m.
24  BY MR. LAMB:

Page 50

1  Q.    Where we left off, I was asking you
2  about August of 2022, and you had mentioned
3  that Dr. Lindner would come in the pharmacy
4  maybe once a month or so.
5         My question was, at that time,
6  roughly, how often were you communicating
7  with Dr. Lindner?
8              MR. BENEDETTO:  Objection.
9              You can answer, Courtney.
10             THE WITNESS:  He would probably
11 send us prescriptions every other day
12 probably depending on when he was working.
13 We would communicate that way but not
14 personally, I think is what you're looking
15 for.
16 BY MR. LAMB:
17 Q.    Have you ever exchanged an e-mail with
18 Dr. Lindner on any subject?
19 A.    Patients, yes.
20 Q.    You've exchanged e-mails with
21 Dr. Lindner on the subject of your patients?
22 A.    Yes.
23 Q.    Have you searched your e-mail to see
24 if there were any e-mails at all concerning

Page 51

1  Stacey Wolking?
2  A.    There are not.
3  Q.    My question was not whether there are
4  not.  My question was have you searched your
5  e-mail to determine whether there are any
6  e-mails concerning Stacey Wolking?
7  A.    Yes, but there are not.
8  Q.    You conducted the search and you found
9  that there were not any e-mails?
10 A.    Yes.
11 Q.    Have you ever exchanged any e-mails
12 with Dr. Lindner that dealt with prednisone
13 or dexamethasone dosages?
14             MS. DENAPLES:  Object to the
15 form.
16             THE WITNESS:  No.
17 BY MR. LAMB:
18 Q.    Has he ever sent you any e-mails that
19 were not about one specific patient but about
20 the issue of corticosteroid dosages, how much
21 is safe for a patient, anything at all that
22 would provide you background with his view on
23 corticosteroids?
24             MS. DENAPLES:  Objection to the

Page 52

1  form.
2              THE WITNESS:  I would have to
3  look.  I'm not 100 percent sure.
4  BY MR. LAMB:
5  Q.    Has he ever sent you an e-mail about
6  Babesiosis, B-A-B-E-S-I-O-S-I-S?
7  A.    I don't believe so.
8  Q.    Have you ever looked at Dr. Lindner's
9  websites?
10 A.    Yes.
11 Q.    Do you remember which website?
12 A.    I didn't know he had multiple, but it
13 would just be his hormone restoration website
14 if a patient had a question or wanted
15 information.  I probably would have maybe
16 mentioned that.  I don't know if I've read
17 the whole thing through.
18 Q.    How well would you say that you knew
19 Dr. Lindner compared to other doctors who
20 were sending prescriptions to Tunkhannock
21 Compounding Center?
22             MR. BENEDETTO:  Objection of the
23 form.
24             You can answer.

Page 53

1              THE WITNESS:  About the same as
2  other providers.  I have a really good
3  relationship with the providers that
4  prescribe, especially hormone replacement
5  therapy here.  So, I know them very well.
6  BY MR. LAMB:
7  Q.    Have you ever had any conversations
8  with Dr. Lindner about safe dosages of
9  corticosteroids?
10             MR. BENEDETTO:  Objection of the
11 form.
12             You can answer.
13             THE WITNESS:  I think I had
14 conversations with him about corticosteroids.
15 I would not say specifically safe doses of
16 corticosteroids, but I have had conversations
17 with him about corticosteroids before, yes.
18 BY MR. LAMB:
19 Q.    I think we might have missed the
20 beginning of your answer.  I'm going to try
21 to ask a clarifying question here to clean up
22 the record.
23             Are those conversations about
24 corticosteroids that you had with him, have

Page 54

1 they always been conversations dealing with a
2 specific patient, or have you had general
3 conversations with him about corticosteroids?
4           MS. DENAPLES:  Object to the
5 form.
6 BY MR. LAMB:
7 Q.     Go ahead and answer again if you don't
8 mind.
9 A.     General conversation.
10 Q.    What did you two talk about when it
11 came to corticosteroids generally?
12 A.     I think that's a little broad.  We
13 would talk about -- can you be a little more
14 specific?
15 Q.    Did you and he ever talk about how
16 much corticosteroid was safe for an
17 individual patient to take?
18           MS. DENAPLES:  Objection of form.
19           THE WITNESS:  No.
20 BY MR. LAMB:
21 Q.    Have you and he ever talked about the
22 issue of someone overdosing on
23 corticosteroids?
24           MR. BENEDETTO:  Objection of the

Page 55

1 form.
2           You can answer, Courtney.
3           THE WITNESS:  No.
4 BY MR. LAMB:
5 Q.    Did he ever offer to give you any sort
6 of training or education or other information
7 about corticosteroids?
8           MS. DENAPLES:  Object to the
9 form.
10           THE WITNESS:  No.
11 BY MR. LAMB:
12 Q.    Have you ever asked him how much
13 prednisone or dexamethasone would be safe for
14 one of his patients to take?
15           MR. BENEDETTO:  Objection to the
16 form.
17           THE WITNESS:  No.
18 BY MR. LAMB:
19 Q.    I want to talk a little bit about
20 babesiosis.
21      Do you recognize that term?
22 A.     Yes.
23 Q.    What does it mean?
24 A.     Having an infection of the Babesia

Page 56

1 parasite.
2 Q.     Is it your understanding that the
3 Babesia parasite can be carried into humans
4 by tick bites?
5 A.     Yes.
6 Q.     When did you first learn about
7 babesiosis?
8 A.     I can't say exactly when, but
9 personally my husband and several other
10 family members are affected by tick-born
11 illnesses.  That's when I would have learned
12 about Lyme disease and other tick-born
13 illnesses.
14 Q.     Have you ever had a family member who
15 was diagnosed with babesiosis?
16 A.     No.
17 Q.     Did you learn about babesiosis in
18 pharmacy school?
19 A.     No.
20 Q.     Did you ever talk to Dr. Lindner about
21 babesiosis?
22 A.     Yes.
23 Q.     Can you describe conversations with
24 Dr. Lindner about babesiosis?

Page 57

1 A.     He would often describe how sick his
2 patients were, including his daughter.
3 Because we had a relationship and I know of
4 his daughter, we would ask about his
5 daughter, how she was doing.  We would talk
6 about it in regards to that and just how sick
7 his patients were.
8 Q.     Did you first learn about babesiosis
9 from Dr. Lindner?
10 A.     No.
11 Q.     Before Stacey Wolking, did your
12 pharmacy fill prescriptions for other
13 patients who had been diagnosed with
14 babesiosis?
15 A.     I don't know.
16 Q.     Were you aware in August of 2022 that
17 Dr. Lindner had diagnosed Stacey Wolking with
18 babesiosis?
19 A.     Not sure, but I knew that's what he --
20 was part of her treatment plan.  I knew that
21 was part of her treatment plan, but I don't
22 know exactly when it would have been before
23 we filled her prescriptions.  But I guess
24 around August, yes.

Page 58

1  Q.    You're saying, before you filled
2  Ms. Wolking's prescriptions, you would have
3  understood what the diagnosis was in her
4  case, correct?
5  A.    Yes, or at least part of it.  I don't
6  know if there were additional diagnoses, but
7  in relationship to the steroids and
8  babesiosis, yes.
9  Q.    As you sit here right now, do you know
10 whether or not she was Tunkhannock
11 Compounding Center's first ever babesiosis
12 patient?
13        MR. BENEDETTO:  Objection to the
14 form.
15        THE WITNESS:  No.
16 BY MR. LAMB:
17 Q.    You don't know?
18 A.    No.
19 Q.    Is that included in your records?
20 Could you find out?  Meaning, do you have the
21 diagnosis of your other patients available in
22 your records?
23 A.    No, that's generally not on
24 prescriptions, the diagnosis code.

Page 59

1  Q.    There is nowhere else that you -- go
2  ahead.
3  A.    At least not historically they're not.
4  Diagnosis codes are not on prescriptions.
5  Q.    There is nowhere else that you
6  preserve the diagnosis codes in your records?
7  A.    No.
8  Q.    Other than talking to Dr. Lindner and
9  having family members who have dealt with
10 tick-born diseases, did you gather any other
11 information about babesiosis before your
12 pharmacy began treating Stacey Wolking?
13        MR. BENEDETTO:  Objection of
14 form.
15        You can answer, Courtney.
16        THE WITNESS:  Personally, yes,
17 I've read books on it but not for the
18 pharmacy, no.
19 BY MR. LAMB:
20 Q.    What books have you read about it?
21 A.    Stephen Buhner's books on Lyme disease
22 and tick-born illnesses.
23 Q.    Would you mind spelling his last name
24 for the record.

Page 60

1  A.    Sure.  I just have to look it up.
2  It's spelled a little different.
3        The last name is B-U-H-N-E-R.
4  Q.    Did you read any of his books before
5  August of 2022?
6  A.    Yes.
7  Q.    Did you ever look up the Centers For
8  Disease Control and Prevention Guidance on
9  Babesiosis?
10 A.    No.
11 Q.    Did you ever look up whether high
12 corticosteroid dosing was a standard
13 recommended treatment for someone who's been
14 infected with babesiosis?
15 A.    I don't remember.
16 Q.    Would it surprise you to learn that
17 the Centers For Disease Control and
18 Prevention consider corticosteroid treatment
19 to be a risk factor for someone who's
20 infected with babesiosis?
21        MS. DENAPLES:  Object to the
22 form.
23        THE WITNESS:  I'm sorry, could
24 you repeat the question.

Page 61

1  BY MR. LAMB:
2  Q.    Would it surprise you to learn that
3  the Centers For Disease Control and
4  Prevention consider corticosteroid treatment
5  to be a risk factor for someone who's been
6  infected with babesiosis?
7        MS. DENAPLES:  Same objection.
8        THE WITNESS:  Would it surprise
9  me?  Yes and no.  I didn't know that
10 information, but it is not on the cutting
11 edge of information either.
12 BY MR. LAMB:
13 Q.    When you say it is not on the cutting
14 edge of information, what do you mean by it?
15 A.    I guess that information I wouldn't
16 think is -- I don't know how old that
17 information is because I didn't look it up.
18        Would it surprise me?  Yes and no.  I
19 didn't know the information, but I'm not
20 surprised, I guess.
21 Q.    Are you aware that --
22 A.    I guess I don't know how to answer the
23 question.
24 Q.    Are you aware that people that take

Page 62

1  corticosteroid can become immunosuppressed?
2  A.    Yes.
3  Q.    What does immunosuppressed mean to
4  you?
5  A.    The immune system is not working
6  optimally.
7  Q.    Could that be a problem for someone
8  whose immune system is trying to fight an
9  infection, like babesiosis?
10        MR. BENEDETTO:  Objection of
11  form.
12        THE WITNESS:  It depends.
13  BY MR. LAMB:
14  Q.    What does it depend on?
15  A.    The patient.  For autoimmune patients,
16  their immune system is also not working
17  optimally, but they give steroids all the
18  time for those patients as well.  It just
19  depends on the patient and what's going on.
20  Q.    I'd like to turn now to the
21  prescriptions that your pharmacy filled for
22  Stacey Wolking between August and October of
23  2022 that are alleged in the complaint in
24  this case.

Page 63

1        First of all, I would like to ask,
2  Stacey Wolking, have you ever met her in
3  person?
4  A.    No.
5  Q.    Have you ever spoken with her over the
6  phone?
7  A.    I can't remember.  I would think yes,
8  but I can't remember.
9  Q.    Have you ever corresponded with her
10  via e-mail?
11  A.    Not that I'm aware of.
12  Q.    Do you have the same three answers for
13  her husband Daryl walking?
14  A.    Yes.
15  Q.    I'm going to show you what I'll mark
16  as Exhibit-2 to the this deposition.
17        For everybody's benefit, these are
18  documents that your lawyer produced in
19  discovery.  It's four pages.  The Bates
20  numbers are YA0019 through YA0022.
21        The first page we're looking at is
22  page 1 of this PDF.  It's YA0019.
23        Do you recognize this document?
24  A.    Yes.

Page 64

1  Q.    What is it?
2  A.    It's a history report of what we
3  filled through those specific dates for
4  Stacey Wolking.
5  Q.    Where did this report come from?
6  A.    Our computer system.
7  Q.    Is there a name for that computer
8  system?
9  A.    RX Compounder.
10  Q.    Sorry, could you repeat that.  I think
11  you got cut off?
12  A.    RX Compounder.  It's a system from
13  PCCA.
14  Q.    How long have you have you had that
15  system at Tunkhannock Compounding Center?
16  A.    Since before I purchased the pharmacy.
17  Q.    Is this information that's in this
18  document we're looking at, page 1 of
19  Exhibit-2, how does all that information get
20  into RX Compounder?
21        MR. BENEDETTO:  Objection to the
22  form.
23        THE WITNESS:  When we fill a
24  prescription and ask it to run a report, that

Page 65

1  is what comes from filling a prescription is
2  this report, if requested.
3  BY MR. LAMB:
4  Q.    Somebody would have to enter the
5  prescription information into RX Compounder
6  on the front end, right?
7  A.    Yes, like fill the prescription, yes.
8  Q.    At the time of filling the
9  prescription, is the prescription information
10  put into RX Compounder?
11  A.    No.  Generally, at the time that we
12  receive a prescription, the information is
13  put into and the prescription to be put on
14  hold, and if a patient requests the
15  prescription to be filled then it's filled.
16  But the information would be put in once a
17  prescription is received.
18  Q.    Does the pharmacist do that manually?
19  A.    Yes.
20  Q.    For each of your patients, as a
21  pharmacist, when you receive a prescription,
22  you put the prescription information into RX
23  Compounder.
24        Do I have that right?

Page 66

1  A.    Yes.
2  Q.    In this case, for the document with
3  the Bates number YA0019, do you recognize the
4  pharmacist's signature on that page?
5  A.    Yes, that's mine.
6  Q.    Is that your signature?
7  A.    Yes, that's just me signing.
8  Q.    Sorry, go ahead.
9  A.    That's just me signing the history
10 report.
11 Q.    Did you run this report?
12 A.    Yes, I ran the report.
13 Q.    I notice up top it says prescriptions
14 filled between 7/1/2022 and 10/31/2023.
15        Is that the date range you used for
16 this search?
17 A.    Yes, I believe that was the date range
18 on the request for information.  That's why I
19 would have put the numbers in there, I
20 believe.
21 Q.    Is that the same date range you used
22 for every search in this case?
23        For example, I asked you earlier about
24 whether you searched your e-mails concerning

Page 67

1  Stacey Wolking.
2        Did you only search those dates?
3  A.    No, I would have -- a search for
4  e-mail would have been the since this e-mail
5  started in 2020.
6  Q.    You see this column that says RPH?
7  A.    Yes.
8  Q.    Three of the lines say BTB and one
9  says CFY.
10        Do you know what those initials
11 signify?
12 A.    The pharmacist.  CFY is myself,
13 Courtney Young and BTB is Brian Bryk.
14 Q.    Does that mean that you were only the
15 pharmacist for filling this one prescription
16 on August 16, 2022?
17        MR. BENEDETTO:  Objection to
18 form.
19        THE WITNESS:  Correct.
20 BY MR. LAMB:
21 Q.    Sorry, did you say correct?
22 A.    Correct.
23 Q.    Which pharmacist, according to this
24 record, which pharmacist handled the

Page 68

1  prescriptions on August 8th, September 27th,
2  and October 4, 2022?
3  A.    Brian filled those prescriptions.
4  Q.    Did you ever see those three
5  prescriptions?
6        MR. BENEDETTO:  Objection to the
7  form.
8        THE WITNESS:  I'm not sure.
9  Again, I could have put them on file
10 beforehand.  It's hard to say who put them on
11 file because it's just who filled the
12 prescriptions and the date they were filled.
13 BY MR. LAMB:
14 Q.    When you use the term filled the
15 prescription, can you specify for me exactly
16 what you mean?
17 A.    The day the patient asked for the
18 prescription.  We would have filled it,
19 ordered the medication, if needed, filled it,
20 and that's the date that we would have done
21 that.
22        A prescription can be on hold.  We
23 might have other prescriptions on file, but
24 they were never requested by the patient to

Page 69

1  be filled.  So, she never received them.
2  Q.    Based on what you just said, tell me
3  if I'm correct.
4        Are you saying that that means that,
5  on August 8th of 2022, Brian Bryk was the
6  pharmacist that made sure the pills were in
7  the bottle and went in the mail to Stacey
8  Wolking?
9        MR. BENEDETTO:  Objection of
10 form.
11        THE WITNESS:  Yes.
12 BY MR. LAMB:
13 Q.    Between those dates of August 8, 2022
14 and October 4, 2022, am I correct that you
15 and Brian Bryk were the only two pharmacists
16 at Tunkhannock Compounding Center?
17 A.    Yes.
18 Q.    Am I also correct that you did not
19 check his work before an individual
20 prescription went out the door?
21        MR. BENEDETTO:  Objection of the
22 form.
23        THE WITNESS:  No, it's not
24 required.

