IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
CIVIL ACTION 3:23-cv-00806-JFS

STACEY WOLKING and DARYL          )
WOLKING, W/H,                     )          VIDEOTAPE
                                  )
         Plaintiffs,              )     DEPOSITION UPON
                                  )
    - vs -                        )     ORAL EXAMINATION
                                  )
HENRY LINDER, M.D., and           )              OF
YOUNGS APOTHECARY, INC.           )
d/b/a TUNKHANNOCK                 )     THOMAS JOHNS, Pharm.D.
COMPOUNDING CENTER,               )
                                  )
         Defendants.              )
- - - - - - - - - - - - -

         TRANSCRIPT OF VIDEOTAPE DEPOSITION,
taken by and before JENNIFER O'NEILL, Professional
Reporter and Notary Public, via Zoom
videoconferencing, on Thursday, June 6, 2024,
commencing at 9:11 a.m.


ERSA COURT REPORTERS
30 South 17th Street
United Plaza - Suite 1520
Philadelphia, PA  19103
(215) 564-1233

THOMAS JOHNS, Pharm.D.

**2**

APPEARANCES:

KLINE & SPECTER, P.C.
BY: CONOR LAMB, ESQUIRE
1525 Locust Street, 19th Floor
Philadelphia, Pennsylvania 19102
    Attorneys for the Plaintiffs

MCCORMICK & PRIORE, P.C.
BY: CONRAD JAMES BENEDETTO, ESQUIRE
SUSAN KEESLER, ESQUIRE
2001 Market Street, Suite 3810
Philadelphia, Pennsylvania 19103
    Attorneys for the Defendant,
    Youngs Apothecary d/b/a
    Tunkhannock Compounding Center

CIPRIANI & WERNER, P.C.
BY: CIARA DENAPLES, ESQUIRE
415 Wyoming Avenue
Scranton, Pennsylvania 18503
    Attorneys for the Defendant,
    Henry Lindner, M.D.


ALSO PRESENT:

Luke Simpson, videographer
Joe DePasquale
Angelesa DeNaples

**3**

INDEX

WITNESS                          PAGE

THOMAS JOHNS, Pharm.D.

By: Mr. Benedetto              4, 153

By: Mr. Lamb                   151

By: Ms. DeNaples               155


- - -


EXHIBITS

NUMBER      DESCRIPTION           MARKED  ATTACHED
JOHNS
No. 1    Amended Notice of         156      161
         Deposition

No. 2    Curriculum Vitae          156      162

No. 3    Expert Testimony List     156      163

No. 4    4/18/24 Report            156      164

**4**

1    THE VIDEOGRAPHER: This
2  deposition is being taken on Thursday,
3  June 6th, 2024, scheduled for 9:00 a.m.,
4  via Zoom conferencing.
5    This deposition is for the United
6  States District Court for the Middle
7  District of Pennsylvania, Nos. 806, in the
8  case of Stacey Wolking, et al., versus
9  Henry Lindner, M.D., et al.
10    Present for the taking of this
11  videotape deposition is the deponent,
12  Thomas Johns, Pharm.D. All counsel will
13  be noted on the stenographic record.
14    The court reporter is Jennifer
15  O'Neill of ERSA. The court reporter will
16  now swear in the witness.
17    THOMAS JOHNS, Pharm.D., having
18  been duly sworn, was examined and
19  testified as follows:
20    THE VIDEOGRAPHER: The time is
21  9:12. We will now begin questioning.
22
23  BY MR. BENEDETTO:
24  Q.    Good morning, Mr. Johns. Do you hear me

**5**

1  okay?
2  A.    Yes, I can.
3  Q.    Pardon me, Dr. Johns. Doctor, my name is
4  Conrad. I didn't have an opportunity to introduce
5  myself before we went on the record, but I'm an
6  attorney for Youngs Apothecary who is a named
7  defendant in this matter and we're here to take your
8  deposition. You understand that?
9  A.    Yes, I do.
10  Q.    Okay. And you understand it's being video
11  recorded?
12  A.    I do.
13  Q.    Okay. Excellent. I'm just going to go
14  over a few ground rules. Looking at your CV, I see
15  that you have testified recently, so I'm sure you
16  understand the basic rules, but I just wanted to
17  review them with you and I'm sure you have with
18  counsel as well.
19    First thing, so far you're doing great.
20  Make sure you say yes or no to any affirmative or
21  negative response, not a shake of the head or a nod
22  because that won't get picked up by the written
23  transcript. You understand that?
24  A.    I do.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

THOMAS JOHNS, Pharm.D.

**6**

1  Q.      Okay.  And please do not guess on any
2  answer.  You can approximate or estimate, and I'd ask
3  that you just say that you're approximating or
4  estimating.  Do you understand that?
5  A.      I do.
6  Q.      Okay.  And we should not be here
7  prohibitively long, but it will take at least a
8  couple of hours.  So if you do need to take a break,
9  if I need to take a break, I would just say that you
10  do.  I only ask that if there's a question I've asked
11  you, you answer the question before we take that
12  break.  Okay?
13  A.      I understand.
14  Q.      All right.  Great.  Thank you.  Have you
15  had a chance to review your report before this
16  morning?
17  A.      Yes, I have.
18  Q.      Okay.  Have you reviewed any other
19  materials in advance of this deposition this morning?
20  A.      Just what's included in my timesheet.
21  Q.      And what would those materials be?
22  A.      Sure.  I have reviewed the TCC Pharmacy
23  records, various deposition transcripts, the defense
24  expert reports, I believe it's Green, Pharm.D. and

**7**

1  Smith, M.D., Dr. Lindner's records.  From memory I
2  think that may include everything.
3  Q.      Okay.  And when you said you reviewed the
4  transcripts, did you review Ms. Wolking's transcript?
5  A.      No, I don't think I did.
6  Q.      Did you review Mr. Wolking's transcript?
7  A.      No.
8  Q.      Okay.  And I noticed in your report you
9  had -- you reviewed both Ms. Young's deposition
10  transcript and then the 30(b)(6) transcript who also
11  happened to be Ms. Young; is that correct?
12  A.      That's correct.
13  Q.      All right.  And then you reviewed
14  Dr. Bryk's transcript as well?
15  A.      I did.
16  Q.      Where are you testifying from this
17  morning?
18  A.      My home in Gainesville, Florida.
19  Q.      Okay.  And so counsel is not presently in
20  Florida, correct?
21  A.      No, he's not.
22  Q.      Maybe Mr. Lamb wishes he were in Florida.
23  I don't know.  I think it's less muggy down there
24  right now.

**8**

1        Okay.  Any other materials that you may
2  have reviewed in preparation for today's deposition?
3  A.      Not that I recall.
4  Q.      Do you have your file with you?
5  A.      It's electronically, but I have my report
6  in hard copy in front of me.
7  Q.      Okay.  Great.  And I will tell you right
8  now we're going to mark as exhibits -- we're going to
9  mark four exhibits at least to start.  The first
10  exhibit will be Johns 1 will be the amended notice,
11  Johns 2 will be Dr. Johns' CV, Johns 3 will be
12  Dr. Johns' testimony that was provided to us
13  yesterday, and also it looks like it's Page 9 of the
14  CV, and then Johns 4 will be Dr. Johns' report.
15        There may be others, but at least right
16  now, Counsel, that is what we'll mark.
17        Dr. Johns, do you have your CV in front of
18  you?
19  A.      No, I don't.
20  Q.      Are you able to access that relatively
21  quickly and easily?
22  A.      I am.
23  Q.      Okay.  Do you mind pulling that up for us?
24  A.      Would you like me to share --

**9**

1  Q.      No, you don't have to share the screen.
2  Just so you can look at it because I have a hard copy
3  as well that I'll go through with you just so you see
4  it.
5        MR. BENEDETTO:  Counsel, do I
6    need to share the screen or does everybody
7    have a copy of Dr. Johns' CV?
8        MR. LAMB:  I'm good whichever way
9    you want to do it.
10        MS. DENAPLES:  I have a copy.
11        MR. BENEDETTO:  All right.
12    Good.  I'll just leave it like this then.
13    Okay.
14  BY MR. BENEDETTO:
15  Q.      Dr. Johns, where are you currently
16  employed?
17  A.      University of Florida Health Shands
18  Hospital.
19  Q.      And that's in Gainesville?
20  A.      Yes, it is.
21  Q.      And what is your title currently?
22  A.      Associate vice president of operations.
23  Q.      And what are your duties as an associate
24  vice president of operations?

THOMAS JOHNS, Pharm.D.

**10**

1  A.      I have hospital executive leadership
2  oversight over several ancillary clinical
3  departments, including the pharmacy department,
4  radiology, laboratory services, and neurodiagnostics.
5  Q.      All right.  What are your duties as an
6  associate vice president?
7  A.      My duties relative to all of the
8  departments is to ensure that their operations,
9  clinical activities, regulatory compliance, and
10  financial matters are in line with the hospital's
11  goals and strategies.
12  Q.      Do you dispense medication as an associate
13  vice president of operations?
14  A.      Well, I can tell you that even as early as
15  this week I have been in our electronic medical
16  record Epic reviewing medication profiles for
17  patients and verifying medication orders, which then
18  subsequently result in the dispensing of those
19  medications to patients via our automated dispensing
20  cabinets which are located in various patient care
21  areas.
22  Q.      So you currently as an associate vice
23  president of operations that oversees various
24  departments and the operations, regulatory

**11**

1  compliance, and financial aspects of the hospital
2  system, you also verify orders for patients that are
3  inpatient at the hospital?
4  A.      Like I said, I did it just this week, so
5  yes.  I'm currently a licensed pharmacist in the
6  state of Florida and that certainly is something
7  within the scope of my duties that I have the ability
8  to do.
9  Q.      Are you required to do that?
10  A.      No, I'm not.
11  Q.      Okay.  And why do you do that, meaning
12  that is the verification of patient orders?
13  A.      Sure.  It's a fair question.  I think it's
14  important that most pharmacists maintain their skill
15  sets in a variety of areas that they may be licensed
16  and professionally trained.
17  Q.      Okay.  You graduated with a Pharm.D. in
18  1992 from University of Florida; is that correct?
19  A.      Yes.
20  Q.      Okay.  And then you had an internal
21  medicine pharmacy residency for one year at the VA
22  center in Gainesville, correct?
23  A.      Correct.
24  Q.      Okay.  Have you been continuously --

**12**

1  strike that.  I'll go backwards.  When was the last
2  time you actually though dispensed an order as a
3  pharmacist?
4  A.      Maybe you can help me understand your
5  definition of dispense and then I can better answer
6  the question.
7  Q.      Sure.  Instead of verifying it, my
8  understanding is that verifying it is the doctor puts
9  in an order in a hospital system, correct?
10  A.      That's correct.
11  Q.      And you mentioned the word Epic and that's
12  a hospital software communication system, correct?
13  A.      It's an electronic medical record within
14  the hospital.
15  Q.      Okay.  And the doctor will enter his
16  prescription or order in that Epic system, correct?
17  A.      Yes.
18  Q.      And then you when you verify it, maybe you
19  can help me, what do you mean by verify?
20  A.      Similar to processing a prescription in an
21  outpatient or community, slash, retail pharmacy, the
22  same principles apply, ensuring that the medication
23  order is appropriate relative to drug dosing, drug
24  interactions, any contraindications that may be

**13**

1  present for any given patient.
2  Q.      Okay.  And this is all in the hospital
3  setting though, correct?
4  A.      Yes, that's correct.
5  Q.      Okay.  And then once you verify that by
6  the appropriate means, and we can get into the
7  mechanics a little bit later, then is the medicine
8  dispensed to the patient?
9  A.      Yes, that's correct.
10  Q.      And who usually in your setting at the
11  University of Florida Hospital System dispenses that
12  medication to the patient?
13  A.      Well, that depends.  Like I mentioned
14  earlier, a lot of medications within the hospital are
15  located within automated devices.  So when a
16  pharmacist acknowledges -- reviews, acknowledges, and
17  verifies an order, it releases that order for nursing
18  staff to retrieve it from the machine.
19          So these machines are physically located
20  on the nursing units and contain most of the
21  medications that will be utilized for a particular
22  patient population.  If the medication is not located
23  in that machine, then the physical, quote, unquote,
24  dispensing would occur from an inpatient pharmacy

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

---

**14**

1  location.
2  Q.      Okay.  And either by way of the automated
3  machine or the in-person pharmacist in the hospital
4  pharmacy would then -- the medicine would then be
5  obtained by a nurse, a doctor, or some type of
6  professional staff that is attending to the patient,
7  correct?
8  A.      Yes, that's correct.
9  Q.      And then that nurse or doctor would then
10  provide the patient with that medication, correct?
11  A.      That's correct.
12  Q.      Okay.  Does that happen in an outpatient
13  setting?
14  A.      Not usually.  Here at Shands we have four
15  outpatient pharmacies that are also underneath my
16  jurisdiction and oversight, but it's a little bit
17  different.  In those settings the pharmacist or the
18  pharmacy technician is providing that patient
19  directly to the patient or the family member.
20  Q.      Okay.  And then the patient or the family
21  member obviously since they're outpatient go home or
22  go to wherever and then pick up the medication,
23  correct?
24  A.      We hope so.

---

**15**

1  Q.      But you don't know, right?
2  A.      You never know.
3  Q.      You never know.  And maybe they do have a
4  nurse or an aide with them, but maybe they don't,
5  correct?
6  A.      Unlikely that they do.  It would depend on
7  --
8  Q.      Depend on the situation, correct?
9  A.      That's correct.
10  Q.      All right.  But whereas in a hospital
11  setting, once the medication is verified and
12  dispensed, we know that the doctor or the nurse or
13  some type of professional staff is administering that
14  medication to the patient?
15  A.      Yes, we do.
16  Q.      Okay.  What was your residency?  Can you
17  just describe it briefly at the VA Hospital?
18  A.      Sure.  It's a one-month postgraduate
19  pharmacy practice residency that specialized in the
20  area of adult internal medicine.  It consisted of a
21  variety of rotations working side-by-side with the
22  medical and nursing staff in a variety of hospital
23  locations in order to advance my training.
24  Q.      And could you just describe briefly what

---

**16**

1  -- when you say advance your training, what was
2  involved in that?  Would you shadow another
3  pharmacist at the VA Hospital?  Were you in charge of
4  verifying and dispensing orders?
5  A.      Sure.  Yeah.  It was all of that, in
6  addition to having an assigned program director that
7  would oversee completion of a variety of competencies
8  all leading up to successful awarding of the PGY1
9  certificate.
10  Q.      What is the PGY1?
11  A.      It's basically just nomenclature
12  designating postgraduate year or postgraduate year
13  two training very similar to the medical model.
14  Q.      Okay.  And would you be asked to research
15  certain medication and give a brief presentation
16  either to your preceptor or your supervisor during
17  that residency?
18  A.      Regularly.
19  Q.      Okay.  And then during your undergrad or
20  the Pharm.D. program at Florida, can you just
21  describe some of your coursework?
22  A.      That's been quite a long time ago.
23  There's certainly a variety of courses I'll
24  characterize it as in the chemistry space,

---

**17**

1  biochemistry, medicinal chemistry, a variety of
2  pharmacology classes, therapeutics, pharmaceutics,
3  pharmacodynamics, just a variety -- law and
4  regulatory practice.  You're testing my memory, but
5  that's probably a good summary.
6  Q.      Okay.  That's good.  Are you originally
7  from Florida?
8  A.      Yes, I am.
9  Q.      From north or south Florida?
10  A.      I'll call it central Florida.
11  Q.      Central Florida.  Okay.  How much time
12  currently as an associate vice president of
13  operations percentage wise do you spend verifying
14  orders?
15  A.      Oh, it would be not much at all in a
16  percentage wise.
17  Q.      Okay.  Less than 10 percent?
18  A.      Oh, sure.
19  Q.      And less than 5 percent?
20  A.      Probably.
21  Q.      Okay.  And so obviously most of your time
22  is being responsible for greater than the 900
23  employees, the administering of the annual budget of
24  253 million, and again regulatory and financial

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**THOMAS JOHNS, Pharm.D.**

---

**18**

1  aspects of your job, correct?
2  A.    That's correct.
3  Q.    Okay.  And it looks like in your resume,
4  your CV, that starting in April of 1999 through
5  present you have been in the administration and the
6  administrative aspect of the hospital system; is that
7  correct?
8  A.    Yes, that's correct.
9  Q.    Okay.  And prior to that for five years or
10  approximately five years it looks like you were the
11  clinical pharmacist in the adult internal medicine
12  infectious disease at the University of Florida
13  Health System, correct?
14  A.    Yes.  Correct.
15  Q.    Okay.  And would you say that since April
16  of 1999 when you became the assistant director of
17  pharmacy services, your job roles involved less
18  verification of orders than it was as a clinical
19  pharmacist?
20  A.    Yes, I would agree.
21  Q.    Okay.  And since April 1999 has your
22  percentage of your job duties that have verified
23  orders been at 5 percent or less or has it decreased
24  with each role that you've accepted?

---

**19**

1  A.    I'll say I'll agree to the 5 percent or
2  less.
3  Q.    Okay.  And from your resume looking at the
4  -- well, strike that.  The VA Medical Center, was it
5  part of the University of Florida Shands System or is
6  it separate?
7  A.    It's really a collaboration between the
8  two entities.  They're across the street from each
9  other.  So although the VA paid my salary, they were
10  -- sponsored my residency, most of my rotations were
11  actually at Shands Hospital.
12  Q.    Okay.  I'll use my alma mater and local VA
13  hospital as an example.  The VA hospital here in
14  Philadelphia is across the street from University of
15  Pennsylvania's medical school and near the University
16  of Pennsylvania Health System.  Would it be similar
17  to that where it's literally across the street or
18  adjacent to, but not part of the system, but works in
19  conjunction with the system?  Would that be accurate?
20  A.    Yes, I would characterize it that way.
21  Q.    Okay.  So since you started your Pharm.D.
22  program in 1987 to the present, have you been
23  employed by any system other than the University of
24  Florida?

---

**20**

1  A.    Yes.  I was employed for less than a year
2  by Florida Hospital Medical Center, which is now
3  Advent Health in Orlando.  That's not represented on
4  my CV.
5  Q.    And when was that?
6  A.    That would have been around '93 to '94.
7  Q.    Okay.  During your time when you were --
8  strike that.  Okay.  I see.  That's the August 1993
9  to July 1994 clinical pharmacist at Florida Hospital
10  Medical Center in Orlando.  Understood.
11        And then you were a U.S. Army Reserve
12  pharmacy tech or pharmacist?
13  A.    I was a variety of things in the United
14  States Army.  I was an enlisted person from '83 to
15  '87.  I was trained as a pharmacy technician by the
16  Army.  I was stationed at Tripler Army Medical Center
17  in Honolulu, Hawaii, until '87.  In which time I
18  moved to Gainesville to go to pharmacy school.
19        While I was in pharmacy school, I
20  maintained my reserved status, was subsequently
21  involuntarily activated during the first Gulf War and
22  deployed to Riyadh, Saudi Arabia, again as a pharmacy
23  technician.  Once I returned back, I finished
24  pharmacy school and was a commissioned officer in the

---

**21**

1  Army as a pharmacist for a number of years.
2  Q.    And fair to say your Pharm.D., it looks
3  like it took five years.  That one year was spent
4  deployed, correct?
5  A.    I would say the deployment cost me about
6  four months actually.
7  Q.    Okay.  Okay.
8  A.    The university was very kind when I
9  returned.  Allowed me to finish my coursework and
10  clerkships a little out of cycle from a normal
11  pharmacy class.  And instead of graduating in May, I
12  graduated I think in August of that year.
13  Q.    Okay.  And while you were in either active
14  duty or as a reserve and deployed between 1983 and
15  1991 as a pharmacy tech, what were your duties?
16  A.    With the Army?
17  Q.    In the Army, like what would be a pharmacy
18  tech's duties in the United States Army?
19  A.    Really no different than in the civilian
20  space.  It would be processing physician orders,
21  dispensing medications under the supervision of a
22  licensed pharmacist, compounding sterile products, a
23  variety of activities like that, but really
24  materially no different than a nonmilitary facility.

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

THOMAS JOHNS, Pharm.D.

22

1  Q.        And from 1983 to the time you started at
2  the University of Florida where were you -- so '83 to
3  '87 where were you located physically?  You said
4  Honolulu?
5  A.        Yeah, I think I mentioned that.  I was at
6  Tripler Army Medical Center in Honolulu, Hawaii.
7  Q.        And then as a tech either at Tripler or in
8  the Persian Gulf or while you were still completing
9  your Pharm.D. and right after, when you were
10  performing that work for the United States Army, was
11  that in a hospital setting as well?
12  A.        Yes.  Or in an ambulatory outpatient
13  pharmacy, both.  So I have inpatient experience and
14  outpatient experience as a pharmacy technician.
15  Q.        Okay.  But since approximately 1993 or so
16  most of your experience, if not all of your
17  experience, has been in a hospital setting, correct?
18  A.        That's correct.  I did a little
19  moonlighting at a local grocery store pharmacy here
20  in Gainesville for a year or so.  It was called
21  Albertson's.  I don't know if you're familiar with
22  that chain, but I would fill in as a retail
23  pharmacist in that setting.
24  Q.        Just the Publix, Dr. Johns.  And when was

23

1  that approximately?
2  A.        Can you clarify?
3  Q.        Oh, when were you moonlighting?
4  A.        Oh, that would have been probably during
5  my residency year, because at the conclusion of the
6  residency year I moved to Orlando to work at Florida
7  Hospital.
8  Q.        Okay.  And then since 1994 July, you've
9  been in the hospital setting exclusively, correct?
10  A.        Well, I wouldn't say that.  Again, my
11  oversight is both inpatient and outpatient
12  operations.
13  Q.        Before the University of Florida Shands
14  Hospital System?
15  A.        Yeah.  At this hospital system I have
16  responsibilities for not only the inpatient pharmacy,
17  but four ambulatory or community pharmacies that are
18  located within our buildings and around Gainesville
19  proper.
20  Q.        And those what we're calling outpatient
21  pharmacies that are attached to the hospital system,
22  they utilize Epic and the other hospital system
23  software and electronic systems, correct?
24  A.        Actually they don't.  At our setting they

24

1  use an outpatient pharmacy computer system named
2  QS/1, but our pharmacists certainly have access to
3  Epic in all of those locations.
4  Q.        And is QS/1 administered and monitored by
5  the University of Florida Shands Health System?
6  A.        Yes, it is.
7  Q.        And just to close the circle, it's not an
8  -- the outpatient pharmacies that the pharmacist may
9  work at at University of the Florida Shands, they're
10  not independent of University of Florida Shands
11  Health System?
12  A.        No.  They are owned by UF Health Shands.
13  Q.        Gotcha.  Okay.  Thank you.  And so at
14  least since April 1999 have you been a clinical
15  pharmacist in any capacity other than what we've
16  already talked about?
17  A.        Nothing in addition to what we've talked
18  about.
19  Q.        Okay.  I'm looking at Page 2 of your CV,
20  Dr. Johns.  So the first publication there at the
21  bottom, the development and validation of a
22  complexity-score to rank hospitalized patients at
23  risk for preventable adverse drug events, what was
24  this article about?

25

1  A.        That was a study that was funded by a
2  national health system pharmacy organization
3  essentially to develop a tool that looked at
4  inpatients and categorized them by level of risk for
5  a preventable adverse drug event while they're in the
6  hospital.
7  Q.        And what were the drugs that were studied?
8  A.        Oh, it was a variety of drugs.  It could
9  be anywhere from anticoagulants to diabetes drugs.
10  It was quite the variety.  Drugs that cause falls in
11  hospitals.  It was a very lengthy detailed complex
12  analysis, but it's published.
13  Q.        Yeah.  Do you recall was the study about
14  -- were corticosteroids involved with the study?
15  A.        Not that I recall specifically, but they
16  certainly could have been.
17  Q.        And did it cover all pharmacy settings or
18  just the hospitalized inpatient setting?
19  A.        That particular study was only inpatient
20  environment.
21  Q.        Turning to Page 3 of your CV, it's seven
22  down.  It's midway through the page.  It was an
23  article you coauthored with Winterstein, Rosenberg,
24  Hatton, Gonzalez-Rothi, and Kanjanarat, nature and

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

26

1  causes of clinically significant medication errors in
2  a tertiary care hospital.  Do you see where I'm
3  referring to?
4      A.    I do.
5      Q.    What is a tertiary care hospital?
6      A.    That would describe our setting here in
7  Gainesville typically referred to as an academic
8  medical center with very complex patient populations,
9  high degree of Level 1 trauma, transplant, oncology,
10 high in the number of critical care beds compared to
11 a community hospital, for example.
12     Q.    Okay.  The one below that, the resource
13 use and cost of care for patients hospitalized with
14 community acquired pneumonia, do you see where I'm
15 referring to?
16     A.    I do.
17     Q.    So would you agree with me in the medical
18 setting generally, including the pharmacy setting,
19 the cost of a patient's care is one consideration to
20 take into account?
21     A.    The cost effectiveness of that medication
22 for sure.
23     Q.    Okay.  Several down further it looks like
24 you're back with Winterstein, Winterstein.  Is

27

1  Dr. Winterstein a colleague of yours or someone
2  you've just coauthored articles with?
3      A.    She's a colleague and a friend.
4      Q.    Okay.  And same question for
5  Gonzalez-Rothi and Hatton, are they also colleagues
6  at the University of Florida?
7      A.    They are colleagues.  Dr. Gonzalez-Rothi
8  has subsequently left and I believe Dr. Hatton has
9  retired.
10     Q.    Okay.  Identifying clinically significant
11 preventable adverse drug events through a hospital's
12 database of adverse drug reaction reports, can you
13 just briefly describe what that article was about?
14     A.    You're testing my memory.  These are over
15 20 years in the past, but, you know, there was a
16 common theme back then when myself and
17 Dr. Winterstein conducted a number of studies
18 relative to medication errors within the hospital,
19 what causes them, what is the impact, and how can we
20 prevent them in the future.  So all of these articles
21 that you've mentioned have a very similar theme to
22 them relative to ultimately devising systems that
23 prevent errors from occurring.
24     Q.    And do you recall back in 2002 when this

28

1  particular paper was authored, what were those
2  preventable or preventable adverse drug events, what
3  were the errors at least at the initial stage or
4  maybe throughout the entire process that you
5  discovered during the study and the publication of
6  the report?
7      A.    I would be guessing.
8      Q.    I don't want you to guess.  I mean, again,
9  I could access the article myself, but I was curious
10 to know if you recall what some of those big themes
11 were?
12     A.    Not specifically.
13     Q.    Okay.  And on Page 4, a little -- about a
14 third of the page down, it's an article from 1998, so
15 it is older.  It's with Hammett-Stabler.  It's
16 laboratory guidelines for monitoring of antimicrobial
17 drugs.  Do you see where that is?
18     A.    I do.
19     Q.    What kinds of antimicrobial drugs are you
20 referring to in this article?
21     A.    I believe that centered on therapeutic
22 drug monitoring of vancomycin and aminoglycoside
23 antibiotics.
24     Q.    Okay.  And two down below that, the

29

1  inhaler and asthma article?
2      A.    I see it.
3      Q.    Okay.  Do you know what is the dosage of
4  an albuterol inhaler currently?
5      A.    I don't recall specifically.
6      Q.    Okay.  And what about a nebulizer?
7      A.    Again, if you're referring to that
8  specific article, that's well over 20, 25 years ago.
9      Q.    No, I'm not necessarily referring to that
10 specific article.  Just generally if a patient
11 inpatient at the University of Florida is having a
12 severe asthma attack and you have to bring in a
13 nebulizer, what is the dosage of the steroid in that
14 nebulizer?
15     A.    Well, it just depends on the particular
16 agent for sure, but I would have to refer to
17 references to get you the exact dosage.
18     Q.    Okay.  As a licensed pharmacist in
19 Florida, your license is current, correct?
20     A.    That's correct.
21     Q.    What is the renewal or testing period for
22 that?
23     A.    Every two years.
24     Q.    Every?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

30

1   A.   Every two years.
2   Q.   Two years.  Okay.  Is that a renewal or do
3   you have to take a test every two years?
4   A.   You have to complete the required number
5   of continuing education credits and then submit your
6   application to review.
7   Q.   And how many CEs are required annually in
8   the state of Florida for a licensed pharmacist?
9   A.   For the basic pharmacist I believe it's 15
10  CEUs per year, so 30 every two years.  I also
11  maintain a consultant pharmacist license in the state
12  of Florida, which requires an additional 12 CEUs per
13  year.
14  Q.   And what is a -- what's the difference
15  between a consultant pharmacist and a pharmacist
16  license?
17  A.   They're quite a bit different.  The
18  regular pharmacist license, if you will, enables you
19  to practice pharmacy in a variety of pharmacy
20  practice locations, including hospitals.  The state
21  of Florida Board of Pharmacy requires a pharmacist in
22  that setting to hold a consultant license and be
23  listed within the pharmacy's license as the
24  consultant pharmacist of record.

31

1        It's essentially somebody that the Board
2   of Pharmacy can tap into if anything goes wrong
3   within a pharmacy.  They need someone to haul before
4   the board meeting to hold them accountable.
5   Q.   In the hospital setting?
6   A.   In the hospital setting, yes, and in other
7   settings as well.
8   Q.   Okay.  But in Florida specifically, would
9   typically a local mom and pop for lack of a better
10  term pharmacy, they wouldn't be required to have a
11  consultant pharmacy license, just their pharmacy
12  license?
13  A.   Community pharmacies licensed in the state
14  of Florida do not require a consultant pharmacist of
15  record.
16  Q.   And when you say community pharmacy, again
17  I used the term mom and pop because that's what I'm
18  thinking of, but does that also encapsulate the big
19  box CVS, Rite Aid, Walgreens, or is that separate?
20  A.   I view them all the same.
21  Q.   Okay.
22  A.   A retail pharmacy, an independent
23  pharmacy.
24  Q.   Consumer pharmacy, they're all --

32

1   A.   They're all I'll say outpatient pharmacy
2   types.  Some are certainly owned by national retail
3   organizations such as CVS and Walgreens, Rite Aid,
4   others.  Then you have your big box grocery store
5   chains that have pharmacies, Kroger, Publix, others.
6        And then you do have independents, which
7   are shrinking in numbers around the country as the
8   national chains buy them up, but the practice of
9   pharmacy is essentially the same in all of those
10  locations.
11  Q.   We'll call them retail or consumer
12  pharmacies; is that okay?
13  A.   Let's stick with retail.  How is that?
14  Q.   That's fair enough.  What's the difference
15  between a retail pharmacy and a compounding center?
16  A.   Again, it depends on the state how they
17  are specifically licensed.  Compounding can occur in
18  any pharmacy setting.  It could be an inpatient
19  pharmacy.  It could be CVS, Walgreens.  Certain
20  states have a designated compounding license and then
21  there are certain pharmacies who distinguish
22  themselves from others more as a business patient
23  care model highlighting the fact that they may have
24  certain competencies and expertise in the compounding

33

1   space.
2   Q.   In Florida are there compounding centers?
3   A.   There are.
4   Q.   And are they held to a different standard
5   than retail pharmacies?
6   A.   Well, it just depends.  There's two types
7   of compounding.  There's nonsterile compounding and
8   sterile compounding, so you have to differentiate
9   between the two.
10  Q.   And do you know if in Pennsylvania there
11  are compounding centers and retail pharmacies?
12  A.   Maybe you could --
13  Q.   Sure.  I mean, do you know if there are
14  different standards between compounding centers and
15  retail pharmacies in Pennsylvania?
16  A.   Pennsylvania, I don't specifically know if
17  there's a designated compounding licensure required
18  by the Board of Pharmacy, but, again, you know,
19  retail pharmacies and certain compounding pharmacies
20  depending on what they are compounding can have
21  oversight by not only state boards of pharmacy, but
22  also by certain regulatory organizations.
23  Q.   On Page 8 of your CV, just looking at
24  professional affiliations, are there any other

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

34

1  professional affiliations that aren't listed here
2  that you belong to?
3      A.      I don't think so.  That looks like a
4  complete list.
5      Q.      Okay.  Is there an accreditation in
6  pharmacy or does a pharmacist just have their
7  license?
8      A.      A pharmacist or a pharmacy?
9      Q.      I'm sorry.  A pharmacist.
10     A.      As far as I know there aren't
11  accreditations for pharmacists.
12     Q.      Or board certification similar in
13  subspecialties in medicine, is there anything similar
14  to that in pharmacy?
15     A.      There is.  In the pharmacy space there is
16  a national board certification that is available
17  involuntary for most pharmacists to become board
18  certified.
19     Q.      And you don't need to be board certified
20  to have your license though, correct?
21     A.      That's correct.
22     Q.      And you're not board certified, correct?
23     A.      Not any longer.
24     Q.      Okay.  When were you board certified?

35

1      A.      I'll see if that's on my CV.  Give me a
2  moment.  It looks like I probably took that off.
3  Somewhere in the '90s to 2000s.
4      Q.      Okay.  Is it fair when you moved more to
5  administration work at the University of Florida, you
6  probably didn't need a board certification?
7      A.      No.  I actually maintained my board
8  certification for a number of years as I moved into
9  more administrative roles.
10     Q.      Okay.  But since about the 2000s, you're
11  no longer board certified?
12     A.      Somewhere in there, again, just grossly
13  estimating the timeframe.
14     Q.      Okay.  Exhibit 3 is your -- it's Page 9 of
15  your CV, but it's your testimony in the last four
16  years approximately.  I just have a couple questions
17  about that.  Other than these that are listed here in
18  the last four years, how many times have you provided
19  testimony as an expert in pharmacy?
20     A.      Approximately 30.
21     Q.      30.  And do you recall approximately when
22  the first time you provided testimony as an expert in
23  pharmacy was?
24     A.      Probably late '90s.

36

1      Q.      Have you ever been disqualified as a
2  pharmacy expert?
3      A.      No, I haven't.
4      Q.      Out of these approximately 30 times, can
5  you tell me how many times you testified in state
6  court versus federal court?
7      A.      Oh, I would say the predominance is state.
8      Q.      Predominance is state.  And how many have
9  you testified at a trial?
10     A.      Less than five.
11     Q.      Okay.  And when was your most recent
12  testimony provided?
13     A.      Deposition testimony?
14     Q.      Deposition testimony or trial testimony.
15     A.      Deposition testimony was in April, and I
16  don't recall exactly the last trial testimony.  It
17  would have been a number of years ago.
18     Q.      And the last -- so the last deposition
19  testimony was provided in approximately the last six
20  weeks or so?
21     A.      Sometime around mid April, I believe.
22     Q.      Okay.  And were you -- did you testify on
23  behalf of the plaintiff or the defendant in that
24  case?

37

1      A.      I believe it was a defendant.
2      Q.      In looking in your CV exhibit or Johns 3,
3  the five cases that are listed here you testified for
4  the defense four out of the five times, correct?
5      A.      Correct.
6      Q.      Okay.  The plaintiff's case here -- I'm
7  sorry.  Do you have Johns 3 in front of you, Page 9
8  of your CV?
9      A.      I don't.  I think I sent Mr. Lamb an
10  updated list yesterday you probably have.  Let me
11  pull that up.
12     Q.      And I can share the screen with you if you
13  want me to do that?
14     A.      Why don't you do that?  That would be --
15     Q.      Yeah.  Yeah.  Let me do that.  Give me one
16  second.  Everybody see that?
17     A.      Yes.
18     Q.      Okay.  And you see my little hand here, it
19  says Burnett versus KMC, there's plaintiff, and it's
20  deposition testimony given in February of 2022 in
21  Kansas?
22     A.      Yes, I see it.
23     Q.      What is -- is KMC Kansas Medical Center or
24  Kansas City Medical Center?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

---

**38**

1  A.    Yes, it is.
2  Q.    Do you recall that case?
3  A.    I do.
4  Q.    What was -- briefly what was that case
5  about?
6  A.    That was a case involving hydromorphone or
7  Dilaudid. I'm totally blanking at this point. It
8  was opioid induced respiratory depression.
9  Q.    And what was the allegation there?
10 A.    I believe it had something to do with the
11 pharmacy dispensing an inappropriate dose perhaps.
12 Q.    Okay.
13 A.    I'm guessing a little bit. It had to do
14 with opioid induced respiratory depression.
15 Q.    Opioid, correct?
16 A.    That's correct.
17 Q.    Okay. And that was in the hospital
18 setting where the hospital pharmacy dispensed what
19 was alleged to be an inappropriate level of opioid to
20 an inpatient patient?
21 A.    Yes, that's correct.
22 Q.    Okay. Is that case still pending to your
23 knowledge?
24 A.    No, I don't think it is.

---

**39**

1  Q.    And did that settle?
2  A.    I believe it did.
3  Q.    Okay. All right. And then we can just go
4  down this list. Williams versus Melbourne, you
5  testified for the defense? That's the first one
6  there.
7  A.    Correct.
8  Q.    And do you recall the facts of that case,
9  the allegations and the posture?
10 A.    I don't specifically.
11 Q.    Do you recall what the allegations against
12 -- strike that. Did you provide testimony as an
13 expert in pharmacy in that case?
14 A.    I'm certain I did.
15 Q.    And did you provide testimony as an expert
16 in pharmacy in all of these cases?
17 A.    Yes, that's correct.
18 Q.    Okay. Do you recall the allegations
19 against the pharmacy or the pharmacist in Williams
20 versus Melbourne Regional?
21 A.    I don't recall specifically.
22 Q.    Okay. And then the day before you
23 testified in Kansas, you testified in Thomas v.
24 NFRMC, do you see that?