Page 70

1   BY MR. LAMB:
2   Q.    Let's tart with this first
3   prescription that's listed on the record.
4   It's for 500 prednisone tablets, which are 10
5   milligrams each.
6         Do I have that correct?
7   A.    Yes.
8   Q.    It's listed underneath the date of
9   August 8, 2022.  It says day supply 30.
10        Do you see that?
11  A.    I do.
12  Q.    Who decided that it was a 30-day
13  supply?
14  A.    The day supply is just something that
15  the system requires of a prescription.  It
16  was not specified as a 30-day supply.  No one
17  said it was a 30-day supply.  It just can
18  auto-populate in there as a 30-day supply
19  because it needs to be a filled field under a
20  prescription.
21        That was not something that was said
22  to us.  It wasn't something we knew was a
23  30-day prescription.  When we had the
24  understanding with Dr. Lindner, we did not

Page 71

1   think it was a 30-day prescription.
2         We were just under the impression that
3   he needed some on hand just in case they --
4   depending on the patient, what would be
5   needed.
6         That 30-day supply was not -- it was
7   decided that it was just something that
8   needed to be filled.  So, we put that number
9   in there.
10  Q.    With respect to this prescription from
11  August 8th of 2022, you've already said that,
12  because it say BTB in the RPH column, that
13  means that Brian Bryk is the one that filled
14  this prescription, correct?
15  A.    Uh-huh, yes.
16  Q.    How do you know how the date supply
17  ended up being 30 in this case if Brian Bryk
18  is the one that sold the prescription?
19  A.    I know the system, and I know what
20  auto-populates and what maybe can get missed
21  or not missed.  We had had a conversation
22  about it, as well.
23  Q.    When you say we, who do you mean?
24  A.    Brian and myself.

Page 72

1   Q.    When was that conversation?
2   A.    Well, we had a few conversations about
3   it before it was filled, but, again, the
4   30-day supply was not something he said that
5   I talked to Dr. Lindner and this is what he
6   said.
7         He didn't say I knew this was a 30-day
8   supply.  Again, that was just a field that
9   needs to be populated for the prescription.
10  Mostly, if you're billing insurances, they
11  need to know that number.  That's just
12  something that the system requires of us to
13  put in.
14        Again, we don't bill insurance, but
15  it's something that insurances use for their
16  systems.  It's just a required field.  It
17  cannot be blank.  Something needs to be
18  there.
19  Q.    You've used a term a couple times of
20  auto-populate.
21        Are you saying that the system
22  automatically put in 30 as the day supply for
23  this prescription on August 8, 2022?
24  A.    I believe so.

Page 73

1   Q.    You said that you and Brian had a
2   conversation.
3         The conversation you're referring to,
4   was it about this particular prescription
5   from August 8, 2022?
6   A.    We would have had a conversation
7   before it was filled.  Because of the
8   prescription itself, we looked it up.  We
9   researched the prescription.  We talked to
10  Dr. Lindner about it, either myself.
11        Then myself and Brian talked about the
12  prescription.  I don't know 100 percent if he
13  had a conversation with Dr. Lindner about it.
14  I know I did.  Then Brian and I would have
15  talked about the prescription and the
16  prescriptions following, as well.
17  Q.    I want to break that into a few parts,
18  if we can.
19  A.    Sure.
20  Q.    You said a couple times that you would
21  have had a conversation with Brian Bryk about
22  this prescription.
23        As you sit here today, do you actually
24  remember having a conversation with Brian

| Page 74 |
| --- |

1   Bryk about this prescription from August 8,
2   2022?
3                MR. BENEDETTO:  Objection to the
4   form.
5                THE WITNESS:  I can't
6   specifically remember.
7   BY MR. LAMB:
8   Q.    Do you remember having a conversation
9   with Dr. Lindner about this prescription for
10  Stacey Wolking from August 8, 2022?
11               MR. BENEDETTO:  Objection to the
12  form.
13               THE WITNESS:  I can't remember
14  this prescription specifically, but, in
15  reference to the patient, yes, we had
16  conversations about her before we filled it.
17  BY MR. LAMB:
18  Q.    Just so I'm clear what you're saying.
19        You had multiple conversations with
20  Dr. Lindner about Stacey Wolking before this
21  prescription was filled for her on August 8,
22  2022; is that correct?
23               MR. BENEDETTO:  Objection to the
24  form.

| Page 75 |
| --- |

1                THE WITNESS:  I'm not sure if it
2   was multiple.  I can't remember.
3   BY MR. LAMB:
4   Q.    What was your conversation with
5   Dr. Lindner about Stacey Wolking, the one
6   that you're referring to?
7   A.    That he was -- again, my recollection
8   of it is that he was treating her for
9   babesiosis.  She needed steroids to be able
10  to take the anti-malarials, which were not
11  from our pharmacy.  So, I didn't know exactly
12  what the treatment course was.  And that he
13  wasn't sure what she was going to need.
14        So, he needed stuff on hand because he
15  wasn't sure what the treatment course was
16  exactly going to be until she started taking
17  them.  But she needed probably more than just
18  a few that she was going to get possibly
19  somewhere else.  Again, I'm not 100 percent
20  sure of the exact conversation, but that was
21  my recollection of it.
22  Q.    When did the conversation take place?
23               MR. BENEDETTO:  Objection to the
24  form.

| Page 76 |
| --- |

1                THE WITNESS:  I don't remember.
2   BY MR. LAMB:
3   Q.    Are you confident that it was before
4   this prescription was filled on August 8,
5   2022?
6   A.    Yes.
7   Q.    Was the conversation in person?
8   A.    No.
9   Q.    How did it occur?
10  A.    It would have been over the phone, I
11  believe, but I don't believe it was in
12  person.
13  Q.    Would you guys have corresponded by
14  e-mail or text message to set up that phone
15  call?
16  A.    No, I don't believe so.
17  Q.    Did you call him or did he call you?
18  A.    I can't remember.
19  Q.    Is there anything about this
20  prescription from August 8, 2022 for Stacey
21  Wolking that would have made you reach out to
22  him?
23               MS. DENAPLES:  Object to form.
24               THE WITNESS:  If anything, it was

| Page 77 |
| --- |

1   the quantity prescribed.  I just wanted to
2   have a conversation with him about why he
3   needed the quantity that he wrote for.
4   BY MR. LAMB:
5   Q.    What about the quantity would have
6   made you reach out to Dr. Lindner?
7                MS. DENAPLES:  Object to form.
8                THE WITNESS:  I felt like it was
9   a higher quantity.  Not that it was.  That's
10  just what I felt.
11  BY MR. LAMB:
12  Q.    Why did you feel that way?
13               MR. BENEDETTO:  Objection to the
14  form.
15               THE WITNESS:  It just was a
16  higher quantity than maybe that I would have
17  saw at Rite Aid.  Dealing with insurance
18  companies, I know an insurance company
19  wouldn't cover that quantity.  I just wanted
20  to have a conversation with him about it.
21  BY MR. LAMB:
22  Q.    Am I right that by this point of
23  August 8, 2022 you had been working at
24  Tunkhannock Compounding Center for around six

Page 78

1  years?
2             MR. BENEDETTO:  Objection of
3  form.
4             THE WITNESS:  Two years
5  full-time, and then before then it was just
6  per diem.  Maybe once a month, maybe twice a
7  month.
8  BY MR. LAMB:
9  Q.     In that time, had you ever filled a
10  prednisone prescription of this quantity?
11            MR. BENEDETTO:  Objection of
12  form.
13            THE WITNESS:  I would have to
14  look back.  I don't believe so.
15  BY MR. LAMB:
16  Q.     It's possible that on August 8, 2022
17  this was the largest prednisone prescription,
18  at least for you, that you ever would have
19  been part of filling?
20            MR. BENEDETTO:  Objection to the
21  form.
22            THE WITNESS:  I don't know.
23  BY MR. LAMB:
24  Q.     Do you agree with me it's possible,

Page 79

1  though, based on what you just said?
2             MR. BENEDETTO:  Same objection.
3             THE WITNESS:  It's possible.
4  BY MR. LAMB:
5  Q.     You're saying that you don't remember
6  whether it was you that called him or him
7  that called you to talk about Stacey Wolking
8  and this prescription?
9  A.     No.
10  Q.     It's also possible that you did not
11  reach out to him initially, but that he
12  reached out to you to talk about Stacey
13  Wolking?
14            MS. DENAPLES:  Object to form.
15            THE WITNESS:  It could have been.
16  I do not remember.  He also could have called
17  on another patient and I might have brought
18  it up.  Again, I do not remember.
19  BY MR. LAMB:
20  Q.     Are there any notes from this
21  conversation about Stacey Wolking and the
22  August 8th prescription, any notes or record,
23  written record, of that conversation of any
24  kind?

Page 80

1  A.     No.
2  Q.     In that conversation, did you and
3  Dr. Lindner talk about any potential side
4  effects that Stacey Wolking could experience
5  or risks to her from that prescription?
6  A.     To me specifically, no.
7  Q.     I'm asking if you and Dr. Lindner
8  talked about that in the conversation?
9  A.     No.
10  Q.     In your initial description of that
11  conversation from a few minutes ago, you
12  talked about your knowledge that Stacey
13  Wolking was getting anti-malerial medications
14  from Dr. Lindner; is that correct?
15  A.     Yes.
16  Q.     Did he explain that to you in this
17  conversation before filling the August 8th
18  prescription?
19  A.     I can't remember.
20  Q.     Do you know whether you talked to
21  Dr. Lindner about Stacey Wolking before this
22  phone conversation you and I have been
23  talking about?
24            MR. BENEDETTO:  Objection of the

Page 81

1  form.
2             THE WITNESS:  I can't remember.
3  BY MR. LAMB:
4  Q.     In your description from a few minutes
5  ago.  You also suggested you're awareness
6  that Stacey Wolking was getting
7  corticosteroids from other pharmacies besides
8  your own; is that correct?
9  A.     I was not aware of that.
10  Q.     I'm mistaken about that?  You were not
11  aware that Stacey Wolking was also getting
12  prescribed corticosteroids from other
13  pharmacies at the same time as yours?
14  A.     No.
15  Q.     Dr. Lindner did not tell you that he
16  was having Stacey fill prescriptions at other
17  pharmacies besides Tunkhannock Compounding
18  Center?
19            MS. DENAPLES:  Objection to form.
20            THE WITNESS:  No.
21  BY MR. LAMB:
22  Q.     A few minutes ago, you used the term
23  on hand to describe -- actually, I don't know
24  what you were describing.

Page 82

1    Can you explain to me what you meant
2  when you said Dr. Lindner wanted to have some
3  prednisone on hand?
4  A.    My understanding is that the dose
5  would be dependent on the patient and the
6  patient's condition, how she was doing.  He
7  didn't want her to run out.  They wanted to
8  be able to have enough to fill what she
9  needed for the time being.  The taper would
10 be dependent on the patient and her condition
11 was my understanding.
12 Q.    When you use the term taper, what do
13 you mean by that?
14 A.    Taper means to -- ideally, you want to
15 taper, which means lower the dose slowly of
16 corticosteroids.
17 Q.    From your knowledge of
18 corticosteroids, how soon should a patient
19 begin tapering the dose?
20          MR. BENEDETTO:  Objection of
21 form.
22          THE WITNESS:  It depends on the
23 patient.  Often, in the hospital, they're
24 only there for a short amount of time.  They

Page 83

1  would be tapering after a few days ideally.
2  A lot of times, once they leave the hospital,
3  I wouldn't know what they would be on.  So, I
4  don't know.
5  BY MR. LAMB:
6  Q.    Why is tapering necessary for
7  corticosteroids?
8          MR. BENEDETTO:  Objection to the
9  form.
10          THE WITNESS:  My understanding is
11 that you need - the system needs the steroids
12 in order to function.  So, you have to give
13 the adrenals time to catch up from not having
14 to make them to make them itself.
15 BY MR. LAMB:
16 Q.    Did Dr. Lindner say who was going to
17 decide how much prednisone Stacey Wolking
18 took?
19          MS. DENAPLES:  Object to form.
20          THE WITNESS:  No.
21 BY MR. LAMB:
22 Q.    Are you familiar with the term
23 patient-centered dosing or patient-directive
24 dosing?

Page 84

1  A.    Yes, especially in relationship to
2  hormone replacement therapy.
3  Q.    What do those terms mean to you?
4  A.    For hormone replacement therapy, a lot
5  of it is based on patients' symptoms.
6  Sometimes they'll need something a little
7  higher, a little lower.  Depending on the
8  patient-doctor relationship -- again, a lot
9  of times the pharmacist isn't involved in
10 that exact conversation between the two, but
11 I have an understanding that between the
12 doctor and the patient they -- between
13 patient symptoms, how they're feeling and the
14 doctor's direction, they can change the dose
15 a little bit higher, a little bit lower
16 depending on what's going on.
17          It's easier for them to have --
18 instead of needing something a different
19 dose, something different that day and not be
20 able to get it, it's better for the patient
21 to have on hand what they can utilize so that
22 the treatment doesn't get delayed or the
23 patient doesn't need something they can't
24 get.

Page 85

1  Q.    Is that your understanding of what was
2  happening between Dr. Lindner and Stacey
3  Wolking with respect to this prednisone
4  prescription on August 8, 2022?
5  A.    A little bit, yes.  A lot of times
6  when a prescription says take as directed or
7  use up to this amount as directed, there is
8  an understanding that the doctor will help
9  the patient decide the dose that is needed.
10 That's not uncommon for pharmacies to fill
11 something like that.  I filled them many
12 times in retail settings.
13 Q.    What I'm asking, though, is, did you
14 have that understanding between yourself and
15 Dr. Lindner with respect to Stacey Wolking?
16          MS. DENAPLES:  Object to form.
17          THE WITNESS:  That was my
18 understanding.
19 BY MR. LAMB:
20 Q.    Did you share the contents of your
21 conversations with Dr. Lindner about Stacey
22 Wolking that you testified occurred before
23 the August 8, 2022 prescription, did you
24 share the contents of that conversation with

Page 86

1  Brian Bryk?
2         MR. BENEDETTO:  Objection of the
3  form.
4         THE WITNESS:  I would have, yes.
5  BY MR. LAMB:
6  Q.    You would have or you did?
7  A.    I did.  Brian and I talked about it.
8  Q.    Just to be perfectly clear, Brian was
9  not part of the conversation with Dr.
10 Lindner, correct?
11 A.    No, I don't know if he spoke with him
12 separately.
13 Q.    Why did you convey the contents of
14 that conversation to Brian Bryk?
15        MR. BENEDETTO:  Objection of the
16 form.
17        THE WITNESS:  Because these
18 prescriptions aren't something we would
19 normally fill.  So, we had a conversation
20 about it.
21 BY MR. LAMB:
22 Q.    Can you describe your conversation
23 with Brian Bryk?
24 A.    Basically, from remembering, it would

Page 87

1  just have been kind of about the quantity,
2  explaining why Dr. Lindner explained he
3  needed the quantity for the patient.  That's
4  what I can remember.
5  Q.    Did you tell Brian that it was okay to
6  fill the August 8, 2022 prescription?
7         MR. BENEDETTO:  Objection to the
8  form.
9         THE WITNESS:  He didn't need my
10 approval to fill anything.
11 BY MR. LAMB:
12 Q.    I appreciate that, but my question was
13 did you tell him it was okay?
14        MR. BENEDETTO:  Objection to the
15 form.
16        THE WITNESS:  I can't -- I don't
17 think he asked me is it okay if I fill this
18 and I said okay.  That wasn't part of the
19 conversation.
20 BY MR. LAMB:
21 Q.    So, you did not address one way or the
22 other whether he could or should fill the
23 August 8th prescription?
24        MR. BENEDETTO:  Objection to the

Page 88

1  form.
2         THE WITNESS:  I think if he felt
3  that it wasn't necessary he didn't have to
4  fill it.  I don't think that was part of the
5  conversation.
6  BY MR. LAMB:
7  Q.    I just want to make clear, though, I'm
8  not asking you to speculate about what he
9  might have thought.  I'm asking what words
10 were exchanged in the conversation.
11        Did you address with him at all
12 whether he could or should fill the August
13 8th prescription?
14 A.    No.
15 Q.    When you said a few minutes ago that
16 these were not prescriptions your pharmacy
17 would ordinarily fill, is that because of the
18 quantity?
19        MR. BENEDETTO:  Objection of
20 form.
21        THE WITNESS:  Mostly because
22 they're just not compounded prescriptions.
23 BY MR. LAMB:
24 Q.    After the conversation with

Page 89

1  Dr. Lindner we've been referring to, the one
2  you testified you had about Stacey Wolking
3  before the August 8, 2022 prescription was
4  filled, were you satisfied with the
5  explanation Dr. Lindner gave for writing this
6  prescription?
7         MR. BENEDETTO:  Objection of the
8  form.
9         THE WITNESS:  Yes.
10 BY MR. LAMB:
11 Q.    Did you believe it was reasonable for
12 a pharmacist at the Tunkhannock Compounding
13 Center to fill that prescription?
14        MR. BENEDETTO:  Objection of the
15 form.
16        THE WITNESS:  Yes, with doctor
17 approval.
18 BY MR. LAMB:
19 Q.    And you believe that despite not
20 having discussed any side effects or risks to
21 Stacey Wolking with Dr. Lindner during that
22 conversation?
23        MR. BENEDETTO:  Objection to
24 form.