---

**40**

1  A.    I do.
2  Q.    What is NFR?
3  A.    North Florida Regional Medical Center here
4  in Gainesville actually.
5  Q.    Okay. Do you recall the facts,
6  allegations, or posture of that case?
7  A.    It had something to do with a gentleman
8  who had an unknown history of opioid abuse that was
9  treated as an inpatient and subsequently passed away.
10 Q.    And then about six weeks after that, you
11 testified at Bayview Pharmacy versus Pharmacist
12 Mutual, do you see that?
13 A.    I do.
14 Q.    And that looks like it was a federal case?
15 A.    I don't remember specifically.
16 Q.    Okay. Do you recall what that matter was
17 about?
18 A.    I think it was a pharmacist in south
19 Florida who alleged that a flood in his pharmacy had
20 destroyed all of his medications and so I was
21 retained by the insurance company to give my opinions
22 in that case.
23 Q.    Okay. And then Harr versus Henderson, do
24 you recall the facts and circumstances around that,

---

**41**

1  those allegations in that case?
2  A.    I don't. I'm sorry.
3  Q.    Okay. And the most recent one in the
4  April of 2024, what is that case?
5  A.    That case involved allegations against the
6  pharmacist of inappropriate dispensing of medications
7  that led to a patient having a pulmonary embolism.
8  Q.    What type of medication?
9  A.    They were hormone replacement therapies.
10 Q.    Okay. Can hormone replacement therapy
11 medication cause a pulmonary embolism?
12 A.    It just depends.
13 Q.    Okay. Out of these 30 times that you
14 testified as an expert, approximately how many times
15 have you testified on behalf of the plaintiff or the
16 defendant? I may have asked that already. I
17 apologize if I did.
18 A.    I don't think you did. I would estimate
19 about 60 to 70 percent defense, 30 to 40 percent
20 plaintiff.
21 Q.    How many times have you testified against
22 another pharmacist or pharmacy?
23 A.    Oh, I couldn't even venture a guess.
24 Q.    I mean, for example, in the Johns 3 I see

---

**11 (Pages 38 to 41)**

THOMAS JOHNS, Pharm.D.

42

1  the one of Bayview Pharmacy verses Pharmacist Mutual,
2  but that was in a different -- that was more like --
3  it sounds like it was like a property damage
4  insurance claim setting. It had nothing to do with
5  the pharmacist performing the duty of a pharmacist in
6  terms of verifying or dispensing medication, correct?
7  A.      That's correct.
8  Q.      And you cannot estimate how many times
9  you've testified in the 30 times or you've
10 provided expert testimony against a pharmacy or
11 pharmacist in the performance of their duties as a
12 pharmacist in terms of verifying and dispensing
13 medication, correct?
14 A.      No, I really can't estimate that.
15 Q.      Okay. Out of the 30 times you've
16 testified as an expert, approximately how many cases
17 involved allegations that the medication, if there
18 was medication dispensed to an individual patient or
19 plaintiff, involved opioids?
20 A.      I don't recall specifically.
21 Q.      More than half?
22 A.      I would not even want to guess.
23 Q.      Okay. More than one?
24 A.      Probably. You know, if you look at the

43

1  totality of all of the cases I reviewed, I would
2  probably venture to guess that a large portion
3  involved opioid medications.
4  Q.      Okay. Is there a different standard
5  either by the federal, state, or local governments in
6  the United States in terms of dispensing opioids
7  versus other types of medications in the pharmacy
8  setting whether inpatient or outpatient in the retail
9  space?
10 A.      I mean, there certainly are regulations
11 that are published by the Drug Enforcement Agency,
12 but also most state boards of pharmacies as well as
13 there are state statutes in a lot of states that
14 speak to proper prescribing and dispensing of
15 opioids.
16 Q.      And opioids specifically independent of
17 the totality of the universe of other medications,
18 correct?
19 A.      Correct.
20 Q.      And that's at least in part to what's been
21 well publicized over the last 10 or 20 years in terms
22 of opioid abuse, correct?
23 A.      Yes, I would agree.
24 Q.      Okay. And you would agree that there is

44

1  in a general sense an opioid problem, correct?
2  A.      Well, I would say that, but that's just my
3  opinion.
4  Q.      There is a lot of literature and
5  information being publicized since 2000 about
6  opioids, correct?
7  A.      Yes, I would agree.
8  Q.      Okay. So it's kind of just out there for
9  the public consumption, correct?
10 A.      Well, that just depends what you mean by
11 out there to the public for consumption.
12 Q.      The information, not the opioid. The
13 information. In other words, it's a newsworthy
14 situation more so than other medications that
15 individuals may take, correct?
16 A.      I would agree with that.
17 Q.      Okay. And I don't even pretend to know
18 why, but you -- and you testified that federal,
19 state, local agencies, regulatory bodies, there's
20 like -- they have specific to opioids a different set
21 of rules governing how they're consumed and verified
22 and dispensed both in the medical community generally
23 to doctors, to pharmacists, and others involved in
24 the medical system?

45

1  A.      Well, I would broaden it beyond opioids
2  and just classify it as all controlled substances.
3  Q.      Okay. Controlled substances. Okay.
4  Thank you. Are corticosteroids a controlled
5  substance?
6  A.      No, they're not.
7  Q.      Are antimalarials a controlled substance?
8  A.      No.
9  Q.      Is ate-m, a-t-e, dash, M a controlled
10 substance?
11 A.      I don't know what that is.
12 Q.      Okay. Are antibiotics a controlled
13 substance?
14 A.      No.
15 Q.      And by controlled substance, we're using
16 the schedule promulgated by, what is it, the FDA,
17 correct?
18 A.      Yes, Schedule 1 through 5.
19 Q.      Okay. Doctor, do you need to take a break
20 or do you want to -- because I'm ready to move on to
21 your report and have questions about the report?
22 A.      Yeah. Why don't we take five.
23 Q.      That's good. Yeah. Do we want to come
24 back at --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

46

1    THE VIDEOGRAPHER: 10:03, off
2  video.
3    (At this time, a brief recess was
4  taken.)
5    THE VIDEOGRAPHER: 10:12, on
6  video.
7  BY MR. BENEDETTO:
8    Q.    Doctor, just turning your attention to the
9  deposition testimony that you gave in April of 2024,
10  I'm looking for the name of it.  I know it was
11  provided to us yesterday, but it was separate from
12  this list.  You testified that it was regarding
13  allegations of improper verification and dispensing
14  of medication related to hormone replacement therapy;
15  is that correct?
16    A.    That's correct.
17    Q.    What is your -- what was your opinion in
18  that case regarding the dispensing of hormone
19  replacement therapy medication?
20    A.    I mean, it's an open case, so I'm not sure
21  if I'm at liberty to talk about the details outside
22  of that counsel particularly.
23    Q.    Okay.  And I understand that.  What is
24  hormone replacement therapy medication?

47

1    A.    Just some nomenclature that's used to
2  characterize medications that can be used to replace
3  hormones in patients who are deficient.
4    Q.    When does that occur, the deficiency of
5  hormones in other words?
6    A.    Can you be more specific?
7    Q.    Yes.  Can you be born with a condition
8  that requires hormone replacement?
9    A.    I'm not sure.
10    Q.    Do you acquire a condition that requires
11  hormone replacement?
12    A.    I think you can.
13    Q.    Do patients in premenopausal or menopausal
14  state sometimes require or voluntarily consume
15  hormone replacement therapy medication?
16    A.    Yes, they do.
17    Q.    What are the side-effects of hormone
18  replacement therapy medication?
19    A.    It just depends on the particular
20  medication, but in some cases it can lead to
21  thromboembolic events, for example.
22    Q.    And what are those?
23    A.    Things such as deep venous thrombosis or
24  pulmonary embolism.

48

1    Q.    And what happens if you have a deep vein
2  thrombosis or pulmonary embolism?
3    A.    Hopefully we treat it effectively and you
4  live.  Alternatively they can be fatal.
5    Q.    Any other side-effects from an improper
6  dosing or consumption of hormone replacement therapy
7  medication?
8    A.    I'm sure there probably are, but I can't
9  really list them here today.
10    Q.    Have you ever verified or dispensed
11  hormone replacement therapy medication?
12    A.    Probably, but I can't be specific with
13  that.
14    Q.    Any other side-effects that you know of?
15    A.    I think you just asked me that question.
16    Q.    Okay.  I mean, other than the two that you
17  mentioned?
18    A.    Well, there's side-effects to every
19  medication.  It could be a variety of constitutional
20  side-effects.  If you pull up the package insert,
21  you'll see a variety of things listed for nearly all
22  medications.
23    Q.    And for medications that you're not
24  familiar with as a pharmacist, you would consult the

49

1  package insert, correct?
2    A.    You can, but there's a variety of drug
3  information resources that could be consulted.
4    Q.    Okay.  Textbooks?
5    A.    Textbooks, online references, primary
6  medical literature, professional organizations.
7    Q.    Other pharmacists?
8    A.    You could certainly seek counsel from
9  other pharmacists, but I would probably aim more
10  toward an independent assessment of the information
11  before I made any subsequent decisions based on that
12  information.
13    Q.    In the state of Florida is a pharmacist to
14  be licensed required to know the maximum dosing or
15  side-effects or the totality of circumstances
16  surrounding every medication on the market?
17    A.    In Florida a pharmacist is required to
18  perform a drug utilization review.
19    Q.    And what is a drug utilization review?
20    A.    The purpose of the drug utilization review
21  is to identify any potential problems, drug related
22  problems, that may arise from a contraindication, an
23  incorrect dosage, therapeutic duplication.  It's
24  basically the same requirement in most states that I

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

50

1 found have a very similar Board of Pharmacy
2 regulations surrounding the pharmacist's duty to
3 ensure that the drugs are appropriate for any given
4 patient.
5 Q.      And does the state of Florida require a
6 pharmacist to know each of those pieces of
7 information off the top of their head or are they
8 required to if you don't know, search it out by means
9 of package inserts, online references, articles,
10 textbooks, et cetera?
11             MR. LAMB:  Objection to form.
12       You can answer, Dr. Johns.
13             THE WITNESS:  There's no
14       requirement for a pharmacist to have every
15       piece of information relative to every
16       drug memorialized in their brain.  Right.
17       It's never going to happen, so we
18       certainly rely on our wealth of drug
19       information that's in the universe to help
20       us formulate answers to questions that we
21       can use in the dispensing process.
22 BY MR. BENEDETTO:
23 Q.      Okay.  Have you provided testimony in the
24 past in the 30 times that you did in a criminal

51

1 setting?
2 A.      I believe I have -- no, actually not.  I
3 participated in a criminal trial.  That's why I
4 hesitated.  But I actually didn't give expert
5 testimony, so I think the answer to your question is
6 no.
7 Q.      What was the criminal trial about, if you
8 recall?
9 A.      That was an individual that the defense
10 claimed took, if I recall correctly, one dose of
11 Oxycodone, became manic, and brutally beat and raped
12 his girlfriend.  I was asked by the state attorney's
13 office to help them cross-examine the defense
14 witness.  It was quite interesting.
15 Q.      I imagine.  Any other criminal trials that
16 you were involved in either providing testimony or
17 consulting?
18 A.      Not that I recall.
19 Q.      Okay.  Have you been involved either in
20 providing testimony or in consultation in any class
21 action suits against opioid manufacturers, either on
22 behalf of the manufacturers or on behalf of the class
23 action?
24 A.      I'm trying to think how to answer that

52

1 because there are -- there are some things that may
2 be privileged that I am not at liberty to disclose in
3 this forum relative to one particular class action
4 lawsuit.
5 Q.      Okay.  Do you currently go on rounds at
6 the hospital?
7 A.      I do not, not in my current practice, no.
8 Q.      When was the last time you went on rounds,
9 if you recall?
10 A.      By rounds if you mean working directly
11 with providers while they're treating specific
12 patients would be a number of years ago, many years
13 ago.
14 Q.      And that is what I'm talking about, the
15 team of the treating physician, the nurse, the
16 pharmacist, and whomever else, it was a number of
17 years ago?
18 A.      Oh, absolutely.
19 Q.      Okay.  When was the last time you verified
20 a prednisone order?
21 A.      Oh, years.
22 Q.      When was the last time you verified a
23 dexamethasone order?
24 A.      I'm sure the same.

53

1 Q.      Since 1999 has hospital technology
2 changed?
3 A.      Significantly.
4 Q.      In 1999 were hospitals required to your
5 knowledge or recollection to maintain electronic
6 patient files?
7 A.      I don't recall in 1999.  I know it's been,
8 you know, an evolution of computer technology over
9 the course of my career all the way from no
10 technology at all, typing prescriptions on a
11 typewriter, to fast forward to where we are today
12 with very robust electronic medical records.  I
13 probably can't tell you in that continuum of time in
14 particular milestones.
15 Q.      Okay.  Do you recall when the University
16 of Florida implemented Epic?
17 A.      I would estimate about 15 years ago.
18 Q.      Were you involved in that process in any
19 capacity?
20 A.      Yes I was.
21 Q.      In what capacity, if you recall?
22 A.      My job at the time specifically related to
23 the cutover, if you will.  It's a term that describes
24 the activities going from one computer system to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

54

1  another computer system and how you take the
2  information that's in one system and move it into
3  another system.
4      Q.    Okay.  You can text message or direct
5  message on Epic, correct?
6      A.    It's called Secure Chat.
7      Q.    Secure Chat.  Okay.  And that's because
8  the team, the doctor, the pharmacist, the nurse,
9  they're able to communicate with each other with
10  Secure Chat, correct?
11     A.    Sure.  And that's just one means of
12  communication.  They can obviously have in-person
13  communication, telephone communication, text
14  communication.  That's just one.
15     Q.    Sure.  Sure.  Through the Epic system --
16  and that's communication through the Epic system, one
17  form of communication between the team that's
18  treating a patient?
19     A.    That's correct.
20     Q.    Okay.  And a doctor could -- in a hospital
21  setting at the University of Florida, could a doctor
22  prescribe a medication and a pharmacist verify a
23  medication and the nurse provide the patient with the
24  medication through the Secure Chat on the Epic

55

1  system?
2      A.    Not through Secure Chat.  An order would
3  have to be placed within Epic.  Secure Chat is merely
4  a communication device.  It would be quite frowned
5  upon for orders be placed through Secure Chat.
6      Q.    And why is that?  Why would it be frowned
7  upon?
8      A.    Because it's not a legitimate order.
9      Q.    And why not?
10     A.    Because in our system we have a mechanism
11  through Epic to do that.  If the physician wishes to
12  place a verbal order, then he should do that through
13  the telephone, for example, so that the nurse can
14  complete her read back requirement.
15     Q.    Okay.  And if a verbal order is placed and
16  then the pharmacy department receives that order,
17  what does the pharmacy department do?
18     A.    It's no different than an order that is
19  placed by the provider.  The pharmacist still has a
20  duty to conduct their drug utilization review and
21  dispense the medication appropriately.
22     Q.    Okay.  And then do they make a note on
23  that on Epic?
24     A.    If they so choose.  There is no

56

1  requirement to document their drug utilization review
2  other than what's already documented in the system
3  through its audit trail functionality.
4      Q.    And the document utilization review, does
5  that -- when you use that term, does that also
6  include doctor or treatment provider/pharmacist
7  communication with each other regarding the
8  treatment?  So when the doctor -- a doctor writes or
9  makes an order, correct, to treat the patient with a
10  medication?
11     A.    Prescribes an order, yes.
12     Q.    Okay.  He writes a prescription or he
13  orally states a prescription?
14     A.    He types it in the computer would be more
15  accurate.
16     Q.    Okay.  Using Epic, Epic software?
17     A.    That's correct.
18     Q.    Okay.  And then the pharmacy department
19  receives that prescription, correct?
20     A.    Yes.  It's technically a medication order
21  in the hospital setting.  The term prescription is
22  reserved for outpatient community, slash, retail
23  pharmacy.
24     Q.    Retail setting?

57

1      A.    Yes.
2      Q.    Okay.  Understood.  So the medical order
3  is received by the pharmacy department, correct?
4      A.    Medication order, yes.
5      Q.    Medication order.  I apologize.  And if,
6  for example, the pharmacist and the medical doctor
7  and the nurse are rounding together, the medical
8  doctor would put -- place the medical order --
9  medication order in the Epic system and the
10  pharmacist would receive that order, correct?
11     A.    Right.
12     Q.    Okay.  Now, if that medication order is
13  received and there's a question about that, would the
14  pharmacist then communicate with the medical doctor
15  about that medication order?
16     A.    Yes.  Correct.
17     Q.    Would that pharmacist be required either
18  by the state of Florida or by the University of
19  Florida Medical System to communicate with the doctor
20  about that medication order through Epic?
21     A.    Not necessarily through Epic.  They can
22  pick up the phone and call the doctor.
23     Q.    Or see them in the hallway, correct?
24     A.    That's absolutely right.

15 (Pages 54 to 57)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

58

1  Q.     Okay.  And then once the pharmacist talks
2  with the doctor about the order and is satisfied with
3  the doctor's explanation for the reason for that
4  medication order, the pharmacist then dispenses that
5  medication, correct?
6  A.     Well, again, that communication is only
7  going to take place if the pharmacist actually had a
8  question about the medication while conducting their
9  drug utilization review.  Once that communication has
10  resulted in the pharmacist being satisfied with
11  whatever question they may have, then they would
12  proceed with the dispensing activity.
13  Q.     That's a good point.  In fact, if the
14  pharmacist does not have a question during the drug
15  utilization review, that conversation might not even
16  happen, correct?
17  A.     More likely than not that's the case.
18  Q.     But if they do have a question during
19  their drug utilization review, if they see an order,
20  they might have a question or two, they look up the
21  information, then they speak with the doctor, they're
22  satisfied with both their review of that information,
23  whether it be the package insert or the online
24  reference or whatever other reference and the

59

1  communication with the doctor, they then verify the
2  order and the order is dispensed, correct?
3  A.     That's correct.
4  Q.     And then in a hospital setting, that means
5  that a nurse or a physician or some other hospital
6  employee takes that medication and physically
7  provides it to the patient, correct?
8  A.     That's correct.
9  Q.     And that physician or nurse then monitors
10  the patient's consumption of and reaction to that
11  medication, correct?
12  A.     Yes, they do.
13  Q.     And you have your report in front of you,
14  correct, Doctor?
15  A.     I do.
16  Q.     Okay.  So on Page 1, the factual
17  background, you list there are nine like bullet
18  points I would call them or enumerated materials that
19  you reviewed when writing your report.  Did you
20  review or utilize any other materials in coming to
21  the conclusions and opinions contained in this
22  report?
23  A.     Not of the opinions that are contained in
24  this report.  I think I mentioned earlier that I

60

1  recently reviewed the defense expert pharmacist and
2  physician.
3  Q.     Yes.  And you did state that you did not
4  review Mr. or Ms. Wolking's deposition testimony,
5  correct?
6  A.     Yes, that's correct.
7  Q.     Okay.  So the bottom paragraph on Page 1,
8  the opening clause is Stacey Wolking sought out
9  medical care from Henry Lindner, M.D. at
10  Hormonerestoration.com and completed a medical
11  history form on November 1st, 2013.
12       You would agree that Dr. Lindner was her
13  treating physician at least beginning on November
14  1st, 2013 for medical care that Ms. Wolking sought?
15  A.     From his specific location, yes.
16       MS. DENAPLES:  Objection to form.
17  BY MR. BENEDETTO:
18  Q.     At the bottom of that paragraph, back in
19  2013 Ms. Wolking stated her current hormone
20  treatments as E3, E2, prog 100 troche, troche, and 12
21  and a half milligrams of DHEA.  Can you just briefly
22  explain to me is that vitamin E3?
23  A.     No.  I believe those are estrogen
24  compounds.

61

1  Q.     Estrogen compounds.  E3, E2 are estrogen
2  compounds?
3  A.     Well, I'm assuming.  They could certainly
4  be something different, but I just copied this
5  literally from the record.
6  Q.     Okay.  I understand.  And that makes sense
7  that she was seeking hormone restoration or hormone
8  replacement therapy, correct?
9  A.     Yes, that's correct.
10  Q.     And that's why you're assuming E3 and E2
11  are estrogen compounds, correct?
12  A.     Correct.
13  Q.     Okay.  What is prog?
14  A.     I think that's an abbreviation for
15  progesterone.
16  Q.     And DHEA, that's vitamin D, the fish oil
17  that you can buy at Trader Joe's?
18  A.     That's my understanding.
19  Q.     And on Page 2, I'm at the first paragraph,
20  you wrote Ms. Wolking received medical care from
21  Dr. Lindner from 2013 through 2022.  Again, you would
22  agree with me that Dr. Lindner was Ms. Wolking's, one
23  of at least, medical physician, medical treatment
24  providers, correct?

16 (Pages 58 to 61)

THOMAS JOHNS, Pharm.D.

62

1  A.    Agreed was one of.
2  Q.    And then that list of symptoms or
3  diagnoses between November 1st, 2013 and January
4  17th, 2022, again, did you just copy that from the
5  records?
6  A.    I did from Dr. Lindner's records
7  specifically.
8  Q.    Okay.  What is a glucocorticoid
9  deficiency?
10  A.    It would be a deficiency in your normal
11  body's glucocorticoids.
12  Q.    What would cause that?
13  A.    There's probably a variety of disease
14  states that could cause that particular deficiency.
15  Q.    As a pharmacist what do you see as
16  treatment for that condition?
17  A.    It would be replacement of the
18  glucocorticoid if indeed the patient has a
19  deficiency.
20  Q.    Have you ever verified or dispensed
21  medication to treat a patient with a glucocorticoid
22  deficiency?
23  A.    Maybe, but I certainly couldn't sit here
24  today and state that specifically.

63

1  Q.    Is a patient ever treated in inpatient or
2  in the hospital setting for such a deficiency?
3  A.    Absolutely.
4  Q.    Okay.  Would they be in the hospital or in
5  the inpatient setting specifically because of that
6  condition or would that condition be associated with
7  other conditions that that patient was in the
8  hospital for?
9  A.    I would say both.
10  Q.    Okay.  So to your understanding a patient
11  -- there could be a circumstance where a patient
12  could be an inpatient in a hospital to treat for only
13  glucocorticoid deficiency?
14  A.    Yes, I believe so.
15  Q.    Okay.  And what would be the treatment for
16  that again?
17  A.    Similar to my prior answer would be
18  administering the glucocorticoids to reverse the
19  deficiency.
20  Q.    And what would be the dosage of that
21  administration?
22  A.    It would just depend on the particular
23  patient circumstance.
24  Q.    And what do you mean by depend on the

64

1  circumstance?  What are those circumstances?
2  A.    It would be up to the prescribing
3  physician to have an understanding of what the
4  particular levels of glucocorticoids are and then
5  prescribe replacement dosing that's consistent with
6  the known medical literature and drug information
7  references around that particular treatment.
8  Q.    But you personally don't recall a
9  situation where you had to verify or dispense
10  medication for a patient that was treating only for
11  glucocorticoid deficiency?
12  A.    I think I said I probably have.  I just
13  can't recall the specific case.
14  Q.    Right.  Okay.  In pharmacy school or
15  during your residency do you study specific
16  conditions of a patient?  In other words, are there
17  times in class, either a day, a week, where you run
18  through a patient that's suffering from diabetes to
19  use a hypothetical example what kind of medication is
20  used to treat a person who is suffering from Type 1
21  or Type 2 diabetes, the medication that's required,
22  the medication that is guided by either the FDA or
23  other boards how to verify and dispense that
24  medication and what to do when you are faced with a

65

1  prescription or medical order, medication order, that
2  does not comply with those guidelines?  And I
3  apologize for the length of that question.
4  A.    Yeah.  Why don't you break that down a
5  little bit?
6  Q.    Sure.
7  A.    I can certainly tell you that pharmacy
8  school curriculum contains coursework relative to the
9  therapeutic application of drugs exactly as you're
10  describing, what is the appropriate drug at the
11  appropriate dose for given disease states.  Not only
12  does that happen in pharmacy school, I've taught that
13  in pharmacy school.
14  So one thing we didn't cover on my CV is
15  my role as a clinical associate professor in the
16  College of Pharmacy.  So over the years I've taught
17  many classes relative to the appropriate use of
18  medications particularly in the infectious diseases
19  area.
20  Q.    Okay.  And, again, not every -- just like
21  not every lawyer is a litigator, not every pharmacist
22  is in the neurosurgery department of the University
23  of Florida once they graduate with their Pharm.D.,
24  correct?

17 (Pages 62 to 65)

THOMAS JOHNS, Pharm.D.

66

1   A.      Correct.
2   Q.      And so they're not required either by
3   state law, federal law, local law, the pharmacy
4   licensing board, to have memorized all of that
5   clinical treatment for every medication for every
6   indication, correct?
7   A.      Correct.
8   Q.      Okay. But you hope at everybody's
9   Pharm.D. program they're exposed to what we just
10  talked about, various circumstances and various
11  indications and the treatment plan and how to verify
12  and dispense those orders and just to learn about the
13  process of practicing pharmacy, correct?
14  A.      I would say it something like this. We
15  teach in a variety of settings problem solving and
16  critical thinking skills, and we do that in a
17  practical setting side-by-side teaching pharmacy
18  students in the direct patient care environment, but
19  we also do it didactically in the classroom where we
20  present case scenarios in an effort to not have
21  students memorize everything that we're presenting,
22  but teaching them a skill set that they can use in
23  the future when they encounter a potential problem
24  that warrants further investigation and

67

1   understanding.
2   Q.      Understood. Thank you for clarifying it
3   like that. It's more eloquently stated than I was
4   getting out. And I'm sorry to jump back, Dr. Johns,
5   to your licensing and your CEs. Does the state of
6   Florida require your CEs to have any legal or like
7   pharmacy law component to it? Is there a minimum CE
8   requirement in that regard?
9   A.      There's not.
10  Q.      Your licensing test that you took to
11  become a licensed pharmacist in the state of Florida,
12  was there a pharmacy law component to that test?
13  A.      Yes.
14  Q.      Do you recall percentage wise of that
15  licensing test what the pharmacy law component was?
16  A.      I have no idea.
17  Q.      Do you know if Pennsylvania requires a
18  pharmacy law component to their licensing test?
19  A.      I would assume so, but I don't know for
20  100 percent sure, but I would bet pretty highly that
21  they do.
22  Q.      And you're assuming that because you
23  probably would be willing to bet most, if not all,
24  states require a pharmacy law component to their

68

1   licensing test?
2   A.      Yes, that's correct.
3   Q.      Turning to Page 2 of your report, after
4   the list of dates of those symptoms and diagnoses
5   that you see there, the first sentence of that next
6   paragraph is Dr. Lindner eventually prescribed
7   Ms. Wolking extremely high doses of corticosteroids,
8   including prednisone, hydrocortisone, and
9   dexamethasone. When you say eventually, what
10  timeframe are you referring to here?
11  A.      I'm referring specifically to the later
12  dates in 2022.
13  Q.      Okay. And by high doses of
14  corticosteroids, what are referring to?
15  A.      I'm referring to the doses that were
16  prescribed to Ms. Wolking subsequently dispensed by
17  Pharmacist Young and Pharmacist Bryk relative to the
18  prednisone and dexamethasone prescriptions and doses
19  thereof.
20  Q.      And what are the doses on those
21  prescriptions?
22  A.      Looking at my report, the prescription
23  that was dispensed on August 8th was for prednisone
24  10 milligrams, 500 of them, with instructions for the

69

1   patient to take up to 10 tablets every day as
2   directed. You want me to go through the rest of
3   them?
4   Q.      No. Let's just stay on that one for right
5   this second. What is the dosing of that
6   prescription?
7   A.      That would be up to 100 milligrams per
8   day.
9   Q.      That's up to, but what is the actual
10  dosing that the patient is being instructed to take
11  per day?
12  A.      Well, I think the patient was instructed
13  to self-direct the amount based on the symptoms that
14  they were having at the time.
15  Q.      Who was instructing the patient?
16  A.      I would assume that would be Dr. Lindner
17  was instructing the patient to take the dosing.
18  Q.      Of up to 10 tabs per day?
19  A.      Well, I think what we can say for sure is
20  that that's what's on the prescription. I don't know
21  that we know exactly what was communicated to the
22  patient directly, but that was what was issued as a
23  result of the prescription.
24  Q.      And you don't know what was communicated

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

70

1    directly to the patient by Dr. Lindner, correct?
2    A.    That's correct.
3    Q.    Okay.  And it says as directed.  What does
4    that mean?
5    A.    Typically that means as directed by the
6    physician.
7    Q.    Is it common for a physician to write a
8    prescription or in your setting at the University of
9    Florida submit a medication order with, quote,
10   instructions on it?
11   A.    I'm not sure I follow the question.
12   Q.    Sure.  So the prescription as written here
13   and as you have in your report is instructions up to
14   10 tabs per day as directed.  Have you seen other
15   prescriptions where the physician has either written
16   the prescription in an outpatient or retail setting
17   or submitted a medication order in the inpatient
18   setting with instructions?
19   A.    Well, all medications --
20         MR. LAMB:  Objection to form.
21         THE WITNESS:  -- have
22   instructions.
23   BY MR. BENEDETTO:
24   Q.    And the physician is the one providing

71

1    those instructions, correct?
2    A.    Yes.
3    Q.    Okay.  And have you seen prescriptions
4    written or medication orders submitted where part of
5    those instructions are as directed?
6    A.    Yes.
7    Q.    And as directed per the instructions are
8    being provided by the treating physician, correct?
9    A.    By whoever the prescribing physician was
10   on that particular prescription or order.
11   Q.    Okay.  And what is your understanding of
12   as directed again?
13   A.    My understanding is those are instructions
14   that are provided to the patient by the provider that
15   issued the prescription.
16   Q.    Are you aware of any medical rule or
17   regulation that prohibits a physician from providing
18   instructions or providing instructions as directed on
19   a prescription or medication order?
20   A.    No.
21   Q.    Have you ever dispensed medication
22   personally in your setting for a medication order or
23   a prescription where there were instructions provided
24   by the physician to use the medication as directed?

72

1    A.    Usually in the inpatient setting we don't
2    use as directed within the instructions, but
3    certainly in my career I'm almost certain I would
4    have dispensed medications in an outpatient setting
5    that used the phraseology as directed.  It's not
6    uncommon.
7    Q.    It's not uncommon, correct?
8    A.    That's correct.
9    Q.    In an inpatient setting you don't
10   typically see that because the physician and
11   eventually the nurse are there to monitor and provide
12   the patient with that medication directly, correct?
13   A.    Yes, that's correct.
14   Q.    And I don't know necessarily at least at
15   this time want to go through each of the four there
16   because it would be the same questions.  Each of
17   those prescriptions have instructions to take a
18   certain amount of tablets per day and each of those
19   tablets have a certain amount of milligrams of the
20   steroid contained in them and to be done as directed,
21   correct, each of those four?
22   A.    That's what the prescriptions say, yes.
23   Q.    Okay.  There's a footnote about evidence
24   of a prednisone prescription for Ms. Wolking from TCC

73

1    on May 19th, 2022.  Do you recall what was contained
2    in that prescription in terms of amount or dosing?
3    A.    I don't remember exactly what the
4    instructions were, but I believe it was as I
5    indicated here an additional prednisone prescription
6    that was dispensed in May.
7    Q.    Okay.
8    A.    If you want to pull it up from the
9    records, I'd be happy to look at it.
10   Q.    Sure.  And we might do that later.  In the
11   bottom paragraph you make a note that Tuckhannock
12   Compounding Center in located in the same building as
13   Dr. Lindner's medical practice in Tuckhannock,
14   Pennsylvania.  Why did you make that note?
15   A.    Probably in the context of the pharmacist
16   having access to Dr. Lindner in his practice because
17   subsequently I'm sure we're going to talk about my
18   opinions about what exactly the pharmacist should
19   have done relative to investigating this particular
20   treatment for Ms. Wolking.
21   Q.    Well, we can talk about it now because the
22   next sentence says Pharmacist Young would ask
23   Dr. Lindner questions about his patients.  She states
24   she had conversations with Dr. Lindner about

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

---

**74**

1  corticosteroids. So my -- I guess the implication of
2  those two sentences together is that because they
3  were next to each other geographically, they may have
4  had more opportunity to discuss professionally
5  Dr. Lindner's practice and the dispensing of any
6  medication that was prescribed, correct?
7  A.    Well, I believe there's deposition
8  testimony that points to Young and Lindner having
9  conversations about Lindner's daughter specifically
10  and the use of corticosteroids to treat chronic
11  babesiosis.
12  Q.    I'm not even talking about the steroids or
13  the babesiosis at this point. I mean, like his
14  treatment of his hormone replacement therapy
15  patients, a sick niece or nephew that he might have
16  had, there were more opportunities for Dr. Young and
17  Dr. Lindner to have conversations professionally than
18  you may not see in a retail setting where the
19  pharmacist and the doctor were not that close
20  together?
21  A.    I would agree.
22  Q.    Okay. And further implication from that
23  is they had more conversations than -- about pharmacy
24  or medicine than your typical pharmacist would have

---

**75**

1  with a particular physician, correct?
2  A.    If you're comparing to a CVS or Walgreens,
3  for example, I would agree.
4  Q.    Okay. You have -- the last sentence of
5  that first paragraph at the top of Page 3, it's not a
6  full paragraph, it says she never asked him how much
7  prednisone or dexamethasone would be safe for one of
8  his patients.
9          Would she have to ask Dr. Lindner how much
10  would be safe for one of his patients when he's
11  talking about a patient generally and a steroid
12  prescription generally?
13  A.    In the general discussion of steroid
14  prescriptions, I would agree with you not
15  necessarily. In the context of the diseases that we
16  are here to talk about, I would say absolutely.
17  Q.    What if the pharmacist, and not Dr. Young
18  and not Dr. Lindner, but what if the pharmacist was
19  able to obtain that knowledge independently of
20  talking with the treating physician, would they need
21  to talk about it?
22          MR. LAMB: Objection to form.
23          You can answer.
24          MS. DENAPLES: Join.

---

**76**

1          MR. BENEDETTO: Sorry if that was
2  confusing.
3          THE WITNESS: That's okay. Do
4  you want to repeat the question?
5  BY MR. BENEDETTO:
6  Q.    Sure. The sentence states she never asked
7  him how much prednisone or dexamethasone would be
8  safe for one of his patients, but my question is not
9  related to Dr. Young and Dr. Lindner's conversation
10  about steroids, but about any medication and any
11  conversation between a pharmacist and a physician,
12  would the pharmacist have to talk to a physician
13  about a medication if the pharmacist is able to
14  determine on his or her own independent research
15  obtaining of information regarding how much would be
16  safe to treat a specific disease or condition?
17  A.    Not necessarily. The pharmacy has a
18  variety of resources they can pull from to answer
19  questions, but one of them is talking to a physician
20  individual physician.
21  Q.    And we had discussed that earlier in your
22  deposition, correct? That is one resource in terms
23  of -- and I keep forgetting the term, but when you
24  obtain a prescription or a medication order, you

---

**77**

1  perform a review, and one of the tools in that review
2  is talking to the actual physician that's prescribing
3  the medication?
4  A.    Correct. It's one of the tools.
5  Q.    So then going to specifically Dr. Young
6  and Dr. Lindner, in the next paragraph, the second
7  sentence states -- or the first sentence states she
8  testified that she had conversations with Dr. Lindner
9  about how sick his patients are from babesiosis and
10  she was aware in August 2022 that Ms. Wolking
11  received a treatment plan from Dr. Lindner related to
12  the diagnosis of babesiosis and the use of
13  corticosteroids.
14          And I suppose my question is based on
15  those sentences in conjunction with the prior
16  paragraph, is it your understanding that by talking
17  with Dr. Lindner generally being in that same
18  geographic similar space that she became aware of
19  Ms. Wolking and his treatment plan for Ms. Wolking as
20  it relates to his treatment of the chronic
21  babesiosis?
22  A.    Well, I think as I wrote here, that's
23  certainly what she testified to, but I think the
24  totality of the records would question whether that

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

78

1  conversation actually took place.  I believe that
2  Dr. Lindner, and I think this is in one of my later
3  paragraphs, indicated that he doesn't know if he
4  talked to the pharmacist and he also stated that
5  Pharmacist Young never asked him for any reference
6  materials or documents related to this course of
7  treatment.
8  Q.      Right.  So she never asked about --
9  assuming that is true and assuming taking what you
10  have written in your report as an accurate display of
11  what the testimony states, and the testimony can
12  speak for itself, but if she is able to obtain that
13  information from other sources, even including other
14  physicians, let alone package inserts, internet
15  research, resources, textbooks, articles, would she
16  have to talk to Dr. Lindner about it?
17              MR. LAMB:  Objection to form.
18          You can answer.
19              THE WITNESS:  Not necessarily.
20  BY MR. BENEDETTO:
21  Q.      And I believe, and I'm looking for it,
22  Dr. Lindner testified that he did speak to Ms. Young
23  about his treatment plan for patients he was treating
24  for babesiosis; isn't that correct?

79

1              MR. LAMB:  Objection to form.
2          You can answer.
3              THE WITNESS:  I think that's
4          correct, but I don't think he recalled
5          specifically talking to the pharmacist
6          about Ms. Wolking.
7  BY MR. BENEDETTO:
8  Q.      Okay.  The second full paragraph on Page
9  3, the first sentence says Pharmacist Young stated
10  she was satisfied with the explanation provided by
11  Dr. Lindner concerning the prescriptions for
12  Ms. Wolking and felt it was reasonable to fill the
13  prescriptions with doctor approval.
14          So that would to me indicate, whether they
15  specifically recall a specific conversation, that
16  they did speak about Ms. Wolking and Dr. Lindner's
17  treatment plan, correct?
18              MR. LAMB:  Objection to form.
19          You can answer.
20              MS. DENAPLES:  Objection to form.
21              THE WITNESS:  That appears to be
22          what she stated during her deposition
23          testimony, yes.
24  BY MR. BENEDETTO:

80

1  Q.      Okay.  Wouldn't that be part of the --
2  and, again, I'm blanking on the term in terms of the
3  review process in determining whether to verify and
4  dispense a medication?
5              MR. LAMB:  Objection to form.
6          You can answer.
7              MS. DENAPLES:  Join.
8              THE WITNESS:  It's certainly part
9          of it, but it's not the totality of what
10          should have occurred in this case.
11  BY MR. BENEDETTO:
12  Q.      Okay.  And going back up to the prior
13  paragraph, the first full paragraph, it's about two
14  or three lines down on Page 3, Ms. Young testified
15  that she had a conversation with Dr. Lindner about
16  Ms. Wolking before they dispensed that August 8th
17  prescription and that she had an understanding with
18  Dr. Lindner that Ms. Wolking would use patient
19  directed dosing.  Did I read that correctly?
20  A.      You did.
21  Q.      And then referring back to the
22  prescription that we looked at a few minutes ago
23  where the instructions included as directed, would
24  that tie into patient directed dosing?