Page 90

1    THE WITNESS:  Yes, my
2 understanding was he had a very in-depth
3 conversation with her about it.
4 BY MR. LAMB:
5 Q.    Did he tell you he had a conversation
6 with Stacey Wolking about side effects or
7 risks of corticosteroids?
8        MR. BENEDETTO:  Object to form.
9        MS. DENAPLES:  Object to form.
10       THE WITNESS:  I can't remember.
11 It might have just been my assumption.
12 BY MR. LAMB:
13 Q.    In your conversation with Brian Bryk
14 where you relayed the contents of your
15 conversation with Dr. Lindner, did you and
16 Brian Bryk talk about side effects or risks
17 posed by the quantity of corticosteroids that
18 you were filling the prescription for Stacey
19 Wolking?
20        MR. BENEDETTO:  Objection of
21 form.
22        THE WITNESS:  My understanding
23 was that it was hoped she wasn't hopefully
24 going to be taking that many in a short

Page 91

1 amount of time.  So, we didn't -- the
2 quantity, she might have only needed 5 out of
3 all of them.  We didn't know how many.
4        I don't think the quantity was an
5 issue, looking into it, because it was our
6 understanding she was just going to use the
7 smallest amount and hopefully she didn't need
8 more, or that with the therapy sometimes
9 she'd have to take anti-malarials and they
10 pause therapy and then they start it again.
11 It was a nuanced thing.  It wasn't a
12 black-or-white case was my understanding.
13 BY MR. LAMB:
14 Q.    But my question is a little simpler
15 than that.  It's just whether you and Brian
16 Bryk discussed side effects or risks posed to
17 Stacey Wolking by taking this quantity of
18 corticosteroids.
19        Did you talk about it at all?
20        MR. BENEDETTO:  Objection to the
21 form.
22        THE WITNESS:  I can't remember.
23 BY MR. LAMB:
24 Q.    The understanding that you laid out

Page 92

1 for me in your previous answer about whether
2 Ms. Wolking was going to take a little or a
3 lot, a couple times you said hopefully she
4 wouldn't take all of it.
5        That understanding, is that based
6 solely on things that Dr. Lindner said to you
7 in the conversation before your pharmacy
8 filled the August 8th prescription?
9 A.    Can you repeat the question.
10 Q.    We've been talking about a
11 conversation that you had with Dr. Lindner
12 before your pharmacy filled Stacey Wolking's
13 August 8th prescription.
14        Did that conversation form the entire
15 basis for the understanding you just laid out
16 for me about how you hoped Ms. Wolking was
17 going to use this prednisone prescription?
18        MR. BENEDETTO:  Objection to the
19 form.
20 BY MR. LAMB:
21 Q.    In other words, is there any other
22 information that gave you that understanding
23 that you described?
24        MR. BENEDETTO:  Same objection.

Page 93

1        THE WITNESS:  No.
2 BY MR. LAMB:
3 Q.    In response to this prescription from
4 August 8, 2022, did you conduct any of your
5 own research about babesiosis?
6 A.    I can't remember specifically.  Again,
7 I would have been interested in researching
8 it other than this case.  I can't say if it
9 was before, during, or after this case and
10 the timeframe that I would have been
11 researching it a little more on my own.
12 Q.    Have you ever researched whether
13 prednisone is an accepted and recommended
14 treatment for someone suffering from
15 babesiosis?
16        MR. BENEDETTO:  Objection to the
17 form.
18        THE WITNESS:  No, because I know
19 that's not what the steroid is for.
20 BY MR. LAMB:
21 Q.    Is Dr. Lindner the one who told you
22 that's not what the steroid is for?
23 A.    No.
24 Q.    Have you ever spoken to another doctor

Page 94

1    besides Dr. Lindner about babesiosis?
2    A.    Yes.
3    Q.    Who were the doctors that you spoke to
4    about it?
5    A.    There is a doctor locally, Dr. Mast,
6    who has some patients he treats for
7    coinfections, Lyme and coinfections.
8    Q.    Including babesiosis?
9    A.    Yes.
10   Q.    Other than Dr. Lindner and Dr. Mast,
11   have you ever spoken to a doctor about
12   babesiosis?
13   A.    Personally, yes, but that's for my
14   family.  Not in any of these cases.
15   Q.    Other than Dr. Lindner, have you ever
16   spoken to a doctor about using
17   corticosteroids for a babesiosis patient?
18   A.    No.
19   Q.    The conversation with Dr. Lindner from
20   before the August 8, 2022 prescription for
21   Stacey Wolking, did you convey the contents
22   of that conversation to either Stacey or
23   Daryl Wolking?
24   A.    No, my understanding was Dr. Lindner

Page 95

1    talked to her about everything.
2    Q.    After your conversation with
3    Dr. Lindner about Stacey Wolking, did you
4    have any concerns that the 500 10-milligram
5    tablets of prednisone your pharmacy was
6    filling could be dangerous or have any
7    negative side effects for Stacey Wolking?
8          MR. BENEDETTO:  Objection of
9    form.
10         MS. DENAPLES:  Objection of form.
11         THE WITNESS:  Can you repeat the
12   question.
13   BY MR. LAMB:
14   Q.    After your conversation with
15   Dr. Lindner about Stacey Wolking, which you
16   testified occurred before the August 8, 2022
17   prescription, did you have any concerns that
18   the August 8, 2022 prescriptions, which
19   contained 500 prednisone tablets of 10
20   milligrams each, did you have any concern
21   that that quantity of prednisone posed any
22   risk or danger to Stacey Wolking?
23         MR. BENEDETTO:  Objection to the
24   form.

Page 96

1          THE WITNESS:  No.
2    BY MR. LAMB:
3    Q.    None at all?
4          MR. BENEDETTO:  Objection of
5    form.
6    BY MR. LAMB:
7    Q.    Let's go to the second prescription
8    listed, the date of which is August 16, 2022.
9          Do you see that on this document we're
10   looking at, which is still the first page of
11   exhibit-2?
12   A.    Yes.
13   Q.    For this one, CFY is listed in the RPH
14   column.
15         Am I correct that that means you
16   yourself filled this prescription?
17   A.    Yes.
18   Q.    This time, the date supplied is listed
19   as 50.
20         Can you explain why this one was
21   listed as 50 when the previous was listed as
22   30?
23   A.    My only thought is that the system
24   defaulted to that.  Again, I generally have

Page 97

1    to enter and billed prescriptions in the
2    system.  Again, because there are 50 for all
3    three, I might have set it to 50 by accident
4    without thinking about it.  Again, that's my
5    only thought as to why they would be 50 and
6    not 30.
7    Q.    Are you familiar with the term
8    therapeutic duplication?
9    A.    Yes.
10   Q.    What does it mean?
11   A.    That two medications, sometimes same
12   class or indication, are being prescribed to
13   someone at the same time or similar times.
14   Q.    Sorry, the video got a little choppy
15   there for a second.  I want to clarify one
16   part.
17         You said two medications in the same
18   class or?
19   A.    Same indication.
20   Q.    Was there therapeutic duplication
21   between the August 8th prescription shown
22   here on the first page of Exhibit-2 and the
23   August 16th prescription shown on the same
24   page?

Page 98

1    A.       Our system does not have errors like a
2    Rite Aid system would or that I was familiar
3    with at Rite Aid, but that would be a
4    therapeutic duplication that you would have
5    to override in a different system, yes.
6    Q.       Why would a prescription for
7    prednisone be therapeutically duplicative
8    with a prescription for dexamethasone 8 days
9    later?
10   A.       They're both corticosteroids.  My
11   understanding was that the prednisone was
12   discontinued and he was starting
13   dexamethasone.
14   Q.       How did you achieve that
15   understanding?
16   A.       I knew that he had switched steroids
17   for other patients.  So, again, I don't
18   remember a conversation necessarily, but that
19   was my understanding of the prescription.
20   Q.       Did you speak to Dr. Lindner about
21   Stacey Wolking between August 8th of 2022 and
22   August 16th of 2022?
23   A.       I can't remember.
24   Q.       Did you have any written

Page 99

1    communications of any kind with him during
2    that time period?
3    A.       No.
4    Q.       You said about a minute ago you
5    understood that Dr. Lindner switched
6    corticosteroids for other patients.
7            Do I have that right?
8    A.       That was my understanding, yes.
9    Q.       When you filled this prescription on
10   August 16th of 2022, do you know whether you
11   talked to Dr. Lindner about this individual
12   prescription for Stacey Wolking?
13           MR. BENEDETTO:  Objection of
14   form.
15           THE WITNESS:  I can't remember.
16   BY MR. LAMB:
17   Q.       You testified earlier about having
18   concerns about the quantity of prednisone in
19   the August 8, 2022 prescription.
20           Did you have any concerns about the
21   quantity of dexamethasone in the August 16,
22   2022 prescription for Stacey Wolking?
23           MR. BENEDETTO:  Objection of
24   form.

Page 100

1            THE WITNESS:  The conversation we
2    had initially carried through for those
3    prescriptions.  So, if that was the original
4    prescription, I would have had the same
5    conversation, but I understood the treatment
6    plan for her, my understanding of the
7    treatment plan and why he wanted the quantity
8    for her.  I took that through for each of the
9    prescriptions.
10   BY MR. LAMB:
11   Q.       If the original conversation carried
12   through, do you know whether you reached out
13   to him about the August 16, 2022 prescription
14   specifically?
15           MR. BENEDETTO:  Objection of
16   form.
17           THE WITNESS:  I can't remember.
18   BY MR. LAMB:
19   Q.       This prescription of 200 dexamethasone
20   tablets that was 4 milligrams each, have you
21   filled other dexamethasone prescriptions that
22   were that large?
23           MR. BENEDETTO:  Objection of the
24   form.

Page 101

1            THE WITNESS:  Not that I can
2    remember, but I don't think insurance
3    companies would cover that quantity and pay
4    for that quantity.  I would probably say no.
5    BY MR. LAMB:
6    Q.       This August 16, 2022 prescription for
7    Stacey Wolking is the largest dexamethasone
8    prescription you have ever filled?
9            MR. BENEDETTO:  Objection of
10   form.
11           THE WITNESS:  Possibly, yes.
12   BY MR. LAMB:
13   Q.       Has anyone ever taught you that a
14   prescription of that quantity of
15   dexamethasone is safe for a patient?
16           MR. BENEDETTO:  Objection of
17   form.
18           THE WITNESS:  No.
19   BY MR. LAMB:
20   Q.       Before you filled the August 16, 2022
21   prescription, do you know whether you
22   counselled Stacey Wolking?
23           MR. BENEDETTO:  Objection of the
24   form.

## Page 102

1  THE WITNESS:  We would have
2  offered counselling.  I don't know if they
3  had any questions.
4  BY MR. LAMB:
5  Q.    Would that offer of counselling have
6  been over the phone?
7  A.    Yes.
8  Q.    Before or after you filled the August
9  16, 2022 prescription, did you warn Stacey
10 Wolking?
11 MR. BENEDETTO:  Objection of the
12 form.
13 THE WITNESS:  No, we would have
14 offered if she had any questions on the
15 prescription, and then the conversation would
16 have been between her and her provider
17 Dr. Lindner.
18 BY MR. LAMB:
19 Q.    Am I correct that all four of these
20 prescriptions we're looking at for Stacey
21 Wolking were sent to her through the mail?
22 Am I correct about that?
23 A.    Yes.
24 Q.    Did Tunkhannock Compounding Center

## Page 103

1  include the drug manufacturer dosage
2  information that you referred to earlier?
3  Did it include it in what was mailed to
4  Stacey Wolking?
5  A.    No.
6  Q.    As far as you know for this August 16,
7  2022 prescription, did Stacey Wolking receive
8  any sort of written warning or dosage
9  information in what she got in the mail?
10 MR. BENEDETTO:  Objection of the
11 form.
12 THE WITNESS:  No, that would have
13 been between her and the provider.
14 BY MR. LAMB:
15 Q.    But you did say earlier that you
16 believe there is dosing information that
17 comes from the manufacturer to Tunkhannock
18 Compounding Center; do I have that correct?
19 MR. BENEDETTO:  Objection to the
20 form.
21 THE WITNESS:  I'm not sure I
22 understand the question.
23 BY MR. LAMB:
24 Q.    You said earlier that for prednisone

## Page 104

1  and dexamethasone that's not compounded you
2  buy it from a place and it comes to
3  Tunkhannock Compounding Center.
4  You referred to some sort of
5  information that comes along with those two
6  drugs that discusses dosage amounts.
7  Am I characterizing your testimony
8  fairly there?
9  A.    A package insert could have been sent
10 to her.  I'm not sure if that was left on the
11 bottle or not.  Sometimes they are.
12 Sometimes they fall off because they're not
13 attached very well.
14 It would have been a lot of
15 information.  I would not have referred it to
16 her to read, like given it to her and said
17 read the packages and make your own decision.
18 I would not have said that.
19 Q.    I think you answered all I was trying
20 to ask, which is for August 16th of 2022 do
21 you know whether the package insert was sent
22 to Stacey Wolking or not?
23 A.    I don't know.
24 Q.    Now, I'm going to show you a different

## Page 105

1  exhibit that I will mark as Exhibit-3 to this
2  deposition.
3  For the benefit of counsel and
4  everyone, this is an e-mail that the
5  plaintiffs provided in discovery to both
6  Dr. Lindner and Youngs apothecary.  The Bates
7  number on it is P2-000449.
8  I want you to look at the -- I'll try
9  to zoom to make it even easier for you.
10 There you go -- this portion of the top of
11 the screen that starts with I want you to
12 purchase.
13 I'll represent to you that this is an
14 e-mail from Dr. Lindner to Stacey Wolking
15 dated August 15, 2022.  I want you to just
16 read that paragraph to yourself that starts
17 with I want you to purchase and ends with
18 Henry Lindner, MD, and let me know when
19 you're done reading it.
20 A.    I want you to purchase some more --
21 Q.    You don't have to read it out loud,
22 I'm sorry.  Just let me know when you're done
23 reading it.
24 A.    Okay.

Page 106

1  Q.    Now, are you aware of any different
2  rules that would apply to a local pharmacy
3  versus Tunkhannock Compounding Center when it
4  comes to the quantity of corticosteroids?
5  A.    No, there are not different rules.
6  Q.    Did you and Dr. Lindner ever discuss
7  the issue of someone reporting him to his
8  medical board?
9  A.    No.
10  Q.    Can you think of anything at all in
11  anything you've said to Dr. Lindner or
12  written to him that would give him the
13  impression that Tunkhannock Compounding
14  Center would not report him to his medical
15  board for something that another pharmacy
16  would?
17  A.    No.
18  Q.    Did Dr. Lindner ever tell you that he
19  was telling patients to fill their
20  prescriptions at your pharmacy in order to
21  avoid questions being sent to his medical
22  board?
23        MS. DENAPLES:  Object to form.
24        THE WITNESS:  No.