81

1  A.      Not at all.
2  Q.      Okay.  So what is patient directed dosing
3  versus as directed?
4  A.      In my mind as directed dosing means as the
5  prescribing physician detailed to the patient.  In
6  this particular case, patient directed dosing to me
7  means the dosing on any given day is at the
8  discretion of the patient.
9  Q.      Is the dosing under a treatment physician
10  ever patient directed in the sense of the doctor not
11  providing any direction to the patient?
12              MS. DENAPLES:  Object to form.
13              THE WITNESS:  Break that down a
14          little bit for me.
15  BY MR. BENEDETTO:
16  Q.      Sure.  So when you say she understood that
17  Ms. Wolking would use patient directed dosing, what
18  is your understanding of what you think as a
19  pharmacist Ms. Young was understanding?
20  A.      I think Pharmacist Young knew exactly what
21  was happening, was that by stating that she knew that
22  upon dispensing a large quantity of corticosteroids
23  and despite the instructions on the face of the
24  prescription that the patient herself was determining

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

82

1  on any given day based on her symptomatology what
2  dose that she was to administer to herself, and
3  that's just grossly inappropriate for this class of
4  medications.
5  Q.      Is that ever appropriate, patient directed
6  dosing?
7  A.      It may be, but generally those
8  prescriptions are written as needed.  This
9  prescription was not written as needed.  As needed
10  refers to a set of parameters that a physician may
11  give the patient.
12       You mentioned albuterol earlier in the
13  deposition.  If albuterol is dosed one to two puffs
14  every four to six hours as needed for an asthma
15  exacerbation, then the patient would be able to
16  within the framework of that prescription administer
17  different doses to themselves.  This is a very, very
18  different scenario.
19  Q.      So where the prescription is written as
20  directed and then the understanding is patient
21  directed, could it possibly be that the patient
22  within a framework of a treatment plan provided by
23  the physician take a range of medication based on the
24  doctor's instruction and direction that does not

83

1  comply with a very specific dosage at a very specific
2  time of day for a very specific amount of days?
3       MR. LAMB:  Objection to form.
4  You can answer.
5       MS. DENAPLES:  Join.
6       THE WITNESS:  As part of your
7  question you said is it possible.  I would
8  say, yes, it's possible.
9  BY MR. BENEDETTO:
10  Q.      So that where the terminology as directed
11  and patient directed, they're not mutually exclusive,
12  correct?
13  A.      They're not.
14  Q.      And even using your hypothetical using the
15  inhaler, and I used that because I have asthma and I
16  have an inhaler, as needed is not based on
17  necessarily solely my own input about how much to use
18  that, but based on a physician's instructions
19  regarding either as directed or as needed, not
20  mutually exclusive from my own judgment, correct?
21       MR. LAMB:  Objection to form.
22  You can answer.
23       MS. DENAPLES:  Join.
24       THE WITNESS:  I think I said

84

1  correct.  Sorry.  We talked over each
2  other.
3       MR. BENEDETTO:  Yeah.  We got it.
4  Thank you.
5  BY MR. BENEDETTO:
6  Q.      Okay.  I think I asked this earlier, but
7  have you verified and dispensed prednisone before?
8  A.      Probably.  Most likely for sure.
9  Q.      But not recently, correct?
10  A.      Correct.
11  Q.      Okay.  And the same for dexamethasone?
12  A.      Same.
13  Q.      Do you recall the largest total amount of
14  prednisone you've dispensed or verified?
15  A.      No.
16  Q.      And the same question for dexamethasone?
17  A.      No.
18  Q.      Do you recall the largest dosing of
19  prednisone that you've ever verified or dispensed?
20  A.      I think you used the same word, right,
21  dose or dosing?  Can you clarify?
22  Q.      Sure.  I'm using dosing as an instruction
23  per ingestion of a medication in pill form versus a
24  total quantity.

85

1  A.      Yeah.  I only ask for clarification
2  because dose, dosing, and dosage are typically used
3  interchangeably.
4  Q.      Okay.
5  A.      Whereas quantity has a very different
6  characterization.
7  Q.      And I thought I used quantity in the first
8  set, but I can -- we can go back to make it very
9  clear.  Do you recall the largest quantity of
10  prednisone you've ever verified or dispensed?
11  A.      No.
12  Q.      Do you recall the largest quantity of
13  dexamethasone you've ever verified or dispensed?
14  A.      No.
15  Q.      Do you recall the largest dose or dosing
16  of prednisone you've ever verified or dispensed?
17  A.      No.
18  Q.      Do you recall the largest dose or dosing
19  of dexamethasone that you've ever verified or
20  dispensed?
21  A.      No.
22  Q.      Okay.  What does the term overdose mean to
23  you as a pharmacist?
24  A.      A dose in excess of any known dosage that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

86

1  could result in toxicity for that particular
2  medication.
3  Q.    What is the dose that would result in
4  toxicity of prednisone?
5  A.    Well, it just depends on the particular
6  patient, the condition being treated, but all of
7  these medications have significant adverse drug
8  reactions and certainly can result in toxicities if
9  the doses are excessive.
10  Q.    Would you agree with me that any
11  medication that can have an adverse effect and cause
12  toxicity have a dose whereby if you exceed that dose
13  it's an overdose?
14  A.    Not necessarily.
15  Q.    Okay.  And when you said condition of the
16  patient, not only is it the indication for which
17  you're treating, but things like age, height, weight,
18  health, other conditions, would that be considered
19  part of what you termed the condition of the patient?
20  A.    Yes, that's correct.
21  Q.    Okay.  What does withdrawal mean to you as
22  a pharmacist?
23  A.    Withdrawal is generally a concept whereby
24  the body is, quote, unquote, acclimated to a

87

1  particular dosage of a medication and then once that
2  medication is stopped being administered, the blood
3  levels, for example, start to decline, that the
4  patient may exhibit some physical symptomatology of
5  not having that drug any longer.
6  Q.    Can a patient undergo withdrawal from
7  prednisone?
8  A.    Yes.
9  Q.    Can a patient undergo withdrawal from
10  dexamethasone?
11  A.    Yes.
12  Q.    What are symptoms of withdrawal from
13  prednisone or dexamethasone?
14  A.    It can be a variety of things, most
15  commonly gastrointestinal symptoms, endocrine type
16  symptoms, central nervous system effects just to be
17  general.
18  Q.    And would you agree with me as both a
19  pharmacist and a person who practices in the medical
20  field, we're trying to avoid withdrawal symptoms,
21  correct?
22  A.    Some withdrawal symptoms may be
23  unavoidable, but in general I would agree.
24  Q.    On Page 3 of your report, I think it's the

88

1  third paragraph, full paragraph down that starts with
2  -- it's a clause on the third line.  It starts and
3  even as Pharmacist Young recognized that they were
4  therapeutically duplicative.  What does
5  therapeutically duplicative mean?
6  A.    It generally means administering drugs of
7  the same pharmacological class.
8  Q.    Are prednisone and dexamethasone
9  therapeutically duplicative?
10  A.    Yes, they are.
11  Q.    Is there ever a time where prednisone or
12  dexamethasone are not therapeutically duplicative?
13  A.    Not that I'm aware of.
14  Q.    Is there any time where a patient should
15  be or could be prescribed and taking prednisone and
16  then have the prednisone discontinued and started on
17  dexamethasone instead?
18  A.    I'm sure there are.
19  Q.    Why would that occur?
20  A.    That would be generally at the discretion
21  of the physician.  In my experience and training it's
22  usually relative to the prescriber wanting a higher
23  potency corticosteroid for administering to the
24  patient.

89

1  Q.    Is there any other reason why a physician
2  may discontinue a patient on prednisone and switch to
3  dexamethasone?
4  A.    There may be, but that's the reason that,
5  again, just generally from my own experience and
6  training.
7  Q.    Is there anything contained in either
8  prednisone or dexamethasone that is not anything,
9  meaning a property, that is not contained in the
10  other that may cause the treating physician to switch
11  from one to the other or discontinue using one over
12  the other regarding one individual patient?
13  A.    Well, there might be.  Maybe not in the
14  case of these two corticosteroids, but in a lot of
15  cases there are inactive ingredients in one
16  particular drug that the patient may be sensitive or
17  intolerant to that would cause a physician to change
18  to another drug.
19  Q.    Are you aware of what those ingredients
20  are or would be?
21  A.    Oh, the types of ingredients that are
22  inactive in drugs are endless, so I couldn't sit here
23  and name them for you.
24  Q.    I forget what I saw.  One of the capsules

23 (Pages 86 to 89)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

90

1  of some medication that might be fairly common is 60
2  or 70 percent, you know, I don't know, cornstarch or
3  something like that, correct?
4  A.    Sure.
5  Q.    Okay. But there could be something, an
6  ingredient contained in one or the other that either
7  adverse reaction -- a patient has an adverse reaction
8  to or causes the treating physician to discontinue
9  and switch from one to the other?
10  A.    There could be. It's possible.
11  Q.    Would a treating physician communicate
12  that to the pharmacist?
13  A.    Not necessarily.
14  Q.    So the next paragraph down, the second
15  sentence says she, meaning Dr. Young, on August 16th
16  acknowledged the therapeutic duplication between
17  prednisone and dexamethasone, but stated her belief
18  that the prednisone had been discontinued.
19        So that would go to what we were just
20  discussing in that there could have been, we don't
21  know for certain based even just taking your report
22  as accurate, a reason that Dr. Young understood that
23  the prednisone was being discontinued so the
24  dexamethasone was being written by Dr. Lindner,

91

1  correct?
2              MR. LAMB: Objection to form.
3        You can answer.
4              MS. DENAPLES: Join.
5              THE WITNESS: She had an
6        obligation to find out for sure.
7  BY MR. BENEDETTO:
8  Q.    Okay. So even just a minute ago when you
9  said that the doctor might not necessarily explain to
10  the individual pharmacist why a medication was being
11  discontinued, she should have said is it being
12  discontinued and why is it being discontinued?
13  A.    She has an obligation to perform a drug
14  utilization review. She should have identified in
15  conducting that DUR that there was a therapeutic
16  duplication and she had an obligation to find out and
17  resolve that potential problem.
18        So your prior question to me related to
19  the physician proactively providing that information
20  to the pharmacist. In this particular case I'm
21  saying that in the context of conducting a proper DUR
22  that she should have identified this potential
23  problem and resolved it by either contacting the
24  patient, contacting the physician, to ensure that her

92

1  assumption was correct that the prednisone had been
2  discontinued and the dexamethasone started.
3  Q.    But we don't know if she did or not? She
4  could have is my point, correct?
5              MR. LAMB: Objection to form.
6        You can answer.
7              THE WITNESS: Can you rephrase
8        the question, please?
9  BY MR. BENEDETTO:
10  Q.    Sure. The next sentence says was unable
11  to provide any documentation to support this belief.
12  So my question is they verbally could have had a
13  conversation about this exact issue, discontinuing
14  one and starting the other. We just don't have any
15  documentation to show the support for that belief,
16  correct?
17  A.    Yes, that's correct.
18  Q.    And is it standard to, for example, in
19  this case where two medications are therapeutically
20  duplicative to verify and dispense a medication where
21  one is being discontinued such as in this very
22  scenario?
23  A.    If one is being continued, then it's
24  technically not a therapeutic duplication.

93

1  Q.    No. Where one is being discontinued?
2  A.    I thoughts that's what I said. If one is
3  discontinued and another corticosteroid is being
4  prescribed, then that would not be a therapeutic
5  duplication.
6  Q.    Okay. And I'm sorry, Doctor. The way the
7  technology is working that dis part of your
8  discontinued popped out.
9        Okay. What if the corticosteroid had been
10  discontinued and the pharmacist did not dispense the
11  other corticosteroid, what would occur?
12              MR. LAMB: Objection to form.
13        You can answer.
14              THE WITNESS: I don't think I
15        understand.
16  BY MR. BENEDETTO:
17  Q.    Sure. We discussed a few minutes ago are
18  there adverse effects to withdrawal from
19  corticosteroids?
20  A.    Yes. We listed them.
21  Q.    Yes. What is the dosing that would result
22  in if a corticosteroid prescription and consumption
23  was stopped result in a withdrawal?
24  A.    There isn't an exact dose. What is

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

94

1  thought is that anything above a physiological
2  equivalent could result in withdrawal symptoms if the
3  medication is not tapered appropriately.
4      Q.      And if the medication is not dispensed and
5  the first steroid or medication of a duplicative
6  therapy medication is discontinued and then the
7  second medication is not dispensed, could there be
8  withdrawal?
9      A.      If the second medication is not dispensed
10  and it's above normal therapeutic levels, yes, that
11  could result in withdrawal.
12     Q.      What is chronic steroid use?
13     A.      Chronic is a very vague term that just
14  essentially means something over an extended period
15  of time, but time is not defined.
16     Q.      What is the time period for steroid use
17  for it to become chronic?
18     A.      I don't know that I would label it
19  chronic.  I would probably say that anything beyond
20  30 to 60 days that is above physiologic levels should
21  be appropriately titrated.  I think that may be what
22  you're asking.
23     Q.      And is there a dosing involved with that?
24     A.      Anything above physiologic levels.

95

1      Q.      And what are the physiologic levels here
2  for Ms. Wolking?
3      A.      I really can't say specific to Ms. Wolking
4  because I don't know what her hormone levels are, so
5  I really can't answer that.
6      Q.      And you would have to know what those
7  hormone levels are to determine what the dosing for
8  the quantity of time would require a chronic steroid
9  use determination as to Ms. Wolking?
10     A.      No, I wouldn't say that.  I would say that
11  anything generally above 7 and a half to 10
12  milligrams per day over an extended period of time
13  should result in a patient individualized tapering
14  schedule.
15     Q.      And when you reviewed Dr. Lindner's
16  records as you indicated, on Page 1, Item 2, under
17  factual background Lindner chart, did that include
18  medication and Ms. Wolking's prior diagnoses before
19  June 2022?
20     A.      I believe so, because I think that
21  resulted in the list of diagnoses that we included on
22  Page 2.
23     Q.      Okay.  Would a retail pharmacy have access
24  to automatically a patient's current medication list?

96

1      A.      That depends.  If the medication list is
2  contained within the physician records, not
3  necessarily, but generally pharmacists are required
4  to maintain demographic records for a patient and all
5  prescriptions that they have dispensed.
6      Q.      All prescriptions that the pharmacy itself
7  has dispensed, correct?
8      A.      Yes, that's correct.
9      Q.      Would the pharmacy itself know if other
10  pharmacies have dispensed medication to that
11  particular patient?
12     A.      Not necessarily.
13     Q.      In the hospital setting at the University
14  of Florida, using it as an example, if a patient
15  comes in for a certain condition and the patient
16  meets with the physician and goes over all of their
17  prior conditions and medications, assuming it's a new
18  patient and not already in the University of Florida
19  Health System, the doctor and the team will then put
20  those medications and conditions into the system, the
21  Epic system, correct?
22     A.      Yes.  There's an expectation in hospitals
23  that we perform an activity called medication
24  reconciliation, and one important component of that

97

1  is obtaining an accurate prior to admission
2  medication list.
3      Q.      Why?
4      A.      Because in the hospital it's generally
5  thought that having the complete list results in the
6  potential to lessen the degree of medication errors
7  that occur as the patient is being admitted and
8  treated and at discharge from the facility.
9      Q.      So in other words, when a doctor is
10  treating the patient prescribes a medication that may
11  conflict with another medication that the plaintiff
12  or the patient is taking or condition that the
13  patient has, the hospital, meaning the physician, the
14  pharmacist, the nurse, they all know and have access
15  to that information, correct?
16     A.      Yes, that's correct.
17     Q.      So when that occurs, the pharmacist has
18  knowledge of the patient's current medication, prior
19  medication, conditions, and prior conditions,
20  correct?
21     A.      Yes, that's correct, while they're in the
22  hospital.
23     Q.      So that if a doctor prescribes a
24  medication that conflicts with a current medication

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

98

1  or condition, the pharmacist when getting that
2  medication order is able to go onto Epic with the
3  Secure Chat or go find the doctor in the hallway and
4  say, hey, Doc, you prescribed X, but the patient
5  can't take X because the patient is taking Y and has
6  condition A, you need to prescribe medication Z
7  instead, and the doctor says, oh, you're right, I'll
8  submit a new order, is that a scenario that occurs in
9  the hospital setting such as the University of
10  Florida?
11  A.      Yes, it does.
12  Q.      Okay.  Does that occur in a retail
13  pharmacy setting?
14  A.      It certainly can if the patient -- or,
15  excuse me, if the pharmacist has that knowledge.
16  Q.      Is it more -- strike that.  It almost
17  always happens in the hospital setting because of the
18  scenario we've discussed, that all of the team has
19  access to the same information, the doctors develop
20  that information, and they're all within the same
21  confines and using the same software system, correct?
22  A.      I would say that it's somewhat easier in
23  the inpatient setting, but pharmacists across all
24  practice settings have the same obligation to conduct

99

1  a thorough drug utilization review.
2  Q.      Sure.  And maybe the best term for this is
3  access.  They don't have the same access to the
4  treating physician or the individual who is
5  administering the medication, whether it's the
6  patient, him or herself, or an aide at home or
7  whomever, as you would in the hospital setting,
8  correct?
9  A.      I would disagree.  The pharmacist in a
10  retail setting certainly can access the patient or
11  the provider, again, in the context of completing
12  their duty to perform the DUR.  They're obligated to
13  do that.
14  Q.      Sure.  That wasn't my question.  My
15  question was they don't have the same access as in a
16  hospital, correct?
17  A.      I think define access for me.
18  Q.      Okay.  The doctor being right next to the
19  pharmacist or the nurse as they're treating the
20  patient in the bed?
21  A.      Yeah.  I think we've gone over this
22  earlier in the deposition.
23  Q.      Okay.  On Page 4 the top in the first --
24  it's not a full paragraph, but in the first

100

1  paragraph, the second full sentence states it's often
2  necessary to go beyond the FDA approved product
3  labeling while conducting drug information research,
4  yet Pharmacist Bryk could not think of any reference
5  material that he uses besides the package insert or a
6  bookmarked website or web search.
7          What is the product labeling?
8  A.      That would be the official FDA approved
9  label that's jointly developed between the
10  pharmaceutical manufacturer and the Food & Drug
11  Administration.
12  Q.      Based on the clinical studies and approval
13  by the FDA?
14  A.      True.
15  Q.      Okay.  And is that contained in the
16  package insert?
17  A.      Which part?
18  Q.      The product labeling as you just --
19  A.      The product labeling is the package
20  insert.
21  Q.      Okay.  So the term labeling and package
22  insert are interchangeable?
23  A.      Yes.
24  Q.      Other than a bookmarked website or web

101

1  search or drug information research, what else should
2  a pharmacist do when determining whether to verify or
3  dispense medication?  And we talked about this a
4  little bit earlier.
5  A.      Yeah, we have already.  We mentioned
6  talking to the patient, talking to the provider,
7  conducting their own independent research.  Those are
8  the things that we typically do to reconcile any
9  potential drug related problems.
10  Q.      And some of that research though is
11  conducting online research, whether it be by -- and
12  I'm blanking on the names of the tools that a
13  pharmacist could utilize, but there are online tools
14  that a pharmacist could utilize in terms of
15  researching medication and dosing and quantity of
16  that medication, correct?
17  A.      There are a variety of resources
18  available.
19  Q.      Okay.  I can't remember if we discussed
20  this earlier, but what is the difference between a
21  compounding center specifically and a retail
22  pharmacy?
23  A.      I think we did go over that earlier.  I
24  would say the retail pharmacy is what we

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

102

1  traditionally think of as a pharmacy that's
2  dispensing tablets, capsules, oral liquids.
3  Q.    Patches?
4  A.    Sure.  But retail pharmacies also have the
5  ability to compound.  You have to differentiate two
6  types of compounding, nonsterile compounding and
7  sterile compounding.  You can't have --
8  Q.    I'm sorry to interrupt you, but what are
9  the differences between sterile and nonsterile
10  compounding?
11  A.    Sterile compounding is the creation of a
12  final drug product that is administered
13  intervenously, for example, whereas nonsterile does
14  not have to have the same degree of cleanliness, for
15  example, for administration through the oral route.
16  Q.    Okay.  I'm sorry to interrupt you.
17  A.    That's okay.
18  Q.    In the state of Florida, I might have
19  asked this again, I apologize if I did, is a
20  pharmacist who works in a compounding center held to
21  a different standard than a pharmacist who works in a
22  retail setting?
23  A.    It depends on which standard we're talking
24  about.  If we're talking about a standard to conduct

103

1  a drug utilization review, no, there's no difference
2  in the standard.  If we're talking about the
3  standards of sterility related to organizational
4  standards and board regulations, absolutely there's a
5  difference.
6  Q.    Okay.  And then the same question related
7  to hospitals and compounding centers, is a pharmacist
8  at a hospital setting or inpatient setting held to a
9  different standard than a pharmacist at a compounding
10  center?  Is your answer similar to the previous
11  question?
12  A.    It's a little bit different because
13  inpatient hospital pharmacies, we do it all.  We
14  dispense to inpatients, but we also have very robust
15  nonsterile and sterile compounding pharmacy
16  activities.
17  Q.    On Page 4, the third full paragraph
18  halfway down, it says Dr. Lindner diagnosed his
19  daughter with chronic babesiosis, a medical diagnosis
20  he states he invented and discussed the, he put it in
21  quotes, disease and treatment directly with
22  Pharmacist Young and Pharmacist Bryk on multiple
23  occasions.  I read that correctly?
24  A.    Yes.

104

1  Q.    Okay.  Why did you put disease in
2  quotations?
3  A.    Because I don't think it's a disease.
4  That I think it's a term that he invented that's not
5  established by evidence by the medical community and
6  I think he self-proclaims to be the inventor of
7  chronic babesiosis.
8  Q.    Prior to this case have you ever heard the
9  term chronic babesiosis?
10  A.    No, I have not.
11  Q.    Prior to this case have you ever heard the
12  term babesiosis?
13  A.    Yes.
14  Q.    Have you ever heard the term prior to this
15  case of acute babesiosis?
16  A.    I don't recall specifically.
17  Q.    Prior to this case have you ever come
18  across a human being diagnosed with babesiosis?
19  A.    I don't think so.
20  Q.    Prior to this case had you ever come
21  across a human being, and again in your practice as a
22  pharmacist, of a human being diagnosed with chronic
23  babesiosis?
24  A.    No.

105

1  Q.    Is there max dosing for prednisone to
2  treat babesiosis?
3  A.    I don't think you use corticosteroids to
4  treat the infectious disease babesiosis.
5  Q.    Is there a max dosing for prednisone for
6  the treatment of chronic babesiosis?
7  A.    Again, that assumes that chronic
8  babesiosis is a real thing, which I don't believe it
9  is.
10  Q.    Is there a max dosing for dexamethasone
11  for the treatment of babesiosis?
12  A.    Same answers.
13  Q.    Is there a max dosing for dexamethasone in
14  the treatment of chronic babesiosis?
15  A.    The same answer as prednisone.
16  Q.    Okay.  A couple sentences down it says
17  Dr. Lindner testified Pharmacist Young understood his
18  practice and why he wanted the person to have large
19  amounts of steroids on hand in case they needed very
20  high amounts for some period of time.
21  What does the term pulsing mean as it
22  relates to the administering or taking of medication?
23  A.    Did you say pulsing?
24  Q.    Pulse or pulsing.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

106

1    A.    It really depends on the medication.  For
2    example, pulse dosing is usually a bolus if you will
3    of a particular medication versus a standard dose
4    that maintains the same over time.
5    Q.    And can you explain that in a little more
6    detail?
7    A.    Sure.  The only drug class that I'm aware
8    of that results in what you described as pulse dosing
9    is some antibiotic therapies where we'll take a given
10   standard daily dose and combine it into one dose and
11   administer that one dose.  That's my understanding of
12   pulse.
13   Q.    Are there any conditions or indications
14   that require pulse dosing with the use of
15   corticosteroids?
16   A.    Not that I'm aware of.
17   Q.    What does taper mean to you as a
18   pharmacist?
19   A.    I think we've been over taper already.
20   Taper is the gradual decline in dosing of a
21   particular drug over a period of time.
22   Q.    Are there conditions or indications that
23   would either require -- that would require a
24   physician to prescribe medication for a pulse plus a

107

1    taper of a certain medication?
2    A.    Not that I'm aware of.
3    Q.    Are there conditions or indications that a
4    physician may use at his or her discretion to pulse
5    plus taper when prescribing and administering a
6    medication?
7    A.    Not that I'm aware of.
8    Q.    Could a physician prescribe a medication
9    to be dispensed and administered to a patient for
10   multiple pulse plus taper periods?
11   A.    Not that I'm aware of.
12   Q.    What generally are corticosteroids
13   prescribed for?
14   A.    In general I would say inflammatory
15   processes, but those inflammatory processes can be a
16   component of a variety of disease states.
17   Q.    Are there other medications that are
18   antiinflammatory that can be prescribed to a patient
19   instead of corticosteroids?
20   A.    It depends on the patient condition being
21   treated.
22   Q.    Are there other medications that would
23   have the same antiinflammatory effects as a
24   corticosteroid?

108

1    A.    In general, yes, it could be nonsteroidal
2    antiinflammatory drugs for example.
3    Q.    And what kind of drugs are those?
4    A.    They're generally referred to as NSAIDs,
5    Motrin, Aleve, a variety of things you can buy over
6    the counter.
7    Q.    There are over the counter NSAIDs,
8    correct?
9    A.    Yes, there are.
10   Q.    And there are prescription level NSAIDs,
11   correct?
12   A.    I believe so.
13   Q.    Turning to Page 5, first full paragraph,
14   the first sentence, according to the online drug
15   reference Micromedex the initial adult dosage for
16   prednisone should not exceed 68 milligrams a day for
17   noncancer indications.  Is Micromedex one of those
18   online reference tools that we discussed earlier?
19   A.    Yes, it is.
20   Q.    When it says initial adult dosage, what
21   does Micromedex mean by that terminology?
22   A.    It means that the prescriber in
23   prescribing or ordering this medication for a
24   particular disease stage should not exceed that

109

1    particular range, in this case 60 to 80 milligrams as
2    the initial dose.
3    Q.    And that's what -- I maybe asked that a
4    little poorly.  When it says initial dose, is your
5    understanding if you're on a corticosteroid
6    treatment plan by a physician, they want you not to
7    exceed 80 milligrams for noncancer indications?  Is
8    that what it's saying?
9    A.    That's what it's saying, yes.
10   Q.    Okay.  Does it indicate the dosage for
11   prednisone that's not an initial dosage and what it
12   should not exceed?  For example, on day two, on day
13   five, on day 10, on day 20, that's not time what this
14   is saying, correct?
15   A.    That's correct.
16   Q.    And for noncancer indications, are there
17   any indications where the initial dosage could exceed
18   80 milligrams that isn't cancer?
19   A.    Yes, that's correct.
20   Q.    Okay.  So there are noncancer indications
21   where the initial dosage could exceed 80 milligrams.
22   It's just that it should not exceed the 80
23   milligrams, correct?
24                MR. LAMB:  Objection to form.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

110

1    You can answer.
2          THE WITNESS: Can you read that
3    back for me, please?
4    BY MR. BENEDETTO:
5    Q.    Sure. My question is are there
6    indications that are noncancer indications where the
7    initial dosage could exceed 80 milligrams?
8    A.    Yes, that's correct.
9    Q.    Okay. And there are indications that are
10   noncancer indications where a subsequent dosage could
11   exceed 80 milligrams, correct?
12   A.    Yes, that's correct.
13   Q.    What's the ratio in terms of the steroid
14   between prednisone and dexamethasone?
15   A.    I think I have it in the report that the
16   conversion is approximately 5 milligrams of
17   prednisone equals 0.75 milligrams of dexamethasone.
18   Q.    And that's 7 to 1, correct, 7 prednisone
19   to 1 dexamethasone?
20   A.    Close.
21   Q.    And is that common knowledge in the
22   pharmacy essentially?
23   A.    Yes.
24   Q.    So there could be a time in the hospital

111

1    setting, for example, where a doctor submits a
2    medication order for, I don't know, 800 milligrams of
3    -- 700 milligrams of dexamethasone and what they were
4    really submitting after the pharmacist receives the
5    medication order, conducts their drug utilization
6    review, and speaks with the doctor, what they were
7    really saying was we need 100 of dexamethasone, I was
8    thinking 700 of prednisone? Does that scenario or
9    similar scenarios arise in the hospital setting?
10   A.    They do on occasion. It's possible.
11   Q.    And those situations could arise in a
12   retail setting, correct?
13   A.    They could.
14   Q.    And in that scenario, again, the
15   pharmacist should speak to the physician when seeing
16   that amount and say is this amount correct or did you
17   mean -- you said dexamethasone, but did you mean
18   prednisone?
19   A.    That's correct.
20   Q.    And there are -- taking that to the
21   logical conclusion, there are situations where the
22   doctor can retort to the pharmacist no, no, no, no,
23   no, I meant 700 dexamethasone?
24   A.    Well, they can.

112

1    Q.    Yeah. Not whether they should or I'm not
2    even talking about a specific indication. I'm saying
3    that there could be a situation where the pharmacist
4    sees a prescription or a medication order, thinks the
5    doctor had either done a typo essentially or missed a
6    conversion, question the doctor, and the doctor then
7    retorts with, no, that was written correctly and
8    here's why, correct?
9    A.    Yes, that's correct.
10   Q.    And in that scenario should the pharmacist
11   then dispense the medication once receiving the
12   treatment plan from the doctor and the confirmation
13   of what the prescription or medication order was?
14   A.    Not necessarily.
15   Q.    Okay. When that occurs in a hospital
16   setting because -- well, when that occurs in a
17   hospital setting and the physician has submitted a
18   medication order and the pharmacist questions it, is
19   provided with a response, but does not think that
20   that response is adequate, what does the pharmacist
21   to do?
22   A.    In my opinion the pharmacist is to conduct
23   their own independent research or require the
24   physician to provide justification or their research

113

1    to validate why they think they're correct.
2    Q.    Okay. And does that sometimes occur?
3    A.    Yes.
4    Q.    And does the pharmacist then go back and
5    pull articles, Micromedex information, and the
6    physician goes back and does the same thing, journal,
7    articles, or chapters that they may have written and
8    they come back and they talk to each other?
9    A.    They can, yes.
10   Q.    In the meantime the patient is not
11   receiving that medication, correct?
12   A.    That's possible.
13   Q.    Okay. If there's an impasse in this
14   situation in a hospital setting and you as, you know,
15   an administrator, you may have knowledge of this,
16   what happens after that impasse? What are the next
17   steps to perform on the pharmacist's side?
18   A.    It obviously depends on the particular
19   situation, but the pharmacist absolutely in all
20   settings has the ability, the duty, to refuse to fill
21   a particular medication in which they don't think is
22   valid. In my particular hospital setting, because I
23   think that was your question, is we have escalation
24   pathways that if there is as you say an impasse, that

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

114

1  those situations can be escalated to different
2  individuals within the organization to opine on the
3  direction that we should go. The pharmacist
4  absolutely has the duty and ability to refuse to
5  fill.
6  Q.    Okay. And has that occurred at your
7  hospital, for example?
8  A.    Yes.
9  Q.    Okay. And University of Florida Shands
10 System has a protocol in place when that pharmacist
11 refuses to verify and dispense medication because
12 based on their own drug utilization review they've
13 determined that they cannot fill that prescription or
14 medication order?
15 A.    Yes. We have escalation pathways
16 memorialized in policy.
17 Q.    Okay. Is that mandated by the state of
18 Florida?
19 A.    No.
20 Q.    Is that mandated by an agency or the
21 United States government?
22 A.    Not that I'm aware of.
23 Q.    Is that a decision that the University of
24 Florida Shands has made internally?

115

1  A.    I would say that it's the standard of care
2  in hospital practices.
3  Q.    Standard of care of hospital practices.
4  Are you aware of other hospitals that have a similar
5  type of pathway or protocol system?
6  A.    Yes, I am.
7  Q.    Okay. Does that occur in the retail
8  setting?
9  A.    As a memorialized policy with a defined
10 escalation pathway, probably not.
11 Q.    Okay. And to your knowledge do any of --
12 does Pennsylvania require such a pathway or protocol?
13 A.    Not that I'm aware of.
14 Q.    Okay. In that hypothetical situation if
15 the -- I'm trying to think of a way to ask once the
16 pharmacist refuses or determines that it's
17 inappropriate to verify and dispense that medication
18 and the doctor and the pharmacist and the nurse and
19 whomever else are involved in trying to resolve what
20 I called an impasse in terms of providing the
21 medication to the patient, what happens if there are
22 adverse effects to that patient during that
23 procedure, during the escalation pathway procedure?
24        MR. LAMB: Objection to the form.

116

1        You can answer.
2        THE WITNESS: In general that
3  process is expedient.
4  BY MR. BENEDETTO:
5  Q.    When you say expedient, from your position
6  in the administration of the hospital system what
7  timeframe are we looking at here? What are you
8  expecting I mean?
9  A.    Within hours it has to be resolved, but
10 there's almost always an alternative pathway of
11 prescribing that will take care of the patient and
12 not cause harm.
13 Q.    Understood.
14 A.    No way will a pharmacist create a
15 situation where a patient is going to be harmed, and
16 neither will the medical staff. Nobody comes to work
17 every day wanting to harm people.
18 Q.    Right. And there's no way that the
19 pharmacist is in a situation where they cannot
20 dispense the medication or are considering not
21 dispensing the medication are going to create a
22 situation where they're going to harm the patient,
23 correct?
24 A.    That's right. No one intends to harm the

117

1  patient.
2  Q.    Has it occurred where a patient in the
3  University of Florida Shands Health System has been
4  harmed where a pharmacist has not dispensed or
5  verified a medication in this scenario that we just
6  discussed?
7  A.    Not that I'm aware of.
8        MR. BENEDETTO: It's 11:45. Can
9  we take another five minute comfort break,
10 Conor? Are we good with that?
11        MR. LAMB: Yeah. That works for
12 me.
13        THE VIDEOGRAPHER: 11:46, off
14 video.
15        (At this time, a brief recess was
16 taken.)
17        THE VIDEOGRAPHER: 11:52, on
18 video.
19 BY MR. BENEDETTO:
20 Q.    All right. Doctor, turning your attention
21 to Page 5 of your report and just back up to the
22 first full paragraph, there's a sentence about
23 two-thirds of the way down that states the dosage
24 requirements, and we're referring to prednisone or

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

118

1    corticosteroids, are variable and must be
2    individualized based on the disease under treatment
3    and the response of the patient. Did I read that
4    correctly?
5    A.    Yes, you did.
6    Q.    And would it also, the dosage requirement,
7    considering that they're variable, take into other
8    considerations of the patient as well, such as their
9    age, their weight, their other conditions?
10   A.    Yes.
11   Q.    And is that common not just with steroids,
12   but with essentially all medication?
13   A.    Not necessarily. There are medications
14   that are more fixed in their dosage recommendations
15   with a pretty defined escalation. Steroids are a
16   little more variable.
17   Q.    Are NSAIDs more variable as well?
18   A.    No. I would say that they're a little bit
19   more on the fixed side of things.
20   Q.    How about antibiotics, are they variable
21   or more on the fixed sides of things?
22   A.    I would say more fixed except for certain
23   classes like we've talked about earlier. Like some
24   of the aminoglycoside antibiotics can be a little

119

1    different.
2    Q.    How about azithromycin?
3    A.    Azithromycin is a pretty fixed dosage
4    schedule.
5    Q.    How about antimalarial drugs?
6    A.    No. I would say they more resemble
7    antibiotics.
8    Q.    So more fixed?
9    A.    Yes.
10   Q.    Do you know what the FDA -- strike that.
11   Bear with me one second. I'll be right back. Sorry
12   about that. I just wanted to get the words correct.
13         So, for example, atovaquone, is there a
14   max dose that you're aware of to treat any
15   particular condition or indication?
16   A.    Not that I'm aware of.
17   Q.    Same question for tafenoquine?
18   A.    Not that I'm aware of.
19   Q.    Okay. Is it possible to overdose on
20   atovaquone?
21   A.    It's possible to overdose on just about
22   any drug.
23   Q.    Is it possible to overdose on tafenoquine?
24   A.    Same answer.