Page 107

1  BY MR. LAMB:
2  Q.    Did Dr. Lindner ever offer you
3  anything in exchange for filling all of his
4  prescriptions?
5        MS. DENAPLES:  Object to form.
6        THE WITNESS:  No.
7  BY MR. LAMB:
8  Q.    Did he ever give you anything?
9        MS. DENAPLES:  Object to form.
10        THE WITNESS:  No.
11        MR. LAMB:  We had talked about
12  taking a break around 12:30, if people needed
13  one and/or if Brian needed time to get on the
14  phone, et cetera.  This would be a decent
15  topical break.
16        I would guess, if we take a break
17  now and come back, I might have another 45
18  minutes or hour maybe tops depending on
19  responses.  What do people want to do?  I
20  guess we should go off the record first.
21  Sorry, court reporter.  We can go off the
22  record.
23        THE VIDEOGRAPHER:  We are going
24  off the record.  The time is 12:27 p.m.

Page 108

1        - - -
2        (Whereupon, a break was taken at
3  this time.)
4        - - -
5        THE VIDEOGRAPHER:  We are going
6  back on the record.  The time is 12:50 p.m.
7  BY MR. LAMB:
8  Q.    I'm going to show you, Ms. Young,
9  another document, which can be marked as
10  Exhibit-4.  This is the interrogatory
11  responses submitted by your lawyer recently.
12        I want you to look at the bold part.
13  The question is about which pharmacist
14  participated in filling Stacey Wolking's
15  prescriptions and on which dates.  The answer
16  kind of starts halfway through the bolded
17  part.
18        It says, to the best of her
19  recollection, she would have filled the
20  prescriptions and dispensed the medication on
21  the dates that the prescriptions reflect or
22  within one to two days in the patient's
23  prescription history report Bates stamped
24  YA0019 and previously produced, specifically

Page 109

1  to the best of Ms. Young's recollection and
2  according to YA0019, August 8, 2022, August
3  16, 2022, September 27, 2022, and October 4,
4  2022.
5        Looking for that now and considering
6  your earlier testimony about which pharmacist
7  filled the prescriptions, do you agree with
8  me that this answer contained in this
9  Exhibit-4 is not correct?
10        MR. BENEDETTO:  Objection of the
11  form.
12        THE WITNESS:  Yes.  I mean, we
13  have the exact pharmacist that did the
14  prescriptions on those dates.  So, we can
15  make it more specific.
16  BY MR. LAMB:
17  Q.    That's in what we're calling
18  Exhibit-2, I believe.  Let me just make that
19  clear.
20        Are you looking at Exhibit-2 right
21  now?
22  A.    Yes.
23  Q.    We talked about this earlier, but just
24  to make crystal clear for the record.

Page 110

1    Who filled the prescriptions on August
2  8th, September 27th, and October 4, 2022?
3  A.    Brian Bryk.
4  Q.    Did you fill the prescription on
5  August 16, 2022?
6  A.    Correct.
7  Q.    Thank you.  We're going back to
8  looking at the first page of Exhibit-2.  Now,
9  we'll look at the September 27, 2022
10 prescription.
11    I asked you earlier about the issue of
12 therapeutic duplication between the August
13 8th and August 16th prescriptions.
14    Did the September 27, 2022
15 prescription have any issue of therapeutic
16 duplication?
17 A.    Again, the errors don't occur in our
18 system the same as regular ones.  We would
19 just have to note that they were.  Yes, that
20 would be a duplication.
21 Q.    I'm going to scroll down to page 3 of
22 Exhibit-2.
23    Can you see what's on page 3 of
24 Exhibit-2.

Page 111

1  A.    Yes.
2  Q.    Just to save us some time, would you
3  agree that this is the prescription dated
4  September 26, 2022 that was filled by your
5  pharmacy on September 27, 2022?
6  A.    Yes.
7  Q.    Now, the one distinction I can see
8  here is that this prescription on page 3 is
9  for 300 tablets whereas if we go back to page
10 1 and look at the prescription that your
11 pharmacy actually filled it says 100 tablets.
12    Do you see that distinction?
13 A.    Uh-huh, yes.
14 Q.    Did it ever happen that Tunkhannock
15 Compounding Center would fill a prescription
16 for a lower number of tablets than was
17 written on the prescription?
18 A.    Yes, a patient is allowed to get up to
19 what is prescribed.  They cannot get more
20 than what is prescribed.
21 Q.    Do you know why in this case Stacey
22 Wolking got less than what was prescribed?
23 A.    I do not know.
24 Q.    Do you see on page 3 of Exhibit-2

Page 112

1  where it says instructions?
2  A.    Yes.
3  Q.    Do you see where it says up to 10 tabs
4  PO daily as DIRE.
5    Do you see that?
6  A.    Yes.
7  Q.    Is that a same thing as telling the
8  patient to take up to 10 tabs by mouth daily
9  as directed?
10 A.    That's what I would interpret it as,
11 yes.
12 Q.    I'm sorry, I thought I was asking you
13 about page 3, but I was showing you page 4.
14 Let's do that again.  Now, I'm actually on
15 page 3 of Exhibit-2.
16 A.    Okay.
17 Q.    Wait.  No, I'm not.  Here is what I
18 did.  I referred a few minutes ago to page 3
19 of Exhibit-2.  I meant page 4 of Exhibit-2.
20    Just to be totally clear, we've been
21 talking about a prescription that Dr. Lindner
22 wrote on September 26th of 2022.  That is
23 actually page 4 of Exhibit-2, not page 3 of
24 Exhibit-2.  I just want to clear that up for

Page 113

1  the record.
2    Based on my previous question about
3  taking up to 10 tablets per day as directed,
4  let's look now on page 1 of Exhibit-2.
5    This was a prescription for 100
6  dexamethasone tablets that are 4 milligrams
7  each, correct?
8  A.    Yes.
9  Q.    Would you agree with me that if a
10 patient took 10 of these tablets a day they'd
11 be taking 40 milligrams of dexamethasone on
12 that day?
13 A.    Yes.
14 Q.    Would you have any concerns about that
15 quantity of dexamethasone in a single day for
16 a single patient?
17    MR. BENEDETTO:  Objection of
18 form.
19    THE WITNESS:  It would definitely
20 depend on the patient.
21 BY MR. LAMB:
22 Q.    Do you know of any possible side
23 effects or risk factors that could occur from
24 a patient taking 40 milligrams of

Page 114

1  dexamethasone in a single day?
2          MS. DENAPLES:  Object to form.
3          THE WITNESS:  Possibly, but would
4  depend what they were taking before.  If they
5  just took one dose, yes, that would probably
6  be an issue.  If they were taking steroids
7  beforehand and they went off them after.
8  Again, it would just depend on the situation.
9  BY MR. LAMB:
10  Q.    Are you aware of -- I'm just going to
11  stop sharing my screen now.
12         Are you aware of any package inserts
13  for dexamethasone that say 40 milligrams of
14  dexamethasone in a day is a reasonable
15  dosage?
16         MR. BENEDETTO:  Objection of
17  form.
18         THE WITNESS:  Normally, the
19  package inserts would talk about initial
20  dosing, and then it would very specifically
21  say that dose depends on treatment, patient,
22  lots of other factors.
23  BY MR. LAMB:
24  Q.    Do you know what the package insert

Page 115

1  said about initial dosing for the
2  dexamethasone prescription sent to Stacey?
3  A.    Not off the top of my head, no, but
4  would not be initial dosing for a patient
5  since they were already taking
6  corticosteroids.
7  Q.    Now, based on that, for the August 8,
8  2022 prescription, do you know what the
9  package insert for prednisone that was given
10  to Stacey said about initial dosing?
11         MR. BENEDETTO:  Objection of
12  form.
13         THE WITNESS:  I don't remember,
14  not off the top of my head.  I would have
15  looked at it at that point.  I just can't
16  remember right now.
17  BY MR. LAMB:
18  Q.    Did you speak to Dr. Lindner at all
19  about Stacey Wolking in between August 8,
20  2022 and September 27, 2022?
21  A.    I can't remember.  I don't think so,
22  but I cannot remember for sure.
23  Q.    With respect to the September 27, 2022
24  prescription, do you know whether Stacey

Page 116

1  Wolking was counselled or warned by anyone at
2  Tunkhannock Compounding Center?
3          MR. BENEDETTO:  Objection of
4  form.
5          THE WITNESS:  She would have been
6  offered counselling by asking do you have any
7  questions on the prescription every time she
8  filled the prescription.
9  BY MR. LAMB:
10  Q.    Do I understand correctly that that
11  would only happen if Stacey walking herself
12  was on the phone with a pharmacist from
13  Tunkhannock Compounding Center?
14         MR. BENEDETTO:  Objection of
15  form.
16         THE WITNESS:  No, we're allowed
17  to offer counsel to whoever is picking up a
18  prescription.  If someone else calls in, we
19  can ask if there is any questions.
20  BY MR. LAMB:
21  Q.    Other than Stacey Wolking's
22  prescription on September 27, 2022, has
23  Tunkhannock Compounding Center ever filled a
24  prescription that directed an individual

Page 117

1  patient to take up to 40 milligrams of
2  dexamethasone a day?
3          MR. BENEDETTO:  Objection of
4  form.
5          THE WITNESS:  I'm not sure.  I
6  would have to check the record.
7  BY MR. LAMB:
8  Q.    It's possible that this is the largest
9  daily direction of dexamethasone for a single
10  patient for Tunkhannock Compounding Center,
11  it's possible?
12         MR. BENEDETTO:  Objection of
13  form.
14         THE WITNESS:  It's possible.
15  BY MR. LAMB:
16  Q.    Now, moving on to the October 4, 2022
17  prescription.
18         Do you agree that this prescription is
19  therapeutically duplicative with the
20  September 27, 2022 prescription?
21         MR. BENEDETTO:  Objection of
22  form.
23         THE WITNESS:  It's hard to say
24  because this one was a refill.  So, it was

| Page 118 |
|---|

1 not a new prescription. There was a refill
2 on the other prescription. This was just
3 another fill of the same prescriptions.
4 BY MR. LAMB:
5 Q.     This was a refill of the August 16th
6 prescription?
7 A.     No, I believe the one before that. I
8 apologize if that's what you said. I believe
9 it was the 9/27 prescription.
10 Q.    No problem. Let's look at Exhibit-2
11 again so we're all looking at the same.
12        Are you saying that the October 4th
13 prescription is a refill of the September
14 27th prescription that just occurred one week
15 earlier?
16 A.     Yes. If you look at the RX number,
17 they're the same number on the very left
18 side.
19 Q.     I see. Okay.
20 A.     That means they're the same
21 prescription. There was a refill most likely
22 or a quantity remaining on it and she could
23 have requested that.
24 Q.     Would it be unusual for Tunkhannock

| Page 119 |
|---|

1 Compounding Center to refill a prescription
2 containing 40 milligrams of dexamethasone
3 after one week?
4        MR. BENEDETTO: Objection of
5 form.
6        THE WITNESS: Not necessarily.
7 During that time and continually, there is a
8 lot of back orders on a prescription. If we
9 only had a certain amount or could only get a
10 certain amount, we could have sent that and
11 then sent the quantity remaining.
12        Again, I'm not sure why that
13 would have happened. There is lots -- I can
14 think of lots of reasons why that would
15 happen.
16 BY MR. LAMB:
17 Q.     Just tell me if I'm wrong. I think
18 I'm understanding what you're saying.
19        Is it because the original
20 prescription here said 300 and she only took
21 100 at first and then took 200 the week
22 later?
23        Is that why this was permissible and
24 they're the same prescription number?

| Page 120 |
|---|

1 A.     Possibly. If you scroll down to the
2 prescription, I can look at it.
3 Q.     When you use the term refill, I think
4 I'm a bit confused.
5 A.     That's okay. The quantity written was
6 300. She's allowed 300 per fill, up to and
7 including, and then there is also one refill
8 on the prescription.
9        She's allowed 300 and then, at another
10 refill time, she's allowed another 300. So,
11 she probably requested 100 and then requested
12 200 after. She doesn't have to fill a full
13 prescription.
14 Q.     Would October 4th not really be
15 considered a refill then but more continuing
16 to fill the original prescription?
17 A.     Correct. We call it a refill because
18 it's the same prescription just filled
19 another time, but the quantity on this form
20 is what she received even though she was
21 allowed to get up to 300 as written for the
22 prescription.
23        That means she either requested 100.
24 I'm not sure. Maybe only 100 was available

| Page 121 |
|---|

1 from us to get at the time. Again, there
2 could be a lot of reasons she would get 100
3 and then 200 a week later.
4        She might have wanted 300 originally.
5 We might have only had a bottle on hand. We
6 sent her that and ordered the next. Again,
7 I'm not sure.
8 Q.     To wrap up this part. You've
9 testified about a conversation that you had
10 with Dr. Lindner about Stacey Wolking before
11 the October 8th prescription was filled.
12        Do you remember any conversations with
13 Dr. Lindner about Stacey Wolking between
14 August 8th and the October 4, 2022
15 prescription?
16 A.     I cannot remember any specific
17 conversations.
18 Q.     Is that also true about communications
19 of other kinds, meaning e-mails, texts,
20 anything of that nature?
21 A.     Correct.
22 Q.     Has your pharmacy ever dispensed this
23 quantity of corticosteroids to a patient in a
24 two-month period other than Stacey Wolking?

Page 122

1         MR. BENEDETTO:  Objection to the
2  form.
3         THE WITNESS:  I'm not sure.  I
4  would have to look at our records for that
5  information.
6  BY MR. LAMB:
7  Q.    As far as you remember sitting there
8  right now, the total communication between
9  you and Dr. Lindner about these four
10 prescriptions is the conversation before
11 August 8, 2022 that you've testified about?
12 A.    I believe so, yes.
13 Q.    The total communication with Stacey
14 Wolking about these four prescriptions, it's
15 a possibility that she was offered
16 counselling over the phone?
17 A.    Before each prescription filled, yes.
18 Q.    Do you know whether Brian Bryk spoke
19 to Dr. Lindner about Stacey Wolking himself?
20         MS. DENAPLES:  Object to form.
21         THE WITNESS:  I'm not sure.
22 BY MR. LAMB:
23 Q.    Do you know whether Brian Bryk spoke
24 to Stacey Wolking about any of these

Page 123

1  prescriptions between August 8, 2022 and
2  October 4, 2022?
3         MR. BENEDETTO:  Objection of
4  form.
5         THE WITNESS:  I'm not sure.
6  BY MR. LAMB:
7  Q.    Do you believe that Brian Bryk is
8  covered under Youngs Apothecary's insurance
9  policy?
10         MR. BENEDETTO:  Objection of
11 form.
12         THE WITNESS:  I don't know that.
13 I believe so.  Again, I am not -- I don't
14 know.
15 BY MR. LAMB:
16 Q.    Is he your employee?
17 A.    Yes.
18 Q.    When did Brian Bryk join Tunkhannock
19 Compounding Center?
20 A.    August of 2021.
21 Q.    Did you hire him?
22 A.    I did.
23 Q.    Have you ever had any complaints about
24 Brian Bryk as a pharmacist?

Page 124

1  A.    No.
2  Q.    Have you ever had any complaints about
3  Dr. Lindner from the pharmacy's patients?
4  A.    No.
5  Q.    In response to either of the lawsuits
6  against Dr. Lindner, has anyone contacted you
7  about your dealings with him?
8  A.    No.
9  Q.    When did you find out that Stacey
10 Wolking was injured?
11 A.    When I heard about the lawsuit.
12 Q.    Before this lawsuit was filed in the
13 spring of this year, you never knew that
14 Stacey Wolking ended up in the hospital?
15 A.    No.
16 Q.    Are you aware of any other of
17 Dr. Lindner's patients that became
18 hospitalized?
19 A.    No.
20 Q.    Have you had any other patients become
21 hospitalized as a result of taking
22 corticosteroids?
23         MR. BENEDETTO:  Objection of
24 form.

Page 125

1         THE WITNESS:  No.
2  BY MR. LAMB:
3  Q.    Have you put down anything in writing
4  about Stacey Wolking in the events that gave
5  rise to this lawsuit other than just between
6  you and your lawyer?
7         MR. BENEDETTO:  Objection of
8  form.
9         THE WITNESS:  No.
10 BY MR. LAMB:
11 Q.    Do you have any concerns about your
12 pharmacist license with this lawsuit?
13 A.    No.
14 Q.    Have you been contacted by the State
15 Board of Pharmacy?
16 A.    No.
17 Q.    Have you been contacted by any
18 regulatory or law enforcement organization?
19 A.    No.
20 Q.    In the conversation that you testified
21 to between you and Dr. Lindner about Stacey
22 Wolking, did you feel he was accurate and
23 truthful with you?
24 A.     Yes.