120

1    Q.    Okay. Is it possible to have withdrawal
2    from atovaquone?
3    A.    Not that I'm aware of.
4    Q.    Is it possible to have withdrawal from
5    tafenoquine?
6    A.    Not that I'm aware of.
7    Q.    And in your report, specifically the
8    second paragraph of Page 5, you talk about Pharmacist
9    Young and Pharmacist Bryk, and this is not just the
10   only location you discuss this, but should have
11   initiated contact with Dr. Lindner.
12         When you say initiated, are you referring
13   to during their drug utilization review based on your
14   determination about the prescriptions that they
15   should have as part of that review process initiated
16   contact with Dr. Lindner about the specific
17   prescription?
18   A.    Yes, that's correct.
19   Q.    Okay. And is it true that we don't know
20   if they did or not? We just don't have any
21   documentation that they did or did not, correct?
22         MR. LAMB: Objection to form.
23         You can answer.
24         THE WITNESS: Well, I think it's

121

1               conflicting in the records whether they
2               did or didn't. Clearly Dr. Lindner
3               describes a situation where he says he did
4               not talk to either pharmacist directly
5               about Ms. Wolking.
6    BY MR. BENEDETTO:
7    Q.    What are some adverse effects of excess
8    dosing of corticosteroids?
9    A.    I think I have those in my report on
10   Page 5.
11   Q.    Are those all of the adverse effects?
12   A.    In general categories, yes, but it's not
13   explicit in terms of an individual side-effect. For
14   example, under the psychiatry domain, we don't call
15   out psychosis, but there are a variety of individual
16   adverse effects under each of the general categories
17   that we've listed in the report.
18   Q.    Can steroids cause inflammation to the
19   distal jejunum?
20   A.    I don't know that specifically, but we
21   know it can result in bowel perforation.
22   Q.    And can steroids cause injury to the
23   sigmoid colon?
24   A.    I don't know that specifically.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

122

1    Q.    Can steroids cause inflammation to those
2    two areas of the bowel system?
3    A.    Not that I'm aware of.
4    Q.    If a patient generally has adverse effects
5    due to excess dosing or even non-excess dosing of a
6    steroid in their internal GI tract, bowel, digestive
7    system, where would it be most commonly found?
8              MR. LAMB:  Objection to form.
9         You can answer.
10             THE WITNESS:  It can involve the
11             entirety of the GI tract.
12   BY MR. BENEDETTO:
13   Q.    But where is it most commonly found?
14   A.    I don't know where it's most commonly
15   found.
16   Q.    Could nonsteroidal antiinflammatory
17   medications cause adverse effects to the GI system?
18   A.    It's possible.
19   Q.    Could nonsteroidal antiinflammatory
20   medications cause a bowel perforation?
21   A.    I believe they can.
22   Q.    Is it possible for a patient to go into a
23   hospital setting and when the physician or PA or
24   nurse or whomever is taking the patient's history not

123

1    provide all of the medication that they're taking?
2    A.    It's possible.
3    Q.    Have you ever encountered a patient that
4    has been taking large doses of nonsteroidal
5    antiinflammatory medication and just not reported it
6    to the physician?
7    A.    Not that I can recall specifically.
8    Q.    But it could happen, correct?
9    A.    Yes, it could happen.
10   Q.    Is it possible for nonsteroidal
11   antiinflammatory medication or other types of
12   medication to cause similar adverse effects if taken
13   either in a certain dosing amount or excess dosing
14   similar to a certain dosing amount or excess dosing
15   of corticosteroids of the conditions that you listed
16   here on Page 5?
17   A.    I would probably say there's some overlap,
18   but in general I think they would be more distinct
19   than alike.
20   Q.    How about in nonsteroidal antiinflammatory
21   medication when in conjunction with other medication,
22   could that cause similar adverse effects as the
23   adverse effects listed here on Page 5?
24   A.    Well, you said in conjunction with other

124

1    medications --
2    Q.    That the patient has taken, yes.
3    A.    Well, that just depends on the medication.
4    Q.    Okay.  And just to be clear, you're a
5    licensed pharmacist, correct?
6    A.    I think we've established that.
7    Q.    Yes.  And you're providing testimony as a
8    pharmacist, correct?
9    A.    That's correct.
10   Q.    And you're not a licensed infectious
11   disease physician?
12   A.    No, I'm not.
13   Q.    And you're not a licensed gastrointestinal
14   physician?
15   A.    No.
16   Q.    Or a licensed psychologist or
17   psychiatrist, correct?
18   A.    That's correct.
19   Q.    In opinion No. 1 you wrote that when a
20   prescription is unreasonable on its face.  What does
21   that term mean, on its face?
22   A.    On its face means literally as you're
23   looking at the prescription as it's issued by the
24   medical provider, which includes the patient's name,

125

1    any demographic information, the drug name,
2    instructions, dose, number of refills, anything that
3    may stand out.
4    Q.    So on a prescription usually what's
5    contained is the patient's name, correct?
6    A.    That's one of the components, yes.
7    Q.    The date of birth?
8    A.    That's usually defined by state statute.
9    In Florida date of birth I don't believe is a
10   requirement.
11   Q.    Okay.  Could a prescription contain
12   contact information for that patient?
13   A.    Usually it contains the patient's address.
14   Q.    Okay.  And it could contain a phone number
15   or email address, correct?
16   A.    It could.
17   Q.    But it doesn't have to?
18   A.    I'd have to refer back to Pennsylvania
19   statutes to know the exact list of those kind of
20   components.  When it comes down to the drug name,
21   dose, refills, the provider name, those are all very
22   similar.
23   Q.    Yeah.  The contact information for the
24   provider and the date of the prescription?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

126

1    A.    Definitely required by all states.
2    Q.    Okay.  And whether a prescription is
3    unreasonable on its face obviously depends on those
4    factors we just discussed, the patient, the patient's
5    age, the type of drug or medication, the dosing of
6    the medication, the quantity of the medication,
7    correct?
8    A.    Yes.
9         MR. LAMB:  Objection to form.
10        You can answer.
11        THE WITNESS:  Yes.
12   BY MR. BENEDETTO:
13   Q.    Does that vary from pharmacist to
14   pharmacist whether it's unreasonable on its face to
15   each pharmacist?
16   A.    Certainly there's professional judgment
17   that should come into play, but in general the
18   principles I think we've been discussing thus far in
19   this deposition continue to apply relative to the
20   dosing schema that was prescribed as well as the
21   therapeutic duplication that was identified.
22   Q.    And the reason why there's professional
23   judgment too, we can't hold medical professionals to
24   a rigid degree when they're making judgment with such

127

1    variables as patient's condition, age, weight, other
2    medications they may be on, correct?
3         MR. LAMB:  Objection to form.
4         You can answer.
5         THE WITNESS:  I think what we're
6         talking about is the standard of care to
7         perform a thorough and complete drug
8         utilization review, and in that context I
9         think it's pretty clear in Pennsylvania
10        Board of Pharmacy regs exactly what's
11        required by the DUR process.
12   BY MR. BENEDETTO:
13   Q.    So that August 8th prescription which you
14   have listed on Page 2 of the report, is that
15   unreasonable on its face?
16   A.    Yes.
17   Q.    Why is it unreasonable on its face?
18   A.    Because the dosage in and of itself
19   exceeds the FDA approved package insert for initial
20   dosage regimen in noncancer indications.
21   Q.    Is this an initial dosage for prednisone
22   for a noncancer indication on its face?
23   A.    Yes.
24   Q.    If Ms. Wolking had been currently on a

128

1    steroid regimen during that time, would that be an
2    initial dose or not an initial dose?
3    A.    From my understanding of the record as we
4    indicated on Page 2, there appears to be an initial
5    prednisone prescription, but that was in May.  We're
6    now fast-forwarding to August 8th and I would call
7    the August 8th prescription not a continuation of the
8    May prescription and in the eyes of Pharmacist Bryk
9    would be considered a new prescription, a new initial
10   dosage would apply.
11   Q.    And then again returning to that August
12   8th prescription, taking and assuming that it's the
13   initial dose where the instructions are up to 10 tabs
14   daily as directed, is there anything in the
15   prescription to indicate that the initial dosage,
16   meaning the first day's dosage, exceeded 80
17   milligrams?
18   A.    Sure.  It says up to 10 tabs.  So if the
19   patient follows that prescription information, they
20   have the ability on day one to consume 100 milligrams
21   of prednisone.
22   Q.    Even though it says as directed?
23   A.    Even though it says as directed.
24   Q.    Okay.  Which would again indicate the

129

1    instructions are to be directed by the treating
2    physician or provider, correct?
3         MS. DENAPLES:  Object to form.
4         THE WITNESS:  We also had
5         significant testimony that there was
6         patient directed instructions for
7         self-titration.
8    BY MR. BENEDETTO:
9    Q.    And you did not read Ms. Wolking or
10   Mr. Wolking's testimony, correct?
11   A.    No, I did not.
12   Q.    On Page 6, No. 2, what you've termed the
13   breach, Line 3, the first two words are excessive
14   doses to Ms. Wolking from August to October 2022.
15   What are the excessive doses that you're referring
16   to?
17   A.    The dosages that were prescribed on the
18   four dispenses, August 8th, August 16th, and August
19   27th and October 5th that were grossly excessive.
20   Q.    Okay.  And those are what you're terming
21   dosing that are contained in the instructions,
22   correct?
23   A.    The dose prescribed plus the instructions,
24   yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

130

1  Q.    Okay. Can a pharmacist in a retail
2  setting dispense medication if a patient refuses
3  counseling?
4  A.    Yes, they can.
5  Q.    Should a pharmacist dispense medication if
6  a patient refuses counseling?
7  A.    Yes, they should.
8  Q.    And why is that?
9  A.    Because the regulations state that
10  patients -- well, first, the regulations state that
11  the pharmacist's duty is to offer to counsel, but
12  they also acknowledge that if a patient refuses that
13  offer, that the pharmacist is not obligated to
14  conduct that activity.
15  Q.    And why does the pharmacist or why do the
16  regulations require that the pharmacist offer to
17  provide counseling, but at the same time have the
18  pharmacist able to dispense medication even if the
19  patient refuses counseling?
20  A.    I don't know.
21  Q.    What is your opinion on it? What is your
22  thought?
23  A.    It's a long held standard that started
24  from my understanding many years ago with OBRA

131

1  federal regulations that then trickled down into
2  State Board of Pharmacy regs and those have been
3  interpreted a variety of ways, but most states at a
4  minimum require the pharmacist to offer. There are
5  states that go beyond that minimum requirement, but
6  it's more common not to.
7  Q.    And that offer of counseling is something
8  as simple as do you need any counseling or
9  information regarding this medication, yes or no?
10  A.    It's usually stated as would you like to
11  speak to the pharmacist about your medications.
12  Q.    Okay. And in the retail setting,
13  especially at the big box retail pharmacies, it's
14  sometimes on that scanner and the option yes or no,
15  and you can select no and then you get your
16  medication, correct?
17  A.    It does happen that way quite a bit of the
18  time. It's not preferred, but that's how a lot of
19  pharmacies get away with being compliant with the
20  standard.
21  Q.    And part of the reason of that too is that
22  we're relying on the pharmacist performing their
23  professional duties and the physician or the provider
24  performing their professional duties in the sense

132

1  that the pharmacist has performed their drug
2  utilization review upon receiving that prescription,
3  has checked the dosing and the quantity, may have
4  consulted other reference materials, may have talked
5  with the providing physician, and is able to dispense
6  that medication regardless of whether the patient
7  wants to do it because they're having a temper
8  tantrum or something, right?
9  A.    I would call the offer to counsel being
10  completely independent of the drug utilization review
11  process. They're separate. They're distinct
12  requirements. Yes, we have to conduct a DUR on all
13  dispenses, but that doesn't always result in any red
14  flag or need to intervene versus the offer to counsel
15  is required to be made on every first prescription
16  and refill dispensed from the pharmacy.
17  Q.    Right. That's what I was getting at.
18  It's more because whether the patients accepts that
19  counseling or not, you're able -- my question is the
20  pharmacist is able to provide that patient with the
21  medication because based on the totality of the
22  circumstances in the medical provider's opinion, the
23  physician, the pharmacist, it's safe to dispense that
24  medication, correct?

133

1  A.    I would agree. And I would also add that
2  even if patients decline counseling, that it's the
3  standard of practice to affix drug information
4  leaflets to every prescription that's being dispensed
5  from a pharmacy. So regardless of if the patient
6  accepts verbal counseling, pharmacies almost always
7  provide written information to the patient.
8  Q.    Package inserts?
9  A.    No, not a package insert. It is more
10  summarized information from a variety of third party
11  drug information resources that retail pharmacies
12  will rely on.
13  Q.    Could a patient obtain medication from a
14  retail pharmacy that has the package insert with it?
15  A.    They could.
16  Q.    The pharmacy is not obligated to provide
17  the package insert?
18  A.    That's correct.
19  Q.    Could the patient then contact the
20  pharmacy after they've obtained the medication and
21  after they've either accepted or declined counseling
22  for further counseling?
23  A.    Absolutely.
24  Q.    And the patient could contact the treating

34 (Pages 130 to 133)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**THOMAS JOHNS, Pharm.D.**

134

1  physician or the providing physician with those same
2  questions once they obtain the medication, correct?
3  A.    Yes, they can.
4  Q.    The last sentence of conclusion No. 2 on
5  Page 6 states the normal doses for corticosteroids
6  are listed in common reference materials and easy for
7  any pharmacist to find.  What are those normal doses?
8  What do you mean by normal?
9  A.    Back to the FDA initial dosage regimen and
10  any subsequent dosing regimens that may be in the
11  published literature.
12  Q.    And you conclude that pharmacists are
13  required to go beyond the traditional inquiry to
14  prescribing physicians and conduct an independent
15  investigation into the appropriateness of dispensing
16  corticosteroids to Ms. Wolking, and that's the
17  sentence or two before that.
18      And that incorporates what we've already
19  been discussing, things like the drug utilization
20  review, independent questioning of the doctor,
21  further research, things like that, correct?
22  A.    I think the way I would put it is because
23  the doses that were dispensed to Ms. Wolking were in
24  such excess that the pharmacist certainly had a duty

135

1  to talk to the physician, the prescribing physician.
2  I think had that happened since there's controversy
3  that it did or didn't happen with Ms. Wolking, that
4  the explanation given by Dr. Lindner to the
5  pharmacist to satisfy the DUR would have been
6  considered so absurd frankly that the pharmacist
7  should have gone beyond Dr. Lindner to do their own
8  search on the treatment of chronic babesiosis and the
9  use of corticosteroids.  And had they have done that,
10  perhaps Ms. Wolking would not have received the doses
11  that she did.
12  Q.    And what is an excess dosing of
13  corticosteroids in this scenario?
14  A.    In this scenario it's because the face of
15  the prescription as written exceeded the initial
16  dosage that's in the FDA product labeling.
17  Q.    And the initial dosage is the first
18  dosing, correct?
19  A.    That's correct.
20  Q.    Is there excess of a subsequent dosing?
21  A.    Well, I think if you look at the sequence
22  of prescriptions, there was an extremely rapid
23  escalation in dosing from the prednisone to the
24  dexamethasone prescriptions.  Each one in and of

136

1  itself should have raised red flags to the pharmacist
2  that needed to be resolved as part of the drug
3  utilization review process.
4  Q.    But just to be clear, there could be
5  indications or scenarios where the initial dosing
6  exceeds the FDA recommendation in noncancer
7  indications, correct?
8  A.    That's correct.
9  Q.    And there could also be scenarios where
10  the dosing or the quantity is discussed between the
11  treatment provider and the patient, correct?
12  A.    Sure.  That's possible.
13  Q.    What does the term off label mean to you
14  in the medical setting?
15  A.    A provider has the authority to prescribe
16  medications for indications and for dosing that are
17  not contained within the official FDA approved
18  labeling.
19  Q.    And that is acceptable in the medical
20  community, correct?
21  A.    Yes, it is.
22  Q.    Are you aware of off label use of
23  corticosteroids generally?
24  A.    Oh, I'm sure there are, yes.

137

1  Q.    Could Ms. Wolking have obtained this exact
2  same quantity using the August 8th prescription from
3  another pharmacy?
4  A.    Well, anything is possible.
5  Q.    And could Dr. Lindner have written
6  multiple prescriptions that totaled the same quantity
7  so that Ms. Wolking would have to take them to two or
8  three or multiple pharmacies to obtain the same
9  quantity of the August 8th prescription?
10  A.    That wouldn't surprise me.  I think
11  Dr. Lindner in his own testimony said that he was
12  directing prescriptions to TCC because he feared that
13  other pharmacies would not fill and dispense his
14  prescriptions for his patients.
15  Q.    Was TCC cc'd on those communications to
16  your knowledge?
17  A.    Not that I'm aware of.
18  Q.    And if TCC did not fill that August 8th
19  prescription, it's possible that another retail
20  pharmacy could have filled that prescription,
21  correct?
22  A.    Sure.
23  Q.    To your knowledge are retail pharmacies
24  required to know whether duplicative therapy

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

THOMAS JOHNS, Pharm.D.

138

1  medication prescriptions are being filled by another
2  pharmacy?
3  A.      They are not required to know.
4  Q.      Is it possible to obtain the same
5  medication via the same prescription from two
6  different pharmacies simultaneously?
7  A.      Yes, it's possible.
8  Q.      And is it common?
9  A.      I wouldn't say it's common.  It would be
10 quite nefarious for somebody to do that, but people
11 certainly do it.
12 Q.      Do physicians do that for a variety of
13 reasons, not necessarily nefarious at all, but to aid
14 a patient's treatment?
15 A.      I would say --
16         MR. LAMB:  Objection to form.
17         You can answer.
18         THE WITNESS:  -- a reasonable
19         physician would not do that.
20 BY MR. BENEDETTO:
21 Q.      Not order the same medication at two
22 different locations so that the patient could
23 possibly have the medication for the physician's
24 treatment plan that doesn't necessarily mean that

139

1  they're taking the medication simultaneously, but
2  that they have the medication for following the
3  physician's treatment plan?
4          MR. LAMB:  Objection to form.
5          MS. DENAPLES:  Join.
6          MR. BENEDETTO:  That was
7          convoluted.
8          THE WITNESS:  That's okay.  I
9          would say it's not common at all.
10 BY MR. BENEDETTO:
11 Q.      But it does happen, correct?
12 A.      I've never personally encountered it.  It
13 wouldn't surprise me if it did happen, but I would
14 say it's absolutely not common.
15 Q.      If a pharmacist complied with their
16 professional standard of care wherein there are say,
17 for example, four or five different patients all
18 suffering from the same indications or same condition
19 and obviously have different concurrent medications
20 and concurrent other conditions and a physician or
21 treatment provider speak with the pharmacist about,
22 one, describe his treatment plan and then write
23 prescriptions for each of those four or five patients
24 and the pharmacist not talk to the physician about

140

1  those other four or five patients?
2          MR. LAMB:  Objection.  Objection
3          to form.  You can answer.
4          MS. DENAPLES:  Join.
5          THE WITNESS:  I guess I'm not
6          following that question.
7  BY MR. BENEDETTO:
8  Q.      Yeah.  That's a little too convoluted.
9  A.      Simplify it for me.
10 Q.      Sure.  There are four patients, okay, and
11 they each are suffering from a condition that the
12 treatment provider has diagnosed and the treatment
13 provider is going to write prescriptions for each of
14 those four that are substantially similar or the
15 same.  Okay.
16         And he brings it to the pharmacy and says
17 I have this patient.  It's the first patient
18 suffering from this.  I have others.  Here's the
19 prescription for this one.  The pharmacist conducts a
20 drug utilization review of that prescription,
21 including speaking with the treatment provider, and
22 then fills the prescription based on their DUR for
23 that first patient.  Do you understand?
24 A.      I understand.

141

1  Q.      Okay.  Then the second, third, and fourth
2  patient come, is the pharmacist required to speak to
3  that physician about each of those other patients?
4  A.      The pharmacist is required to conduct an
5  independent DUR on each and every prescription
6  regardless of if it's a different patient or the same
7  patient.
8  Q.      Okay.  Which could involve not necessarily
9  speaking to the treating physician, but conducting
10 that DUR, again, that component of speaking to the
11 individual treating physician, not necessarily part
12 of that?
13 A.      I think we've covered that quite a bit
14 today about what steps a pharmacist should do in
15 conducting an appropriate drug utilization review.
16 Q.      Okay.  In this scenario is there a dosing
17 or quantity of corticosteroids that would be -- what
18 is the line?  What is too much to dispense whether by
19 dosing or by quantity in this scenario?
20         MR. LAMB:  Objection to form.
21         You can answer.
22         MS. DENAPLES:  Join.
23         THE WITNESS:  The scenario we're
24         describing is Dr. Lindner's treatment of

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

142

1   chronic babesiosis. What I'm stating is
2   that any dose that exceeds the initial FDA
3   dosing as we've discussed in the label, in
4   third party references, would necessitate
5   the need for further inquiry.
6   BY MR. BENEDETTO:
7   Q.    Would there be any circumstances here
8   where it would be harmful to the patient not to
9   dispense the medication contained in the
10  prescription?
11  A.    I don't believe so at all. Because as we
12  discussed earlier, I don't believe she was suffering
13  from the fabricated disease state that Dr. Lindner
14  was the inventor of.
15  Q.    In your opinion would what I'll call a
16  mainstream or big box retail pharmacy dispense this
17  August 8th prescription?
18  A.    They shouldn't have. They have an
19  independent duty as well to conduct a drug
20  utilization review and every single principle that I
21  described here today would apply to any retail
22  pharmacy.
23  Q.    Would a retail pharmacy, big box retail
24  pharmacy, or local pharmacy dispense the subsequent

143

1   prescriptions?
2   A.    Same answer, each prescription requires an
3   independent DUR to be conducted.
4   Q.    Could the consumption of atovaquone have
5   caused Ms. Wolking's bowel perforation?
6   A.    Not that I'm aware.
7   Q.    Could the consumption of tafenoquine cause
8   Ms. Wolking's claimed bowel perforation?
9   A.    Not that I'm aware.
10  Q.    Could the consumption of nonsteroidal
11  antiinflammatory medication cause Ms. Wolking's bowel
12  perforation?
13  A.    In general NSAIDs can cause bowel
14  perforation.
15  Q.    Could NSAIDs in conjunction with
16  corticosteroid dosing whether in sub-excess or in
17  excess cause a bowel perforation such as
18  Ms. Wolking's?
19  A.    I don't know that for sure. I'd have to
20  review the available literature to come to that
21  conclusion.
22  Q.    Does the physician take into account the
23  risk/benefits of a dosing and quantity of a
24  medication when prescribing the medication?

144

1   A.    I hope so.
2         MS. DENAPLES: Object to form.
3   BY MR. BENEDETTO:
4   Q.    And does a treating physician or provider
5   -- strike that. Do you know what -- is there a
6   dosage of corticosteroids that you're aware of where
7   the max amount of the dosing, the benefit obtained
8   from that starts to diminish and the risk of
9   irritation or injury rises?
10  A.    Not that I'm aware of.
11  Q.    Are there any circumstances where abrupt
12  discontinuance or withdrawal from a medication or
13  where a patient is not allowed access to the
14  medication can be harmful?
15  A.    Yes.
16  Q.    What are those scenarios?
17  A.    From a variety of medication classes.
18  Certainly it can be harmful for corticosteroid
19  withdrawal to occur. We've discussed opioid
20  medications here today. That could also be harmful
21  to the patient to withdrawal. So it just depends on
22  the patient. It depends on the medication, depends
23  on the dose, the duration. Lots of factors go into
24  whether it would actually cause harm or not.

145

1   Q.    Are there conditions where chronic
2   corticosteroid use is appropriate?
3   A.    Is appropriate, I think that's what you
4   said?
5   Q.    Yes.
6   A.    Yes.
7   Q.    And not having access to the
8   corticosteroids if you are using it in an appropriate
9   chronic corticosteroid patient would be harmful to
10  that patient, correct?
11  A.    Sure. But it's certainly not fast. This
12  is -- it would be a long process and certainly not in
13  hours.
14  Q.    Well, how long?
15  A.    Weeks.
16  Q.    In the hospital setting what happens if
17  there's a duplicative order or a medication order for
18  duplicative treatment that comes into the pharmacy?
19  A.    It just depends, but like we've said over
20  and over again the duty to conduct the DUR is
21  irrespectively of the pharmacy practice location, so
22  we would follow the same process that we've already
23  described here. We would contact the physician and
24  have the conversation. And if we were satisfied with

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

146

1    the answer, then we would move forward.  If not, then
2    we would escalate or do further research.
3    Q.      In the inpatient setting is the pharmacy
4    -- I'm sorry.  I'm having a fire drill or a fire.
5    Can we go off the record?
6            THE VIDEOGRAPHER:  12:32, off
7    video.
8            (At this time, a discussion was
9    held off the record.)
10           THE VIDEOGRAPHER:  12:32, on
11   video.
12   BY MR. BENEDETTO:
13   Q.      All right.  Dr. Johns, can a pharmacy in
14   the inpatient setting verify and dispense medication
15   that's not an active order?
16   A.      No.
17   Q.      How is -- well, strike that.  Would you
18   agree with me that a pharmacy or a pharmacist cannot
19   control access to either duplicative or other
20   medication in an outpatient setting where it is
21   possible to do so in the inpatient setting
22   considering the different environments?
23   A.      I don't know that I completely understand
24   that question.

147

1    Q.      Sure.  So a pharmacy in an inpatient
2    setting only verifies and dispenses the active order,
3    correct, where there could possibly be a duplicative
4    medication?
5    A.      I think I'm having trouble with that part
6    of your question.
7    Q.      If there are two orders for a duplicative
8    therapy medication that comes into the pharmacy, the
9    pharmacist, my understanding from your testimony, is
10   that part of their DUR would be to confirm with the
11   treating physician what medication that they're
12   actually looking for, correct?
13   A.      Yes.  They have to resolve the potential
14   conflict.
15   Q.      And so the potential conflict, the one
16   medication if it's duplicative therapy medication,
17   the one is like removed from the order and the active
18   order is then filled?
19   A.      Yeah.  It just depends on the scenario.
20   There are -- so yeah, but typically in general the
21   answer to your question is yes.
22   Q.      And would that be a different scenario in
23   an outpatient setting?
24   A.      A little bit.  In the inpatient setting

148

1    the order would -- the duplicative order, if it was
2    decided was not necessary, inappropriately ordered,
3    would be discontinued by the provider or through a
4    verbal order with the pharmacist.  On the outpatient
5    setting we would just simply not fill the
6    prescription.
7    Q.      Okay.  But if those two different
8    prescriptions were sent to two different locations,
9    one retail pharmacy doesn't necessarily know that
10   that other prescription was sent to another retail
11   pharmacy, correct?
12   A.      It depends on the retail pharmacy.  We
13   certainly know that Walgreens, CVS, Publix, you know,
14   the larger chain pharmacies do have access to
15   prescription records for their patients when they're
16   being filled at other locations.
17   Q.      But not all pharmacies and because it's
18   not required?
19   A.      It is not required.
20   Q.      What was the -- what is the cost of
21   maintaining the Epic system at the University of
22   Florida?
23   A.      I have no idea what it costs to maintain
24   it.

149

1    Q.      A lot of money?
2    A.      Yeah, a lot of money.
3    Q.      A substantial sum?
4    A.      You know, it depends on how you define
5    substantial.
6    Q.      Correct.
7    A.      How I define substantial, I would say the
8    answer is yes.
9    Q.      And how a hospital system might define it
10   versus a local retail pharmacy, correct?
11   A.      I would say there's a considerable
12   difference.
13   Q.      Okay.  Do you know how much it cost to
14   implement Epic at University of Florida when it was
15   implemented?
16   A.      It was around $110,000,000.
17   Q.      Okay.  Do you know why Epic was
18   implemented at the University of Florida?
19   A.      Because at the time it was the, and still
20   is we believe, the premier electronic medical record
21   in the United States and I think it's well
22   established in the medical community that an
23   electronic record is superior to a paper record for
24   hospitalized patients to deliver the care that we

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

150

1  deliver in a quality and safe manner.
2  Q.      Are you aware of any smaller or individual
3  nonhospital medical facilities that implemented Epic?
4  A.      Not that I'm aware of, no.  But also let
5  me remind you we discussed this earlier in the
6  deposition that my four community pharmacies don't
7  utilize Epic today to process their prescriptions.
8  They use a very rudimentary pharmacy computer system
9  to do all of the activities that we've described
10  today.  You don't need Epic to conduct that work.
11  Q.      And those are required by the University
12  of Florida, not by either the state of Florida or the
13  United States, correct?
14  A.      What do you mean by those?
15  Q.      Those meaning your University of Florida
16  retail pharmacies that use the different system other
17  than Epic, that different system is required by the
18  University of Florida, not by the state of Florida?
19  A.      I wouldn't really even call it required by
20  us.  It's just simply the software program that we've
21  chosen today to perform the activities of dispensing
22  prescriptions that's consistent with the laws and
23  regulations of the state of Florida.
24          MR. BENEDETTO: Okay.  Conor, can

151

1          I get two or three minutes to look over my
2          notes?  I think I'm finished with
3          questioning.
4          MR. LAMB:  Sure.  I only have a
5          couple.  Can I just start while you're
6          doing that?
7          MR. BENEDETTO:  Yeah.  Go ahead.
8          MR. LAMB:  Okay.  Great.
9
10  BY MR. LAMB:
11  Q.      Dr. Johns, I just want to clear up
12  something for the purposes of the transcript.  In
13  your report where you talk about Micromedex and
14  initial dosing from 60 to 80 milligrams for noncancer
15  indications, are you aware of any noncancer
16  indications where the initial dosing would be more
17  than the 60 to 80 milligrams?
18  A.      No, I'm not.
19  Q.      Okay.  Because I think a couple times in
20  response to defense counsel's questions you said
21  there were noncancer indications that would get more
22  than 80 milligrams initially.  Did you mean that?
23  A.      Oh, I probably misspoke.  My apologies.
24  Q.      Okay.  Now I want to talk about you using

152

1  the initial dosing as part of your evaluation of
2  whether these pharmacists fulfilled their duty.  Even
3  if -- I mean, you've reviewed Ms. Wolking's medical
4  records in this case, so you're aware that she had
5  been taking steroids for years before August 8th of
6  2022 whether for hormone replacement or otherwise.
7          Even if she was taking steroids at various
8  levels before, do you believe that the initial dosing
9  is relevant to the pharmacist's decisionmaking about
10  what to do with the August 8th, 2022 prescription?
11  A.      I believe that the pharmacist should look
12  at those prescriptions independently of any other
13  prescription that has been dispensed or processed.
14  Q.      And is it fair to say that the initial
15  dosage in the FDA package insert is a useful
16  benchmark for the pharmacist when considering what
17  further inquiries they might make?
18  A.      Yes, I would agree.
19  Q.      When a pharmacist is considering whether a
20  prescription is reasonable on its face, in addition
21  to considering the initial dosage written by the FDA,
22  would they also be able to consider the issue of
23  therapeutic duplication?
24  A.      Yes, they could.

153

1  Q.      So in other words, if they were looking at
2  the August 16th or the September 26th prescriptions,
3  could they consider the prescriptions that had come
4  immediately before those dates?
5  A.      Yes.
6          MR. LAMB:  Those are all the
7          questions that I have.
8          MR. BENEDETTO:  Just one or two
9          follow-up.
10
11  BY MR. BENEDETTO:
12  Q.      So, Dr. Johns, you're saying in your
13  opinion that there are no noncancer indications with
14  the initial dosing that could exceed 80 milligrams a
15  day?
16  A.      What I'm saying is if a prescriber
17  prescribes the medication and exceeds 80 milligrams
18  for a noncancer indication, that the pharmacist has
19  the obligation to conduct the independent
20  investigation that we've described.
21  Q.      Okay.  And if the pharmacist conducts that
22  independent investigation and is satisfied with the
23  explanation and the review and the research, that
24  pharmacist is able to dispense that medication?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

154

1  A.      Well, I think that's the hang-up in this
2  case, right, is because the explanation from
3  Dr. Lindner would defy any reasonableness in the
4  medical community, that the pharmacist should have
5  gone further than just calling Dr. Lindner and
6  saying, hey, is this okay, is this what you intended?
7  Dr. Lindner replies back yes.  The pharmacist, again,
8  because of the anticipated explanation should have
9  done more.
10  Q.      Right.  But in that scenario when if and
11  more is done for this particular case with these
12  particular facts and the explanation is considered,
13  could the medication still be dispensed?
14          MR. LAMB:  Objection to form.
15      You can answer.
16          MS. DENAPLES:  Join.
17          THE WITNESS:  Can it physically
18      be dispensed?  Yes.
19  BY MR. BENEDETTO:
20  Q.      And to be clear, those instructions on the
21  prescriptions as directed are being directed by
22  Dr. Lindner to the patient Ms. Wolking, correct?
23  A.      Via the prescription itself, yes.
24  Q.      Okay.  And up to 10 tablets at 10

155

1  milligrams would be up to 100 milligrams, correct?
2  A.      Yes.
3          MR. BENEDETTO:  Okay.  That's all
4      the questions I have.  Thank you,
5      Dr. Johns.  I appreciate your time.
6          THE VIDEOGRAPHER:  12:43,
7      conclusion of video.
8          MS. DENAPLES:  I have some
9      questions very, very briefly.  I'm not
10      going to hold us up too long.
11
12  BY MS. DENAPLES:
13  Q.      Hi, Dr. Johns.  I represent Defendant
14  Dr. Henry Lindner.  Just very briefly, now you
15  testified earlier a few times regarding your
16  qualifications and you indicated you're a doctor of
17  pharmacy, so am I correct that you will not be
18  providing any opinions regarding the standard of care
19  as it relates to Dr. Lindner's treatment of Stacey
20  Wolking?
21  A.      Yes, that's correct.
22          MS. DENAPLES:  That's all I have
23      for you.  Thank you.
24          THE VIDEOGRAPHER:  Counsel,

156

1  anything further?
2          MR. LAMB:  Not from us.
3          MR. BENEDETTO:  Not from us.
4          THE VIDEOGRAPHER:  12:44,
5  conclusion of video.
6          (At this time, documents were
7  marked for identification as Johns Exhibit
8  Nos. 1 through 4.)
9          (Deposition concluded at 12:44
10  p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24

157

1          C E R T I F I C A T I O N
2
3
4      I, JENNIFER O'NEILL,  Professional
5  Court Reporter and Notary Public, do hereby certify
6  that the foregoing is a true and accurate transcript
7  of the stenographic notes taken by me in the
8  aforementioned matter.
9
10
11
12
13
14
15
16
17
18
19
20
21
22  DATE:      _____
23          JENNIFER O'NEILL
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

**THOMAS JOHNS, Pharm.D.**

---

158

INSTRUCTION TO WITNESS

1
2
3
4     Please read your deposition over carefully
5  and make any necessary corrections.  You should state
6  the reason in the appropriate space on the errata
7  sheet for any corrections that are made.
8         After doing so, please sign the errata
9  sheet and date it.
10        You are signing same subject to the
11  changes you have noted on the errata sheet, which
12  will be attached to your deposition.
13        It is imperative that you return the
14  original errata sheet to the deposing attorney within
15  thirty (30) days of receipt of the deposition
16  transcript by you.  If you fail to do so, the
17  deposition transcript may be deemed to be accurate
18  and may be used in court.
19
20
21
22
23
24

---

160

- - - - - - - -

ERRATA SHEET

- - - - - - - -

PAGE   LINE   CHANGE

___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____
___   ___   _____

---

159

ACKNOWLEDGEMENT OF DEPONENT

1
2
3
4        I,     , do hereby certify that I
5  have read the foregoing pages, and that the same is a
6  correct transcription of the answers given by me to
7  the questions therein propounded, except for the
8  corrections or changes in form or substance, if any,
9  noted in the attached errata sheet.
10
11
12
13  Date          _____
14
15
16
17
18  Subscribed and sworn to before me.
19  My commission expires _____.
20
21
22
23
24

---

161

Johns 1

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

THOMAS JOHNS, Pharm.D.

162

1                    Johns 2
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

164

1                    Johns 4
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

163

1                    Johns 3
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

THOMAS JOHNS, Pharm.D.