## Page 126

1  Q.    Is there anything you would say about
2  Dr. Lindner with respect to this case that I
3  haven't already asked?
4          MS. DENAPLES:  Objection of form.
5          THE WITNESS:  No.
6  BY MR. LAMB:
7  Q.    I'm about to be finished.  I really do
8  appreciate your patience and accommodating us
9  today.  I want to return to one issue that I
10  addressed earlier on when I read you the
11  statement there is no upper limit on
12  prednisone dosing.
13      You told me you agree with that
14  statement; is that correct?
15          MR. BENEDETTO:  Objection of
16  form.
17          THE WITNESS:  From what I have
18  looked up, yes.
19  BY MR. LAMB:
20  Q.    Do you mean that literally, that it's
21  possible to give someone any amount of
22  prednisone?
23          MR. BENEDETTO:  Objection of
24  form.

## Page 127

1          THE WITNESS:  No.  Mostly, it
2  depends on the patient, what's going on,
3  doses before, doses after.  A lot goes into
4  it than just a single dose, a single amount,
5  anything like that.  It's more very much
6  dependent on the patient and what's going on
7  right in front of you.
8  BY MR. LAMB:
9  Q.    Do you believe that there are
10  patients, for example, that you could give
11  2,000 milligrams of prednisone to in a single
12  day?
13          MR. BENEDETTO:  Objection of
14  form.
15          THE WITNESS:  Not sure.  I
16  wouldn't be the one deciding that.
17  BY MR. LAMB:
18  Q.    Well, I'm asking about your knowledge
19  and beliefs about prednisone.  You learned
20  about it in pharmacy school.  You dispense it
21  at your pharmacy.  You discussed it with
22  Dr. Lindner.
23      Do you believe that there is any
24  amount of prednisone that is just simply

## Page 128

1  unsafe for human beings?
2          MR. BENEDETTO:  Objection of
3  form.
4          THE WITNESS:  I'm sure, but,
5  again, it really just depends.  I'm sure that
6  there are instances where a certain amount is
7  not good, but it's dependent.
8      A small amount could be not good
9  for certain people, and that is dependent on
10  the patient.  Even a smaller amount would not
11  be a good for a person depending on the
12  situation.
13  BY MR. LAMB:
14  Q.    Is there any amount of prednisone that
15  would make you seriously hesitate before
16  dispensing it to a patient where their doctor
17  asked for it?
18      Is there any amount that would make
19  you seriously hesitate?
20          MR. BENEDETTO:  Objection of
21  form.
22          THE WITNESS:  I'm sure.  It would
23  depend.  I would have a conversation with the
24  provider before dispensing amounts similar to

## Page 129

1  this case.  It would be a case-dependent
2  decision.
3  BY MR. LAMB:
4  Q.    Would you describe this as a case
5  where you had a serious hesitation?
6          MR. BENEDETTO:  Objection of
7  form.
8          THE WITNESS:  I wanted to ask the
9  doctor the question and see why.
10  BY MR. LAMB:
11  Q.    What was the question?
12  A.    Why do you need the quantity that you
13  need.  His reason was valid.  That's why I
14  filled the prescription that I filled, in my
15  professional opinion.
16  Q.    What was it that made you believe his
17  reason was valid?
18          MR. BENEDETTO:  Objection of
19  form.
20          THE WITNESS:  That, for his
21  treatment course, he needed -- he wasn't sure
22  of the quantity he was going to need up to a
23  certain amount, that he would like the
24  patient to have them on hand to make sure

Page 130

1    that she had the treatment that she required.
2    BY MR. LAMB:
3    Q.    Just so the record is clear, we're
4    talking about your conversation before the
5    first prescription on August 8th, which was
6    for 5,000 total milligrams of prednisone,
7    correct?
8    A.    Yes.
9    Q.    As far as you know, after August 8th,
10   when Lindner sent another corticosteroid
11   prescription on August 16th, when he sent
12   another one on September 27th, when he sent
13   another one on August 4th, as far as you know
14   sitting here today, you're not sure whether
15   you ever questioned his prescriptions a
16   second time?
17           MR. BENEDETTO:  Objection of
18   form.
19           THE WITNESS:  Can you repeat the
20   question.
21   BY MR. LAMB:
22   Q.    I'm not trying to put words in your
23   mouth.  I just want to make sure your
24   testimony is clear and I understand what you

Page 131

1    do and do not remember.
2           You've testified extensively about
3    talking to Dr. Lindner about Stacey Wolking
4    before August 8, 2022.
5           I just want to make sure your
6    testimony is that, when you received a new
7    prescription for Stacey Wolking on August
8    16th, another one on September 27th, another
9    one on October 4th, all 2022, you don't
10   remember whether you reached out to ask Dr.
11   Lindner about any of those three
12   prescriptions?
13           MR. BENEDETTO:  Objection of
14   form.
15           THE WITNESS:  No, because I
16   understood the course of treatment from the
17   previous conversation.
18   BY MR. LAMB:
19   Q.    Your understanding was not changed at
20   all by the mounting total of corticosteroids
21   with those next three prescriptions?
22           MR. BENEDETTO:  Objection of
23   form.
24           THE WITNESS:  No.

Page 132

1           MR. LAMB:  Counsel, I believe
2    that's all I have.  If either of you have
3    questions, please go right ahead.
4           MS. DENAPLES:  I have no
5    questions.  Thank you Ms. Young.
6           MR. BENEDETTO:  I think we're
7    done.
8           THE VIDEOGRAPHER:  This concludes
9    today's deposition of Courtney Young.  We're
10   going off the record.  The time is 1:21 p.m.
11           - - -
12           (Whereupon, the deposition concluded
13   at 1:21 p.m.)
14           - - -
15
16
17
18
19
20
21
22
23
24

Page 133

1           C E R T I F I C A T E
2
3           I hereby certify that the proceedings,
4    evidence and objections noted are contained
5    fully and accurately in the notes taken by me
6    on this hearing of the above-captioned case
7    on November 15, 2023, and that this is a
8    correct transcription of same.
9
10
11
12
13
14
15
                    Kathryn Rose
16
17
18
19
20
21
22
23
24

## Page 134

```
1            INSTRUCTIONS TO THE WITNESS
2
3        Please read your deposition over
4   carefully and make any necessary changes.
5   You should assign a reason in the appropriate
6   column on the errata sheet for any change
7   made.
8        After making any change which has been
9   noted on the following errata sheet, along
10  with the reason for any change, sign your
11  name to the errata sheet and date it.  You
12  are signing it subject to the changes you
13  have made in the errata sheet, which will be
14  attached to the deposition.
15       You must sign in the space provided.
16  Return the original errata sheet to the
17  deposing attorney within thirty (30) days of
18  receipt of the transcript by you.
19
20
21
22
23
24
```

## Page 136

```
1               LAWYER'S NOTES
2   PAGE  LINE #
3   _____
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24  _____
```

## Page 135

```
1            ACKNOWLEDGMENT OF DEPONENT
2
3        I, _____, do hereby
4   certify that I have read the foregoing
5   deposition and that the same is a correct
6   transcription of the answers given by me to
7   the questions therein propounded, except for
8   the corrections or changes in form or
9   substance, if any, noted in the attached
10  errata sheet.
11
12       _____
13       COURTNEY YOUNG      Date
14
15  Subscribed and sworn to before me this _____
16  day of _____, 20____.
17
18  My commission expires: _____.
19       _____
20            NOTARY PUBLIC
21
22
23
24
```

---

**$**

---

**$10,000**  14:18,19

**$140,000**  14:11,20 15:4

**$150,000**  14:21

---

**1**

---

**1**  24:3,7 42:14 46:22 63:22 64:18 111:10 113:4

**10**  24:19 44:20 70:4 95:19 112:3,8 113:3,10

**10-milligram**  95:4

**10/31/2023**  66:14

**100**  13:19 14:17 36:18 52:3 73:12 75:19 111:11 113:5 119:21 120:11, 23,24 121:2

**104**  11:20

**10:01**  5:10

**10:55**  48:22

**10:56**  49:4

**10:57**  49:17

**11/11/1987**  11:17

**11:07**  49:23

**12:27**  107:24

**12:30**  107:12

**12:50**  108:6

**15**  5:9 105:15

**16**  67:16 96:8 99:21 100:13 101:6,20 102:9 103:6 109:3 110:5

**16th**  97:23 98:22 99:10 104:20 110:13 118:5 130:11 131:8

**1:21**  132:10,13

---

**2**

---

**2,000**  127:11

**200**  100:19 119:21 120:12 121:3

**2012**  12:4

**2013**  12:7

**2015**  35:18,19

**2016**  13:20 17:23 35:15 45:10,20

**2020**  13:7,22 19:6 35:24 67:5

**2021**  123:20

**2022**  26:8 27:15 36:21 37:21 47:1 48:9 49:7 50:2 57:16 60:5 62:23 67:16 68:2 69:5,13,14 70:9 71:11 72:23 73:5 74:2,10,22 76:5,20 77:23 78:16 85:4,23 87:6 89:3 93:4 94:20 95:16,18 96:8 98:21,22 99:10,19,22 100:13 101:6,20 102:9 103:7 104:20 105:15 109:2,3,4 110:2,5,9,14 111:4, 5 112:22 115:8,20,23 116:22 117:16, 20 121:14 122:11 123:1,2 131:4,9

**2023**  5:9

**26**  111:4

**26th**  112:22

**27**  109:3 110:9,14 111:5 115:20,23 116:22 117:20

**27th**  68:1 110:2 118:14 130:12 131:8

---

**3**

---

**3**  46:2,6 110:21,23 111:8,24 112:13, 15,18,23

**30**  70:9 71:17 72:22 96:22 97:6

**30-day**  70:12,16,17,18,23 71:1,6 72:4,7

**300**  111:9 119:20 120:6,9,10,21 121:4

---

**4**

---

**4**  68:2 69:14 100:20 109:3 110:2 112:13,19,23 113:6 117:16 121:14 123:2

**40**  113:11,24 114:13 117:1 119:2

**45**  107:17

**4th**  118:12 120:14 130:13 131:9

---

**5**

---

**5**  42:10,15 46:1,8,11 91:2

**5,000**  130:6

**50**  96:19,21 97:2,3,5

**500**  70:4 95:4,19

---

**6**

---

**60**  42:10,15

---

**7**

---

**7**  24:3,4,7

**7/1/2022**  66:14

---

**8**

---

**8**  69:13 70:9 72:23 73:5 74:1,10,21 76:4,20 77:23 78:16 85:4,23 87:6 89:3 93:4 94:20 95:16,18 98:8 99:19 109:2 115:7,19 122:11 123:1 131:4

**8th**  68:1 69:5 71:11 79:22 80:17 87:23 88:13 92:8,13 97:21 98:21 110:2,13 121:11,14 130:5,9

---

**9**

---

**9/27**  118:9

---

**A**

---

**A-N-D-A**  28:11

**a.m.**  5:10 48:22 49:4,17,23

**accept**  16:16,18

**accepted**  93:13

**accident**  97:3

**accommodating**  126:8

**accurate**  125:22

**achieve**  98:14

**acquired**  27:19

**actual**  8:7 47:23

**addition**  37:8

**additional**  58:6

**address**  11:19 46:1,2 87:21 88:11

**addressed**  126:10

**adrenal**  41:1,5 42:7

**adrenals**  83:13

**adult**  40:4

**affected**  56:10

**agree**  7:13,21 19:10 20:5,8,13,15,17

---

24:6 46:9 78:24 109:7 111:3 113:9
117:18 126:13

**Agreed** 22:17

**ahead** 8:17 16:18,24 54:7 59:2 66:8
132:3

**Aid** 35:4,6,8,18,19 36:5 77:17 98:2,3

**akin** 29:10

**alleged** 62:23

**alleges** 23:20

**allowed** 111:18 116:16 120:6,9,10,
21

**American** 39:22

**amount** 82:24 85:7 91:1,7 119:9,10
126:21 127:4,24 128:6,8,10,14,18
129:23

**amounts** 104:6 128:24

**and/or** 107:13

**Anda** 28:11

**answering** 9:9

**answers** 63:12

**anti-malarials** 75:10 91:9

**anti-malerial** 80:13

**apologize** 48:17 118:8

**apothecary** 11:11 12:9,19,23 13:3
16:3,11 105:6

**Apothecary's** 123:8

**applies** 31:11

**apply** 106:2

**approval** 87:10 89:17

**Approximately** 14:23

**asks** 32:14

**assume** 23:18

**assumed** 11:5

**assumption** 25:12 90:11

**asthma** 42:20

**attached** 104:13

**audio** 48:15

**August** 26:8 27:14 36:21 37:20 47:1
48:8 49:7 50:2 57:16,24 60:5 62:22
67:16 68:1 69:5,13 70:9 71:11 72:23
73:5 74:1,10,21 76:4,20 77:23 78:16
79:22 80:17 85:4,23 87:6,23 88:12
89:3 92:8,13 93:4 94:20 95:16,18

96:8 97:21,23 98:21,22 99:10,19,21
100:13 101:6,20 102:8 103:6 104:20
105:15 109:2 110:1,5,12,13 115:7,19
118:5 121:14 122:11 123:1,20 130:5,
9,11,13 131:4,7

**authorized** 12:17,21 13:2

**auto-populate** 70:18 72:20

**auto-populates** 71:20

**autoimmune** 62:15

**automatically** 26:1 72:22

**avoid** 106:21

**aware** 7:3 24:19 57:16 61:21,24
63:11 81:9,11 106:1 114:10,12
124:16

**awareness** 81:5


**B**

**B-A-B-E-S-I-O-S-I-S** 52:6

**B-R-Y-K** 37:4

**B-U-H-N-E-R** 60:3

**Babesia** 55:24 56:3

**babesiosis** 52:6 55:20 56:7,15,17,
21,24 57:8,14,18 58:8,11 59:11 60:9,
14,20 61:6 62:9 75:9 93:5,15 94:1,8,
12,17

**back** 10:4 28:3 36:21 42:23 47:1
49:4,6,12,23 78:14 107:17 108:6
110:7 111:9 119:8

**background** 51:22

**bad** 24:20

**bank** 14:7,9

**based** 69:2 79:1 84:5 92:5 113:2
115:7

**basement** 46:22

**Basically** 41:6 86:24

**basis** 92:15

**Bates** 63:19 66:3 105:6 108:23

**began** 59:12

**begin** 82:19

**beginning** 53:20

**behalf** 12:18 13:2 22:13

**beings** 128:1

**belated** 11:18

**beliefs** 127:19

**Benedetto** 5:19,20 6:7,24 15:10
17:9 19:20 20:10 22:5,17 23:1,11
24:9,22 26:10 27:5,20 29:17 30:17
31:19 33:22 34:10,22 38:2,19 41:17
42:1 43:17 44:17 47:4 48:2,12,19
50:8 52:22 53:10 54:24 55:15 58:13
59:13 62:10 64:21 67:17 68:6 69:9,21
74:3,11,23 75:23 77:13 78:2,11,20
79:2 80:24 82:20 83:8 86:2,15 87:7,
14,24 88:19 89:7,14,23 90:8,20 91:20
92:18,24 93:16 95:8,23 96:4 99:13,23
100:15,23 101:9,16,23 102:11
103:10,19 109:10 113:17 114:16
115:11 116:3,14 117:3,12,21 119:4
122:1 123:3,10 124:23 125:7 126:15,
23 127:13 128:2,20 129:6,18 130:17
131:13,22 132:6

**beneficial** 17:16

**benefit** 63:17 105:3

**bill** 17:2,16 18:17 72:14

**billed** 97:1

**billing** 72:10

**birth** 11:16

**birthday** 11:18

**bit** 27:9 47:2 55:19 84:15 85:5 120:4

**bites** 56:4

**black-or-white** 91:12

**blank** 72:17

**board** 106:8,15,22 125:15

**bold** 108:12

**bolded** 108:16

**bones** 25:19

**book** 38:7

**books** 59:17,20,21 60:4

**bottle** 69:7 104:11 121:5

**bought** 14:21 15:8 19:6 21:15

**bowel** 25:2

**brand** 21:1,9 27:19 28:7 38:11

**brands** 21:16 28:12

**break** 44:1 73:17 107:12,15,16 108:2

**Brian** 37:1,23 67:13 68:3 69:5,15
71:13,17,24 73:1,11,14,21,24 86:1,7,
8,14,23 87:5 90:13,16 91:15 107:13

110:3 122:18,23 123:7,18,24

briefly 35:13

bring 44:4

broad 23:17 54:12

broken 43:15,22 44:23

brought 79:17

Bryk 37:1 67:13 69:5,15 71:13,17
73:21 74:1 86:1,14,23 90:13,16 91:16
110:3 122:18,23 123:7,18,24