## A

**a-t-e** 45:9
**a.m** 1:17 4:3
**abbreviation** 61:14
**ability** 11:7 102:5 113:20 114:4 128:20
**able** 8:20 54:9 75:19 76:13 78:12 82:15 98:2 130:18 132:5,19,20 152:22 153:24
**abrupt** 144:11
**absolutely** 52:18 57:24 63:3 75:16 103:4 113:19 114:4 133:23 139:14
**absurd** 135:6
**abuse** 40:8 43:22
**academic** 26:7
**acceptable** 136:19
**accepted** 18:24 133:21
**accepts** 132:18 133:6
**access** 8:20 24:2 28:9 73:16 95:23 97:14 98:19 99:3,3,10 99:15,17 144:13 145:7 146:19 148:14
**acclimated** 86:24
**account** 26:20 143:22
**accountable** 31:4
**accreditation** 34:5
**accreditations** 34:11
**accurate** 19:19 56:15 78:10 90:22 97:1 157:6 158:17
**acknowledge** 130:12
**acknowledged** 90:16
**ACKNOWLEDGEMENT** 159:1
**acknowledges** 13:16,16
**acquire** 47:10
**acquired** 26:14
**action** 1:2 51:21,23 52:3
**activated** 20:21
**active** 21:13 146:15 147:2,17
**activities** 10:9 21:23 53:24 103:16 150:9,21
**activity** 58:12 96:23 130:14
**actual** 69:9 77:2
**acute** 104:15
**add** 133:1
**addition** 16:6 24:17 152:20

**additional** 30:12 73:5
**address** 125:13,15
**adequate** 112:20
**adjacent** 19:18
**administer** 82:2,16 106:11
**administered** 24:4 87:2 102:12 107:9
**administering** 15:13 17:23 63:18 88:6,23 99:5 105:22 107:5
**administration** 18:5 35:5 63:21 100:11 102:15 116:6
**administrative** 18:6 35:9
**administrator** 113:15
**admission** 97:1
**admitted** 97:7
**adult** 15:20 18:11 108:15,20
**advance** 6:19 15:23 16:1
**Advent** 20:3
**adverse** 24:23 25:5 27:11,12 28:2 86:7,11 90:7,7 93:18 115:22 121:7,11,16 122:4 122:17 123:12,22,23
**affiliations** 33:24 34:1
**affirmative** 5:20
**affix** 133:3
**aforementioned** 157:8
**age** 86:17 118:9 126:5 127:1
**agencies** 44:19
**agency** 43:11 114:20
**agent** 29:16
**ago** 16:22 29:8 36:17 52:12 52:13,17 53:17 80:22 91:8 93:17 130:24
**agree** 18:20 19:1 26:17 43:23 43:24 44:7,16 60:12 61:22 74:21 75:3,14 86:10 87:18 87:23 133:1 146:18 152:18
**Agreed** 62:1
**ahead** 151:7
**aid** 31:19 32:3 138:13
**aide** 15:4 99:6
**aim** 49:9
**al** 4:8,9
**Albertson's** 22:21
**albuterol** 29:4 82:12,13
**Aleve** 108:5

**allegation** 38:9
**allegations** 39:9,11,18 40:6 41:1,5 42:17 46:13
**alleged** 38:19 40:19
**allowed** 21:9 144:13
**alma** 19:12
**alternative** 116:10
**Alternatively** 48:4
**ambulatory** 22:12 23:17
**amended** 3:17 8:10
**aminoglycoside** 28:22 118:24
**amount** 69:13 72:18,19 73:2 83:2 84:13 111:16,16 123:13,14 144:7
**amounts** 105:19,20
**analysis** 25:12
**ancillary** 10:2
**Angelesa** 2:24
**annual** 17:23
**annually** 30:7
**answer** 6:2,11 12:5 50:12 51:5,24 63:17 75:23 76:18 78:18 79:2,19 80:6 83:4,22 91:3 92:6 93:13 95:5 103:10 105:15 110:1 116:1 119:24 120:23 122:9 126:10 127:4 138:17 140:3 141:21 143:2 146:1 147:21 149:8 154:15
**answers** 50:20 105:12 159:6
**antibiotic** 106:9
**antibiotics** 28:23 45:12 118:20,24 119:7
**anticipated** 154:8
**anticoagulants** 25:9
**antiinflammatory** 107:18,23 108:2 122:16,19 123:5,11 123:20 143:11
**antimalarial** 119:5
**antimalarials** 45:7
**antimicrobial** 28:16,19
**apologies** 151:23
**apologize** 41:17 57:5 65:3 102:19
**Apothecary** 1:7 2:10 5:6
**appears** 79:21 128:4
**application** 30:6 65:9

**apply** 12:22 126:19 128:10 142:21
**appreciate** 155:5
**appropriate** 12:23 13:6 50:3 65:10,11,17 82:5 141:15 145:2,3,8 158:6
**appropriately** 55:21 94:3,21
**appropriateness** 134:15
**approval** 79:13 100:12
**approved** 100:2,8 127:19 136:17
**approximate** 6:2
**approximately** 18:10 22:15 23:1 35:16,20,21 36:4,19 41:14 42:16 110:16
**approximating** 6:3
**April** 18:4,15,21 24:14 36:15 36:21 41:4 46:9
**Arabia** 20:22
**area** 15:20 65:19
**areas** 10:21 11:15 122:2
**Army** 20:11,14,16,16 21:1,16 21:17,18 22:6,10
**article** 24:24 25:23 27:13 28:9,14,20 29:1,8,10
**articles** 27:2,20 50:9 78:15 113:5,7
**asked** 6:10 16:14 41:16 48:15 51:12 75:6 76:6 78:5,8 84:6 102:19 109:3
**asking** 94:22
**aspect** 18:6
**aspects** 11:1 18:1
**assessment** 49:10
**assigned** 16:6
**assistant** 18:16
**associate** 9:22,23 10:6,12,22 17:12 65:15
**associated** 63:6
**assume** 67:19 69:16
**assumes** 105:7
**assuming** 61:3,10 67:22 78:9 78:9 96:17 128:12
**assumption** 92:1
**asthma** 29:1,12 82:14 83:15
**ate-m** 45:9
**atovaquone** 119:13,20 120:2

143:4
**attached** 3:15 23:21 158:12 159:9
**attack** 29:12
**attending** 14:6
**attention** 46:8 117:20
**attorney** 5:6 158:14
**attorney's** 51:12
**Attorneys** 2:5,10,15
**audit** 56:3
**August** 20:8 21:12 68:23 77:10 80:16 90:15 127:13 128:6,7,11 129:14,18,18,18 137:2,9,18 142:17 152:5,10 153:2
**authored** 28:1
**authority** 136:15
**automated** 10:19 13:15 14:2
**automatically** 95:24
**available** 34:16 101:18 143:20
**Avenue** 2:14
**avoid** 87:20
**awarding** 16:8
**aware** 71:16 77:10,18 88:13 89:19 106:7,16 107:2,7,11 114:22 115:4,13 117:7 119:14,16,18 120:3,6 122:3 136:22 137:17 143:6,9 144:6,10 150:2,4 151:15 152:4
**azithromycin** 119:2,3

**B**

**B** 3:13
**babesiosis** 74:11,13 77:9,12 77:21 78:24 103:19 104:7,9 104:12,15,18,23 105:2,4,6,8 105:11,14 135:8 142:1
**back** 20:23 26:24 27:16,24 45:24 55:14 60:18 67:4 80:12,21 85:8 110:3 113:4,6 113:8 117:21 119:11 125:18 134:9 154:7
**background** 59:17 95:17
**backwards** 12:1
**based** 49:11 69:13 77:14 82:1

82:23 83:16,18 90:21 100:12 114:12 118:2 120:13 132:21 140:22
**basic** 5:16 30:9
**basically** 16:11 49:24
**Bayview** 40:11 42:1
**Bear** 119:11
**beat** 51:11
**bed** 99:20
**beds** 26:10
**beginning** 60:13
**behalf** 36:23 41:15 51:22,22
**belief** 90:17 92:11,15
**believe** 6:24 27:8 28:21 30:9 36:21 37:1 38:10 39:2 51:2 60:23 63:14 73:4 74:7 78:1 78:21 95:20 105:8 108:12 122:21 125:9 142:11,12 149:20 152:8,11
**belong** 34:2
**benchmark** 152:16
**Benedetto** 2:8 3:5 4:23 9:5,11 9:14 46:7 50:22 60:17 70:23 76:1,5 78:20 79:7,24 80:11 81:15 83:9 84:3,5 91:7 92:9 93:16 110:4 116:4 117:8,19 121:6 122:12 126:12 127:12 129:8 138:20 139:6,10 140:7 142:6 144:3 146:12 150:24 151:7 153:8,11 154:19 155:3 156:3
**benefit** 144:7
**best** 99:2
**bet** 67:20,23
**better** 12:5 31:9
**beyond** 45:1 94:19 100:2 131:5 134:13 135:7
**big** 28:10 31:18 32:4 131:13 142:16,23
**biochemistry** 17:1
**birth** 125:7,9
**bit** 13:7 14:16 30:17 38:13 65:5 81:14 101:4 103:12 118:18 131:17 141:13 147:24
**blanking** 38:7 80:2 101:12

**blood** 87:2
**board** 30:21 31:1,4 33:18
   34:12,16,17,19,22,24 35:6,7
   35:11 50:1 66:4 103:4
   127:10 131:2
**boards** 33:21 43:12 64:23
**bodies** 44:19
**body** 86:24
**body's** 62:11
**bolus** 106:2
**bookmarked** 100:6,24
**born** 47:7
**bottom** 24:21 60:7,18 73:11
**bowel** 121:21 122:2,6,20
   143:5,8,11,13,17
**box** 31:19 32:4 131:13 142:16
   142:23
**brain** 50:16
**breach** 129:13
**break** 6:8,9,12 45:19 65:4
   81:13 117:9
**brief** 16:15 46:3 117:15
**briefly** 15:17,24 27:13 38:4
   60:21 155:9,14
**bring** 29:12
**brings** 140:16
**broaden** 45:1
**brutally** 51:11
**Bryk** 68:17 100:4 103:22
   120:9 128:8
**Bryk's** 7:14
**budget** 17:23
**building** 73:12
**buildings** 23:18
**bullet** 59:17
**Burnett** 37:19
**business** 32:22
**buy** 32:8 61:17 108:5

---

**C**

**C** 2:1 157:1,1
**cabinets** 10:20
**call** 17:10 32:11 57:22 59:18
   121:14 128:6 132:9 142:15
   150:19
**called** 22:20 54:6 96:23
   115:20

**calling** 23:20 154:5
**cancer** 109:18
**capacity** 24:15 53:19,21
**capsules** 89:24 102:2
**care** 10:20 26:2,5,10,13,19
   32:23 60:9,14 61:20 66:18
   115:1,3 116:11 127:6
   139:16 149:24 155:18
**career** 53:9 72:3
**carefully** 158:4
**case** 4:8 36:24 37:6 38:2,4,6
   38:22 39:8,13 40:6,14,22
   41:1,4,5 46:18,20 58:17
   64:13 66:20 80:10 81:6
   89:14 91:20 92:19 104:8,11
   104:15,17,20 105:19 109:1
   152:4 154:2,11
**cases** 37:3 39:16 42:16 43:1
   47:20 89:15
**categories** 121:12,16
**categorized** 25:4
**cause** 25:10 41:11 62:12,14
   86:11 89:10,17 116:12
   121:18,22 122:1,17,20
   123:12,22 143:7,11,13,17
   144:24
**caused** 143:5
**causes** 26:1 27:19 90:8
**cc'd** 137:15
**CE** 67:7
**center** 1:8 2:11 11:22 19:4
   20:2,10,16 22:6 26:8 32:15
   37:23,24 40:3 73:12 101:21
   102:20 103:10
**centered** 28:21
**centers** 33:2,11,14 103:7
**central** 17:10,11 87:16
**certain** 16:15 32:19,21,24
   33:19,22 39:14 72:3,18,19
   90:21 96:15 107:1 118:22
   123:13,14
**certainly** 11:6 16:23 24:2
   25:16 32:2 43:10 49:8
   50:18 61:3 62:23 65:7 72:3
   77:23 80:8 86:8 98:14
   99:10 126:16 134:24 138:11
   144:18 145:11,12 148:13

**certificate** 16:9
**certification** 34:12,16 35:6,8
**certified** 34:18,19,22,24
   35:11
**certify** 157:5 159:4
**CEs** 30:7 67:5,6
**cetera** 50:10
**CEUs** 30:10,12
**chain** 22:22 148:14
**chains** 32:5,8
**chance** 6:15
**change** 89:17 160:5
**changed** 53:2
**changes** 158:11 159:8
**chapters** 113:7
**characterization** 85:6
**characterize** 16:24 19:20
   47:2
**charge** 16:3
**chart** 95:17
**Chat** 54:6,7,10,24 55:2,3,5
   98:3
**checked** 132:3
**chemistry** 16:24 17:1
**choose** 55:24
**chosen** 150:21
**chronic** 74:10 77:20 94:12,13
   94:17,19 95:8 103:19 104:7
   104:9,22 105:6,7,14 135:8
   142:1 145:1,9
**CIARA** 2:13
**CIPRIANI** 2:13
**circle** 24:7
**circumstance** 63:11,23 64:1
**circumstances** 40:24 49:15
   64:1 66:10 132:22 142:7
   144:11
**City** 37:24
**CIVIL** 1:2
**civilian** 21:19
**claim** 42:4
**claimed** 51:10 143:8
**clarification** 85:1
**clarify** 23:2 84:21
**clarifying** 67:2
**class** 21:11 51:20,22 52:3
   64:17 82:3 88:7 106:7

THOMAS JOHNS, Pharm.D.

168

classes 17:2 65:17 118:23
    144:17
classify 45:2
classroom 66:19
clause 60:8 88:2
cleanliness 102:14
clear 85:9 124:4 127:9 136:4
    151:11 154:20
clearly 121:2 129:19
clerkships 21:10
clinical 10:2,9 18:11,18 20:9
    24:14 65:15 66:5 100:12
clinically 26:1 27:10
close 24:7 74:19 110:20
coauthored 25:23 27:2
collaboration 19:7
colleague 27:1,3
colleagues 27:5,7
College 65:16
colon 121:23
combine 106:10
come 45:23 104:17,20 113:8
    126:17 141:2 143:20 153:3
comes 96:15 116:16 125:20
    145:18 147:8
comfort 117:9
coming 59:20
commencing 1:17
commission 159:19
commissioned 20:24
common 27:16 70:7 90:1
    110:21 118:11 131:6 134:6
    138:8,9 139:9,14
commonly 87:15 122:7,13,14
communicate 54:9 57:14,19
    90:11
communicated 69:21,24
communication 12:12 54:12
    54:13,13,14,16,17 55:4 56:7
    58:6,9 59:1
communications 137:15
community 12:21 23:17
    26:11,14 31:13,16 44:22
    56:22 104:5 136:20 149:22
    150:6 154:4
company 40:21
compared 26:10

comparing 75:2
competencies 16:7 32:24
complete 30:4 34:4 55:14
    97:5 127:7
completed 60:10
completely 132:10 146:23
completing 22:8 99:11
completion 16:7
complex 25:11 26:8
complexity-score 24:22
compliance 10:9 11:1
compliant 131:19
complied 139:15
comply 65:2 83:1
component 67:7,12,15,18,24
    96:24 107:16 141:10
components 125:6,20
compound 102:5
compounding 1:8 2:11 21:22
    32:15,17,20,24 33:2,7,7,8
    33:11,14,17,19,20 73:12
    101:21 102:6,6,7,10,11,20
    103:7,9,15
compounds 60:24 61:1,2,11
computer 24:1 53:8,24 54:1
    56:14 150:8
concept 86:23
concerning 79:11
conclude 134:12
concluded 156:9
conclusion 23:5 111:21 134:4
    143:21 155:7 156:5
conclusions 59:21
concurrent 139:19,20
condition 47:7,10 62:16 63:6
    63:6 76:16 86:6,15,19 96:15
    97:12 98:1,6 107:20 119:15
    127:1 139:18 140:11
conditions 63:7 64:16 86:18
    96:17,20 97:19,19 106:13
    106:22 107:3 118:9 123:15
    139:20 145:1
conduct 55:20 98:24 102:24
    112:22 130:14 132:12
    134:14 141:4 142:19 145:20
    150:10 153:19
conducted 27:17 143:3

conducting 58:8 91:15,21
    100:3 101:7,11 141:9,15
conducts 111:5 140:19
    153:21
conferencing 4:4
confines 98:21
confirm 147:10
confirmation 112:12
conflict 97:11 147:14,15
conflicting 121:1
conflicts 97:24
confusing 76:2
conjunction 19:19 77:15
    123:21,24 143:15
Conor 2:4 117:10 150:24
Conrad 2:8 5:4
consider 152:22 153:3
considerable 149:11
consideration 26:19
considerations 118:8
considered 86:18 128:9 135:6
    154:12
considering 116:20 118:7
    146:22 152:16,19,21
consisted 15:20
consistent 64:5 150:22
constitutional 48:19
consult 48:24
consultant 30:11,15,22,24
    31:11,14
consultation 51:20
consulted 49:3 132:4
consulting 51:17
consume 47:14 128:20
consumed 44:21
consumer 31:24 32:11
consumption 44:9,11 48:6
    59:10 93:22 143:4,7,10
contact 120:11,16 125:12,23
    133:19,24 145:23
contacting 91:23,24
contain 13:20 125:11,14
contained 59:21,23 72:20
    73:1 89:7,9 90:6 96:2
    100:15 125:5 129:21 136:17
    142:9
contains 65:8 125:13

THOMAS JOHNS, Pharm.D.

**context** 73:15 75:15 91:21
    99:11 127:8
**continuation** 128:7
**continue** 126:19
**continued** 92:23
**continuing** 30:5
**continuously** 11:24
**continuum** 53:13
**contraindication** 49:22
**contraindications** 12:24
**control** 146:19
**controlled** 45:2,3,4,7,9,12,15
**controversy** 135:2
**conversation** 58:15 76:9,11
    78:1 79:15 80:15 92:13
    145:24
**conversations** 73:24 74:9,17
    74:23 77:8
**conversion** 110:16 112:6
**convoluted** 139:7 140:8
**copied** 61:4
**copy** 8:6 9:2,7,10 62:4
**cornstarch** 90:2
**correct** 7:11,12,20 11:18,22
    11:23 12:9,10,12,16 13:3,4
    13:9 14:7,8,10,11,23 15:5,8
    15:9 18:1,2,7,8,13,14 21:4
    22:17,18 23:9,23 29:19,20
    34:20,21,22 37:4,5 38:15,16
    38:21 39:7,17 42:6,7,13
    43:18,19,22 44:1,6,9,15
    45:17 46:15,16 49:1 54:5,10
    54:19 56:9,17,19 57:3,10,16
    57:23 58:5,16 59:2,3,7,8,11
    59:14 60:5,6 61:8,9,11,12
    61:24 65:24 66:1,6,7,13
    68:2 70:1,2 71:1,8 72:7,8,12
    72:13,21 74:6 75:1 76:22
    77:4 78:24 79:4,17 83:12,20
    84:1,9,10 86:20 87:21 90:3
    91:1 92:1,4,16,17 96:7,8,21
    97:15,16,20,21 98:21 99:8
    99:16 101:16 108:8,11
    109:14,15,19,23 110:8,11
    110:12,18 111:12,16,19
    112:8,9 113:1,11 116:23
    119:12 120:18,21 123:8

124:5,8,9,17,18 125:5,15
    126:7 127:2 129:2,10,22
    131:16 132:24 133:18 134:2
    134:21 135:18,19 136:7,8
    136:11,20 137:21 139:11
    145:10 147:3,12 148:11
    149:6,10 150:13 154:22
    155:1,17,21 159:6
**corrections** 158:5,7 159:8
**correctly** 51:10 80:19 103:23
    112:7 118:4
**corticosteroid** 88:23 93:3,9
    93:11,22 107:24 143:16
    144:18 145:2,9
**corticosteroids** 25:14 45:4
    68:7,14 74:1,10 77:13 81:22
    89:14 93:19 105:3 106:15
    107:12,19 109:5 118:1
    121:8 123:15 134:5,16
    135:9,13 136:23 141:17
    144:6 145:8
**cost** 21:5 26:13,19,21 148:20
    149:13
**costs** 148:23
**counsel** 4:12 5:18 7:19 8:16
    9:5 46:22 49:8 130:11
    132:9,14 155:24
**counsel's** 151:20
**counseling** 130:3,6,17,19
    131:7,8 132:19 133:2,6,21
    133:22
**counter** 108:6,7
**country** 32:7
**couple** 6:8 35:16 105:16
    151:5,19
**course** 53:9 78:6
**courses** 16:23
**coursework** 16:21 21:9 65:8
**court** 1:1,20 4:6,14,15 36:6,6
    157:5 158:18
**cover** 25:17 65:14
**covered** 141:13
**create** 116:14,21
**creation** 102:11
**credits** 30:5
**criminal** 50:24 51:3,7,15
**critical** 26:10 66:16

**cross-examine** 51:13
**curious** 28:9
**current** 29:19 52:7 60:19
    95:24 97:18,24
**currently** 9:15,21 10:22 11:5
    17:12 29:4 52:5 127:24
**curriculum** 3:18 65:8
**cutover** 53:23
**CV** 5:14 8:11,14,17 9:7 18:4
    20:4 24:19 25:21 33:23
    35:1,15 37:2,8 65:14
**CVS** 31:19 32:3,19 75:2
    148:13
**cycle** 21:10

---

**D**

**D** 3:1 61:16
**d/b/a** 1:8 2:10
**daily** 106:10 128:14
**damage** 42:3
**DARYL** 1:3
**dash** 45:9
**database** 27:12
**date** 125:7,9,24 157:22 158:9
    159:13
**dates** 68:4,12 153:4
**daughter** 74:9 103:19
**day** 39:22 64:17 69:1,8,11,18
    70:14 72:18 81:7 82:1 83:2
    95:12 108:16 109:12,12,13
    109:13 116:17 128:20
    153:15
**day's** 128:16
**days** 83:2 94:20 158:15
**decided** 148:2
**decision** 114:23
**decisionmaking** 152:9
**decisions** 49:11
**decline** 87:3 106:20 133:2
**declined** 133:21
**decreased** 18:23
**deemed** 158:17
**deep** 47:23 48:1
**defendant** 2:10,15 5:7 36:23
    37:1 41:16 155:13
**Defendants** 1:9
**defense** 6:23 37:4 39:5 41:19

THOMAS JOHNS, Pharm.D.

51:9,13 60:1 151:20
**deficiency** 47:4 62:9,10,14,19
  62:22 63:2,13,19 64:11
**deficient** 47:3
**define** 99:17 149:4,7,9
**defined** 94:15 115:9 118:15
  125:8
**Definitely** 126:1
**definition** 12:5
**defy** 154:3
**degree** 26:9 97:6 102:14
  126:24
**deliver** 149:24 150:1
**demographic** 96:4 125:1
**DeNaples** 2:13,24 3:8 9:10
  60:16 75:24 79:20 80:7
  81:12 83:5,23 91:4 129:3
  139:5 140:4 141:22 144:2
  154:16 155:8,12,22
**department** 10:3 55:16,17
  56:18 57:3 65:22
**departments** 10:3,8,24
**DePasquale** 2:23
**depend** 15:6,8 63:22,24
**depending** 33:20
**depends** 13:13 29:15 32:16
  33:6 41:12 44:10 47:19
  86:5 96:1 102:23 106:1
  107:20 113:18 124:3 126:3
  144:21,22,22 145:19 147:19
  148:12 149:4
**deployed** 20:22 21:4,14
**deployment** 21:5
**deponent** 4:11 159:1
**deposing** 158:14
**deposition** 1:5,13 3:17 4:2,5
  4:11 5:8 6:19,23 7:9 8:2
  36:13,14,15,18 37:20 46:9
  60:4 74:7 76:22 79:22
  82:13 99:22 126:19 150:6
  156:9 158:4,12,15,17
**depression** 38:8,14
**describe** 15:17,24 16:21 26:6
  27:13 139:22
**described** 106:8 142:21
  145:23 150:7 153:20
**describes** 53:23 121:3

**describing** 65:10 141:24
**DESCRIPTION** 3:15
**designated** 32:20 33:17
**designating** 16:12
**despite** 81:23
**destroyed** 40:20
**detail** 106:6
**detailed** 25:11 81:5
**details** 46:21
**determination** 95:9 120:14
**determine** 76:14 95:7
**determined** 114:13
**determines** 115:16
**determining** 80:3 81:24
  101:2
**develop** 25:3 98:19
**developed** 100:9
**development** 24:21
**device** 55:4
**devices** 13:15
**devising** 27:22
**dexamethasone** 52:23 68:9
  68:18 75:7 76:7 84:11,16
  85:13,19 87:10,13 88:8,12
  88:17 89:3,8 90:17,24 92:2
  105:10,13 110:14,17,19
  111:3,7,17,23 135:24
**DHEA** 60:21 61:16
**diabetes** 25:9 64:18,21
**diagnosed** 103:18 104:18,22
  140:12
**diagnoses** 62:3 68:4 95:18,21
**diagnosis** 77:12 103:19
**didactically** 66:19
**difference** 30:14 32:14
  101:20 103:1,5 149:12
**differences** 102:9
**different** 14:17 21:19,24
  30:17 33:4,14 42:2 43:4
  44:20 55:18 61:4 82:17,18
  85:5 102:21 103:9,12 114:1
  119:1 138:6,22 139:17,19
  141:6 146:22 147:22 148:7
  148:8 150:16,17
**differentiate** 33:8 102:5
**digestive** 122:6
**Dilaudid** 38:7

**diminish** 144:8
**direct** 54:4 66:18
**directed** 69:2 70:3,5,14 71:5
  71:7,12,18,24 72:2,5,20
  80:19,23,24 81:2,3,4,6,10
  81:17 82:5,20,21 83:10,11
  83:19 128:14,22,23 129:1,6
  154:21,21
**directing** 137:12
**direction** 81:11 82:24 114:3
**directly** 14:19 52:10 69:22
  70:1 72:12 103:21 121:4
**director** 16:6 18:16
**dis** 93:7
**disagree** 99:9
**discharge** 97:8
**disclose** 52:2
**discontinuance** 144:12
**discontinue** 89:2,11 90:8
**discontinued** 88:16 90:18,23
  91:11,12,12 92:2,21 93:1,3
  93:8,10 94:6 148:3
**discontinuing** 92:13
**discovered** 28:5
**discretion** 81:8 88:20 107:4
**discuss** 74:4 120:10
**discussed** 76:21 93:17 98:18
  101:19 103:20 108:18 117:6
  126:4 136:10 142:3,12
  144:19 150:5
**discussing** 90:20 126:18
  134:19
**discussion** 75:13 146:8
**disease** 18:12 62:13 65:11
  76:16 103:21 104:1,3 105:4
  107:16 108:24 118:2 124:11
  142:13
**diseases** 65:18 75:15
**dispense** 10:12 12:5 55:21
  64:9,23 66:12 80:4 92:20
  93:10 101:3 103:9,12 111:1
  114:11 115:17 116:20 130:2
  130:5,18 132:5,23 137:13
  141:18 142:9,16,24 146:14
  153:24
**dispensed** 12:2 13:8 15:12
  38:18 42:18 44:22 48:10

THOMAS JOHNS, Pharm.D.

59:2 62:20 68:16,23 71:21
72:4 73:6 80:16 84:7,14,19
85:10,13,16,20 94:4,7,9
96:5,7,10 107:9 117:4
132:16 133:4 134:23 152:13
154:13,18
**dispenses** 13:11 58:4 129:18
132:13 147:2
**dispensing** 10:18,19 13:24
16:4 21:21 38:11 41:6 42:6
42:12 43:6,14 46:13,18
50:21 58:12 74:5 81:22
102:2 116:21 134:15 150:21
**display** 78:10
**disqualified** 36:1
**distal** 121:19
**distinct** 123:18 132:11
**distinguish** 32:21
**District** 1:1,1 4:6,7
**Doc** 98:4
**doctor** 5:3 12:8,15 14:5,9
15:12 45:19 46:8 54:8,20,21
56:6,8,8 57:6,8,14,19,22
58:2,21 59:1,14 74:19 79:13
81:10 91:9 93:6 96:19 97:9
97:23 98:3,7 99:18 111:1,6
111:22 112:5,6,6,12 115:18
117:20 134:20 155:16
**doctor's** 58:3 82:24
**doctors** 44:23 98:19
**document** 56:1,4
**documentation** 92:11,15
120:21
**documented** 56:2
**documents** 78:6 156:6
**doing** 5:19 151:6 158:8
**domain** 121:14
**dosage** 29:3,13,17 49:23
63:20 83:1 85:2,24 87:1
108:15,20 109:10,11,17,21
110:7,10 117:23 118:6,14
119:3,14 127:18,20,21
128:10,15,16 134:9 135:16
135:17 144:6 152:15,21
**dosages** 129:17
**dose** 38:11 51:10 65:11 82:2
84:21 85:2,15,18,24 86:3,12

86:12 93:24 106:3,10,10,11
109:2,4 125:2,21 128:2,2,13
129:23 142:2 144:23
**dosed** 82:13
**doses** 68:7,13,15,18,20 82:17
86:9 123:4 129:14,15 134:5
134:7,23 135:10
**dosing** 12:23 48:6 49:14 64:5
69:5,10,17 73:2 80:19,24
81:2,4,6,7,9,17 82:6 84:18
84:21,22 85:2,15,18 93:21
94:23 95:7 101:15 105:1,5
105:10,13 106:2,8,14,20
121:8 122:5,5 123:13,13,14
123:14 126:5,20 129:21
132:3 134:10 135:12,18,20
135:23 136:5,10,16 141:16
141:19 142:3 143:16,23
144:7 151:14,16 152:1,8
153:14
**Dr** 5:3 7:1,14 8:11,12,14,17
9:7,15 22:24 24:20 27:1,7,8
27:17 50:12 60:12 61:21,22
62:6 67:4 68:6 69:16 70:1
73:13,16,23,24 74:5,16,17
75:9,17,18 76:9,9 77:5,6,8
77:11,17 78:2,16,22 79:11
79:16 80:15,18 90:15,22,24
95:15 103:18 105:17 120:11
120:16 121:2 135:4,7 137:5
137:11 141:24 142:13
146:13 151:11 153:12 154:3
154:5,7,22 155:5,13,14,19
**drill** 146:4
**drug** 12:23,23 24:23 25:5
27:11,12 28:2,22 43:11 49:2
49:18,19,20,21 50:16,18
55:20 56:1 58:9,14,19 64:6
65:10 86:7 87:5 89:16,18
91:13 99:1 100:3,10 101:1,9
102:12 103:1 106:7,21
108:14 111:5 114:12 119:22
120:13 125:1,20 126:5
127:7 132:1,10 133:3,11
134:19 136:2 140:20 141:15
142:19
**drugs** 25:7,8,9,10 28:17,19

50:3 65:9 88:6 89:22 108:2
108:3 119:5
**due** 122:5
**duly** 4:18
**duplication** 49:23 90:16
91:16 92:24 93:5 126:21
152:23
**duplicative** 88:4,5,9,12 92:20
94:5 137:24 145:17,18
146:19 147:3,7,16 148:1
**DUR** 91:15,21 99:12 127:11
132:12 135:5 140:22 141:5
141:10 143:3 145:20 147:10
**duration** 144:23
**duties** 9:23 10:5,7 11:7 18:22
21:15,18 42:11 131:23,24
**duty** 21:14 42:5 50:2 55:20
99:12 113:20 114:4 130:11
134:24 142:19 145:20 152:2

---

**E**

**E** 2:1,1,19,19 3:1,13 157:1
**E2** 60:20 61:1,10
**E3** 60:20,22 61:1,10
**earlier** 13:14 59:24 76:21
82:12 84:6 99:22 101:4,20
101:23 108:18 118:23
142:12 150:5 155:15
**early** 10:14
**easier** 98:22
**easily** 8:21
**easy** 134:6
**education** 30:5
**effect** 86:11
**effectively** 48:3
**effectiveness** 26:21
**effects** 87:16 93:18 107:23
115:22 121:7,11,16 122:4
122:17 123:12,22,23
**effort** 66:20
**either** 14:2 16:16 21:13 22:7
43:5 51:16,19,21 57:17
64:17,22 66:2 70:15 83:19
89:7 90:6 91:23 106:23
112:5 121:4 123:13 133:21
146:19 150:12
**electronic** 10:15 12:13 23:23

THOMAS JOHNS, Pharm.D.

53:5,12 149:20,23
**electronically** 8:5
**eloquently** 67:3
**email** 125:15
**embolism** 41:7,11 47:24 48:2
**employed** 9:16 19:23 20:1
**employee** 59:6
**employees** 17:23
**enables** 30:18
**encapsulate** 31:18
**encounter** 66:23
**encountered** 123:3 139:12
**endless** 89:22
**endocrine** 87:15
**Enforcement** 43:11
**enlisted** 20:14
**ensure** 10:8 50:3 91:24
**ensuring** 12:22
**enter** 12:15
**entire** 28:4
**entirety** 122:11
**entities** 19:8
**enumerated** 59:18
**environment** 25:20 66:18
**environments** 146:22
**Epic** 10:16 12:11,16 23:22
    24:3 53:16 54:5,15,16,24
    55:3,11,23 56:16,16 57:9,20
    57:21 96:21 98:2 148:21
    149:14,17 150:3,7,10,17
**equals** 110:17
**equivalent** 94:2
**errata** 158:6,8,11,14 159:9
    160:2
**errors** 26:1 27:18,23 28:3
    97:6
**ERSA** 1:20 4:15
**escalate** 146:2
**escalated** 114:1
**escalation** 113:23 114:15
    115:10,23 118:15 135:23
**especially** 131:13
**ESQUIRE** 2:4,8,8,13
**essentially** 25:3 31:1 32:9
    94:14 110:22 112:5 118:12
**established** 104:5 124:6
    149:22

**estimate** 6:2 41:18 42:8,14
    53:17
**estimating** 6:4 35:13
**estrogen** 60:23 61:1,1,11
**et** 4:8,9 50:10
**evaluation** 152:1
**event** 25:5
**events** 24:23 27:11 28:2
    47:21
**eventually** 68:6,9 72:11
**everybody** 9:6 37:16
**everybody's** 66:8
**evidence** 72:23 104:5
**evolution** 53:8
**exacerbation** 82:15
**exact** 29:17 92:13 93:24
    125:19 137:1
**exactly** 36:16 65:9 69:21 73:3
    73:18 81:20 127:10
**EXAMINATION** 1:6
**examined** 4:18
**example** 19:13 26:11 41:24
    47:21 55:13 57:6 64:19
    75:3 87:3 92:18 96:14
    102:13,15 106:2 108:2
    109:12 111:1 114:7 119:13
    121:14 139:17
**exceed** 86:12 108:16,24 109:7
    109:12,17,21,22 110:7,11
    153:14
**exceeded** 128:16 135:15
**exceeds** 127:19 136:6 142:2
    153:17
**Excellent** 5:13
**excess** 85:24 121:7 122:5
    123:13,14 134:24 135:12,20
    143:17
**excessive** 86:9 129:13,15,19
**exclusive** 83:11,20
**exclusively** 23:9
**excuse** 98:15
**executive** 10:1
**exhibit** 8:10 35:14 37:2 87:4
    156:7
**exhibits** 8:8,9
**expectation** 96:22
**expecting** 116:8

**expedient** 116:3,5
**experience** 22:13,14,16,17
    88:21 89:5
**expert** 3:19 6:24 35:19,22
    36:2 39:13,15 41:14 42:10
    42:16 51:4 60:1
**expertise** 32:24
**expires** 159:19
**explain** 60:22 91:9 106:5
**explanation** 58:3 79:10 135:4
    153:23 154:2,8,12
**explicit** 121:13
**exposed** 66:9
**extended** 94:14 95:12
**extremely** 68:7 135:22
**eyes** 128:8

**F**

**F** 157:1
**fabricated** 142:13
**face** 81:23 124:20,21,22
    126:3,14 127:15,17,22
    135:14 152:20
**faced** 64:24
**facilities** 150:3
**facility** 21:24 97:8
**fact** 32:23 58:13
**factors** 126:4 144:23
**facts** 39:8 40:5,24 154:12
**factual** 59:16 95:17
**fail** 158:16
**fair** 11:13 21:2 32:14 35:4
    152:14
**fairly** 90:1
**falls** 25:10
**familiar** 22:21 48:24
**family** 14:19,20
**far** 5:19 34:10 126:18
**fast** 53:11 145:11
**fast-forwarding** 128:6
**fatal** 48:4
**FDA** 45:16 64:22 100:2,8,13
    119:10 127:19 134:9 135:16
    136:6,17 142:2 152:15,21
**feared** 137:12
**February** 37:20
**federal** 36:6 40:14 43:5 44:18

66:3 131:1
**felt** 79:12
**field** 87:20
**file** 8:4
**files** 53:6
**fill** 22:22 79:12 113:20 114:5
 114:13 137:13,18 148:5
**filled** 137:20 138:1 147:18
 148:16
**fills** 140:22
**final** 102:12
**financial** 10:10 11:1 17:24
**find** 91:6,16 98:3 134:7
**finish** 21:9
**finished** 20:23 151:2
**fire** 146:4,4
**first** 5:19 8:9 20:21 24:20
 35:22 39:5 61:19 68:5 75:5
 77:7 79:9 80:13 85:7 94:5
 99:23,24 108:13,14 117:22
 128:16 129:13 130:10
 132:15 135:17 140:17,23
**fish** 61:16
**five** 18:9,10 21:3 36:10 37:3,4
 45:22 109:13 117:9 139:17
 139:23 140:1
**fixed** 118:14,19,21,22 119:3,8
**flag** 132:14
**flags** 136:1
**flood** 40:19
**Floor** 2:4
**Florida** 7:18,20,22 9:17 11:6
 11:18 13:11 16:20 17:7,9,10
 17:11 18:12 19:5,24 20:2,9
 22:2 23:6,13 24:5,9,10 27:6
 29:11,19 30:8,12,21 31:8,14
 33:2 35:5 40:3,19 49:13,17
 50:5 53:16 54:21 57:18,19
 65:23 67:6,11 70:9 96:14,18
 98:10 102:18 114:9,18,24
 117:3 125:9 148:22 149:14
 149:18 150:12,12,15,18,18
 150:23
**follow** 70:11 145:22
**follow-up** 153:9
**following** 139:2 140:6
**follows** 4:19 128:19

**Food** 100:10
**footnote** 72:23
**foregoing** 157:6 159:5
**forget** 89:24
**forgetting** 76:23
**form** 50:11 54:17 60:11,16
 70:20 75:22 78:17 79:1,18
 79:20 80:5 81:12 83:3,21
 84:23 91:2 92:5 93:12
 109:24 115:24 120:22 122:8
 126:9 127:3 129:3 138:16
 139:4 140:3 141:20 144:2
 154:14 159:8
**formulate** 50:20
**forum** 52:3
**forward** 53:11 146:1
**found** 50:1 122:7,13,15
**four** 8:9 14:14 21:6 23:17
 35:15,18 37:4 72:15,21
 82:14 129:18 139:17,23
 140:1,10,14 150:6
**fourth** 141:1
**framework** 82:16,22
**frankly** 135:6
**friend** 27:3
**front** 8:6,17 37:7 59:13
**frowned** 55:4,6
**fulfilled** 152:2
**full** 75:6 79:8 80:13 88:1
 99:24 100:1 103:17 108:13
 117:22
**functionality** 56:3
**funded** 25:1
**further** 26:23 66:24 74:22
 133:22 134:21 142:5 146:2
 152:17 154:5 156:1
**future** 27:20 66:23

### G

**Gainesville** 7:18 9:19 11:22
 20:18 22:20 23:18 26:7
 40:4
**gastrointestinal** 87:15 124:13
**general** 44:1 75:13 87:17,23
 107:14 108:1 116:2 121:12
 121:16 123:18 126:17
 143:13 147:20

**generally** 26:18 29:10 44:22
 75:11,12 77:17 82:7 86:23
 88:6,20 89:5 95:11 96:3
 97:4 107:12 108:4 122:4
 136:23
**gentleman** 40:7
**geographic** 77:18
**geographically** 74:3
**getting** 67:4 98:1 132:17
**GI** 122:6,11,17
**girlfriend** 51:12
**give** 16:15 35:1 37:15 40:21
 51:4 82:11
**given** 13:1 37:20 50:3 65:11
 81:7 82:1 106:9 135:4
 159:6
**glucocorticoid** 62:8,18,21
 63:13 64:11
**glucocorticoids** 62:11 63:18
 64:4
**go** 5:13 9:3 12:1 14:21,22
 20:18 39:3 52:5 69:2 72:15
 85:8 90:19 98:2,3 100:2
 101:23 113:4 114:3 122:22
 131:5 134:13 144:23 146:5
 151:7
**goals** 10:11
**goes** 31:2 96:16 113:6
**going** 5:13 8:8,8 50:17 53:24
 58:7 73:17 77:5 80:12
 116:15,21,22 140:13 155:10
**Gonzalez-Rothi** 25:24 27:5,7
**good** 4:24 9:8,12 17:5,6 45:23
 58:13 117:10
**Gotcha** 24:13
**governing** 44:21
**government** 114:21
**governments** 43:5
**gradual** 106:20
**graduate** 65:23
**graduated** 11:17 21:12
**graduating** 21:11
**great** 5:19 6:14 8:7 151:8
**greater** 17:22
**Green** 6:24
**grocery** 22:19 32:4
**grossly** 35:12 82:3

THOMAS JOHNS, Pharm.D.

ground 5:14
guess 6:1 28:8 41:23 42:22
 43:2 74:1 140:5
guessing 28:7 38:13
guided 64:22
guidelines 28:16 65:2
Gulf 20:21 22:8

**H**

H 3:13
half 42:21 60:21 95:11
halfway 103:18
hallway 57:23 98:3
Hammett-Stabler 28:15
hand 37:18 105:19
hang-up 154:1
happen 14:12 50:17 58:16
 65:12 123:8,9 131:17 135:3
 139:11,13
happened 7:11 135:2
happening 81:21
happens 48:1 98:17 113:16
 115:21 145:16
happy 73:9
hard 8:6 9:2
harm 116:12,17,22,24 144:24
harmed 116:15 117:4
harmful 142:8 144:14,18,20
 145:9
Harr 40:23
Hatton 25:24 27:5,8
haul 31:3
Hawaii 20:17 22:6
head 5:21 50:7
health 9:17 18:13 19:16 20:3
 24:5,11,12 25:2 86:18 96:19
 117:3
hear 4:24
heard 104:8,11,14
height 86:17
held 33:4 102:20 103:8
 130:23 146:9
help 12:4,19 50:19 51:13
Henderson 40:23
Henry 1:7 2:15 4:9 60:9
 155:14
hesitated 51:4

hey 98:4 154:6
Hi 155:13
high 26:9,10 68:7,13 105:20
higher 88:22
highlighting 32:23
highly 67:20
history 40:8 60:11 122:24
hold 30:22 31:4 126:23
 155:10
home 7:18 14:21 99:6
Honolulu 20:17 22:4,6
hope 14:24 66:8 144:1
Hopefully 48:3
hormone 41:9,10 46:14,18,24
 47:8,11,15,17 48:6,11 60:19
 61:7,7 74:14 95:4,7 152:6
Hormonerestoration.com
 60:10
hormones 47:3,5
hospital 9:18 10:1 11:1,3
 12:9,12,14 13:2,11,14 14:3
 15:10,17,22 16:3 18:6 19:11
 19:13,13 20:2,9 22:11,17
 23:7,9,14,15,21,22 25:6
 26:2,5,11 27:18 31:5,6
 38:17,18 52:6 53:1 54:20
 56:21 59:4,5 63:2,4,8,12
 96:13 97:4,13,22 98:9,17
 99:7,16 103:8,13 110:24
 111:9 112:15,17 113:14,22
 114:7 115:2,3 116:6 122:23
 145:16 149:9
hospital's 10:10 27:11
hospitalized 24:22 25:18
 26:13 149:24
hospitals 25:11 30:20 53:4
 96:22 103:7 115:4
hours 6:8 82:14 116:9 145:13
human 104:18,21,22
hydrocortisone 68:8
hydromorphone 38:6
hypothetical 64:19 83:14
 115:14