BTB 67:8,13 71:12

Buhner's 59:21

building 45:22 46:19,20

business 13:24 15:13,16 43:2 44:15

buy 13:5,11,21 28:13 104:2

buying 21:2

C

calculation 30:2

call 76:15,17 120:17

called 13:8 36:8 79:6,7,16

calling 109:17

calls 116:18

capital 39:23

Care 36:8

carnival 47:17

Carol 13:12,23

carried 56:3 100:2,11

case 10:8 11:10 23:20 27:13 30:12
38:6,8 58:4 62:24 66:2,22 71:3,17
91:12 93:8,9 111:21 126:2 129:1,4

case-dependent 129:1

cases 94:14

catch 29:9 83:13

Center 11:13 13:9,18 15:9,17,19
16:5,9,15 19:3 28:24 35:9 36:23
37:18 43:1,6 44:5 45:3,12,20,24 46:6
52:21 64:15 69:16 77:24 81:18 89:13
102:24 103:18 104:3 106:3,14 111:15
116:2,13,23 117:10 119:1 123:19

Center's 58:11

Centers 60:7,17 61:3

cetera 107:14

CFY 67:9,12 96:13

chance 6:18

change 84:14

changed 131:19

changing 15:21

characterizing 104:7

charge 19:2,5 28:19 30:7 37:9

charts 24:12

chat 47:9

check 69:19 117:6

choose 16:20 17:6

choppy 97:14

Ciara 5:21 22:14

circumstances 23:9

claim 16:19 17:4

clarify 21:19 97:15

clarifying 53:21

class 19:15 97:12,18

classes 29:2

clean 53:21

clear 8:13 11:3 27:10 74:18 86:8 88:7
109:19,24 112:20,24 130:3,24

clicking 39:19

code 58:24

codes 59:4,6

coinfections 94:7

column 67:6 71:12 96:14

commercially 18:10,12,15

common 25:5,11

communicate 49:12 50:13

communicating 50:6

communication 122:8,13

communications 99:1 121:18

companies 77:18 101:3

company 11:11 14:8,9 17:5 27:18
28:12 77:18

company's 14:6 21:13

compared 52:19

comparison 43:10

complaint 23:20 27:13 62:23

complaints 123:23 124:2

compound 9:1 18:11 43:24 47:24

compounded 17:4,13 18:2,5 30:11
31:13,14 44:9,13,16 88:22 104:1

Compounder 64:9,12,20 65:5,10,23

compounding 11:13 13:9,18 15:9,
16,19 16:4,9,15 18:14 19:3 28:24
29:22 30:1,3 35:9 36:23 37:18 43:1,5
44:5,6 45:3,12,20,24 46:6 52:21
58:11 64:15 69:16 77:24 81:17 89:12
102:24 103:18 104:3 106:3,13 111:15
116:2,13,23 117:10 119:1 123:19

computer 64:6,7

concept 30:21

concern 95:20

concerns 95:4,17 99:18,20 113:14
125:11

concluded 132:12

concludes 132:8

condition 42:20 82:6,10

conditions 42:16

conduct 93:4

conducted 51:8

confident 76:3

confirm 11:16

confused 120:4

confusing 8:24 9:8

Connor 5:16 6:14 48:12

Conrad 5:19

consequences 10:19

considered 19:11 120:15

contacted 124:6 125:14,17

contained 95:19 109:8

contents 85:20,24 86:13 90:14
94:21

continually 119:7

continuing 120:15

contribute 14:24

Control 60:8,17 61:3

conversation 33:13 54:9 71:21 72:1

73:2,3,6,13,21,24 74:8 75:4,20,22
76:7 77:2,20 79:21,23 80:2,8,11,17,
22 84:10 85:24 86:9,14,19,22 87:19
88:5,10,24 89:22 90:3,5,13,15 92:7,
11,14 94:19,22 95:2,14 98:18 100:1,
5,11 102:15 121:9 122:10 125:20
128:23 130:4 131:17

**conversations** 53:7,14,16,23 54:1,3
56:23 72:2 74:16,19 85:21 121:12,17

**conversion** 24:2

**convert** 23:22

**convey** 86:13 94:21

**corporation** 15:14,15

**correct** 12:5,8 17:24 18:19,21,22,23
19:1 37:9 44:11 46:5 49:10 58:4
67:19,21,22 69:3,14,18 70:6 71:14
74:22 80:14 81:8 86:10 96:15 102:19,
22 103:18 109:9 110:6 113:7 120:17
121:21 126:14 130:7

**correctly** 38:14 116:10

**corresponded** 63:9 76:13

**corticosteroid** 26:19,22 27:2 38:16
40:3 51:20 54:16 60:12,18 61:4 62:1
130:10

**corticosteroids** 18:1 19:12,14
25:15 26:7,15 29:6 30:12 51:23 53:9,
14,16,17,24 54:3,11,23 55:7 81:7,12
82:16,18 83:7 90:7,17 91:18 94:17
98:10 99:6 106:4 115:6 121:23
124:22 131:20

**counsel** 5:14 22:11,16 31:17,23
32:2,8 34:18 105:3 116:17 132:1

**counselled** 33:12 101:22 116:1

**counselling** 33:16 34:7 102:2,5
116:6 122:16

**couple** 72:19 73:20 92:3

**court** 5:7,23 8:1,13,18 9:8 37:2
107:21

**Courtney** 5:13 6:3 19:22 22:7,10
23:2,13 29:19 38:4 48:15 50:9 55:2
59:15 67:13 132:9

**Courtney's** 48:13

**cover** 77:19 101:3

**covered** 17:14,18 18:15 123:8

**crystal** 109:24

**current** 15:3

**customer** 15:23

**cut** 7:18 64:11

**cutting** 61:10,13

## D

**daily** 112:4,8 117:9

**danger** 95:22

**dangerous** 95:6

**Daryl** 5:18 63:13 94:23

**data** 43:4

**date** 5:9 11:16 66:15,17,21 68:12,20
70:8 71:16 96:8,18

**dated** 105:15 111:3

**dates** 64:3 67:2 69:13 108:15,21
109:14

**daughter** 57:2,4,5

**day** 42:11 50:11 68:17 70:9,14 72:22
84:19 113:3,10,12,15 114:1,14 117:2
127:12

**days** 83:1 98:8 108:22

**dealing** 40:2 54:1 77:17

**dealings** 124:7

**dealt** 36:13 51:12 59:9

**decent** 107:14

**decide** 13:21 83:17 85:9

**decided** 70:12 71:7

**deciding** 127:16

**decision** 104:17 129:2

**deemed** 22:12

**defaulted** 96:24

**defendant** 5:22

**defendants** 5:20

**delay** 37:16

**delayed** 41:9,16 42:10 84:22

**Denaples** 5:21 22:8,18 24:8 51:14,
24 54:4,18 55:8 60:21 61:7 76:23
77:7 79:14 81:19 83:19 85:16 90:9
95:10 106:23 107:5,9 114:2 122:20
126:4 132:4

**depend** 23:15 38:24 62:14 113:20
114:4,8 128:23

**dependent** 82:5,10 127:6 128:7,9

**depending** 50:12 71:4 84:7,16
107:18 128:11

**depends** 38:5 62:12,19 82:22 114:21
127:2 128:5

**deponent** 5:13

**deposition** 5:6,11 6:15 10:1,10,18
16:7 39:18 63:16 105:2 132:9,12

**describe** 20:23 23:8 35:13 47:3
56:23 57:1 81:23 86:22 129:4

**describing** 31:7 81:24

**description** 80:10 81:4

**determine** 51:5

**developing** 28:20

**dexamethasone** 18:2 19:9 23:6,22
24:4,21 27:12,17 51:13 55:13 98:8,13
99:21 100:19,21 101:7,15 104:1
113:6,11,15 114:1,13,14 115:2 117:2,
9 119:2

**diagnosed** 56:15 57:13,17

**diagnoses** 58:6

**diagnosis** 58:3,21,24 59:4,6

**diem** 35:20 78:6

**difficulties** 7:17

**DIRE** 112:4

**directed** 85:6,7 112:9 113:3 116:24

**direction** 84:14 117:9

**directly** 18:17 35:10

**director** 35:23

**disagree** 20:5,9

**discontinued** 98:12

**discovery** 63:19 105:5

**discuss** 106:6

**discussed** 42:17 89:20 91:16
127:21

**discusses** 41:8 104:6

**discussion** 48:24 49:19

**disease** 39:11 56:12 59:21 60:8,17
61:3

**diseases** 59:10

**dispense** 127:20

**dispensed** 108:20 121:22

**dispensing** 128:16,24

**distinction** 41:11 111:7,12

**District** 5:7,8

**disturbances** 26:2

**doctor** 84:12 85:8 89:16 93:24 94:5, 11,16 128:16 129:9

**doctor's** 84:14

**doctors** 52:19 94:3

**document** 29:10 39:20,21 63:23 64:18 66:2 96:9 108:9

**documents** 28:16,17 63:18

**door** 29:11 30:5 69:20

**dosage** 23:22,23 40:14 103:1,8 104:6 114:15

**dosages** 51:13,20 53:8

**dose** 42:8 82:4,15,19 84:14,19 85:9 114:5,21 127:4

**doses** 38:16 53:15 127:3

**dosing** 20:7,16,21 21:23 37:24 39:11 40:4 60:12 83:23,24 103:16 114:20 115:1,4,10 126:12

**double-check** 24:16

**double-checking** 30:2

**drug** 8:16 30:16,22 34:20 36:13 38:1, 6 103:1

**drugs** 19:15 23:8 24:6 29:2,3 30:11 31:14 43:9,11 44:4 104:6

**due** 25:11

**duly** 6:3

**duplication** 97:8,20 98:4 110:12,16, 20

**duplicative** 98:7 117:19

**Duquesne** 12:3

**duty** 31:16

---

**E**

---

**e-mail** 50:17,23 51:5 52:5 63:10 67:4 76:14 105:4,14

**e-mails** 50:20,24 51:6,9,11,18 66:24 121:19

**earlier** 10:3 66:23 99:17 103:2,15,24 109:6,23 110:11 118:15 126:10

**easier** 15:20,23 84:17 105:9

**edema** 25:17

**edge** 61:11,14

**education** 55:6

**effect** 25:14 27:4

**effects** 24:20 25:3 80:4 89:20 90:6, 16 91:16 95:7 113:23

**employee** 12:22 123:16

**encourage** 23:21

**end** 16:22 47:22 65:6

**ended** 47:18 71:17 124:14

**ends** 105:17

**enforcement** 125:18

**enter** 65:4 97:1

**entire** 92:14

**equivalent** 23:23 24:4

**errors** 30:2 98:1 110:17

**estimate** 49:11

**events** 125:4

**everybody's** 63:17

**exact** 9:23 46:11 75:20 84:10 109:13

**EXAMINATION** 6:10

**examined** 6:4

**exchange** 107:3

**exchanged** 50:17,20 51:11 88:10

**exhibit** 105:1

**Exhibit-1** 39:18 42:14,22

**exhibit-2** 63:16 64:19 96:11 97:22 109:18,20 110:8,22,24 111:24 112:15,19,23,24 113:4 118:10

**Exhibit-3** 105:1

**Exhibit-4** 108:10 109:9

**experience** 80:4

**expert** 9:3

**explain** 10:14 28:9 30:24 80:16 82:1 96:20

**explained** 87:2

**explaining** 87:2

**explanation** 89:5

**extensively** 131:2

**eyes** 29:14

---

**F**

---

**facial** 25:17

**factor** 60:19 61:5

**factors** 31:5 113:23 114:22

**fail** 10:18

**fair** 16:12 23:7

**fairly** 104:8

**fall** 104:12

**familiar** 25:15 26:18 28:22 30:21 40:6 83:22 97:7 98:2

**family** 56:10,14 59:9 94:14

**feedback** 49:15

**feel** 77:12 125:22

**feeling** 84:13

**felt** 77:8,10 88:2

**field** 70:19 72:8,16

**fight** 62:8

**file** 33:21 68:9,11,23

**filed** 124:12

**fill** 32:21 57:12 64:23 65:7 81:16 82:8 85:10 86:19 87:6,10,17,22 88:4,12,17 89:13 106:19 110:4 111:15 118:3 120:6,12,16

**filled** 57:23 58:1 62:21 64:3 65:15 66:14 68:3,11,12,14,18,19 69:1 70:19 71:8,13 72:3 73:7 74:16,21 76:4 78:9 85:11 89:4 92:8,12 96:16 99:9 100:21 101:8,20 102:8 108:19 109:7 110:1 111:4,11 116:8,23 120:18 121:11 122:17 129:14

**filling** 43:11,16 65:1,8 67:15 78:19 80:17 90:18 95:6 107:3 108:14

**fills** 31:8

**final** 29:9 30:3 38:24

**finance** 14:2

**financial** 43:1,15

**financing** 14:13

**find** 21:3,5,8 27:23 28:1,7 39:1 40:8 49:14 58:20 124:9

**fine** 22:13

**finished** 9:10 126:7

---

**fire** 12:22

**flag** 39:22

**flies** 10:2

**floor** 46:4,14,16

**floors** 46:17

**form** 15:11 16:19 17:4,10 18:8 19:21
20:11 22:6 23:12 24:23 27:6 29:18
30:18 31:20 32:2 33:23 34:11,23
38:3,20 41:18 42:2 43:18 44:18 47:5
48:3 51:15 52:1,23 53:11 54:5,18
55:1,9,16 58:14 59:14 60:22 62:11
64:22 67:18 68:7 69:10,22 74:4,12,24
75:24 76:23 77:7,14 78:3,12,21 79:14
81:1,19 82:21 83:9,19 85:16 86:3,16
87:8,15 88:1,20 89:8,15,24 90:8,9,21
91:21 92:14,19 93:17 95:9,10,24 96:5
99:14,24 100:16,24 101:10,17,24
102:12 103:11,20 106:23 107:5,9
109:11 113:18 114:2,17 115:12
116:4,15 117:4,13,22 119:5 120:19
122:2,20 123:4,11 124:24 125:8
126:4,16,24 127:14 128:3,21 129:7,
19 130:18 131:14,23

**forms** 15:23 30:3

**found** 17:15 39:2 51:8

**fourth** 42:20

**fraction** 44:14

**front** 47:22 65:6 127:7

**full** 120:12

**full-time** 78:5

**function** 83:12

---

**G**

**gain** 25:11,14

**garbled** 16:22

**gather** 59:10

**gave** 89:5 92:22 125:4

**Geisinger** 36:9

**general** 54:2,9

**generally** 43:23 54:11 58:23 65:11
96:24

**give** 11:4 39:9 55:5 62:17 83:12
106:12 107:8 126:21 127:10

**giving** 8:11 30:15

**glands** 41:5

**good** 6:13 7:3 22:16,18 53:2 128:7,8,
11

**graduate** 11:22 12:2

**graduated** 35:13

**Great** 7:23

**group** 45:1

**guess** 9:17 34:1 40:12 57:23 61:15,
20,22 107:16,20

**Guidance** 60:8

**guys** 76:13

---

**H**

**halfway** 108:16

**hand** 71:3 75:14 81:23 82:3 84:21
121:5 129:24

**handled** 67:24

**happen** 111:14 116:11 119:15

**happened** 119:13

**happening** 85:2

**Happy** 11:18

**hard** 68:10 117:23

**head** 8:5 10:2 21:17 24:14 25:6 27:1
38:13 115:3,14

**health** 16:16

**hear** 7:15,17 24:10 48:16,18

**heard** 8:19 26:20 39:4 124:11

**heart** 26:2

**held** 5:11 48:24 49:19

**Henry** 5:22 45:6 105:18

**hesitate** 128:15,19

**hesitation** 129:5

**high** 60:11

**higher** 77:9,16 84:7,15

**hire** 12:22 123:21

**historically** 59:3

**history** 64:2 66:9 108:23

**hold** 49:13 65:14 68:22

**honestly** 15:20 19:23 23:14

**hoped** 90:23 92:16

**hormone** 52:13 53:4 84:2,4

**hormones** 41:6

**hospital** 35:20,23 36:2,3 82:23 83:2
124:14

**hospitalized** 124:18,21

**hour** 107:18

**human** 128:1

**humans** 56:3

**husband** 56:9 63:13

---

**I**

**ideally** 82:14 83:1

**illnesses** 56:11,13 59:22

**immune** 62:5,8,16

**immunosuppressed** 62:1,3

**important** 7:10 8:2 12:18 19:18

**imprecisely** 18:24

**impression** 71:2 106:13

**in-depth** 90:2

**include** 16:4 40:21 103:1,3

**included** 42:19 58:19

**includes** 8:14

**including** 35:21 57:2 94:8 120:7

**Incorporated** 11:12 12:10,23 13:3
16:3

**indication** 40:24 97:12,19

**individual** 31:9 37:24 54:17 69:19
99:11 116:24

**infected** 60:14,20 61:6

**infection** 55:24 62:9

**information** 33:21 38:9 39:1,11,12,
15 40:7 43:2 52:15 55:6 59:11 61:10,
11,14,15,17,19 64:17,19 65:5,9,12,
16,22 66:18 92:22 103:2,9,16 104:5,
15 122:5