**I**

idea 67:16 148:23
identification 156:7

identified 91:14,22 126:21
identify 49:21
Identifying 27:10
imagine 51:15
immediately 153:4
impact 27:19
impasse 113:13,16,24 115:20
imperative 158:13
implement 149:14
implemented 53:16 149:15
 149:18 150:3
implication 74:1,22
important 11:14 96:24
improper 46:13 48:5
in-person 14:3 54:12
inactive 89:15,22
inappropriate 38:11,19 41:6
 82:3 115:17
inappropriately 148:2
include 7:2 56:6 95:17
included 6:20 80:23 95:21
includes 124:24
including 10:3 26:18 30:20
 68:8 78:13 140:21
incorporates 134:18
incorrect 49:23
independent 24:10 31:22
 43:16 49:10 76:14 101:7
 112:23 132:10 134:14,20
 141:5 142:19 143:3 153:19
 153:22
independently 75:19 152:12
independents 32:6
indicate 79:14 109:10 128:15
 128:24
indicated 73:5 78:3 95:16
 128:4 155:16
indication 66:6 86:16 112:2
 119:15 127:22 153:18
indications 66:11 106:13,22
 107:3 108:17 109:7,16,17
 109:20 110:6,6,9,10 127:20
 136:5,7,16 139:18 151:15
 151:16,21 153:13
individual 42:18 51:9 76:20
 89:12 91:10 99:4 121:13,15
 141:11 150:2

**individualized** 95:13 118:2
**individuals** 44:15 114:2
**induced** 38:8,14
**infectious** 18:12 65:18 105:4
  124:10
**inflammation** 121:18 122:1
**inflammatory** 107:14,15
**information** 44:5,12,13 49:3
  49:10,12 50:7,15,19 54:2
  58:21,22 64:6 76:15 78:13
  91:19 97:15 98:19,20 100:3
  101:1 113:5 125:1,12,23
  128:19 131:9 133:3,7,10,11
**ingestion** 84:23
**ingredient** 90:6
**ingredients** 89:15,19,21
**inhaler** 29:1,4 83:15,16
**initial** 28:3 108:15,20 109:2,4
  109:11,17,21 110:7 127:19
  127:21 128:2,2,4,9,13,15
  134:9 135:15,17 136:5
  142:2 151:14,16 152:1,8,14
  152:21 153:14
**initially** 151:22
**initiated** 120:11,12,15
**injury** 121:22 144:9
**inpatient** 11:3 13:24 22:13
  23:11,16 25:18,19 29:11
  32:18 38:20 40:9 43:8 63:1
  63:5,12 70:17 72:1,9 98:23
  103:8,13 146:3,14,21 147:1
  147:24
**inpatients** 25:4 103:14
**input** 83:17
**inquiries** 152:17
**inquiry** 134:13 142:5
**insert** 48:20 49:1 58:23 100:5
  100:16,20,22 127:19 133:9
  133:14,17 152:15
**inserts** 50:9 78:14 133:8
**instructed** 69:10,12
**instructing** 69:15,17
**instruction** 82:24 84:22
  158:1
**instructions** 68:24 70:10,13
  70:18,22 71:1,5,7,13,18,18
  71:23 72:2,17 73:4 80:23

81:23 83:18 125:2 128:13
  129:1,6,21,23 154:20
**insurance** 40:21 42:4
**intended** 154:6
**intends** 116:24
**interactions** 12:24
**interchangeable** 100:22
**interchangeably** 85:3
**interesting** 51:14
**internal** 11:20 15:20 18:11
  122:6
**internally** 114:24
**internet** 78:14
**interpreted** 131:3
**interrupt** 102:8,16
**intervene** 132:14
**intervenously** 102:13
**intolerant** 89:17
**introduce** 5:4
**invented** 103:20 104:4
**inventor** 104:6 142:14
**investigating** 73:19
**investigation** 66:24 134:15
  153:20,22
**involuntarily** 20:21
**involuntary** 34:17
**involve** 122:10 141:8
**involved** 16:2 18:17 25:14
  41:5 42:17,19 43:3 44:23
  51:16,19 53:18 94:23
  115:19
**involving** 38:6
**irrespectively** 145:21
**irritation** 144:9
**issue** 92:13 152:22
**issued** 69:22 71:15 124:23
**Item** 95:16

---

**J**

**JAMES** 2:8
**January** 62:3
**jejunum** 121:19
**Jennifer** 1:14 4:14 157:4,23
**job** 18:1,17,22 53:22
**Joe** 2:23
**Joe's** 61:17
**Johns** 1:8 3:3,16 4:12,17,24

5:3 8:10,11,14,17 9:15
  22:24 24:20 37:2,7 41:24
  50:12 67:4 146:13 151:11
  153:12 155:5,13 156:7
  161:1 162:1 163:1 164:1
**Johns'** 8:11,12,14 9:7
**Join** 75:24 80:7 83:5,23 91:4
  139:5 140:4 141:22 154:16
**jointly** 100:9
**journal** 113:6
**judgment** 83:20 126:16,23,24
**July** 20:9 23:8
**jump** 67:4
**June** 1:16 4:3 95:19
**jurisdiction** 14:16
**justification** 112:24

---

**K**

**Kanjanarat** 25:24
**Kansas** 37:21,23,24 39:23
**keep** 76:23
**KEESLER** 2:8
**kind** 21:8 44:8 64:19 108:3
  125:19
**kinds** 28:19
**KLINE** 2:3
**KMC** 37:19,23
**knew** 81:20,21
**know** 7:23 15:1,2,3,12 22:21
  27:15 28:10 29:3 33:10,13
  33:16,18 34:10 42:24 44:17
  45:11 46:10 48:14 49:14
  50:6,8 53:7,8 67:17,19
  69:20,21,24 72:14 78:3 90:2
  90:2,21 92:3 94:18 95:4,6
  96:9 97:14 111:2 113:14
  119:10 120:19 121:20,21,24
  122:14 125:19 130:20
  137:24 138:3 143:19 144:5
  146:23 148:9,13,13 149:4
  149:13,17
**knowledge** 38:23 53:5 75:19
  97:18 98:15 110:21 113:15
  115:11 137:16,23
**known** 64:6 85:24
**Kroger** 32:5

THOMAS JOHNS, Pharm.D.

## L

**L** 2:19
**label** 94:18 100:9 136:13,22 142:3
**labeling** 100:3,7,18,19,21 135:16 136:18
**laboratory** 10:4 28:16
**lack** 31:9
**Lamb** 2:4 3:6 7:22 9:8 37:9 50:11 70:20 75:22 78:17 79:1,18 80:5 83:3,21 91:2 92:5 93:12 109:24 115:24 117:11 120:22 122:8 126:9 127:3 138:16 139:4 140:2 141:20 151:4,8,10 153:6 154:14 156:2
**large** 43:2 81:22 105:18 123:4
**larger** 148:14
**largest** 84:13,18 85:9,12,15 85:18
**late** 35:24
**law** 17:3 66:3,3,3 67:7,12,15 67:18,24
**laws** 150:22
**lawsuit** 52:4
**lawyer** 65:21
**lead** 47:20
**leadership** 10:1
**leading** 16:8
**leaflets** 133:4
**learn** 66:12
**leave** 9:12
**led** 41:7
**left** 27:8
**legal** 67:6
**legitimate** 55:8
**length** 65:3
**lengthy** 25:11
**lessen** 97:6
**Let's** 32:13 69:4
**level** 25:4 26:9 38:19 108:10
**levels** 64:4 87:3 94:10,20,24 95:1,4,7 152:8
**liberty** 46:21 52:2
**license** 29:19 30:11,16,18,22 30:23 31:11,12 32:20 34:7

34:20
**licensed** 11:5,15 21:22 29:18 30:8 31:13 32:17 49:14 67:11 124:5,10,13,16
**licensing** 66:4 67:5,10,15,18 68:1
**licensure** 33:17
**LINDER** 1:7
**Lindner** 2:15 4:9 60:9,12 61:21,22 68:6 69:16 70:1 73:16,23,24 74:8,17 75:9,18 77:6,8,11,17 78:2,16,22 79:11 80:15,18 90:24 95:17 103:18 105:17 120:11,16 121:2 135:4,7 137:5,11 142:13 154:3,5,7,22 155:14
**Lindner's** 7:1 62:6 73:13 74:5,9 76:9 79:16 95:15 141:24 155:19
**line** 10:10 88:2 129:13 141:18 160:5
**lines** 80:14
**liquids** 102:2
**list** 3:19 34:4 37:10 39:4 46:12 48:9 59:17 62:2 68:4 95:21,24 96:1 97:2,5 125:19
**listed** 30:23 34:1 35:17 37:3 48:21 93:20 121:17 123:15 123:23 127:14 134:6
**literally** 19:17 61:5 124:22
**literature** 44:4 49:6 64:6 134:11 143:20
**litigator** 65:21
**little** 13:7 14:16 21:10 22:18 28:13 37:18 38:13 65:5 81:14 101:4 103:12 106:5 109:4 118:16,18,24 140:8 147:24
**live** 48:4
**local** 19:12 22:19 31:9 43:5 44:19 66:3 142:24 149:10
**located** 10:20 13:15,19,22 22:3 23:18 73:12
**location** 14:1 60:15 120:10 145:21
**locations** 15:23 24:3 30:20 32:10 138:22 148:8,16

**Locust** 2:4
**logical** 111:21
**long** 6:7 16:22 130:23 145:12 145:14 155:10
**longer** 34:23 35:11 87:5
**look** 9:2 42:24 58:20 73:9 135:21 151:1 152:11
**looked** 25:3 80:22
**looking** 5:14 19:3 24:19 33:23 37:2 46:10 68:22 78:21 116:7 124:23 147:12 153:1
**looks** 8:13 18:3,10 21:2 26:23 34:3 35:2 40:14
**lot** 13:14 43:13 44:4 89:14 131:18 149:1,2
**Lots** 144:23
**Luke** 2:22

## M

**M** 45:9
**M.D** 1:7 2:15 4:9 7:1 60:9
**machine** 13:18,23 14:3
**machines** 13:19
**mainstream** 142:16
**maintain** 11:14 30:11 53:5 96:4 148:23
**maintained** 20:20 35:7
**maintaining** 148:21
**maintains** 106:4
**making** 126:24
**mandated** 114:17,20
**manic** 51:11
**manner** 150:1
**manufacturer** 100:10
**manufacturers** 51:21,22
**mark** 8:8,9,16
**marked** 3:15 156:7
**market** 2:9 49:16
**mater** 19:12
**material** 100:5
**materially** 21:24
**materials** 6:19,21 8:1 59:18 59:20 78:6 132:4 134:6
**matter** 5:7 40:16 157:8
**matters** 10:10
**max** 105:1,5,10,13 119:14

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

144:7
**maximum** 49:14
**MCCORMICK** 2:7
**mean** 12:19 28:8 33:13 41:24
43:10 44:10 46:20 48:16
52:10 63:24 70:4 74:13
85:22 86:21 88:5 105:21
106:17 108:21 111:17,17
116:8 124:21 134:8 136:13
138:24 150:14 151:22 152:3
**meaning** 11:11 89:9 90:15
97:13 128:16 150:15
**means** 13:6 50:8 54:11 59:4
70:5 81:4,7 88:6 94:14
108:22 124:22
**meant** 111:23
**mechanics** 13:7
**mechanism** 55:10
**medical** 10:15 12:13 15:22
16:13 19:4,15 20:2,10,16
22:6 26:8,17 37:23,24 40:3
44:22,24 49:6 53:12 57:2,6
57:7,8,14,19 60:9,10,14
61:20,23,23 64:6 65:1 71:16
73:13 87:19 103:19 104:5
116:16 124:24 126:23
132:22 136:14,19 149:20,22
150:3 152:3 154:4
**medication** 10:12,16,17
12:22 13:12,22 14:10,22
15:11,14 16:15 26:1,21
27:18 41:8,11 42:6,13,17,18
46:14,19,24 47:15,18,20
48:7,11,19 49:16 54:22,23
54:24 55:21 56:10,20 57:4,5
57:9,12,15,20 58:4,5,8 59:6
59:11 62:21 64:10,19,21,22
64:24 65:1 66:5 70:9,17
71:4,19,21,22,24 72:12 74:6
76:10,13,24 77:3 80:4 82:23
84:23 86:2,11 87:1,2 90:1
91:10 92:20 94:3,4,5,6,7,9
95:18,24 96:1,10,23 97:2,6
97:10,11,18,19,24,24 98:2,6
99:5 101:3,15,16 105:22
106:1,3,24 107:1,6,8 108:23
111:2,5 112:4,11,13,18

113:11,21 114:11,14 115:17
115:21 116:20,21 117:5
118:12 123:1,5,11,12,21,21
124:3 126:5,6,6 130:2,5,18
131:9,16 132:6,21,24
133:13,20 134:2 138:1,5,21
138:23 139:1,2 142:9
143:11,24,24 144:12,14,17
144:22 145:17 146:14,20
147:4,8,11,16,16 153:17,24
154:13
**medications** 10:19 13:14,21
21:21 40:20 41:6 43:3,7,17
44:14 47:2 48:22,23 65:18
70:19 72:4 82:4 86:7 92:19
96:17,20 107:17,22 118:13
122:17,20 124:1 127:2
131:11 136:16 139:19
144:20
**medicinal** 17:1
**medicine** 11:21 13:7 14:4
15:20 18:11 34:13 74:24
**meeting** 31:4
**meets** 96:16
**Melbourne** 39:4,20
**member** 14:19,21
**memorialized** 50:16 114:16
115:9
**memorize** 66:21
**memorized** 66:4
**memory** 7:1 17:4 27:14
**menopausal** 47:13
**mentioned** 12:11 13:13 22:5
27:21 48:17 59:24 82:12
101:5
**merely** 55:3
**message** 54:4,5
**Micromedex** 108:15,17,21
113:5 151:13
**mid** 36:21
**Middle** 1:1 4:6
**midway** 25:22
**milestones** 53:14
**milligrams** 60:21 68:24 69:7
72:19 95:12 108:16 109:1,7
109:18,21,23 110:7,11,16
110:17 111:2,3 128:17,20

151:14,17,22 153:14,17
155:1,1
**million** 17:24
**mind** 8:23 81:4
**minimum** 67:7 131:4,5
**minute** 91:8 117:9
**minutes** 80:22 93:17 151:1
**missed** 112:5
**misspoke** 151:23
**model** 16:13 32:23
**mom** 31:9,17
**moment** 35:2
**money** 149:1,2
**monitor** 72:11
**monitored** 24:4
**monitoring** 28:16,22
**monitors** 59:9
**months** 21:6
**moonlighting** 22:19 23:3
**morning** 4:24 6:16,19 7:17
**Motrin** 108:5
**move** 45:20 54:2 146:1
**moved** 20:18 23:6 35:4,8
**muggy** 7:23
**multiple** 103:22 107:10 137:6
137:8
**Mutual** 40:12 42:1
**mutually** 83:11,20

<table>
<tr><td colspan="1" align="center">**N**</td></tr>
</table>

**N** 2:1,19 3:1 157:1
**name** 5:3 46:10 89:23 124:24
125:1,5,20,21
**named** 5:6 24:1
**names** 101:12
**national** 25:2 32:2,8 34:16
**nature** 25:24
**near** 19:15
**nearly** 48:21
**nebulizer** 29:6,13,14
**necessarily** 29:9 57:21 72:14
75:15 76:17 78:19 83:17
86:14 90:13 91:9 96:3,12
112:14 118:13 138:13,24
141:8,11 148:9
**necessary** 100:2 148:2 158:5
**necessitate** 142:4

THOMAS JOHNS, Pharm.D.

**need** 6:8,9 9:6 31:3 34:19
35:6 45:19 75:20 98:6
111:7 131:8 132:14 142:5
150:10
**needed** 82:8,9,9,14 83:16,19
105:19 136:2
**nefarious** 138:10,13
**negative** 5:21
**neither** 116:16
**nephew** 74:15
**nervous** 87:16
**neurodiagnostics** 10:4
**neurosurgery** 65:22
**never** 15:2,3 50:17 75:6 76:6
78:5,8 139:12
**new** 96:17 98:8 128:9,9
**newsworthy** 44:13
**NFR** 40:2
**NFRMC** 39:24
**niece** 74:15
**nine** 59:17
**nod** 5:21
**nomenclature** 16:11 47:1
**non-excess** 122:5
**noncancer** 108:17 109:7,16
109:20 110:6,10 127:20,22
136:6 151:14,15,21 153:13
153:18
**nonhospital** 150:3
**nonmilitary** 21:24
**nonsterile** 33:7 102:6,9,13
103:15
**nonsteroidal** 108:1 122:16,19
123:4,10,20 143:10
**normal** 21:10 62:10 94:10
134:5,7,8
**north** 17:9 40:3
**Nos** 4:7 156:8
**Notary** 1:15 157:5
**note** 55:22 73:11,14
**noted** 4:13 158:11 159:9
**notes** 151:2 157:7
**notice** 3:17 8:10
**noticed** 7:8
**November** 60:11,13 62:3
**NSAIDs** 108:4,7,10 118:17
143:13,15

**number** 3:15 21:1 26:10
27:17 30:4 35:8 36:17
52:12,16 125:2,14
**numbers** 32:7
**nurse** 14:5,9 15:4,12 52:15
54:8,23 55:13 57:7 59:5,9
72:11 97:14 99:19 115:18
122:24
**nursing** 13:17,20 15:22

## O

**O** 2:19 157:1
**O'Neill** 1:14 4:15 157:4,23
**Object** 81:12 129:3 144:2
**Objection** 50:11 60:16 70:20
75:22 78:17 79:1,18,20 80:5
83:3,21 91:2 92:5 93:12
109:24 115:24 120:22 122:8
126:9 127:3 138:16 139:4
140:2,2 141:20 154:14
**obligated** 99:12 130:13
133:16
**obligation** 91:6,13,16 98:24
153:19
**OBRA** 130:24
**obtain** 75:19 76:24 78:12
133:13 134:2 137:8 138:4
**obtained** 14:5 133:20 137:1
144:7
**obtaining** 76:15 97:1
**obviously** 14:21 17:21 54:12
113:18 126:3 139:19
**occasion** 111:10
**occasions** 103:23
**occur** 13:24 32:17 47:4 88:19
93:11 97:7 98:12 113:2
115:7 144:19
**occurred** 80:10 114:6 117:2
**occurring** 27:23
**occurs** 97:17 98:8 112:15,16
**October** 129:14,19
**offer** 130:11,13,16 131:4,7
132:9,14
**office** 51:13
**officer** 20:24
**official** 100:8 136:17
**oh** 17:15,18 23:3,4 25:8 36:7

41:23 52:18,21 89:21 98:7
136:24 151:23
**oil** 61:16
**okay** 5:1,10,13 6:1,6,12,18
7:3,8,16,19 8:1,7,23 9:13
11:11,17,20,24 12:15 13:2,5
14:2,12,20 15:16 16:14,19
17:6,11,17,21 18:3,9,15,21
19:3,12,21 20:7,8 21:7,7,13
22:15 23:8 24:13,19 26:12
26:23 27:4,10 28:13,24 29:3
29:6,18 30:2 31:8,21 32:12
34:5,24 35:4,10,14 36:11,22
37:6,18 38:12,17,22 39:3,18
39:22 40:5,16,23 41:3,10,13
42:15,23 43:4,24 44:8,17
45:3,3,12,19 46:23 48:16
49:4 50:23 51:19 52:5,19
53:15 54:4,7,20 55:15,22
56:12,16,18 57:2,12 58:1
59:16 60:7 61:6,13 62:8
63:4,10,15 64:14 65:20 66:8
68:13 70:3 71:3,11 72:23
73:7 74:22 75:4 76:3 79:8
80:1,12 81:2 84:6,11 85:4
85:22 86:15,21 90:5 91:8
93:6,9 95:23 98:12 99:18,23
100:15,21 101:19 102:16,17
103:6 104:1 105:16 109:10
109:20 110:9 112:15 113:2
113:13 114:6,9,17 115:7,11
115:14 119:19 120:1,19
124:4 125:11,14 126:2
128:24 129:20 130:1 131:12
139:8 140:10,15 141:1,8,16
148:7 149:13,17 150:24
151:8,19,24 153:21 154:6
154:24 155:3
**older** 28:15
**once** 13:5 15:11 20:23 58:1,9
65:23 87:1 112:11 115:15
134:2
**oncology** 26:9
**one-month** 15:18
**online** 49:5 50:9 58:23
101:11,13 108:14,18
**open** 46:20

THOMAS JOHNS, Pharm.D.

179

opening 60:8
operations 9:22,24 10:8,13
  10:23,24 17:13 23:12
opine 114:2
opinion 44:3 46:17 112:22
  124:19 130:21 132:22
  142:15 153:13
opinions 40:21 59:21,23
  73:18 155:18
opioid 38:8,14,15,19 40:8
  43:3,22 44:1,12 51:21
  144:19
opioids 42:19 43:6,15,16 44:6
  44:20 45:1
opportunities 74:16
opportunity 5:4 74:4
option 131:14
oral 1:6 102:2,15
orally 56:13
order 12:2,9,16,23 13:17,17
  15:23 52:20,23 55:2,8,12,15
  55:16,18 56:9,11,20 57:2,4
  57:5,8,9,10,12,15,20 58:2,4
  58:19 59:2,2 65:1,1 70:9,17
  71:10,19,22 76:24 98:2,8
  111:2,5 112:4,13,18 114:14
  138:21 145:17,17 146:15
  147:2,17,18 148:1,1,4
ordered 148:2
ordering 108:23
orders 10:17 11:2,12 16:4
  17:14 18:18,23 21:20 55:5
  66:12 71:4 147:7
organization 25:2 114:2
organizational 103:3
organizations 32:3 33:22
  49:6
original 158:14
originally 17:6
Orlando 20:3,10 23:6
outpatient 12:21 14:12,15,21
  22:12,14 23:11,20 24:1,8
  32:1 43:8 56:22 70:16 72:4
  146:20 147:23 148:4
outside 46:21
overdose 85:22 86:13 119:19
  119:21,23

overlap 123:17
oversee 16:7
oversees 10:23
oversight 10:2 14:16 23:11
  33:21
owned 24:12 32:2
Oxycodone 51:11

**P**

P 2:1,1,19
P.C 2:3,7,13
p.m 156:10
PA 1:23 122:23
package 48:20 49:1 50:9
  58:23 78:14 100:5,16,19,21
  127:19 133:8,9,14,17
  152:15
page 3:2 8:13 24:19 25:21,22
  28:13,14 33:23 35:14 37:7
  59:16 60:7 61:19 68:3 75:5
  79:8 80:14 87:24 95:16,22
  99:23 103:17 108:13 117:21
  120:8 121:10 123:16,23
  127:14 128:4 129:12 134:5
  160:5
pages 159:5
paid 19:9
paper 28:1 149:23
paragraph 60:7,18 61:19
  68:6 73:11 75:5,6 77:6,16
  79:8 80:13,13 88:1,1 90:14
  99:24 100:1 103:17 108:13
  117:22 120:8
paragraphs 78:3
parameters 82:10
Pardon 5:3
part 19:5,18 43:20 71:4 80:1
  80:8 83:6 86:19 93:7
  100:17 120:15 131:21 136:2
  141:11 147:5,10 152:1
participated 51:3
particular 13:21 25:19 28:1
  29:15 47:19 52:3 53:14
  62:14 63:22 64:4,7 71:10
  73:19 75:1 81:6 86:1,5 87:1
  89:16 91:20 96:11 106:3,21
  108:24 109:1 113:18,21,22

119:15 154:11,12
particularly 46:22 65:18
party 133:10 142:4
passed 40:9
Patches 102:3
pathway 115:5,10,12,23
  116:10
pathways 113:24 114:15
patient 10:20 11:12 13:1,8,12
  13:22 14:6,10,18,19,20
  15:14 26:8 29:10 32:22
  38:20 41:7 42:18 50:4 53:6
  54:18,23 56:9 59:7 62:18,21
  63:1,7,10,11,23 64:10,16,18
  66:18 69:1,10,12,15,17,22
  70:1 71:14 72:12 75:11
  80:18,24 81:2,5,6,8,10,11
  81:17,24 82:5,11,15,20,21
  83:11 86:6,16,19 87:4,6,9
  88:14,24 89:2,12,16 90:7
  91:24 95:13 96:4,11,14,15
  96:18 97:7,10,12,13 98:4,5
  98:14 99:6,10,20 101:6
  107:9,18,20 113:10 115:21
  115:22 116:11,15,22 117:1
  117:2 118:3,8 122:4,22
  123:3 124:2 125:12 126:4
  128:19 129:6 130:2,6,12,19
  132:6,20 133:5,7,13,19,24
  136:11 138:22 140:17,17,23
  141:2,6,7 142:8 144:13,21
  144:22 145:9,10 154:22
patient's 26:19 59:10 95:24
  97:18 122:24 124:24 125:5
  125:13 126:4 127:1 138:14
patients 10:17,19 11:2 24:22
  26:13 47:3,13 52:12 73:23
  74:15 75:8,10 76:8 77:9
  78:23 130:10 132:18 133:2
  137:14 139:17,23 140:1,10
  141:3 148:15 149:24
pending 38:22
Pennsylvania 1:1 2:5,9,14
  4:7 19:16 33:10,15,16 67:17
  73:14 115:12 125:18 127:9
Pennsylvania's 19:15
people 116:17 138:10

THOMAS JOHNS, Pharm.D.

**percent** 17:17,19 18:23 19:1 41:19,19 67:20 90:2
**percentage** 17:13,16 18:22 67:14
**perforation** 121:21 122:20 143:5,8,12,14,17
**perform** 49:18 77:1 91:13 96:23 99:12 113:17 127:7 150:21
**performance** 42:11
**performed** 132:1
**performing** 22:10 42:5 131:22,24
**period** 29:21 94:14,16 95:12 105:20 106:21
**periods** 107:10
**Persian** 22:8
**person** 20:14 64:20 87:19 105:18
**personally** 64:8 71:22 139:12
**PGY1** 16:8,10
**Pharm.D** 1:8 3:3 4:12,17 6:24 11:17 16:20 19:21 21:2 22:9 65:23 66:9
**pharmaceutical** 100:10
**pharmaceutics** 17:2
**pharmacies** 14:15 23:17,21 24:8 31:13 32:5,12,21 33:5 33:11,15,19,19 43:12 96:10 102:4 103:13 131:13,19 133:6,11 137:8,13,23 138:6 148:14,17 150:6,16
**pharmacist** 11:5 12:3 13:16 14:3,17 16:3 18:11,19 20:9 20:12 21:1,22 22:23 24:8,15 29:18 30:8,9,11,15,15,18,21 30:24 31:14 34:6,8,9 39:19 40:11,18 41:6,22 42:1,5,5 42:11,12 48:24 49:13,17 50:6,14 52:16 54:8,22 55:19 57:6,10,14,17 58:1,4,7,10 58:14 60:1 62:15 65:21 67:11 68:17,17 73:15,18,22 74:19,24 75:17,18 76:11,12 76:13 78:4,5 79:5,9 81:19 81:20 85:23 86:22 87:19 88:3 90:12 91:10,20 93:10

97:14,17 98:1,15 99:9,19 100:4 101:2,13,14 102:20 102:21 103:7,9,22,22 104:22 105:17 106:18 111:4 111:15,22 112:3,10,18,20 112:22 113:4,19 114:3,10 115:16,18 116:14,19 117:4 120:8,9 121:4 124:5,8 126:13,14,15 128:8 130:1,5 130:13,15,16,18 131:4,11 131:22 132:1,20,23 134:7 134:24 135:5,6 136:1 139:15,21,24 140:19 141:2 141:4,14 146:18 147:9 148:4 152:11,16,19 153:18 153:21,24 154:4,7
**pharmacist's** 50:2 113:17 130:11 152:9
**pharmacists** 11:14 24:2 34:11,17 44:23 49:7,9 96:3 98:23 134:12 152:2
**pharmacodynamics** 17:3
**pharmacological** 88:7
**pharmacology** 17:2
**pharmacy** 6:22 10:3 11:21 12:21 13:24 14:4,18 15:19 18:17 20:12,15,18,19,22,24 21:11,15,17 22:13,14,19 23:16 24:1 25:2,17 26:18 30:19,19,21 31:2,3,10,11,11 31:16,22,23,24 32:1,9,15,18 32:19 33:18,21 34:6,8,14,15 35:19,23 36:2 38:11,18 39:13,16,19 40:11,19 41:22 42:1,10 43:7 50:1 55:16,17 56:18,23 57:3 64:14 65:7,12 65:13,16 66:3,13,17 67:7,12 67:15,18,24 74:23 76:17 95:23 96:6,9 98:13 101:22 101:24 102:1 103:15 110:22 127:10 131:2 132:16 133:5 133:14,16,20 137:3,20 138:2 140:16 142:16,22,23 142:24,24 145:18,21 146:3 146:13,18 147:1,8 148:9,11 148:12 149:10 150:8 155:17
**pharmacy's** 30:23

**Philadelphia** 1:23 2:5,9 19:14
**phone** 57:22 125:14
**phraseology** 72:5
**physical** 13:23 87:4
**physically** 13:19 22:3 59:6 154:17
**physician** 21:20 52:15 55:11 59:5,9 60:2,13 61:23 64:3 70:6,7,15,24 71:8,9,17,24 72:10 75:1,20 76:11,12,20 77:2 81:5,9 82:10,23 88:21 89:1,10,17 90:8,11 91:19,24 96:2,16 97:13 99:4 106:24 107:4,8 109:6 111:15 112:17,24 113:6 122:23 123:6 124:11,14 129:2 131:23 132:5,23 134:1,1 135:1,1 138:19 139:20,24 141:3,9,11 143:22 144:4 145:23 147:11
**physician's** 83:18 138:23 139:3
**physicians** 78:14 134:14 138:12
**physiologic** 94:20,24 95:1
**physiological** 94:1
**pick** 14:22 57:22
**picked** 5:22
**piece** 50:15
**pieces** 50:6
**pill** 84:23
**place** 55:12 57:8 58:7 78:1 114:10
**placed** 55:3,5,15,19
**plaintiff** 36:23 37:19 41:15 41:20 42:19 97:11
**plaintiff's** 37:6
**Plaintiffs** 1:5 2:5
**plan** 66:11 77:11,19 78:23 79:17 82:22 109:6 112:12 138:24 139:3,22
**play** 126:17
**Plaza** 1:22
**please** 6:1 92:8 110:3 158:4,8
**plus** 106:24 107:5,10 129:23
**pneumonia** 26:14

THOMAS JOHNS, Pharm.D.

181

**point** 38:7 58:13 74:13 92:4
**points** 59:18 74:8
**policy** 114:16 115:9
**poorly** 109:4
**pop** 31:9,17
**popped** 93:8
**population** 13:22
**populations** 26:8
**portion** 43:2
**position** 116:5
**possible** 83:7,8 90:10 111:10
   113:12 119:19,21,23 120:1
   120:4 122:18,22 123:2,10
   136:12 137:4,19 138:4,7
   146:21
**possibly** 82:21 138:23 147:3
**postgraduate** 15:18 16:12,12
**posture** 39:9 40:6
**potency** 88:23
**potential** 49:21 66:23 91:17
   91:22 97:6 101:9 147:13,15
**practical** 66:17
**practice** 15:19 17:4 30:19,20
   32:8 52:7 73:13,16 74:5
   98:24 104:21 105:18 133:3
   145:21
**practices** 87:19 115:2,3
**practicing** 66:13
**preceptor** 16:16
**prednisone** 52:20 68:8,18,23
   72:24 73:5 75:7 76:7 84:7
   84:14,19 85:10,16 86:4 87:7
   87:13 88:8,11,15,16 89:2,8
   90:17,18,23 92:1 105:1,5,15
   108:16 109:11 110:14,17,18
   111:8,18 117:24 127:21
   128:5,21 135:23
**predominance** 36:7,8
**preferred** 131:18
**premenopausal** 47:13
**premier** 149:20
**preparation** 8:2
**prescribe** 54:22 64:5 98:6
   106:24 107:8 136:15
**prescribed** 68:6,16 74:6
   88:15 93:4 98:4 107:13,18
   126:20 129:17,23

**prescriber** 88:22 108:22
   153:16
**prescribes** 56:11 97:10,23
   153:17
**prescribing** 43:14 64:2 71:9
   77:2 81:5 107:5 108:23
   116:11 134:14 135:1 143:24
**prescription** 12:16,20 56:12
   56:13,19,21 65:1 68:22 69:6
   69:20,23 70:8,12,16 71:10
   71:15,19,23 72:24 73:2,5
   75:12 76:24 80:17,22 81:24
   82:9,16,19 93:22 108:10
   112:4,13 114:13 120:17
   124:20,23 125:4,11,24
   126:2 127:13 128:5,7,8,9,12
   128:15,19 132:2,15 133:4
   135:15 137:2,9,19,20 138:5
   140:19,20,22 141:5 142:10
   142:17 143:2 148:6,10,15
   152:10,13,20 154:23
**prescriptions** 53:10 68:18,21
   70:15 71:3 72:17,22 75:14
   79:11,13 82:8 96:5,6 120:14
   135:22,24 137:6,12,14
   138:1 139:23 140:13 143:1
   148:8 150:7,22 152:12
   153:2,3 154:21
**present** 4:10 13:1 18:5 19:22
   66:20
**presentation** 16:15
**presenting** 66:21
**presently** 7:19
**president** 9:22,24 10:6,13,23
   17:12
**pretend** 44:17
**pretty** 67:20 118:15 119:3
   127:9
**prevent** 27:20,23
**preventable** 24:23 25:5 27:11
   28:2,2
**previous** 103:10
**primary** 49:5
**principle** 142:20
**principles** 12:22 126:18
**prior** 18:9 63:17 77:15 80:12
   91:18 95:18 96:17 97:1,18

97:19 104:8,11,14,17,20
**PRIORE** 2:7
**privileged** 52:2
**proactively** 91:19
**probably** 17:5,20 23:4 35:2,6
   35:24 37:10 42:24 43:2
   48:8,12 49:9 53:13 62:13
   64:12 67:23 73:15 84:8
   94:19 115:10 123:17 151:23
**problem** 44:1 66:15,23 91:17
   91:23
**problems** 49:21,22 101:9
**procedure** 115:23,23
**proceed** 58:12
**process** 28:4 50:21 53:18
   66:13 80:3 116:3 120:15
   127:11 132:11 136:3 145:12
   145:22 150:7
**processed** 152:13
**processes** 107:15,15
**processing** 12:20 21:20
**product** 100:2,7,18,19 102:12
   135:16
**products** 21:22
**professional** 1:14 14:6 15:13
   33:24 34:1 49:6 126:16,22
   131:23,24 139:16 157:4
**professionally** 11:16 74:4,17
**professionals** 126:23
**professor** 65:15
**profiles** 10:16
**prog** 60:20 61:13
**progesterone** 61:15
**program** 16:6,20 19:22 66:9
   150:20
**prohibitively** 6:7
**prohibits** 71:17
**promulgated** 45:16
**proper** 23:19 43:14 91:21
**property** 42:3 89:9
**propounded** 159:7
**protocol** 114:10 115:5,12
**provide** 14:10 39:12,15 54:23
   72:11 92:11 112:24 123:1
   130:17 132:20 133:7,16
**provided** 8:12 35:18,22 36:12
   36:19 42:10 46:11 50:23

THOMAS JOHNS, Pharm.D.