**initial** 42:8 80:10 114:19 115:1,4,10

**initially** 79:11 100:2

**initials** 67:10

**injured** 124:10

**insert** 20:22,24 21:2,22 38:18 104:9,
21 114:24 115:9

**inserts** 38:8,12 114:12,19

instances 128:6

instructions 112:1

insufficiency 41:1 42:8

insurance 16:16 17:2,3,5,8,15
18:16,17 72:14 77:17,18 101:2 123:8

insurances 17:17 72:10,15

interchangeable 16:13

interest 12:15

interested 93:7

interpret 112:10

interrogatory 108:10

introduce 5:15

involve 6:21 31:16 34:7

involved 84:9

involves 44:15

issue 27:13 30:12 51:20 54:22 91:5
106:7 110:11,15 114:6 126:9

issued 12:6

---

### J

James 5:19

join 22:8,15 123:18

---

### K

Karen 5:4

Kathryn 5:24

kind 12:15 14:8 39:15 46:19 48:14
79:24 87:1 99:1 108:16

kinds 7:16 121:19

Kline 5:16

knew 13:13 52:18 57:19,20 70:22
72:7 98:16 124:13

knowledge 26:6,8 80:12 82:17
127:18

---

### L

L-I-N-D-N-E-R 45:7

laid 91:24 92:15

lamb 5:16 6:12,14 16:1 17:19 20:2,14
22:10,20,22 23:5,19 24:17 25:1 26:12
27:8,22 30:6,20 32:1 34:2,13 35:5

---

38:10 39:3 41:22 42:6 43:20 44:21
47:12 48:7,14 49:5,24 50:16 51:17
52:4 53:6,18 54:6,20 55:4,11,18
58:16 59:19 61:1,12 62:13 65:3 67:20
68:13 69:12 70:1 74:7,17 75:3 76:2
77:4,11,21 78:8,15,23 79:4,19 81:3,
21 83:5,15,21 85:19 86:5,21 87:11,20
88:6,23 89:10,18 90:4,12 91:13,23
92:20 93:2,20 95:13 96:2,6 99:16
100:10,18 101:5,12,19 102:4,18
103:14,23 107:1,7,11 108:7 109:16
113:21 114:9,23 115:17 116:9,20
117:7,15 118:4 119:16 122:6,22
123:6,15 125:2,10 126:6,19 127:8,17
128:13 129:3,10 130:2,21 131:18
132:1

large 100:22

largest 78:17 101:7 117:8

law 125:18

lawsuit 124:11,12 125:5,12

lawsuits 124:5

lawyer 6:18,22 28:16 63:18 108:11
125:6

lawyers 7:1 8:23

learn 26:14 56:6,17 57:8 60:16 61:2

learned 56:11 127:19

learning 35:3

leave 83:2

left 10:3 35:24 50:1 104:10 118:17

legal 10:19 34:20

letters 39:23

level 46:18,19,22

Lexitas 5:5

license 12:6 125:12

licensure 15:17

limit 20:6,15,20 21:23 126:11

Lindner 5:12,22 23:21 45:6,8,21
46:1,7 47:3 49:8,12 50:3,7,18,21
51:12 52:19 53:8 56:20,24 57:9,17
59:8 70:24 72:5 73:10,13 74:9,20
75:5 77:6 80:3,7,14,21 81:15 82:2
83:16 85:2,15,21 86:10 87:2 89:1,5,
21 90:15 92:6,11 93:21 94:1,10,15,
19,24 95:3,15 98:20 99:5,11 102:17
105:6,14,18 106:6,11,18 107:2
112:21 115:18 121:10,13 122:9,19
124:3,6 125:21 126:2 127:22 130:10
131:3,11

---

Lindner's 52:8 124:17

lines 67:8

liquid 40:23

listed 41:1 70:3,8 96:8,13,18,21

literally 126:20

literature 25:5 26:4

live 47:10,19

loan 13:2 14:4,5,20 15:4

local 47:17 106:2

locally 94:5

long 8:24 64:14

long-term 25:20

looked 38:6,8 52:8 73:8 115:15
126:18

lot 26:24 29:22,24 44:7 49:15 83:2
84:4,8 85:5 92:3 104:14 119:8 121:2
127:3

lots 114:22 119:13,14

loud 105:21

lower 82:15 84:7,15 111:16

Lyme 56:12 59:21 94:7

---

### M

made 13:21 69:6 76:21 77:6 129:16

mail 69:7 102:21 103:9

mailed 32:7,13 103:3

make 8:12 11:7,10 27:10 44:7,10,12
83:14 88:7 104:17 105:9 109:15,18,
24 128:15,18 129:24 130:23 131:5

makes 29:13

manually 65:18

manufacturer 103:1,17

mark 39:17 63:15 105:1

marked 108:9

marking 42:22

marks 25:8

Mast 94:5,10

matter 5:12

maximum 14:18

MD 105:18

---

**meaning** 21:12 24:3 58:20 121:19

**means** 40:17 69:4 71:13 82:14,15 96:15 118:20 120:23

**meant** 29:9 30:14 82:1 112:19

**medical** 106:8,14,21

**medication** 28:4,9,13 31:3,4,22 32:4,6 68:19 108:20

**medications** 39:12 44:6,9,12,13,16 80:13 97:11,17

**medium** 32:23

**meet** 45:8

**member** 56:14

**members** 56:10 59:9

**Memorial** 36:3

**mentioned** 36:5 50:2 52:16

**merchants** 44:11

**message** 76:14

**met** 45:14,17 63:2

**Micromedex** 39:4,10,14 40:2,8,9,11 41:8

**Middle** 5:8

**milligram** 24:3 42:11,15

**milligrams** 24:5 70:5 95:20 100:20 113:6,11,24 114:13 117:1 119:2 127:11 130:6

**mind** 17:1 26:1,5 54:8 59:23

**mine** 66:5

**minute** 99:4

**minutes** 80:11 81:4,22 88:15 107:18 112:18

**missed** 53:19 71:20,21

**mistaken** 81:10

**mistakes** 29:10

**moment** 9:23

**money** 14:13,14,24 15:1 44:12

**month** 48:4 49:9 50:4 78:6,7

**monthly** 43:7,8,19

**morning** 6:13 10:17

**mounting** 131:20

**mouth** 40:20 112:8 130:23

**move** 21:20

**moving** 117:16

**multifactorial** 44:8

**multiple** 21:12 52:12 74:19 75:2

**muscle** 25:21

**myopathy** 25:22

## N

**naturally** 8:4

**nature** 121:20

**necessarily** 98:18 119:6

**needed** 48:5 68:19 71:3,5,8 75:9,14, 17 77:3 82:9 85:9 87:3 91:2 107:12, 13 129:21

**needing** 84:18

**negative** 27:3 95:7

**nodding** 8:5

**normal** 40:14

**note** 110:19

**notes** 79:20,22

**notice** 66:13

**November** 5:9 13:7

**nuanced** 91:11

**number** 12:7 46:11 66:3 71:8 72:11 105:7 111:16 118:16,17 119:24

**numbers** 63:20 66:19

## O

**Object** 51:14 54:4 55:8 60:21 76:23 77:7 79:14 83:19 85:16 90:8,9 106:23 107:5,9 114:2 122:20

**objection** 15:10 17:9 19:20 20:10 22:5,9,12 23:1,11 24:8,9,22 26:10 27:5,20 29:17 30:17 31:19 33:22 34:10,22 38:2,19 41:17 42:1 43:17 44:17 47:4 48:2 50:8 51:24 52:22 53:10 54:18,24 55:15 58:13 59:13 61:7 62:10 64:21 67:17 68:6 69:9,21 74:3,11,23 75:23 77:13 78:2,11,20 79:2 80:24 81:19 82:20 83:8 86:2,15 87:7,14,24 88:19 89:7,14,23 90:20 91:20 92:18,24 93:16 95:8,10,23 96:4 99:13,23 100:15,23 101:9,16,23 102:11 103:10,19 109:10 113:17 114:16 115:11 116:3,14 117:3,12,21 119:4 122:1 123:3,10 124:23 125:7

126:4,15,23 127:13 128:2,20 129:6, 18 130:17 131:13,22

**obligations** 34:20

**occur** 76:9 110:17 113:23

**occurred** 85:22 95:16 118:14

**October** 27:15 62:22 68:2 69:14 109:3 110:2 117:16 118:12 120:14 121:11,14 123:2 131:9

**offer** 16:19 17:3 32:2 34:17 41:14,20 55:5 102:5 107:2 116:17

**offered** 14:1 31:23 32:5,8 102:2,14 116:6 122:15

**office** 46:3,13

**online** 21:3,4,6 32:21 40:2

**operating** 28:18,20 29:1,5,8,13,24 30:13 36:11,12,16

**opinion** 129:15

**optimally** 62:6,17

**options** 39:13

**oral** 40:13,17

**orally** 42:11

**order** 28:9 83:12 106:20

**ordered** 28:4,6 68:19 121:6

**orders** 119:8

**ordinarily** 88:17

**organization** 125:18

**original** 100:3,11 119:19 120:16

**originally** 121:4

**overarching** 6:20

**overdose** 22:3,24

**overdosing** 54:22

**overhearing** 48:9

**override** 98:5

**owned** 17:22

**owner** 12:12 13:23 15:14 37:8 42:24

**ownership** 11:14 12:15

**owns** 12:9

## P

**p.m.** 107:24 108:6 132:10,13

**P2-000449** 105:7

**package** 20:22,23 21:2,22 38:8,12, 18 104:9,21 114:12,19,24 115:9

**packages** 104:17

**pages** 63:19

**painful** 25:7

**paper** 32:9,19

**paperwork** 12:18

**paragraph** 105:16

**parasite** 56:1,3

**part** 15:18 57:20,21 58:5 78:19 86:9 87:18 88:4 97:16 108:12,17 121:8

**participated** 108:14

**parts** 73:17

**past** 39:5 41:23 42:3

**patience** 126:8

**patient** 23:10,16 29:16 30:9,15 31:5, 9,18,21 33:14,18 34:3,8 51:19,21 52:14 54:2,17 58:12 62:15,19 65:14 68:17,24 71:4 74:15 79:17 82:5,10, 18,23 84:12,13,20,23 85:9 87:3 94:17 101:15 111:18 112:8 113:10,16,20,24 114:21 115:4 117:1,10 121:23 127:2, 6 128:10,16 129:24

**patient's** 33:21 82:6 108:22

**patient-centered** 83:23

**patient-directive** 83:23

**patient-doctor** 84:8

**patients** 16:16 17:4 23:21 26:18 31:12 32:3,12,20 33:9 47:7 50:19,21 55:14 57:2,7,13 58:21 62:15,18 65:20 94:6 98:17 99:6 106:19 124:3,17,20 127:10

**patients'** 84:5

**pause** 91:10

**pay** 17:16 101:3

**paying** 15:6

**PCCA** 64:13

**PDF** 63:22

**PDR** 30:22 31:16

**Pennsylvania** 5:8 11:21 12:6

**people** 8:4 9:7,21 61:24 107:12,19 128:9

**percent** 13:19 14:17 36:18 44:20 52:3 73:12 75:19

**perfectly** 86:8

**perforation** 25:2

**perform** 36:19

**period** 48:8 49:7 99:2 121:24

**permissible** 119:23

**person** 22:3 32:24 34:4 48:20 63:3 76:7,12 128:11

**personally** 23:3 50:14 56:9 59:16 94:13

**perspective** 30:22 34:20 36:13

**pharmacies** 32:18 39:6 81:7,13,17 85:10

**pharmacist** 8:16 9:3 13:12 19:2,5 24:18 28:19 30:7 31:2,3,17 36:18 37:7,9,11,17,20 40:16 65:18,21 67:12,15,23,24 69:6 84:9 89:12 108:13 109:6,13 116:12 123:24 125:12

**pharmacist's** 66:4

**pharmacists** 36:22 37:5 69:15

**pharmacy** 11:22 12:4,5 13:5,22 14:3 15:24 17:3 18:3,16 19:6,15 21:10 26:13,16 27:19 28:18 29:21 30:15 31:8,24 34:4 35:2,14,17,21,22,23 36:6,7 41:14 42:4 47:21,22,23 49:9 50:3 56:18 57:12 59:12,18 62:21 64:16 75:11 88:16 92:7,12 95:5 106:2,15,20 111:5,11 121:22 125:15 127:20,21

**pharmacy's** 7:6 124:3

**phone** 33:2 34:1 63:6 76:10,14 80:22 102:6 107:14 116:12 122:16

**pick** 32:6,12 33:3

**picking** 116:17

**piece** 33:20

**pills** 69:6

**Pine** 11:20

**place** 33:16 38:17 75:22 104:2

**places** 18:16 35:19,21

**plaintiffs** 5:17 105:5

**plan** 57:20,21 100:6,7

**PO** 112:4

**point** 10:23 21:19 77:22 115:15

**policy** 123:9

**populated** 72:9

**portion** 105:10

**posed** 90:17 91:16 95:21

**possibility** 122:15

**possibly** 10:19 25:23 45:10 75:18 101:11 114:3 120:1

**potential** 27:3 80:3

**potentially** 23:8

**practice** 17:20

**practicing** 24:18 37:7,11,17,20

**prednisone** 18:1 19:9 20:6,16,18, 20,22 21:10,13,23 22:4,24 23:7,23 24:5,21 27:12,17 39:23 40:3,22 41:15,16 51:12 55:13 70:4 78:10,17 82:3 83:17 85:3 92:17 93:13 95:5,19, 21 98:7,11 99:18 103:24 115:9 126:12,22 127:11,19,24 128:14 130:6

**preliminaries** 6:16

**prescribe** 53:4

**prescribed** 77:1 81:12 97:12 111:19, 20,22

**prescriber** 44:23 45:1

**prescribers** 45:2

**prescription** 18:18 29:15 30:4,8 31:9 32:13 33:3 64:24 65:1,5,7,9,12, 13,15,17,21,22 67:15 68:15,18,22 69:20 70:3,15,20,23 71:1,10,14,18 72:9,23 73:4,8,9,12,15,22 74:1,9,14, 21 76:4,20 78:10,17 79:8,22 80:5,18 85:4,6,23 87:6,23 88:13 89:3,6,13 90:18 92:8,13,17 93:3 94:20 95:17 96:7,16 97:21,23 98:6,8,19 99:9,12, 19,22 100:4,13,19 101:6,8,14,21 102:9,15 103:7 108:23 110:4,10,15 111:3,8,10,15,17 112:21 113:5 115:2, 8,24 116:7,8,18,22,24 117:17,18,20 118:1,2,6,9,13,14,21 119:1,8,20,24 120:2,8,13,16,18,22 121:11,15 122:17 129:14 130:5,11 131:7

**prescriptions** 17:13,17 18:4,6,11,13 27:14 43:11,16 50:11 52:20 57:12,23 58:2,24 59:4 62:21 66:13 68:1,3,5,12, 23 73:16 81:16 86:18 88:16,22 95:18 97:1 100:3,9,21 102:20 106:20 107:4 108:15,20,21 109:7,14 110:1,13 118:3 122:10,14 123:1 130:15 131:12,21