71:8,14,23 79:10 82:22
112:19
**provider** 55:19 71:14 99:11
101:6 124:24 125:21,24
129:2 131:23 136:11,15
139:21 140:12,13,21 144:4
148:3
**provider's** 132:22
**provider/pharmacist** 56:6
**providers** 52:11 61:24
**provides** 59:7
**providing** 14:18 51:16,20
70:24 71:17,18 81:11 91:19
115:20 124:7 132:5 134:1
155:18
**psychiatrist** 124:17
**psychiatry** 121:14
**psychologist** 124:16
**psychosis** 121:15
**public** 1:15 44:9,11 157:5
**publication** 24:20 28:5
**publicized** 43:21 44:5
**published** 25:12 43:11
134:11
**Publix** 22:24 32:5 148:13
**puffs** 82:13
**pull** 37:11 48:20 73:8 76:18
113:5
**pulling** 8:23
**pulmonary** 41:7,11 47:24
48:2
**pulse** 105:24 106:2,8,12,14
106:24 107:4,10
**pulsing** 105:21,23,24
**purpose** 49:20
**purposes** 151:12
**put** 57:8 96:19 103:20 104:1
134:22
**puts** 12:8

**Q**

**QS/1** 24:2,4
**qualifications** 155:16
**quality** 150:1
**quantity** 81:22 84:24 85:5,7,9
85:12 95:8 101:15 126:6
132:3 136:10 137:2,6,9

141:17,19 143:23
**question** 6:10,11 11:13 12:6
27:4 48:15 51:5 57:13 58:8
58:11,14,18,20 65:3 70:11
76:4,8 77:14,24 83:7 84:16
91:18 92:8,12 99:14,15
103:6,11 110:5 112:6
113:23 119:17 132:19 140:6
146:24 147:6,21
**questioning** 4:21 134:20
151:3
**questions** 35:16 45:21 50:20
72:16 73:23 76:19 112:18
134:2 151:20 153:7 155:4,9
159:7
**quickly** 8:21
**quite** 16:22 25:10 30:17
51:14 55:4 131:17 138:10
141:13
**quotations** 104:2
**quote** 13:23 70:9 86:24
**quotes** 103:21

**R**

**R** 2:1,19 157:1
**radiology** 10:4
**raised** 136:1
**range** 82:23 109:1
**rank** 24:22
**raped** 51:11
**rapid** 135:22
**ratio** 110:13
**reaction** 27:12 59:10 90:7,7
**reactions** 86:8
**read** 55:14 80:19 103:23
110:2 118:3 129:9 158:4
159:5
**ready** 45:20
**real** 105:8
**really** 19:7 21:19,23 42:14
48:9 95:3,5 106:1 111:4,7
150:19
**reason** 58:3 89:1,4 90:22
126:22 131:21 158:6
**reasonable** 79:12 138:18
152:20
**reasonableness** 154:3

**reasons** 138:13
**recall** 8:3 25:13,15 27:24
28:10 29:5 35:21 36:16
38:2 39:8,11,18,21 40:5,16
40:24 42:20 51:8,10,18 52:9
53:7,15,21 64:8,13 67:14
73:1 79:15 84:13,18 85:9,12
85:15,18 104:16 123:7
**recalled** 79:4
**receipt** 158:15
**receive** 57:10
**received** 57:3,13 61:20 77:11
135:10
**receives** 55:16 56:19 111:4
**receiving** 112:11 113:11
132:2
**recess** 46:3 117:15
**recognized** 88:3
**recollection** 53:5
**recommendation** 136:6
**recommendations** 118:14
**reconcile** 101:8
**reconciliation** 96:24
**record** 4:13 5:5 10:16 12:13
30:24 31:15 61:5 128:3
146:5,9 149:20,23,23
**recorded** 5:11
**records** 6:23 7:1 53:12 62:5,6
73:9 77:24 95:16 96:2,4
121:1 148:15 152:4
**red** 132:13 136:1
**refer** 29:16 125:18
**reference** 58:24,24 78:5
100:4 108:15,18 132:4
134:6
**references** 29:17 49:5 50:9
64:7 142:4
**referred** 26:7 108:4
**referring** 26:3,15 28:20 29:7
29:9 68:10,11,14,15 80:21
117:24 120:12 129:15
**refers** 82:10
**refill** 132:16
**refills** 125:2,21
**refuse** 113:20 114:4
**refuses** 114:11 115:16 130:2
130:6,12,19

THOMAS JOHNS, Pharm.D.

regard 67:8
regarding 46:12,18 56:7
    76:15 83:19 89:12 131:9
    155:15,18
regardless 132:6 133:5 141:6
regimen 127:20 128:1 134:9
regimens 134:10
Regional 39:20 40:3
regs 127:10 131:2
regular 30:18
Regularly 16:18
regulation 71:17
regulations 43:10 50:2 103:4
    130:9,10,16 131:1 150:23
regulatory 10:9,24 17:4,24
    33:22 44:19
related 46:14 49:21 53:22
    76:9 77:11 78:6 91:18
    101:9 103:3,6
relates 77:20 105:22 155:19
relative 10:7 12:23 27:18,22
    50:15 52:3 65:8,17 68:17
    73:19 88:22 126:19
relatively 8:20
releases 13:17
relevant 152:9
rely 50:18 133:12
relying 131:22
remember 40:15 73:3 101:19
remind 150:5
removed 147:17
renewal 29:21 30:2
repeat 76:4
rephrase 92:7
replace 47:2
replacement 41:9,10 46:14
    46:19,24 47:8,11,15,18 48:6
    48:11 61:8 62:17 64:5
    74:14 152:6
replies 154:7
report 3:20 6:15 7:8 8:5,14
    28:6 45:21,21 59:13,19,22
    59:24 68:3,22 70:13 78:10
    87:24 90:21 110:15 117:21
    120:7 121:9,17 127:14
    151:13
reported 123:5

reporter 1:15 4:14,15 157:5
REPORTERS 1:20
reports 6:24 27:12
represent 155:13
represented 20:3
require 31:14 47:14 50:5
    67:6,24 95:8 106:14,23,23
    112:23 115:12 130:16 131:4
required 11:9 30:4,7 31:10
    33:17 49:14,17 50:8 53:4
    57:17 64:21 66:2 96:3
    126:1 127:11 132:15 134:13
    137:24 138:3 141:2,4
    148:18,19 150:11,17,19
requirement 49:24 50:14
    55:14 56:1 67:8 118:6
    125:10 131:5
requirements 117:24 132:12
requires 30:12,21 47:8,10
    67:17 143:2
research 16:14 76:14 78:15
    100:3 101:1,7,10,11 112:23
    112:24 134:21 146:2 153:23
researching 101:15
resemble 119:6
reserve 20:11 21:14
reserved 20:20 56:22
residency 11:21 15:16,19
    16:17 19:10 23:5,6 64:15
resolve 91:17 115:19 147:13
resolved 91:23 116:9 136:2
resource 26:12 76:22
resources 49:3 76:18 78:15
    101:17 133:11
respiratory 38:8,14
response 5:21 112:19,20
    118:3 151:20
responsibilities 23:16
responsible 17:22
rest 69:2
restoration 61:7
result 10:18 69:23 86:1,3,8
    93:21,23 94:2,11 95:13
    121:21 132:13
resulted 58:10 95:21
results 97:5 106:8
resume 18:3 19:3

retail 12:21 22:22 31:22 32:2
    32:11,13,15 33:5,11,15,19
    43:8 56:22,24 70:16 74:18
    95:23 98:12 99:10 101:21
    101:24 102:4,22 111:12
    115:7 130:1 131:12,13
    133:11,14 137:19,23 142:16
    142:21,23,23 148:9,10,12
    149:10 150:16
retained 40:21
retired 27:9
retort 111:22
retorts 112:7
retrieve 13:18
return 158:13
returned 20:23 21:9
returning 128:11
reverse 63:18
review 5:17 6:15 7:4,6 30:6
    49:18,19,20 55:20 56:1,4
    58:9,15,19,22 59:20 60:4
    77:1,1 80:3 91:14 99:1
    103:1 111:6 114:12 120:13
    120:15 127:8 132:2,10
    134:20 136:3 140:20 141:15
    142:20 143:20 153:23
reviewed 6:18,22 7:3,9,13 8:2
    43:1 59:19 60:1 95:15
    152:3
reviewing 10:16
reviews 13:16
right 6:14 7:13,24 8:7,15
    9:11 10:5 15:1,10 22:9 39:3
    50:16 57:11,24 64:14 69:4
    78:8 84:20 98:7 99:18
    116:18,24 117:20 119:11
    132:8,17 146:13 154:2,10
rigid 126:24
rises 144:9
risk 24:23 25:4 144:8
risk/benefits 143:23
Rite 31:19 32:3
Riyadh 20:22
robust 53:12 103:14
role 18:24 65:15
roles 18:17 35:9
Rosenberg 25:23

THOMAS JOHNS, Pharm.D.

184

rotations 15:21 19:10
rounding 57:7
rounds 52:5,8,10
route 102:15
rudimentary 150:8
rule 71:16
rules 5:14,16 44:21
run 64:17

**S**

S 2:1,19,19 3:13
safe 75:7,10 76:8,16 132:23
  150:1
salary 19:9
satisfied 58:2,10,22 79:10
  145:24 153:22
satisfy 135:5
Saudi 20:22
saw 89:24
saying 91:21 109:8,9,14
  111:7 112:2 153:12,16
  154:6
says 37:19 70:3 73:22 75:6
  79:9 90:15 92:10 98:7
  103:18 105:16 108:20 109:4
  121:3 128:18,22,23 140:16
scanner 131:14
scenario 82:18 92:22 98:8,18
  111:8,14 112:10 117:5
  135:13,14 141:16,19,23
  147:19,22 154:10
scenarios 66:20 111:9 136:5
  136:9 144:16
schedule 45:16,18 95:14
  119:4
scheduled 4:3
schema 126:20
school 19:15 20:18,19,24
  64:14 65:8,12,13
scope 11:7
Scranton 2:14
screen 9:1,6 37:12
search 50:8 100:6 101:1
  135:8
second 37:16 69:5 77:6 79:8
  90:14 94:7,9 100:1 119:11
  120:8 141:1

Secure 54:6,7,10,24 55:2,3,5
  98:3
see 5:14 9:3 20:8 26:2,14
  28:17 29:2 35:1 37:16,18,22
  39:24 40:12 41:24 48:21
  57:23 58:19 62:15 68:5
  72:10 74:18
seeing 111:15
seek 49:8
seeking 61:7
seen 70:14 71:3
sees 112:4
select 131:15
self-direct 69:13
self-proclaims 104:6
self-titration 129:7
sense 44:1 61:6 81:10 131:24
sensitive 89:16
sent 37:9 148:8,10
sentence 68:5 73:22 75:4
  76:6 77:7,7 79:9 90:15
  92:10 100:1 108:14 117:22
  134:4,17
sentences 74:2 77:15 105:16
separate 19:6 31:19 46:11
  132:11
September 153:2
sequence 135:21
services 10:4 18:17
set 44:20 66:22 82:10 85:8
sets 11:15
setting 13:3,10 14:13 15:11
  22:11,17,23 23:9,24 25:18
  26:6,18,18 30:22 31:5,6
  32:18 38:18 42:4 43:8 51:1
  54:21 56:21,24 59:4 63:2,5
  66:17 70:8,16,18 71:22 72:1
  72:4,9 74:18 96:13 98:9,13
  98:17,23 99:7,10 102:22
  103:8,8 111:1,9,12 112:16
  112:17 113:14,22 115:8
  122:23 130:2 131:12 136:14
  145:16 146:3,14,20,21
  147:2,23,24 148:5
settings 14:17 25:17 31:7
  66:15 98:24 113:20
settle 39:1

seven 25:21
severe 29:12
shadow 16:2
shake 5:21
Shands 9:17 14:14 19:5,11
  23:13 24:5,9,10,12 114:9,24
  117:3
share 8:24 9:1,6 37:12
sheet 158:7,9,11,14 159:9
  160:2
show 92:15
shrinking 32:7
sick 74:15 77:9
side 113:17 118:19
side-by-side 15:21 66:17
side-effect 121:13
side-effects 47:17 48:5,14,18
  48:20 49:15
sides 118:21
sigmoid 121:23
sign 158:8
significant 26:1 27:10 86:7
  129:5
Significantly 53:3
signing 158:10
similar 12:20 16:13 19:16
  27:21 34:12,13 50:1 63:17
  77:18 103:10 111:9 115:4
  123:12,14,19,22 125:22
  140:14
simple 131:8
Simplify 140:9
simply 148:5 150:20
Simpson 2:22
simultaneously 138:6 139:1
single 142:20
sit 62:23 89:22
situation 15:8 44:14 64:9
  112:3 113:14,19 115:14
  116:15,19,22 121:3
situations 111:11,21 114:1
six 36:19 40:10 82:14
skill 11:14 66:22
skills 66:16
slash 12:21 56:22
smaller 150:2
Smith 7:1

THOMAS JOHNS, Pharm.D.

185

software 12:12 23:23 56:16
  98:21 150:20
solely 83:17
solving 66:15
somebody 31:1 138:10
somewhat 98:22
sorry 34:9 37:7 41:2 67:4
  76:1 84:1 93:6 102:8,16
  119:11 146:4
sought 60:8,14
sounds 42:3
sources 78:13
south 1:21 17:9 40:18
space 16:24 21:20 33:1 34:15
  43:9 77:18 158:6
speak 43:14 58:21 78:12,22
  79:16 111:15 131:11 139:21
  141:2
speaking 140:21 141:9,10
speaks 111:6
specialized 15:19
specific 29:8,10 44:20 47:6
  48:12 52:11 60:15 64:13,15
  76:16 79:15 83:1,1,2 95:3
  112:2 120:16
specifically 25:15 28:12 29:5
  31:8 32:17 33:16 39:10,21
  40:15 42:20 43:16 53:22
  62:7,24 63:5 68:11 74:9
  77:5 79:5,15 101:21 104:16
  120:7 121:20,24 123:7
SPECTER 2:3
spend 17:13
spent 21:3
sponsored 19:10
Stacey 1:3 4:8 60:8 155:19
staff 13:18 14:6 15:13,22
  116:16
stage 28:3 108:24
stand 125:3
standard 33:4 43:4 92:18
  102:21,23,24 103:2,9 106:3
  106:10 115:1,3 127:6
  130:23 131:20 133:3 139:16
  155:18
standards 33:14 103:3,4
start 8:9 87:3 151:5

started 19:21 22:1 88:16 92:2
  130:23
starting 18:4 92:14
starts 88:1,2 144:8
state 11:6 30:8,11,20 31:13
  32:16 33:21 36:5,7,8 43:5
  43:12,13 44:19 47:14 49:13
  50:5 51:12 57:18 60:3
  62:24 66:3 67:5,11 102:18
  114:17 125:8 130:9,10
  131:2 142:13 150:12,18,23
  158:5
stated 60:19 67:3 78:4 79:9
  79:22 90:17 131:10
states 1:1 4:6 20:14 21:18
  22:10 32:20 43:6,13 49:24
  56:13 62:14 65:11 67:24
  73:23 76:6 77:7,7 78:11
  100:1 103:20 107:16 114:21
  117:23 126:1 131:3,5 134:5
  149:21 150:13
stating 81:21 142:1
stationed 20:16
status 20:20
statute 125:8
statutes 43:13 125:19
stay 69:4
stenographic 4:13 157:7
steps 113:17 141:14
sterile 21:22 33:8 102:7,9,11
  103:15
sterility 103:3
steroid 29:13 72:20 75:11,13
  94:5,12,16 95:8 110:13
  122:6 128:1
steroids 74:12 76:10 105:19
  118:11,15 121:18,22 122:1
  152:5,7
stick 32:13
stopped 87:2 93:23
store 22:19 32:4
strategies 10:11
street 1:21 2:4,9 19:8,14,17
strike 12:1 19:4 20:8 39:12
  98:16 119:10 144:5 146:17
students 66:18,21
studied 25:7

studies 27:17 100:12
study 25:1,13,14,19 28:5
  64:15
sub-excess 143:16
subject 158:10
submit 30:5 70:9 98:8
submits 111:1
submitted 70:17 71:4 112:17
submitting 111:4
Subscribed 159:18
subsequent 49:11 110:10
  134:10 135:20 142:24
subsequently 10:18 20:20
  27:8 40:9 68:16 73:17
subspecialties 34:13
substance 45:5,7,10,13,15
  159:8
substances 45:2,3
substantial 149:3,5,7
substantially 140:14
successful 16:8
suffering 64:18,20 139:18
  140:11,18 142:12
Suite 1:22 2:9
suits 51:21
sum 149:3
summarized 133:10
summary 17:5
superior 149:23
supervision 21:21
supervisor 16:16
support 92:11,15
suppose 77:14
sure 5:15,17,20 6:22 11:13
  12:7 15:18 16:5 17:18
  26:22 29:16 33:13 46:20
  47:9 48:8 52:24 54:11,15,15
  65:6 67:20 69:19 70:11,12
  73:10,17 76:6 81:16 84:8,22
  88:18 90:4 91:6 92:10
  93:17 99:2,14 102:4 106:7
  110:5 128:18 136:12,24
  137:22 140:10 143:19
  145:11 147:1 151:4
surprise 137:10 139:13
surrounding 49:16 50:2
SUSAN 2:8

**swear** 4:16
**switch** 89:2,10 90:9
**sworn** 4:18 159:18
**symptomatology** 82:1 87:4
**symptoms** 62:2 68:4 69:13
  87:12,15,16,20,22 94:2
**system** 11:2 12:9,12,16 13:11
  18:6,13 19:5,16,18,19,23
  23:14,15,21,22 24:1,5,11
  25:2 44:24 53:24 54:1,2,3
  54:15,16 55:1,10 56:2 57:9
  57:19 87:16 96:19,20,21
  98:21 114:10 115:5 116:6
  117:3 122:2,7,17 148:21
  149:9 150:8,16,17
**systems** 23:23 27:22

**T**
**T** 2:19 3:13 157:1,1
**tablets** 69:1 72:18,19 102:2
  154:24
**tabs** 69:18 70:14 128:13,18
**tafenoquine** 119:17,23 120:5
  143:7
**take** 5:7 6:7,8,9,11 26:20
  30:3 44:15 45:19,22 54:1
  58:7 69:1,10,17 72:17 82:23
  98:5 106:9 116:11 117:9
  118:7 137:7 143:22
**taken** 1:14 4:2 46:4 117:16
  123:12 124:2 157:7
**takes** 59:6
**talk** 46:21 73:17,21 75:16,21
  76:12 78:16 113:8 120:8
  121:4 135:1 139:24 151:13
  151:24
**talked** 24:16,17 66:10 78:4
  84:1 101:3 118:23 132:4
**talking** 52:14 74:12 75:11,20
  76:19 77:2,16 79:5 101:6,6
  102:23,24 103:2 112:2
  127:6
**talks** 58:1
**tantrum** 132:8
**tap** 31:2
**taper** 106:17,19,20 107:1,5
  107:10

**tapered** 94:3
**tapering** 95:13
**taught** 65:12,16
**TCC** 6:22 72:24 137:12,15,18
**teach** 66:15
**teaching** 66:17,22
**team** 52:15 54:8,17 96:19
  98:18
**tech** 20:12 21:15 22:7
**tech's** 21:18
**technically** 56:20 92:24
**technician** 14:18 20:15,23
  22:14
**technology** 53:1,8,10 93:7
**telephone** 54:13 55:13
**tell** 8:7 10:14 36:5 53:13 65:7
**temper** 132:7
**term** 31:10,17 53:23 56:5,21
  76:23 80:2 85:22 94:13
  99:2 100:21 104:4,9,12,14
  105:21 124:21 136:13
**termed** 86:19 129:12
**terming** 129:20
**terminology** 83:10 108:21
**terms** 42:6,12 43:6,21 73:2
  76:22 80:2 101:14 110:13
  115:20 121:13
**tertiary** 26:2,5
**test** 30:3 67:10,12,15,18 68:1
**testified** 4:19 5:15 36:5,9
  37:3 39:5,23,23 40:11 41:14
  41:15,21 42:9,16 44:18
  46:12 77:8,23 78:22 80:14
  105:17 155:15
**testify** 36:22
**testifying** 7:16
**testimony** 3:19 8:12 35:15,19
  35:22 36:12,13,14,14,15,16
  36:19 37:20 39:12,15 42:10
  46:9 50:23 51:5,16,20 60:4
  74:8 78:11,11 79:23 124:7
  129:5,10 137:11 147:9
**testing** 17:4 27:14 29:21
**text** 54:4,13
**textbooks** 49:4,5 50:10 78:15
**Thank** 6:14 24:13 45:4 67:2
  84:4 155:4,23

**theme** 27:16,21
**themes** 28:10
**therapeutic** 28:21 49:23 65:9
  90:16 91:15 92:24 93:4
  94:10 126:21 152:23
**therapeutically** 88:4,5,9,12
  92:19
**therapeutics** 17:2
**therapies** 41:9 106:9
**therapy** 41:10 46:14,19,24
  47:15,18 48:6,11 61:8 74:14
  94:6 137:24 147:8,16
**thereof** 68:19
**thing** 5:19 65:14 105:8 113:6
**things** 20:13 47:23 48:21
  52:1 86:17 87:14 101:8
  108:5 118:19,21 134:19,21
**think** 7:2,5,23 11:13 21:12
  22:5 34:3 37:9 38:24 40:18
  41:18 47:12 48:15 51:5,24
  59:24 61:14 64:12 69:12,19
  77:22,23 78:2 79:3,4 81:18
  81:20 83:24 84:6,20 87:24
  93:14 94:21 95:20 99:17,21
  100:4 101:23 102:1 104:3,4
  104:6,19 105:3 106:19
  110:15 112:19 113:1,21,23
  115:15 120:24 121:9 123:18
  124:6 126:18 127:5,9
  134:22 135:2,21 137:10
  141:13 145:3 147:5 149:21
  151:2,19 154:1
**thinking** 31:18 66:16 111:8
**thinks** 112:4
**third** 28:14 88:1,2 103:17
  133:10 141:1 142:4
**thirty** 158:15
**Thomas** 1:8 3:3 4:12,17
  39:23
**thorough** 99:1 127:7
**thought** 85:7 94:1 97:5
  130:22
**thoughts** 93:2
**three** 80:14 137:8 151:1
**thromboembolic** 47:21
**thrombosis** 47:23 48:2
**Thursday** 1:16 4:2

**tie** 80:24
**time** 4:20 12:2 16:22 17:11
    17:21 20:7,17 22:1 35:22
    46:3 52:8,19,22 53:13,22
    69:14 72:15 83:2 88:11,14
    94:15,15,16 95:8,12 105:20
    106:4,21 109:13 110:24
    117:15 128:1 130:17 131:18
    146:8 149:19 155:5 156:6
**timeframe** 35:13 68:10 116:7
**times** 35:18 36:4,5 37:4 41:13
    41:14,21 42:8,9,15 50:24
    64:17 151:19 155:15
**timesheet** 6:20
**title** 9:21
**titrated** 94:21
**today** 48:9 53:11 62:24
    141:14 142:21 144:20 150:7
    150:10,21
**today's** 8:2
**tool** 25:3
**tools** 77:1,4 101:12,13 108:18
**top** 50:7 75:5 99:23
**total** 84:13,24
**totaled** 137:6
**totality** 43:1,17 49:15 77:24
    80:9 132:21
**totally** 38:7
**toxicities** 86:8
**toxicity** 86:1,4,12
**tract** 122:6,11
**Trader** 61:17
**traditional** 134:13
**traditionally** 102:1
**trail** 56:3
**trained** 11:16 20:15
**training** 15:23 16:1,13 88:21
    89:6
**transcript** 1:13 5:23 7:4,6,10
    7:10,14 151:12 157:6
    158:16,17
**transcription** 159:6
**transcripts** 6:23 7:4
**transplant** 26:9
**trauma** 26:9
**treat** 48:3 56:9 62:21 63:12
    64:20 74:10 76:16 105:2,4

119:14
**treated** 40:9 63:1 86:6 97:8
    107:21
**treating** 52:11,15 54:18
    60:13 64:10 71:8 75:20
    78:23 86:17 89:10 90:8,11
    97:10 99:4,19 129:1 133:24
    141:9,11 144:4 147:11
**treatment** 56:6,8 61:23 62:16
    63:15 64:7 66:5,11 73:20
    74:14 77:11,19,20 78:7,23
    79:17 81:9 82:22 103:21
    105:6,11,14 109:6 112:12
    118:2 135:8 136:11 138:14
    138:24 139:3,21,22 140:12
    140:12,21 141:24 145:18
    155:19
**treatments** 60:20
**trial** 36:9,14,16 51:3,7
**trials** 51:15
**trickled** 131:1
**Tripler** 20:16 22:6,7
**troche** 60:20,20
**trouble** 147:5
**true** 78:9 100:14 120:19
    157:6
**trying** 51:24 87:20 115:15,19
**Tuckhannock** 73:11,13
**Tunkhannock** 1:8 2:11
**turning** 25:21 46:8 68:3
    108:13 117:20
**two** 16:13 19:8 28:24 29:23
    30:1,2,3,10 33:6,9 48:16
    58:20 74:2 80:13 82:13
    89:14 92:19 102:5 109:12
    122:2 129:13 134:17 137:7
    138:5,21 147:7 148:7,8
    151:1 153:8
**two-thirds** 117:23
**type** 14:5 15:13 41:8 64:20,21
    87:15 115:5 126:5
**types** 32:2 33:6 43:7 56:14
    89:21 102:6 123:11
**typewriter** 53:11
**typical** 74:24
**typically** 26:7 31:9 70:5
    72:10 85:2 101:8 147:20

**typing** 53:10
**typo** 112:5

----

**U**

**U.S** 20:11
**UF** 24:12
**ultimately** 27:22
**unable** 92:10
**unavoidable** 87:23
**uncommon** 72:6,7
**undergo** 87:6,9
**undergrad** 16:19
**underneath** 14:15
**understand** 5:8,10,16,23 6:4
    6:13 12:4 46:23 61:6 93:15
    140:23,24 146:23
**understanding** 12:8 61:18
    63:10 64:3 67:1 71:11,13
    77:16 80:17 81:18,19 82:20
    106:11 109:5 128:3 130:24
    147:9
**understood** 20:10 57:2 67:2
    81:16 90:22 105:17 116:13
**United** 1:1,22 4:5 20:13
    21:18 22:10 43:6 114:21
    149:21 150:13
**units** 13:20
**universe** 43:17 50:19
**university** 9:17 11:18 13:11
    18:12 19:5,14,15,23 21:8
    22:2 23:13 24:5,9,10 27:6
    29:11 35:5 53:15 54:21
    57:18 65:22 70:8 96:13,18
    98:9 114:9,23 117:3 148:21
    149:14,18 150:11,15,18
**unknown** 40:8
**unquote** 13:23 86:24
**unreasonable** 124:20 126:3
    126:14 127:15,17
**updated** 37:10
**use** 19:12 24:1 26:13 50:21
    56:5 64:19 65:17 66:22
    71:24 72:2 74:10 77:12
    80:18 81:17 83:17 94:12,16
    95:9 105:3 106:14 107:4
    135:9 136:22 145:2 150:8
    150:16

THOMAS JOHNS, Pharm.D.

**useful** 152:15
**uses** 100:5
**usually** 13:10 14:14 72:1
88:22 106:2 125:4,8,13
131:10
**utilization** 49:18,19,20 55:20
56:1,4 58:9,15,19 91:14
99:1 103:1 111:5 114:12
120:13 127:8 132:2,10
134:19 136:3 140:20 141:15
142:20
**utilize** 23:22 59:20 101:13,14
150:7
**utilized** 13:21

---

**V**

**v** 39:23
**VA** 11:21 15:17 16:3 19:4,9
19:12,13
**vague** 94:13
**valid** 113:22
**validate** 113:1
**validation** 24:21
**vancomycin** 28:22
**variable** 118:1,7,16,17,20
**variables** 127:1
**variety** 11:15 15:21,22 16:7
16:23 17:1,3 20:13 21:23
25:8,10 30:19 48:19,21 49:2
62:13 66:15 76:18 87:14
101:17 107:16 108:5 121:15
131:3 133:10 138:12 144:17
**various** 6:23 10:20,23 66:10
66:10 152:7
**vary** 126:13
**vein** 48:1
**venous** 47:23
**venture** 41:23 43:2
**verbal** 55:12,15 133:6 148:4
**verbally** 92:12
**verification** 11:12 18:18
46:13
**verified** 15:11 18:22 44:21
48:10 52:19,22 62:20 84:7
84:14,19 85:10,13,16,19
117:5
**verifies** 13:17 147:2

**verify** 11:2 12:18,19 13:5
54:22 59:1 64:9,23 66:11
80:3 92:20 101:2 114:11
115:17 146:14
**verifying** 10:17 12:7,8 16:4
17:13 42:6,12
**verses** 42:1
**versus** 4:8 36:6 37:19 39:4,20
40:11,23 43:7 81:3 84:23
106:3 132:14 149:10
**vice** 9:22,24 10:6,13,22 17:12
**video** 5:10 46:2,6 117:14,18
146:7,11 155:7 156:5
**videoconferencing** 1:16
**videographer** 2:22 4:1,20
46:1,5 117:13,17 146:6,10
155:6,24 156:4
**videotape** 1:4,13 4:11
**view** 31:20
**Vitae** 3:18
**vitamin** 60:22 61:16
**voluntarily** 47:14
**vs** 1:6

---

**W**

**W/H** 1:4
**Walgreens** 31:19 32:3,19
75:2 148:13
**want** 9:9 28:8 37:13 42:22
45:20,23 69:2 72:15 73:8
76:4 109:6 151:11,24
**wanted** 5:16 105:18 119:12
**wanting** 88:22 116:17
**wants** 132:7
**War** 20:21
**warrants** 66:24
**wasn't** 99:14
**way** 9:8 14:2 19:20 53:9 93:6
115:15 116:14,18 117:23
131:17 134:22
**ways** 131:3
**we'll** 8:16 32:11 106:9
**we're** 5:7 8:8,8 23:20 45:15
66:21 73:17 87:20 102:23
102:24 103:2 117:24 127:5
128:5 131:22 141:23
**we've** 24:15,17 98:18 99:21

106:19 118:23 121:17 124:6
126:18 134:18 141:13 142:3
144:19 145:19,22 150:9,20
153:20
**wealth** 50:18
**web** 100:6,24
**website** 100:6,24
**week** 10:15 11:4 64:17
**weeks** 36:20 40:10 145:15
**weight** 86:17 118:9 127:1
**went** 5:5 52:8
**WERNER** 2:13
**whichever** 9:8
**Williams** 39:4,19
**willing** 67:23
**Winterstein** 25:23 26:24,24
27:1,17
**wise** 17:13,16 67:14
**wishes** 7:22 55:11
**withdrawal** 86:21,23 87:6,9
87:12,20,22 93:18,23 94:2,8
94:11 120:1,4 144:12,19,21
**witness** 3:2 4:16 50:13 51:14
70:21 76:3 78:19 79:3,21
80:8 81:13 83:6,24 91:5
92:7 93:14 110:2 116:2
120:24 122:10 126:11 127:5
129:4 138:18 139:8 140:5
141:23 154:17 158:1
**Wolking** 1:3,4 4:8 60:8,14,19
61:20 68:7,16 72:24 73:20
77:10,19,19 79:6,12,16
80:16,18 81:17 95:2,3,9
121:5 127:24 129:9,14
134:16,23 135:3,10 137:1,7
154:22 155:20
**Wolking's** 7:4,6 60:4 61:22
95:18 129:10 143:5,8,11,18
152:3
**word** 12:11 84:20
**words** 44:13 47:5 64:16 97:9
119:12 129:13 153:1
**work** 22:10 23:6 24:9 35:5
116:16 150:10
**working** 15:21 52:10 93:7
**works** 19:18 102:20,21
117:11

THOMAS JOHNS, Pharm.D.

**wouldn't** 23:10 31:10 80:1
  95:10 137:10 138:9 139:13
  150:19
**write** 70:7 139:22 140:13
**writes** 56:8,12
**writing** 59:19
**written** 5:22 70:12,15 71:4
  78:10 82:8,9,19 90:24 112:7
  113:7 133:7 135:15 137:5
  152:21
**wrong** 31:2
**wrote** 61:20 77:22 124:19
**Wyoming** 2:14

---
**X**

**X** 3:1,13 98:4,5

---
**Y**

**Y** 98:5
**yeah** 16:5 22:5 23:15 25:13
  37:15,15 45:22,23 65:4 84:3
  85:1 99:21 101:5 112:1
  117:11 125:23 140:8 147:19
  147:20 149:2 151:7
**year** 11:21 16:12,12 20:1
  21:3,12 22:20 23:5,6 30:10
  30:13
**years** 18:9,10 21:1,3 27:15
  29:8,23 30:1,2,3,10 35:8,16
  35:18 36:17 43:21 52:12,12
  52:17,21 53:17 65:16
  130:24 152:5
**yesterday** 8:13 37:10 46:11
**Young** 7:11 68:17 73:22 74:8
  74:16 75:17 76:9 77:5 78:5
  78:22 79:9 80:14 81:19,20
  88:3 90:15,22 103:22
  105:17 120:9
**Young's** 7:9
**Youngs** 1:7 2:10 5:6

---
**Z**

**Z** 98:6
**Zoom** 1:15 4:4

---
**0**

**0.75** 110:17

---
**1**

**1** 3:17 8:10 26:9 45:18 59:16
  60:7 64:20 95:16 110:18,19
  124:19 156:8 161:1
**10** 17:17 43:21 68:24 69:1,18
  70:14 95:11 109:13 128:13
  128:18 154:24,24
**10:03** 46:1
**10:12** 46:5
**100** 60:20 67:20 69:7 111:7
  128:20 155:1
**11:45** 117:8
**11:46** 117:13
**11:52** 117:17
**110,000,000** 149:16
**12** 30:12 60:20
**12:32** 146:6,10
**12:43** 155:6
**12:44** 156:4,9
**15** 30:9 53:17
**151** 3:6
**1520** 1:22
**1525** 2:4
**153** 3:5
**155** 3:8
**156** 3:17,18,19,20
**161** 3:17
**162** 3:18
**163** 3:19
**164** 3:20
**16th** 90:15 129:18 153:2
**17th** 1:21 62:4
**18503** 2:14
**19102** 2:5
**19103** 1:23 2:9
**1983** 21:14 22:1
**1987** 19:22
**1991** 21:15
**1992** 11:18
**1993** 20:8 22:15
**1994** 20:9 23:8
**1998** 28:14
**1999** 18:4,16,21 24:14 53:1,4
  53:7
**19th** 2:4 73:1
**1st** 60:11,14 62:3

---
**2**

**2** 3:18 8:11 24:19 61:19 64:21
  68:3 95:16,22 127:14 128:4
  129:12 134:4 162:1
**20** 27:15 29:8 43:21 109:13
**2000** 44:5
**2000s** 35:3,10
**2001** 2:9
**2002** 27:24
**2013** 60:11,14,19 61:21 62:3
**2022** 37:20 61:21 62:4 68:12
  73:1 77:10 95:19 129:14
  152:6,10
**2024** 1:16 4:3 41:4 46:9
**215** 1:24
**25** 29:8
**253** 17:24
**26th** 153:2
**27th** 129:19

---
**3**

**3** 3:19 8:11 25:21 35:14 37:2
  37:7 41:24 75:5 79:9 80:14
  87:24 129:13 163:1
**3:23-cv-00806-JFS** 1:2
**30** 1:21 30:10 35:20,21 36:4
  41:13,19 42:9,15 50:24
  94:20 158:15
**30(b)(6)** 7:10
**3810** 2:9

---
**4**

**4** 3:5,20 8:14 28:13 99:23
  103:17 156:8 164:1
**4/18/24** 3:20
**40** 41:19
**415** 2:14

---
**5**

**5** 17:19 18:23 19:1 45:18
  108:13 110:16 117:21 120:8
  121:10 123:16,23
**500** 68:24
**564-1233** 1:24
**5th** 129:19

---
**6**

THOMAS JOHNS, Pharm.D.

**6** 1:16 129:12 134:5
**60** 41:19 90:1 94:20 109:1
  151:14,17
**68** 108:16
**6th** 4:3

---

**7**

**7** 95:11 110:18,18
**70** 41:19 90:2
**700** 111:3,8,23

---

**8**

**8** 33:23
**80** 109:1,7,18,21,22 110:7,11
  128:16 151:14,17,22 153:14
  153:17
**800** 111:2
**806** 4:7
**83** 20:14 22:2
**87** 20:15,17 22:3
**8th** 68:23 80:16 127:13 128:6
  128:7,12 129:18 137:2,9,18
  142:17 152:5,10

---

**9**

**9** 8:13 35:14 37:7
**9:00** 4:3
**9:11** 1:17
**9:12** 4:21
**900** 17:22
**90s** 35:3,24
**93** 20:6
**94** 20:6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STACEY WOLKING and<br>DARYL WOLKING, W/H<br><br>               Plaintiffs,<br><br>    v.<br><br>HENRY LINDER, M.D., and YOUNGS<br>APOTHECARY, INC.<br>d/b/a TUNKHANNOCK COMPOUNDING<br>CENTER<br><br>            Defendants. | CIVIL ACTION<br>3:23-cv-00806-JFS<br><br>JURY TRIAL DEMANDED<br><br>**AMENDED NOTICE OF DEPOSITION**<br>**OF THOMAS JOHNS, PHARM.D.** |

TO:    Thomas Johns, Pharm.D.
          c/o Conor Lamb, Esquire
          Kline & Specter, P.C.
          1525 Locust Street
          19th Floor
          Philadelphia, PA 19102
          *Attorney for Plaintiff*

**PLEASE TAKE NOTICE** that pursuant to the Federal Rules of Civil Procedure, Defendant Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding Center will take the deposition, upon oral examination before a person authorized by the laws of the State of Pennsylvania to administer oaths, of **Thomas Johns, Pharm.D.,** via Zoom videoconferencing or some other virtual platform, commencing on **Thursday, June 6, 2024 beginning at 9:00 a.m.** and continuing every day thereafter until completion. The deposition is to be simultaneously recorded by sound, visual, stenographic, and Zoom recording.

The deponent shall bring with him any and all documents, recordings, and tangible things, including all notes, correspondence, photos, and memoranda, related to this litigation.

**MCCORMICK & PRIORE, P.C.**

By: ___/s/ Susan C. Keesler___

Philip D. Priore, Esquire
Attorney ID: 38987
Conrad James Benedetto, Esquire
Attorney ID: 312404
Susan C. Keesler, Esquire
Attorney ID: 312977
2001 Market Street, Suite 3810
Philadelphia, PA 19103
(T) 215-972-0161
(F) 215-972-5580
ppriore@mccormickpriore.com
cbenedetto@mccormickpriore.com
skeesler@mccormickpriore.com
Attorneys for Defendant,
Youngs Apothecary, Inc. d/b/a
Tunkhannock Compounding Center

Date: June 3, 2024

<u>**CERTIFICATE OF SERVICE**</u>

I, Susan C. Keesler, certify that the foregoing Notice of Deposition of Thomas Johns, Pharm.D.,

was served on parties of record by electronic mail on this day:

Conor Lamb, Esquire
Kline & Specter, P.C.
1525 Locust Street
19th Floor
Philadelphia, PA 19102
215-772-1000
215-402-2359
***Attorney for Plaintiff***

Amy A. Shwed, Esquire
Cipriani & Werner, P.C.
415 Wyoming Ave.
Scranton, PA 18503
570-347-0600
***Attorney for Defendant,***
***Hendry Lindner, M.D.***

**MCCORMICK & PRIORE, P.C.**

By:____*/s/ Susan C. Keesler*_____
    Philip D. Priore, Esquire
    Attorney ID: 38987
    Conrad James Benedetto, Esquire
    Attorney ID: 312404
    Susan C. Keesler, Esquire
    Attorney ID: 312977
    2001 Market Street, Suite 3810
    Philadelphia, PA 19103
    (T) 215-972-0161
    (F) 215-972-5580
    ppriore@mccormickpriore.com
    cbenedetto@mccormickpriore.com
    skeesler@mccormickpriore.com
    Attorneys for Defendant,
    Youngs Apothecary, Inc. d/b/a
    Tunkhannock Compounding Center

Date: <u>June 3, 2024</u>

**Curriculum Vitae**

# Thomas Johns, PharmD

---

## Personal Information

Work Address:          UF Health Shands Hospital
                       Gainesville, Florida
                       (352) 219-9567
                       johtho@shands.ufl.edu

Home Address:          5902 NW 72nd Street
                       Gainesville, Florida 32653
                       (352) 219-9567
                       thomasjohns729@gmail.com

Licensure:             Florida (Pharmacist) PS 28039
                       Florida (Consultant Pharmacist) PU 5721

## Education and Training

1992-1993              Adult Internal Medicine Pharmacy Practice Residency
                       VA Medical Center/ University of Florida College of Pharmacy
                       Gainesville, Florida

1987-1992              Doctor of Pharmacy
                       University of Florida College of Pharmacy
                       Gainesville, Florida

## Professional Experience

Apr 2021-Present       Associate Vice President, Operations
                       UF Health Shands Hospital, Gainesville, Florida

                       Serve as hospital leader with oversight of clinical departments including
                       Pharmacy, Radiology, Radiation Oncology, Ambulatory Infusion Center, and
                       Cancer Registry.