**preserve** 59:6

**Prevention** 60:8,18 61:4

**previous** 92:1 96:21 113:2 131:17

**previously** 108:24

**problem** 10:5 62:7 118:10

**procedure** 29:13 30:13

**procedures** 28:18,21 29:1,6,9 30:1 36:11,13,16

**process** 31:7

**produce** 41:6

**produced** 63:18 108:24

**produces** 45:2

**producing** 43:9

**professional** 47:11 129:15

**proofreading** 29:10

**provide** 51:22

**provided** 28:17 105:5

**provider** 102:16 103:13 128:24

**providers** 53:2,3

**purchase** 14:1,2 105:12,17,20

**purchased** 42:4 48:6 64:16

**purposes** 23:24

**put** 14:13,16 65:10,13,16,22 66:19 68:9,10 71:8 72:13,22 125:3 130:22

## Q

**qualify** 46:23

**quantity** 77:1,3,5,9,16,19 78:10 87:1,3 88:18 90:17 91:2,4,17 95:21 99:18,21 100:7 101:3,4,14 106:4 113:15 118:22 119:11 120:5,19 121:23 129:12,22

**question** 7:19 8:3,23 9:2,6,10,11,15, 22 10:4,13 11:4,6 22:1,21,23 33:4 36:10 37:24 38:15 50:5 51:3,4 52:14 53:21 60:24 61:23 87:12 91:14 92:9 95:12 103:22 108:13 113:2 129:9,11 130:20

**questioned** 130:15

**questions** 6:21 7:6,8,11 8:24 11:9 19:8 32:15,24 33:5,15,19 34:6,9 47:7 102:3,14 106:21 116:7,19 132:3,5

## R

**radio** 48:20

**ran** 66:12

**range** 42:16 66:15,17,21

**ratio** 24:6,15

**reach** 76:21 77:6 79:11

**reached** 79:12 100:12 131:10

**reaches** 30:8

**read** 6:7 20:3,17,19 52:16 59:17,20 60:4 104:16,17 105:16,21 126:10

**reading** 105:19,23

**realize** 10:3

**reason** 18:8 129:13,17

**reasonable** 89:11 114:14

**reasons** 119:14 121:2

**receive** 31:22 65:12,21 103:7

**received** 65:17 69:1 120:20 131:6

**receiving** 31:13

**recently** 20:18 108:11

**recognize** 41:11 55:21 63:23 66:3

**recollection** 75:7,21 108:19 109:1

**recommended** 42:9 60:13 93:13

**record** 5:4,15 27:10 28:2 33:11,13,20 48:22 49:1,4,17,20,23 53:22 59:24 67:24 70:3 79:22,23 107:20,22,24 108:6 109:24 113:1 117:6 130:3 132:10

**recorded** 33:6

**records** 58:19,22 59:6 122:4

**refer** 24:12

**reference** 39:12 74:15

**references** 36:20 38:7

**referred** 103:2 104:4,15 112:18

**referring** 16:11 32:11 73:3 75:6 89:1

**refill** 117:24 118:1,5,13,21 119:1 120:3,7,10,15,17

**reflect** 108:21

**reflected** 8:7

**regular** 110:18

**regulatory** 125:18

**reimbursement** 17:6

**relates** 11:12

**relationship** 45:6 47:3,14 53:3 57:3 58:7 84:1,8

**relayed** 90:14

**release** 41:9,10,15,16 42:5,9,10

**reliable** 39:15

**remaining** 118:22 119:11

**remember** 9:22 10:1 14:7,10 19:19, 24 35:2,3 38:11 40:10 45:17 52:11 60:15 63:7,8 73:24 74:6,8,13 75:2 76:1,18 79:5,16,18 80:19 81:2 87:4 90:10 91:22 93:6 98:18,23 99:15 100:17 101:2 115:13,16,21,22 121:12,16 122:7 131:1,10

**remembering** 86:24

**repayment** 15:5

**repeat** 7:10 16:24 22:20 37:14 60:24 64:10 92:9 95:11 130:19

**rephrase** 7:10

**replacement** 53:4 84:2,4

**report** 64:2,5,24 65:2 66:10,11,12 106:14 108:23

**reporter** 5:24 8:2,13,18 9:8 37:3 107:21

**reporting** 23:24 106:7

**represent** 40:1 105:13

**request** 66:18

**requested** 65:2 68:24 118:23 120:11,23

**requests** 65:14

**required** 69:24 72:16 130:1

**requires** 70:15 72:12

**research** 26:4 93:5

**researched** 73:9 93:12

**researching** 93:7,11

**respect** 29:2,6 71:10 85:3,15 115:23 126:2

**response** 93:3 124:5

**responses** 107:19 108:11

**rest** 16:7

**restoration** 52:13

result 124:21

retail 32:17 34:17 35:22 36:6,7 85:12

retained 5:5

retire 13:24

return 126:9

revenue 43:10,15 44:4,22 45:2

revenues 43:5

reversed 46:7

review 30:8,22 34:21 43:1,14

reviews 36:14

revisit 10:4

rhythm 26:2

Ridge 11:20

rise 125:5

risk 60:19 61:5 95:22 113:23

risks 24:19 80:5 89:20 90:7,16 91:16

Rite 35:4,6,8,18,19 36:5 77:17 98:2,3

Road 11:20

role 28:19

Rose 5:24

roughly 24:7 36:21 50:6

route 40:13,17

RP447961 12:7

RPH 67:6 71:12 96:13

rules 106:2,5

run 13:6 64:24 66:11 82:7

RX 64:9,12,20 65:5,10,22 118:16

S

safe 51:21 53:8,15 54:16 55:13
  101:15

safeguard 30:14

satisfied 89:4

save 111:2

scarring 25:7

scenario 23:17

school 11:23 12:3 19:16 26:14,17
  35:2,14,17 56:18 127:20

screen 39:19,21 105:11 114:11

scroll 110:21 120:1

Scrolling 42:13

search 21:7 51:8 66:16,22 67:2,3

searched 50:23 51:4 66:24

self-reimbursement 16:20

sell 13:24

send 17:5 50:11

sending 52:20

sense 11:7

separately 86:12

September 27:15 68:1 109:3 110:2,
  9,14 111:4,5 112:22 115:20,23
  116:22 117:20 118:13 130:12 131:8

series 7:5

set 76:14 97:3

settings 85:12

shaking 8:5

share 85:20,24

shareholders 12:14

sharing 39:19 114:11

she'd 91:9

Sheldon 13:12

short 82:24 90:24

show 39:17 63:15 104:24 108:8

showing 112:13

shown 97:21,23

sick 57:1,6

side 24:20 25:3,14 27:3 80:3 89:20
  90:6,16 91:16 95:7 113:22 118:18

sign 6:8 12:18 32:5,12,16 34:5

signage 15:22

signature 66:4,6

signify 67:11

signing 66:7,9

similar 15:14 22:1 26:7 32:17 97:13
  128:24

simple 20:3

simpler 91:14

simply 127:24

single 113:15,16 114:1 117:9 127:4,
  11

sit 16:2 58:9 73:23

Site 36:8

sitting 122:7 130:14

situation 114:8 128:12

skin 25:8

slowly 82:15

small 47:19 128:8

smaller 128:10

smallest 91:7

social 47:13

sold 71:18

sole 12:12

solely 92:6

someone's 8:15 29:13

sort 11:14 47:13 55:5 103:8 104:4

sound 28:22

sounds 48:19

source 14:12 39:15

space 47:21

speak 98:20 115:18

specialty 35:21

specific 27:16 29:2,14 39:11 41:6
  51:19 54:2,14 64:3 109:15 121:16

specifically 19:24 21:15 25:13
  26:23 35:4 36:16 53:15 74:6,14 80:5
  93:6 100:14 108:24 114:20

Specter 5:17

speculate 9:17 88:8

spell 8:17 37:2

spelled 60:2

spelling 59:23

spoke 86:11 94:3 122:18,23

spoken 63:5 93:24 94:11,16

spring 124:13

Stacey 5:17 7:7 18:5 27:15 51:1,6
  57:11,17 59:12 62:22 63:2 64:4 67:1
  69:7 74:10,20 75:5 76:20 79:7,12,21
  80:4,12,21 81:6,11,16 83:17 85:2,15,
  21 89:2,21 90:6,18 91:17 92:12
  94:21,22 95:3,7,15,22 98:21 99:12,22
  101:7,22 102:9,20 103:4,7 104:22
  105:14 108:14 111:21 115:2,10,19,24
  116:11,21 121:10,13,24 122:13,19,24

124:9,14 125:4,21 131:3,7

**stamped** 108:23

**standard** 28:18,20 29:1,5,8,24 30:13 36:10,12,15 60:12

**standing** 29:12

**start** 6:16 8:4 9:9 13:17 38:22 91:10

**started** 17:21,23 35:14 45:9,15,19 67:5 75:16

**starting** 98:12

**starts** 105:11,16 108:16

**State** 125:14

**statement** 20:4,8 126:11,14

**states** 5:7 36:17

**status** 15:3

**Stephen** 59:21

**steroid** 27:4 93:19,22

**steroids** 25:12 58:7 62:17 75:9 83:11 98:16 114:6

**stipulate** 22:12

**stipulating** 22:14

**stock** 28:5

**stop** 114:11

**stretch** 25:8

**stuck** 37:15

**stuff** 30:3 47:9 75:14

**subject** 50:18,21

**submitted** 108:11

**suffering** 93:14

**suggested** 81:5

**suggesting** 28:8

**suite** 46:1,2,6,8,11

**suites** 46:3,13

**supplements** 47:8

**supplied** 96:18

**supply** 70:9,13,14,16,17,18 71:6,16 72:4,8,22

**surprise** 60:16 61:2,8,18

**surprised** 61:20

**swear** 5:24

**switched** 98:16 99:5

**swore** 10:16

**sworn** 6:4

**symptoms** 26:21 84:5,13

**system** 28:2 32:14 62:5,8,16 64:6,8, 12,15 70:15 71:19 72:12,21 83:11 96:23 97:2 98:1,2,5 110:18

**systems** 72:16

---
**T**
---

**tablet** 18:7

**tablets** 27:16 40:21 41:9,10,15,16 42:10 70:4 95:5,19 100:20 111:9,11, 16 113:3,6,10

**tabs** 112:3,8

**takes** 33:16

**taking** 23:6 24:1,20 43:6 75:16 90:24 91:17 107:12 113:3,11,24 114:4,6 115:5 124:21

**talk** 6:18 45:5 54:10,13,15 55:19 56:20 57:5 79:7,12 80:3 90:16 91:19 114:19

**talked** 6:22,23 27:9 37:16 54:21 72:5 73:9,11,15 80:8,12,20 86:7 95:1 99:11 107:11 109:23

**talking** 9:7 39:20 48:18 59:8 80:23 92:10 112:21 130:4 131:3

**talks** 27:14

**taper** 82:9,12,14,15

**tapering** 82:19 83:1,6

**tart** 70:2

**taught** 19:14,19 101:13

**technical** 7:17

**technically** 34:12,14 46:22,23

**television** 48:20

**telling** 106:19 112:7

**tend** 8:4

**tendency** 8:23

**term** 55:21 68:14 72:19 81:22 82:12 83:22 97:7 120:3

**terms** 16:13 84:3

**testified** 6:4 85:22 89:2 95:16 99:17 121:9 122:11 125:20 131:2

**testimony** 104:7 109:6 130:24 131:6

**text** 76:14

**texts** 121:19

**therapeutic** 97:8,20 98:4 110:12,15

**therapeutically** 98:7 117:19

**therapy** 53:5 84:2,4 91:8,10

**thing** 6:20 7:3,15 8:11,22 11:2,14 37:15 52:17 91:11 112:7

**things** 6:17 19:18 39:8 41:12 92:6

**thinking** 97:4

**thought** 88:9 96:23 97:5 112:12

**tick** 56:4

**tick-born** 56:10,12 59:10,22

**time** 5:9 13:8,23 15:6 19:24 23:6 26:13 31:3,8,22 36:24 37:8,10,23 44:7 48:8,22 49:4,6,17,23 50:5 62:18 65:8,11 78:9 81:13 82:9,24 83:13 91:1 96:18 97:13 99:2 107:13,24 108:3,6 111:2 116:7 119:7 120:10,19 121:1 130:16 132:10

**timeframe** 93:10

**times** 72:19 73:20 83:2 84:9 85:5,12 92:3 97:13

**today** 6:17,21 7:6,24 10:12 11:4 16:2 22:14 26:7 37:12 73:23 126:9 130:14

**today's** 5:8 132:9

**token** 9:21

**told** 7:2 10:23 16:12 93:21 126:13

**top** 21:17 24:14 25:6 26:24 38:13 39:23 46:18 66:13 105:10 115:3,14

**topical** 107:15

**tops** 107:18

**total** 122:8,13 130:6 131:20

**totally** 112:20

**town** 47:10,19

**toxic** 23:8,10

**trained** 34:19

**training** 55:6

**transcribed** 8:1

**transcript** 8:8 10:9

**treating** 59:12 75:8

**treatment** 7:7 39:13 57:20,21 60:13, 18 61:4 75:12,15 84:22 93:14 100:5,7 114:21 129:21 130:1 131:16

**treats** 94:6

**trial** 10:9,11,14

**Trimby** 5:4

**true** 121:18

**truth** 10:17,18

**truthful** 125:23

**Tunkhannock** 5:20 11:13,20 13:9,
18 15:9,16,18 16:4,8,9,15 19:3 28:24
35:9,15 36:4,23 37:18,21 42:24 43:5
44:5 45:3,11,20,24 46:6 52:20 58:10
64:15 69:16 77:24 81:17 89:12
102:24 103:17 104:3 106:3,13 111:14
116:2,13,23 117:10 118:24 123:18

**turn** 62:20

**two-month** 121:24

**Tyler** 36:3

**type** 9:8 40:7

**typed** 8:1

**types** 43:9,16

**typically** 32:21

### U

**uh-huh** 8:6 34:5 42:21 71:15 111:13

**uncommon** 85:10

**underneath** 40:14 41:8 70:8

**understand** 7:8,11 8:9,14,20 9:12,
19 10:6,8,16,24 11:11 38:14 103:22
116:10 130:24

**understanding** 31:1,11 56:2 70:24
82:4,11 83:10 84:11 85:1,8,14,18
90:2,22 91:6,12,24 92:5,15,22 94:24
98:11,15,19 99:8 100:6 119:18
131:19

**understood** 11:6 58:3 99:5 100:5
131:16

**unfamiliar** 8:15

**United** 5:7

**University** 12:3

**unsafe** 128:1

**unusual** 118:24

**upper** 20:6,15,20 21:22 126:11

**utilize** 84:21

### V

**valid** 129:13,17

**verifies** 31:4

**versus** 106:3

**video** 5:6,9 16:23 97:14

**view** 34:7 51:22

### W

**wait** 9:5 112:17

**walking** 63:13 116:11

**wanted** 52:14 77:1,19 82:2,7 100:7
121:4 129:8

**wanting** 13:24

**warn** 31:17 102:9

**warned** 116:1

**warning** 103:8

**weakening** 25:19

**weakness** 25:21

**website** 52:11,13

**websites** 52:9

**week** 118:14 119:3,21 121:3

**weight** 25:11,14

**withdrawal** 26:19,22 27:3

**Wolking** 5:12,18 7:7 18:5 27:16
51:1,6 57:11,17 59:12 62:22 63:2
64:4 67:1 69:8 74:10,20 75:5 76:21
79:7,13,21 80:4,13,21 81:6,11 83:17
85:3,15,22 89:2,21 90:6,19 91:17
92:2,16 94:21,23 95:3,7,15,22 98:21
99:12,22 101:7,22 102:10,21 103:4,7
104:22 105:14 111:22 115:19 116:1
121:10,13,24 122:14,19,24 124:10,14
125:4,22 131:3,7

**Wolking's** 58:2 92:12 108:14 116:21

**words** 8:3,7 29:12,14 43:14 88:9
92:21 130:22

**work** 13:15 35:6,8 41:7 47:16 48:13
69:19

**worked** 34:16 35:16,17,18,19 36:23
39:6

**working** 13:17 17:22,23 35:15 45:9,
15,19,21 50:12 62:5,16 77:23

**wrap** 121:8

**writing** 89:5 125:3

**written** 79:23 98:24 103:8 106:12
111:17 120:5,21

**wrong** 119:17

**wrote** 77:3 112:22

### Y

**YA0019** 63:20,22 66:3 108:24 109:2

**YA0022** 63:20

**year** 12:1 26:9 47:2 124:13

**years** 24:19 35:10 40:10 78:1,4

**yes-no** 8:3

**Young** 5:13 6:3,13 12:9 17:1 67:13
108:8 132:5,9

**Young's** 109:1

**Youngs** 11:11 12:19,22 13:3 16:3,11
105:6 123:8

### Z

**zoom** 5:12 7:16 105:9