                       • Responsible for greater than 900 employees.
                       • Administer annual budget of $253M in total operating expense.
                       • Pharmacy areas include inpatient operations across three patient care
                         towers, four outpatient pharmacies, ambulatory infusion center pharmacy,
                         offsite supply chain distribution and 340B program compliance.

*Curriculum Vitae*
*Thomas Johns*
*Page 2*

| | |
|---|---|
| Aug 2020-Apr 2021 | Executive Director, Operations/Pharmacy<br>UF Health Shands Hospital, Gainesville, Florida |
| Apr 2018-Aug 2020 | Director, Pharmacy and Operations<br>UF Health Shands Hospital, Gainesville, Florida |
| Mar 2014-Apr 2018 | Director, Pharmacy Services<br>UF Health Shands Hospital, Gainesville, Florida |
| Mar 2013-Mar 2014 | Interim Director, Pharmacy Services<br>UF Health Shands Hospital, Gainesville, Florida |
| Apr 1999-Mar 2013 | Assistant Director, Pharmacy Services<br>Shands at the University of Florida, Gainesville, Florida |
| Jul 1994-Apr 1999 | Clinical Pharmacist, Adult Internal Medicine/Infectious Diseases<br>Shands at the University of Florida, Gainesville, Florida |
| Aug 1993-Jul 1994 | Clinical Pharmacist, Adult Internal Medicine<br>Florida Hospital Medical Center, Orlando, Florida |
| Jul 1983-Jan 2001 | US Army/Army Reserve<br>　　　Pharmacy Technician 1983-1993<br>　　　Persian Gulf War Veteran 1990-1991<br>　　　Pharmacist 1993-2001 |

## Academic Appointments

| | |
|---|---|
| Feb 2013-Present | Clinical Associate Professor<br>Department of Pharmaceutical Outcomes and Policy<br>University of Florida College of Pharmacy, Gainesville, Florida |
| Sept 1992-Feb 2013 | Clinical Assistant Professor<br>University of Florida College of Pharmacy, Gainesville, Florida |

## Publications

Winterstein AG, Staley B, Henrickson C, Xu Dandan, Lipori G, Jeon N, Choi Y, Li Y, Castillo JH, Soria-Saucedo R, Brumback B, **Johns TE**.  Development and validation of a complexity-score to rank hospitalized patients at risk for preventable adverse drug events. *Am J Health-Syst Pharm* 2017;74(23):1970-1984.

*Curriculum Vitae*
*Thomas Johns*
*Page 3*

---

Jeon N, Staley B, **Johns TE**, Lipori G, Brumback B, Segal R, Winterstein AG.  Identifying and characterizing preventable adverse drug events for pharmacist intervention in hospitals. *Am J Health-Syst Pharm* 2017;74(21):1774-1783.

Winterstein AG, **Johns TE**, Campbell KN, Libby J, and Pannell R.  Development of a medication safety and quality survey for small rural hospitals.  *Journal of Patient Safety*.  2017 Dec;13(4):249-254.

Guervil DJ, Rosenberg AF, Winterstein AG, Harris NS, **Johns TE**, and Zumberg MS.  Activated partial thromboplastin time versus antifactor Xa heparin assay in monitoring unfractionated heparin by continuous intravenous infusion. *Ann Pharmacother* 2011;45:861-868.

Hartzema AG, Winterstein AG, **Johns TE**, De Leon JM, Bailey W, McDonald K, and Pannell R.  Planning for pharmacy health information technology in critical access hospitals.  *Am J Health-Syst Pharm* 2007;64:315-321.

Winterstein AG, Hartzema AG, **Johns TE**, De Leon JM, McDonald K, Henshaw Z, and Pannell R.  Medication safety infrastructure in critical-access hospitals in Florida.  *Am J Health-Syst Pharm* 2006;63:442-450.

Smith WD, Winterstein AG, **Johns TE**, Rosenberg EI, Sauer BC.  Causes of hyperglycemia and hypoglycemia in adult inpatients. *Am J Health-Syst Pharm* 2005;62:714-719.

Winterstein AG, **Johns TE**, Rosenberg EI, Hatton RC, Gonzalez-Rothi R, Kanjanarat P.  Nature and causes of clinically significant medication errors in a tertiary care hospital. *Am J Health-Syst Pharm* 2004;61:1908-1916.

Orrick JJ, Segal R, **Johns TE**, Russell WR, Wang F, Yin D.   Resource use and cost of care for patients hospitalized with community acquired pneumonia.  Impact of adherence to Infectious Diseases Society of America Guidelines.  *Pharmacoeconomics* 2004;22(11):751-757.

Kanjanarat P, Winterstein AG, **Johns TE**, Hatton RC, Gonzalez-Rothi R, Segal R.  Nature of preventable adverse drug events in hospitals: A literature review. *Am J Health-Syst Pharm* 2003;60:1750-1759.

Winterstein AG, Hatton RC, Gonzalez-Rothi R, **Johns TE**, Segal R.  Identifying clinically significant preventable adverse drug events through a hospital's database of adverse drug reaction reports.  *Am J Health-Syst Pharm* 2002;59:1742-1749.

Orrick JJ, **Johns TE**, Janelle J, Ramphal R.  Thrombocytopenia secondary to linezolid administration: What is the Risk? (Letter) *Clin Infect Dis* 2002;35:348-349.

Eversole A, Hancock W, **Johns TE**, Lopez LM, Conti CR.  Ibutilide:  Efficacy and safety in atrial fibrillation and atrial flutter in a general cardiology practice.  *Clin Cardiol*  2001;24:521-525.

*Curriculum Vitae*
*Thomas Johns*
*Page 4*

---

**Johns TE**, Klinker KP, Lopez LM.  Antihypertensive therapy made easier.  *Patient Care* 1999;33(11):109-124.

Hammett-Stabler CA, **Johns TE**.  Antibiotic Drug Monitoring.  In: Warner A, Annesley T, eds.  *Standards of Laboratory Practice: Guidelines for Therapeutic Drug Monitoring Services*. The National Academy of Clinical Biochemistry, 1999.

Klinker KP, **Johns TE**, Lopez LM. Fixed-dose Antihypertensives: What you need to know.  *IM Internal Medicine* 1998;19(10):15-26.

Harbilas JW, **Johns TE**.  Treatment of Cytomegalovirus Retinitis in Patients with HIV Disease.  *Home HealthCare Consultant* 1998;5(8)25-32.

Hammett-Stabler CA, **Johns TE**.  Laboratory Guidelines for Monitoring of Antimicrobial Drugs.  *Clinical Chemistry* 1998;44(5):1129-40.

Bell D, **Johns TE**, Lopez LM.  Endothelial Dysfunction: Implications for Therapy of Cardiovascular Diseases.  *Ann Pharmacother* 1998;32:459-70.

**Johns TE**, Buring SM, Marshik PL.  Inhaled Corticosteroids for the Management of Asthma.  *Drug Store News Chain Pharmacy*, July 14, 1997.

**Johns TE**, Iafrate P, Sproat TT, Palmer S.  Antibiotic Treatment of Infective Endocarditis. (Letter) *JAMA* 1996;275:911.

**Johns TE**, Lopez LM.  Bisoprolol: Is This Just Another Beta-Blocker for Hypertension or Angina?  *Ann Pharmacother* 1995;29:403-414.

## Book Chapters

Whitby DH, **Johns TE**.  Drug-Induced Hematologic Disorders.  In: DiPiro JT, Talbert RL, Yee GC, et al, eds.  *Pharmacotherapy: A Pathophysiologic Approach*. 7th ed.  New York, NY: McGraw-Hill, 2008.

Weaver J, **Johns TE**.  Drug-Induced Hematologic Disorders.  In: DiPiro JT, Talbert RL, Yee GC, et al, eds.  *Pharmacotherapy: A Pathophysiologic Approach*. 6th ed.  New York, NY: McGraw-Hill, 2005.

Klinker K, Harbilas JW, **Johns TE**.  Drug-Induced Hematologic Disorders.  In: DiPiro JT, Talbert RL, Yee GC, et al, eds.  *Pharmacotherapy: A Pathophysiologic Approach*. 5th ed.  New York, NY: McGraw-Hill, 2002.
**Johns TE**, Harbilas JW.  Drug-Induced Hematologic Disorders.  In: DiPiro JT, Talbert RL, Yee GC, et al, eds.  *Pharmacotherapy: A Pathophysiologic Approach*. 4th ed.  Stamford, CT: Appleton & Lange, 1999.

Uphold C, **Johns TE**.  Upper Respiratory Disorders.  In: Youngkin E, Sawin K, Kissinger J, Israel D, eds.  *Pharmacotherapeutics: A Primary Care Clinical Guide, first edition*.  Stamford, CT: Appleton & Lange, 1999.

*Curriculum Vitae*
*Thomas Johns*
*Page 5*

## Poster Presentations/Abstracts

Li Y, Staley B, Henriksen C, Kubilis P, Lipori G, Brumback B, **Johns TE**, Winterstein AG. The Development of a dynamic Risk Model for Hospital-associated Hyperkalemia. 32nd International Conference of Pharmacoepidemiology & Therapeutic Risk Management, Dublin, Ireland; August 2016. Pharmacoepi Drug Saf 2016;25(Suppl. 3):301.

Kiskaddon A, **Johns TE**, Staley B, and Winterstein A. Identifying risk factors associated with inpatient hyperglycemic events to develop a dynamic risk model. Poster session presented at: 48th Annual Meeting of the Florida Society of Health-System Pharmacists. August 2014, Orlando, Florida.

Mandernach M, Lottenberg R, **Johns TE**, Speed E, Findlay R, Hou W, Rajasekhar A. Effectiveness of Standardized Venous Thromboembolism Prophylaxis Order Sets in Patients Undergoing Abdominal or Pelvic Surgery for Cancer. Abstract 4248. American Society of Hematology. December 2012, Atlanta, Georgia.

Hogan C, Winterstein AG, **Johns TE**, Layon J, Russin M, Klodell CT. Weight-based heparin protocols are efficacious - but are they effective? Annual Meeting of the Society of Critical Care Medicine. January 2006, San Francisco, California.

Norberg JA, Winterstein AG, **Johns TE**, LeClaire AC. Insulin infusion protocols improve glycemic control, or do they? Abstract 72. Annual Meeting of American College of Clinical Pharmacy. October 2005, San Francisco, California.

Winterstein AG, **Johns TE**, Hatton RC, Weiner DI. Incidence of acute renal failure associated with inappropriate use of NSAIDs in acute care. 20th International Conference on Pharmacoepidemiology and Theraoeutic Risk Management. August 22-25, 2004. Bordeaux, France. Pharmacepidem Drug Saf 2004;13:S8.

Winterstein AG, **Johns TE**, Hatton RC, Rosenber EI, Gonzalez-Rothi R, Smith WD. Screening logic to establish the incidence of preventable hypoglycemic events in acute care. 20th International Conference on Pharmacoepidemiology and Theraoeutic Risk Management. August 22-25, 2004. Bordeaux, France. Pharmacepidem Drug Saf 2004;13:S212.

Winterstein AG, Weiner ID, **Johns TE**, Hatton RC. Validation of automated database algorithms to identify hospital-acquired acute renal failure. ISPOR 9th Annual International Meeting of the International Society for Pharmacoeconomics and Outcomes Research, May 2004, Arlington, VA. Value in Health 2004;7(3):366.

Winterstein AG, Rosenberg EI, **Johns TE**, Hatton RC, Smith W. Nature of medication errors of omission identified through solicited reports by attending physicians in an academic medical center. Presented at the Society of General Internal Medicine Meeting, February 2004, New Orleans, Louisiana.

*Curriculum Vitae*
*Thomas Johns*
*Page 6*

Smith WD, Winterstein AG, **Johns TE**, Sauer BC.  Identifying Root Causes of Hyper/Hypoglycemic Episodes in Adult Medical and Surgical Patients in a Large Teaching Hospital. Presented at the 38th American Society of Health-Systems Pharmacists Midyear Clinical Meeting. December 2003, New Orleans, Louisiana.

Taylor MD, Greenwood K, **Johns TE**, Schmidt JC, Segal R, Hatton R.  Cost-Minimization Analysis of a Pharmacist-Directed, Pantoprazole Intravenous to Oral Dosage Form Conversion Program.  Presented at the International Society for Pharmacoeconomics and Outcomes Research 8th Annual International Meeting, 2003, Arlington, Virginia.

Patel PG, Klinker KP, Leather HL, **Johns TE**, Zumberg M.  Efficacy of 0.5 mg Versus 1 mg Tissue Plasminogen Activator (TPA) in Clearing Peripherally Inserted Central Catheters (PICC). Abstract P-86E. Presented at the 37th American Society of Health-Systems Pharmacists Midyear Clinical Meeting. December 2002, Atlanta, Georgia.

Winterstein AG, **Johns TE**, Hatton RC, Gonzelez-Rothi R, Segal R.  Pharmacoepidemilogic methods to detect preventable adverse drug events.  Abstract 413.  Presented at the 18th International Conference on Pharmacoepidemiology, August 2002, Edinburgh, Scotland.

Kanjanarat P, Winterstein AG, **Johns TE,** Gonzalez-Rothi R, Hatton RC, Segal R. Stimulated report of in-hospital medication errors of omission and commission utilizing personal digital assistants (PDAs). Presented at Annual Meeting of the Drug Information Association (DIA), June 2002, Chicago, Illinois.

Kanjanarat P, Winterstein AG, Segal R, Hatton RC, Gonzalez-Rothi R, **Johns TE**. Preventable adverse drug events in hospital: medications, types of errors, and outcomes. Abstract 327.  Presented at the Annual Meeting of American College of Clinical Pharmacy, October 2001, Tampa, Florida.

Orrick JJ, **Johns TE**, Ramphal R. Recovery and Decline in *Enterobacter sp.* susceptibility to Ceftazidime (CAZ): Utilization of Antimicrobial Defined Daily Dose (DDD) data with the Institutional Antibiogram to Monitor Trends. Presented at the 39th Annual Meeting of the Infectious Diseases Society of America (IDSA), October 2001, San Francisco, California.

Orrick JJ, Weaver SJ, **Johns TE**, Simpson KD.  Evaluation of the HIV/AIDS educational needs, preferences, and experience among pharmacists in the State of Florida: A Survey Sponsored by The Florida AIDS Education Teaching Center.  Presented at the 35th Annual Meeting of the Florida Society of Health-systems Pharmacists, August 2001, Orlando, Florida.

Totleben ER, **Johns TE**, Orrick JJ, Klinker KP, Kahler DA and Kilroy RA.  Design and Implementation of a Pharmacist Competency Assessment Program.  35th Annual American Society of Health-System Pharmacists Midyear Clinical Meeting.  December 2000, Las Vegas, Nevada.

*Curriculum Vitae*
*Thomas Johns*
*Page 7*

---

Russell W, Segal R, Wang F, Yin D, **Johns TE**, Orrick J.  Resource use and cost of care for patients hospitalized with community-acquired pneumonia (CAP).  Abstract MoO46 (oral presentation) 10th European Congress of Clinical Microbiology and Infectious Diseases (ECCMID), May 2000, Stockholm, Sweden.

Orrick J, Ramphal R, **Johns TE**, Russell WR.  Improving antibiotic susceptibility of Type-1 beta-lactamase-producing organisms after formulary replacement of ceftazidime with cefepime.  Abstract 731. 39th Interscience Conference on Antimicrobial Agents and Chemotherapy (ICAAC). September 1999, San Francisco, California.

**Johns TE**, Hancock WW, Lopez LM.  Does ibutilide cause ventricular tachycardia?  Presented during the Annual Meeting of American College of Clinical Pharmacy.  Phoenix, Arizona, November 1997.

Klinker KP, **Johns TE**, Lipowski E, and Lopez LM.  Physician attitudes toward pharmacist-managed anticoagulation clinics. Presented during the Annual Meeting of American College of Clinical Pharmacy. Phoenix, Arizona, November 1997.

**Johns TE**, Spivey-Miller S, Lopez LM, Chen L, Mehta J.  Celiprolol, but not felodipine, increases nitric oxide synthase activity and decreases superoxide anion generation in patients with hypertension. Presented as a platform presentation during the Annual Meeting of American College of Clinical Pharmacy. St. Louis, Missouri, August 1994.

## Research and Project Experience

Winterstein AG, Lipori G, Johns TE, Belgado, B.  Real-time risk stratification for hypo- or hyperglycemia to enhance glucose management outcomes in hospitals.  Funded by the Food and Drug Administration (FDA), $296,477. 2015.

Winterstein AG, Johns TE, Lipori G, Brumback B, Segal R.  Development and Validation of a Complexity Score to Identify Hospitalized Patients at High-Risk for Preventable Adverse Drug Events.  Funded by the American Society of Health-System Pharmacists Research and Education Foundation, $500,000. 2013.

Patient Safety - Medication Error Prevention in Critical Access Hospitals. Florida Department of Health, Office of Rural Health/Florida Medical Quality Assurance, Inc., $1,300,000.  2002-2015.

Health Information Technology (HIT) for Medication Safety in Critical Access Hospitals.  Agency and Healthcare Research and Quality (AHRQ), U.S. Department of Health and Human Services (DHHS), $150,559.  2004-2005.

Identifying root causes of hyper- and hypoglycemic episodes for the development and implementation of intervention(s) to decrease their incidence. Funded by the American Society of Health-System Pharmacists Research and Education Foundation, $1,900. 2002-2003.

*Curriculum Vitae*
*Thomas Johns*
*Page 8*

---

The nature and etiology of medication errors of omission - Creating an advanced knowledge base through solicited error reporting and systematic analysis. Funding provided by the Drug Information Association (DIA), $25,000. 2002.

Development of a screening tool for medication errors in hospital inpatients. Funding provided by University of Florida Research and Graduate Programs, $50,000. 2001-2002.

Development of a screening instrument for preventable drug-related morbidity in hospital inpatients. Funded by the American Society of Health-System Pharmacists Research and Education Foundation, $22,900. 2001-2002.

Incidence and severity of antiretroviral drug interactions in a large teaching hospital. Merck, $2,500. 1998-1999.

**Professional Affiliations**

American Society of Health-System Pharmacists
        House of Delegates 2003, 2007, 2008, 2016
Florida Society of Health-System Pharmacists
        President 2003-2004, 2015-2016
        Interim Executive Vice President 2015-2016
        Board of Directors 1999-2002
North Central Florida Society of Health-System Pharmacists
        President 1997

**Awards/Honors**

Florida Society of Health-System Pharmacists Medication Safety Award        2008
Florida Society of Health-System Pharmacists Pharmacist of the Year        2005
Florida Society of Health-System Pharmacists Meritorious Service Award        2002, 2015
Florida Society of Health-System Pharmacists Forerunner Award        1997

*Curriculum Vitae*
*Thomas Johns*
*Page 9*

---

**EXPERT TESTIMONY LIST (LAST 4 YEARS)**

| CASE | D/P | CASE NUMBER | FIRM | D/T | DATE | STATE |
|------|-----|-------------|------|-----|------|-------|
| Williams v. Melbourne Regional Medical | Defense | 05-2019-CA-018502 | Wicker Smith | Deposition | 10/9/20 | FL |
| Thomas v. NFRMC | Defense | 20-2030-CA | La Cava Jacobson and Goodis | Deposition | 2/22/22 | FL |
| Burnett v. KMC | Plaintiff | 20-CV-84 | Wall Huntington | Deposition | 2/23/22 | KS |
| Bayview Pharmacy v. Pharmacist Mutual | Defense | 21-cv-23621-ALTMAN/Reid | Cole, Scott & Kissane | Deposition | 4/4/22 | FL |
| Harr v. Henderson Hospital | Defense | A-19-797366-C, Dept. No. 18 | Hall Prangle and Schoonveld | Deposition | 2/9/23 | NV |

Thomas Johns, Pharm.D.
5902 NW 72nd Street, Gainesville, Florida 32653
Phone: 352-219-9567
johtho@shands.ufl.edu

April 18, 2024

Conor Lamb, Esquire
Kline & Specter, PC
1525 Locust Street, 19th Floor
Philadelphia, PA 19102

Re:  Wolking v. Lindner MD, and Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding
Center

Dear Mr. Lamb:

I am a Pharmacist licensed in the state of Florida since 1992.  My current position is Associate
Vice President, Operations at University of Florida Health.  I serve as the hospital leader with
oversight of clinical departments including Pharmacy Services.  I also hold an academic
appointment as a Clinical Associate Professor in the Department of Pharmaceutical Outcomes
and Policy at the University of Florida College of Pharmacy.  I have served as the President of the
Florida Society of Health-System Pharmacists.  Over the course of my career, I have authored
many articles in peer-reviewed medical literature and given numerous national and
international presentations.  Please consider the attached Curriculum Vitae to be incorporated
into this report.  My fees for serving as an expert are as follows: $375/hour for records review
and $500/hour for deposition and trial testimony.

**Factual Background**

The following documents and records have been reviewed in preparation of this report:

1. Complaint
2. Lindner Chart 1-607.pdf
3. Pharmacy records provided by Stacey Wolking (P4-000001-07)
4. Wolking pill bottle images (P3-000001-04)
5. Courtney Young PharmD deposition transcript with exhibits
6. Brian Bryk PharmD deposition transcript with exhibits
7. Dr. Henry Lindner MD deposition transcript with exhibits
8. Tunkhannock Compounding Center 30(b)(6) deposition transcript with exhibits
9. The opinion of the Pennsylvania Superior Court in *Riff v. Morgan Pharmacy*

Stacy Wolking sought out medical care from Henry Lindner, MD at HormoneRestoration.com
and completed a medical history form on November 1, 2013.  She was 51 years old.  Her address
was listed as Purcellville, Virginia.  Ms. Wolking listed her medical condition as "biotoxin
illness/post-lyme."  She listed her current hormone treatments as E3, E2, Prog (100) Troche, and
12.5mg DHEA troche.  Her treatment goals included no hot flashes, HRT that was safe, and less

periods. Ms. Wolking indicated her symptoms included fatigue, aches and pains, cold hands and feet, weight gain, depression, dry skin, mental slowness, sugar cravings, irregular periods, hot flashes, night sweats and moodiness. Ms. Wolking received medical care from Dr. Lindner from 2013 through 2022. The following represents each diagnosis included in Ms. Wolking's formal health record at the office of Dr. Lindner.

| | |
|---|---|
| 11/1/2013 | Fatigue/Malaise |
| 11/1/2013 | Menopausal State, Symptomatic |
| 11/1/2013 | Vitamin D Deficiency |
| 3/10/2015 | Glucocorticoid Deficiency |
| 11/19/2015 | Glucocorticoid Deficiency |
| 11/19/2015 | Menopausal State, Symptomatic |
| 11/19/2015 | Vitamin D Deficiency |
| 5/9/2017 | Iron Deficiency Unspecified |
| 5/24/2018 | Fatigue/Lethargy |
| 1/17/2022 | Babesiosis due to Babesia Odocoilei |

Dr. Lindner eventually prescribed Ms. Wolking extremely high doses of corticosteroids, including prednisone, hydrocortisone, and dexamethasone. The following pharmacies dispensed Dr. Lindner's corticosteroid prescriptions to Ms. Wolking: Harris Teeter, Wal-Mart, and Tunkhannock Compounding Center. In an email dated August 15, 2022, Dr. Lindner directed Ms. Wolking to obtain certain high-dose corticosteroid prescriptions from Tunkhannock Compounding Center because her local pharmacy (Harris Teeter) might complain to his medical board about the high doses.

The Complaint alleges that Tunkhannock Compounding Center dispensed four prescriptions for high doses of corticosteroids.[1] These occurred on August 8, August 16, September 27 and October 5, 2022.

| | | |
|---|---|---|
| August 8 | Rx 155694 | Prednisone 10mg tablets, #500, 30 day supply<br>*Instructions: Up to 10 tabs po daily as directed* |
| August 16 | Rx 155853 | Dexamethasone 4mg tablets, #200, 50 day supply<br>*Instructions: Take up to 4 tabs po daily in divided doses as directed* |
| September 27 | Rx 156272 | Dexamethasone 4mg, #100, 50 day supply<br>*Instructions: Take up to 10 tabs po daily as directed* |
| October 5 | Rx 156272 | Dexamethasone 4mg, #100, 50 day supply<br>*Instructions: Take up to 10 tabs po daily as directed* |

Courtney Young, PharmD was the owner and pharmacist in charge at Tunkhannock Compounding Center in 2022 at the time of the corticosteroid dispenses to Ms. Wolking. Tunkhannock Compounding Center is located in the same building as Dr. Lindner's medical practice in Tunkhannock, Pennsylvania. Pharmacist Young would ask Dr. Lindner questions

---

[1] On P4-000003, there is evidence of a prednisone prescription for Ms. Wolking from TCC on 5/19/22.

about his patients. She states she had conversations with Dr. Lindner about corticosteroids, but not specifically about safe doses. She never asked him how much prednisone or dexamethasone would be safe for one of his patients.

Pharmacist Young testified that she has had conversations with Dr. Lindner about how sick his patients are from babesiosis. (Nov. 15, 2023 Young Dep. At 56-57.) She was aware in August 2022 that Ms. Wolking received a treatment plan from Dr. Lindner related to the diagnosis of babesiosis and the use of corticosteroids. (*Id.*at 57-58.) During Pharmacist Young's deposition, she testified that she had a conversation with Dr. Lindner about Ms. Wolking before Tunkhannock Compounding Center dispensed the August 8, 2022 corticosteroid prescription (*Id.* at 74-76) and that she had an understanding with Dr. Lindner that Ms. Wolking would use patient-directed dosing. (*Id.* at 85-86.) Pharmacist Young testified that she does not know whether she actually initiated the conversation with Dr. Lindner, nor does she remember the date or many of the details of the conversation. (*Id.*) Yet she acknowledged in her deposition that this was possibly the largest prednisone prescription she had ever dispensed. (*Id.* at 78-79.)

Pharmacist Young stated she was satisfied with the explanation provided by Dr. Lindner concerning the prescriptions for Ms. Wolking and felt it was reasonable to fill the prescriptions with doctor approval. (*Id.* at 88-89.) Even though she and Dr. Lindner did not discuss potential negative side effects and risks of such high corticosteroid doses, she testified in her deposition that she believed it was reasonable to dispense the August 8, 2022 prescription. (*Id.* at 80, 89.) Pharmacist Young also testified that she doesn't believe it's possible to overdose on prednisone. (*Id.* at 22-23.)

Pharmacist Young testified that she does not remember ever having a second conversation with Dr. Lindner about Ms. Wolking, even as the dosages of her corticosteroid prescriptions grew in August and September 2022, and even as Pharmacist Young recognized that they were therapeutically duplicative. (*Id.* at 97-100.) Pharmacy Young spoke to Pharmacist Byrk because the prescriptions were not something they would normally fill. (*Id.* at 86.)

On August 16, Pharmacist Young personally dispensed Rx 155853 for dexamethasone to Ms. Wolking. She acknowledged the therapeutic duplication between prednisone and dexamethasone, but stated her belief that prednisone had been discontinued. (*Id.* at 98.) Pharmacist Young was unable to provide any documentation to support this belief. She also testified that this was possibly the largest dexamethasone prescription she had ever dispensed. (*Id.* at 101.)

Pharmacist Young testified she was aware of the Pharmacist requirement to perform prospective drug review or PDR for each prescription dispensed. (*Id.* at 30-31.) Title 49 Pa. Code 27.19 requires a Pharmacist to conduct prospective drug review and patient counseling in the process of dispensing prescription medications. The Pharmacist is required to evaluate the prescription to identify potential drug therapy problems that might result from therapeutic duplication, drug-drug interactions, incorrect dosage, incorrect duration of drug treatment, drug-allergy interactions, and clinical abuse or misuse.

Pharmacist Bryk was employed by Tunkhannock Compounding Center and was personally responsible for dispensing the corticosteroid prescriptions referenced above on August 8, September 27 and October 5. (Feb. 2, 2024 Bryk Dep. at 7, 14-15; Ex. 1.) He had a duty,

independent of Pharmacist Young, to conduct a PDR for each of the prescription corticosteroid dispenses. Pharmacist Bryk could have used a variety of drug information resources to validate the starting dose of corticosteroids. It's often necessary go beyond the FDA approved product labeling while conducting drug information research, yet Pharmacist Bryk could not think of any reference material that he uses besides the package insert, or a bookmarked website or web search. (*Id*. at 28-29.). It's clear Pharmacist Byrk did not have a complete understanding of corticosteroid dosing. He even testified that he did not know if it's possible to overdose on prednisone or dexamethasone. (*Id*. at 40-41.).

Pharmacist Bryk testified that he did not remember whether he knew the diagnosis of Ms. Wolking. (*Id*. at 8-10.) He was aware Ms. Wolking was a patient of Dr. Lindner. (*Id*. at 11.) Pharmacist Bryk does not recall ever speaking with Pharmacist Young or Dr. Lindner about the corticosteroid prescriptions prior to dispensing to Ms. Wolking. (*Id*. at 12-16.) When questioned about a situation in which he has questioned a prescribing physician, Pharmacist Bryk responded with "when you think something is out of the realm of normalcy." (*Id*. at 22.)

Pharmacist Bryk described situations where he believes prednisone and dexamethasone are not necessarily therapeutically duplicative. (*Id*. at 38-40.) While each of the stated situations may be legitimate, he made no independent effort to resolve this real conflict by either discussing with Ms. Wolking or Dr. Lindner.

Dr. Lindner does not represent himself as an endocrinologist or consider himself an infectious disease physician. (Feb. 21, 2024 Lindner Dep. at 21-22.) His medical practice centers on hormone replacement therapies (HRT). (*Id*.) Dr. Lindner sends prescriptions to Tunkhannock Compounding Center due to their specialization in this area of pharmacy practice. (*Id*. at 281-82.) Dr. Lindner diagnosed his daughter with chronic babesiosis, a medical diagnosis he states he invented, and discussed the "disease" and treatment directly with Pharmacist Young and Pharmacist Bryk on multiple occasions. (*Id*. at 62-63, 286-88, 295.) Dr. Lindner also stated Pharmacist Young never asked for any reference materials or documents. (*Id*. at 289.) Dr. Lindner testified Pharmacist Young understood his practice and why he wanted the person to have large amounts of steroids on hand, in case they needed very high amounts for some period of time, as he had discussed with my daughter. And he had bought it in the same way for his daughter. He would buy several bottles of prednisone or dexamethasone at once. (*Id*. at 305.)

Dr. Lindner stated chronic babesiosis is not a medical diagnosis recognized by the Infectious Disease Society of America (IDSA) or the Centers for Disease Control (CDC). (*Id*. at 63-64.) In fact, he referred to these international medical experts as "ignorant." (*Id*. at 132.) Pharmacist Young also testified that the CDC was "not on the cutting edge of information."

Dr. Lindner believes there is no upper limit to corticosteroid dosing. This corticosteroid treatment approach lacks scientific merit or published evidence to support. No reasonable Pharmacist would dispense these corticosteroid prescriptions to Ms. Wolking. Dr. Lindner stated he never discussed the treatment plan for Ms. Wolking with either Pharmacist Young or Pharmacist Bryk. He described the drugs Ms. Wolking received from TCC as "a mountain of steroids." (*Id*. at 307.)

Prednisone and dexamethasone belong to the corticosteroid class of medications. They are mainly prescribed for their anti-inflammatory effects in different disorders or many organ

systems. Corticosteroids cause profound and varied metabolic effects, modifications to the immune response of the body to diverse stimuli and are used as replacement therapy for adrenocortical deficient patients.

According to the online drug reference, Micromedex, the initial adult dosage for prednisone should not exceed 60-80mg/day for non-cancer indications. The official, FDA-approved, product label for prednisone includes a section for Dosage and Administration. As described in the product labeling, the initial dose of prednisone may vary from 5mg – 60mg per day depending on the specific disease entity being treated. The dosage requirements are variable and must be individualized on the basis of the disease under treatment and the response of the patient. The lowest effective dose should be prescribed. Prednisone 5mg is approximately equal to dexamethasone 0.75mg, which closely tracks Dr. Lindner's preferred conversion of 7:1 between prednisone and dexamethasone.

Ms. Wolking was dispensed prednisone up to 100mg/day and dexamethasone up to 40mg/day (equivalent to approximately 266 mg/day prednisone). Corticosteroids can cause extremely serious adverse effects when administered in excessive amounts and/or over long duration of treatment. Organ systems impacted include cardiovascular, endocrine, gastrointestinal, immunologic, musculoskeletal, ophthalmic, psychiatric, and respiratory. Pharmacist Young and Pharmacist Bryk should have initiated contact with Dr. Lindner to determine the legitimacy of these prescriptions based on several factors, including the initial dosage exceeding the FDA approved product labeling and other drug information resources, and prescription instructions stating take "up to" a specified amount, which implies the actual daily dose may be at the discretion of the patient. In addition, it's clear from deposition testimony that Pharmacist Young and Pharmacist Bryk had prior knowledge that Dr. Lindner allowed his patients taking high-dose corticosteroid to self-titrate daily dosages, which should have raised serious concern about this prescribing practice.

Ms. Wolking developed very serious and potentially fatal adverse reactions. Her adverse effects included the painful perforation of her bowel, severe steroid myopathy, pounding heart, high heart rate, puffy face, weight gain, and severe diarrhea. Ms. Wolking's husband described her as near comatose. Dr. Lindner acknowledged the excessive dosages of corticosteroids were weakening her muscles, bones and connective tissue. Following months of extremely high doses of corticosteroids, Ms. Wolking was hospitalized in October 2022 with a small bowel perforation and peritonitis. In the hospital, Ms. Wolking refused nutrition and medical treatment and demanded to be transferred to hospice care and allowed to die.

Opinions:

1. Duty: Pharmacists in Pennsylvania have a duty to exercise due care and diligence in the performance of their professional duties, including a duty to warn a patient or notify a prescribing physician when a prescription is unreasonable on its face, creating a substantial risk of serious harm to the patient.[2] Because the initial dosage exceeded the official, FDA-approved, product label and other reputable drug information resources,

---

[2] *See Riff v. Morgan Pharmacy*, 508 A.2d 1247, 1251-52 (Pa. Super. Ct. 1986).

Pharmacists Courtney Young and Brian Bryk had a duty to contact Dr. Lindner to ensure the appropriateness of the prescription.

2.  Breach: Pharmacists Courtney Young and Brian Bryk breached their duty and fell below the standard of care by dispensing prednisone and dexamethasone prescriptions in excessive doses to Ms. Wolking from August to October 2022. In just eight days in August 2022, Tunkhannock Compounding Center (acting through Brian Bryk and Courtney Young) dispensed the equivalent of 10,600 mg of prednisone to Stacey Wolking, a single patient who was not hospitalized. Neither pharmacist warned Ms. Wolking about the substantial risk of serious harm presented by this quantity of corticosteroids, nor did they notify Dr. Lindner that these prescriptions were facially unreasonable. In this case, although Pharmacist Young claims that she spoke to Dr. Lindner about Ms. Wolking before the August 8, 2022 prescription, she testified that she does not know whether she even initiated her conversation with Dr. Lindner, and she did not discuss negative side effects or risks with him. Dr. Lindner did not recall talking to Pharmacist Young about Ms. Wolking at all. There is no evidence that Brian Bryk ever spoke to Dr. Lindner about Ms. Wolking. Thus, the evidence is conflicting concerning whether either Tunkhannock Compounding Center ever performed the required inquiry of Dr. Lindner about these prescriptions. Because of the extremely high and potentially fatal corticosteroid doses involved, the standard of care required both Pharmacists to go beyond the traditional inquiry to the prescribing physician and conduct an independent investigation into the appropriateness of dispensing corticosteroids to Ms. Wolking. Both Pharmacists should have known the significant health risk posed by the extremely high corticosteroid doses. The normal doses for corticosteroids are listed in common reference materials and easy for any pharmacist to find.

3.  Cause: Tunkhannock Compounding Center caused Ms. Wolking's injuries because it was the only pharmacy Lindner could rely on to prescribe such large and dangerous corticosteroid doses. Dr. Lindner testified other pharmacies would likely not have filled these large prescriptions. (*Id.* at 305.) Pharmacist Young testified that Ms. Wolking's prescriptions were larger than what she saw when she worked at Rite-Aid, and Lindner instructed Ms. Wolking to fill her prescriptions at Tunkhannock Compounding Center because he believed more mainstream pharmacies would question or refuse to fill such large prescriptions, and even report him to his medical board. Although Ms. Wolking still filled some smaller corticosteroid prescriptions at Harris Teeter in August 2022, a careful review of her emails with Dr. Lindner and his medical chart makes clear that the vast majority of corticosteroids she consumed in August, September, and October 2022 were dispensed by Tunkhannock Compounding Center. That pharmacy's failure to exercise the same caution toward Dr. Lindner as the mainstream pharmacies caused the unsafe doses of corticosteroids to reach Ms. Wolking and inflict the injuries described in the Complaint. Based on my experience, no mainstream pharmacy would have dispensed these prescriptions without questioning Dr. Lindner.

I reserve the right to amend these opinions if more information becomes available.

Respectfully submitted,

Thomas Johns, Pharm.D.
Associate Vice President, Operations
University of Florida Health
Clinical Associate Professor
Department of Pharmaceutical Outcomes and Policy
University of Florida College of Pharmacy