```
          IN THE UNITED STATES DISTRICT COURT
        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA
                    CIVIL ACTION
STACEY WOLKING and DARYL    :  NO.3:23-cv-00806-JFS
                            :
                Plaintiff   :
                            :
         vs.                :
                            :
HENRY LINDNER, M.D., and    :
YOUNGS APOTHECARY, INC. d/b/a:
TUNKHANNOCK COMPOUNDING     :
CENTER,                     :
                            :
                Defendants  :
-----------------------------
```

 VIDEOTAPED ZOOM DEPOSITION OF CARL GAINOR, Ph.D, JD


                    Taken via Zoom on Tuesday,
June 18, 2024, commencing at 1:30 p.m., by Stacy D.
Serba, Notary Public.




                    * * *
              ERSA COURT REPORTING
            Professional Court Reporters
          30 South 17th Street, Suite 1520
              Philadelphia, PA   19103

**2**

1  APPEARANCES:
2    KLINE & SPECTER, P.C.
3    BY:  CONOR LAMB, ESQ.
     1525 Locust Street, 19th Floor
     Philadelphia, PA  19102
4    215.772.1000
     conor.lamb@klinespecter.com
5    -- For the Plaintiffs
6
     CIPRIANI & WERNER, P.C.
7    BY:  CIARA L. DeNAPLES, ESQ.
     415 Wyoming Avenue
8    Scranton, PA  18503
     570.347.0600
9    cdenaples@c-wlaw.com
     -- For the Defendant
10
11   McCORMICK & PRIORE, P.C.
     BY:  SUSAN KEESLER, ESQ.
12   2001 Market Street, Suite 3810
     Philadelphia, PA  19103
13   215.972.0161
     Skeesler@mccormickpriore.com
14   -- For Youngs Apothecary, Inc.
        D/b/a Tunkhannock Compounding Center
15
16   ALSO PRESENT:  Luke Simpson, Videographer
17
18
19
20
21
22
23
24

**3**

1              I N D E X
2              WITNESSES
3    ALL WITNESSES                    PAGE
4
5    CARL GAINOR, PhD, JD
6      Examination by MS. KEESLER      4:20
7              EXHIBITS
8    NO.    DESCRIPTION              PAGE
9    GAINOR
10   No. 1  Expert Report and Curriculum Vitae
                                      12:18
11
12   No. 2  Patient Prescription History
          Report
                                      57:6
13
14   No. 3  Prescriptions
                                      100:9
15   No. 4  Package Insert
                                      113:18
16
17   No. 5  Report dated 6/3/2024
                                      173:2
18
19
20
21
22
23
24

**4**

1              THE VIDEOGRAPHER:  This deposition
2    is being taken on Tuesday, June 18th, 2024, scheduled
3    for 1:30 p.m., via Zoom conferencing.
4              This deposition is for the United States
5    District Court for the Middle District of
6    Pennsylvania Nos. 806 in the case of Stacey Wolking,
7    et al., versus Henry Lindner, M.D., et al.
8              Present for the taking of this videotape
9    deposition is the deponent, Carl Gainor, PhD, J.D.
10   All counsel will be noted on the stenographic record.
11             The court reporter is Stacy Serba of
12   ERSA.  The court reporter will now wear in the
13   witness.
14             CARL GAINOR, PhD, JD, having been
15   duly sworn, was examined and testified as follows:
16             THE VIDEOGRAPHER:  Time is now
17   1:36.  We will now begin questioning.
18                  * * *
19             EXAMINATION
20   BY MS. KEESLER:
21   Q.      Thank you.  Good afternoon, Dr. Gainor.
22   Thank you for being available today.
23   A.      Absolutely.
24   Q.      All right.  If you ever have trouble hearing

**5**

1    me, just let me know.  Sometimes the audio on my
2    computer is a little bit fussy.
3              Have you ever been deposed before?
4    A.      Yes, I have.
5    Q.      On how many occasions, approximately?
6    A.      Pardon me?
7    Q.      On how many occasions, approximately?
8    A.      How far back would you like me to go?
9    Q.      As many as you can remember.
10   A.      Well, I'm going to say in the last five
11   years, probably three or four times.
12   Q.      Okay.  I'm just going to review some
13   deposition procedures.  You might have already gone
14   over them with your attorney; however, during your
15   deposition, if you do not understand the question
16   that I am asking, just let me know and I'll attempt
17   to rephrase it.  Okay?
18   A.      Absolutely.
19   Q.      Okay.  And then in order to create a clean
20   record in this case, we want to avoid talking over
21   one another.  So I just ask that you let me finish my
22   question fully before you begin answering.
23             You understand?
24   A.      Yes, I do.

CARL GAINOR, Ph.D, JD

**6**

1  Q.    Okay.  There might be some objections from
2  counsel during your deposition.  If there is one, you
3  just want to pause, let the objection go on the
4  record first and then your attorney will let you know
5  if you can answer the question or not.  Okay?
6  A.    I understand.
7  Q.    All right.  Do you -- sorry.  We're probably
8  going to take some breaks during your deposition.
9  If, however, you need a break before I call for one,
10  just let me know.  All I ask is that if there's a
11  question pending, that you answer the question before
12  we take a break.
13        Do you understand that?
14  A.    Yes, I do.
15  Q.    Okay.  And you must keep your responses
16  verbal.  So I ask that you avoid responding with
17  either head nods or shrugging of the shoulders
18  because the court -- court reporter can only take
19  down verbal responses.
20        Do you understand that?
21  A.    I understand.
22  Q.    Okay.  All right.  So your attorney provided
23  us with a copy of your CV, along with your report,
24  your initial report, and then your supplemental

**7**

1  report.  Do you have those documents in front of you,
2  Dr. Gainor?
3        If you don't, that's okay because I'll
4  also be displaying or sharing my screen with
5  everybody.  Okay?
6  A.    That's fine.
7  Q.    Sometimes the witnesses like to look at
8  their hard copy.  Okay.
9        So in your report itself, you had
10  indicated that you have testified as an expert before
11  at trial or deposition.  Is that correct?
12  A.    That is correct.
13  Q.    Were those -- I imagine just based on the
14  case caption that those were both federal cases.  Is
15  that correct?
16  A.    That is correct.
17  Q.    Have you ever testified in a state case
18  before?
19  A.    Yes.
20  Q.    Okay.  When was the last time you testified
21  in a state case and when -- which state was that?
22  A.    Would have been decades ago.  Case out of
23  Ohio.  I'm sorry.  Case out of West Virginia and a
24  case -- I think out of Illinois.  But they -- they go

**8**

1  back well over a decade.
2  Q.    Have you ever testified as an expert in a
3  state case that involved allegations against a
4  pharmacist?
5  A.    Yes.
6  Q.    Okay.  Was that civil or criminal?
7  A.    Civil.
8  Q.    Civil.  And was that -- did you ever testify
9  under those same circumstances, but in the state of
10  Pennsylvania?
11  A.    I haven't testified in Pennsylvania in a
12  very long time.
13  Q.    Okay.  How many cases have you testified as
14  an expert as it pertains to allegations against a
15  pharmacist or pharmacy?
16  A.    Probably testified maybe two or three times.
17  Q.    In those cases, in those two or three times
18  that you testified as an expert in cases involving
19  allegations against a pharmacist and/or a pharmacy,
20  were you hired by defense or plaintiff?
21  A.    Well, if I was testifying against a
22  pharmacist, I would have had to have been hired by
23  the plaintiff.
24  Q.    Okay.  So were you always testifying against

**9**

1  the pharmacy in both those two or three instances?
2  A.    Well, let's simplify this.  Over the course
3  of testifying in 20 some years, I've tried to testify
4  on both plaintiff's behalf and on defendant's behalf.
5        I've testified in criminal cases,
6  primarily for the United States Government.  I don't
7  remember ever testifying on behalf of a criminal
8  defendant.
9        But I would say the number of times that
10  I've testified in civil cases would be approximately
11  50 percent for the plaintiff's side and 50 percent
12  for the defense.
13  Q.    Okay.  What's the breakdown of percentage
14  wise, as best as you can estimate, that you have
15  testified in civil cases versus criminal cases?
16  A.    The vast majority -- well, I shouldn't say
17  that.  Yes, I should.  The majority have been civil
18  cases, both on the federal side and on the state
19  side.  The number of criminal cases have been very
20  limited.
21  Q.    Give me one moment.  All right.  So two of
22  the cases you listed in your report included US
23  versus Stehl.  And I apologize if I am mispronouncing
24  that.  But S-T-E-H-L.

3 (Pages 6 to 9)

CARL GAINOR, Ph.D, JD

**10**

1              Do you recall that case?
2    A.    I believe it was a case in Alabama against a
3    prescriber, criminal case brought in federal court.
4    Q.    Okay.  And when you say prescriber, was it
5    a -- like a treating physician or a -- the
6    prescribing doctor?
7    A.    I'm sorry.  I'm not understanding the
8    difference between a prescriber and a doctor.
9    Q.    Was the prescriber a doctor?
10   A.    Yes.
11   Q.    Okay.  And do you recall what -- what
12   medication or substance that doctor was prescribing?
13   A.    No, I don't.  I know it involved Schedule II
14   opioids, but I don't remember the details of the
15   case.  That case goes back many, many years.
16   Q.    Okay.  Therefore, it -- it involved a
17   control substance, correct --
18   A.    Yes.
19   Q.    -- Schedule II controlled substance?
20   A.    Yes.
21   Q.    And do you recall what your opinion was in
22   that matter?
23   A.    Well, the US attorney primarily wanted my
24   testimony to explain to the jury about the various

**11**

1    drugs involved in the case.  I did not opine as to
2    the innocence, guilt, appropriateness,
3    inappropriateness of the prescriber's actions.  It
4    was to explain to the jury about the drugs involved
5    in the case.
6    Q.    Okay.  Let's talk about the next case you
7    listed, US versus Shaffer Pharmacy, Inc., Thomas
8    Tadsen and Wilson Bunton.
9              Do you recall that case?
10   A.    Yes.  A little bit.  It was a case out of
11   the northern district of Ohio.
12   Q.    What did that case involve?
13   A.    A pharmacy that was dispensing what the
14   government alleged were excessive opioids and/or
15   combinations of opioids, of benzodiazepines and
16   perhaps a couple muscle relaxants, extended dosage --
17   extended therapy, rather.
18              And it was a case, in essence, against
19   the pharmacy.
20   Q.    Okay.  Have you ever testified as an expert
21   in a case involving the duty of care owed by a
22   pharmacist?
23   A.    Well, I think every case that I've testified
24   that is a civil case involving drug therapy would

**12**

1    involve the duty of care of a pharmacist.
2    Q.    Okay.  Were you specifically asked to opine
3    on the duty of care owed by a pharmacist to a patient
4    in those cases?
5    A.    I can't remember the specifics of those
6    cases, no.
7    Q.    Okay.  All right.  Dr. Gainor, where are you
8    currently testifying from, the address?
9    A.    6907 Southeast 12th Circle, Ocala, Florida.
10   Q.    And is that a private residence -- private
11   residence or office?
12   A.    It's a private residence.
13   Q.    Okay.  I'd like to go through your CV.  So
14   give me one moment.  Hold on up.
15              MS. KEESLER:  I'll mark this as
16   Exhibit 1.
17         (Whereupon, Gainor Exhibit 1, Expert Report
18   and Curriculum Vitae, was marked for identification.)
19   BY MS. KEESLER:
20   Q.    Dr. Gainor, do you see the document in front
21   of you?
22   A.    Yes, I do.
23   Q.    Okay.  Is this a CV attached to your initial
24   report for this case?

**13**

1    A.    I believe it is.  I don't see the bottom of
2    the CV, but, yes.
3              Yeah, that would be the CV that was
4    attached.
5    Q.    Okay.  And is this CV up to date?
6    A.    Yes, it is.
7    Q.    Is there anything you'd like to add or
8    delete from the CV?
9    A.    No.
10   Q.    Okay.  All right.  I'd like to start with
11   your educational background.  Can you just briefly
12   describe your educational background?
13   A.    Well, I think the CV speaks for itself.
14   Q.    Okay.  All right.  So why don't we start
15   with the top line entry, 1961 to 1963, it says
16   University of Michigan.  Did you obtain a degree
17   during that time?
18   A.    No.  Those were the -- those were
19   pre-pharmacy courses, the two years that a pharmacist
20   goes to more general college curriculums.  And then
21   '96 [sic] through '66 was the actual School of
22   Pharmacy, which is the professional programs.
23   Q.    Okay.  And you stated you got your BS in
24   pharmacy at University of Pittsburgh?

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

CARL GAINOR, Ph.D, JD

**14**

1    A.    Right.
2    Q.    Do you recall what you obtained your BS in?
3    A.    I'm sorry.  Say again, please.
4    Q.    Sorry.  Strike that.
5          Your BS -- your bachelor of science, do
6    you recall what you got your BS in?
7    A.    Pharmacy.
8    Q.    Pharmacy.  Do you recall what the curriculum
9    covered?
10   A.    What the curriculum covered?
11   Q.    Yes.
12   A.    General courses relating to the practice of
13   pharmacy, chemistry, pharmacology.  I don't remember
14   the names of all the courses.  But it's a -- it was a
15   very basic, typical pharmacy school curriculum
16   approved by the licensing boards.
17   Q.    Okay.  The next line item I see is an MS in
18   1967 to 1968.  Where did you obtain your MS from?
19   A.    Again, the CV should speak for itself.  It's
20   the University of Pittsburgh, School of Pharmacy.
21   Q.    Okay.  And what did you get your master's in
22   science in?
23   A.    I believe it was titled pharmaceutical
24   economics.

**15**

1    Q.    Sorry.  Could you repeat?  I didn't hear
2    that.
3    A.    Pardon me?
4    Q.    I didn't hear that.  Could you repeat that?
5    A.    Sure.  I believe it was titled
6    pharmaceutical economics.
7    Q.    Okay.  Did you present a dissertation for
8    that MS?
9    A.    I do not remember the master's side, no.  I
10   may have, but I may not have.  I don't know what -- I
11   cannot remember the requirements for that.
12   Q.    Sure.  What is pharmaceutical economics --
13   are you able to briefly describe to us what
14   pharmaceutical economics is?
15   A.    It was involved with, No. 1, economics.
16   Obviously I had to take micro-economics,
17   macro-economics.  But it allowed me to take, also,
18   courses in the school of healthcare, in general,
19   including some legal courses because what I was
20   actually kind of working toward was the legal side of
21   healthcare, but there was no such specific master's
22   program offered, nor PhD.  The closest thing that I
23   could use was the program called pharmaceutical
24   economics.

**16**

1    Q.    Okay.  And then it looks like in 1968 to
2    1972, you obtained your PhD at the University of
3    Pittsburgh School of Pharmacy, correct?
4    A.    Correct.
5    Q.    Okay.  Do you recall what your dissertation
6    was for the PhD?
7    A.    Do I remember what my dissertation was?
8    Q.    Yes.
9    A.    Basically, yes.  It was the design of a
10   potential healthcare system for the United States.
11   Q.    All right.  And then moving on between 1972
12   and 1975, you obtained your juris doctorate at the
13   University of Pittsburgh School of Law.  Is that
14   correct?
15   A.    That's correct.
16   Q.    All right.  Now I'm looking -- I'm moving
17   forward, Dr. Gainor, to your positions held.  Can you
18   briefly describe your positions held starting with
19   the oldest to the most recent, indicating what your
20   title position was -- I know it's listed here -- but
21   then also what your duties were with respect to
22   the -- to the -- with respect to each position.
23   A.    In every one of the universities, all five
24   of them, I was responsible for teaching the

**17**

1    pharmaceutical jurisprudence or pharmacy law course
2    to the pharmacy students.  It was a required course
3    and I was responsible for teaching that course at
4    those five universities at various times.
5    Q.    Okay.  What -- can you tell me or briefly
6    describe what the course pharmacy law covered or
7    entailed?
8    A.    The pharmacy law course covers pharmacy law
9    and regulations, both the State Pharmacy Act, the
10   state board rules and regulations, the Federal
11   Controlled Substances Act, the Federal Controlled
12   Substances Regulations and various other aspects
13   relating to law in general, and specifically pharmacy
14   law.
15   Q.    Okay.  So is it my understanding -- it looks
16   like the first one, two, three, four, five, six items
17   listed under positions held, so from 1977 to that --
18   to 2020, you were engaged in teaching pharmacy law.
19   Is that correct?
20   A.    Yes.
21   Q.    Okay.  So then the next line item -- that
22   1978 to 2003, it indicates legal counsel to the
23   Pennsylvania Pharmacists Association.  What were
24   you -- what were your duties as legal counsel for the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

**18**

1    Pennsylvania Pharmacists Association?
2    A.    I was their legal counsel, advising the
3    president and the board on legal matters relating to
4    the operation of the association.
5    Q.    Okay.  So essentially were you, like,
6    in-house counsel for the association?
7    A.    Yes.
8    Q.    Got it.  What type of legal matters did you
9    advise the association on during your tenure there?
10   A.    Anything that came up.  It -- I don't
11   remember specifically, but everything that the
12   association became involved in that had a legal
13   aspect, I was responsible for discussing with the
14   appropriate individuals in the association.
15   Q.    Okay.  I probably should have started with
16   this question.  But what is the Pennsylvania
17   Pharmacists Association and what is its purpose?
18   A.    It is the state association representing
19   pharmacists; Pennsylvania pharmacists, specifically.
20   Q.    Okay.  And what do you mean they represent
21   pharmacists in PA?
22   A.    Well, as with any association, any
23   professional association, it's concerned with the
24   best interests of the pharmacists of Pennsylvania.

**19**

1    Q.    Okay.  Does the association lay out certain
2    guidelines for the pharmacists in PA?
3    A.    I'm not sure that I understand that
4    question.  It has no guidelines that it establishes
5    for the -- for a pharmacy's behavior.  That is
6    established by the Pharmacy Act and the State board
7    regulations.
8    Q.    Okay.  So you mentioned that the association
9    was concerned with the best interests of the
10   pharmacies.  So what do you mean by that?  What did
11   they do or facilitate or inform regarding
12   pharmacists?
13   A.    I cannot remember.  I mean this goes back 20
14   some years since I've been there.
15        Obviously they were interested in
16   pharmacists' working conditions.  They were
17   interested in pharmacists' reimbursement.  The
18   majority of the members at that point were
19   independent community pharmacists and so that would
20   be the kind of issues that would come up.
21   Q.    Okay.  Did the association perform any type
22   of investigations?
23   A.    I can never remember them performing
24   investigations.

**20**

1    Q.    Okay.  Looking at your next line item here
2    under positions held.  From 1976 to 1992, you
3    practiced private law in Pittsburgh, PA.  Is that
4    correct?
5    A.    That's correct.
6    Q.    Okay.  Did you specialize in a particular
7    area of law or were you a general practitioner?
8    A.    I was a general practitioner.
9    Q.    Okay.  And then it looks like from 1970 to
10   1976, you were a staff pharmacist at Montefiore
11   Hospital in Pittsburgh, Pennsylvania.  Is that
12   correct?
13   A.    That is correct.
14   Q.    Okay.  I'd like to talk about that for a
15   little bit.
16        All right.  In this hospital setting,
17   what were your duties as a staff pharmacist?
18   A.    To dispense any medications that were
19   ordered for patients in the hospital.
20   Q.    Okay.  Were part of your duties to verify
21   the medications that were ordered?
22   A.    I'm not sure what you mean by verify the
23   medications.
24   Q.    Yeah.  I used that term because one of the

**21**

1    other experts used that term, where he also served as
2    a pharmacist in a hospital setting.  So I'm not --
3    are you aware of that terminology, verifying orders
4    or prescription orders?
5    A.    Well, if they're meaning that if there was
6    an ambiguity about an order, the part of the role of
7    the pharmacist would be to verify what the doctor had
8    specifically wanted or ordered.  If there was a
9    problem with the order, again it would be the role of
10   the pharmacist to verify what the practitioner had
11   actually ordered or wanted for the patient.
12   Q.    As -- in your role as a staff pharmacist at
13   Montefiore Hospital, did you ever have an occasion to
14   fill corticosteroids?
15   A.    I'm sure that I filled orders for
16   corticosteroids, but we're now talking 40 or 50 years
17   ago.
18   Q.    So you're -- you're sure that you filled,
19   but you can't specifically remember?
20   A.    Exactly.
21   Q.    Okay.  Do you recall whether you
22   specifically filled Prednisone or Dexamethasone?
23   A.    I'm sure that I did, but I cannot
24   specifically remember orders for those two drugs.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

22

1  But they are very commonly used in a hospital
2  environment. And, yes, I do clearly remember that
3  that type of medication would have been ordered and
4  that I would have been responsible for dispensing it.
5  Q.    Okay. All right. And as a staff
6  pharmacist, Dr. Gainor, during that six year -- six
7  to seven year tenure, do you recall ever questioning
8  a doctor about a particular prescription?
9  A.    I'm sure that I did. I don't remember any
10 specifics.
11 Q.    Do you recall as a staff pharmacist whether
12 you ever refused to fill a prescription?
13 A.    I don't remember specifically doing it. I
14 know that I certainly would have refused to fill a
15 prescription if I believed that it was inappropriate.
16 Q.    Okay. So let's talk about that.
17       As a staff pharmacist -- well, let me ask
18 you this. Prior to you starting your role as a staff
19 pharmacist in 1970, did you receive any pharmacy
20 training prior to that role other than -- other than
21 obtain your pharmacy degree?
22 A.    Yes. I, No. 1, of course had to do an
23 internship. That's part of the requirements of
24 becoming a pharmacist in Pennsylvania. And although

23

1  it doesn't show on my CV because it wasn't that
2  lengthy a work, but I worked for a chain pharmacy for
3  approximately a year. I managed the pharmacy for
4  them before coming back to start my master's degree.
5       And during the probably 15, 20 years
6  after graduating from pharmacy school, I did occasion
7  relief pharmacy work at independent community
8  pharmacies.
9  Q.    Okay. Did you -- did you say you did
10 occasionally relief work?
11 A.    Yes.
12 Q.    Okay. What does that mean?
13 A.    That means that a pharmacist would fill in
14 part time at a pharmacy that may be short-handed,
15 someone was on vacation, the pharmacy did not need a
16 full-time pharmacist, but they needed some additional
17 help.
18 Q.    Okay. And what is the difference between an
19 independent community pharmacy and a retail pharmacy?
20 A.    I'm sorry, I believe I said retail chain
21 pharmacy.
22 Q.    Okay. What is the difference between a
23 retail chain pharmacy and an independent community
24 pharmacy?

24

1  A.    The ownership. One is generally a
2  multi-unit, larger business owned by a corporation;
3  the other is generally an individual pharmacy owned
4  by an individual pharmacist.
5  Q.    Okay. Going back to my question. When you
6  were a staff pharmacist, you mentioned that there are
7  circumstances in which you would have refused to fill
8  a prescription. What were the circumstances in which
9  you would have refused to fill a prescription?
10 A.    If I believed the prescription would cause
11 harm to the patient.
12 Q.    Okay. And you just stated if you believed
13 that a prescription would cause harm to the patient.
14 How would you arrive at that, I guess, conclusion or
15 what analysis did you undergo to arrive at that
16 conclusion?
17 A.    I would use my six -- 13 some years of
18 education in pharmacy, plus my practical experience.
19 And if the order clearly was outside the safety range
20 for a patient, I'm not going to hurt the patient.
21 Every drug has dangers. There is no drug that's 100
22 percent safe. So it's a constant analysis for both
23 the prescriber, as well as the pharmacist, to
24 determine if this therapy is going to help the

25

1  patient, even though we know there may be some risks,
2  or is it so dangerous that it's going to cause harm
3  to the patient that outweighs any potential benefit.
4  Q.    Okay. So I'd like to talk about one of
5  those reasons that you just stated, if the order
6  clearly was outside the safety range for a patient.
7  How would you determine the safety range?
8        So when you were a staff pharmacist -- I
9  know you don't have a specific recollection of
10 refusing a prescription. But given that you've
11 testified that this would be one of the circumstances
12 in which you would refuse a prescription, how would
13 you determine an order was outside of the safety
14 range?
15 A.    I would do some research, I would query the
16 prescriber to find out what experience the prescriber
17 had using this therapy in this dose, and make a
18 determination based on my knowledge and my research
19 whether I felt that the risk was just unreasonably
20 high to the patient.
21 Q.    Okay. After conducting that evaluation, if
22 you were satisfied with the prescriber's information
23 conveyed to you, would you go ahead and fill that
24 prescription?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

26

1  A.    When you say was I satisfied, in what
2  respects?
3  Q.    Sure.  So you just stated when I asked how
4  would you determine whether an order was clearly
5  outside the safety range for a patient, you testified
6  that you would conduct research, query the
7  prescriber, determine the experience he had using the
8  therapy in this dose and make a determination whether
9  you felt that the risk was unreasonably high for the
10  patient.
11       So if at the end of all of that you
12  determined that essentially the -- that the patient
13  would not be at harm in dispensing this medication,
14  would you go ahead and dispense the medication?
15  A.    If I determined that the patient would not
16  be put at unreasonable risk, is that your statement,
17  or your hypothetical?
18  Q.    Sure.  Yes.
19  A.    If I do not believe that the patient is
20  going to be put at unreasonable risk, then, yes, I
21  would fill the prescription.  If I felt that the
22  patient was put at an unreasonable risk, I would not
23  fill the prescription.
24  Q.    Okay.  And to determine at what level the

27

1  patient might be subjected to, did you rely on what
2  the prescriber informed you about his experience in
3  using the therapy?
4  A.    Listen to prescriber and look at his
5  experience using whatever this particular dose was.
6  Q.    Okay.  What do you mean by and look at his
7  experience?
8  A.    Well, if the -- if the physician had only
9  treated one or two patients in his entire life with
10  this kind of a dosage level, especially of
11  corticosteroids, as in this case, I would be suspect
12  without the doctor providing some documentation of
13  where he had determined or where she had determined
14  that this dose was an appropriate therapy.
15  Q.    Okay.  So would you require documentation
16  from the prescriber before agreeing to fill the
17  medication?
18  A.    I think that's a hypothetical I can't
19  answer.  Certain kinds I would.  I mean, in this
20  particular case, certainly I would not have had any
21  hesitation to ask the doctor to provide me with some
22  documentation on where this was an accepted therapy,
23  either by the CDC, by the FDA, by some research
24  facility, where was the data to back up that this was

28

1  an acceptable therapy.
2  Q.    Okay.  So --
3  A.    I certainly -- I certainly would ask for
4  some documentation of that.
5  Q.    Is a pharmacist required to obtain
6  documentation from the doctor before filling a
7  prescription?
8  A.    Required by law?
9  Q.    Correct.
10  A.    No.
11  Q.    Okay.  One moment.  Other than the
12  difference in ownership between a retail chain
13  pharmacy and an independent community pharmacy, are
14  there any other differences?
15  A.    I'm sure there are.  But there are no
16  differences, at least in my opinion, between the
17  duties of the pharmacist, regardless of the practice
18  setting, whether it's an independent community
19  pharmacy or a chain retail pharmacy.
20  Q.    Okay.  Doctor, now just moving on to --
21  actually, let me ask you this.  As a staff pharmacist
22  for Montefiore Hospital -- actually, strike that.
23       The next line item on your positions held
24  shows that from 1966 to 1967 you were resident at a

29

1  hospital pharmacy, Veterans Administration Hospital.
2  Can you tell me what -- what your duties were at the
3  Veterans Administration Hospital?
4  A.    Again, that's going back almost 60 years.
5  But that program was one of the few residencies and
6  hospital pharmacy at the time that was available.
7  And it was a rotation through various departments
8  within the Veterans Administration Hospitals in the
9  Pittsburgh area.  Each of the three hospitals had
10  certain specialties.  And it basically gave me
11  exposure to each one of the hospitals.  And then
12  within the hospitals, my recollection is that I would
13  have to rotate through various departments.
14       So my duties would be filling
15  prescriptions, filling drug orders both for
16  inpatients and outpatients.  I remember that we did
17  compound certain products for the hospital that they
18  didn't buy.  These were over-the-counter kind of
19  products, not pharmaceuticals.
20       And I don't remember specifically other
21  than filling orders for inpatients, filling orders
22  for outpatients, making some of the products that
23  were used in the hospital and observing the operation
24  of the various departments.

8 (Pages 26 to 29)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

---

30

1    Q.    Okay.  During your time at -- at Veterans
2    Administration Hospital, do you recall if you ever
3    filled prescriptions for corticosteroids;
4    specifically, Prednisone or Dexamethasone?
5    A.    I would anticipate that I would have because
6    those are both relatively common drugs.  But in terms
7    of specificity, there's no way that I can remember
8    specific prescriptions that I filled 50 or 60 years
9    ago.
10   Q.    Do you recall ever questioning a doctor
11   about their prescription during your time at the
12   Veterans Administration Hospital?
13   A.    I don't remember.
14   Q.    Do you recall ever refusing to fill a
15   prescription in your role at the Veterans
16   Administration Hospital?
17   A.    I doubt very much that that would have been
18   my role.  That would have been a role that would have
19   been assigned to a pharmacist.
20   Q.    Okay.  So you mentioned you filled
21   prescriptions for both inpatient and outpatient.  So
22   what position were you in when you filled
23   prescriptions?
24   A.    When you said what position was I in?

---

31

1    Q.    Yes.  Because you mentioned you filled
2    prescriptions, but you just stated that you weren't a
3    pharmacist.
4    A.    No.  Perhaps I misspoke.  I became a
5    pharmacist in 1965.
6    Q.    Okay.
7    A.    Registered by the State of Pennsylvania.  So
8    I was a pharmacist.  But I was not hired as a
9    pharmacist with the Veterans Administration.  I was a
10   resident and, therefore, I rotated through various
11   departments doing various tasks.
12          But in terms of the dispensing, yes, I
13   was a pharmacist, but I was a resident.  So that
14   those decisions would generally have been made by one
15   of the staff pharmacists.
16   Q.    Okay.  So you just mentioned that you became
17   licensed as a pharmacist in 1965.  Is that correct?
18   A.    Again, you'd have to look at the CV.  I
19   believe it was 1966 --
20   Q.    Got it.
21   A.    -- as opposed to 1965.
22   Q.    Okay.  And that was in Pennsylvania,
23   correct?
24   A.    Correct.

---

32

1    Q.    Okay.  How often would you say you -- you
2    performed relief work for the independent community
3    pharmacies that you previously mentioned?
4    A.    How often?
5    Q.    Yep.
6    A.    When I was doing it, maybe one shift a week.
7    Q.    One shift a week for how long?  How many
8    years?
9    A.    It varied dramatically.  There would be
10   years when I wouldn't do any and there may be years
11   when I worked every week for one shift.
12   Q.    Okay.  Are you able to estimate how many
13   times total you worked or did relief work for
14   independent community pharmacies?
15   A.    I'm sorry.  Could you restate that?
16   Q.    Sure.  Can you estimate in total how many
17   times you did relief work for independent community
18   pharmacies?
19   A.    It would be a guess.  But I would say at
20   least a hundred times.
21   Q.    Okay.
22   A.    If not more.
23   Q.    When was the last time you worked as a
24   pharmacist in a retail setting?

---

33

1    A.    I would say approximately ten to 15 years
2    ago -- ten years ago.  I don't remember exactly.  But
3    somewhere in the ten to 15 years ago range.  I felt
4    that I had lost touch with the problems or the
5    challenges that pharmacists were facing and trying to
6    teach students, I felt that I needed a little bit of
7    practical experience, so I worked one whole summer --
8    I worked three months, so that would have been -- I
9    don't know how many hours, you'd have to calculate
10   the hours, but I worked full time, January,
11   February -- I'm sorry -- June, July and August for a
12   retail pharmacy chain in North Carolina.
13   Q.    Do you recall which pharmacy that was?
14   A.    Kerr Drugs.
15   Q.    Kerr Drugs?  Okay.
16          Okay.  And just to be clear, that's not
17   on this CV, correct?
18   A.    Well, you can see in 2004, I was licensed to
19   practice pharmacy in North Carolina.
20   Q.    Right.
21   A.    But I didn't -- but in the positions held,
22   no, I didn't include that because it was a -- a three
23   month job.  It was not lengthy as all the other ones
24   under positions held were.

---

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

**34**

```
1   Q.      Okay.  So --
2   A.      Nor did I list, as I told you, the one year
3   that I managed a store in the Pittsburgh,
4   Pennsylvania area, or those occasional relief
5   pharmacist jobs that I did.
6   Q.      Right.  Okay.  So in -- before you began
7   working for Kerr Drugs in North Carolina, when was
8   the last -- so before that time, when was the last
9   time you had worked as a pharmacist in a retail
10  setting?
11  A.      That I can't tell you.
12  Q.      More than five years?
13  A.      I don't want to guess.  I don't remember.  I
14  know that I was doing relief work periodically, but I
15  don't remember the last time that I did it prior to
16  the summer in North Carolina.
17  Q.      All right.  Fair enough.
18  A.      And it would have been in 2005 or 2006 --
19  Q.      Okay.
20  A.      -- that I worked the summer in North
21  Carolina.
22  Q.      Okay.  The summer that you worked in North
23  Carolina as a pharmacist for Kerr Drugs, did you ever
24  dispense corticosteroids, specifically Prednisone and
```

**35**

```
1   Dexamethasone?
2   A.      I'm sure that I did, but I cannot remember
3   any specific prescriptions.
4   Q.      Okay.  During your time as a pharmacist for
5   Kerr Drugs, do you recall ever questioning a doctor's
6   prescription?
7   A.      I cannot remember back.  Sorry.
8   Q.      That's okay.  Do you recall ever refusing a
9   doctor's prescription when you worked as a pharmacist
10  at Kerr Drugs?
11  A.      I do not remember.  I'm sorry.
12  Q.      That's all right.
13  Q.      And -- and, Dr. Gainor, what -- where are
14  you currently employed?
15  A.      I'm self employed.  I do consulting work.  I
16  do expert testimony.
17  Q.      Okay.  How much of your income is derived
18  from expert testimony or expert reports?
19  A.      Less than 10 percent.
20  Q.      Does that mean the remaining 90 percent is
21  from your consultant work?
22  A.      No.  My consultant work and my expert
23  testimony are 10 percent of my gross income annually.
24  90 percent comes from other sources.
```

**36**

```
1   Q.      Okay.  Where does the other 90 percent come
2   from?  Are you employed anywhere else?
3   A.      I'm not employed anywhere else.
4   Q.      Okay.  So where does the other 90 percent
5   come from?
6   A.      I'm not sure that's relevant to my
7   credentials.  I really don't feel that I need to
8   disclose to you my financial situation other than the
9   fact that 10 percent or less of my annual gross
10  income comes from work as an expert or consultant in
11  the area of pharmacy.
12  Q.      Does your 90 percent come from anything
13  related to pharmacy work?
14  A.      Again, I'm not going to go in to things
15  unrelated to this case or anything unrelated to --
16  for serving as a pharmacy expert.  I will tell you
17  and I'll testify under oath, which I am, that none of
18  my other income has anything to do with pharmacy.
19  Q.      Okay.  So the other remaining 90 percent has
20  nothing to do with pharmacy, correct?
21  A.      That is correct.
22  Q.      Okay.  Does the remaining 90 percent have
23  anything to do with legal work?
24  A.      Again, I'm not -- unless Mr. Lamb directs me
```

**37**

```
1   to answer, this is --
2               MR. LAMB:  Do you want -- do you
3   want to talk about this off the record for a second,
4   Susan?
5               MS. KEESLER:  Yes.
6               MR. LAMB:  See if we can clear it
7   up.
8               THE VIDEOGRAPHER:  2:22, off video.
9        (Discussion off the record.)
10              THE VIDEOGRAPHER:  2:29, on video.
11  BY MS. KEESLER:
12  Q.      Doctor, the less than 10 percent of your
13  income that's derived from expert work, are you able
14  to break down that percentage whether you're hired by
15  plaintiffs or defendants for the expert work?
16  A.      I'm sorry, you have to ask that again,
17  Susan.
18  Q.      Sure.  The less than 10 percent that you
19  derive from expert work, are you able to provide a
20  breakdown as to whether you're hired by plaintiff or
21  defense?
22  A.      I cannot -- no, I can't give you a specific
23  breakdown.  And it varies by year because I may only
24  have -- be involved in two or three cases a year.
```

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

38

1  Sometimes it's on plaintiff side, sometimes it's on
2  defense side.  I try to be approximately equal in
3  terms of representing both sides so that I don't show
4  a bias toward one or the other.
5  Q.    Do you believe the breakdown is closer to
6  50/50?
7  A.    It would obviously depend on what year we're
8  talking about, Susan.  There would have been some
9  years --
10  Q.    I'm asking in total, Dr. Gainor.
11  A.    I can't give you that number.  I'm sorry,
12  Susan.
13  Q.    Okay.  Are you still currently licensed in
14  Pennsylvania to practice pharmacy?
15  A.    Yes, I am.
16  Q.    When does that license expire?
17  A.    This is an even numbered year, it will
18  expire at the end of September.
19  Q.    Okay.  All right.  And you indicate in your
20  report that your rate of compensation for expert
21  reports is 300 an hour.  Is that correct?
22  A.    Yes.
23  Q.    Okay.  And what is your rate of compensation
24  for testimony?

39

1  A.    Same.
2  Q.    Okay.  Is it any different for trial
3  testimony?
4  A.    I have a flat rate per hour.  It doesn't
5  matter what I'm doing.
6  Q.    Okay.  How much were you compensated in this
7  matter?
8  A.    I have no idea.  I've only sent one bill and
9  I think that was $1,800.
10  Q.    Okay.  Dr. Gainor, have you ever testified
11  as an expert regarding dosing or adverse affects of
12  corticosteroids?
13  A.    I cannot remember any specific case.  Seems
14  to me there was a case involving corticosteroids, but
15  I don't remember the specifics of it.  And it goes
16  back many, many years.
17  Q.    Okay.  To your knowledge, have you ever had
18  any of your expert opinions precluded from trial?
19  A.    Never.
20  Q.    To your knowledge, have you ever been
21  disqualified as an expert before?
22  A.    Never.
23  Q.    Do you know if you've ever -- your expert
24  opinion or report has ever been subject to a Daubert

40

1  motion?
2  A.    I'm sorry.  Subject to --
3  Q.    A Daubert or Frye motion?
4  A.    To the best of my knowledge, no.
5  Q.    Okay.  I'm going to just scroll up here, Dr.
6  Gainor, to the section under list of cases and
7  publications.  You list here, in the previous ten
8  years, I've contributed to one publication.  And you
9  listed, the opioid abuse and misuse epidemic, colon,
10  implications for pharmacists in hospitals and health
11  systems.
12        That publication, Dr. Gainor, it looks
13  like it only addresses opioid abuse, but did that
14  publication at all involve anything in regards to
15  corticosteroids?
16  A.    My recollection is, no, that was strictly
17  opioid use in hospital environments.
18  Q.    Okay.  Have you ever published any articles
19  regarding the dosage and/or effects of
20  corticosteroids?
21  A.    No.
22  Q.    Further down in your -- sorry, further up.
23  Here we go.  Bottom of Page 1.  Dr. Gainor, you
24  indicate that you have presented over 500 lectures

41

1  throughout the United States and Canada on legal
2  aspects of healthcare.  Did any of those lectures
3  involve or address corticosteroids?
4  A.    None of them specifically addressed
5  corticosteroids, but I am certain that a number of
6  them, corticosteroids may have been mentioned as a
7  therapeutic class that could involve risk to
8  patients.  Because those lectures would have also
9  included antibiotics and the risk to patients,
10  analgesics and the risk to patients, and basically
11  any other therapeutic class of drugs.  Because as we
12  started out saying, almost every drug has some risk
13  to it.
14  Q.    Okay.  Do you know or you think -- or you
15  think that corticosteroids, as a therapeutic class,
16  that could have involved a risk to patients?
17  A.    I know for sure that part of those lectures
18  would have involved a discussion, perhaps very brief,
19  but a discussion on corticosteroids.
20  Q.    Okay.  Did you keep any of your, I guess,
21  written materials with respect to those lectures?
22  A.    No.
23  Q.    Okay.  Therefore, do you have any written
24  materials related to the lecture where you indicated

CARL GAINOR, Ph.D, JD

42

1  that -- that you mentioned corticosteroids as a
2  therapeutic class that could have involved risk to
3  patients?
4  A.    Not that I know of, no.
5  Q.    What do you recall from that lecture where
6  you mentioned corticosteroids as a therapeutic class
7  that could have involved risk to patients in terms of
8  the risks?
9  A.    I don't remember the specifics.  I can tell
10 you that generally, I would always lecture on the
11 risks of any therapeutic class of drugs and --
12 Q.    Okay.
13 A.    Something that both the doctors, the nurses
14 and the pharmacists had to be aware of.
15 Q.    Okay.
16 A.    And a list of side effects and potential
17 adverse affects from corticosteroids, of course, are
18 pretty well documented.
19 Q.    Okay.  But you can't recall what risks were
20 laid out in that lecture as it pertained to
21 corticosteroids?
22 A.    Not specifically.
23 Q.    Okay.  Do you recall if it addressed dosage
24 of corticosteroids?

43

1  A.    I don't remember specifically.  But they --
2  almost every lecture would address the issue of
3  excessive doses on all therapeutic classes.
4  Q.    And when you say therapeutic class, what
5  does that mean?
6  A.    A class of drugs that does a specific
7  therapeutic -- has a specific therapeutic action in
8  the human body.
9  Q.    Okay.  We're going to get back to that.
10       When you worked for the Pharmacists
11 Association, Dr. Gainor, did you ever provide any
12 legal counsel to the association as it pertained to
13 the dosage and/or effects of corticosteroids?
14 A.    No.  That would not have been my role as
15 counsel to the Pennsylvania Pharmacists Association.
16 Q.    Okay.  So you mentioned -- sorry, I'm
17 looking at your -- back to your CV.  In all of your
18 academic positions -- and I apologize if I already
19 asked this -- but did any of your academic teaching
20 cover the dosage and/or effects of corticosteroids?
21 A.    I would say every single class -- every
22 single course that I taught would have involved
23 issues of potential risks from dosing that was
24 inappropriate.

44

1  Can I tell you that I specifically
2  addressed corticosteroids in every single course?
3  No.  But certainly it would be highly probable that
4  it would have been one of the therapeutic classes
5  that we would have discussed in the law course as a
6  drug that could potentially cause harm and that the
7  pharmacist needed to be aware in terms of the risks
8  of what the patient was ordered and whether that
9  would be a potential problem.
10 Q.    Okay.  And what -- what did your teaching
11 involve in terms of advising students as to when to
12 question providers?
13 A.    I think that's been asked and answered.  I
14 basically told -- taught pharmacists the laws, the
15 regulations and civil liability.  And as part of the
16 civil liability -- well, as actually part of the law,
17 is also we talked about doing prospective drug
18 utilization reviews, we talked about counseling
19 patients and we talked about the potential civil
20 liability if a pharmacist did not adequately protect
21 the patient.
22 Q.    Okay.  What did you teach your pharmacy
23 students about the standard of care at pharmacies to
24 patients, if any?

45

1  A.    I'm sorry.  You're --
2  Q.    Okay.  During your academic teaching, did
3  you cover or teach the pharmacy students about the
4  standard of care owed to patients by pharmacists?
5  A.    Did I teach them about the standard of care?
6  Q.    Yes.
7  A.    Yes.
8  Q.    Okay.  And so what did you teach during that
9  time about the standard of care?
10 A.    That pharmacists have a duty to the patient;
11 if they breach that duty and the breach causes harm,
12 they're going to be liable.
13 Q.    Okay.  And what -- how was the duty to the
14 patient defined?  What did that include?
15 A.    Protecting the patient from harm.
16 Q.    Okay.  And did you teach your students as to
17 how they would go about doing so?
18 A.    I gave them general suggestions, the things
19 that we've already talked about; consulting with the
20 doctor, doing research in the literature, talking to
21 the patient.
22 Q.    When you say talking to the patient, talking
23 to patient about what?
24 A.    What their symptoms are, what their problems

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

46

1    were, what their age was, what their weight was in
2    certain cases.  I mean, we sometimes have to ask
3    rather personal questions of patients in order to
4    help protect them.
5    Q.      Is the pharmacist required to ask those
6    questions of the patient?
7    A.      The pharmacists are required to do a
8    prospective drug utilization review.  In order to
9    properly do that, the pharmacist needs to have
10   adequate information.  So each patient, each
11   prescription is going to differ based upon what the
12   condition is, who the patient is, what information
13   the pharmacist needs to go through, whatever the
14   pharmacist is going to feel is important in that
15   prospective drug utilization review.
16   Q.      Okay.  Let's talk about this terminology
17   you're using, drug utilization review.  What is that?
18   A.      It's looking at the prescription before we
19   give it to the patient to assure that it's
20   appropriate.
21   Q.      Okay.  And when you say to make sure it's
22   appropriate, what do you mean by appropriate?
23   A.      That it's not going to hurt the patient,
24   that the benefit is going to outweigh or the

47

1    potential benefit is going to outweigh the potential
2    for harm.  Back to being redundant, but every single
3    drug has some risks associated with it.
4    Q.      Okay.  And is a pharmacist required to
5    perform a drug utilization review for every single
6    patient?
7    A.      Yes.  In some states it's required on both
8    new prescriptions and refills.  On other states, it's
9    just required with new prescriptions.
10   Q.      Okay.  So let's talk about Pennsylvania.
11   What is a pharmacist required -- what does
12   Pennsylvania require as to pharmacists and drug
13   utilization reviews?
14   A.      I would have to look that up.  I know it's
15   required on all new prescriptions.  I always
16   taught -- all the pharmacy students that I taught,
17   you should do it on both new and refill because
18   circumstances can change.
19   Q.      And one second.  Okay.  So you don't know as
20   of today whether in PA it's required on refill
21   prescriptions, correct?
22   A.      I would have to look it up.  It's a very
23   narrow wording in the various statutes.  And some of
24   them say on new prescriptions and some of them say on

48

1    all prescriptions.  Different states have different
2    rules.  And I have to look that sort of thing up for
3    each individual state.
4        But as I say, I taught pharmacy students
5    and I believe that it is the standard of care that
6    they should do it certainly on refills, as well as
7    new prescriptions because as I say, circumstances for
8    the patient can change.  And so the fact that you did
9    it once weeks, months ago, does not necessarily
10   assure that the same fact situation on the part of
11   the patient exists today.
12   Q.      Okay.  So does the pharmacist standard of
13   care to a patient include the pharmacist performing
14   the drug utilization review?
15   A.      Yes.
16   Q.      Okay.  And for Pennsylvania specifically, in
17   terms of today, you know that it's required on all
18   new prescriptions --
19   A.      Correct.
20   Q.      -- correct?
21   A.      Correct.
22   Q.      All right.  Dr. Gainor, have you ever met
23   the plaintiff in this case, Stacey Wolking?
24   A.      No, I have not.

49

1    Q.      Have you ever had any conversations with the
2    plaintiff?
3    A.      No, I have not.
4    Q.      Now, you prepared an expert report, looks
5    like dated on April 24th, 2024, correct?
6    A.      I'm sorry.  I prepared an expert report?
7    Q.      Yes.  Dated April 24th, 2024?
8    A.      Yes.  April 24th, correct.
9    Q.      Okay.  What were you specifically asked to
10   opine on in this matter?
11   A.      I believe that Mr. Lamb just asked me to
12   review the documents, review the facts of the case,
13   and give my opinion as to whether the pharmacists had
14   behaved properly, had they breach the standard of
15   care.
16   Q.      Were you asked to provide a causation
17   opinion in this matter?
18   A.      Was I asked to provide --
19   Q.      A causation opinion in this matter.
20   A.      No.  No.  Causation is not part of my role.
21   Q.      All right.  So I want to go now -- I'm going
22   to -- since we still have this up here, expert
23   report.  Okay.
24        MR. LAMB:  Susan, is there any

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

---

**50**

1  chance we can take a five minute break?
2          MS. KEESLER: Yeah.  Sure.
3          THE VIDEOGRAPHER:  2:39, off video.
4          (Whereupon, a short recess was held.)
5          THE VIDEOGRAPHER:  2:44 on video.
6  BY MS. KEESLER:
7      Q.   Dr. Gainor, I'm going to share my screen
8  again with you, display Exhibit 1.  And this is your
9  expert report beginning on Page 1, correct?
10     A.   Correct.  It appears to be, yes.
11     Q.   Okay.  I'm going to jump to bottom of Page 2
12 going on to the top of Page 3.  It indicates in
13 materials reviewed, are these all the documents that
14 you reviewed in preparing your expert report dated
15 April 24th, 2024?
16     A.   My recollection is yes.
17     Q.   Okay.  Did you review any additional
18 materials since that time?
19     A.   I can't answer that.  Mr. Lamb has provided
20 some transcripts, I guess the transcripts were
21 already there.  I know he did provide me with a copy
22 of the actual prescriptions and an e-mail from the
23 doctor.  Those are the only things that I think I
24 remember getting that were not included in that list

---

**51**

1  of materials reviewed back in April.
2      Q.   Okay.  But you had reviewed the
3  prescriptions themselves prior to today's deposition?
4      A.   Well, I've only -- I've been able to review
5  three prescriptions, yes.
6      Q.   Okay.  So I see that the materials reviewed,
7  you reviewed the transcripts of Courtney Young, Brian
8  Bryk and Henry Lindner.
9           Did you review the deposition transcript
10 of the plaintiff in this case, Stacey Wolking?
11     A.   I do not believe I had reviewed that when I
12 did the report.  I know that Mr. Lamb has now
13 provided me with a copy of the plaintiff's
14 deposition.
15     Q.   Okay.  Did you review that prior to today's
16 deposition?
17     A.   I believe I did skim through it.  I didn't
18 read it in detail.  But I did skim through it, yes.
19     Q.   Okay.  Is there a reason why you did not
20 review the plaintiff's deposition prior to drafting
21 the April 24th, 2024 report?
22     A.   I don't believe I had it.
23     Q.   Okay.  Would you have found it helpful to
24 have in preparing your expert report?

---

**52**

1      A.   I don't really know.  I'm thinking back --
2  I'm thinking now, I did read through it briefly.  I
3  do not think that there was anything in the
4  plaintiff's deposition that would have altered my
5  opinions.
6           So in that regard, no, I can't say it
7  would be helpful.
8      Q.   Okay.  Prior to preparing this expert
9  report, did you review any of plaintiff's
10 prescriptions from other pharmacies that she was
11 receiving around the same time?
12     A.   I only know that there was some document
13 that showed she had gotten a few prescriptions, that
14 I believe it was Harris Teeter.  The quantities were
15 rather minimal as compared to the quantities that the
16 patient had received from the defendant pharmacy.
17          So I know that there were several
18 prescriptions from Harris Teeter, but they did not
19 appear to be that significant in terms of quantity,
20 especially as compared to the amount dispensed by
21 Tunkhannock Pharmacy.
22     Q.   Okay.  So is that why it was not listed as
23 one of the materials --
24     A.   No, I didn't have it.  As I told you, I

---

**53**

1  didn't have it at the time.
2      Q.   Oh, you didn't have it at the time.  When
3  did you receive it?
4      A.   Probably within the last two weeks.
5      Q.   Okay.  Would it have been helpful to have
6  that information prior to drafting your report, your
7  initial report?
8      A.   I believe I -- I believe, Susan, I said, no,
9  I did not really find anything in that deposition
10 that --
11     Q.   I'm not talking about the deposition
12 transcript.  I'm talking about her other
13 prescriptions from the other pharmacies at around the
14 same time.
15     A.   Well, I believe I knew that she had had
16 several prescriptions filled at Harris Teeter.  But
17 as I keep saying, the quantities were so small by
18 comparison to the quantities of corticosteroids that
19 were dispensed by this -- by the defendant pharmacy,
20 that it would not have changed my opinion.
21     Q.   Okay.  When did you know that information;
22 prior to drafting this report or after?
23     A.   That I can't tell you exactly because I've
24 gotten various documents.  I know that I had spoken

---

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

CARL GAINOR, Ph.D, JD

54

1  with Mr. Lamb. So I cannot tell you exactly when I
2  knew that the patient had received some prescriptions
3  from Harris Teeter.
4  Q.    Okay.
5  A.    But as I say, the quantities there were not
6  anywhere near close to what she received from the
7  defendant pharmacy.
8  Q.    Okay. How did you learn of the quantities
9  that she received from the other pharmacies? What
10 document did you review?
11 A.    I don't know when I got this, that's my
12 problem. But it was an e-mail from, I believe, Dr.
13 Lindner to the patient. And it shows one, two, three
14 prescriptions from Harris Teeter. There was a bit of
15 a problem with that because the doctor had also
16 written another prescription that he did not include
17 in this list. And I'm not sure why that problem
18 existed. But again, it wasn't really relevant to the
19 request that Mr. Lamb had given to me.
20 Q.    Okay. So is your only source of information
21 as to what amounts of steroids she received from
22 other pharmacies based on that e-mail from Dr.
23 Lindner to the patient? Or did you review any other
24 documents?

55

1  A.    I believe that's the only document that
2  actually gave me quantities and specific
3  prescriptions that were filled at Harris Teeter.
4  Q.    Okay. What were those prescriptions and the
5  amounts?
6  A.    According to the e-mail that Dr. Lindner
7  provided to the patient, there was a prescription
8  written on August 7th for Prednisone, five
9  milligrams. It appears to be 120 total tablets.
10         On August 30th, the prescription was for
11 Prednisone, one milligram tablets. So the dose was
12 only one-fifth -- or the strength, rather. That was
13 180 tablets. And the directions were again
14 significantly lower than the original prescription
15 that they filled.
16         And the last one that I believe I saw was
17 on October 5th. And that was a prescription for
18 Dexamethasone, four milligrams, No. 100.
19         Those were the three that I remember
20 seeing based on what the doctor had e-mailed to the
21 patient. But as I said, there was one issue that I
22 had a problem with because there was a prescription
23 that the doctor wrote that was filled with the
24 defendant pharmacy for Dexamethasone, four

56

1  milligrams, 200 of them, on August 15th, which
2  doesn't appear in the e-mail, but does appear in the
3  pharmacy records.
4  Q.    Okay. The 10/5 prescription that she
5  received from Harris Teeter, I couldn't hear what you
6  said. Was it four milligram and how many tablets?
7  A.    100.
8  Q.    Thank you.
9         Okay. So those are the only
10 prescriptions that you have been made aware of that
11 she received from another pharmacy, Harris Teeter,
12 correct?
13 A.    Correct. That's correct.
14 Q.    Okay. Did you receive -- did you receive
15 any other information or documents as to any other
16 prescriptions she was on around the same time period?
17 A.    No, I don't believe so.
18 Q.    Did you ever ask to see plaintiff's
19 deposition transcript prior to preparing your report?
20 A.    No, I didn't.
21 Q.    Okay. You list here in the materials
22 reviewed the patient prescription history report. I
23 just want to make sure that I understand which
24 document you reviewed. Hang on one second.

57

1         I was going to stop sharing it and
2  briefly show my screen to you. Sorry.
3         MS. KEESLER: I'm going to mark
4  this as Exhibit 2.
5         (Whereupon, Gainor Exhibit 2, Patient
6  Prescription History Report, was marked for
7  identification.)
8  BY MS. KEESLER:
9  Q.    Is this the document that you reviewed that
10 you referred to as patient prescription history
11 report, No. 6 in materials reviewed?
12 A.    Yes.
13 Q.    Okay. Stop sharing that for a second.
14        You also have here listed patient
15 dispensing report with copy of one prescription. So
16 I'm not familiar with that document just by the title
17 that was given. Can you just describe to me what was
18 contained in that report?
19 A.    That one I do not have a hard copy and I do
20 not remember it, so I can't comment on what that was.
21 I did ask for a -- a more detailed one, which Mr.
22 Lamb provided with copies of prescriptions and that
23 you just had it up on the screen.
24 Q.    Okay. So at the time of your report, you

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

58

1  didn't have the actual -- the prescriptions for each
2  of the -- each of the prescriptions that TCC filled
3  that are at issue in this case?
4  A.     Again, I think I did know the quantities.
5  Now it may have been based on information in the
6  Complaint or it may have been based on some other
7  information that Mr. Lamb had given me.  But I was
8  aware of the significant quantities of drugs, of
9  corticosteroids that had been dispensed by
10 Tunkhannock Pharmacy.
11 Q.     Okay.  Were you aware of the dosing
12 instructions that accompanied each of the
13 prescriptions at issue before preparing this expert
14 report?
15 A.     I believe I did, yes, because that was one
16 of the things that led me to the conclusions that I
17 did based on the quantity that this patient was
18 receiving.
19 Q.     Okay.
20 A.     Because I remember there were no -- the
21 amount that she was taking, the doctor had been
22 very, I'm going to say flexible, in allowing her to
23 take, it seemed, whatever she wanted or felt she
24 needed, which is a little unusual with this type of a

59

1  drug.  You know, it's one thing if a patient's in
2  pain and the doctor says take as needed.  It's a
3  little unusual, at least in my experience, to see
4  that for corticosteroids.
5  Q.     Was it your understanding that under Dr.
6  Lindner, she was essentially under, I guess, how he
7  referred to it as a patient-directed treatment plan?
8  A.     I saw that terminology.  And again, it was
9  just very unusual because normally I see that on
10 medications like analgesics for pain, but not for
11 things like corticosteroids or antibiotics or drugs
12 where the patient really can't feel what's happening.
13 Q.     All right.  Give me one second.  All right.
14        So it looks -- I'm going to -- I'll get
15 back to that.
16        Did you ever ask for any records
17 reflecting any other medications that Miss Wolking
18 was on at the time?  And when I say other
19 medications, I mean other non-steroid medications
20 that she was on at the time.
21 A.     I did not ask.  It was my understanding,
22 either from the Complaint or it may have been some
23 discussions with Mr. Lamb, that he had ordered some
24 anti-malarial or antibiotic medications, but those

60

1  were not -- it does not seem like they were relevant
2  to the problems involved in this case.
3  Q.     Who made that determination that those
4  medications were not relevant to the problems in this
5  case?
6  A.     Well, I -- for my purposes, I made that
7  decision, that whether she was on antibiotics or
8  anti-malarials, those weren't the drugs that were
9  causing her problems.  Although, I can make the
10 argument that you certainly normally are not going to
11 give high doses of corticosteroids with -- when
12 you're trying to treat an infection because of course
13 the corticosteroids are immunosuppressants and
14 normally you do not want to suppress a patient's
15 immune system if you're trying to treat an infection.
16 Q.     Did you ever -- do you have any records that
17 showed prior occasions where -- I'm going to refer to
18 Tunkhannock Compounding Center as TCC throughout the
19 deposition.
20        But did you ever review any records
21 indicating prior occasions where TCC had filled
22 Prednisone or Dexamethasone prescriptions for other
23 patients other than Miss Wolking?
24 A.     No.

61

1  Q.     Did you ever ask for any records related to
2  that?
3  A.     No.  I -- no.
4  Q.     Okay.  Did you believe that those -- that
5  information could be helpful in your -- your expert
6  evaluation in this case?
7  A.     No, I don't believe that what they did with
8  other patients would be relevant or even admissible
9  in this case.
10 Q.     Okay.  So let's put admissibility aside.
11 Why did you not think it would be relevant?
12 A.     Because the only issue I was being asked to
13 consider was the plaintiff in this case.
14 Q.     Would you have -- actually, strike that.
15        Dr. Gainor, in preparing your expert
16 opinions, what methodology did you use?
17 A.     You're going to have to define methodology.
18 Q.     How is it that you arrived at your expert
19 opinions in this case?
20 A.     I looked at the facts and I made a
21 professional opinion based on my 40 or 50 years of
22 experience in pharmacy.
23 Q.     When you say you looked at facts, you looked
24 at the materials that were provided to you?

16 (Pages 58 to 61)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

62

1    A.    I looked at the materials that were provided
2    to me.  And also, as I say, the knowledge that I've
3    accumulated over the last four or five decades.
4    Q.    How much time did you spend in reviewing the
5    records?
6    A.    I have no idea.  I would have to go back
7    through billing and I don't have that handy at this
8    point.
9    Q.    Okay.  Do you recall how much time you spent
10   in drafting a report?
11   A.    No, I don't.
12   Q.    Okay.  Before we move forward, do you have
13   any other additional opinions that are not in your
14   initial report?
15   A.    That's so broad a question I can't answer
16   it.  I have opinions about a number of things, Susan.
17   But relevant to that case, no, I think the things
18   that are in the report are all that I believe to be
19   relevant to this case.
20   Q.    Okay.  What limitations did you encounter,
21   if any, in preparing this report or in evaluating --
22   A.    I'm sorry, what was --
23   Q.    What -- what limitations did you face in
24   preparing your expert report or in evaluating this

63

1    case?
2    A.    I don't feel that I had limitations.  If I
3    felt there were limitations, I would have discussed
4    it with Mr. Lamb and asked for additional
5    information.
6         I believe that I had adequate information
7    based on what the prescriptions were, the knowledge
8    that I have, the scientific literature giving normal
9    dosage ranges for corticosteroids, the experience
10   that I've had over the years and the transcripts from
11   the pharmacists.
12   Q.    One moment.  Okay.  Is there any difference
13   between -- give me one moment.  Is there any
14   difference in a pharmacist's duty in a compounding
15   pharmacy versus a retail pharmacy?
16   A.    No.
17   Q.    Other than what you've already testified to,
18   Dr. Gainor, what is the duty of a pharmacist to a
19   patient when they received a prescription from the
20   provider?
21   A.    Well, in my opinion the duty is to, No. 1,
22   do a prospective drug utilization review which
23   consists of various things; considering the dose, the
24   duration of therapy, other drugs a patient's taking,

64

1    idiosyncrasies of that patient, et cetera.  So the
2    first duty would be to go through that.
3         And if any of those -- I'm going to say
4    checklist items raise concern, then the pharmacist
5    needs to resolve that concern before he or she
6    provides a drug to the patient.
7         The next thing, of course, is to fill the
8    prescription accurately, putting the correct drug in
9    the correct dose in the prescription vial or bottle.
10        The next step would be to label it
11   properly to make sure that the label correctly
12   directs the patient on how to take the medication.
13        And then of course to counsel the
14   patient, if the patient's willing to accept
15   counseling, on the drug.
16        And then the pharmacist would dispense
17   it.
18        So at every step is the duty.  And if
19   they provide that, then I believe they've complied
20   with their duty of care.  Part of that duty may also
21   include documentation of anything that was unusual,
22   any discussions with the patient, any discussions
23   with the prescriber.  So documentation is, again,
24   part of the pharmacist's duty of care.

65

1    Q.    Okay.  I know you've already testified to
2    some of the pharmacist's procedures to fulfill
3    certain of those -- those items that you just listed
4    out.  In terms of the third duty you listed out,
5    having to resolve concerns, if any, before providing
6    the drug to the patient, is there anything else you
7    want to add as to what their procedure should entail
8    to do that?
9    A.    No.  I think I've -- I've told you what a
10   pharmacist normally and should do relative to
11   dispensing a prescription.
12        Now, any one of those steps may require
13   further investigation, further discussions with the
14   patient, with the doctor.  So there may be additional
15   things that need to be done under the duty of care.
16   But that depends on each individual prescription, the
17   facts of that particular treatment and that
18   particular patient.
19   Q.    Dr. Gainor, when is a -- based on your
20   training as a pharmacist and your knowledge in
21   pharmacy, when is a pharmacist required to reject a
22   prescription?
23   A.    There's no particular time when a pharmacist
24   is required to reject a prescription, except under

17 (Pages 62 to 65)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

**66**

1   the Controlled Substances Act.  And the DA's
2   interpretation is that if there are red flags
3   associated with a prescription, then the pharmacist
4   has to resolve those red flags.  If he or she is not
5   able to resolve them, then the pharmacist is directed
6   to reject the prescription.
7           But that's really the only time I can
8   think where a pharmacist is by law directed to reject
9   a prescription.  The rest of it is based on the
10  pharmacist's professional duties, professional
11  responsibility of care to the patient.
12  Q.      Okay.  And would you say part of that
13  involves the pharmacist's own judgment or exercising
14  their own judgment?
15  A.      Well, pharmacists are going to exercise
16  their own judgment, but I'm not going to say that
17  every pharmacist has good judgment.
18  Q.      Okay.
19  A.      So, you know, I mean this particular case is
20  in court because of a situation where the pharmacist
21  did not, in my opinion, exercise good judgment.
22  Q.      Okay.  Therefore, does a pharmacist have
23  discretion to reject a prescription -- so
24  notwithstand -- so putting control substances aside.

**67**

1   So we're not dealing with controlled substances.
2           Can a pharmacist exercise discretion to
3   reject a prescription?
4   A.      Yes.  A pharmacist has no legal duty to fill
5   any prescription if there is a legitimate reason for
6   refusing to fill it.  And in Pennsylvania, and I
7   don't want to get in to political issues, but for
8   instance a pharmacist can refuse to fill any drugs
9   that he or she feels are an abortion patient,
10  having nothing to do with -- in fact arguably at the
11  detriment to the patient.  So the pharmacist has
12  discretion.
13  Q.      Okay.  And in exercising that discretion,
14  Dr. Gainor, what factors should the pharmacist
15  consider?
16  A.      All the ones we talked about.  I mean,
17  that's way too broad a question and we covered, I
18  think, the duty of a pharmacist.  And as long as the
19  pharmacist has assured that the dangers to the
20  patient are outweighed by the benefits, then I
21  believe that's it.
22  Q.      Doctor, you've heard of the term off label
23  use, correct?
24  A.      Correct.

**68**

1   Q.      Can you just briefly describe the practice
2   of prescribing certain medications off label?
3   A.      Off label just means that it's being used
4   for a non-FDA approved use.
5   Q.      Okay.  Do you agree that this practice
6   involves prescribing drugs for -- involves
7   prescribing drugs for unapproved indication, age
8   group, dosage or pharma administration?
9           MR. LAMB:  Objection to form.
10          You can answer.
11  A.      Pardon me?
12  Q.      Do you agree that the practice of off label
13  use involves prescribing drugs for an unapproved
14  indication --
15  A.      Let's stop right there.  Yes, I do believe
16  that it is --
17  Q.      Hold on.  I need to finish my question
18  first, Dr. Gainor.
19  A.      Well, the reason -- the problem, Susan, then
20  you're -- you've made a compound question and it
21  can't be answered.  If you take them one step at a
22  time, I'll be more than happy to answer them.
23  Q.      Okay.
24  A.      For instance, you said for an unapproved

**69**

1   use.  Yes, that would be an off label or unapproved
2   use of an approved drug.
3   Q.      Okay.  Do you agree this practice
4   involves -- also involves prescribing drugs for a
5   particular age group?
6   A.      That could be definitely an unapproved use
7   of an approved drug.  A drug that hasn't been
8   approved for use in children, very frequently
9   pediatricians are forced to use a drug that is not
10  approved for children on children because there's no
11  other drug available or no other drug that's as
12  appropriate for the child.  So certainly, yes, age
13  groups could be an unapproved use.
14  Q.      Do you agree that the off label practice
15  involves prescribing -- or can involve prescribing
16  drugs for an unapproved dosage?
17  A.      Absolutely.  The same thing.  These
18  drugs -- every drug that is approved by the FDA is
19  approved for certain indications in certain dosage
20  levels, certain manufacturing practices.  The FDA is
21  pretty strict about approving drugs.  And so drugs
22  are approved within these very narrow parameters.
23          But once they're on the market,
24  physicians are permitted by law to use that drug for

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

**70**

1    anything that the doctor feels is appropriate. There
2    are no limits on the doctor's use of the drug once
3    it's been approved by the FDA. And it's very
4    frequent that drugs are used outside their FDA
5    approved parameters.
6    Q.    Okay. Do you agree that this off label
7    practice also involves prescribing drugs for an
8    unapproved form of administration?
9    A.    That one you're going to have to help me
10   with because I can't see a form of administration --
11   the answer to your question is yes. And I can give
12   you a specific example.
13   Q.    Okay.
14   A.    When I worked at the Veterans Administration
15   Hospital, the psychiatric facility, these patients
16   would not swallow tablets. So one of the things that
17   we as pharmacists did was grind the tablets up, put
18   it in to a syrup, made it a liquid dosage form which
19   they could swallow. That was an unapproved dosage
20   form. But it was a common practice to help the
21   patients be able to take their medication.
22        So, yes, there are situations where --
23   and especially, I would say, in a compounding
24   pharmacy where you may be changing the dosage form to

**71**

1    make it more palatable or make it more easily
2    digested or consumed by the patient.
3    Q.    What factors would influence off label
4    prescribing?
5    A.    I just told you. I gave you a total list.
6    Q.    Okay. Do you -- do you agree that it
7    includes clinical experience; in other words, that
8    physicians may rely on their own experience or the
9    experience of their colleagues?
10   A.    Doctors have the ability or the legal right,
11   the legal ability, to order any drug for any purpose.
12   Once the drug's an FDA approved drug, the doctor can
13   order it for an unapproved use. And that's -- but
14   then it becomes a question for the pharmacist, is
15   this drug now being used in a way that is so
16   dangerous to the patient that the pharmacist should
17   not provide that drug to the patient.
18   Q.    Do you agree that one of the factors that
19   influence off label prescribing also includes a
20   patient's needs; in other words, an individual
21   patient's circumstances, such as unique medical
22   history or specific health conditions?
23   A.    That would strictly be up to the doctor and
24   the patient. I gave you the example, certainly of a

**72**

1    patient that can't swallow tablets and so we at the
2    VA made a liquid dosage form to allow them to swallow
3    it more easily. So there's an example where a
4    patient idiosyncrasy requires an off label use.
5    Q.    So you would agree with that --
6    A.    Yes.
7    Q.    -- as one of the factors? Okay.
8    A.    Yes. Probably done regularly.
9    Q.    Okay. Do you also agree that one of the
10   factors that may influence off label prescribing can
11   include emerging research? In other words, studies
12   published in medical journals, if not yet leading to
13   official guidelines.
14   A.    Once the drug is FDA approved -- now if it's
15   in the literature, but not yet FDA approved, it's an
16   illegal drug. So, no, that does not apply to a drug
17   that is just involved in research.
18        But once a drug has been approved for one
19   use, research may be going on for a second or third
20   use, and doctors are permitted to order that drug for
21   the unapproved use and pharmacists are permitted to
22   fill the prescription.
23        But all of this off label, everything
24   that you and I have talked about in the last few

**73**

1    minutes, does not alleviate the pharmacist from
2    the -- the duty of care to make sure it's not going
3    to hurt the patient, that the risk is not greater
4    than the potential benefit.
5    Q.    Doctor, do you agree that many rare diseases
6    lack extensive clinical trials for all of the
7    potential treatments?
8    A.    I'm not sure that I'm qualified to answer
9    that question.
10   Q.    Okay. Do you agree that in situations where
11   no approved medications exists, doctors may prescribe
12   off label drugs based on their pharmacological
13   properties and clinical experience?
14   A.    I've answered that question. By law,
15   pharmacists -- or doctors, rather, are permitted to
16   order drugs that have been FDA approved for non-FDA
17   approved uses or off -- what we would call off label
18   use, unapproved uses.
19   Q.    In your report you make -- you state here
20   that -- well, actually, let me rephrase that. When
21   is a pharmacist required to question the
22   appropriateness of a medical provider's prescription?
23   A.    You'll have to define appropriateness.
24   Q.    Okay. So in your report, you state at the

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

74

1  very bottom that TCC failed to question the
2  appropriateness of Dr. Lindner's therapy.
3  A.      Correct.  The dose was grossly excessive, in
4  my opinion.
5  Q.      Okay.  Before we get there, what did -- so
6  when you -- when I asked when is a pharmacist
7  required to question the appropriateness of a medical
8  provider's prescription, so -- are you using the same
9  definition of appropriateness as you used in your
10 report -- let's -- strike that.
11        What did you mean by appropriateness when
12 you rendered the opinion TCC failed to question the
13 appropriateness of Dr. Lindner's therapy?
14 A.      I was using in this particular case in the
15 excessive doses that were ordered.  Those doses were,
16 in my opinion, not appropriate.  They were not backed
17 up by any scientific data.  They contradicted the
18 general recommendations for treating this condition.
19        But appropriateness, it could be that
20 it's a drug that was wrong for the infection, that
21 the organism wasn't susceptible to that antibiotic,
22 so that antibiotic would be -- would not be
23 appropriate.
24        So when we talk about pharmacists

75

1  determining appropriateness, it could cover the whole
2  gambit of is this the right drug for the condition,
3  is this the right dose, is this the right duration of
4  therapy, what about other drugs the patient's taking,
5  what about allergies that the patient has.  That
6  whole list, that litany of things that pharmacists
7  have been taught and trained to consider.
8         Part of the prospective drug use review,
9  perhaps, but that's what I mean when I say
10 appropriateness.
11 Q.      Okay.  So when is a pharmacy required to
12 question the appropriateness of a medical provider's
13 prescription?
14 A.      Any time the pharmacist believes, through
15 his or her knowledge and training, that the patient
16 may be harmed by this particular medication.  And by
17 the way, when I say harmed, it may be that the
18 condition would worsen.  It isn't that the drug would
19 cause a problem, it would be that the condition would
20 just worsen because the drug was inappropriate for
21 the patient's condition.
22        Example, an antibiotic that was not
23 approved and was not capable of treating a given
24 organism.  Well, that's going to harm the patient

76

1  because the organism is going to flourish in the
2  patient's body and the patient's infection is going
3  to get worse.
4         In this particular case, it's very
5  simple.  Appropriateness means you don't give
6  absolutely excessive doses of corticosteroids to a
7  patient, unless there's some emergency in an
8  intensive care unit where it's absolutely necessary
9  to get quantities of corticosteroids in to a patient
10 or there the risk of not giving it would outweigh the
11 risk of giving it.
12 Q.      Okay.  So let me ask you this.  You talk
13 about absolutely excessive doses.  You reviewed the
14 prescriptions in this case, correct?
15        You reviewed the prescriptions that were
16 dispensed by TCC in this case, correct?
17 A.      Yes.
18 Q.      Okay.  Are you alleging that each and every
19 one of those prescriptions was excessive or are
20 you -- are you opining that in total they were
21 excessive?
22 A.      I am opining that the quantities and the
23 doses were excessive based upon what the pharmacist
24 knew about this case.  They knew that this patient

77

1  was taking excessive doses.
2  Q.      How -- what is that based -- how did TCC
3  know that this patient was taking excessive doses?
4  A.      They could look at the prescription.  They
5  could see the quantity that she took and when she
6  asks for more.  And the fact that the doses were
7  being increased by virtue of changing from Prednisone
8  to Dexamethasone, going to a much more potent
9  medication --
10 Q.      Okay.
11 A.      -- it should have been clear to the
12 pharmacist that this was highly risky therapy.
13 Q.      Okay.
14 A.      It could have been backed up.  If the
15 scientific literature had backed it up and the
16 pharmacist had done that and documented something to
17 show that they had, in fact, considered these
18 factors, it might have been acceptable.
19 Q.      Okay.
20 A.      But certainly not under the circumstances
21 and facts of this case where there's almost no
22 documentation at all, there's no research that was
23 done in to the appropriateness of this drug for this
24 condition.  And, clearly, there was no documentation

20  (Pages 74 to 77)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

**78**

1  of appropriate dosing levels.  And the pharmacy knew
2  what they were dispensing.
3  Q.    Okay.
4  A.    They could look on their records and see
5  that on this date, the patient got X number hundred
6  of the drug.  They can see on the next date, the
7  patient got a higher potency drug.  And then after
8  that, another prescription.
9        So the pharmacist had a history of
10  exactly what this patient was taking and they
11  continued to --
12  Q.    Well, taking or given?
13  A.    Well, we have to assume that the patient is
14  taking the drugs that they're ordered.
15  Q.    Why do we have to assume?
16  A.    Which is a totally different case.  If it's
17  an opioid case, then they may be selling the drugs on
18  the street.
19  Q.    Okay.
20  A.    We know that.
21  Q.    Let me ask you a question.  Let me ask you a
22  question.
23        Is your statement that you just gave,
24  that TCC knew this patient was taking excessive

**79**

1  doses, based solely on the prescriptions themselves?
2  A.    Well, they knew because the patient was
3  ordering more.  Apparently talking to the pharmacy,
4  asking for refills.
5  Q.    Where did you get that information?
6  A.    From the deposition transcripts of the
7  pharmacists.  They don't document.  Almost nothing is
8  documented.  But their own testimony is that the
9  patient or the patient's husband would phone in and
10  ask for a refill and then the prescriptions would be
11  mailed out.
12  Q.    What --
13  A.    The doctor would electronically transmit a
14  prescription to the pharmacy with the directions to
15  fill it and mail it to patient.
16  Q.    Doctor, let me ask you something.  What
17  evidence did you look at that indicated that TCC knew
18  what the patient was taking on a daily basis?
19  A.    They can do basic math.  They knew how many
20  hundreds of Prednisone --
21  Q.    That's not my question.  Dr. Gainor, that's
22  not my question.
23        I -- my question was, what evidence that
24  you reviewed indicated that TCC knew what the patient

**80**

1  was taking on a daily basis.
2  A.    Because they knew -- since they had
3  dispensed that prescription, and if the patient or
4  the doctor is calling and ordering more, all the --
5  all the pharmacist has to do is divide the number of
6  tablets that they dispensed by the number of days
7  that had elapsed since the prior prescription.
8  Q.    Okay.  You reviewed the deposition
9  transcripts in this case.  I understand that you
10  didn't review the plaintiff's deposition.  But Dr.
11  Lindner's deposition and the records that you were
12  provided indicate that essentially her course of
13  treatment or how much she was taking on a daily
14  dosage depended on how she was feeling or doing at
15  the time, correct?
16        MR. LAMB:  Objection to form.
17  Objection to form.
18  Q.    You can answer.
19        MR. LAMB:  You can answer.
20  Q.    Correct?
21  A.    My understanding is that the doctor had left
22  it up to the patient to determine how much she
23  needed.
24  Q.    Okay.  And there is no evidence that what

**81**

1  plaintiff was taking on a daily basis, so she was
2  taking what she felt she was needed, was ever
3  communicated to TCC directly, correct?
4  A.    No.
5        MR. LAMB:  Objection to form.
6  A.    Susan, I think you're wrong.  I'm sorry.  I
7  don't mean to contradict you.  But if I'm a
8  pharmacist and I dispense a hundred tablets today and
9  four days later the patient or the doctor calls in
10  for a refill, I can justifiably assume that the
11  patient is taking 25 tablets a day.  It's basic
12  pharmacy calculations.  We do it regularly,
13  especially with analgesics where the patient comes in
14  too early to get a refill.
15  Q.    Okay.
16  A.    So you're -- you're question does not
17  address the facts of this case, which is the patient
18  or the doctor said the patient needs more.
19  Q.    Right.
20  A.    The pharmacist must assume then that the
21  patient has taken all that they dispensed in the
22  prior prescription.  You divide that by the number --
23  Q.    Okay.  So you're stating --
24  A.    Susan, if you let me answer.

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

**CARL GAINOR, Ph.D, JD**

82

1  Q.    Sure.  But there's no --
2  A.    Susan, let me answer.
3  Q.    Let me ask my next question.
4  A.    I dispense a hundred tablets and four days
5  later the patient comes back for a refill, I can --
6  not only can I, but I should assume that the
7  patient's taking 25 tablets a day.
8  Q.    Okay.
9  A.    Possibly even more.  But at least 25 because
10  she used up a hundred tablets in four days.
11  Q.    So, Doctor, your opinion --
12  A.    Your question doesn't make sense.
13  Q.    So, Doctor, your -- again, your statement is
14  assuming -- or rather your statement is based on
15  assumption, correct?
16  A.    Well, everything we're doing in this case is
17  based on some assumptions.
18  Q.    okay.
19  A.    I mean, we assume that the patient took the
20  drugs or you and I would not be talking today.
21  Q.    Is it your opinion that a pharmacist must
22  assume what the patient is taking on a daily dose
23  based on the prescription?
24  A.    We do, yes.  Absolutely.

83

1  Q.    Do you agree that when pharmacists are
2  filling prescriptions, that they are -- they are
3  often unaware of the patient's diagnosis or condition
4  for which they are filling the prescription for?
5  A.    By law, unfortunately, they are not required
6  to have that information.  The doctor does not have
7  to provide it.  Most pharmacists when they are
8  counseling a patient or discussing any ambiguities
9  will ask that question of the patient.  Very
10  tactfully, what seems to be bothering you, what are
11  your symptoms, what are the problems.
12       There are situations, though, clearly,
13  when the pharmacist is not given the information of
14  what the patient's diagnosis is.
15       That's irrelevant, though, in my
16  understanding, in this case.
17  Q.    Is the pharmacist required to question the
18  appropriateness of a doctor's treatment plan for a
19  particular condition?
20  A.    I think a pharmacist is only required to
21  question the doctor's treatment plan if the drug
22  therapy poses an unreasonable risk of harm to the
23  patient.
24  Q.    And how is a pharmacist to determine the

84

1  risks of harm that the particular drug therapy poses?
2  A.    The pharmacist is charged with that
3  knowledge based on going to four, five, six years of
4  pharmacy school, their training.  They certainly
5  should know that the starting dose of Prednisone is
6  maximum of 60 milligrams a day, not 250, or whatever
7  this particular patient was being prescribed.
8       So pharmacists have basic knowledge.
9  That's part of the duty of a pharmacist is to know
10  what affect the drugs they're dispensing are going to
11  have on the patient, especially the risks that may be
12  evident from the drugs they're dispensing.
13  Q.    Can a pharmacist dispense medication if a
14  patient declines counseling?
15  A.    Of course.
16  Q.    Can a pharmacist dispense medication after
17  questioning the treating physician about the
18  medication prescribed and speaking with the treating
19  physician?
20  A.    I'm sorry, you're going to have to ask that
21  question again.
22  Q.    Sure.  Can a pharmacist dispense medication
23  after questioning the treating physician about the
24  medication and speaking with that treating physician?

85

1  A.    Of course a pharmacist can refuse to fill
2  it.
3  Q.    I didn't ask --
4  A.    Not only --
5  Q.    I didn't ask -- Doctor, I didn't ask if they
6  could refuse.  I said can a pharmacist dispense
7  medication after questioning or speaking with a
8  treating physician about the medication?
9  A.    Well, of course.
10  Q.    Does the pharmacist's standard of care to a
11  patient require the pharmacist to know the
12  physician's specific diagnosis for the patient before
13  filling the doctor's prescription?
14  A.    Unfortunately, no.  We very frequently are
15  dispensing products where we don't know the patient's
16  diagnosis.  This is one of the issues in pharmacy and
17  medicine today, is that pharmacists are required to
18  protects the patient and yet this is one key element
19  that they don't by law have in terms of the knowledge
20  about the patient, patient's condition.
21       So the answer to your question is, yes,
22  the pharmacist may very well dispense a prescription
23  when he or she does not know the patient's diagnosis.
24  But, clearly it is done at the pharmacist's peril, if

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

CARL GAINOR, Ph.D, JD

86

1  you will, because if it's totally wrong for the
2  patient, how do you do that prospective drug use
3  review?
4  Q.    Does the pharmacist's standard of care to a
5  patient require the pharmacist to know the
6  physician's specific treatment plan of the patient
7  before filling the prescription?
8  A.    No, not necessarily.
9  Q.    Does the pharmacist's standard of care to a
10 patient require a pharmacist to talk to the
11 prescribing doctor before filling each and every
12 prescription?
13 A.    No.
14 Q.    If the pharmacist is aware of the doctor's
15 general treatment plan for a particular condition,
16 does the pharmacist's standard of care to a patient
17 require the pharmacist to talk to the treating
18 physician before filling each prescription during the
19 course of treatment plans?
20         MR. LAMB:  Objection to form.
21         You can answer.
22 A.    I think that that's a very impossible
23 question to answer because it's going to vary with
24 every patient, with every condition, with every

87

1  prescription.  There is no set rule.  The burden or
2  the responsibility, the duty of the pharmacist is to
3  prevent the patient from being harmed by the
4  medication that the pharmacist provided.
5         Now, whatever that takes, it may involve
6  discussions with the pharmacist -- or with the
7  physician, rather.  It may involve doing research on
8  the drug itself.  It may involve research on accepted
9  parameters of therapy.  So every case, every
10 prescription is going to be different.
11 Q.    I'm going to show -- I want to display what
12 I'm going to mark -- I think we've already marked as
13 Exhibit 2.
14        Do you see the plaintiff's patient
15 history report displayed before you?
16 A.    Yes, I do.
17 Q.    Okay.  So we see here four -- four dates
18 that I guess corticosteroids were dispensed to Miss
19 Wolking, correct?
20 A.    That's what this would show, yes.
21 Q.    Okay.  Let's look at the first one, the
22 August 8th, 2022 prescription.  Okay?
23 A.    Correct.
24 Q.    So for this particular prescription, based

88

1  on the materials you reviewed, how specifically did
2  TCC, as you allege, breach their duty of care to Miss
3  Wolking?
4  A.    On this particular prescription, which was
5  the first one, this does not show me the directions,
6  it only shows what was dispensed.  So I can't give
7  you -- answer based on that.
8         But let me, if you will, go to the
9  prescription itself, which is the supporting document
10 for this.  And the directions were up to ten tablets
11 daily as directed.  So that would have been a hundred
12 milligrams.  This is the first prescription they ever
13 filled.  The normal dose is anywhere from -- I
14 believe five to probably 60 milligrams a day.  So
15 this starting off, right off the bat, was almost
16 twice the maximum normal starting dose of Prednisone.
17 Q.    This is almost twice the max of what?
18 A.    I'm sorry, say again, please.
19 Q.    Sorry.  You said this is almost twice the
20 max of the starting dose?
21 A.    Of the recommended starting range of
22 Prednisone is five milligrams to -- I believe it's
23 about 60 milligrams per day.
24 Q.    Okay.

89

1  A.    And this they're starting out at over a
2  hundred.  But this -- had this been the only
3  prescription, it would be one thing.  No. 1, you and
4  I would not be here talking.  But if you look then
5  back to the prescription history, eight days later --
6  Q.    Okay.  So we're not there yet.
7  A.    Eight days later --
8  Q.    Hold on, Doctor.  We're not there yet.
9  We're still on the 8/8 prescription.
10 A.    Susan, let me finish, if you will, and then
11 you can ask --
12 Q.    Doctor, there isn't a second question
13 pending.  So I'm still on the 8/8 prescription.  So
14 I'm leading the question.
15 A.    Go ahead.
16 Q.    I'm following the questions with respect to
17 what you just testified to.  Okay?
18 A.    On 8/8, I'm looking at the prescription.
19 Q.    Yes.  Okay.  So you just stated that this
20 amount is almost twice the max of the recommended
21 starting range.  You indicated that the starting
22 range is somewhere between five milligrams and 60
23 milligrams.
24        Where is that information from?  Where

23 (Pages 86 to 89)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

90

1  did you obtain that information from?
2  A.    Medical literature and my knowledge of
3  corticosteroids.  And I think every pharmacist would
4  know that that's an approximate starting range.
5  Q.    Okay.  Is it your opinion that for any
6  prescription that is outside the recommended starting
7  range, that a pharmacist is required to speak to the
8  prescribing physician?
9  A.    No.  That's not my testimony.
10  Q.    Okay.  Okay.  All right.  Now, I'd like
11  to -- you just stated earlier that this prescription
12  alone, if we were only dealing with this
13  prescription, we wouldn't be here today, correct?
14  A.    In all probability, I do not believe we'd be
15  here today if it was just this prescription.
16  Q.    Okay.
17  A.    Now, I can't guarantee that --
18  Q.    Hold on.
19  A.    -- nor can anyone know whether this
20  prescription alone might have caused it.  Causation
21  is somebody else's issue, not mine.
22       But I can tell you as a pharmacist, when
23  I looked at a prescription for 500 Prednisone, ten
24  milligram tablets, red flags would immediately go up.

91

1  I've never in my entire life -- and I filled
2  thousands of prescriptions and I've talked to
3  thousands of pharmacists -- I have never heard of
4  anybody getting 500 Prednisone tablets as an initial
5  starting dose.
6  Q.    Okay.  So just focusing on the 8/8
7  prescription alone, what are you opining that TCC
8  should have done when they received this
9  prescription?
10  A.    I think, Susan, I'm suggesting that they
11  should have done everything that we talked about.
12  They should have, No. 1, started doing some research
13  to see if there was any possible explanation or
14  justification for giving a hundred milligrams as a
15  starting dose, a hundred milligrams daily because it
16  was up to ten milligrams a day of ten milligram
17  tablets.
18       No. 2, and I'm going to have to jump
19  ahead because, as I said, if it was just one
20  prescription, we probably wouldn't be here.  That's a
21  causation issue.  Maybe she would have had serious
22  problems anyway.  But eight days later --
23  Q.    Well, I'm still --
24  A.    May I finish answering my question -- your

92

1  question?
2  Q.    No.  Because now you're answering a
3  different --
4  A.    Eight days later --
5  Q.    Hold on.  Doctor, now you're answering a
6  question that I haven't asked, so --
7       MR. LAMB:  I think -- sorry.
8  Doctor, I think she's only trying to ask you about
9  their decision making --
10       MS. KEESLER:  Correct.
11       MR. LAMB:   -- on August 8th.
12       THE WITNESS:  Okay.  That's fine.
13       MR. LAMB:  I think they're going to
14  gets to the next prescription.
15       THE WITNESS:  Sure.  That
16  particular prescription would have raised red flags
17  for me certainly because of the quantity.
18  BY MS. KEESLER:
19  Q.    Okay.
20  A.    The quantity was prescribed and the initial
21  doses, which were 100 milligrams a day.
22  Q.    Okay.  So are you opining that TCC should
23  not have dispensed this medication on 8/8/2022?
24  A.    I can't answer that without knowing a lot

93

1  more facts.  Based on what I know today, I can opine
2  that, yeah, they should not have filled it.  But
3  there's not a documentation of whether they verified
4  anything with the doctor, whether they checked the
5  medical literature, whether they have any way to
6  justify starting the patient on a hundred milligrams
7  of Prednisone a day.
8  Q.    All right.  Now, let's move on to the next
9  prescription.  The second line item here, as you see,
10  the August 16th, '22 prescription.  How specifically
11  did TCC breach their duty of care to Miss Wolking as
12  you opine?
13  A.    Say again, please.
14  Q.    How did TCC specifically breach their duty
15  of care to Miss Wolking as you have opined?
16  A.    Well, a number of ways.  No. 1, the same
17  problem with the prescription on 8/8, where they did
18  not do any research, they just blindly apparently
19  followed the directions of the doctor.  But this is
20  only eight days after they had dispensed a 50-day
21  supply.  Remember they provided 500 -- 500
22  Prednisone, ten milligram tablets.  So even under the
23  doctor's directions, it was only -- we would have
24  lasted 50 days, ten a day, 500 tablets is 50 days.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

94

1    Eight days later the patient comes in
2  with another corticosteroid prescription, which is
3  more potent than the first one. And they give her
4  200 four milligram tablets. That's, again, a
5  quantity that should have raised tremendous alarms.
6  Q.    Okay. You -- you say this term of, like,
7  the patient coming in. You do understand that these
8  were mail order prescriptions, correct?
9  A.    Yes.
10  Q.    Okay. Give me one moment. Okay.
11    Did you review the testimony of Courtney
12  Young in this case, Dr. Gainor?
13  A.    I looked at the transcript, yeah.
14  Q.    Okay. What -- do you recall her testifying
15  that they were under the understanding that the
16  previous Prednisone prescription that they had
17  dispensed was being discontinued as part of the
18  treatment plan by Dr. Lindner?
19  A.    They made that assumption, apparently, but
20  they have no documentation for it. And even -- even
21  assuming that they had documentation, this dose again
22  of the Dexamethasone was extremely high.
23  Q.    Okay. Your statement about that they had no
24  documentation, even if there's no documentation, that

95

1  doesn't necessarily mean the conversation between TCC
2  and Dr. Lindner about the discontinuation of the
3  previous medication didn't occur, correct?
4  A.    Normally the duty of the pharmacist would be
5  to document something as important as that.
6  Q.    And I understand what you're saying about
7  the duty to document, but that doesn't mean the
8  conversation didn't transpire, correct?
9  A.    We can make all kinds of assumptions, Susan.
10  We can make the assumptions that they fell down the
11  toilet.
12  Q.    Okay. But the TCC testified that their
13  understanding was that the Prednisone had been
14  discontinued before they filled the 8/16/2022
15  prescription, correct?
16  A.    I don't --
17    MR. LAMB: Objection. Objection to
18  form.
19    You can answer.
20  A.    I don't have the transcript in front of me.
21  But, no, that is not what I understood. My
22  understanding was that they assumed that the
23  Prednisone had been DC'd. I do not remember anything
24  in the transcript where they specifically said, I

96

1  talked to the doctor and the doctor said, I have
2  discontinued the Prednisone. They assumed, which was
3  very dangerous to do in this case.
4  Q.    One moment. Sorry. Just closed out that
5  exhibit. Okay. All right.
6    Now, looking at the third item, Dr.
7  Gainor, the 9/27/2022, the date dispensed and that
8  corresponding prescription. How specifically did TCC
9  breach their duty of care to Miss Wolking as you --
10  as you opine?
11  A.    Please bear with me for one minute.
12  Q.    Sure.
13  A.    I just want to make sure that I'm not doing
14  bad math here.
15    The prescription on 8/16 was for 200
16  Dexamethasone, four tablets a day. That was another
17  prescription that should have lasted 50 days.
18    You have asked me now about the 9/27
19  prescription. Is that correct?
20  Q.    Correct.
21  A.    Well, the 9/27 was filled 30, maybe 40 days
22  after the 8/16 one, not 50 days. So, again, if a
23  patient comes in a day or two early to get a refill,
24  that would not wave a red flag. Ten days early would

97

1  be something that would be of concern. It would
2  indicate that the patient was taking more than the
3  doctor was directing and, No. 2, the dose of that
4  Dexamethasone would then be excessive.
5  Q.    So based on your opinion, you're assuming
6  that she -- by the time that this prescription had
7  been filled, that she had already -- she had already
8  gone through the entirety of the previous
9  prescription?
10  A.    Why else would she want more and why would
11  the doctor be ordering more if she hadn't taken what
12  she had on hand. That's the -- the question that the
13  pharmacist would have to answer. That's part of this
14  investigation of whether I'm dispensing a drug that
15  may cause harm.
16    And based on the first prescription, 8/8,
17  which was a -- again a 50-day prescription, there is
18  no documentation that the patient -- that the doctor
19  ever told Courtney that the prescription had been
20  DC'd.
21    Even if we take what you have
22  hypothesized, which I find questionable, but let's
23  assume we do, then they start the Dexamethasone,
24  which again is an excessive dose, that would be

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

98

1  almost a hundred milligram equivalent of Prednisone.
2  And it's eight days after she starts. There's no way
3  that dose would normally be acceptable in
4  anything other than a hospital, maybe in an emergency
5  situation.
6        But then the third prescription is waving
7  yet another red flag because the patient had 50 days
8  of therapy and here they're coming in ten days early
9  to get more Dexamethasone.
10        And if you want to jump, which I think
11  we're going to have do, to the 10/4.
12  Q.     Yes. Can you hang on one second. There's
13  just no question pending right now, Doctor.
14        Dr. Gainor, did you see in your record
15  review -- actually, I'll get to that later.
16        Going on to the next prescription visit
17  or the date dispensed of 10/4/22, and the
18  corresponding prescription. You understand that that
19  10/4 date of dispense was for the remainder of the
20  9/27 initial prescription?
21  A.     Well, they're showing, though, 200 being
22  dispensed. The prescription some place in there on
23  8/15 -- okay. You understand that she obviously had
24  not used up all of the 8/16 prescription when she

99

1  gets the 9/27 prescription. And so the 9/27,
2  regardless of whether it's a continuation which
3  you're saying it's part of the 300 that were ordered,
4  the pharmacist is, to my opinion, compounding his or
5  her error by now providing even more, even though it
6  was ordered by the doctor as 300 initially.
7        And I'm going to guess that probably the
8  reason they couldn't give the full 300 is because
9  they didn't have it on hand. But regardless, on 9/27
10  they dispense another hundred, which would have been
11  dispensed prior to the prescription on 8/16 being
12  consumed if she'd taken it under normal
13  circumstances.
14  Q.     Okay.
15  A.     So even though that's the original
16  prescription, I don't think that factors in to
17  whether it was an excessive dose or whether the
18  patient was taking even more than the doctor had
19  ordered.
20  Q.     Okay. So for clarification, I'm going to
21  pull up the prescription for -- for the
22  e-prescription that Dr. Lindner issued on -- or wrote
23  on 9/26.
24        But looking at the patient profile, you

100

1  see that the date of dispense on 9/27, a hundred
2  tablets of Dex, four milligram tablets were
3  dispensed, correct?
4  A.     Okay.
5  Q.     Okay. I'm going to take this down for a
6  second.
7        MR. KEESLER: I'm going to mark
8  this as Exhibit 3.
9        (Whereupon, Gainor Exhibit 3, Prescriptions,
10  was marked for identification.)
11  BY MS. KEESLER:
12  Q.     Do you see this document in front of you?
13  A.     Yes.
14  Q.     Were you -- did you review these
15  prescriptions?
16  A.     Yes. I'm looking at them.
17  Q.     Okay. No, I mean before today.
18  A.     Yes, I looked at them.
19  Q.     Okay. Let's go to the 9/26. The
20  e-prescription, date written, 9/26/22. Do you see
21  that? Okay.
22        And the initial prescription indicated
23  300 tablets, Dexamethasone, four milligrams, oral
24  tablets, correct? And the instructions are up to ten

101

1  tablets daily as directed?
2  A.     Okay. Yeah. I'm looking at the
3  prescription.
4  Q.     Okay. Great. Let's take this one down.
5  I'm going to display the patient history report back
6  up. Sorry. Okay.
7        So looking at the date of dispense, TCC
8  only dispensed a hundred of the 300 that was
9  initially ordered of the Dexamethasone --
10  A.     Right.
11  Q.     -- correct?
12  A.     Uh-huh.
13  Q.     Okay. And so for this particular
14  prescription, you already indicated what you believed
15  to be their breach -- or TCC's breach of duty. For
16  the 10/4 date where they then dispense the remainder
17  of the 200 Dexamethasone prescription, are you
18  alleging that TCC specifically breached their duty as
19  it pertains to this -- to this 10/4 dispense date?
20  A.     I'm assuming -- and you correct me because I
21  want to answer your question -- that the 10/4
22  dispensing reflects the prescription that was written
23  on 9/26.
24  Q.     Correct. The remainder.

26 (Pages 98 to 101)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

102

1  A.    Well, here's the problem.
2  Q.    Hold on.
3  A.    The prescription written --
4  Q.    Yeah, go ahead.
5  A.    I'm trying to figure out exactly what you're
6  asking me.  Because on 8/15, the doctor ordered 200
7  Dexamethasone.  I think we agree on that.  The
8  directions were four a day, so that would have been
9  50 days of therapy.
10  Q.    You mean how it's reflected on here as date
11  supplied, 50?  Yes.
12  A.    Okay.  And then approximately 40 days later,
13  she comes in with a prescription for 300, but the
14  pharmacy apparently only has a hundred on hand.  So
15  they give her a hundred out of the 300 on 9/27.
16        Now, that prescription was written the
17  day before, 9/26.  It was written for 300 tablets.
18  And so let me go back to that 9/27 for just a minute
19  because the directions now increase the dose to ten
20  tablets a day, which would be the equivalent of 240
21  milligrams of Prednisone.  I mean just an astronomic
22  quantity of corticosteroid.  But they filled it.
23        And then approximately eight days later,
24  they gave her the additional 200 that were ordered on

103

1  the prescription of 9/26, which was filled on 9/27.
2  Q.    Okay.
3  A.    I repeat -- I think that's what you asked
4  me, is they never should have filled the prescription
5  on September 27th because it clearly was a risk to
6  the patient and they did not appear to do any amount
7  of research, investigation to determine that the
8  benefits outweighed the risk.
9        But then to come in then a few days later
10  with another 200 just compounded that initial filling
11  on the 27th in terms of my opinion that they deviated
12  from the standard of care; that a pharmacist should
13  not have done that.
14  Q.    Okay.  So you're now -- okay.  So you're
15  opining that on 9/27, they should have never filled
16  that prescription, and then on 10/4, they should have
17  never filled that prescription?
18  A.    Correct.
19  Q.    And what is that based on?
20  A.    The fact that it was an excessive dose of
21  corticosteroids that they should have known pose an
22  unreasonable risk to the patient without them doing
23  adequate research to find a justification that would
24  say the benefits potentially outweighed the risks.

104

1  Q.    Now, I'm going to take this down for a
2  second.
3        Okay.  You talked about the pharmacist's
4  duty to avoid harm to the patient.  Do you recall
5  that testimony?
6  A.    Yes.
7  Q.    During your review of the records, Doctor,
8  there was no evidence that Miss Wolking ever
9  communicated any side effects or issues that she was
10  having with any -- with any of the prescriptions
11  dispensed by TCC, correct?
12  A.    That I can't answer.  I don't -- I don't
13  know.  I don't remember reading anything in the
14  transcripts that would indicate that the patient
15  specifically talked to the pharmacy about the side
16  effects.
17        I do seem to remember, though, that the
18  husband, when ordering some of these prescriptions,
19  did say that his wife was in terrible shape and
20  started talking about some of the symptoms that
21  she --
22  Q.    Is that Dr. Lindner or TCC?
23  A.    I'm sorry?
24  Q.    Who was he communicating that to, Dr.

105

1  Lindner or TCC?
2  A.    It's my recollection -- and I may not have
3  this correct -- that when he called the pharmacy to
4  order more drugs to be sent out, that he did explain
5  to the pharmacist or tell them that the patient was
6  doing terribly.
7  Q.    Okay.
8  A.    That's my recollection.  And as I say, it
9  may not -- it may not be correct, but it was the -- I
10  would say the pharmacist's duty to initiate that
11  conversation.  With these high doses of steroids, the
12  pharmacist should have wanted to check to see if the
13  patient was suffering known potential risks from that
14  massive dose.
15        So whether the husband initiated the
16  conversation, the pharmacist should have.
17  Q.    What is the basis for your belief that Mr.
18  Wolking communicated with the pharmacy about the side
19  effects that Miss Wolking was suffering from?
20  A.    I'm saying that's strictly something that I
21  seem to remember from reading a transcript either of
22  the pharmacist, possibly the patient transcript.  But
23  it seems to me there was something in there where the
24  pharmacists were even told that the patient was doing

CARL GAINOR, Ph.D, JD

106

1  terribly.
2  Q.    So is it your testimony that based your
3  review of the records, TCC was informed that Miss
4  Wolking was doing terribly?
5  A.    I don't know.  Let's -- Susan, I will say it
6  would not change my opinion.  It was the duty of the
7  pharmacists to verify that the patient was not
8  suffering adverse events from this massive dose of
9  corticosteroids.  The duty was on the pharmacists.
10        I mean, we give pharmacists this
11  tremendous, wonderful opportunity to work in the
12  healthcare profession and to help people.  But it
13  comes with responsibility.  And part of that
14  responsibility would be to verify that you're not
15  hurting the patient.
16        And when you dispense a dose that is so
17  excessive, in order to -- to follow up on that, it is
18  my belief and my feeling that the pharmacist should
19  have verified that the patient was not suffering
20  serious adverse events as a result of the
21  prescription I was providing, especially based on the
22  history here that she's getting it more frequently
23  than she should and she's getting excessive doses.
24  Q.    Okay.

107

1  A.    And pharmacists just acted like a vending
2  machine.  If you ask me for the drug, I'm going to
3  give it to you.  That defied all the training that a
4  pharmacist has.
5  Q.    Doctor, earlier you stated the pharmacist
6  should have assumed what the patient was taking on
7  daily basis just based on the prescription -- the
8  prescriptions themselves.  Do you recall that
9  testimony?
10  A.    Pharmacists should always -- I'm going to
11  say suspect -- I think assume is an appropriate
12  word -- that the patient is going to take the drug
13  according to directions.
14  Q.    Okay.
15  A.    And if the pharmacist finds out that they
16  are not or facts come up that indicate there's --
17  there's a problem -- and as I say, we normally see
18  this with analgesics, with pain medication where the
19  patient's taking too much, the pharmacist is
20  responsible for monitoring that.
21  Q.    Okay.  Do you agree that that -- let me rephrase.
22        If as you say the patient is coming in
23  with these subsequent prescriptions, right, she's
24  coming in with these new prescriptions after, let's

108

1  just say, the first prescription, do you agree that
2  the pharmacist is likely to assume she is not
3  suffering from any side effects or issues if she's
4  coming in with additional prescriptions?
5        MR. LAMB:  Objection to form.
6        You can answer.
7  A.    I think that would be a terribly risky
8  assumption to make when you have dispensed excessive
9  doses of corticosteroids.
10        Had she gotten the normal dose -- and I
11  don't know how much research you've done on it, but
12  if you talk to most pharmacists, we dispense what
13  were called Prednisone Dosepaks quite regularly.  If
14  my recollection is correct, it started the first day
15  with 30 milligrams, then it went down to 25, then it
16  went down to 20, down to 15.  It was a nice taper
17  until she was down to one tablet a day and that was
18  it. Now that's what we normally see in outpatient
19  corticosteroid therapy.  Prednisone Dosepaks at last
20  were very, very prevalent.
21        Now, in this case, the patient is getting
22  astronomic quantities of corticosteroids.  I mean,
23  you may have an expert that says taking a hundred
24  milligrams of Prednisone a day is okay or taking by

109

1  the Dexamethasone, Prednisone equivalent, she was up
2  to over 200 milligrams of Prednisone equivalent a
3  day.  And, Susan, if you think that that's okay, that
4  the pharmacist should just assume everything's fine,
5  I understand your position.  But from a professional
6  standpoint, and I believe from a legal standpoint,
7  the pharmacist had a duty when they dispensed these
8  dangerous quantities to verify that she wasn't
9  suffering from the very foreseeable adverse events
10  that we know can occur with long term high dose
11  corticosteroids.
12  Q.    Dr. Gainor, are you aware that Daryl Wolking
13  testified that he was not aware whether Miss Wolking
14  was having any of her prescriptions filled by TCC as
15  it pertained to Dr. Lindner's treatment of her
16  Babesia?
17  A.    I have no idea.
18  Q.    Did you review his transcript?
19  A.    Did I review what?
20  Q.    Did you review his transcript?
21  A.    Not of Daryl.
22  Q.    Oh, I'm sorry.  Did you review Daryl
23  Wolking's -- I'm sorry, Daryl Wolking's transcript?
24  A.    Is Daryl Wilson the husband?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

110

1  Q.   No. I'm just asking if you reviewed Daryl
2  Wolking's transcript?
3  A.   I have no idea who Daryl Wilson is and I've
4  never seen a transcript with the name Daryl Wilson
5  on.
6  Q.   Okay. You agree, though, that there is no
7  evidence that Dr. Lindner ever communicated to TTC
8  that Miss Wolking was experiencing any side effects,
9  correct?
10       MR. LAMB:  Objection to form.
11       You can answer.
12  A.   To the best of my knowledge, no, Dr. Lindner
13  was not advising the pharmacy that there was any
14  problem.
15  Q.   Okay. And there's no evidence that Stacey
16  Wolking herself ever communicated any side effects to
17  TCC, correct --
18       MR. LAMB:  Objection to form.
19  Q.   -- for any prescription dispensed by TCC?
20  A.   That I don't know for sure, Susan. As I
21  said, my recollection was that the husband, I believe
22  his name was Daryl, I may be wrong about that, but
23  that the husband of the patient did say that his --
24  his wife was doing badly. Now I may not --

111

1  Q.   To whom?
2  A.   When he was talking to one of the
3  pharmacists at the pharmacy ordering more
4  medications, more corticosteroids.
5  Q.   Are you able to pinpoint a page number on
6  the transcript where you --
7  A.   No, I can't.
8  Q.   -- saw that information?
9  A.   Susan, I told you, I can't and I said I may
10 be totally wrong about that information, but I
11 believe it to be irrelevant to the case.
12       It was the pharmacist's duty. It wasn't
13 Daryl -- it wasn't the husband's duty, it was the
14 pharmacist's duty to verify that this therapy was not
15 causing harm.
16 Q.   During your record review, Dr. Gainor --
17 give me one moment. There was no evidence that Dr.
18 Lindner had ever communicated to TCC prior to October
19 22nd that any of his Babesiosis patients who -- who
20 he had been treating had been suffering side effects
21 or required hospitalization, correct?
22 A.   No.
23       MR. LAMB:  Objection to form.
24 Objection to form.

112

1  A.   No. To the best of my knowledge, Dr.
2  Lindner never acknowledged there was ever a problem
3  with his therapy.
4  Q.   Okay. You talked a lot about these, quote,
5  unquote, excessive doses of corticosteroids. To your
6  knowledge -- I recall you testifying that it's a
7  therapeutic class.
8       What are corticosteroids used to treat?
9  A.   Corticosteroids are used to treat a
10 multitude of conditions. They are an
11 anti-inflammatory drug. So that any condition where
12 there is inflammation of any sort, you might want to
13 use a corticosteroid. So it's one of these drugs
14 that can be used for a number of different
15 conditions.
16 Q.   Okay. And you had mentioned -- you had
17 already testified to this starting dosage for -- for
18 Prednisone, correct?
19 A.   Correct.
20 Q.   All right. And you reviewed the
21 manufacturer inserts in this case?
22 A.   Pardon me?
23 Q.   Did you review the -- I'm sorry -- the
24 package inserts for Prednisone in this case?

113

1  A.   Well, there was one package insert I believe
2  that I was provided and it's very -- I'm going to say
3  generic in nature. It doesn't talk about maximum
4  doses or anything of that sort. It's a very --
5  almost a perfunctory package insert. I did just
6  glance at it. I believe -- I believe it was included
7  in one of the documents that I reviewed. But as I
8  remember, it was a minimal package insert in terms of
9  information.
10 Q.   Okay. Let me ask you this. Were you ever
11 provided a package insert for the Dexamethasone?
12 A.   No.
13 Q.   Wait a second. I'm just going to share my
14 screen with you.
15       MS. KEESLER:  Mark this as Exhibit
16 4.
17       (Whereupon, Gainor Exhibit 4, Package
18 Insert, was marked for identification.)
19 BY MS. KEESLER:
20 Q.   Do you see the document in front of you?
21 A.   Yes.
22 Q.   All right. Bates stamped YA -- starting at
23 YA 236. I'm going to jump to dosage.
24       Okay. Do you see where I'm reading here,

CARL GAINOR, Ph.D, JD

**114**

1  dosage and administration at the bottom of YA 242?
2  A.    Yeah.  Just a -- just a question.  What is
3  this package insert?  Where did -- I did not -- I
4  don't ever remember seeing this package insert.
5  Q.    Oh, I apologize.  When you stated that you
6  had received the package insert for Prednisone, I'd
7  assumed you had received the one that was exchanged
8  in discovery.
9        So have you ever seen this Prednisone
10  package insert?
11  A.    I don't -- no, I don't believe I've seen one
12  that was this -- this is much more complete than the
13  one that I saw.  But go ahead, I'm --
14  Q.    Sure.
15  A.    I have to look --
16  Q.    Before I go on to this document, which
17  Prednisone package insert did you review?
18  A.    I don't -- don't remember.  As I said, it
19  was Prednisone package insert, but it was much less
20  complete than this one.
21  Q.    Okay.  Was it -- do you know if it was
22  provided in the discovery; in other words, in
23  document productions of the parties or was provided
24  outside of that?

**115**

1  A.    I have no idea, Susan.
2  Q.    Okay.  Well, Dr. Gainor I'm going to
3  represent to you that this package insert for
4  Prednisone was exchanged in discovery.  It's
5  represented by TCC that this is the package insert
6  for the Prednisone --
7  A.    Okay.
8  Q.    -- that was prescribed to Miss Wolking.
9  A.    Okay.
10  Q.    I'm going to jump to Page -- Bates stamp YA
11  243 under the header of dosage and administration.
12  Do you see that?
13  A.    Yes.
14  Q.    Okay.  So the top of this line states the
15  initial dosage of Prednisone tablets may vary from
16  five milligram to 60 milligrams of Prednisone per day
17  depending on a specific disease entity being treated.
18        Did I read that correctly?
19  A.    Yeah.  And that's basically, I think, what
20  we've talked about prior to looking at this, is that
21  the starting dose is between five and 60 milligrams.
22  That's pretty standard.
23  Q.    Okay.  It says may vary, correct?
24  A.    Yes.

**116**

1  Q.    All right.  And then the package insert
2  makes very clear in bold upper case, it should be
3  emphasized that dosage requirements are variable and
4  must be individualized on the basis of the disease
5  under treatment and the response of the patient.
6        Did I read that correctly?
7  A.    Yes.
8  Q.    Okay.  Take that down.
9        You referred earlier that the package
10  insert that you had reviewed, it didn't indicate a
11  max dosage and had very limited information.
12        Do you remember that testimony?
13  A.    That's my recollection of -- but as I say, I
14  didn't -- I don't have a copy and I didn't refer to
15  it in the -- my report at all.
16  Q.    Okay.  Are you aware of a maximum dosage of
17  Prednisone that can be prescribed?
18  A.    There is no such thing as a maximum dosage
19  that can be prescribed.  The law does not get
20  involved.  It is up to the discretion of the doctor
21  who orders it how much he or she wants to order.  And
22  then it's up to the pharmacist to determine whether
23  that dose is going to pose a greater risk of harm to
24  the patient than the potential benefit.

**117**

1  Q.    Okay.  There's no max dosage for
2  Dexamethasone either, correct?
3  A.    Correct.
4  Q.    Do you see -- rather -- the package insert
5  that I had indicated -- that I had just showed you,
6  it indicated that the dosage can depend on a specific
7  disease being treated.  Do you remember that?
8  A.    Yes.
9  Q.    Okay.  Does the dosage amount of
10  corticosteroids depend on any other factors?
11  A.    I'm assuming it could depend on a number of
12  factors.  I mean, specifically --
13  Q.    Well, let me ask you this.  Do you agree
14  that it can depend on the disease severity level?
15  A.    Yes, absolutely.
16  Q.    Do you agree that it could depend on the
17  patient's current condition?
18  A.    The patient's --
19  Q.    Current condition.
20  A.    Yes.
21  Q.    Okay.  Do you agree that it could depend or
22  vary on the response of the patient to the
23  medication?
24  A.    It could, yes.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

118

1    Q.    Do you agree that it could depend on the
2    patient's weight?
3    A.    Of course it could.
4    Q.    Do you agree that it could depend on what
5    other maybe preexisting conditions she might have?
6    A.    Absolutely.
7    Q.    Your earlier testimony had indicated that
8    TCC filled excessive doses, right, of the
9    corticosteroids?
10    A.    Yes.
11    Q.    Okay.  Are you able to provide -- I know you
12    were just looking at the amounts of the prescriptions
13    themselves, right?  But at what amount -- or in other
14    words, what amount of steroids would cause -- would
15    cause injury to the plaintiff?  So are you able to
16    quantify the amount of corticosteroids that placed
17    Miss Wolking at harm?
18    A.    It would vary for every individual patient.
19    It is my professional opinion, however, that the
20    doses here were so excessive that they posed a
21    serious risk of harm to the patient.
22    Q.    So after the first prescription, after the
23    second prescription, after the third prescription?
24    At what point do you believe that Miss Wolking was

119

1    placed in harm's way by the corticosteroids?
2    A.    It's my opinion that with the very first
3    prescription because of the excessive dose of
4    Prednisone that was ordered.  I mean, the package
5    insert, as you saw, normally starting dose between
6    five and 60 milligrams and the patient, by the
7    doctor's order, is taking at least a hundred.  But we
8    know in reality, she must have been taking more.  Or
9    even believing your hypothesis, that the Prednisone
10    was discontinued, the Dexamethasone dose was even
11    higher in terms of Prednisone equivalence.
12    Q.    So is it your opinion that a hundred
13    milligrams per day was enough to cause harm to the
14    plaintiff?
15    A.    It certainly could have, yes.
16    Q.    Okay.  Do you have any data or citations or
17    articles to support that opinion?
18    A.    Starting with the -- your own package insert
19    that says the maximum starting dosage is normally
20    less than 60 -- 60 milligrams or less.
21    Q.    Okay.  That's not how it was stated,
22    correct?
23    A.    It said the starting dose is between five
24    and 60 milligrams a day.

120

1    Q.    Right.  It said it may vary from five
2    milligrams to 60 milligrams of Prednisone per day,
3    correct?
4    A.    Sure.
5    Q.    Okay.  It did not indicate that amounts
6    above that would create a risk of harm, correct?
7    A.    There's no specific dosage that we know is
8    going to cause harm.
9    Q.    Okay.
10    A.    That's where we get to your question of
11    individualization of the doses.
12    Q.    Doctor, you agree that there are certain
13    conditions or certain patients that may require high
14    or higher dosing of steroids, correct?
15    A.    I think it has to be individualized for
16    every patient based upon the patient factors and the
17    disease or condition factors.
18    Q.    Okay.  Have -- have you seen dosages above
19    that initial dosage range of five milligrams to 60
20    milligrams?  Have you seen doses higher than that
21    range dispensed to a patient in your entire career?
22    A.    I can say that I never remember in my entire
23    career seeing a prescription with a starting dose of
24    Prednisone in excess of 60 milligrams on day one.

121

1    Except -- now I take that back, except in a hospital
2    environment where we're actually injecting the
3    steroids because it's an emergency situation.
4    But we're talking about outpatient retail
5    pharmacies.
6    Q.    Okay.  Have you ever dispensed medication
7    for a patient who had been diagnosed with Babesiosis?
8    A.    No.
9    Q.    Do you agree that -- that for dosing of
10    steroid -- or rather that certain inflammatory
11    conditions require higher doses of steroids?
12    A.    Yes.  We already said that the dose has to
13    be adjusted based on patient considerations and the
14    condition.  But it's not unlimited.
15    Q.    What do you mean by that?
16    A.    Well, I know you'd like me to say that they
17    can give any dose they want and that's just not the
18    facts.  That is not the case.
19    Q.    Well, that's not what I'm asking.
20    A.    Susan, every drug has risks and at some
21    point the dose becomes so dangerous that it outweighs
22    any potential benefit to the patient, whether we're
23    talking about antibiotics, analgesics, cardiac
24    medications or corticosteroids.

31 (Pages 118 to 121)

**ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES**

CARL GAINOR, Ph.D, JD

122

1    Q.    So when you stated that TCC had prescribed
2    excessive doses and they failed to evaluate the harm,
3    if there's no specific dosage that is known to cause
4    harm, how -- how would the pharmacist or TCC know
5    that?
6    A.    Because they got a package insert saying
7    that maximum daily dosage, the starting dose is
8    normally between five milligrams and 60 milligrams.
9    Q.    Okay.  The --
10   A.    And, yes, the doses may vary.  The dose may
11   vary, but certainly that's right there the very first
12   line in terms of the dosing.  So the pharmacist --
13   and they should know that from pharmacy school.
14   These were not pharm -- these are not pharmacists
15   that just graduated the day before.  These are --
16   these are trained pharmacists with experience.
17   Q.    Okay.  But the packages are -- also
18   communicates that dosage requirements are variable
19   and must be individualized on the basis of the
20   disease under treatment and the response of the
21   patient, correct?
22   A.    Susan, yes.  Every drug has to be adjusted
23   or almost every drug.  Pain medication, we have a
24   certain dosing range for pain medication.  And, yes,

123

1    some patient with terminal cancer may need a higher
2    dose.  But I -- even the terminal cancer patient, I'm
3    not going to dispense 200 milligrams of Oxycodone
4    because I know it will kill the patient.  And so
5    don't -- you can't exonerate the pharmacists because
6    they just gave an unlimited quantity, way above what
7    their own package insert said.  Even though, yes,
8    there's language that says you adjust the dosage.
9    Q.    Okay.
10   A.    I didn't see anything in there --
11   Q.    Are you're opining that TCC gave an
12   unlimited amount of corticosteroids to Miss Wolking?
13   A.    I'm saying they dispensed an excessive
14   amount, a dangerously excessive amount.
15   Q.    Okay.  But you're still unaware to quantify
16   at what amount actually created a potential risk of
17   harm to plaintiff, correct?
18   A.    There -- there is absolutely no way that we
19   can ever know exactly what milligram is going to be
20   the one milligram too many of any drug because every
21   patient's different.
22   Q.    Okay.
23   A.    But clearly when you know that the starting
24   dose is between five milligrams and 60 milligrams and

124

1    you're starting at almost twice the highest starting
2    dose, that is a red flag right there.  And so you
3    don't need to know that at 65 milligrams there's
4    going to be a problem because you're already warned
5    based on your knowledge, your experience, your
6    training, that these drugs, corticosteroids, have
7    tremendous numbers of side effects and you're
8    dispensing excessive doses.  Even on day one.  But
9    certainly on day -- I'm going to say eight because
10   they dispensed the first prescription on August 8th
11   and then they went to August 16.  At this point
12   they're dispensing even a higher dose with a more
13   potent medication.  And then it gets even higher with
14   the next prescription.
15       So I cannot give you and no one, I
16   believe, can give you a specific number.
17   Q.    Okay.
18   A.    It's like asking which drink made the
19   alcoholic an alcoholic; the first one, the second
20   one.
21   Q.    All right.  But -- but let me ask you this.
22   Sorry, I'm actually moving on to -- let me pull up
23   your report here.  Okay.
24       Do you see your report?  I'm on the last

125

1    page of your report, Page 5.
2    A.    Okay.
3    Q.    Okay.  You state here in your last line, in
4    this case, it appears that the pharmacists at TCC
5    failed to question the appropriateness of Dr.
6    Lindner's therapy, failed to evaluate the harm that
7    might be caused by these extremely high doses of
8    corticosteroids, and the result was serious harm to
9    Stacey Wolking.
10       Now, Doctor, let me ask you something.
11   That first prescription, that 8/8 prescription, if
12   TCC had had the conversation with Dr. Lindner about
13   his treatment plan and they were satisfied with his
14   response to justify the dosages and the amounts, and
15   based on their own education and training, do you
16   believe it would have been responsible for TCC to
17   have dispensed the medications?
18   A.    Susan --
19       MR. LAMB:  Objection.
20       You can answer.
21   A.    -- that's a compound question.  I don't
22   understand it.
23   Q.    Okay.
24       MR. LAMB:  Sorry.  I just want to

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

126

1  make sure, I don't now if you noted my objection, but
2  I had an objection to form on the record.
3       MS. KEESLER:  Okay.  Sure.
4  BY MS. KEESLER:
5  Q.     Under what circumstances would it have been
6  reasonable for TCC to have dispensed that 8/8
7  prescription?
8  A.     Dispensed --
9       MR. LAMB:  I'm just going to object
10 to form again.
11      You can answer.
12 Q.     Under -- yeah.  Under what circumstances
13 would it have been reasonable for TCC to dispense
14 that medication?  In other words, what steps would
15 they have had to take for it to have been reasonable
16 for them to have dispensed that medication?
17 A.     Susan, I believe that question's been asked
18 and answered several times, but I'll try a last time.
19      They would have had to have researched
20 the appropriateness and the potential risks of the
21 Predni -- of the cortisone dose that is that high.
22 They would have had to find something in medical
23 literature that would have indicated that this would
24 be an appropriate therapy.

127

1  Q.     Okay.
2  A.     So they did apparently none of that other
3  than maybe there was one conversation between the
4  pharmacists and the doctor about the fact that this
5  was the same therapy that the doctor had used for his
6  daughter.
7  Q.     Right.  So you already established that
8  there is no max limit, right, for either Prednisone
9  or Dexamethasone, right?
10 A.     Susan, that's not exactly right.  The
11 recommended starting dose --
12 Q.     I'm not asking about the recommended
13 starting dose.  I'm asking, is there -- we've already
14 established there's no upper limit for Prednisone or
15 Dexamethasone, correct?
16      MR. LAMB:  Objection to form.
17      You can answer.
18 A.     Define for me what -- what upper limit,
19 allowable upper limit is.  Is it a legal standard?
20 No, there's nothing in the law that says you cannot
21 prescribe more than 60 milligrams of Prednisone.
22      But this is part of the duty of a
23 professional, both on the doctor's side and on the
24 pharmacist's side.  There is a limit when you are

128

1  dealing with a dangerous drug.  And that limit is
2  what's going to cause harm to the patient.
3  Q.     Right.
4  A.     At least that should have been questioned by
5  the pharmacist.  They should have done some research
6  to see was there any indication that you should never
7  exceed a certain dose or should they take the package
8  inserts at its face and say we really should never
9  exceed 60 milligrams.
10 Q.     Okay.  Well, not never, the initial dose
11 recommendation provided a range, correct?
12 A.     It's a range.  But I'm -- and I was giving
13 you the benefit of the doubt of the highest level
14 possible.
15 Q.     Okay.
16 A.     Normally we start with 30 milligrams on a
17 Prednisone Dosepak, just as an example.
18 Q.     Okay.
19 A.     Six five milligram tablets and immediately
20 the very next day it's cut down by five milligrams
21 and the very next day it's cut down by another five
22 milligrams.
23 Q.     You've -- so you've already also established
24 that there's no specific dosage that is known to

129

1  cause harm, correct?
2  A.     There's no known dosage with probably 90
3  percent of drugs.  But we know that at some point if
4  you take too much Oxycodone with Fentanyl, you're
5  going to get respiratory depression and you're going
6  to die.  But we don't know the exact number of
7  milligrams.
8       It's like saying, which drink made the
9  alcoholic an alcoholic.  Was it the first dose -- the
10 first milligram, the 20th milligram, the 30th
11 milligram.  At some point this patient's going to die
12 if they take too much respiratory depressors.
13      Well, it's the same thing with oxy --
14 With corticosteroids as it is with Oxycodone.
15 Q.     Is there any literature that you can cite to
16 that supports that excessive doses of corticosteroids
17 causes death?
18 A.     No.
19 Q.     Okay.
20 A.     But certainly I can document --
21 Q.     Hold on.  There's no question pending.
22      Was there any evidence that TCC did in
23 fact question or discuss Dr. Lindner's therapy for
24 treatment of Babesiosis?

CARL GAINOR, Ph.D, JD

130

1  A.    The only thing that I remember seeing was a
2  perhaps brief discussion that the owner of TCC had
3  with Dr. Lindner.  And I think it related to his
4  daughter more than relating to the plaintiff in this
5  case.
6  Q.    Okay.  Did you review Courtney Young's
7  deposition from April 3rd, 2024?
8  A.    I believe I did, yes.
9  Q.    Okay.  Do you recall that she testified that
10  TCC was aware that Dr. Lindner was treating several
11  patients for Babesiosis?
12  A.    The only thing I remember was treating his
13  daughter.  That was what seemed to stand out as
14  opposed to other patients.  There may very well have
15  been other patients.  But it did not appear that TCC
16  had been treating any other patients.
17  Q.    Were you ever provided records or
18  supplemental production from TCC indicating that they
19  were dispensing for other of Dr. Lindner's Babesiosis
20  patients?
21  A.    You have to ask that question again.
22  Q.    Were you ever provided records showing that
23  TCC had dispensed medication for Dr. Lindner's other
24  Babesiosis patients?

131

1  A.    No.
2  Q.    So do you recall Miss Young's testimony
3  where she testified she had actually conversed with
4  Dr. Lindner about his approach to the treatment of
5  Babesiosis and that that conversation included that
6  it was dependent on the patient, their symptoms at
7  the time, and often that it was, quote, unquote,
8  cyclical, that it could get worse or better at times?
9          Do you recall reviewing that testimony?
10          MR. LAMB:  Objection to form.
11          You can answer.
12  A.    Not that detail.
13          MS. DeNAPLES:  Join.
14  A.    I do remember that there was an indication
15  that the pharmacist had had what appeared to be a
16  very cursory discussion where she at least believed
17  she had discussion.  There's absolutely no
18  documentation, from what I understand, nothing that
19  I've been given that anything of that sort is ever
20  documented.
21  Q.    Okay.
22  A.    There was some vague recollection from the
23  pharmacist that she had discussed something about
24  Babesiosis with the doctor.

132

1  Q.    Okay.
2  A.    But nothing that dealt with dosing, nothing
3  that dealt with anything specific to this patient,
4  this plaintiff.
5  Q.    Do you recall Miss Young's testifying that
6  as of August 2022, before TCC filled plaintiff's
7  corticosteroid prescriptions, that she was aware that
8  part of Lindner's treatment plan for Miss Wolking's
9  Babesiosis included prescribing steroids?
10          MR. LAMB:  Objection to form.
11          You can answer.
12  A.    You have to ask that question again.
13  Q.    Sure.  Do you recall that Miss Young also
14  testified that as of August 2022, before TCC filled
15  Miss Wolking's steroid prescriptions, that she was
16  aware that part of Dr. Lindner's treatment plan for
17  Miss Wolking's Babesiosis included prescribing
18  steroids?
19  A.    I believe that, yes, she did because Dr.
20  Lindner had discussed treating his daughter with
21  steroids.
22  Q.    I'm not talking about the daughter, I'm
23  talking about that she had a discussion as to Dr.
24  Lindner's treatment plan of Miss Wolking.

133

1  A.    That I do not know.
2          MR. LAMB:  Objection to form.
3          You can answer.
4  A.    I'm sorry.  I do not remember that.
5  Q.    Did you review both her transcripts, Doctor,
6  her April transcript, as well as her November
7  transcript?
8  A.    That I do not remember.  I -- I remember
9  reviewing at least one transcript.  Now, Mr. Lamb may
10  have sent me a second one, I don't remember.
11          MR. LAMB:  You can look at the
12  report, if you want.  You can look at the report.
13  Q.    Do you recall that Miss Young also testified
14  that in addition to her conversations with Dr.
15  Lindner, that she had also researched Babesiosis
16  odocoilei on her own before filling Miss Wolking's
17  prescription?
18          MR. LAMB:  Objection to form.
19          You can answer.
20  A.    I remember something of her testimony, but
21  it seemed like it was a very perfunctory review, that
22  there wasn't much available.  And again, none of this
23  is documented.
24  Q.    Okay.  Do you also recall Miss Wolking

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

134

1    testifying that she learned that there was -- I'm
2    sorry -- that she had read about or learned about
3    Babesiosis in Stephen Buhner's books on Lyme disease
4    and tick borne illnesses?  Do you --
5              MR. LAMB:  Objection to form.
6    Q.    -- recall that testimony?
7              MR. LAMB:  Objection to form.
8    A.    I do remember that because some members of
9    her family, I believe, had suffered Lyme disease and
10   so she had read up on Lyme disease and Babesiosis was
11   potentially related in that it was tick borne.
12   Q.    Do you recall Miss Young also testifying
13   that she discussed the August 8th, '22 prescription
14   with the other pharmacist, Brian Bryk, and that they
15   had researched the prescription itself before filling
16   it?
17   A.    No.  I -- again --
18             MR. LAMB:  I'm going to object.
19   Sorry, Dr. Gainor, if you can just slow down a little
20   bit on the answers so that I can get these objections
21   in.
22             I'm going to object to form again.
23             And now you can answer.
24             THE WITNESS:  Sure.  My apologies.

135

1    A.    Again, there's absolutely no documentation
2    of anything that they did specifically.  There is
3    this vague statement, as I remember, that she looked
4    into it.  I don't remember whether she actually said
5    that she discussed it with Brian, I believe his name
6    is Bryk.
7    Q.    Yes, Bryk.
8    A.    So the bottom line is, there's nothing in
9    any of the documents that show what they researched,
10   where they looked, what they found.
11   Q.    Okay.
12   A.    And clearly, I can guarantee you that they
13   would never find in the medical literature that it is
14   acceptable to order hundreds and hundreds of
15   milligrams of corticosteroids a day for an
16   outpatient.
17   Q.    Dr. Gainor, are you discounting all of Miss
18   Young's testimony and the steps she took to
19   essentially undergo her drug utilization review
20   because it was -- because there's no documentation to
21   show that she took those steps?
22             MR. LAMB:  Objection to form.
23             You can answer.
24   A.    I'm sorry, but I don't know what she did.

136

1    Am I saying that she didn't do it?  No.  There's
2    no -- this case is so unusual, this dose is so
3    unusual, it would be the kind of thing that normally
4    a pharmacist would document.  This is not a typical
5    prescription.  And so if it's so out of the norm,
6    this is a classic example of where we would expect to
7    see the pharmacist document.  And unfortunately, she
8    didn't.
9    Q.    Dr. Gainor --
10   A.    Now when I say that she didn't do --
11   Q.    Hold on.
12             MR. LAMB:  Susan, I'm sorry.  He
13   hasn't finished his answered.  Let him finish.
14   Q.    Okay.  Go ahead
15   A.    So in this particular case, if she had done
16   the research, she would have documented some place
17   it's okay to give hundreds of milligrams of
18   corticosteroids.  The fact that it is a glaring
19   absence makes me question how much research she did
20   because I can, as I said, guarantee to you there is
21   no medical literature that would ever approve
22   ordering hundreds of milligrams of corticosteroids a
23   day for an outpatient.  The literature just doesn't
24   exist.

137

1    Q.    But you also agree that there's no medical
2    literature that would prohibit her from dispensing
3    that amount of corticosteroids either, correct?
4    A.    There's no medical literature that would
5    prohibit her from dispensing corticosteroids, that
6    part's true.
7    Q.    Or that amount?
8    A.    There's no medical literature to support
9    that.  And it is so far out of the norm, that you
10   would need, in my opinion, to satisfy your duty of
11   care to your patient, you would have had to do
12   research to show that there was some justification,
13   some medical acceptance of doses that were that high.
14   Q.    Let me ask you this.  Dr. Gainor, are you
15   opining that Courtney Young's independent
16   recollection of all the steps she took for -- for her
17   drug utilization review before filling that
18   prescription, are you opining that her independent
19   recollection just does not matter because there's no
20   documentation to show she underwent it?
21             MR. LAMB:  Objection to form.
22             You can answer it.
23   A.    I am saying that her recollection is -- has
24   to be questioned in that, No. 1, it was -- happened

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

138

1  in 2022, so it happened almost two years ago. And
2  there's no documentation. So of course it's got to
3  be questioned.
4          And the other thing is, I know -- I can
5  testify that there is no literature that would
6  support what the pharmacy did.
7  Q.      Now, Doctor, are you aware that Miss Young
8  testified -- sorry -- that Miss Young also testified
9  that she had a conversation with Dr. Lindner
10 about the 8/8/2022 prescription before filling it?
11         MR. LAMB: Objection to form.
12         You can answer.
13 A.      I don't -- I don't remember -- the 8/8/22?
14 No, I don't remember her specifically saying any
15 discussions about that. But again, even if she had,
16 I don't think it changed -- changes the facts of the
17 case.
18 Q.      Okay.
19 A.      I mean, what you're saying is that she
20 should basically follow the doctor's directions
21 regardless of how dangerous it is to the patient.
22 And that's just not the law, nor is it professional
23 standards.
24         The law of Pennsylvania, as you're

139

1  probably aware, is that the pharmacist has an
2  independent duty and professional standards show us
3  that the pharmacist's duty of care includes learning
4  and considering the harm that may be caused by a
5  prescription before they provide it to the patient.
6  Q.      Now, Doctor, you would -- you had indicated
7  earlier that part of the pharmacist's standard of
8  care or -- in performing the drug utilization review
9  also depends on one of the factors which is relying
10 on the doctor's expertise or clinical experience,
11 correct?
12 A.      That would be one factor, certainly.
13 Q.      Okay. Are you aware that Miss Young also
14 testified that she discussed with Dr. Lindner his
15 treatment for Miss Wolking's Babesiosis included not
16 only steroids, but anti-malarials?
17         MR. LAMB: Objection to form.
18         You can answer.
19 A.      I do remember that I had that -- antibiotic,
20 if I'm not mistaken, prescribed, perhaps an
21 anti-malarial, also. That raised a little bit of
22 suspicion for me because remember the corticosteroids
23 are immunosuppressants, and you're not going to give
24 an antibiotic unless the patient has some kind of an

140

1  infection, which our immune system normally would
2  fight. So it raised another question for me, at
3  least, as a pharmacist, why would I want to suppress
4  the immune system and then give antibiotics.
5          So even if she's correct that she had
6  this discussion, it doesn't -- it doesn't eliminate
7  her burden, her duty to the patient to protect the
8  patient.
9  Q.      Okay. But you would agree that in having
10 these conversations with Dr. Lindner, she is trying
11 to essentially get information as to explain the
12 prescription, the dosage, the need, correct?
13         MR. LAMB: Objection to form.
14         You can answer.
15 A.      I can't guess what was in her mind.
16 Q.      Okay. Do you also recall that she testified
17 that Dr. Lindner explained to TCC that Miss Wolking
18 needed steroids to be able to take in conjunction
19 with the anti-malarials, that he also explained to
20 Miss Young that she needed the corticosteroids on
21 hand because he was not sure what the treatment --
22 the specific treatment course would be until she
23 started taking them?
24         Do you remember that testimony?

141

1          MR. LAMB: Objection to form.
2          You can answer.
3          MS. DeNAPLES: Join.
4  A.      I remember the testimony, but the actions of
5  the pharmacist belie that because they were giving
6  more than she would have needed. If she had it on
7  hand, she wouldn't have needed more. They were
8  prescribing -- they were dispensing tremendous
9  quantities, not so she could have it on hand, but so
10 she could take it. If she hadn't taken it, she
11 wouldn't have needed the pills that she got.
12 Q.      Do you recall Miss Young testifying that Dr.
13 Lindner explained to her in these conversations that
14 the dose for Miss Wolking would be dependent on the
15 patient, the patient's condition and how she was
16 responding and that he didn't want Miss Wolking to
17 run out and he wanted her to have enough on hand and
18 that the taper would be dependent on the patient and
19 the patient's condition?
20         MR. LAMB: Objection to form.
21         You can answer.
22         MS. DeNAPLES: Join.
23 A.      I remember something to that effect, but it
24 makes no sense based on the facts of the case. The

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

142

1  patient was taking the drug.  She didn't have it on
2  hand.  She needed more and more because she was
3  taking more and more.
4         And go back to my example of pain.  Yeah,
5  we don't want a cancer patient to be in pain so, yes,
6  we want them to always have pain medication on hand.
7  But we don't want to give them a fatal overdose.
8  Q.     Okay.  Do you recall reviewing Miss Young's
9  testimony and her testifying that she and Dr. Lindner
10 discussed the 8/8/2022 prescription and she had
11 questioned him about the quantity prescribed so that
12 she could have a conversation with him about why she
13 needed that quantity?
14 A.     I don't remember --
15        MR. LAMB:  Objection to form.
16 Objection to form.
17        You can answer.
18        MS. DeNAPLES:  Join.
19 A.     No, I don't remember the specif -- that
20 being -- the conversation being that specific.  I
21 remember the generality that the doctor said the
22 patient will have -- always want to have some on
23 hand.  And that I understand.
24        But the facts of the case say that isn't

143

1  what was done because she kept getting more and more.
2  And mathematically, with what we started with three
3  or four hours ago, was the fact that patient was
4  taking these quantities that were extremely dangerous
5  and that the pharmacy just kept providing more.
6  Q.     Do you recall reviewing Miss Young's
7  testimony that she shared the contents of her
8  conversation with Dr. Lindner as to the treatment of
9  Miss Wolking's Babesiosis with the other pharmacist,
10 Brian Bryk, before filling the 8/8/2022 prescription?
11        MR. LAMB:  Objection to form.
12        You can answer.
13 A.     My recollection is she could not remember
14 whether they had discussed it.  They might have, was
15 my recollection.  Again, it was very vague as to
16 whether there was really ever a conversation and
17 clearly there was no documentation of it.
18 Q.     Do you recall --
19 A.     And something this important would normally
20 be documented.
21 Q.     Do you recall that Miss Young test -- also
22 testified that the conversation she had with Dr.
23 Lindner about the treatment plan of Miss Wolking's
24 Babesiosis carried through for the subsequent

144

1  prescriptions and that she -- and therefore
2  understood what the course of treatment would be from
3  that conversation?
4  A.     You're going to have to --
5         MR. LAMB:  Objection to -- sorry,
6  Dr. Gainor.  If you can just try to remember to --
7         THE WITNESS:  My fault.
8         MR. LAMB:  -- wait to answer.
9         Objection to form.
10        You can answer.
11 BY MS. KEESLER:
12 Q.     Do you recall that Miss Young additionally
13 testified that the conversation she had with Dr.
14 Lindner about his treatment plan of Miss Wolking's
15 Babesiosis carried through for the subsequent
16 corticoid prescription -- corticoid prescription --
17 corticosteroid prescription and that she understood
18 what the course of treatment was from that
19 conversation?
20 A.     Again, I don't know exactly what she
21 understood because I don't remember anything in the
22 deposition and none of us know exactly what was in
23 her mind.  But having agreed that, no, she -- she may
24 or may not have accepted that this was going to be

145

1  the course of therapy, that does not justify giving
2  the patient these astronomic dangerous doses.
3         Just because the doctor order -- if the
4  doctor had ordered a fatal overdose of a drug and
5  said this is what I want and this is my course of
6  therapy, if a pharmacist filled a fatal overdose,
7  they would not only suffer civil liability, they
8  might very well suffer criminal liability.
9         So the mere fact that the doctor gave her
10 some course of therapy that he believed to be
11 appropriate does not exonerate a pharmacist.  If
12 pharmacists are nothing more than a vending machine,
13 they don't need to go to college.
14 Q.     Okay.  You agree that TCC had an established
15 relationship with Dr. Lindner years before they
16 dispensed the corticosteroid medications to Miss
17 Wolking, correct?
18 A.     I -- I gathered that there had been some
19 relationship because the pharmacy and Dr. Lindner's
20 office were located in the same building.
21 Q.     Okay.  And is there -- is there any
22 significance to the trust between a pharmacy and the
23 prescribing provider?
24 A.     I'm sorry?

37 (Pages 142 to 145)

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

146

1   Q.    Is there any significance to the trust
2   between a pharmacist and a prescribing provider?  In
3   other words, how does that play in to a pharmacist's
4   duty of care and relying on a prescriber's clinical
5   experience?
6   A.    I do not believe that familiarity exonerates
7   a pharmacist from his or her duty of care.  The fact
8   that they may have known the doctor, liked the
9   doctor, he may have been a wonderful human being, but
10  if he orders an excessive dose of a drug that may
11  cause serious harm to the patient and the risks
12  clearly outweigh the benefits, even if the pharmacist
13  liked the doctor and have known him for years, it
14  does not exonerate or release the pharmacist from
15  their duty of care to the patient.
16  Q.    I'm not asking if it exonerates.  I'm asking
17  why is -- why is trust between a pharmacist and the
18  prescribing provider important?
19  A.    I'm not sure I even understand that
20  question.
21  Q.    Okay.  So are you saying it's not important?
22  A.    I don't understand your question.
23  Q.    Okay.  Do you believe that there needs to be
24  a level of trust between pharmacists and the

147

1   prescribing provider when -- when receiving
2   prescription orders and then dispensing
3   prescriptions?
4   A.    You'd have to explain trust in what.
5   Q.    Trust in relying on a doctor's
6   representations, clinical experience, any
7   representations he's making as to why he is
8   prescribing this certain medication for this
9   particular condition and in what amounts and
10  duration.
11  A.    Trust would certainly help in the evaluation
12  of whether I should dispense this prescription.  But
13  trust would not exonerate me from protecting the
14  patient from a doctor that I trusted, but he made a
15  mistake.
16  Q.    Let me ask you this.  I just went through
17  all of -- I shouldn't say all.  But I went through
18  points of Miss Young's testimony.  I asked if you
19  recalled any of that testimony.  In response to a lot
20  of that testimony you had indicated there was no
21  documentation to reflect that.
22        Do you remember that?
23  A.    Yes.
24  Q.    Okay.  Absence of documentation aside,

148

1   assuming that Miss Young and TCC had engaged in those
2   conversations about the treatment plan, about the
3   corticosteroids being part of the treatment plan,
4   about inquiring as to the dosages, about the fact
5   that he had treated other patients for Babesiosis
6   with corticosteroids, okay, including the fact that
7   she conducted research on her own on the condition
8   itself, as well, okay; assuming all of that to be
9   true, Doctor, is it still your opinion that TCC
10  failed to evaluate -- failed their standard of care
11  or breached their standard of care to Miss Wolking?
12        MR. LAMB:  Objection to form.
13        You can answer.
14  A.    Yes, they breached the standard of care.
15  Q.    Okay.
16  A.    I don't care how good that doctor was, I
17  don't care how much trust they had in the doctor.  We
18  are all human, we all can make mistakes.  So a doctor
19  that I trust, that I've had experience with who may
20  have inadvertently or -- I'm not going to say
21  inadvertency -- maybe for the lack of knowledge,
22  tried some therapy, that does not make it all right.
23  That does not exonerate me as the pharmacist from my
24  duty to protect the patient.

149

1         Because if all I'm doing is following the
2   doctor's directions, I don't need to go to pharmacy
3   school.  I can have a machine that just will dispense
4   whatever drug the doctor ordered.  And that's not
5   what -- the way we operate healthcare in Pennsylvania
6   and not in the United States.
7   Q.    So, okay.
8   A.    We have healthcare with a team of healthcare
9   providers that protect patients.
10  Q.    What are --
11  A.    So even though she may have had all these
12  conversations, she had nothing to support giving
13  these dangerous doses, except the doctor's word for
14  it.  She needed more than the doctor's word.  She
15  needed some medical literature.  She needed some
16  scientific evidence.  She needed something that would
17  show that it was -- even in unusual cases --
18  Q.    Okay.
19  A.    -- acceptable to order hundreds of
20  milligrams of corticosteroids day after day after day
21  for a condition that clearly never has had that as an
22  accepted therapy.
23  Q.    Okay.  But there was no medical literature
24  available to indicate a dosage that would cause harm,

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

150

1  correct?
2  A.      Of course, if you're reading in the
3  literature the dangers of corticosteroids, it takes
4  paragraphs.
5  Q.      So the specific --
6  A.      Everything from --
7  Q.       -- dosage --
8  A.       -- weight gain to immunosuppression, to
9  bowel perforations, to moon face.
10  Q.      How about --
11  A.      There's a litany of side effects and adverse
12  events.  So you can't say, Susan, that there's
13  nothing in the literature that warns doctors and
14  pharmacists about the risk of corticosteroids.
15  Q.      That's -- that's not my question, Doctor.
16  My doctor was -- there is no medical literature
17  outlining specific dosages of corticosteroids that
18  are known to cause harm, correct?
19  A.      There's medical literature that indicates --
20  that indicates acceptable ranges of therapy.
21  Q.      That wasn't my question, Doctor.  Just yes
22  or no.  There is no medical literature that outlines
23  a specific dosage that is known to cause harm --
24  specific doses of the corticosteroids that is known

151

1  to cause harm, correct?
2  A.      There is no known dosage of Oxycodone that's
3  known to kill a patient, either.
4  Q.      So your answer --
5  A.      In theory, every patient --
6  Q.       -- is yes, correct?
7  A.      Just let me finish.
8  Q.      Well, you didn't answer the question.
9  A.      Susan, let me finish, please.  Be courteous.
10  There is no medical literature that's
11  going to say at a specific dose this drug will cause
12  harm.  There is no literature that says which drink
13  makes an alcoholic an alcoholic.
14          So you're asking a question that is not
15  really legitimate.  We know as a pharmacist the
16  dosage ranges that are acceptable.  That's black and
17  white in the literature.  And when you're going to
18  exceed that, not just by a little bit, but by a
19  tremendous amount, you'd have to find some
20  justification.  The hint being that the FDA has said
21  any dose -- any starting dose above 60 milligrams is
22  dangerous.
23          And unfortunately these pharmacists never
24  did anything other than take the doctor's word for

152

1  this is perfectly acceptable, it's my theory, but
2  it's tested, I am so confident in it that I used it
3  on my daughter.  And I'm not sure what relevance the
4  fact that his daughter died has.  But I think if
5  you're going to talk about the fact that he did it on
6  his daughter, that is certainly an issue that has to
7  be investigated.
8          But there's nothing that would support
9  what the pharmacist did in the medical literature.
10  And so you're saying there's no specific limit of
11  what's dangerous and my --
12  Q.      That's what I stated.
13  A.       -- testimony would be that pharmacy schools
14  would teach this.  If the dosage range is normally
15  five to 60 milligrams, you better have a good
16  justification for giving more than five to 60
17  milligrams.  And they don't have it.
18          And the fact that she did suffer all
19  these injuries, Susan, should clearly indicate
20  that -- I'm not the causation expert -- but it's
21  common sense and from what I understand, the
22  causation experts have testified that it was this
23  excessive dose of corticosteroids that caused the
24  patient's injury.

153

1          And my testimony is that a pharmacist's
2  duty of care would be to verify that that dose was
3  acceptable.
4  Q.      Okay.  I'm going to move on to my next --
5  A.      There's nothing to show that they did that
6  other than perhaps your statement that they trusted
7  the doctor.
8  Q.      Okay.  I'm going move on to my next
9  question, Dr. Gainor.
10          What are you opining that TCC -- what
11  additional steps are you opining that TCC should have
12  under -- or taken, in addition to everything that
13  Miss Young testified to?  What additional step -- you
14  indicated that that was not enough.  So what
15  additional step should TCC have taken before filling
16  those prescriptions?
17          MR. LAMB:  Objection to form.
18          You can answer.
19  A.      They should have done some research in to
20  the medical literature to see if they could find any
21  legitimate justification for exceeding the
22  recommended doses.
23  Q.      Where would she have -- where would TCC have
24  turned to find that information?

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

154

1  A.    I think they have Micromedex there.  They
2  could have used Facts and Comparisons.  They could
3  have used any pharmacology texts.  They could have
4  used the Merck manual.
5  Q.    Okay.  And are you aware of what that
6  medical literature says?
7  A.    All it says about the same thing --
8  Q.    Which is?
9  A.    -- that the dose should be between five and
10  60 milligrams starting, that there are going to be
11  conditions that require much higher doses, but these
12  are generally in the hospital.  These are emergency
13  situations.  And normally you're not even doing it
14  orally, if you're going to go much higher than that,
15  it's normally injectable.
16      So they needed to do more than just say,
17  Doctor, is this acceptable.  Doctor says yes, then
18  I'm going to do it.  Well, that gets back to this
19  vending machine.  If all you're going to do is follow
20  the doctor's directions, you don't need to go to five
21  or six years of pharmacy school.
22  Q.    Okay.  Well, she did testify that she
23  conducted independent research, correct?
24      MR. LAMB:  Objection to form.

155

1      You can answer.
2  A.    I don't believe that she did any significant
3  research because she didn't document anything and she
4  didn't say anything.  She said she didn't find
5  anything.
6  Q.    So again, you're indicating that because it
7  wasn't documented, it didn't happen.  Is that
8  correct?
9  A.    I'm saying if she had found something that
10  would have said that was acceptable, that would have
11  been different.  She testified to that.  She never
12  said that she found something that meant it was too
13  high a dose.
14      The bottom line what you're suggesting is
15  if she can't find anything that says don't do it,
16  then it's okay to do it.
17  Q.    Dr. Gainor --
18  A.    That's just not the standard of care,
19  unfortunately.
20  Q.    Now, Doctor, you opined that TCC failed to
21  evaluate the harm that might be caused to Stacey
22  Wolking.  What -- what do you mean by that?
23  A.    Well, they should have known the risks of
24  these astronomic doses of corticosteroids.

156

1  Q.    What are the risks --
2  A.    They knew that as pharmacists.
3  A.    What are the risks of these, quote, unquote,
4  astronomical --
5  A.    Susan --
6  Q.    -- doses of steroids?
7  A.    Susan, we've gone through this a number of
8  times.  I'll start with the moon face, the fluid
9  retention, it can cause blood pressure problems, it
10  can cause perforation of the stomach and bowel, it
11  can cause a number of side effects.
12      Corticosteroids are wonderful drugs, but
13  they are drugs with known serious side effects.  And
14  so it's a drug that if you're in the normal dosing
15  range, fine.  It's going to probably do a wonderful
16  job to help the patients for any number of
17  conditions.
18      But when you start exceeding the dose by
19  this astronomic amount, every pharmacist should know
20  that they're in dangerous territory relative to
21  causing harm to the patient.
22  Q.    And are you also alleging that the
23  pharmacist should know at what dosages that that harm
24  essentially would be present?

157

1  A.    Well, they know from the literature what the
2  recommended doses are.  And so if you're going to
3  exceed that, then they need to find some
4  justification for the fact that you're going to have
5  higher doses.
6      Now we know in a hospital environment,
7  certainly you may need to use higher doses.  But
8  there's nothing that I have ever seen and obviously
9  that the pharmacists at TCC ever saw that said that
10  it's okay to use hundreds of milligrams of
11  corticosteroids a day.
12  Q.    Okay.  Doctor, what were Miss Wolking's
13  injuries?
14  A.    I do not remember because that's beyond my
15  scope of the -- the case.  I think on the Complaint
16  cited a number of problems, perforated bowel, nausea,
17  pain, a number of symptoms which I believe would be
18  consistent with corticosteroid overdose.
19  Q.    And what is that based on?
20  A.    What is what based on?
21  Q.    That -- those conditions that you just
22  listed that you believe are associated with
23  corticosteroids.  Where --
24  A.    Well, the medical literature --

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

158

1  Q.    Are you able to cite any articles that
2  support that contention?
3  A.    No. I'm going to tell you that if you go in
4  to the medical literature, whether it's Micromedex,
5  whether it's Facts and Comparisons, whether it's the
6  Merck Manual, whether it's any other literature
7  source, whether it's one of the ones from a hospital
8  or something else, all that literature on
9  corticosteroids is going to indicate that there are
10 serious side effects and it's going to give this
11 litany of side effects.  Did I include all of them?
12 no.
13         But certainly every competent pharmacist
14 knows that there are a multitude of side effects,
15 dangerous side effects, adverse side effects that can
16 result from corticosteroid therapy.
17 Q.    Do you know where specifically Miss Wolking
18 suffered a perforation?
19 A.    I know none of the specifics other than what
20 appears in the Complaint.
21 Q.    You did not review plaintiff's medical
22 records, correct?
23 A.    No.
24 Q.    Okay.  And you're not a medical doctor,

159

1  correct?
2  A.    No, I'm not.
3  Q.    You're not an infectious disease doctor,
4  correct?
5  A.    Correct.
6  Q.    You're not an endocrinologist, correct?
7  A.    Correct.
8  Q.    You're not qualified to make any medical
9  diagnoses, correct?
10 A.    Correct.
11 Q.    You're not qualified to make any causation
12 opinions as to whether the corticosteroids caused
13 Miss Wolking's injuries, correct?
14 A.    I do not believe that I'm involved in the
15 causation issue.  I'm not going to get in to whether
16 I'm qualify to make a decision on causation.  I think
17 pharmacists do have enough knowledge to make some --
18 some decisions as to causation.  But clearly in this
19 case, no, I'm not.  And I believe that there are
20 competent experts to address the issue of causation.
21 Q.    Okay.  Dr. Gainor, in the last line of your
22 report you indicate, and the result was serious harm
23 to Stacey Wolking.
24         Do you see that line?

160

1  A.    Yes.
2  Q.    Okay.  So are you -- are you opining in this
3  report that as a result of TCC's actions; in other
4  words, in -- as you state, failed to question the
5  appropriateness, failed to evaluate the harm,
6  that -- and as a result, that that caused the harm to
7  Miss Wolking?
8  A.    That's what the medical experts have opined
9  and I'm just repeating what the medical experts
10 opined.
11 Q.    Okay.  Thank you.  So -- so you're relying
12 on the plaintiff's experts' opinions as to their
13 belief as to causation, correct?
14 A.    Well, of course.
15 Q.    Okay.  In other words, that the plaintiff's
16 experts are opining that the corticosteroids caused
17 Miss Wolking's injuries?
18 A.    That is my understanding.  And my knowledge
19 of corticosteroid therapy and the induced adverse
20 events would be consistent with that.
21 Q.    Okay.  Have you since reviewed the expert
22 report of Dr. Smith?
23 A.    No, I've not.
24 Q.    Okay.  Are you aware that he provided a

161

1  different causation opinion?
2  A.    That he --
3  Q.    That he provided a different causation
4  opinion than the plaintiff's experts?
5  A.    No, I have not idea.  I don't even know
6  whether he was the plaintiff or defendant expert.
7  Q.    Okay.  Did you consider any other causes of
8  plaintiff's injuries?
9  A.    There could be -- I'm assuming a myriad of
10 causes.  But I can't speculate.  I can say that the
11 injuries she suffered were clearly consistent with
12 excessive doses of corticosteroids.  That I can say
13 as a pharmacist.
14         I cannot say in this particular case that
15 it was caused by the corticosteroids.  I think that
16 requires medical opinion and is my understanding that
17 medical experts have opined that the cause of her
18 symptoms was the excessive corticosteroid dose.
19 Q.    Okay.  Are you aware that Dr. Lindner had
20 prescribed very high doses of Tafenoquine to Miss
21 Wolking --
22 A.    High dose -- I'm sorry.
23 Q.    High doses of Tafenoquine to Miss Wolking
24 during the same time period leading up to her

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

162

1  hospitalization?
2  A.    I don't have her -- I don't have her medical
3  records, so I don't know what other drugs she was
4  prescribed.  The only thing I looked at was the
5  corticosteroids.  And there was some, as I say, brief
6  reference, I believe by the owner of TCC, that the
7  doctor had ordered some anti-malarials.
8  Q.    Okay.  Do you know what Tafenoquine is?
9  A.    Not exactly.  It's not a drug I'm
10  particularly familiar with.
11  Q.    Okay.  Did you consider whether any of other
12  pharmacies who dispensed corticosteroids to Miss
13  Wolking during the same time frame, such as Harris
14  Teeter, breached their duty -- their duty of care to
15  her?
16  A.    The answer to the question is, I can't tell
17  because I don't have the prescriptions that they
18  filled.  It seems to me clearly that the number of
19  prescriptions that they filled and the quantities
20  that they filled were significantly lower than the
21  quantities and the doses that TCC filled.
22  Q.    Okay.  And the information you have
23  reflected just three prescriptions by Harris Teeter,
24  an 8/7 prescription, I believe you said an 8 -- let

163

1  me just double check here -- I don't want to get that
2  wrong -- an 8/30 prescription and a 10/5
3  prescription.  Is that correct?
4  A.    Who are we talking about?  Which pharmacy?
5  Q.    Harris -- Harris Teeter.
6  A.    Harris Teeter.  Okay.  Just a moment if
7  you'll let me.
8  Q.    Yes.
9  A.    I show Harris Teeter filled a prescription
10  for Dexamethasone on October 5th; and I show that on
11  August 30th, Harris Teeter filled a prescription for
12  Prednisone; and on August 7th, Harris Teeter filled a
13  prescription for Prednisone.
14  Q.    Okay.  So that was the information you had
15  or was provided to you, correct?
16  A.    Correct.
17  Q.    All right.  Are you aware that there are
18  additional prescriptions for corticosteroids
19  dispensed by Harris Teeter during that time?
20  A.    No.
21  Q.    Okay.  Are you aware that Harris Teeter also
22  filled a prescription on 8/13 for Dexamethasone, 120
23  tablets of four milligrams?
24  A.    No.  As I said, all I have is the e-mail

164

1  sent by Dr. Lindner to Courtney Young.  And the only
2  thing that I noted was that his e-mail neglected to
3  indicate the prescription on August 15th for
4  Dexamethasone, four milligram, No. 200.  It just
5  wasn't in the e-mail.  But that's all that I have
6  relative to any prescriptions that were filled other
7  than at TCC.
8  Q.    Are you also aware that Harris Teeter filled
9  a prescription on 9/26/22 for Dexamethasone, four
10  milligram tablets, 120 in quantity?
11  A.    Susan, as I testified, I'm only aware of the
12  ones we discussed that are on the sheet created by
13  Dr. Lindner in an e-mail to Courtney Young.
14  Q.    Okay.
15  A.    I gave you those three dates.  They were
16  October 5th, August 30th and August 7th.
17  Q.    Okay.  Now knowing those two additional ones
18  that I just told you, okay -- so I just provided an
19  8/13 prescription and a 9/26 prescription.  Okay.
20  Now knowing those prescriptions that were filled by
21  Harris Teeter and the amounts, do you still have the
22  same opinion that Harris Teeter did not prescribe her
23  large doses of Prednisone that could have potentially
24  caused Miss Wolking harm or injury?

165

1        MR. LAMB:  Objection to form.
2  A.    Can you bring up the prescriptions from
3  Harris Teeter so I can see what was actually ordered?
4  Q.    were you ever -- let me ask you this.  Were
5  you ever provided Harris Teeter's prescriptions?
6  A.    Pardon me?
7  Q.    Were you ever provided the actual
8  prescriptions from Harris Teeter?
9  A.    Was I provided the prescriptions from Harris
10  Teeter?
11  Q.    Correct.
12  A.    Is that your question?
13  Q.    Correct.
14  A.    Only the summary from Dr. Lindner.
15  Q.    Okay.  Dr. Gainor -- give me one moment.
16        Would that information have been helpful
17  to know, Dr. Gainor, in rendering your opinion, the
18  additional prescriptions that were prescribed by
19  Harris Teeter?
20  A.    Would it have been helpful?
21  Q.    In other words -- let me ask you this.
22  A.    I was not asked to address the conduct of
23  the pharmacists at Harris Teeter.
24  Q.

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

166

1   A.    I was asked to address the conduct of the
2   pharmacists at TCC.  And I can say that regardless of
3   what Harris Teeter did, again, it doesn't exonerate
4   the pharmacists at TCC for what they did.
5   Q.    Okay.
6   A.    So would it have been helpful, not in my
7   evaluation of whether TCC's pharmacists behaved in a
8   professional manner and fulfilled their duty to the
9   patient, their duty of care.
10  Q.    Okay.  Are you aware that one of plaintiff's
11  experts, Dr. Paul Atwater recently testified?
12          MR. LAMB:  Objection to form.
13          Can we -- can we go off the record for a
14  moment?
15          MS. KEESLER:  Sure.
16          THE VIDEOGRAPHER:  5:07, off video.
17          (Whereupon, a discussion was held off the
18  record.)
19          THE VIDEOGRAPHER:  5:09, on video.
20  BY MS. KEESLER:
21  Q.    Dr. Gainor, are you aware that one of
22  plaintiff's experts, Dr. Paul Atwater, recently
23  testified?
24  A.    Susan, could you repeat it, please?

168

1   A.    Again, I -- Susan, could you state the
2   question again, please?
3   Q.    Sure.  Are you aware that Dr. Paul Atwater
4   testified that the -- that Harris Teeter prescribed
5   large doses of Prednisone or Prednisone equivalent
6   and that those amounts for that duration could have
7   caused Miss Wolking's bowel perforation?
8   A.    Susan, I'm sorry if I wasn't clear in my
9   prior answer.
10  Q.    You can just say yes or no.
11  A.    The -- Susan, I'm trying to -- to avoid this
12  going until midnight.
13          I testified that I have not seen any
14  transcripts, nor have I had any information about
15  medical experts on the defense side or the
16  plaintiff's side.
17  Q.    Okay.
18  A.    Period.  There's nothing that I know about
19  any testimony from any medical practitioners in this
20  case.
21  Q.    Does Paul Atwater's opinion surprise you?
22  Does it surprise you to hear that today?
23  A.    I don't know what --
24          MR. LAMB:  Objection to form.

167

1   Q.    Sure.  Are you aware that one of plaintiff's
2   experts, Dr. Paul Atwater, recently testified?
3   A.    No.  Please understand, I have not seen any
4   transcripts from any experts on either the
5   plaintiff's side or the defense side relating -- who
6   are doctors who are relating to the issue of
7   causation.
8   Q.    Okay.  I understand.
9   A.    I haven't had -- I want to make that clear
10  and that should eliminate a number of the questions
11  that you were asking because, no, I've never seen a
12  transcript, I don't believe it's relevant to my
13  testimony.
14  Q.    Okay.
15  A.    So I don't know what any of the experts,
16  either plaintiff's or defendant's experts have
17  stated.
18  Q.    Okay.  Are you aware that he testified that
19  Harris Teeter prescribed large doses of Prednisone or
20  Prednisone equivalent and that those amounts for that
21  duration could have caused Miss Wolking's bowel
22  perforation?
23          MR. LAMB:  Objection to form.
24          You can answer.

169

1           You can answer.
2   A.    I don't know what the opinion is.
3   Q.    I just stated it.
4   A.    Well, I wasn't -- I'm sorry.  You're
5   avoiding my answer --
6   Q.    Are you surprised --
7   A.    -- because clearly I have no idea what he
8   may or may not have said because I -- you asked me
9   was I aware.
10  Q.    Correct.
11  A.    The answer is no, I'm not aware of any
12  defense expert or plaintiff's expert's medical
13  testimony.
14  Q.    That's fine.
15          And I'm telling you -- I'm representing
16  to you that Dr. Paul Atwater testified that Harris
17  Teeter prescribed large doses of Prednisone or
18  Prednisone equivalent and that those amounts for that
19  duration could have caused Miss Wolking's bowel
20  perforation.
21          Does that surprise -- are you surprised
22  to hear that?
23          MR. LAMB:  And again, I'm going to
24  object to form and place on the record that we've

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

CARL GAINOR, Ph.D, JD

170

1  already taken a break to discuss that Dr. Gainor has
2  made perfectly clearly he's not opining on cause, he
3  has repeatedly said that he doesn't know who these
4  experts are, has not read their testimony, has not
5  read their reports.
6        There's no foundation for this question
7  that has been asked and answered already.
8        And I suppose with that, you can answer.
9  But I'm going to repeat that we're not going to sit
10  here all night answering the same questions over and
11  over again.
12  A.    Susan, my answer is I do not have any
13  opinion because I've never seen it.  I don't know.
14  I'm not the causation expert.  All I can do is
15  testify to the drugs that were dispensed by TCC.
16  Q.    Okay.  Did you think it would be important
17  to review the other prescriptions that plaintiff was
18  taking during that time frame?
19        MR. LAMB:  Objection to form.
20  A.    Would it -- would it have helped?  I would
21  certainly like as much information as I can possibly
22  have to form my opinions.  I always like additional
23  or as much information as possible.
24        But would it change my opinion as to

171

1  whether TCC's pharmacists breached their duty of
2  care, the answer is, no, it would not change it
3  because what they did was not acceptable in terms of
4  their duty of care to the patient.
5        Just because some other pharmacy may have
6  done something right or wrong does not impact whether
7  TCC did something right or wrong.
8  Q.    Okay.  Would it change your opinion if you
9  knew that the causation -- or rather that the cause
10  of plaintiff's injuries were not caused by the
11  corticosteroids?
12  A.    I'm not sure I even understand it.  Are you
13  saying -- you want me to, as a hypothetical, assume
14  that the corticosteroids did not cause her problems?
15  Q.    Strike that.  If you -- if hypothetically --
16  so as I indicated before, Dr. Smith has rendered a
17  different causation opinion.  Okay?  And Dr. Smith
18  has opined that the cause of plaintiff's injuries
19  were not caused by corticosteroids, but rather the
20  other non-corticosteroid prescriptions dispensed by
21  other pharmacies.  Okay?
22        Knowing that information, does that
23  change your opinion at all?
24  A.    My opinion is not on causation, as Mr. Lamb

172

1  has pointed out.  I'm not a causation expert.  So --
2  Q.    I'm not talking about -- the standard of
3  care -- the standard of care that TCC had to the --
4  had to the patient here, Miss Wolking, and whether
5  they breached that standard of care to Miss Wolking.
6  A.    I'm sorry, I don't understand the question,
7  so let's repeat it.
8  Q.    Okay.  That's fine.  Give me one moment.  I
9  don't think I have much further.
10        MS. KEESLER:  I'm going to review
11  my notes.  Let's go off the record for two -- for two
12  minutes.
13        THE VIDEOGRAPHER:  5:17, off video.
14        (Whereupon, a short recess was held.)
15        THE VIDEOGRAPHER:  5:23, on video.
16  BY MS. KEESLER:
17  Q.    Dr. Gainor, you provided a supplemental
18  report in this case, correct?
19  A.    Yes.  Mr. Lamb asked me to comment on the
20  defendant's pharmacy expert's report, if I'm not
21  mistaken.
22        MS. KEESLER:  Just pull up that
23  report.  I'm going to make this, I believe, as --
24  we're at Exhibit 5.

173

1        (Whereupon, Gainor Exhibit 5, Report dated
2  6/3/2024, was marked for identification.)
3  BY MS. KEESLER:
4  Q.    Dr. Gainor, is this your supplemental report
5  dated -- oh, I don't -- June 3rd, 2024?
6  A.    Okay.  Yes.
7  Q.    Okay.  I'm going to direct your attention to
8  this paragraph here where it states, Dr. Greene.  Do
9  you see that?
10  A.    Dr. Greene next addresses the cause of Miss
11  Wolking's injuries, okay.
12  Q.    I'm going to start here by the second -- or
13  I'm sorry, the third sentence where it starts with
14  by.  Do you see that?
15  A.    Uh-huh.  Yes.
16  Q.    By providing the steroids that directly led
17  to the serious and foreseeable drug-induced adverse
18  events suffered by plaintiff, the pharmacists at TCC
19  did, in fact, cause her injuries.
20        Did I read that correctly?
21  A.    Yes.
22  Q.    Okay.  So you indicated earlier that you
23  were not asked to opine on causation, correct?
24  A.    Correct.

CARL GAINOR, Ph.D, JD

**174**

1  Q.      And yet you're opining on causation here in
2  the supplemental report, correct?
3  A.      I was just responding to what Dr. Greene had
4  said.
5  Q.      Okay.  Well, what -- what is your basis for
6  that opinion?
7  A.      Everything that we've testified to or I've
8  testified to in the last few hours; that these were
9  mammoth doses of corticosteroids, the patient
10  suffered foreseeable drug-induced adverse events and,
11  in my professional opinion, the pharmacists did not
12  provide the duty of care that they were required to.
13         Now I'm not trying to testify as to
14  causation.  And the fact that I put that in was just
15  a -- an acknowledgement of Dr. Greene addressing the
16  fact that the pharmacists were not responsible for
17  causing the patient's injuries, and I said that they
18  did, in fact, cause the injuries, in my opinion.
19         I'm not acting, though, as an expert on
20  causation.
21  Q.      Okay.  And again, your -- actually, strike
22  that.
23         MS. KEESLER:  I don't have anything
24  further.  Thank you, Dr. Gainor.  I appreciate your

**175**

1  time.
2         THE VIDEOGRAPHER:  5:25, conclusion
3  of video.
4         (Concluded at 5:25 p.m.)

**176**

4  _____, 2024

7         I hereby certify that the evidence
8  and proceedings are contained fully and accurately in
9  the notes taken by me of the testimony of the within
10  witness who was duly sworn by me, and that this is a
11  correct transcript of the same.

15  _____

     Stacy D. Serba
16  Notary Public

     The foregoing certification does not apply to any
19  reproduction of the same by any means unless under
     the direct control and/or supervision of the
20  certifying reporter.

**177**

| | PAGE | LINE | FROM | TO |
|---|---|---|---|---|
| 1 | | | | |
| 2 | _____ | _____ | _____ | _____ |
| 3 | _____ | _____ | _____ | _____ |
| 4 | _____ | _____ | _____ | _____ |
| 5 | _____ | _____ | _____ | _____ |
| 6 | _____ | _____ | _____ | _____ |
| 7 | _____ | _____ | _____ | _____ |
| 8 | _____ | _____ | _____ | _____ |
| 9 | _____ | _____ | _____ | _____ |
| 10 | _____ | _____ | _____ | _____ |
| 11 | _____ | _____ | _____ | _____ |
| 12 | _____ | _____ | _____ | _____ |
| 13 | _____ | _____ | _____ | _____ |
| 14 | _____ | _____ | _____ | _____ |
| 15 | _____ | _____ | _____ | _____ |
| 16 | _____ | _____ | _____ | _____ |
| 17 | _____ | _____ | _____ | _____ |
| 18 | _____ | _____ | _____ | _____ |
| 19 | _____ | _____ | _____ | _____ |
| 20 | _____ | _____ | _____ | _____ |
| 21 | _____ | _____ | _____ | _____ |
| 22 | _____ | _____ | _____ | _____ |
| 23 | _____ | _____ | _____ | _____ |
| 24 | _____ | _____ | _____ | _____ |

CARL GAINOR, Ph.D, JD

178

1
2
3                     _____, 2024
4
5
6
7          I have read the foregoing transcript of
8    my deposition and, with the changes noted, find it to
9    be complete and accurate.
10
11
12
13                     _____
14                     CARL GAINOR
15
16
17
18
19
20
21
22
23
24

ELECTRONIC REPORTING STENOGRAPHIC AFFILIATES

## A

**ability** 71:10,11
**able** 15:13 32:12 37:13,19
  51:4 66:5 70:21 111:5
  118:11,15 140:18 158:1
**abortion** 67:9
**absence** 136:19 147:24
**absolutely** 4:23 5:18 69:17
  76:6,8,13 82:24 117:15
  118:6 123:18 131:17 135:1
**abuse** 40:9,13
**academic** 43:18,19 45:2
**accept** 64:14
**acceptable** 28:1 77:18 98:3
  135:14 149:19 150:20
  151:16 152:1 153:3 154:17
  155:10 171:3
**acceptance** 137:13
**accepted** 27:22 87:8 144:24
  149:22
**accompanied** 58:12
**accumulated** 62:3
**accurate** 178:9
**accurately** 64:8 176:8
**acknowledged** 112:2
**acknowledgement** 174:15
**Act** 17:9,11 19:6 66:1
**acted** 107:1
**acting** 174:19
**action** 1:2 43:7
**actions** 11:3 141:4 160:3
**actual** 13:21 50:22 58:1
  165:7
**add** 13:7 65:7
**addition** 133:14 153:12
**additional** 23:16 50:17 62:13
  63:4 65:14 102:24 108:4
  153:11,13,15 163:18 164:17
  165:18 170:22
**additionally** 144:12
**address** 12:8 41:3 43:2 81:17
  159:20 165:22 166:1
**addressed** 41:4 42:23 44:2
**addresses** 40:13 173:10
**addressing** 174:15
**adequate** 46:10 63:6 103:23
**adequately** 44:20

**adjust** 123:8
**adjusted** 121:13 122:22
**administration** 29:1,3,8 30:2
  30:12,16 31:9 68:8 70:8,10
  70:14 114:1 115:11
**admissibility** 61:10
**admissible** 61:8
**adverse** 39:11 42:17 106:8,20
  109:9 150:11 158:15 160:19
  173:17 174:10
**advise** 18:9
**advising** 18:2 44:11 110:13
**affect** 84:10
**afternoon** 4:21
**age** 46:1 68:7 69:5,12
**ago** 7:22 21:17 30:9 33:2,2,3
  48:9 138:1 143:3
**agree** 68:5,12 69:3,14 70:6
  71:6,18 72:5,9 73:5,10 83:1
  102:7 107:21 108:1 110:6
  117:13,16,21 118:1,4
  120:12 121:9 137:1 140:9
  145:14
**agreed** 144:23
**agreeing** 27:16
**ahead** 25:23 26:14 89:15
  91:19 102:4 114:13 136:14
**al** 4:7,7
**Alabama** 10:2
**alarms** 94:5
**alcoholic** 124:19,19 129:9,9
  151:13,13
**allegations** 8:3,14,19
**allege** 88:2
**alleged** 11:14
**alleging** 76:18 101:18 156:22
**allergies** 75:5
**alleviate** 73:1
**allow** 72:2
**allowable** 127:19
**allowed** 15:17
**allowing** 58:22
**altered** 52:4
**ambiguities** 83:8
**ambiguity** 21:6
**amount** 52:20 58:21 89:20
  103:6 117:9 118:13,14,16

123:12,14,14,16 137:3,7
  151:19 156:19
**amounts** 54:21 55:5 118:12
  120:5 125:14 147:9 164:21
  167:20 168:6 169:18
**analgesics** 41:10 59:10 81:13
  107:18 121:23
**analysis** 24:15,22
**and/or** 8:19 11:14 40:19
  43:13,20 176:19
**annual** 36:9
**annually** 35:23
**answer** 6:5,11 27:19 37:1
  50:19 62:15 68:10,22 70:11
  73:8 80:18,19 81:24 82:2
  85:21 86:21,23 88:7 92:24
  95:19 97:13 101:21 104:12
  108:6 110:11 125:20 126:11
  127:17 131:11 132:11 133:3
  133:19 134:23 135:23
  137:22 138:12 139:18
  140:14 141:2,21 142:17
  143:12 144:8,10 148:13
  151:4,8 153:18 155:1
  162:16 167:24 168:9 169:1
  169:5,11 170:8,12 171:2
**answered** 44:13 68:21 73:14
  126:18 136:13 170:7
**answering** 5:22 91:24 92:2,5
  170:10
**answers** 134:20
**anti-inflammatory** 112:11
**anti-malarial** 59:24 139:21
**anti-malarials** 60:8 139:16
  140:19 162:7
**antibiotic** 59:24 74:21,22
  75:22 139:19,24
**antibiotics** 41:9 59:11 60:7
  121:23 140:4
**anticipate** 30:5
**anybody** 91:4
**anyway** 91:22
**apologies** 134:24
**apologize** 9:23 43:18 114:5
**Apothecary** 6:2:14
**apparently** 79:3 93:18 94:19
  102:14 127:2

**appear** 52:19 56:2,2 103:6
130:15
**APPEARANCES** 2:1
**appeared** 131:15
**appears** 50:10 55:9 125:4
158:20
**apply** 72:16 176:18
**appreciate** 174:24
**approach** 131:4
**appropriate** 18:14 27:14
46:20,22,22 69:12 70:1
74:16,23 78:1 107:11
126:24 145:11
**appropriateness** 11:2 73:22
73:23 74:2,7,9,11,13,19
75:1,10,12 76:5 77:23 83:18
125:5 126:20 160:5
**approve** 136:21
**approved** 14:16 68:4 69:2,7,8
69:10,18,19,22 70:3,5 71:12
72:14,15,18 73:11,16,17
75:23
**approving** 69:21
**approximate** 90:4
**approximately** 5:5,7 9:10
23:3 33:1 38:2 102:12,23
**April** 49:5,7,8 50:15 51:1,21
130:7 133:6
**area** 20:7 29:9 34:4 36:11
**arguably** 67:10
**argument** 60:10
**arrive** 24:14,15
**arrived** 61:18
**articles** 40:18 119:17 158:1
**aside** 61:10 66:24 147:24
**asked** 12:2 26:3 43:19 44:13
49:9,11,16,18 61:12 63:4
74:6 92:6 96:18 103:3
126:17 147:18 165:22 166:1
169:8 170:7 172:19 173:23
**asking** 5:16 38:10 79:4 102:6
110:1 121:19 124:18 127:12
127:13 146:16,16 151:14
167:11
**asks** 77:6
**aspect** 18:13
**aspects** 17:12 41:2

**assigned** 30:19
**associated** 47:3 66:3 157:22
**association** 17:23 18:1,4,6,9
18:12,14,17,18,22,23 19:1,8
19:21 43:11,12,15
**assume** 78:13,15 81:10,20
82:6,19,22 97:23 107:11
108:2 109:4 171:13
**assumed** 95:22 96:2 107:6
114:7
**assuming** 82:14 94:21 97:5
101:20 117:11 148:1,8
161:9
**assumption** 82:15 94:19
108:8
**assumptions** 82:17 95:9,10
**assure** 46:19 48:10
**assured** 67:19
**astronomic** 102:21 108:22
145:2 155:24 156:19
**astronomical** 156:4
**attached** 12:23 13:4
**attempt** 5:16
**attention** 173:7
**attorney** 5:14 6:4,22 10:23
**Atwater** 166:11,22 167:2
168:3 169:16
**Atwater's** 168:21
**audio** 5:1
**August** 33:11 55:8,10 56:1
87:22 92:11 93:10 124:10
124:11 132:6,14 134:13
163:11,12 164:3,16,16
**available** 4:22 29:6 69:11
133:22 149:24
**Avenue** 2:7
**avoid** 5:20 6:16 104:4 168:11
**avoiding** 169:5
**aware** 21:3 42:14 44:7 56:10
58:8,11 86:14 109:12,13
116:16 130:10 132:7,16
138:7 139:1,13 154:5
160:24 161:19 163:17,21
164:8,11 166:10,21 167:1
167:18 168:3 169:9,11

---

**B**

---

**Babesia** 109:16
**Babesiosis** 111:19 121:7
129:24 130:11,19,24 131:5
131:24 132:9,17 133:15
134:3,10 139:15 143:9,24
144:15 148:5
**bachelor** 14:5
**back** 5:8 8:1 10:15 19:13
23:4 24:5 27:24 29:4 35:7
39:16 43:9,17 47:2 51:1
52:1 59:15 62:6 82:5 89:5
101:5 102:18 121:1 142:4
154:18
**backed** 74:16 77:14,15
**background** 13:11,12
**bad** 96:14
**badly** 110:24
**based** 7:13 25:18 46:11 54:22
55:20 58:5,6,17 61:21 63:7
65:19 66:9 73:12 76:23
77:2 79:1 82:14,17,23 84:3
87:24 88:7 93:1 97:5,16
103:19 106:2,21 107:7
120:16 121:13 124:5 125:15
141:24 157:19,20
**basic** 14:15 79:19 81:11 84:8
**basically** 16:9 29:10 41:10
44:14 115:19 138:20
**basis** 79:18 80:1 81:1 105:17
107:7 116:4 122:19 174:5
**bat** 88:15
**Bates** 113:22 115:10
**bear** 96:11
**becoming** 22:24
**began** 34:6
**beginning** 50:9
**behalf** 9:4,4,7
**behaved** 49:14 166:7
**behavior** 19:5
**belie** 141:5
**belief** 105:17 106:18 160:13
**believe** 10:2 13:1 14:23 15:5
23:20 26:19 31:19 38:5
48:5 49:11 51:11,17,22
52:14 53:8,8,15 54:12 55:1
55:16 56:17 58:15 61:4,7
62:18 63:6 64:19 67:21

68:15 88:14,22 90:14 109:6
110:21 111:11 113:1,6,6
114:11 118:24 124:16
125:16 126:17 130:8 132:19
134:9 135:5 146:6,23 155:2
157:17,22 159:14,19 162:6
162:24 167:12 172:23
**believed** 22:15 24:10,12
101:14 131:16 145:10
**believes** 75:14
**believing** 119:9
**benefit** 25:3 46:24 47:1 73:4
116:24 121:22 128:13
**benefits** 67:20 103:8,24
146:12
**benzodiazepines** 11:15
**best** 9:14 18:24 19:9 40:4
110:12 112:1
**better** 131:8 152:15
**beyond** 157:14
**bias** 38:4
**bill** 39:8
**billing** 62:7
**bit** 5:2 11:10 20:15 33:6
54:14 134:20 139:21 151:18
**black** 151:16
**blindly** 93:18
**blood** 156:9
**board** 17:10 18:3 19:6
**boards** 14:16
**body** 43:8 76:2
**bold** 116:2
**books** 134:3
**borne** 134:4,11
**bothering** 83:10
**bottle** 64:9
**bottom** 13:1 40:23 50:11 74:1
114:1 135:8 155:14
**bowel** 150:9 156:10 157:16
167:21 168:7 169:19
**breach** 45:11,11 49:14 88:2
93:11,14 96:9 101:15,15
**breached** 101:18 148:11,14
162:14 171:1 172:5
**break** 6:9,12 37:14 50:1
170:1
**breakdown** 9:13 37:20,23

38:5
**breaks** 6:8
**Brian** 51:7 134:14 135:5
143:10
**brief** 41:18 130:2 162:5
**briefly** 13:11 15:13 16:18
17:5 52:2 57:2 68:1
**bring** 165:2
**broad** 62:15 67:17
**brought** 10:3
**Bryk** 51:8 134:14 135:6,7
143:10
**BS** 13:23 14:2,5,6
**Buhner's** 134:3
**building** 145:20
**Bunton** 11:8
**burden** 87:1 140:7
**business** 24:2
**buy** 29:18

------

## C

**calculate** 33:9
**calculations** 81:12
**call** 6:9 73:17
**called** 15:23 105:3 108:13
**calling** 80:4
**calls** 81:9
**Canada** 41:1
**cancer** 123:1,2 142:5
**capable** 75:23
**caption** 7:14
**cardiac** 121:23
**care** 11:21 12:1,3 44:23 45:4
45:5,9 48:5,13 49:15 64:20
64:24 65:15 66:11 73:2
76:8 85:10 86:4,9,16 88:2
93:11,15 96:9 103:12
137:11 139:3,8 146:4,7,15
148:10,11,14,16,17 153:2
155:18 162:14 166:9 171:2
171:4 172:3,3,5 174:12
**career** 120:21,23
**Carl** 1:11 3:5 4:9,14 178:14
**Carolina** 33:12,19 34:7,16,21
34:23
**carried** 143:24 144:15
**case** 4:6 5:20 7:14,17,21,22

7:23,24 8:3 10:1,2,3,15,15
11:1,5,6,9,10,12,18,21,23
11:24 12:24 27:11,20 36:15
39:13,14 48:23 49:12 51:10
58:3 60:2,5 61:6,9,13,19
62:17,19 63:1 66:19 74:14
76:4,14,16,24 77:21 78:16
78:17 80:9 81:17 82:16
83:16 87:9 94:12 96:3
108:21 111:11 112:21,24
116:2 121:18 125:4 130:5
136:2,15 138:17 141:24
142:24 157:15 159:19
161:14 168:20 172:18
**cases** 7:14 8:13,17,18 9:5,10
9:15,15,18,19,22 12:4,6
37:24 40:6 46:2 149:17
**causation** 49:16,19,20 90:20
91:21 152:20,22 159:11,15
159:16,18,20 160:13 161:1
161:3 167:7 170:14 171:9
171:17,24 172:1 173:23
174:1,14,20
**cause** 24:10,13 25:2 44:6
75:19 97:15 118:14,15
119:13 120:8 122:3 128:2
129:1 146:11 149:24 150:18
150:23 151:1,11 156:9,10
156:11 161:17 170:2 171:9
171:14,18 173:10,19 174:18
**caused** 90:20 125:7 139:4
152:23 155:21 159:12 160:6
160:16 161:15 164:24
167:21 168:7 169:19 171:10
171:19
**causes** 45:11 129:17 161:7,10
**causing** 60:9 111:15 156:21
174:17
**CDC** 27:23
**cdenaples@c-wlaw.com** 2:9
**Center** 1:7 2:14 60:18
**certain** 19:1 27:19 29:10,17
41:5 46:2 65:3 68:2 69:19
69:19,20 120:12,13 121:10
122:24 128:7 147:8
**certainly** 22:14 27:20 28:3,3
44:3 48:6 60:10 69:12

71:24 77:20 84:4 92:17 119:15 122:11 124:9 129:20 139:12 147:11 152:6 157:7 158:13 170:21
**certification** 176:18
**certify** 176:7
**certifying** 176:20
**cetera** 64:1
**chain** 23:2,20,23 28:12,19 33:12
**challenges** 33:5
**chance** 50:1
**change** 47:18 48:8 106:6 170:24 171:2,8,23
**changed** 53:20 138:16
**changes** 138:16 178:8
**changing** 70:24 77:7
**charged** 84:2
**check** 105:12 163:1
**checked** 93:4
**checklist** 64:4
**chemistry** 14:13
**child** 69:12
**children** 69:8,10,10
**CIARA** 2:7
**CIPRIANI** 2:6
**Circle** 12:9
**circumstances** 8:9 24:7,8 25:11 47:18 48:7 71:21 77:20 99:13 126:5,12
**citations** 119:16
**cite** 129:15 158:1
**cited** 157:16
**civil** 1:2 8:6,7,8 9:10,15,17 11:24 44:15,16,19 145:7
**clarification** 99:20
**class** 41:7,11,15 42:2,6,11 43:4,6,21 112:7
**classes** 43:3 44:4
**classic** 136:6
**clean** 5:19
**clear** 33:16 37:6 77:11 116:2 167:9 168:8
**clearly** 22:2 24:19 25:6 26:4 77:24 83:12 85:24 103:5 123:23 135:12 143:17 146:12 149:21 152:19

159:18 161:11 162:18 169:7 170:2
**clinical** 71:7 73:6,13 139:10 146:4 147:6
**close** 54:6
**closed** 96:4
**closer** 38:5
**closest** 15:22
**colleagues** 71:9
**college** 13:20 145:13
**colon** 40:9
**combinations** 11:15
**come** 19:20 36:1,5,12 103:9 107:16
**comes** 35:24 36:10 81:13 82:5 94:1 96:23 102:13 106:13
**coming** 23:4 94:7 98:8 107:22,24 108:4
**commencing** 1:15
**comment** 57:20 172:19
**common** 30:6 70:20 152:21
**commonly** 22:1
**communicated** 81:3 104:9 105:18 110:7,16 111:18
**communicates** 122:18
**communicating** 104:24
**community** 19:19 23:7,19,23 28:13,18 32:2,14,17
**compared** 52:15,20
**comparison** 53:18
**Comparisons** 154:2 158:5
**compensated** 39:6
**compensation** 38:20,23
**competent** 158:13 159:20
**Complaint** 58:6 59:22 157:15 158:20
**complete** 114:12,20 178:9
**complied** 64:19
**compound** 29:17 68:20 125:21
**compounded** 103:10
**compounding** 1:7 2:14 60:18 63:14 70:23 99:4
**computer** 5:2
**concern** 64:4,5 97:1
**concerned** 18:23 19:9

**concerns** 65:5
**Concluded** 175:4
**conclusion** 24:14,16 175:2
**conclusions** 58:16
**condition** 46:12 74:18 75:2 75:18,19,21 77:24 83:3,19 85:20 86:15,24 112:11 117:17,19 120:17 121:14 141:15,19 147:9 148:7 149:21
**conditions** 19:16 71:22 112:10,15 118:5 120:13 121:11 154:11 156:17 157:21
**conduct** 26:6 165:22 166:1
**conducted** 148:7 154:23
**conducting** 25:21
**conferencing** 4:3
**confident** 152:2
**conjunction** 140:18
**CONOR** 2:2
**conor.lamb@klinespecter....** 2:4
**consider** 61:13 67:15 75:7 161:7 162:11
**considerations** 121:13
**considered** 77:17
**considering** 63:23 139:4
**consistent** 157:18 160:20 161:11
**consists** 63:23
**constant** 24:22
**consultant** 35:21,22 36:10
**consulting** 35:15 45:19
**consumed** 71:2 99:12
**contained** 57:18 176:8
**contention** 158:2
**contents** 143:7
**continuation** 99:2
**continued** 78:11
**contradict** 81:7
**contradicted** 74:17
**contributed** 40:8
**control** 10:17 66:24 176:19
**controlled** 10:19 17:11,11 66:1 67:1
**conversation** 95:1,8 105:11

105:16 125:12 127:3 131:5
138:9 142:12,20 143:8,16
143:22 144:3,13,19
**conversations** 49:1 133:14
140:10 141:13 148:2 149:12
**conversed** 131:3
**conveyed** 25:23
**copies** 57:22
**copy** 6:23 7:8 50:21 51:13
57:15,19 116:14
**corporation** 24:2
**correct** 7:11,12,15,16 10:17
16:3,4,14,15 17:19 20:4,5
20:12,13 28:9 31:17,23,24
33:17 36:20,21 38:21 47:21
48:19,20,21 49:5,8 50:9,10
56:12,13,13 64:8,9 67:23,24
74:3 76:14,16 80:15,20 81:3
82:15 87:19,23 90:13 92:10
94:8 95:3,8,15 96:19,20
100:3,24 101:11,20,24
103:18 104:11 105:3,9
108:14 110:9,17 111:21
112:18,19 115:23 117:2,3
119:22 120:3,6,14 122:21
123:17 127:15 128:11 129:1
137:3 139:11 140:5,12
145:17 150:1,18 151:1,6
154:23 155:8 158:22 159:1
159:4,5,6,7,9,10,13 160:13
163:3,15,16 165:11,13
169:10 172:18 173:23,24
174:2 176:11
**correctly** 64:11 115:18 116:6
173:20
**corresponding** 96:8 98:18
**corticoid** 144:16,16
**corticosteroid** 94:2 102:22
108:19 112:13 132:7 144:17
145:16 157:18 158:16
160:19 161:18
**corticosteroids** 21:14,16
27:11 30:3 34:24 39:12,14
40:15,20 41:3,5,6,15,19
42:1,6,17,21,24 43:13,20
44:2 53:18 58:9 59:4,11
60:11,13 63:9 76:6,9 87:18

90:3 103:21 106:9 108:9,22
109:11 111:4 112:5,8,9
117:10 118:9,16 119:1
121:24 123:12 124:6 125:8
129:14,16 135:15 136:18,22
137:3,5 139:22 140:20
148:3,6 149:20 150:3,14,17
150:24 152:23 155:24
156:12 157:11,23 158:9
159:12 160:16 161:12,15
162:5,12 163:18 171:11,14
171:19 174:9
**cortisone** 126:21
**counsel** 4:10 6:2 17:22,24
18:2,6 43:12,15 64:13
**counseling** 44:18 64:15 83:8
84:14
**couple** 11:16
**course** 9:2 17:1,2,3,6,8 22:22
42:17 43:22 44:2,5 60:12
64:7,13 80:12 84:15 85:1,9
86:19 118:3 138:2 140:22
144:2,18 145:1,5,10 150:2
160:14
**courses** 13:19 14:12,14 15:18
15:19
**court** 1:1,22,23 4:5,11,12
6:18,18 10:3 66:20
**courteous** 151:9
**Courtney** 51:7 94:11 97:19
130:6 137:15 164:1,13
**cover** 43:20 45:3 75:1
**covered** 14:9,10 17:6 67:17
**covers** 17:8
**create** 5:19 120:6
**created** 123:16 164:12
**credentials** 36:7
**criminal** 8:6 9:5,7,15,19 10:3
145:8
**current** 117:17,19
**currently** 12:8 35:14 38:13
**curriculum** 3:10 12:18 14:8
14:10,15
**curriculums** 13:20
**cursory** 131:16
**cut** 128:20,21
**CV** 6:23 12:13,23 13:2,3,5,8

13:13 14:19 23:1 31:18
33:17 43:17
**cyclical** 131:8

---

## D

**D** 1:15 3:1 176:15
**d/b/a** 1:6 2:14
**DA's** 66:1
**daily** 79:18 80:1,13 81:1
82:22 88:11 91:15 101:1
107:7 122:7
**dangerous** 25:2 71:16 96:3
109:8 121:21 128:1 138:21
143:4 145:2 149:13 151:22
152:11 156:20 158:15
**dangerously** 123:14
**dangers** 24:21 67:19 150:3
**Daryl** 1:3 109:12,21,22,23,24
110:1,3,4,22 111:13
**data** 27:24 74:17 119:16
**date** 13:5 78:5,6 96:7 98:17
98:19 100:1,20 101:7,16,19
102:10
**dated** 3:16 49:5,7 50:14
173:1,5
**dates** 87:17 164:15
**Daubert** 39:24 40:3
**daughter** 127:6 130:4,13
132:20,22 152:3,4,6
**day** 81:11 82:7 84:6 88:14,23
91:16 92:21 93:7,24 96:16
96:23 102:8,17,20 108:14
108:17,24 109:3 115:16
119:13,24 120:2,24 122:15
124:8,9 128:20,21 135:15
136:23 149:20,20,20 157:11
**days** 80:6 81:9 82:4,10 89:5,7
91:22 92:4 93:20,24,24 94:1
96:17,21,22,24 98:2,7,8
102:9,12,23 103:9
**DC'd** 95:23 97:20
**dealing** 67:1 90:12 128:1
**dealt** 132:2,3
**death** 129:17
**decade** 8:1
**decades** 7:22 62:3
**decision** 60:7 92:9 159:16

**decisions** 31:14 159:18
**declines** 84:14
**defendant** 2:9 9:8 52:16
    53:19 54:7 55:24 161:6
**defendant's** 9:4 167:16
    172:20
**defendants** 1:8 37:15
**defense** 8:20 9:12 37:21 38:2
    167:5 168:15 169:12
**defied** 107:3
**define** 61:17 73:23 127:18
**defined** 45:14
**definitely** 69:6
**definition** 74:9
**degree** 13:16 22:21 23:4
**delete** 13:8
**DeNAPLES** 2:7 131:13 141:3
    141:22 142:18
**departments** 29:7,13,24
    31:11
**depend** 38:7 117:6,10,11,14
    117:16,21 118:1,4
**depended** 80:14
**dependent** 131:6 141:14,18
**depending** 115:17
**depends** 65:16 139:9
**deponent** 4:9
**deposed** 5:3
**deposition** 1:11 4:1,4,9 5:13
    5:15 6:2,8 7:11 51:3,9,14,16
    51:20 52:4 53:9,11 56:19
    60:19 79:6 80:8,10,11 130:7
    144:22 178:8
**depression** 129:5
**depressors** 129:12
**derive** 37:19
**derived** 35:17 37:13
**describe** 13:12 15:13 16:18
    17:6 57:17 68:1
**DESCRIPTION** 3:8
**design** 16:9
**detail** 51:18 131:12
**detailed** 57:21
**details** 10:14
**determination** 25:18 26:8
    60:3
**determine** 24:24 25:7,13 26:4

    26:7,24 80:22 83:24 103:7
    116:22
**determined** 26:12,15 27:13
    27:13
**determining** 75:1
**detriment** 67:11
**deviated** 103:11
**Dex** 100:2
**Dexamethasone** 21:22 30:4
    35:1 55:18,24 60:22 77:8
    94:22 96:16 97:4,23 98:9
    100:23 101:9,17 102:7
    109:1 113:11 117:2 119:10
    127:9,15 163:10,22 164:4,9
**diagnosed** 121:7
**diagnoses** 159:9
**diagnosis** 83:3,14 85:12,16
    85:23
**die** 129:6,11
**died** 152:4
**differ** 46:11
**difference** 10:8 23:18,22
    28:12 63:12,14
**differences** 28:14,16
**different** 39:2 48:1,1 78:16
    87:10 92:3 112:14 123:21
    155:11 161:1,3 171:17
**digested** 71:2
**direct** 173:7 176:19
**directed** 66:5,8 88:11 101:1
**directing** 97:3
**directions** 55:13 79:14 88:5
    88:10 93:19,23 102:8,19
    107:13 138:20 149:2 154:20
**directly** 81:3 173:16
**directs** 36:24 64:12
**disclose** 36:8
**discontinuation** 95:2
**discontinued** 94:17 95:14
    96:2 119:10
**discounting** 135:17
**discovery** 114:8,22 115:4
**discretion** 66:23 67:2,12,13
    116:20
**discuss** 129:23 170:1
**discussed** 44:5 63:3 131:23
    132:20 134:13 135:5 139:14

    142:10 143:14 164:12
**discussing** 18:13 83:8
**discussion** 37:9 41:18,19
    130:2 131:16,17 132:23
    140:6 166:17
**discussions** 59:23 64:22,22
    65:13 87:6 138:15
**disease** 115:17 116:4 117:7
    117:14 120:17 122:20 134:3
    134:9,10 159:3
**diseases** 73:5
**dispense** 20:18 26:14 34:24
    64:16 81:8 82:4 84:13,16,22
    85:6,22 98:19 99:10 100:1
    101:7,16,19 106:16 108:12
    123:3 126:13 147:12 149:3
**dispensed** 52:20 53:19 58:9
    76:16 80:3,6 81:21 87:18
    88:6 92:23 93:20 94:17
    96:7 98:17,22 99:11 100:3
    101:8 104:11 108:8 109:7
    110:19 120:21 121:6 123:13
    124:10 125:17 126:6,8,16
    130:23 145:16 162:12
    163:19 170:15 171:20
**dispensing** 11:13 22:4 26:13
    31:12 57:15 65:11 78:2
    84:10,12 85:15 97:14
    101:22 124:8,12 130:19
    137:2,5 141:8 147:2
**display** 50:8 87:11 101:5
**displayed** 87:15
**displaying** 7:4
**disqualified** 39:21
**dissertation** 15:7 16:5,7
**district** 1:1,1 4:5,5 11:11
**divide** 80:5 81:22
**doctor** 10:6,8,9,12 21:7 22:8
    27:12,21 28:6,20 30:10
    37:12 45:20 50:23 54:15
    55:20,23 58:21 59:2 65:14
    67:22 70:1 71:12,23 73:5
    79:13,16 80:4,21 81:9,18
    82:11,13 83:6 85:5 86:11
    89:8,12 92:5,8 93:4,19 96:1
    96:1 97:3,11,18 98:13 99:6
    99:18 102:6 104:7 107:5

116:20 120:12 125:10 127:4
127:5 131:24 133:5 138:7
139:6 142:21 145:3,4,9
146:8,9,13 147:14 148:9,16
148:17,18 149:4 150:15,16
150:21 153:7 154:17,17
155:20 157:12 158:24 159:3
162:7
**doctor's** 35:5,9 70:2 83:18,21
85:13 86:14 93:23 119:7
127:23 138:20 139:10 147:5
149:2,13,14 151:24 154:20
**doctorate** 16:12
**doctors** 42:13 71:10 72:20
73:11,15 150:13 167:6
**document** 12:20 52:12 54:10
55:1 56:24 57:9,16 79:7
88:9 95:5,7 100:12 113:20
114:16,23 129:20 136:4,7
155:3
**documentation** 27:12,15,22
28:4,6 64:21,23 77:22,24
93:3 94:20,21,24,24 97:18
131:18 135:1,20 137:20
138:2 143:17 147:21,24
**documented** 42:18 77:16
79:8 131:20 133:23 136:16
143:20 155:7
**documents** 7:1 49:12 50:13
53:24 54:24 56:15 113:7
135:9
**doing** 22:13 31:11 32:6 34:14
39:5 44:17 45:17,20 80:14
82:16 87:7 91:12 96:13
103:22 105:6,24 106:4
110:24 149:1 154:13
**dosage** 11:16 27:10 40:19
42:23 43:13,20 63:9 68:8
69:16,19 70:18,19,24 72:2
80:14 112:17 113:23 114:1
115:11,15 116:3,11,16,18
117:1,6,9 119:19 120:7,19
122:3,7,18 123:8 128:24
129:2 140:12 149:24 150:7
150:23 151:2,16 152:14
**dosages** 120:18 125:14 148:4
150:17 156:23

**dose** 25:17 26:8 27:5,14
55:11 63:23 64:9 74:3 75:3
82:22 84:5 88:13,16,20 91:5
91:15 94:21 97:3,24 98:3
99:17 102:19 103:20 105:14
106:8,16 108:10 109:10
115:21 116:23 119:3,5,10
119:23 120:23 121:12,17,21
122:7,10 123:2,24 124:2,12
126:21 127:11,13 128:7,10
129:9 136:2 141:14 146:10
151:11,21,21 152:23 153:2
154:9 155:13 156:18 161:18
161:22
**Dosepak** 128:17
**Dosepaks** 108:13,19
**doses** 43:3 60:11 74:15,15
76:6,13,23 77:1,3,6 79:1
92:21 105:11 106:23 108:9
112:5 113:4 118:8,20
120:11,20 121:11 122:2,10
124:8 125:7 129:16 137:13
145:2 149:13 150:24 153:22
154:11 155:24 156:6 157:2
157:5,7 161:12,20,23
162:21 164:23 167:19 168:5
169:17 174:9
**dosing** 39:11 43:23 58:11
78:1 120:14 121:9 122:12
122:24 132:2 156:14
**double** 163:1
**doubt** 30:17 128:13
**Dr** 4:21 7:2 12:7,20 16:17
22:6 35:13 38:10 39:10
40:5,12,23 43:11 48:22 50:7
54:12,22 55:6 59:5 61:15
63:18 65:19 67:14 68:18
74:2,13 79:21 80:10 94:12
94:18 95:2 96:6 98:14
99:22 104:22,24 109:12,15
110:7,12 111:16,17 112:1
115:2 125:5,12 129:23
130:3,10,19,23 131:4
132:16,19,23 133:14 134:19
135:17 136:9 137:14 138:9
139:14 140:10,17 141:12
142:9 143:8,22 144:6,13

145:15,19 153:9 155:17
159:21 160:22 161:19 164:1
164:13 165:14,15,17 166:11
166:21,22 167:2 168:3
169:16 170:1 171:16,17
172:17 173:4,8,10 174:3,15
174:24
**drafting** 51:20 53:6,22 62:10
**dramatically** 32:9
**drink** 124:18 129:8 151:12
**drug** 11:24 24:21,21 29:15
41:12 44:6,17 46:8,15,17
47:3,5,12 48:14 59:1 63:22
64:6,8,15 65:6 69:2,7,7,9,11
69:11,18,24 70:2 71:11,12
71:15,17 72:14,16,16,18,20
74:20 75:2,8,18,20 77:23
78:6,7 83:21 84:1 86:2 87:8
97:14 107:2,12 112:11
121:20 122:22,23 123:20
128:1 135:19 137:17 139:8
142:1 145:4 146:10 149:4
151:11 156:14 162:9
**drug's** 71:12
**drug-induced** 173:17 174:10
**drugs** 11:1,4 21:24 30:6
33:14,15 34:7,23 35:5,10
41:11 42:11 43:6 58:8
59:11 60:8 63:24 67:8 68:6
68:7,13 69:4,16,18,21,21
70:4,7 73:12,16 75:4 78:14
78:17 82:20 84:10,12 105:4
112:13 124:6 129:3 156:12
156:13 162:3 170:15
**duly** 4:15 176:10
**duration** 63:24 75:3 147:10
167:21 168:6 169:19
**duties** 16:21 17:24 20:17,20
28:17 29:2,14 66:10
**duty** 11:21 12:1,3 45:10,11
45:13 63:14,18,21 64:2,18
64:20,20,24 65:4,15 67:4,18
73:2 84:9 87:2 88:2 93:11
93:14 95:4,7 96:9 101:15,18
104:4 105:10 106:6,9 109:7
111:12,13,14 127:22 137:10
139:2,3 140:7 146:4,7,15

CARL GAINOR, Ph.D, JD

148:24 153:2 162:14,14
166:8,9 171:1,4 174:12

**E**

**E** 3:1
**e-mail** 50:22 54:12,22 55:6
56:2 163:24 164:2,5,13
**e-mailed** 55:20
**e-prescription** 99:22 100:20
**earlier** 90:11 107:5 116:9
118:7 139:7 173:22
**early** 81:14 96:23,24 98:8
**easily** 71:1 72:3
**economics** 14:24 15:6,12,14
15:15,24
**education** 24:18 125:15
**educational** 13:11,12
**effect** 141:23
**effects** 40:19 42:16 43:13,20
104:9,16 105:19 108:3
110:8,16 111:20 124:7
150:11 156:11,13 158:10,11
158:14,15,15
**eight** 89:5,7 91:22 92:4 93:20
94:1 98:2 102:23 124:9
**either** 6:17 27:23 59:22
105:21 117:2 127:8 137:3
151:3 167:4,16
**elapsed** 80:7
**electronically** 79:13
**element** 85:18
**eliminate** 140:6 167:10
**else's** 90:21
**emergency** 76:7 98:4 121:3
154:12
**emerging** 72:11
**emphasized** 116:3
**employed** 35:14,15 36:2,3
**encounter** 62:20
**endocrinologist** 159:6
**engaged** 17:18 148:1
**entail** 65:7
**entailed** 17:7
**entire** 27:9 91:1 120:21,22
**entirety** 97:8
**entity** 115:17
**entry** 13:15

**environment** 22:2 121:2
157:6
**environments** 40:17
**epidemic** 40:9
**equal** 38:2
**equivalence** 119:11
**equivalent** 98:1 102:20 109:1
109:2 167:20 168:5 169:18
**error** 99:5
**ERSA** 1:22 4:12
**especially** 27:10 52:20 70:23
81:13 84:11 106:21
**ESQ** 2:2,7,11
**essence** 11:18
**essentially** 18:5 26:12 59:6
80:12 135:19 140:11 156:24
**established** 19:6 127:7,14
128:23 145:14
**establishes** 19:4
**estimate** 9:14 32:12,16
**et** 4:7,7 64:1
**evaluate** 122:2 125:6 148:10
155:21 160:5
**evaluating** 62:21,24
**evaluation** 25:21 61:6 147:11
166:7
**events** 106:8,20 109:9 150:12
160:20 173:18 174:10
**everybody** 7:5
**everything's** 109:4
**evidence** 79:17,23 80:24
104:8 110:7,15 111:17
129:22 149:16 176:7
**evident** 84:12
**exact** 129:6
**exactly** 21:20 33:2 53:23 54:1
78:10 102:5 123:19 127:10
144:20,22 162:9
**Examination** 3:6 4:19
**examined** 4:15
**example** 70:12 71:24 72:3
75:22 128:17 136:6 142:4
**exceed** 128:7,9 151:18 157:3
**exceeding** 153:21 156:18
**excess** 120:24
**excessive** 11:14 43:3 74:3,15
76:6,13,19,21,23 77:1,3

78:24 97:4,24 99:17 103:20
106:17,23 108:8 112:5
118:8,20 119:3 122:2
123:13,14 124:8 129:16
146:10 152:23 161:12,18
**exchanged** 114:7 115:4
**exercise** 66:15,21 67:2
**exercising** 66:13 67:13
**exhibit** 12:16,17 50:8 57:4,5
87:13 96:5 100:8,9 113:15
113:17 172:24 173:1
**EXHIBITS** 3:7
**exist** 136:24
**existed** 54:18
**exists** 48:11 73:11
**exonerate** 123:5 145:11
146:14 147:13 148:23 166:3
**exonerates** 146:6,16
**expect** 136:6
**experience** 24:18 25:16 26:7
27:2,5,7 33:7 59:3 61:22
63:9 71:7,8,9 73:13 122:16
124:5 139:10 146:5 147:6
148:19
**experiencing** 110:8
**expert** 3:10 7:10 8:2,14,18
11:20 12:17 35:16,18,18,22
36:10,16 37:13,15,19 38:20
39:11,18,21,23 49:4,6,22
50:9,14 51:24 52:8 58:13
61:5,15,18 62:24 108:23
152:20 160:21 161:6 169:12
170:14 172:1 174:19
**expert's** 169:12 172:20
**expertise** 139:10
**experts** 21:1 152:22 159:20
160:8,9,16 161:4,17 166:11
166:22 167:2,4,15,16
168:15 170:4
**experts'** 160:12
**expire** 38:16,18
**explain** 10:24 11:4 105:4
140:11 147:4
**explained** 140:17,19 141:13
**explanation** 91:13
**exposure** 29:11
**extended** 11:16,17

**F**

extensive 73:6
extremely 94:22 125:7 143:4

face 62:23 128:8 150:9 156:8
facilitate 19:11
facility 27:24 70:15
facing 33:5
fact 36:9 48:8,10 67:10 77:6
  77:17 103:20 127:4 129:23
  136:18 143:3 145:9 146:7
  148:4,6 152:4,5,18 157:4
  173:19 174:14,16,18
factor 139:12
factors 67:14 71:3,18 72:7,10
  77:18 99:16 117:10,12
  120:16,17 139:9
facts 49:12 61:20,23 65:17
  77:21 81:17 93:1 107:16
  121:18 138:16 141:24
  142:24 154:2 158:5
failed 74:1,12 122:2 125:5,6
  148:10,10 155:20 160:4,5
Fair 34:17
familiar 57:16 162:10
familiarity 146:6
family 134:9
far 5:8 137:9
fatal 142:7 145:4,6
fault 144:7
FDA 27:23 69:18,20 70:3,4
  71:12 72:14,15 73:16
  151:20
February 33:11
federal 7:14 9:18 10:3 17:10
  17:11
feel 36:7 46:14 59:12 63:2
feeling 80:14 106:18
feels 67:9 70:1
fell 95:10
felt 25:19 26:9,21 33:3,6
  58:23 63:3 81:2
Fentanyl 129:4
fight 140:2
figure 102:5
fill 21:14 22:12,14 23:13 24:7
  24:9 25:23 26:21,23 27:16

30:14 64:7 67:4,6,8 72:22
  79:15 85:1
filled 21:15,18,22 30:3,8,20
  30:22 31:1 53:16 55:3,15,23
  58:2 60:21 88:13 91:1 93:2
  95:14 96:21 97:7 102:22
  103:1,4,15,17 109:14 118:8
  132:6,14 145:6 162:18,19
  162:20,21 163:9,11,12,22
  164:6,8,20
filling 28:6 29:14,15,21,21
  83:2,4 85:13 86:7,11,18
  103:10 133:16 134:15
  137:17 138:10 143:10
  153:15
financial 36:8
find 25:16 53:9 97:22 103:23
  126:22 135:13 151:19
  153:20,24 155:4,15 157:3
  178:8
finds 107:15
fine 7:6 92:12 109:4 156:15
  169:14 172:8
finish 5:21 68:17 89:10 91:24
  136:13 151:7,9
finished 136:13
first 6:4 17:16 64:2 68:18
  87:21 88:5,12 94:3 97:16
  108:1,14 118:22 119:2
  122:11 124:10,19 125:11
  129:9,10
five 5:10 16:23 17:4,16 34:12
  50:1 55:8 62:3 84:3 88:14
  88:22 89:22 115:16,21
  119:6,23 120:1,19 122:8
  123:24 128:19,20,21 152:15
  152:16 154:9,20
flag 96:24 98:7 124:2
flags 66:2,4 90:24 92:16
flat 39:4
flexible 58:22
Floor 2:3
Florida 12:9
flourish 76:1
fluid 156:8
focusing 91:6
follow 106:17 138:20 154:19

followed 93:19
following 89:16 149:1
follows 4:15
forced 69:9
foregoing 176:18 178:7
foreseeable 109:9 173:17
  174:10
form 68:9 70:8,10,18,20,24
  72:2 80:16,17 81:5 86:20
  95:18 108:5 110:10,18
  111:23,24 126:2,10 127:16
  131:10 132:10 133:2,18
  134:5,7,22 135:22 137:21
  138:11 139:17 140:13 141:1
  141:20 142:15,16 143:11
  144:9 148:12 153:17 154:24
  165:1 166:12 167:23 168:24
  169:24 170:19,22
forward 16:17 62:12
found 51:23 135:10 155:9,12
foundation 170:6
four 5:11 17:16 55:18,24 56:6
  62:3 81:9 82:4,10 84:3
  87:17,17 94:4 96:16 100:2
  100:23 102:8 143:3 163:23
  164:4,9
frame 162:13 170:18
frequent 70:4
frequently 69:8 85:14 106:22
front 7:1 12:20 95:20 100:12
  113:20
Frye 40:3
fulfill 65:2
fulfilled 166:8
full 33:10 99:8
full-time 23:16
fully 5:22 176:8
further 40:22,22 65:13,13
  172:9 174:24
fussy 5:2

**G**

gain 150:8
Gainor 1:11 3:5,9 4:9,14,21
  7:2 12:7,17,20 16:17 22:6
  35:13 38:10 39:10 40:6,12
  40:23 43:11 48:22 50:7

57:5 61:15 63:18 65:19
67:14 68:18 79:21 94:12
96:7 98:14 100:9 109:12
111:16 113:17 115:2 134:19
135:17 136:9 137:14 144:6
153:9 155:17 159:21 165:15
165:17 166:21 170:1 172:17
173:1,4 174:24 178:14
**gambit** 75:2
**gathered** 145:18
**general** 13:20 14:12 15:18
17:13 20:7,8 45:18 74:18
86:15
**generality** 142:21
**generally** 24:1,3 31:14 42:10
154:12
**generic** 113:3
**getting** 50:24 91:4 106:22,23
108:21 143:1
**give** 9:21 12:14 37:22 38:11
46:19 49:13 59:13 60:11
63:13 70:11 76:5 88:6 94:3
94:10 99:8 102:15 106:10
107:3 111:17 121:17 124:15
124:16 136:17 139:23 140:4
142:7 157:10 158:10 165:15
172:8
**given** 25:10 54:19 57:17 58:7
75:23 78:12 83:13 131:19
**giving** 63:8 76:10,11 91:14
128:12 141:5 145:1 149:12
152:16
**glance** 113:6
**glaring** 136:18
**go** 5:8 6:3 7:24 12:13 25:23
26:14 36:14 40:23 45:17
46:13 49:21 62:6 64:2 88:8
89:15 90:24 100:19 102:4
102:18 114:13,16 136:14
142:4 145:13 149:2 154:14
154:20 158:3 166:13 172:11
**goes** 10:15 13:20 19:13 39:15
**going** 5:10,12 6:8 24:5,20,24
25:2 26:20 29:4 36:14 40:5
43:9 45:12 46:11,14,23,24
47:1 49:21 50:7,11,12 57:1
57:3 58:22 59:14 60:10,17

61:17 64:3 66:15,16 70:9
72:19 73:2 75:24 76:1,2
77:8 84:3,10,20 86:23 87:10
87:11,12 91:18 92:13 98:11
98:16 99:7,20 100:5,7 101:5
104:1 107:2,10,12 113:2,13
113:23 115:2,10 116:23
120:8 123:3,19 124:4,9
126:9 128:2 129:5,5,11
134:18,22 139:23 144:4,24
148:20 151:11,17 152:5
153:4,8 154:10,14,18,19
156:15 157:2,4 158:3,9,10
159:15 168:12 169:23 170:9
170:9 172:10,23 173:7,12
**good** 4:21 66:17,21 148:16
152:15
**gotten** 52:13 53:24 108:10
**government** 9:6 11:14
**graduated** 122:15
**graduating** 23:6
**Great** 101:4
**greater** 73:3 116:23
**Greene** 173:8,10 174:3,15
**grind** 70:17
**gross** 35:23 36:9
**grossly** 74:3
**group** 68:8 69:5
**groups** 69:13
**guarantee** 90:17 135:12
136:20
**guess** 24:14 32:19 34:13
41:20 50:20 59:6 87:18
99:7 140:15
**guidelines** 19:2,4 72:13
**guilt** 11:2

**H**

**hand** 97:12 99:9 102:14
140:21 141:7,9,17 142:2,6
142:23
**handy** 62:7
**hang** 56:24 98:12
**happen** 155:7
**happened** 137:24 138:1
**happening** 59:12
**happy** 68:22

**hard** 7:8 57:19
**harm** 24:11,13 25:2 26:13
44:6 45:11,15 47:2 75:24
83:22 84:1 97:15 104:4
111:15 116:23 118:17,21
119:13 120:6,8 122:2,4
123:17 125:6,8 128:2 129:1
139:4 146:11 149:24 150:18
150:23 151:1,12 155:21
156:21,23 159:22 160:5,6
164:24
**harm's** 119:1
**harmed** 75:16,17 87:3
**Harris** 52:14,18 53:16 54:3
54:14 55:3 56:5,11 162:13
162:23 163:5,5,6,9,11,12,19
163:21 164:8,21,22 165:3,5
165:8,9,19,23 166:3 167:19
168:4 169:16
**head** 6:17
**header** 115:11
**health** 40:10 71:22
**healthcare** 15:18,21 16:10
41:2 106:12 149:5,8,8
**hear** 15:1,4 56:5 168:22
169:22
**heard** 67:22 91:3
**hearing** 4:24
**held** 16:17,18 17:17 20:2
28:23 33:21,24 50:4 166:17
172:14
**help** 23:17 24:24 46:4 70:9,20
106:12 147:11 156:16
**helped** 170:20
**helpful** 51:23 52:7 53:5 61:5
165:16,20 166:6
**Henry** 1:6 4:7 51:8
**hesitation** 27:21
**high** 25:20 26:9 60:11 94:22
105:11 109:10 120:13 125:7
126:21 137:13 155:13
161:20,22,23
**higher** 78:7 119:11 120:14,20
121:11 123:1 124:12,13
154:11,14 157:5,7
**highest** 124:1 128:13
**highly** 44:3 77:12

hint 151:20
hired 8:20,22 31:8 37:14,20
history 3:11 56:22 57:6,10
  71:22 78:9 87:15 89:5
  101:5 106:22
Hold 12:14 68:17 89:8 90:18
  92:5 102:2 129:21 136:11
hospital 20:11,16,19 21:2,13
  22:1 28:22 29:1,1,3,6,17,23
  30:2,12,16 40:17 70:15 98:4
  121:1 154:12 157:6 158:7
hospitalization 111:21 162:1
hospitals 29:8,9,11,12 40:10
hour 38:21 39:4
hours 33:9,10 143:3 174:8
human 43:8 146:9 148:18
hundred 32:20 78:5 81:8
  82:4,10 88:11 89:2 91:14,15
  93:6 98:1 99:10 100:1
  101:8 102:14,15 108:23
  119:7,12
hundreds 79:20 135:14,14
  136:17,22 149:19 157:10
hurt 24:20 46:23 73:3
hurting 106:15
husband 79:9 104:18 105:15
  109:24 110:21,23
husband's 111:13
hypothesis 119:9
hypothesized 97:22
hypothetical 26:17 27:18
  171:13
hypothetically 171:15

I

idea 39:8 62:6 109:17 110:3
  115:1 161:5 169:7
identification 12:18 57:7
  100:10 113:18 173:2
idiosyncrasies 64:1
idiosyncrasy 72:4
II 10:13,19
illegal 72:16
Illinois 7:24
illnesses 134:4
imagine 7:13
immediately 90:24 128:19

immune 60:15 140:1,4
immunosuppressants 60:13
  139:23
immunosuppression 150:8
impact 171:6
implications 40:10
important 46:14 95:5 143:19
  146:18,21 170:16
impossible 86:22
in-house 18:6
inadvertency 148:21
inadvertently 148:20
inappropriate 22:15 43:24
  75:20
inappropriateness 11:3
include 33:22 45:14 48:13
  54:16 64:21 72:11 158:11
included 9:22 41:9 50:24
  113:6 131:5 132:9,17
  139:15
includes 71:7,19 139:3
including 15:19 148:6
income 35:17,23 36:10,18
  37:13
increase 102:19
increased 77:7
independent 19:19 23:7,19
  23:23 28:13,18 32:2,14,17
  137:15,18 139:2 154:23
indicate 38:19 40:24 80:12
  97:2 104:14 107:16 116:10
  120:5 149:24 152:19 158:9
  159:22 164:3
indicated 7:10 41:24 79:17
  79:24 89:21 100:22 101:14
  117:5,6 118:7 126:23 139:6
  147:20 153:14 171:16
  173:22
indicates 17:22 50:12 150:19
  150:20
indicating 16:19 60:21
  130:18 155:6
indication 68:7,14 128:6
  131:14
indications 69:19
individual 24:3,4 48:3 65:16
  71:20 118:18

individualization 120:11
individualized 116:4 120:15
  122:19
individuals 18:14
induced 160:19
infection 60:12,15 74:20 76:2
  140:1
infectious 159:3
inflammation 112:12
inflammatory 121:10
influence 71:3,19 72:10
inform 19:11
information 25:22 46:10,12
  53:6,21 54:20 56:15 58:5,7
  61:5 63:5,6 79:5 83:6,13
  89:24 90:1 111:8,10 113:9
  116:11 140:11 153:24
  162:22 163:14 165:16
  168:14 170:21,23 171:22
informed 27:2 106:3
initial 6:24 12:23 53:7 62:14
  91:4 92:20 98:20 100:22
  103:10 115:15 120:19
  128:10
initially 99:6 101:9
initiate 105:10
initiated 105:15
injectable 154:15
injecting 121:2
injuries 152:19 157:13
  159:13 160:17 161:8,11
  171:10,18 173:11,19 174:17
  174:18
injury 118:15 152:24 164:24
innocence 11:2
inpatient 30:21
inpatients 29:16,21
inquiring 148:4
insert 3:15 113:1,5,8,11,18
  114:3,4,6,10,17,19 115:3,5
  116:1,10 117:4 119:5,18
  122:6 123:7
inserts 112:21,24 128:8
instance 67:8 68:24
instances 9:1
instructions 58:12 100:24
intensive 76:8

**interested** 19:15,17
**interests** 18:24 19:9
**internship** 22:23
**interpretation** 66:2
**investigated** 152:7
**investigation** 65:13 97:14
  103:7
**investigations** 19:22,24
**involve** 11:12 12:1 40:14 41:3
  41:7 44:11 69:15 87:5,7,8
**involved** 8:3 10:13,16 11:1,4
  15:15 18:12 37:24 41:16,18
  42:2,7 43:22 60:2 72:17
  116:20 159:14
**involves** 66:13 68:6,6,13 69:4
  69:4,15 70:7
**involving** 8:18 11:21,24
  39:14
**irrelevant** 83:15 111:11
**issue** 43:2 55:21 58:3,13
  61:12 90:21 91:21 152:6
  159:15,20 167:6
**issued** 99:22
**issues** 19:20 43:23 67:7 85:16
  104:9 108:3
**item** 14:17 17:21 20:1 28:23
  93:9 96:6
**items** 17:16 64:4 65:3

---

**J**

**J.D** 4:9
**January** 33:10
**JD** 1:11 3:5 4:14
**job** 33:23 156:16
**jobs** 34:5
**Join** 131:13 141:3,22 142:18
**journals** 72:12
**judgment** 66:13,14,16,17,21
**July** 33:11
**jump** 50:11 91:18 98:10
  113:23 115:10
**June** 1:15 4:2 33:11 173:5
**juris** 16:12
**jurisprudence** 17:1
**jury** 10:24 11:4
**justifiably** 81:10
**justification** 91:14 103:23

137:12 151:20 152:16
  153:21 157:4
**justify** 93:6 125:14 145:1

---

**K**

**keep** 6:15 41:20 53:17
**KEESLER** 2:11 3:6 4:20
  12:15,19 37:5,11 50:2,6
  57:3,8 92:10,18 100:7,11
  113:15,19 126:3,4 144:11
  166:15,20 172:10,16,22
  173:3 174:23
**kept** 143:1,5
**Kerr** 33:14,15 34:7,23 35:5
  35:10
**key** 85:18
**kill** 123:4 151:3
**kind** 15:20 19:20 27:10 29:18
  136:3 139:24
**kinds** 27:19 95:9
**KLINE** 2:2
**knew** 53:15 54:2 76:24,24
  78:1,24 79:2,17,19,24 80:2
  156:2 171:9
**know** 5:1,16 6:4,10 10:13
  15:10 16:20 22:14 25:1,9
  33:9 34:14 39:23 41:14,17
  42:4 47:14,19 48:17 50:21
  51:12 52:1,12,17 53:21,24
  54:11 58:4 59:1 65:1 66:19
  77:3 78:20 84:5,9 85:11,15
  85:23 86:5 90:4,19 93:1
  104:13 106:5 108:11 109:10
  110:20 114:21 118:11 119:8
  120:7 121:16 122:4,13
  123:4,19,23 124:3 129:3,6
  133:1 135:24 138:4 144:20
  144:22 151:15 156:19,23
  157:1,6 158:17,19 161:5
  162:3,8 165:17 167:15
  168:18,23 169:2 170:3,13
**knowing** 92:24 164:17,20
  171:22
**knowledge** 25:18 39:17,20
  40:4 62:2 63:7 65:20 75:15
  84:3,8 85:19 90:2 110:12
  112:1,6 124:5 148:21

159:17 160:18
**known** 103:21 105:13 122:3
  128:24 129:2 146:8,13
  150:18,23,24 151:2,3
  155:23 156:13
**knows** 158:14

---

**L**

**L** 2:7
**label** 64:10,11 67:22 68:2,3
  68:12 69:1,14 70:6 71:3,19
  72:4,10,23 73:12,17
**lack** 73:6 148:21
**laid** 42:20
**Lamb** 2:2 36:24 37:2,6 49:11
  49:24 50:19 51:12 54:1,19
  57:22 58:7 59:23 63:4 68:9
  80:16,19 81:5 86:20 92:7,11
  92:13 95:17 108:5 110:10
  110:18 111:23 125:19,24
  126:9 127:16 131:10 132:10
  133:2,9,11,18 134:5,7,18
  135:22 136:12 137:21
  138:11 139:17 140:13 141:1
  141:20 142:15 143:11 144:5
  144:8 148:12 153:17 154:24
  165:1 166:12 167:23 168:24
  169:23 170:19 171:24
  172:19
**language** 123:8
**large** 164:23 167:19 168:5
  169:17
**larger** 24:2
**lasted** 93:24 96:17
**law** 16:13 17:1,6,8,8,13,14,18
  20:3,7 28:8 44:5,16 66:8
  69:24 73:14 83:5 85:19
  116:19 127:20 138:22,24
**laws** 44:14
**lay** 19:1
**leading** 72:12 89:14 161:24
**learn** 54:8
**learned** 134:1,2
**learning** 139:3
**lecture** 41:24 42:5,10,20 43:2
**lectures** 40:24 41:2,8,17,21
**led** 58:16 173:16

left 80:21
legal 15:19,20 17:22,24 18:2
    18:3,8,12 36:23 41:1 43:12
    67:4 71:10,11 109:6 127:19
legitimate 67:5 151:15
    153:21
lengthy 23:2 33:23
let's 9:2 11:6 22:16 46:16
    47:10 61:10 68:15 74:10
    87:21 93:8 97:22 100:19
    101:4 106:5 107:24 172:7
    172:11
level 26:24 27:10 117:14
    128:13 146:24
levels 69:20 78:1
liability 44:15,16,20 145:7,8
liable 45:12
license 38:16
licensed 31:17 33:18 38:13
licensing 14:16
life 27:9 91:1
liked 146:8,13
limit 127:8,14,18,19,24 128:1
    152:10
limitations 62:20,23 63:2,3
limited 9:20 116:11
limits 70:2
Lindner 1:6 4:7 51:8 54:13
    54:23 55:6 59:6 94:18 95:2
    99:22 104:22 105:1 110:7
    110:12 111:18 112:2 125:12
    130:3,10 131:4 132:20
    133:15 138:9 139:14 140:10
    140:17 141:13 142:9 143:8
    143:23 144:14 145:15
    161:19 164:1,13 165:14
Lindner's 74:2,13 80:11
    109:15 125:6 129:23 130:19
    130:23 132:8,16,24 145:19
line 13:15 14:17 17:21 20:1
    28:23 93:9 115:14 122:12
    125:3 135:8 155:14 159:21
    159:24 177:1
liquid 70:18 72:2
list 34:2 40:6,7 42:16 50:24
    54:17 56:21 71:5 75:6
listed 9:22 11:7 16:20 17:17

40:9 52:22 57:14 65:3,4
    157:22
Listen 27:4
litany 75:6 150:11 158:11
literature 45:20 63:8 72:15
    77:15 90:2 93:5 126:23
    129:15 135:13 136:21,23
    137:2,4,8 138:5 149:15,23
    150:3,13,16,19,22 151:10
    151:12,17 152:9 153:20
    154:6 157:1,24 158:4,6,8
little 5:2 11:10 20:15 33:6
    58:24 59:3 134:19 139:21
    151:18
located 145:20
Locust 2:3
long 8:12 32:7 67:18 109:10
look 7:7 27:4,6 31:18 47:14
    47:22 48:2 77:4 78:4 79:17
    87:21 89:4 114:15 133:11
    133:12
looked 61:20,23,23 62:1
    90:23 94:13 100:18 135:3
    135:10 162:4
looking 16:16 20:1 43:17
    46:18 89:18 96:6 99:24
    100:16 101:2,7 115:20
    118:12
looks 16:1 17:15 20:9 40:12
    49:4 59:14
lost 33:4
lot 92:24 112:4 147:19
lower 55:14 162:20
Luke 2:16
Lyme 134:3,9,10

M

M.D 1:6 4:7
machine 107:2 145:12 149:3
    154:19
macro-economics 15:17
mail 79:15 94:8
mailed 79:11
majority 9:16,17 19:18
making 29:22 92:9 147:7
mammoth 174:9
managed 23:3 34:3

manner 166:8
manual 154:4 158:6
manufacturer 112:21
manufacturing 69:20
mark 12:15 57:3 87:12 100:7
    113:15
marked 12:18 57:6 87:12
    100:10 113:18 173:2
market 2:12 69:23
massive 105:14 106:8
master's 14:21 15:9,21 23:4
materials 41:21,24 50:13,18
    51:1,6 52:23 56:21 57:11
    61:24 62:1 88:1
math 79:19 96:14
mathematically 143:2
matter 10:22 39:5,7 49:10,17
    49:19 137:19
matters 18:3,8
max 88:17,20 89:20 116:11
    117:1 127:8
maximum 84:6 88:16 113:3
    116:16,18 119:19 122:7
McCORMICK 2:11
mean 18:20 19:10,13 20:22
    23:12 27:6,19 35:20 43:5
    46:2,22 59:19 66:19 67:16
    74:11 75:9 81:7 82:19 95:1
    95:7 100:17 102:10,21
    106:10 108:22 117:12 119:4
    121:15 138:19 155:22
meaning 21:5
means 23:13 68:3 76:5
    176:19
meant 155:12
medical 71:21 72:12 73:22
    74:7 75:12 90:2 93:5
    126:22 135:13 136:21 137:1
    137:4,8,13 149:15,23
    150:16,19,22 151:10 152:9
    153:20 154:6 157:24 158:4
    158:21,24 159:8 160:8,9
    161:16,17 162:2 168:15,19
    169:12
medication 10:12 22:3 26:13
    26:14 27:17 64:12 70:21
    75:16 77:9 84:13,16,18,22

84:24 85:7,8 87:4 92:23
95:3 107:18 117:23 121:6
122:23,24 124:13 126:14,16
130:23 142:6 147:8
**medications** 20:18,21,23
59:10,17,19,19,24 60:4 68:2
73:11 111:4 121:24 125:17
145:16
**medicine** 85:17
**members** 19:18 134:8
**mentioned** 19:8 24:6 30:20
31:1,16 32:3 41:6 42:1,6
43:16 112:16
**Merck** 154:4 158:6
**mere** 145:9
**met** 48:22
**methodology** 61:16,17
**Michigan** 13:16
**micro-economics** 15:16
**Micromedex** 154:1 158:4
**Middle** 1:1 4:5
**midnight** 168:12
**milligram** 55:11 56:6 90:24
91:16 93:22 94:4 98:1
100:2 115:16 123:19,20
128:19 129:10,10,11 164:4
164:10
**milligrams** 55:9,18 56:1 84:6
88:12,14,22,23 89:22,23
91:14,15,16 92:21 93:6
100:23 102:21 108:15,24
109:2 115:16,21 119:6,13
119:20,24 120:2,2,19,20,24
122:8,8 123:3,24,24 124:3
127:21 128:9,16,20,22
129:7 135:15 136:17,22
149:20 151:21 152:15,17
154:10 157:10 163:23
**mind** 140:15 144:23
**mine** 90:21
**minimal** 52:15 113:8
**minute** 50:1 96:11 102:18
**minutes** 73:1 172:12
**mispronouncing** 9:23
**misspoke** 31:4
**mistake** 147:15
**mistaken** 139:20 172:21

**mistakes** 148:18
**misuse** 40:9
**moment** 9:21 12:14 28:11
63:12,13 94:10 96:4 111:17
163:6 165:15 166:14 172:8
**monitoring** 107:20
**Montefiore** 20:10 21:13
28:22
**month** 33:23
**months** 33:8 48:9
**moon** 150:9 156:8
**motion** 40:1,3
**move** 62:12 93:8 153:4,8
**moving** 16:11,16 28:20
124:22
**multi-unit** 24:2
**multitude** 112:10 158:14
**muscle** 11:16
**myriad** 161:9

### N

**N** 3:1
**name** 110:4,22 135:5
**names** 14:14
**narrow** 47:23 69:22
**nature** 113:3
**nausea** 157:16
**near** 54:6
**necessarily** 48:9 86:8 95:1
**necessary** 76:8
**need** 6:9 23:15 36:7 65:15
68:17 123:1 124:3 137:10
140:12 145:13 149:2 154:20
157:3,7
**needed** 23:16 33:6 44:7 58:24
59:2 80:23 81:2 140:18,20
141:6,7,11 142:2,13 149:14
149:15,15,16 154:16
**needs** 46:9,13 64:5 71:20
81:18 146:23
**neglected** 164:2
**never** 19:23 39:19,22 91:1,3
103:4,15,17 110:4 112:2
120:22 128:6,8,10 135:13
149:21 151:23 155:11
167:11 170:13
**new** 47:8,9,15,17,24 48:7,18

107:24
**nice** 108:16
**night** 170:10
**NO.3:23-cv-00806-JFS** 1:3
**nods** 6:17
**non-corticosteroid** 171:20
**non-FDA** 68:4 73:16
**non-steroid** 59:19
**norm** 136:5 137:9
**normal** 63:8 88:13,16 99:12
108:10 156:14
**normally** 59:9 60:10,14
65:10 95:4 98:3 107:17
108:18 119:5,19 122:8
128:16 136:3 140:1 143:19
152:14 154:13,15
**North** 33:12,19 34:7,16,20,22
**northern** 11:11
**Nos** 4:6
**Notary** 1:16 176:16
**noted** 4:10 126:1 164:2 178:8
**notes** 172:11 176:9
**notwithstand** 66:24
**November** 133:6
**number** 9:9,19 38:11 41:5
62:16 78:5 80:5,6 81:22
93:16 111:5 112:14 117:11
124:16 129:6 156:7,11,16
157:16,17 162:18 167:10
**numbered** 38:17
**numbers** 124:7
**nurses** 42:13

### O

**oath** 36:17
**object** 126:9 134:18,22
169:24
**objection** 6:3 68:9 80:16,17
81:5 86:20 95:17,17 108:5
110:10,18 111:23,24 125:19
126:1,2 127:16 131:10
132:10 133:2,18 134:5,7
135:22 137:21 138:11
139:17 140:13 141:1,20
142:15,16 143:11 144:5,9
148:12 153:17 154:24 165:1
166:12 167:23 168:24

170:19
**objections** 6:1 134:20
**observing** 29:23
**obtain** 13:16 14:18 22:21
  28:5 90:1
**obtained** 14:2 16:2,12
**obviously** 15:16 19:15 38:7
  98:23 157:8
**Ocala** 12:9
**occasion** 21:13 23:6
**occasional** 34:4
**occasionally** 23:10
**occasions** 5:5,7 60:17,21
**occur** 95:3 109:10
**October** 55:17 111:18 163:10
  164:16
**odocoilei** 133:16
**offered** 15:22
**office** 12:11 145:20
**official** 72:13
**oh** 53:2 109:22 114:5 173:5
**Ohio** 7:23 11:11
**okay** 5:12,17,19 6:1,5,15,22
  7:3,5,8,20 8:6,13,24 9:13
  10:4,11,16 11:6,20 12:2,7
  12:13,23 13:5,10,14,23
  14:17,21 15:7 16:1,5 17:5
  17:15,21 18:5,15,20 19:1,8
  19:21 20:1,6,9,14,20 21:21
  22:5,16 23:9,12,18,22 24:5
  24:12 25:4,21 26:24 27:6,15
  28:2,11,20 30:1,20 31:6,16
  31:22 32:1,12,21 33:15,16
  34:1,6,19,22 35:4,8,17 36:1
  36:4,19,22 38:13,19,23 39:2
  39:6,10,17 40:5,18 41:14,20
  41:23 42:12,15,19,23 43:9
  43:16 44:10,22 45:2,8,13,16
  46:16,21 47:4,10,19 48:12
  48:16 49:9,23 50:11,17 51:2
  51:6,15,19,23 52:8,22 53:5
  53:21 54:4,8,20 55:4 56:4,9
  56:14,21 57:13,24 58:11,19
  61:4,10 62:9,12,20 63:12
  65:1 66:12,18,22 67:13 68:5
  68:23 69:3 70:6,13 71:6
  72:7,9 73:10,24 74:5 75:11

76:12,18 77:10,13,19 78:3
78:19 80:8,24 81:15,23 82:8
82:18 87:17,21,22 88:24
89:6,17,19 90:5,10,10,16
91:6 92:12,19,22 94:6,10,10
94:14,23 95:12 96:5 98:23
99:14,20 100:4,5,17,19,21
101:2,4,6,13 102:12 103:2
103:14,14 104:3 105:7
106:24 107:14,21 108:24
109:3 110:6,15 112:4,16
113:10,24 114:21 115:2,7,9
115:14,23 116:8,16 117:1,9
117:21 118:11 119:16,21
120:5,9,18 121:6 122:9,17
123:9,15,22 124:17,23
125:2,3,23 126:3 127:1
128:10,15,18 129:19 130:6
130:9 131:21 132:1 133:24
135:11 136:14,17 138:18
139:13 140:9,16 142:8
145:14,21 146:21,23 147:24
148:6,8,15 149:7,18,23
153:4,8 154:5,22 155:16
157:10,12 158:24 159:21
160:2,11,15,21,24 161:7,19
162:8,11,22 163:6,14,21
164:14,17,18,19 165:15,24
166:5,10 167:8,14,18
168:17 170:16 171:8,17,21
172:8 173:6,7,11,22 174:5
174:21
**oldest** 16:19
**once** 48:9 69:23 70:2 71:12
  72:14,18
**one-fifth** 55:12
**ones** 33:23 67:16 158:7
  164:12,17
**operate** 149:5
**operation** 18:4 29:23
**opine** 11:1 12:2 49:10 93:1,12
  96:10 173:23
**opined** 93:15 155:20 160:8
  160:10 161:17 171:18
**opining** 76:20,22 91:7 92:22
  103:15 123:11 137:15,18
  153:10,11 160:2,16 170:2

174:1
**opinion** 10:21 28:16 39:24
  49:13,17,19 53:20 61:21
  63:21 66:21 74:4,12,16
  82:11,21 90:5 97:5 99:4
  103:11 106:6 118:19 119:2
  119:12,17 137:10 148:9
  161:1,4,16 164:22 165:17
  168:21 169:2 170:13,24
  171:8,17,23,24 174:6,11,18
**opinions** 39:18 52:5 61:16,19
  62:13,16 159:12 160:12
  170:22
**opioid** 40:9,13,17 78:17
**opioids** 10:14 11:14,15
**opportunity** 106:11
**opposed** 31:21 130:14
**oral** 100:23
**orally** 154:14
**order** 5:19 21:6,9 24:19 25:5
  25:13 26:4 46:3,8 71:11,13
  72:20 73:16 94:8 105:4
  106:17 116:21 119:7 135:14
  145:3 149:19
**ordered** 20:19,21 21:8,11
  22:3 44:8 59:23 74:15
  78:14 99:3,6,19 101:9 102:6
  102:24 119:4 145:4 149:4
  162:7 165:3
**ordering** 79:3 80:4 97:11
  104:18 111:3 136:22
**orders** 21:3,4,15,24 29:15,21
  29:21 116:21 146:10 147:2
**organism** 74:21 75:24 76:1
**original** 55:14 99:15
**outlines** 150:22
**outlining** 150:17
**outpatient** 30:21 108:18
  121:4 135:16 136:23
**outpatients** 29:16,22
**outside** 24:19 25:6,13 26:5
  70:4 90:6 114:24
**outweigh** 46:24 47:1 76:10
  146:12
**outweighed** 67:20 103:8,24
**outweighs** 25:3 121:21
**over-the-counter** 29:18

CARL GAINOR, Ph.D, JD

**overdose** 142:7 145:4,6
  157:18
**owed** 11:21 12:3 45:4
**owned** 24:2,3
**owner** 130:2 162:6
**ownership** 24:1 28:12
**oxy** 129:13
**Oxycodone** 123:3 129:4,14
  151:2

**P**

**P.C** 2:2,6,11
**p.m** 1:15 4:3 175:4
**PA** 1:24 2:3,8,12 18:21 19:2
  20:3 47:20
**package** 3:15 112:24 113:1,5
  113:8,11,17 114:3,4,6,10,17
  114:19 115:3,5 116:1,9
  117:4 119:4,18 122:6 123:7
  128:7
**packages** 122:17
**page** 3:3,8 40:23 50:9,11,12
  111:5 115:10 125:1,1 177:1
**pain** 59:2,10 107:18 122:23
  122:24 142:4,5,6 157:17
**palatable** 71:1
**paragraph** 173:8
**paragraphs** 150:4
**parameters** 69:22 70:5 87:9
**Pardon** 5:6 15:3 68:11
  112:22 165:6
**part** 20:20 21:6 22:23 23:14
  41:17 44:15,16 48:10 49:20
  64:20,24 66:12 75:8 84:9
  94:17 97:13 99:3 106:13
  127:22 132:8,16 139:7
  148:3
**part's** 137:6
**particular** 20:6 22:8 27:5,20
  65:17,18,23 66:19 69:5
  74:14 75:16 76:4 83:19
  84:1,7 86:15 87:24 88:4
  92:16 101:13 136:15 147:9
  161:14
**particularly** 162:10
**parties** 114:23
**patient** 3:11 12:3 21:11 24:11

24:13,20,20 25:1,3,6,20
26:5,10,12,15,19,22 27:1
44:8,21 45:10,14,15,21,22
45:23 46:6,10,12,19,23 47:6
48:8,11,13 52:16 54:2,13,23
55:7,21 56:22 57:5,10,14
58:17 59:12 63:19 64:1,6,12
64:14,22 65:6,14,18 66:11
67:9,11,20 71:2,16,17,24
72:1,4 73:3 75:5,15,24 76:7
76:9,24 77:3 78:5,7,10,13
78:24 79:2,9,15,18,24 80:3
80:22 81:9,11,13,17,18,21
82:5,19,22 83:8,9,23 84:7
84:11,14 85:11,12,18,20
86:2,5,6,10,16,24 87:3,14
93:6 94:1,7 96:23 97:2,18
98:7 99:18,24 101:5 103:6
103:22 104:4,14 105:5,13
105:22,24 106:7,15,19
107:6,12,22 108:21 110:23
116:5,24 117:22 118:18,21
119:6 120:16,16,21 121:7
121:13,22 122:21 123:1,2,4
128:2 131:6 132:3 137:11
138:21 139:5,24 140:7,8
141:15,18 142:1,5,22 143:3
145:2 146:11,15 147:14
148:24 151:3,5 156:21
166:9 171:4 172:4 174:9
**patient's** 59:1 60:14 63:24
  64:14 71:20,21 75:4,21 76:2
  76:2 79:9 82:7 83:3,14
  85:15,20,23 107:19 117:17
  117:18 118:2 123:21 129:11
  141:15,19 152:24 174:17
**patient-directed** 59:7
**patients** 20:19 27:9 41:8,9,10
  41:16 42:3,7 44:19,24 45:4
  46:3 60:23 61:8 70:15,21
  111:19 120:13 130:11,14,15
  130:16,20,24 148:5 149:9
  156:16
**Paul** 166:11,22 167:2 168:3
  168:21 169:16
**pause** 6:3
**pediatricians** 69:9

**pending** 6:11 89:13 98:13
  129:21
**Pennsylvania** 1:1 4:6 8:10,11
  17:23 18:1,16,19,24 20:11
  22:24 31:7,22 34:4 38:14
  43:15 47:10,12 48:16 67:6
  138:24 149:5
**people** 106:12
**percent** 9:11,11 24:22 35:19
  35:20,23,24 36:1,4,9,12,19
  36:22 37:12,18 129:3
**percentage** 9:13 37:14
**perfectly** 152:1 170:2
**perforated** 157:16
**perforation** 156:10 158:18
  167:22 168:7 169:20
**perforations** 150:9
**perform** 19:21 47:5
**performed** 32:2
**performing** 19:23 48:13
  139:8
**perfunctory** 113:5 133:21
**peril** 85:24
**period** 56:16 161:24 168:18
**periodically** 34:14
**permitted** 69:24 72:20,21
  73:15
**personal** 46:3
**pertained** 42:20 43:12 109:15
**pertains** 8:14 101:19
**Ph.D** 1:11
**pharm** 122:14
**pharma** 68:8
**pharmaceutical** 14:23 15:6
  15:12,14,23 17:1
**pharmaceuticals** 29:19
**pharmacies** 19:10 23:8 32:3
  32:14,18 44:23 52:10 53:13
  54:9,22 121:5 162:12
  171:21
**pharmacist** 8:4,15,19,22
  11:22 12:1,3 13:19 20:10,17
  21:2,7,10,12 22:6,11,17,19
  22:24 23:13,16 24:4,6,23
  25:8 28:5,17,21 30:19 31:3
  31:5,8,9,13,17 32:24 34:5,9
  34:23 35:4,9 44:7,20 46:5,9

46:13,14 47:4,11 48:12,13
63:18 64:4,16 65:10,20,21
65:23 66:3,5,8,17,20,22
67:2,4,8,11,14,18,19 71:14
71:16 73:1,21 74:6 75:14
76:23 77:12,16 78:9 80:5
81:8,20 82:21 83:13,17,20
83:24 84:2,9,13,16,22 85:1
85:6,11,22 86:5,10,14,17
87:2,4,6 90:3,7,22 95:4
97:13 99:4 103:12 105:5,12
105:16,22 106:18 107:4,5
107:15,19 108:2 109:4,7
116:22 122:4,12 128:5
131:15,23 134:14 136:4,7
139:1 140:3 141:5 143:9
145:6,11 146:2,7,12,14,17
148:23 151:15 152:9 156:19
156:23 158:13 161:13

**pharmacist's** 63:14 64:24
65:2 66:10,13 85:10,24 86:4
86:9,16 104:3 105:10
111:12,14 127:24 139:3,7
146:3 153:1

**pharmacists** 17:23 18:1,17
18:19,19,21,24 19:2,12,19
31:15 33:5 40:10 42:14
43:10,15 44:14 45:4,10 46:7
47:12 49:13 63:11 66:15
70:17 72:21 73:15 74:24
75:6 79:7 83:1,7 84:8 85:17
91:3 105:24 106:7,9,10
107:1,10 108:12 111:3
122:14,16 123:5 125:4
127:4 145:12 146:24 150:14
151:23 156:2 157:9 159:17
165:23 166:2,4,7 171:1
173:18 174:11,16

**pharmacists'** 19:16,17
**pharmacological** 73:12
**pharmacology** 14:13 154:3
**pharmacy** 8:15,19 9:1 11:7
11:13,19 13:22,24 14:7,8,13
14:15,20 16:3 17:1,2,6,8,8,9
17:13,19 19:6 22:19,21 23:2
23:3,6,7,14,15,19,19,21,23
23:24 24:3,18 28:13,13,19

28:19 29:1,6 33:12,13,19
36:11,13,16,18,20 38:14
44:22 45:3 47:16 48:4
52:16,21 53:19 54:7 55:24
56:3,11 58:10 61:22 63:15
63:15 65:21 70:24 75:11
78:1 79:3,14 81:12 84:4
85:16 102:14 104:15 105:3
105:18 110:13 111:3 122:13
138:6 143:5 145:19,22
149:2 152:13 154:21 163:4
171:5 172:20

**pharmacy's** 19:5
**PhD** 3:5 4:9,14 15:22 16:2,6
**Philadelphia** 1:24 2:3,12
**phone** 79:9
**physician** 10:5 27:8 84:17,19
84:23,24 85:8 86:18 87:7
90:8

**physician's** 85:12 86:6
**physicians** 69:24 71:8
**pills** 141:11
**pinpoint** 111:5
**Pittsburgh** 13:24 14:20 16:3
16:13 20:3,11 29:9 34:3
**place** 98:22 136:16 169:24
**placed** 118:16 119:1
**plaintiff** 1:4 8:20,23 37:20
38:1 48:23 49:2 51:10
61:13 81:1 118:15 119:14
123:17 130:4 132:4 161:6
170:17 173:18

**plaintiff's** 9:4,11 51:13,20
52:4,9 56:18 80:10 87:14
132:6 158:21 160:12,15
161:4,8 166:10,22 167:1,5
167:16 168:16 169:12
171:10,18

**plaintiffs** 2:5 37:15
**plan** 59:7 83:18,21 86:6,15
94:18 125:13 132:8,16,24
143:23 144:14 148:2,3
**plans** 86:19
**play** 146:3
**please** 14:3 88:18 93:13
96:11 151:9 166:24 167:3
168:2

**plus** 24:18
**point** 19:18 62:8 118:24
121:21 124:11 129:3,11
**pointed** 172:1
**points** 147:18
**political** 67:7
**pose** 103:21 116:23
**posed** 118:20
**poses** 83:22 84:1
**position** 16:20,22 30:22,24
109:5
**positions** 16:17,18 17:17 20:2
28:23 33:21,24 43:18
**possible** 91:13 128:14 170:23
**possibly** 82:9 105:22 170:21
**potency** 78:7
**potent** 77:8 94:3 124:13
**potential** 16:10 25:3 42:16
43:23 44:9,19 47:1,1 73:4,7
105:13 116:24 121:22
123:16 126:20
**potentially** 44:6 103:24
134:11 164:23
**practical** 24:18 33:7
**practice** 14:12 28:17 33:19
38:14 68:1,5,12 69:3,14
70:7,20
**practiced** 20:3
**practices** 69:20
**practitioner** 20:7,8 21:10
**practitioners** 168:19
**pre-pharmacy** 13:19
**precluded** 39:18
**Predni** 126:21
**Prednisone** 21:22 30:4 34:24
55:8,11 60:22 77:7 79:20
84:5 88:16,22 90:23 91:4
93:7,22 94:16 95:13,23 96:2
98:1 102:21 108:13,19,24
109:1,2 112:18,24 114:6,9
114:17,19 115:4,6,15,16
116:17 119:4,9,11 120:2,24
127:8,14,21 128:17 163:12
163:13 164:23 167:19,20
168:5,5 169:17,18
**preexisting** 118:5
**prepared** 49:4,6

**preparing** 50:14 51:24 52:8 56:19 58:13 61:15 62:21,24
**prescribe** 73:11 127:21 164:22
**prescribed** 84:7,18 92:20 115:8 116:17,19 122:1 139:20 142:11 161:20 162:4 165:18 167:19 168:4 169:17
**prescriber** 10:3,4,8,9 24:23 25:16,16 26:7 27:2,4,16 64:23
**prescriber's** 11:3 25:22 146:4
**prescribing** 10:6,12 68:2,6,7 68:13 69:4,15,15 70:7 71:4 71:19 72:10 86:11 90:8 132:9,17 141:8 145:23 146:2,18 147:1,8
**prescription** 3:11 21:4 22:8 22:12,15 24:8,9,10,13 25:10 25:12,24 26:21,23 28:7 30:11,15 35:6,9 46:11,18 54:16 55:7,10,14,17,22 56:4 56:22 57:6,10,15 63:19 64:8 64:9 65:11,16,22,24 66:3,6 66:9,23 67:3,5 72:22 73:22 74:8 75:13 77:4 78:8 79:14 80:3,7 81:22 82:23 83:4 85:13,22 86:7,12,18 87:1,10 87:22,24 88:4,9,12 89:3,5,9 89:13,18 90:6,11,13,15,20 90:23 91:7,9,20 92:14,16 93:9,10,17 94:2,16 95:15 96:8,15,17,19 97:6,9,16,17 97:19 98:6,16,18,20,22,24 99:1,11,16,21 100:22 101:3 101:14,17,22 102:3,13,16 103:1,4,16,17 106:21 107:7 108:1 110:19 118:22,23,23 119:3 120:23 124:10,14 125:11,11 126:7 133:17 134:13,15 136:5 137:18 138:10 139:5 140:12 142:10 143:10 144:16,16,17 147:2 147:12 162:14,24 163:2,3,9,11 163:13,22 164:3,9,19,19
**prescriptions** 3:13 29:15

30:3,8,21,23 31:2 35:3 47:8 47:9,15,21,24 48:1,7,18 50:22 51:3,5 52:10,13,18 53:13,16 54:2,14 55:3,4 56:10,16 57:22 58:1,2,13 60:22 63:7 76:14,15,19 79:1 79:10 83:2 91:2 94:8 100:9 100:15 104:10,18 107:8,23 107:24 108:4 109:14 118:12 132:7,15 144:1 147:3 153:16 162:17,19,23 163:18 164:6,20 165:2,5,8,9,18 170:17 171:20
**present** 2:16 4:8 15:7 156:24
**presented** 40:24
**president** 18:3
**pressure** 156:9
**pretty** 42:18 69:21 115:22
**prevalent** 108:20
**prevent** 87:3
**previous** 40:7 94:16 95:3 97:8
**previously** 32:3
**primarily** 9:6 10:23
**prior** 22:18,20 34:15 51:3,15 51:20 52:8 53:6,22 56:19 60:17,21 80:7 81:22 99:11 111:18 115:20 168:9
**PRIORE** 2:11
**private** 12:10,10,12 20:3
**probability** 90:14
**probable** 44:3
**probably** 5:11 6:7 8:16 18:15 23:5 53:4 72:8 88:14 91:20 99:7 129:2 139:1 156:15
**problem** 21:9 44:9 54:12,15 54:17 55:22 68:19 75:19 93:17 102:1 107:17 110:14 112:2 124:4
**problems** 33:4 45:24 60:2,4,9 83:11 91:22 156:9 157:16 171:14
**procedure** 65:7
**procedures** 5:13 65:2
**proceedings** 176:8
**production** 130:18
**productions** 114:23

**products** 29:17,19,22 85:15
**profession** 106:12
**professional** 1:23 13:22 18:23 61:21 66:10,10 109:5 118:19 127:23 138:22 139:2 166:8 174:11
**profile** 99:24
**program** 15:22,23 29:5
**programs** 13:22
**prohibit** 137:2,5
**properly** 46:9 49:14 64:11
**properties** 73:13
**prospective** 44:17 46:8,15 63:22 75:8 86:2
**protect** 44:20 46:4 140:7 148:24 149:9
**protecting** 45:15 147:13
**protects** 85:18
**provide** 27:21 37:19 43:11 49:16,18 50:21 64:19 71:17 83:7 118:11 139:5 174:12
**provided** 6:22 50:19 51:13 55:7 57:22 61:24 62:1 80:12 87:4 93:21 113:2,11 114:22,23 128:11 130:17,22 160:24 161:3 163:15 164:18 165:5,7,9 172:17
**provider** 63:20 145:23 146:2 146:18 147:1
**provider's** 73:22 74:8 75:12
**providers** 44:12 149:9
**provides** 64:6
**providing** 27:12 65:5 99:5 106:21 143:5 173:16
**psychiatric** 70:15
**Public** 1:16 176:16
**publication** 40:8,12,14
**publications** 40:7
**published** 40:18 72:12
**pull** 99:21 124:22 172:22
**purpose** 18:17 71:11
**purposes** 60:6
**put** 26:16,20,22 61:10 70:17 174:14
**putting** 64:8 66:24

---

**Q**

---

CARL GAINOR, Ph.D, JD

**qualified** 73:8 159:8,11
**qualify** 159:16
**quantify** 118:16 123:15
**quantities** 52:14,15 53:17,18
 54:5,8 55:2 58:4,8 76:9,22
 108:22 109:8 141:9 143:4
 162:19,21
**quantity** 52:19 58:17 77:5
 92:17,20 94:5 102:22 123:6
 142:11,13 164:10
**query** 25:15 26:6
**question** 5:15,22 6:5,11,11
 18:16 19:4 24:5 44:12
 62:15 67:17 68:17,20 70:11
 71:14 73:9,14,21 74:1,7,12
 75:12 78:21,22 79:21,22,23
 81:16 82:3,12 83:9,17,21
 84:21 85:21 86:23 89:12,14
 91:24 92:1,6 97:12 98:13
 101:21 114:2 120:10 125:5
 125:21 129:21,23 130:21
 132:12 136:19 140:2 146:20
 146:22 150:15,21 151:8,14
 153:9 160:4 162:16 165:12
 168:2 170:6 172:6
**question's** 126:17
**questionable** 97:22
**questioned** 128:4 137:24
 138:3 142:11
**questioning** 4:17 22:7 30:10
 35:5 84:17,23 85:7
**questions** 46:3,6 89:16
 167:10 170:10
**quite** 108:13
**quote** 112:4 131:7 156:3

---

**R**

**raise** 64:4
**raised** 92:16 94:5 139:21
 140:2
**range** 24:19 25:6,7,14 26:5
 33:3 88:21 89:21,22 90:4,7
 120:19,21 122:24 128:11,12
 152:14 156:15
**ranges** 63:9 150:20 151:16
**rare** 73:5
**rate** 38:20,23 39:4

**read** 51:18 52:2 115:18 116:6
 134:2,10 170:4,5 173:20
 178:7
**reading** 104:13 105:21
 113:24 150:2
**reality** 119:8
**really** 36:7 52:1 53:9 54:18
 59:12 66:7 128:8 143:16
 151:15
**reason** 51:19 67:5 68:19 99:8
**reasonable** 126:6,13,15
**reasons** 25:5
**recall** 10:1,11,21 11:9 14:2,6
 14:8 16:5 21:21 22:7,11
 30:2,10,14 33:13 35:5,8
 42:5,19,23 62:9 94:14 104:4
 107:8 112:6 130:9 131:2,9
 132:5,13 133:13,24 134:6
 134:12 140:16 141:12 142:8
 143:6,18,21 144:12
**recalled** 147:19
**receive** 22:19 53:3 56:14,14
**received** 52:16 54:2,6,9,21
 56:5,11 63:19 91:8 114:6,7
**receiving** 52:11 58:18 147:1
**recess** 50:4 172:14
**recollection** 25:9 29:12 40:16
 50:16 105:2,8 108:14
 110:21 116:13 131:22
 137:16,19,23 143:13,15
**recommendation** 128:11
**recommendations** 74:18
**recommended** 88:21 89:20
 90:6 127:11,12 153:22
 157:2
**record** 4:10 5:20 6:4 37:3,9
 98:14 111:16 126:2 166:13
 166:18 169:24 172:11
**records** 56:3 59:16 60:16,20
 61:1 62:5 78:4 80:11 104:7
 106:3 130:17,22 158:22
 162:3
**red** 66:2,4 90:24 92:16 96:24
 98:7 124:2
**redundant** 47:2
**refer** 60:17 116:14
**reference** 162:6

**referred** 57:10 59:7 116:9
**refill** 47:17,20 79:10 81:10,14
 82:5 96:23
**refills** 47:8 48:6 79:4
**reflect** 147:21
**reflected** 102:10 162:23
**reflecting** 59:17
**reflects** 101:22
**refuse** 25:12 67:8 85:1,6
**refused** 22:12,14 24:7,9
**refusing** 25:10 30:14 35:8
 67:6
**regard** 52:6
**regarding** 19:11 39:11 40:19
**regardless** 28:17 99:2,9
 138:21 166:2
**regards** 40:14
**Registered** 31:7
**regularly** 72:8 81:12 108:13
**regulations** 17:9,10,12 19:7
 44:15
**reimbursement** 19:17
**reject** 65:21,24 66:6,8,23
 67:3
**related** 36:13 41:24 61:1
 130:3 134:11
**relating** 14:12 17:13 18:3
 130:4 167:5,6
**relationship** 145:15,19
**relative** 65:10 156:20 164:6
**relatively** 30:6
**relaxants** 11:16
**release** 146:14
**relevance** 152:3
**relevant** 36:6 54:18 60:1,4
 61:8,11 62:17,19 167:12
**relief** 23:7,10 32:2,13,17 34:4
 34:14
**rely** 27:1 71:8
**relying** 139:9 146:4 147:5
 160:11
**remainder** 98:19 101:16,24
**remaining** 35:20 36:19,22
**remember** 5:9 9:7 10:14 12:5
 14:13 15:9,11 16:7 18:11
 19:13,23 21:19,24 22:2,9,13
 29:16,20 30:7,13 33:2 34:13

34:15 35:2,7,11 39:13,15
42:9 43:1 50:24 55:19
57:20 58:20 93:21 95:23
104:13,17 105:21 113:8
114:4,18 116:12 117:7
120:22 130:1,12 131:14
133:4,8,8,10,20 134:8 135:3
135:4 138:13,14 139:19,22
140:24 141:4,23 142:14,19
142:21 143:13 144:6,21
147:22 157:14
**rendered** 74:12 171:16
**rendering** 165:17
**repeat** 15:1,4 103:3 166:24
170:9 172:7
**repeatedly** 170:3
**repeating** 160:9
**rephrase** 5:17 73:20 107:21
**report** 3:10,12,16 6:23,24 7:1
7:9 9:22 12:17,24 38:20
39:24 49:4,6,23 50:9,14
51:12,21,24 52:9 53:6,7,22
56:19,22 57:6,11,15,18,24
58:14 62:10,14,18,21,24
73:19,24 74:10 87:15 101:5
116:15 124:23,24 125:1
133:12,12 159:22 160:3,22
172:18,20,23 173:1,4 174:2
**reporter** 4:11,12 6:18 176:20
**Reporters** 1:23
**REPORTING** 1:22
**reports** 35:18 38:21 170:5
**represent** 18:20 115:3
**representations** 147:6,7
**represented** 115:5
**representing** 18:18 38:3
169:15
**reproduction** 176:19
**request** 54:19
**require** 27:15 47:12 65:12
85:11 86:5,10,17 120:13
121:11 154:11
**required** 17:2 28:5,8 46:5,7
47:4,7,9,11,15,20 48:17
65:21,24 73:21 74:7 75:11
83:5,17,20 85:17 90:7
111:21 174:12

**requirements** 15:11 22:23
116:3 122:18
**requires** 72:4 161:16
**research** 25:15,18 26:6 27:23
45:20 72:11,17,19 77:22
87:7,8 91:12 93:18 103:7,23
108:11 128:5 136:16,19
137:12 148:7 153:19 154:23
155:3
**researched** 126:19 133:15
134:15 135:9
**residence** 12:10,11,12
**residencies** 29:5
**resident** 28:24 31:10,13
**resolve** 64:5 65:5 66:4,5
**respect** 16:21,22 41:21 89:16
**respects** 26:2
**respiratory** 129:5,12
**responding** 6:16 141:16
174:3
**response** 116:5 117:22
122:20 125:14 147:19
**responses** 6:15,19
**responsibility** 66:11 87:2
106:13,14
**responsible** 16:24 17:3 18:13
22:4 107:20 125:16 174:16
**rest** 66:9
**restate** 32:15
**result** 106:20 125:8 158:16
159:22 160:3,6
**retail** 23:19,20,23 28:12,19
32:24 33:12 34:9 63:15
121:4
**retention** 156:9
**review** 5:12 46:8,15,17 47:5
48:14 49:12,12 50:17 51:4,9
51:15,20 52:9 54:10,23
60:20 63:22 75:8 80:10
86:3 94:11 98:15 100:14
104:7 106:3 109:18,19,20
109:22 111:16 112:23
114:17 130:6 133:5,21
135:19 137:17 139:8 158:21
170:17 172:10
**reviewed** 50:13,14 51:1,2,6,7
51:11 56:22,24 57:9,11

76:13,15 79:24 80:8 88:1
110:1 112:20 113:7 116:10
160:21
**reviewing** 62:4 131:9 133:9
142:8 143:6
**reviews** 44:18 47:13
**right** 4:24 6:7,22 9:21 12:7
13:10,14 14:1 16:11,16
20:16 22:5 33:20 34:6,17
35:12 38:19 48:22 49:21
59:13,13 68:15 71:10 75:2,3
75:3 81:19 88:15 90:10
93:8 96:5 98:13 101:10
107:23 112:20 113:22 116:1
118:8,13 120:1 122:11
124:2,21 127:7,8,9,10 128:3
148:22 163:17 171:6,7
**risk** 25:19 26:9,16,20,22 41:7
41:9,12,16 42:2,7 73:3
76:10,11 83:22 103:5,8,22
116:23 118:21 120:6 123:16
150:14
**risks** 25:1 41:10 42:8,11,19
43:23 44:7 47:3 84:1,11
103:24 105:13 121:20
126:20 146:11 155:23 156:1
156:3
**risky** 77:12 108:7
**role** 21:6,9,12 22:18,20 30:15
30:18,18 43:14 49:20
**rotate** 29:13
**rotated** 31:10
**rotation** 29:7
**rule** 87:1
**rules** 17:10 48:2
**run** 141:17

---

**S**

**S-T-E-H-L** 9:24
**safe** 24:22
**safety** 24:19 25:6,7,13 26:5
**satisfied** 25:22 26:1 125:13
**satisfy** 137:10
**saw** 55:16 59:8 111:8 114:13
119:5 157:9
**saying** 41:12 53:17 95:6 99:3
105:20 122:6 123:13 129:8

136:1 137:23 138:14,19
146:21 152:10 155:9 171:13
**says** 13:15 59:2 108:23
115:23 119:19 123:8 127:20
151:12 154:6,7,17 155:15
**Schedule** 10:13,19
**scheduled** 4:2
**school** 13:21 14:15,20 15:18
16:3,13 23:6 84:4 122:13
149:3 154:21
**schools** 152:13
**science** 14:5,22
**scientific** 63:8 74:17 77:15
149:16
**scope** 157:15
**Scranton** 2:8
**screen** 7:4 50:7 57:2,23
113:14
**scroll** 40:5
**second** 37:3 47:19 56:24
57:13 59:13 72:19 89:12
93:9 98:12 100:6 104:2
113:13 118:23 124:19
133:10 173:12
**section** 40:6
**see** 12:20 13:1 14:17 33:18
37:6 51:6 56:18 59:3,9
70:10 77:5 78:4,6 87:14,17
91:13 93:9 98:14 100:1,12
100:20 105:12 107:17
108:18 113:20,24 115:12
117:4 123:10 124:24 128:6
136:7 153:20 159:24 165:3
173:9,14
**seeing** 55:20 114:4 120:23
130:1
**seen** 110:4 114:9,11 120:18
120:20 157:8 167:3,11
168:13 170:13
**self** 35:15
**selling** 78:17
**sense** 82:12 141:24 152:21
**sent** 39:8 105:4 133:10 164:1
**sentence** 173:13
**September** 38:18 103:5
**Serba** 1:16 4:11 176:15
**serious** 91:21 106:20 118:21

125:8 146:11 156:13 158:10
159:22 173:17
**served** 21:1
**serving** 36:16
**set** 87:1
**setting** 20:16 21:2 28:18
32:24 34:10
**seven** 22:7
**severity** 117:14
**Shaffer** 11:7
**shape** 104:19
**share** 50:7 113:13
**shared** 143:7
**sharing** 7:4 57:1,13
**she'd** 99:12
**sheet** 164:12
**shift** 32:6,7,11
**short** 50:4 172:14
**short-handed** 23:14
**shoulders** 6:17
**show** 23:1 38:3 57:2 77:17
87:11,20 88:5 135:9,21
137:12,20 139:2 149:17
153:5 163:9,10
**showed** 52:13 60:17 117:5
**showing** 98:21 130:22
**shows** 28:24 54:13 88:6
**shrugging** 6:17
**sic** 13:21
**side** 9:11,18,19 15:9,20 38:1
38:2 42:16 104:9,15 105:18
108:3 110:8,16 111:20
124:7 127:23,24 150:11
156:11,13 158:10,11,14,15
158:15 167:5,5 168:15,16
**sides** 38:3
**significance** 145:22 146:1
**significant** 52:19 58:8 155:2
**significantly** 55:14 162:20
**simple** 76:5
**simplify** 9:2
**Simpson** 2:16
**single** 43:21,22 44:2 47:2,5
**sit** 170:9
**situation** 36:8 48:10 66:20
98:5 121:3
**situations** 70:22 73:10 83:12

154:13
**six** 17:16 22:6,6 24:17 84:3
128:19 154:21
**Skeesler@mccormickprio...**
2:13
**skim** 51:17,18
**slow** 134:19
**small** 53:17
**Smith** 160:22 171:16,17
**solely** 79:1
**somebody** 90:21
**sorry** 6:7 7:23 10:7 14:3,4
15:1 23:20 32:15 33:11
35:7,11 37:16 38:11 40:2,22
43:16 45:1 49:6 57:2 62:22
81:6 84:20 88:18,19 92:7
96:4 101:6 104:23 109:22
109:23 112:23 124:22
125:24 133:4 134:2,19
135:24 136:12 138:8 144:5
145:24 161:22 168:8 169:4
172:6 173:13
**sort** 48:2 112:12 113:4
131:19
**source** 54:20 158:7
**sources** 35:24
**South** 1:23
**Southeast** 12:9
**speak** 14:19 90:7
**speaking** 84:18,24 85:7
**speaks** 13:13
**specialize** 20:6
**specialties** 29:10
**specif** 142:19
**specific** 15:21 25:9 30:8 35:3
37:22 39:13 43:6,7 55:2
70:12 71:22 85:12 86:6
115:17 117:6 120:7 122:3
124:16 128:24 132:3 140:22
142:20 150:5,17,23,24
151:11 152:10
**specifically** 12:2 17:13 18:11
18:19 21:8,19,22,24 22:13
29:20 30:4 34:24 41:4
42:22 43:1 44:1 48:16 49:9
88:1 93:10,14 95:24 96:8
101:18 104:15 117:12 135:2

138:14 158:17
**specificity** 30:7
**specifics** 12:5 22:10 39:15
  42:9 158:19
**SPECTER** 2:2
**speculate** 161:10
**spend** 62:4
**spent** 62:9
**spoken** 53:24
**Stacey** 1:3 4:6 48:23 51:10
  110:15 125:9 155:21 159:23
**Stacy** 1:15 4:11 176:15
**staff** 20:10,17 21:12 22:5,11
  22:17,18 24:6 25:8 28:21
  31:15
**stamp** 115:10
**stamped** 113:22
**stand** 130:13
**standard** 44:23 45:4,5,9 48:5
  48:12 49:14 85:10 86:4,9,16
  103:12 115:22 127:19 139:7
  148:10,11,14 155:18 172:2
  172:3,5
**standards** 138:23 139:2
**standpoint** 109:6,6
**start** 13:10,14 23:4 97:23
  128:16 156:8,18 173:12
**started** 18:15 41:12 91:12
  104:20 108:14 140:23 143:2
**starting** 16:18 22:18 84:5
  88:15,16,20,21 89:1,21,21
  90:4,6 91:5,15 93:6 112:17
  113:22 115:21 119:5,18,19
  119:23 120:23 122:7 123:23
  124:1,1 127:11,13 151:21
  154:10
**starts** 98:2 173:13
**state** 7:17,21,21 8:3,9 9:18
  17:9,10 18:18 19:6 31:7
  48:3 73:19,24 125:3 160:4
  168:1
**stated** 13:23 24:12 25:5 26:3
  31:2 89:19 90:11 107:5
  114:5 119:21 122:1 152:12
  167:17 169:3
**statement** 26:16 78:23 82:13
  82:14 94:23 135:3 153:6

**states** 1:1 4:4 9:6 16:10 41:1
  47:7,8 48:1 115:14 149:6
  173:8
**stating** 81:23
**statutes** 47:23
**Stehl** 9:23
**stenographic** 4:10
**step** 64:10,18 68:21 153:13
  153:15
**Stephen** 134:3
**steps** 65:12 126:14 135:18,21
  137:16 153:11
**steroid** 121:10 132:15
**steroids** 54:21 105:11 118:14
  120:14 121:3,11 132:9,18
  132:21 139:16 140:18 156:6
  173:16
**stomach** 156:10
**stop** 57:1,13 68:15
**store** 34:3
**street** 1:23 2:3,12 78:18
**strength** 55:12
**strict** 69:21
**strictly** 40:16 71:23 105:20
**strike** 14:4 28:22 61:14 74:10
  171:15 174:21
**students** 17:2 33:6 44:11,23
  45:3,16 47:16 48:4
**studies** 72:11
**subject** 39:24 40:2
**subjected** 27:1
**subsequent** 107:23 143:24
  144:15
**substance** 10:12,17,19
**substances** 17:11,12 66:1,24
  67:1
**suffer** 145:7,8 152:18
**suffered** 134:9 158:18 161:11
  173:18 174:10
**suffering** 105:13,19 106:8,19
  108:3 109:9 111:20
**suggesting** 91:10 155:14
**suggestions** 45:18
**Suite** 1:23 2:12
**summary** 165:14
**summer** 33:7 34:16,20,22
**supervision** 176:19

**supplemental** 6:24 130:18
  172:17 173:4 174:2
**supplied** 102:11
**supply** 93:21
**support** 119:17 137:8 138:6
  149:12 152:8 158:2
**supporting** 88:9
**supports** 129:16
**suppose** 170:8
**suppress** 60:14 140:3
**sure** 15:5,12 19:3 20:22 21:15
  21:18,23 22:9 26:3,18 28:15
  32:16 35:2 36:6 37:18
  41:17 46:21 50:2 54:17
  56:23 64:11 73:2,8 82:1
  84:22 92:15 96:12,13
  110:20 114:14 120:4 126:1
  126:3 132:13 134:24 140:21
  146:19 152:3 166:15 167:1
  168:3 171:12
**surprise** 168:21,22 169:21
**surprised** 169:6,21
**Susan** 2:11 37:4,17 38:8,12
  49:24 53:8 62:16 68:19
  81:6,24 82:2 89:10 91:10
  95:9 106:5 109:3 110:20
  111:9 115:1 121:20 122:22
  125:18 126:17 127:10
  136:12 150:12 151:9 152:19
  156:5,7 164:11 166:24
  168:1,8,11 170:12
**susceptible** 74:21
**suspect** 27:11 107:11
**suspicion** 139:22
**swallow** 70:16,19 72:1,2
**sworn** 4:15 176:10
**symptoms** 45:24 83:11
  104:20 131:6 157:17 161:18
**syrup** 70:18
**system** 16:10 60:15 140:1,4
**systems** 40:11

---

**T**

**tablet** 108:17
**tablets** 55:9,11,13 56:6 70:16
  70:17 72:1 80:6 81:8,11
  82:4,7,10 88:10 90:24 91:4

CARL GAINOR, Ph.D, JD

91:17 93:22,24 94:4 96:16
  100:2,2,23,24 101:1 102:17
  102:20 115:15 128:19
  163:23 164:10
**tactfully** 83:10
**Tadsen** 11:8
**Tafenoquine** 161:20,23 162:8
**take** 6:8,12,18 15:16,17 50:1
  58:23 59:2 64:12 68:21
  70:21 97:21 100:5 101:4
  104:1 107:12 116:8 121:1
  126:15 128:7 129:4,12
  140:18 141:10 151:24
**taken** 1:14 4:2 81:21 97:11
  99:12 141:10 153:12,15
  170:1 176:9
**takes** 87:5 150:3
**talk** 11:6 20:14 22:16 25:4
  37:3 46:16 47:10 74:24
  76:12 86:10,17 108:12
  113:3 152:5
**talked** 44:17,18,19 45:19
  67:16 72:24 91:2,11 96:1
  104:3,15 112:4 115:20
**talking** 5:20 21:16 38:8 45:20
  45:22,22 53:11,12 79:3
  82:20 89:4 104:20 111:2
  121:4,23 132:22,23 163:4
  172:2
**taper** 108:16 141:18
**tasks** 31:11
**taught** 43:22 44:14 47:16,16
  48:4 75:7
**TCC** 58:2 60:18,21 74:1,12
  76:16 77:2 78:24 79:17,24
  81:3 88:2 91:7 92:22 93:11
  93:14 95:1,12 96:8 101:7,18
  104:11,22 105:1 106:3
  109:14 110:17,19 111:18
  115:5 118:8 122:1,4 123:11
  125:4,12,16 126:6,13
  129:22 130:2,10,15,18,23
  132:6,14 140:17 145:14
  148:1,9 153:10,11,15,23
  155:20 157:9 162:6,21
  164:7 166:2,4 170:15 171:7
  172:3 173:18

**TCC's** 101:15 160:3 166:7
  171:1
**teach** 33:6 44:22 45:3,5,8,16
  152:14
**teaching** 16:24 17:3,18 43:19
  44:10 45:2
**team** 149:8
**Teeter** 52:14,18 53:16 54:3
  54:14 55:3 56:5,11 162:14
  162:23 163:5,6,9,11,12,19
  163:21 164:8,21,22 165:3,8
  165:10,19,23 166:3 167:19
  168:4 169:17
**Teeter's** 165:5
**tell** 17:5 29:2 34:11 36:16
  42:9 44:1 53:23 54:1 90:22
  105:5 158:3 162:16
**telling** 169:15
**ten** 33:1,2,3 40:7 88:10 90:23
  91:16,16 93:22,24 96:24
  98:8 100:24 102:19
**tenure** 18:9 22:7
**term** 20:24 21:1 67:22 94:6
  109:10
**terminal** 123:1,2
**terminology** 21:3 46:16 59:8
**terms** 30:6 31:12 38:3 42:7
  44:7,11 48:17 52:19 65:4
  85:19 103:11 113:8 119:11
  122:12 171:3
**terrible** 104:19
**terribly** 105:6 106:1,4 108:7
**territory** 156:20
**test** 143:21
**tested** 152:2
**testified** 4:15 7:10,17,20 8:2
  8:11,13,16,18 9:5,10,15
  11:20,23 25:11 26:5 39:10
  63:17 65:1 89:17 95:12
  109:13 112:17 130:9 131:3
  132:14 133:13 138:8,8
  139:14 140:16 143:22
  144:13 152:22 153:13
  155:11 164:11 166:11,23
  167:2,18 168:4,13 169:16
  174:7,8
**testify** 8:8 9:3 36:17 138:5

154:22 170:15 174:13
**testifying** 8:21,24 9:3,7 12:8
  94:14 112:6 132:5 134:1,12
  141:12 142:9
**testimony** 10:24 35:16,18,23
  38:24 39:3 79:8 90:9 94:11
  104:5 106:2 107:9 116:12
  118:7 131:2,9 133:20 134:6
  135:18 140:24 141:4 142:9
  143:7 147:18,19,20 152:13
  153:1 167:13 168:19 169:13
  170:4 176:9
**texts** 154:3
**Thank** 4:21,22 56:8 160:11
  174:24
**theory** 151:5 152:1
**therapeutic** 41:7,11,15 42:2,6
  42:11 43:3,4,7,7 44:4 112:7
**therapy** 11:17,24 24:24 25:17
  26:8 27:3,14,22 28:1 63:24
  74:2,13 75:4 77:12 83:22
  84:1 87:9 98:8 102:9
  108:19 111:14 112:3 125:6
  126:24 127:5 129:23 145:1
  145:6,10 148:22 149:22
  150:20 158:16 160:19
**thing** 15:22 48:2 59:1 64:7
  69:17 89:3 116:18 129:13
  130:1,12 136:3 138:4 154:7
  162:4 164:2
**things** 36:14 45:18 50:23
  58:16 59:1 62:16,17 63:23
  65:15 70:16 75:6
**think** 7:24 11:23 13:13 27:18
  39:9 41:14,15 44:13 50:23
  52:3 58:4 61:11 62:17 65:9
  66:8 67:18 81:6 83:20
  86:22 87:12 90:3 91:10
  92:7,8,13 98:10 99:16 102:7
  103:3 107:11 108:7 109:3
  115:19 120:15 130:3 138:16
  152:4 154:1 157:15 159:16
  161:15 170:16 172:9
**thinking** 52:1,2
**third** 65:4 72:19 96:6 98:6
  118:23 173:13
**Thomas** 11:7

thousands 91:2,3
three 5:11 8:16,17 9:1 17:16
    29:9 33:8,22 37:24 51:5
    54:13 55:19 143:2 162:23
    164:15
tick 134:4,11
time 4:16 7:20 8:12 13:17
    23:14 29:6 30:1,11 32:23
    33:10 34:8,9,15 35:4 45:9
    50:18 52:11 53:1,2,14 56:16
    57:24 59:18,20 62:4,9 65:23
    66:7 68:22 75:14 80:15
    97:6 126:18 131:7 161:24
    162:13 163:19 170:18 175:1
times 5:11 8:16,17 9:9 17:4
    32:13,17,20 126:18 131:8
    156:8
title 16:20 57:16
titled 14:23 15:5
today 4:22 47:20 48:11,17
    81:8 82:20 85:17 90:13,15
    93:1 100:17 168:22
today's 51:3,15
toilet 95:11
told 34:2 44:14 52:24 65:9
    71:5 97:19 105:24 111:9
    164:18
top 13:15 50:12 115:14
total 32:13,16 38:10 55:9
    71:5 76:20
totally 78:16 86:1 111:10
touch 33:4
trained 75:7 122:16
training 22:20 65:20 75:15
    84:4 107:3 124:6 125:15
transcript 51:9 53:12 56:19
    94:13 95:20,24 105:21,22
    109:18,20,23 110:2,4 111:6
    133:6,7,9 167:12 176:11
    178:7
transcripts 50:20,20 51:7
    63:10 79:6 80:9 104:14
    133:5 167:4 168:14
transmit 79:13
transpire 95:8
treat 60:12,15 112:8,9
treated 27:9 115:17 117:7

148:5
treating 10:5 74:18 75:23
    84:17,18,23,24 85:8 86:17
    111:20 130:10,12,16 132:20
treatment 59:7 65:17 80:13
    83:18,21 86:6,15,19 94:18
    109:15 116:5 122:20 125:13
    129:24 131:4 132:8,16,24
    139:15 140:21,22 143:8,23
    144:2,14,18 148:2,3
treatments 73:7
tremendous 94:5 106:11
    124:7 141:8 151:19
trial 7:11 39:2,18
trials 73:6
tried 9:3 148:22
trouble 4:24
true 137:6 148:9
trust 145:22 146:1,17,24
    147:4,5,11,13 148:17,19
trusted 147:14 153:6
try 38:2 126:18 144:6
trying 33:5 60:12,15 92:8
    102:5 140:10 168:11 174:13
TTC 110:7
Tuesday 1:14 4:2
Tunkhannock 1:7 2:14 52:21
    58:10 60:18
turned 153:24
twice 88:16,17,19 89:20
    124:1
two 8:16,17 9:1,21 13:19
    17:16 21:24 27:9 37:24
    53:4 54:13 96:23 138:1
    164:17 172:11,11
type 18:8 19:21 22:3 58:24
typical 14:15 136:4

## U

Uh-huh 101:12 173:15
unapproved 68:7,13,24 69:1
    69:6,13,16 70:8,19 71:13
    72:21 73:18
unaware 83:3 123:15
undergo 24:15 135:19
understand 5:15,23 6:6,13,20
    6:21 19:3 56:23 80:9 94:7

95:6 98:18,23 109:5 125:22
    131:18 142:23 146:19,22
    152:21 167:3,8 171:12
    172:6
understanding 10:7 17:15
    59:5,21 80:21 83:16 94:15
    95:13,22 160:18 161:16
understood 95:21 144:2,17
    144:21
underwent 137:20
unfortunately 83:5 85:14
    136:7 151:23 155:19
unique 71:21
unit 76:8
United 1:1 4:4 9:6 16:10 41:1
    149:6
universities 16:23 17:4
University 13:16,24 14:20
    16:2,13
unlimited 121:14 123:6,12
unquote 112:5 131:7 156:3
unreasonable 26:16,20,22
    83:22 103:22
unreasonably 25:19 26:9
unrelated 36:15,15
unusual 58:24 59:3,9 64:21
    136:2,3 149:17
upper 116:2 127:14,18,19
use 15:23 24:17 40:17 61:16
    67:23 68:4,13 69:1,2,6,8,9
    69:13,24 70:2 71:13 72:4,19
    72:20,21 73:18 75:8 86:2
    112:13 157:7
uses 73:17,18
utilization 44:18 46:8,15,17
    47:5,13 48:14 63:22 135:19
    137:17 139:8

## V

VA 72:2
vacation 23:15
vague 131:22 135:3 143:15
variable 116:3 122:18
varied 32:9
varies 37:23
various 10:24 17:4,12 29:7
    29:13,24 31:10,11 47:23

53:24 63:23
vary 86:23 115:15,23 117:22
  118:18 120:1 122:10,11
vast 9:16
vending 107:1 145:12 154:19
verbal 6:16,19
verified 93:3 106:19
verify 20:20,22 21:7,10 106:7
  106:14 109:8 111:14 153:2
verifying 21:3
versus 4:7 9:15,23 11:7 63:15
Veterans 29:1,3,8 30:1,12,15
  31:9 70:14
vial 64:9
video 37:8,10 50:3,5 166:16
  166:19 172:13,15 175:3
Videographer 2:16 4:1,16
  37:8,10 50:3,5 166:16,19
  172:13,15 175:2
videotape 4:8
VIDEOTAPED 1:11
Virginia 7:23
virtue 77:7
visit 98:16
Vitae 3:10 12:18
vs 1:5

                W

wait 113:13 144:8
want 5:20 6:3 34:13 37:2,3
  49:21 56:23 60:14 65:7
  67:7 87:11 96:13 97:10
  98:10 101:21 112:12 121:17
  125:24 133:12 140:3 141:16
  142:5,6,7,22 145:5 163:1
  167:9 171:13
wanted 10:23 21:8,11 58:23
  105:12 141:17
wants 116:21
warned 124:4
warns 150:13
wasn't 23:1 54:18 74:21
  109:8 111:12,13 133:22
  150:21 155:7 164:5 168:8
  169:4
wave 96:24
waving 98:6

way 30:7 67:17 71:15 75:17
  93:5 98:2 119:1 123:6,18
  149:5
ways 93:16
we're 6:7 21:16 38:7 43:9
  67:1 82:16 89:6,8,9 98:11
  121:2,4,22 170:9 172:24
we've 45:19 87:12 115:20
  127:13 156:7 169:24 174:7
wear 4:12
week 32:6,7,11
weeks 48:9 53:4
weight 46:1 118:2 150:8
went 108:15,16 124:11
  147:16,17
weren't 31:2 60:8
WERNER 2:6
West 7:23
white 151:17
wife 104:19 110:24
willing 64:14
Wilson 11:8 109:24 110:3,4
wise 9:14
witness 4:13 92:12,15 134:24
  144:7 176:10
witnesses 3:2,3 7:7
Wolking 1:3 4:6 48:23 51:10
  59:17 60:23 87:19 88:3
  93:11,15 96:9 104:8 105:18
  105:19 106:4 109:12,13
  110:8,16 115:8 118:17,24
  123:12 125:9 132:24 133:24
  140:17 141:14,16 145:17
  148:11 155:22 158:17
  159:23 160:7 161:21,23
  162:13 164:24 172:4,5
Wolking's 109:23,23 110:2
  132:8,15,17 133:16 139:15
  143:9,23 144:14 157:12
  159:13 160:17 167:21 168:7
  169:19 173:11
wonderful 106:11 146:9
  156:12,15
word 107:12 149:13,14
  151:24
wording 47:23
words 71:7,20 72:11 114:22

118:14 126:14 146:3 160:4
  160:15 165:21
work 23:2,7,10 32:2,13,17
  34:14 35:15,21,22 36:10,13
  36:23 37:13,15,19 106:11
worked 23:2 32:11,13,23
  33:7,8,10 34:9,20,22 35:9
  43:10 70:14
working 15:20 19:16 34:7
worse 76:3 131:8
worsen 75:18,20
wouldn't 32:10 90:13 91:20
  141:7,11
written 41:21,23 54:16 55:8
  100:20 101:22 102:3,16,17
wrong 74:20 81:6 86:1
  110:22 111:10 163:2 171:6
  171:7
wrote 55:23 99:22
Wyoming 2:7

                X

X 3:1 78:5

                Y

YA 113:22,23 114:1 115:10
yeah 13:3 20:24 50:2 93:2
  94:13 101:2 102:4 114:2
  115:19 126:12 142:4
year 22:6,7 23:3 34:2 37:23
  37:24 38:7,17
years 5:11 9:3 10:15 13:19
  19:14 21:16 23:5 24:17
  29:4 30:8 32:8,10,10 33:1,2
  33:3 34:12 38:9 39:16 40:8
  61:21 63:10 84:3 138:1
  145:15 146:13 154:21
Yep 32:5
Young 51:7 94:12 132:13
  133:13 134:12 138:7,8
  139:13 140:20 141:12
  143:21 144:12 148:1 153:13
  164:1,13
Young's 130:6 131:2 132:5
  135:18 137:15 142:8 143:6
  147:18
Youngs 1:6 2:14

**Z**

**Zoom** 1:11,14 4:3

**0**

**1**

**1** 3:10 12:16,17 15:15 22:22
    40:23 50:8,9 63:21 89:3
    91:12 93:16 137:24
**1,800** 39:9
**1:30** 1:15 4:3
**1:36** 4:17
**10** 35:19,23 36:9 37:12,18
**10/4** 98:11,19 101:16,19,21
    103:16
**10/4/22** 98:17
**10/5** 56:4 163:2
**100** 24:21 55:18 56:7 92:21
**100:9** 3:14
**113:18** 3:15
**12:18** 3:10
**120** 55:9 163:22 164:10
**12th** 12:9
**13** 24:17
**15** 23:5 33:1,3 108:16
**1520** 1:23
**1525** 2:3
**15th** 56:1 164:3
**16** 124:11
**16th** 93:10
**173:2** 3:17
**17th** 1:23
**18** 1:15
**180** 55:13
**18503** 2:8
**18th** 4:2
**19102** 2:3
**19103** 1:24 2:12
**1961** 13:15
**1963** 13:15
**1965** 31:5,17,21
**1966** 28:24 31:19
**1967** 14:18 28:24
**1968** 14:18 16:1
**1970** 20:9 22:19
**1972** 16:2,11
**1975** 16:12

**1976** 20:2,10
**1977** 17:17
**1978** 17:22
**1992** 20:2
**19th** 2:3

**2**

**2** 3:11 50:11 57:4,5 87:13
    91:18 97:3
**2:22** 37:8
**2:29** 37:10
**2:39** 50:3
**2:44** 50:5
**20** 9:3 19:13 23:5 108:16
**200** 56:1 94:4 96:15 98:21
    101:17 102:6,24 103:10
    109:2 123:3 164:4
**2001** 2:12
**2003** 17:22
**2004** 33:18
**2005** 34:18
**2006** 34:18
**2020** 17:18
**2022** 87:22 132:6,14 138:1
**2024** 1:15 4:2 49:5,7 50:15
    51:21 130:7 173:5 176:4
    178:3
**20th** 129:10
**215.772.1000** 2:4
**215.972.0161** 2:13
**22** 93:10 134:13
**22nd** 111:19
**236** 113:23
**240** 102:20
**242** 114:1
**243** 115:11
**24th** 49:5,7,8 50:15 51:21
**25** 81:11 82:7,9 108:15
**250** 84:6
**27th** 103:5,11

**3**

**3** 3:13 50:12 100:8,9
**30** 1:23 96:21 108:15 128:16
**300** 38:21 99:3,6,8 100:23
    101:8 102:13,15,17
**30th** 55:10 129:10 163:11

164:16
**3810** 2:12
**3rd** 130:7 173:5

**4**

**4** 3:15 113:16,17
**4:20** 3:6
**40** 21:16 61:21 96:21 102:12
**415** 2:7

**5**

**5** 3:16 125:1 172:24 173:1
**5:07** 166:16
**5:09** 166:19
**5:17** 172:13
**5:23** 172:15
**5:25** 175:2,4
**50** 9:11,11 21:16 30:8 61:21
    93:24,24 96:17,22 98:7
    102:9,11
**50-day** 93:20 97:17
**50/50** 38:6
**500** 40:24 90:23 91:4 93:21
    93:21,24
**57:6** 3:12
**570.347.0600** 2:8
**5th** 55:17 163:10 164:16

**6**

**6** 57:11
**6/3/2024** 3:16 173:2
**60** 29:4 30:8 84:6 88:14,23
    89:22 115:16,21 119:6,20
    119:20,24 120:2,19,24
    122:8 123:24 127:21 128:9
    151:21 152:15,16 154:10
**65** 124:3
**66** 13:21
**6907** 12:9

**7**

**7th** 55:8 163:12 164:16

**8**

**8** 162:24
**8/13** 163:22 164:19
**8/15** 98:23 102:6
**8/16** 96:15,22 98:24 99:11

CARL GAINOR, Ph.D, JD

**8/16/2022** 95:14
**8/30** 163:2
**8/7** 162:24
**8/8** 89:9,13,18 91:6 93:17
  97:16 125:11 126:6
**8/8/2022** 92:23 138:10 142:10
  143:10
**8/8/22** 138:13
**806** 4:6
**8th** 87:22 92:11 124:10
  134:13

---

### 9

**9/26** 99:23 100:19 101:23
  102:17 103:1 164:19
**9/26/22** 100:20 164:9
**9/27** 96:18,21 98:20 99:1,1,9
  100:1 102:15,18 103:1,15
**9/27/2022** 96:7
**90** 35:20,24 36:1,4,12,19,22
  129:2
**96** 13:21

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY WOLKING and DARYL WOLKING, W/H | : | |
| | : | |
| Plaintiffs, | : | Civil Action#3:23-cv-00806-MEM |
| | : | |
| vs. | : | |
| | : | |
| HENRY LINDNER, M.D., AND YOUNGS APOTECARY, INC. D/B/A TUNKHANNOCK COUMPOUNDING CENTER | : | JURY TRIAL DEMANDED |
| | : | |
| Defendants. | : | |

**EXPERT REPORT OF CARL GAINOR, Ph.D., J.D. SUBMITTED ON APRIL 24, 2024 ON BEHALF OF PLAINTIFFS**

**<u>Academic and professional credentials</u>**
I attended the University of Michigan for pre-pharmacy studies, and then completed my BS degree in pharmacy at the University of Pittsburgh. After graduation, I completed a residency in hospital pharmacy at the Veterans Administration Hospital facilities in Pittsburgh, PA, and then entered the graduate program at the University of Pittsburgh obtaining M.S. and Ph.D. degrees from the School of Pharmacy. After completion of my Ph.D., I entered the School of Law at the University of Pittsburgh, earning my J.D. degree. While attending graduate school, I gained practical work experience as a staff pharmacist at one of the University of Pittsburgh Medical Center hospitals. I am currently licensed to practice pharmacy in Pennsylvania and North Carolina.

I have been admitted to practice law in the Courts of Pennsylvania, in the U.S. Federal District Court for the Western District of Pennsylvania, and in the U.S. Supreme Court. I served as legal counsel to the Pennsylvania Pharmacists Association for 25 years, and I have presented over 500 lectures throughout the United States and Canada on legal aspects of health care.



My academic work involved concurrently teaching the pharmacy law course at various schools of pharmacy, including the University of Pittsburgh for over 40 years, where the course stressed pharmacy laws and regulations and the legal and professional obligations of pharmacists. Additionally, I taught at West Virginia University for over 15 years, the University of Arizona for over 20 years, Notre Dame of Maryland University for 9 years, and Belmont University for 8 years, and in all the courses I stressed the legal and professional duties of a pharmacist. More specificity on dates may be obtained from my CV which has been previously provided and is incorporated herein.

I have been qualified as an expert witness in several jurisdictions, and have never been disqualified in any jurisdiction.

**List of Cases and Publications:**
During the previous 4 years I have testified as an expert witness at trial or by deposition in the following cases:

United States of America v. Richard A Stehl, Case No. 2:18-CR-358-TFM-SMD on 12/03/2019 (Middle District of Alabama, Northern Division)

United States of America v. Shaffer Pharmacy, Inc., et at., Case No. 3:21 CV 22 on 01/28/2021 (Northern District of Ohio, Western Division)

In the previous 10 years I have contributed to one publication:

*The opioid abuse and misuse epidemic: implications for pharmacists in hospitals and health systems*, Am J Health Syst Pharm, 2014 Sept 15;71(18):1539-54.

**Compensation:** I am being compensated for my work on this case at the rate of $ 300.00 per hour. The fee is not contingent on the content of this Report or the outcome of this case. `

**Materials reviewed:**
The following materials were reviewed relative to the preparation of this Report:
1. Complaint
2. Deposition transcripts of Courtney Young taken on April 03,2024 and November 15, 2023
3. Deposition transcript of Brian Bryk taken on Feb 02, 2024
4. Deposition transcript of Henry Lindner, M.D. taken on Feb 21, 2024

-2-

5. Package insert from Amneal Pharmaceuticals on prednisone
6. Patient prescription history report
7. Patient dispensing report with copy of one prescription

**Expert Opinion:** I offer the following Expert Opinions with a reasonable degree of professional certainty and based upon my over 40 years' experience working in the profession of pharmacy and teaching pharmacy law, including the legal and professional responsibilities of pharmacists, to thousands of pharmacy students. I reserve the right to amend or modify this Report should I be provided with additional documents, information, or facts relative to the issues in this matter.

Tunkhannock Compounding Center ("TCC") is a compounding pharmacy located in the same building in Tunkhannock, Pennsylvania, as the medical office of Dr. Henry Lindner. Dr. Linder had sent prescriptions to TCC for many years, including before Courtney Young became the sole owner of TCC. Young became the sole owner and pharmacist-in-charge of TCC in 2020, and during the times relevant to this case, she employed one other pharmacist, Brian Bryk.

Dr. Henry Lindner began treating Stacey Wolking, hereinafter, "SW", in or about 2021 for what he diagnosed as babesiosis, although that diagnosis was never confirmed with any clinical tests recognize by the CDC or the general medical community. His treatment plan was likewise not generally accepted by the CDC or the general medical community, especially since it involved prescribing massive doses of corticosteroids. By late 2022, SW was taking between 130 mg and 280 mg of prednisone per day, which was an extreme and quite dangerous dosage level. By late September, 2022 SW reported to her doctor that she was taking between 672 and 775 mg of prednisone, and on September 27, 2022 she reported to her doctor that she had taken 1,610 mg of prednisone in the previous 30 hours. On October 4, 2022 her husband reported that SW had consumed 1,848 mg of prednisone. These extreme dangerous doses continued into early October, 2022, with the doctor substituting an even more potent corticosteroid, dexamethasone, for the prednisone. Shortly thereafter SW was hospitalized with a small bowel perforation, admitted to hospice for a period of time, and ultimately discharged to a rehabilitation hospital where she remained until November 17, 2022.

In August of 2022 Dr. Lindner wrote to SW instructing her to have her

-3-

corticosteroid prescriptions filled at Tunkhannock Compounding Center, (TCC), as her local pharmacy might report the doctor to his medical board. In early August, 2022 TCC provided SW with 2,120 prednisone 5 mg tablets, which would be approximately 10,600 mg of prednisone. Eight days later TCC filled a second prescription for 200 dexamethasone 4 mg tablets. Dexamethasone is between 6 and 7 times as potent a corticosteroid as prednisone. In late September, 2022 and early October, 2022 TCC dispensed an additional 8,400 mg of prednisone to SW. During this same period, on September 27, 2022 TCC dispensed 100 tablets of dexamethasone 4mg with instructions to take up to 10 tablets per day. On October 5, 2022 TCC dispensed an additional 200 dexamethasone 4mg tablets with instructions to take up to 20 tablets per day, a dose that would be equivalent to approximately 480 mg of prednisone.

To help put the prior two paragraphs into perspective, the generally accepted starting dosage range of prednisone is between 5mg and 60 mg per day, with a slow tapering of the dose as soon as possible. Doses of the magnitude dispensed by TCC would generally never be seen in a retail pharmacy because it is simply not safe for patients outside of a hospital setting to be consuming hundreds of milligrams of prednisone per day for any length of time. In reviewing the deposition transcripts of the two pharmacists at TCC involved in filling these prescriptions, it appears that neither pharmacist requested or required some clinical documentation of the patient's diagnosis of a very rare disease. One of the pharmacists (Bryk) had no memory of speaking to the prescribing doctor about this patient, and the other pharmacist (Young) testified to a vague memory of such a conversation, but admitted there was no discussion of negative side effects, although there does not appear to be any documentation of even this conversation. The pharmacists did not seem to recognize or acknowledge that corticosteroids in such massive doses are extremely dangerous, nor is there any documentation that they even investigated whether such doses were ever appropriate outside a hospital setting. All competent pharmacists know that corticosteroids are a class of drugs that have multiple serious side effects, and that excessive doses or duration of therapy should be avoided unless absolutely necessary. By accepting the doctor's apparent belief that there is no upper limit on steroid dosing, the pharmacists at TCC failed to exercise their professional judgement, failed to investigate whether such doses were ever acceptable in a retail pharmacy setting, and failed to protect their patient from the foreseeable harm that such doses could cause.

-4-

During my 40 years of teaching pharmacy students about their legal and professional obligations, I have always stressed that they have a professional duty to use their knowledge and training when dispensing prescriptions, and it is my experience that these same duties are taught in every accredited pharmacy school. They are taught that they should not blindly follow the instructions of prescribers, but rather they should use their independent professional judgement when evaluating whether to fill or not fill a given prescription. I have cited in classes and continuing education lectures the Pennsylvania case of Riff v Morgan Pharmacy that demonstrates that the courts have also adopted this reasoning when looking at the duties of a pharmacist. There is no support in the professional literature or binding Pennsylvania case law that would contradict this duty. Pharmacy is a highly regulated profession that requires a pharmacist to follow both laws and regulations that have been adopted to protect patients from harm. In this case it appears that the pharmacists at TCC failed to question the appropriateness of Dr. Lindner's therapy, failed to evaluate the harm that might be caused by these extremely high doses of corticosteroids, and the result was serious harm to SW.

Should you have any additional questions, please feel free to contact me.


Sincerely yours,

Carl Gainor, Ph.D., J.D.

-5-

# ***CURRICULUM VITAE***

## CARL GAINOR, Ph.D., J.D.
6907 SE 12th Circle
Ocala, Florida 34480-6656

Telephone:    (352) 207-4800

**EDUCATION:**

| | |
|---|---|
| 1961-1963 | University of Michigan |
| 1963-1966 | University of Pittsburgh School of Pharmacy |
| | B.S. |
| 1967-1968 | M.S. |
| 1968-1972 | Ph.D. |
| 1972-1975 | University of Pittsburgh School of Law |
| | J.D. |

**POSITIONS HELD:**

| | |
|---|---|
| 1977-2022 | Assistant Professor, University of Pittsburgh |
| 1978-2001 | Continuing Education Lecturer to healthcare providers |
| 1994-2015 | Adjunct Professor, University of Arizona |
| 1999-2017 | Adjunct Professor, West Virginia University |
| 2010-2019 | Adjunct Professor, Notre Dame of Maryland University |
| 2012-2020 | Adjunct Professor, Belmont University |
| 1978-2003 | Legal Counsel to the Pennsylvania Pharmacists Association |
| 1976-1992 | Private law practice-Pittsburgh, Pennsylvania |
| 1970-1976 | Staff Pharmacist-Montefiore Hospital, Pittsburgh, Pennsylvania |
| 1966-1967 | Resident in Hospital Pharmacy, Veterans Administration Hospital |

**LICENSURE:**

| | |
|---|---|
| 1966 | Licensed to practice pharmacy in Pennsylvania |
| 1969 | Licensed to practice pharmacy in Michigan |
| 1975 | Licensed to practice pharmacy in Nevada |
| | Admitted to practice Law in the Supreme Court of Pennsylvania |
| | Admitted to practice Law in the U.S. Federal District Court |
| 1979 | Admitted to practice before the U.S. Supreme Court |
| 2004 | Licensed to practice pharmacy in North Carolina |

# PATIENT Rx HISTORY REPORT

TUNKHANNOCK COMPOUNDING CENTER
23 North Eaton Street Step 3
TUNKHANNOCK, PA 18657 Ph. 570-996-0440

Printed 7/3/2023

Page 1   Prescriptions filled between 7/1/2022 and 10/31/2023

NCPDP #6002810          NPI #1831795558          FT9829461

**Patient:** STACEY WOLKING
36937 BASSWOOD CT
PURCELLVILLE, VA 20132

**Birthdate:** 09/26/1962
**Age:** 60
**Misc. ID:**

**Phone:** 540-454-0630

| Rx number | Date dispensed | Quantity & Drug | | Doctor / DEA phone | | RPh |
|---|---|---|---|---|---|---|
| 155694 | 8/8/2022 | 500 PREDNISONE 10MG TAB 10MG TABLET | | Dr. LINDNER HENRY MD | | BTB |
| | Day supply 30 | NDC: 0060338533821 | Ref# | BL5564782 | 570 955-3495 | |
| 155853 | 8/16/2022 | 200 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER HENRY MD | | CFY |
| | Day supply 50 | NDC: | Ref# | BL5564782 | 570 955-3495 | |
| 156272 | 9/27/2022 | 100 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER HENRY MD | | BTB |
| | Day supply 50 | NDC: | Ref# | BL5564782 | 570 955-3495 | |
| 156272 | 10/4/2022 | 200 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER HENRY MD | | BTB |
| | Day supply 50 | NDC: | Ref# | BL5564782 | 570 955-3495 | |

Pharmacist's signature _____     Date 7/3/2023

GAINOR
**2**
ss  6.18.2024

YA0019

# E-Prescription

Printed 8/4/2022 12:06:49 PM

**TUNKHANNOCK COMPOUNDING CENTER**
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA  18657  Ph. 570-996-0440  Fax

**New**

---

Date Written  8/4/2022

Doctor  Lindner, Henry  MD                    Phone 5709553495

Agent Name                                    SLN

Address 230 West Tioga St Ste 5 Tunkhannock, PA 18657

DEA  BL5564782
      1073536116

Name  WOLKING, STACEY                         Phone 5407510798

Address  36937 BASSWOOD COURT PURCELLVILLE, VA    DOB 9/26/1962
         20132
                                                      Gender F

**Rx**    Qty  500 Tablet
          predniSONE 10 mg oral tablet

Instructions:
Up to 10 tabs po daily as directed

DAW No                                        Refills 0

---

Patient email:
Doctor SPI:        6155893418002
Other Allergies:

Other Drugs:

Doctor note:       MED. NOTE: Patient will call

Pharmacy note:

Message ID:        918
Message key:       1N202208040936428A522A18A

EPCS Signature Validated  ☐

GAINOR
**3**
ss  6.18.2024

YA0020

# E-Prescription

Printed 8/15/2022 10:11:57 AM

TUNKHANNOCK COMPOUNDING CENTER
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA 18657 Ph. 570-996-0440 Fax

**New**

---

Date Written _8/15/2022_

Doctor _Lindner, Henry  MD_

Agent Name_____

Address _230 West Tioga St Ste 5 Tunkhannock, PA 18657_

Phone _5709553495_

SLN_____

DEA _BL5564782_
     _1073536116_

Name _WOLKING, STACEY_

Address _36937 BASSWOOD COURT PURCELLVILLE, VA 20132_

Phone _5407510798_

DOB _9/26/1962_

Gender F

R̶x̶   Qty _200 Tablet_

dexamethasone 4 mg oral tablet

Instructions:

Take up to 4 tabs po daily in divided doses as directed

DAW No

Refills _1_

---

Patient email:
Doctor SPI:           6155893418002
Other Allergies:

Other Drugs:

Doctor note:

Pharmacy note:

Message ID:           935
Message key:          1N20220815085936O536DDDC9

EPCS Signature Validated ☐

$236.00

Mail when
we get
regular
priority OK
mail

YA0021

# E-Prescription

Printed 9/26/2022 3:06:23 PM

TUNKHANNOCK COMPOUNDING CENTER
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA 18657 Ph. 570-996-0440 Fax

**New**

---

**Date Written** 9/26/2022

**Doctor** Lindner, Henry MD

**Agent Name**

**Address** 230 West Tioga St Ste 5 Tunkhannock, PA 18657

**Phone** 5709553495

**SLN**

**DEA** BL5564782
1073536116

---

**Name** WOLKING, STACEY

**Address** 36937 BASSWOOD COURT PURCELLVILLE, VA
20132

**Phone** 5407510798

**DOB** 9/26/1962
Gender F

℞  **Qty** 300 Tablet
dexamethasone 4 mg oral tablet

**Instructions:**

Up to 10 tabs po daily as dire

**DAW** No

**Refills** 1

---

Patient email:
Doctor SPI: 6155893418002
Other Allergies:

Other Drugs:

Doctor note:

Pharmacy note:

Message ID: 1010
Message key: 1N202209261344253AA7D06C3

EPCS Signature Validated ☐

YA0022

Date Written  10/5/2022

Doctor  Lindner, Henry  MD

Phone 5709553495

Agent Name

SLN

Address 230 West Tioga St Ste 5 Tunkhannock, PA
18657

DEA  BL5564782

NPI  1073536116

WOLKING, STACEY

Name

Phone 5407510798

Address  36937 BASSWOOD COURT PURCELLVILLE, VA 20132

DOB 9/26/1962

Gender F

℞  Qty   600 Tablet
dexamethasone 4 mg oral tablet

Instructions:
Up to 20 tabs po daily as directed

DAW  No

Refills  0

**YA 0271**

**PREDNISONE- prednisone tablet**
**Amneal Pharmaceuticals NY LLC**

----------

**PredniSONE Tablets, USP**
**(10 mg and 20 mg)**
**Rx only**

## DESCRIPTION

Prednisone tablets, USP contain prednisone, USP which is a glucocorticoid. Glucocorticoids are adrenocortical steroids, both naturally occurring and synthetic, which are readily absorbed from the gastrointestinal tract. Prednisone, USP is a white to practically white, crystalline powder. It is very slightly soluble in water; slightly soluble in alcohol, in chloroform, in dioxane, and in methanol.

The chemical name for prednisone is 17,21-dihydroxypregna-1,4-diene-3,11,20-trione. Its molecular formula is $C_{21}H_{26}O_5$ and its molecular weight is 358.4 g/mole.

The structural formula is represented below:



Prednisone tablets, USP are available in 2 strengths: 10 mg and 20 mg.

**Inactive Ingredients:** Lactose monohydrate, magnesium stearate, microcrystalline cellulose, pregelatinized starch and sodium starch glycolate type A.

Meets USP Dissolution Test 2.

## ACTIONS

Naturally occurring glucocorticoids (hydrocortisone and cortisone), which also have salt-retaining properties, are used as replacement therapy in adrenocortical deficiency states. Their synthetic analogs are primarily used for their potent anti-inflammatory effects in disorders of many organ systems.

Glucocorticoids cause profound and varied metabolic effects. In addition, they modify the body's immune responses to diverse stimuli.

## INDICATIONS

GAINOR
**4**
ss   6.18.2024

YA 0236

Prednisone tablets are indicated in the following conditions:

## 1. Endocrine Disorders

Primary or secondary adrenocortical insufficiency (hydrocortisone or cortisone is the first choice; synthetic analogs may be used in conjunction with mineralocorticoids where applicable; in infancy mineralocorticoid supplementation is of particular importance)
Congenital adrenal hyperplasia
Hypercalcemia associated with cancer
Nonsuppurative thyroiditis

## 2. Rheumatic Disorders

As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in:
Psoriatic arthritis
Rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy)
Ankylosing spondylitis
Acute and subacute bursitis
Acute nonspecific tenosynovitis
Acute gouty arthritis
Post-traumatic osteoarthritis
Synovitis of osteoarthritis
Epicondylitis

## 3. Collagen Diseases

During an exacerbation or as maintenance therapy in selected cases of:
Systemic lupus erythematosus
Systemic dermatomyositis (polymyositis)
Acute rheumatic carditis

## 4. Dermatologic Diseases

Pemphigus
Bullous dermatitis herpetiformis
Severe erythema multiforme (Stevens-Johnson syndrome)
Exfoliative dermatitis
Mycosis fungoides
Severe psoriasis
Severe seborrheic dermatitis

## 5. Allergic States

Control of severe or incapacitating allergic conditions intractable to adequate trials of conventional treatment:
Seasonal or perennial allergic rhinitis
Bronchial asthma
Contact dermatitis

YA 0237

Atopic dermatitis
Serum sickness
Drug hypersensitivity reactions

## 6. Ophthalmic Diseases

Severe acute and chronic allergic and inflammatory processes involving the eye and its adnexa such as:
Allergic corneal marginal ulcers
Herpes zoster ophthalmicus
Anterior segment inflammation
Diffuse posterior uveitis and choroiditis
Sympathetic ophthalmia
Allergic conjunctivitis
Keratitis
Chorioretinitis
Optic neuritis
Iritis and iridocyclitis

## 7. Respiratory Diseases

Symptomatic sarcoidosis
Loeffler's syndrome not manageable by other means
Berylliosis
Fulminating or disseminated pulmonary tuberculosis when used concurrently with appropriate antituberculous chemotherapy
Aspiration pneumonitis

## 8. Hematologic Disorders

Idiopathic thrombocytopenic purpura in adults
Secondary thrombocytopenia in adults
Acquired (autoimmune) hemolytic anemia
Erythroblastopenia (RBC anemia)
Congenital (erythroid) hypoplastic anemia

## 9. Neoplastic Diseases

For palliative management of:
Leukemias and lymphomas in adults
Acute leukemia of childhood

## 10. Edematous States

To induce a diuresis or remission of proteinuria in the nephrotic syndrome, without uremia, of the idiopathic type or that due to lupus erythematosus

## 11. Gastrointestinal Diseases

To tide the patient over a critical period of the disease in:

YA 0238

Ulcerative colitis
Regional enteritis

## 12. Nervous System

Acute exacerbations of multiple sclerosis

## 13. Miscellaneous

Tuberculous meningitis with subarachnoid block or impending block when used concurrently with appropriate antituberculous chemotherapy
Trichinosis with neurologic or myocardial involvement

## CONTRAINDICATIONS

Systemic fungal infections and known hypersensitivity to components.

## WARNINGS

In patients on corticosteroid therapy subjected to unusual stress, increased dosage of rapidly acting corticosteroids before, during, and after the stressful situation is indicated.

Corticosteroids may mask some signs of infection, and new infections may appear during their use. There may be decreased resistance and inability to localize infection when corticosteroids are used.

Prolonged use of corticosteroids may produce posterior subcapsular cataracts, glaucoma with possible damage to the optic nerves, and may enhance the establishment of secondary ocular infections due to fungi or viruses.

### Usage in pregnancy

Since adequate human reproduction studies have not been done with corticosteroids, the use of these drugs in pregnancy, nursing mothers or women of child-bearing potential requires that the possible benefits of the drug be weighed against the potential hazards to the mother and embryo or fetus. Infants born of mothers who have received substantial doses of corticosteroids during pregnancy, should be carefully observed for signs of hypoadrenalism.

Average and large doses of hydrocortisone or cortisone can cause elevation of blood pressure, salt and water retention, and increased excretion of potassium. These effects are less likely to occur with the synthetic derivatives except when used in large doses. Dietary salt restriction and potassium supplementation may be necessary. All corticosteroids increase calcium excretion.

**While on corticosteroid therapy patients should not be vaccinated against smallpox. Other immunization procedures should not be undertaken in patients who are on corticosteroids, especially on high dose, because of possible hazards of neurological complications and a lack of antibody response.**

YA 0239

The use of prednisone tablets in active tuberculosis should be restricted to those cases of fulminating or disseminated tuberculosis in which the corticosteroid is used for the management of the disease in conjunction with an appropriate anti-tuberculous regimen.

If corticosteroids are indicated in patients with latent tuberculosis or tuberculin reactivity, close observation is necessary as reactivation of the disease may occur. During prolonged corticosteroid therapy, these patients should receive chemoprophylaxis.

Children who are on immunosuppressant drugs are more susceptible to infections than healthy children. Chickenpox and measles, for example, can have a more serious or even fatal course in children on immunosuppressant corticosteroids. In such children, or in adults who have not had these diseases, particular care should be taken to avoid exposure. If exposed, therapy with varicella zoster immune globulin (VZIG) or pooled intravenous immunoglobin (IVIG), as appropriate, may be indicated. If chickenpox develops treatment with antiviral agents may be considered.

## PRECAUTIONS

### General Precautions

Drug-induced secondary adrenocortical insufficiency may be minimized by gradual reduction of dosage. This type of relative insufficiency may persist for months after discontinuation of therapy; therefore, in any situation of stress occurring during that period, hormone therapy should be reinstituted. Since mineralocorticoid secretion may be impaired, salt and/or a mineralocorticoid should be administered concurrently.

There is an enhanced effect of corticosteroids on patients with hypothyroidism and in those with cirrhosis.

Corticosteroids should be used cautiously in patients with ocular herpes simplex because of possible corneal perforation.

The lowest possible dose of corticosteroid should be used to control the condition under treatment, and when reduction in dosage is possible, the reduction should be gradual.

Psychic derangements may appear when corticosteroids are used, ranging from euphoria, insomnia, mood swings, personality changes, and severe depression, to frank psychotic manifestations. Also, existing emotional instability or psychotic tendencies may be aggravated by corticosteroids.

Aspirin should be used cautiously in conjunction with corticosteroids in hypoprothrombinemia.

Steroids should be used with caution in nonspecific ulcerative colitis, if there is a probability of impending perforation, abscess or other pyogenic infection; diverticulitis; fresh intestinal anastomoses; active or latent peptic ulcer; renal insufficiency; hypertension; osteoporosis; and myasthenia gravis.

Growth and development of infants and children on prolonged corticosteroid therapy should be carefully observed.

Although controlled clinical trials have shown corticosteroids to be effective in speeding the resolution of acute exacerbations of multiple sclerosis, they do not show that corticosteroids affect the ultimate outcome or natural history of the disease. The studies

YA 0240

do show that relatively high doses of corticosteroids are necessary to demonstrate a significant effect (see **DOSAGE AND ADMINISTRATION**).

Since complications of treatment with glucocorticoids are dependent on the size of the dose and the duration of treatment, a risk/benefit decision must be made in each individual case as to dose and duration of treatment and as to whether daily or intermittent therapy should be used.

Convulsions have been reported with concurrent use of methylprednisolone and cyclosporin. Since concurrent use of these agents results in a mutual inhibition of metabolism, it is possible that adverse events associated with the individual use of either drug may be more apt to occur.

### Drug Interactions

The pharmacokinetic interactions listed below are potentially clinically important. Drugs that induce hepatic enzymes such as phenobarbital, phenytoin and rifampin may increase the clearance of corticosteroids and may require increases in corticosteroid dose to achieve the desired response. Drugs such as troleandomycin and ketoconazole may inhibit the metabolism of corticosteroids and thus decrease their clearance. Therefore, the dose of corticosteroid should be titrated to avoid steroid toxicity. Corticosteroids may increase the clearance of chronic high dose aspirin. This could lead to decreased salicylate serum levels or increase the risk of salicylate toxicity when corticosteroid is withdrawn. Aspirin should be used cautiously in conjunction with corticosteroids in patients suffering from hypoprothrombinemia. The effect of corticosteroids on oral anticoagulants is variable. There are reports of enhanced as well as diminished effects of anticoagulants when given concurrently with corticosteroids. Therefore, coagulation indices should be monitored to maintain the desired anticoagulant effect.

### Information for the Patient

Patients who are on immunosuppressant doses of corticosteroids should be warned to avoid exposure to chickenpox or measles and, if exposed, to obtain medical advice.

### ADVERSE REACTIONS

### Fluid and Electrolyte Disturbances
    Sodium retention
    Fluid retention
    Congestive heart failure in susceptible patients
    Potassium loss
    Hypokalemic alkalosis
    Hypertension

### Musculoskeletal
    Muscle weakness
    Steroid myopathy
    Loss of muscle mass
    Osteoporosis
    Tendon rupture, particularly of the Achilles tendon
    Vertebral compression fractures

YA 0241

Aseptic necrosis of femoral and humeral heads
Pathologic fracture of long bones

**Gastrointestinal**
Peptic ulcer with possible perforation and hemorrhage
Pancreatitis
Abdominal distention
Ulcerative esophagitis

**Dermatologic**
Impaired wound healing
Thin fragile skin
Petechiae and ecchymoses
Facial erythema
Increased sweating
May suppress reactions to skin tests

**Metabolic**
Negative nitrogen balance due to protein catabolism

**Neurological**
Increased intracranial pressure with papilledema (pseudotumor cerebri) usually after treatment Convulsions
Vertigo
Headache

**Endocrine**
Menstrual irregularities
Development of Cushingoid state
Secondary adrenocortical and pituitary unresponsiveness, particularly in times of stress, as in trauma, surgery or illness
Suppression of growth in children
Decreased carbohydrate tolerance
Manifestations of latent diabetes mellitus
Increased requirements for insulin or oral hypoglycemic agents in diabetics

**Ophthalmic**
Posterior subcapsular cataracts
Increased intraocular pressure
Glaucoma
Exophthalmos

**Additional Reactions**
Urticaria and other allergic, anaphylactic or hypersensitivity reactions

**To report SUSPECTED ADVERSE REACTIONS, contact Amneal Pharmaceuticals at 1-877-835-5472 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch.**

**DOSAGE AND ADMINISTRATION**

YA 0242

The initial dosage of prednisone tablets may vary from 5 mg to 60 mg of prednisone per day depending on the specific disease entity being treated. In situations of less severity lower doses will generally suffice while in selected patients higher initial doses may be required. The initial dosage should be maintained or adjusted until a satisfactory response is noted. If after a reasonable period of time there is a lack of satisfactory clinical response, prednisone tablets should be discontinued and the patient transferred to other appropriate therapy. **IT SHOULD BE EMPHASIZED THAT DOSAGE REQUIREMENTS ARE VARIABLE AND MUST BE INDIVIDUALIZED ON THE BASIS OF THE DISEASE UNDER TREATMENT AND THE RESPONSE OF THE PATIENT.**

After a favorable response is noted, the proper maintenance dosage should be determined by decreasing the initial drug dosage in small decrements at appropriate time intervals until the lowest dosage which will maintain an adequate clinical response is reached. It should be kept in mind that constant monitoring is needed in regard to drug dosage. Included in the situations which may make dosage adjustments necessary are changes in clinical status secondary to remissions or exacerbations in the disease process, the patient's individual drug responsiveness, and the effect of patient exposure to stressful situations not directly related to the disease entity under treatment; in this latter situation it may be necessary to increase the dosage of prednisone tablets for a period of time consistent with the patient's condition. If after long-term therapy the drug is to be stopped, it is recommended that it be withdrawn gradually rather than abruptly.

**Multiple Sclerosis**

In the treatment of acute exacerbations of multiple sclerosis daily doses of 200 mg of prednisolone for a week followed by 80 mg every other day for 1 month have been shown to be effective. (Dosage range is the same for prednisone and prednisolone.)

**ADT® (Alternate Day Therapy)**

ADT is a corticosteroid dosing regimen in which twice the usual daily dose of corticoid is administered every other morning. The purpose of this mode of therapy is to provide the patient requiring long-term pharmacologic dose treatment with the beneficial effects of corticoids while minimizing certain undesirable effects, including pituitary-adrenal suppression, the Cushingoid state, corticoid withdrawal symptoms, and growth suppression in children.

The rationale for this treatment schedule is based on two major premises: (a) the anti-inflammatory or therapeutic effect of corticoids persists longer than their physical presence and metabolic effects and (b) administration of the corticosteroid every other morning allows for re-establishment of more nearly normal hypothalamic-pituitary-adrenal (HPA) activity on the off-steroid day.

A brief review of the HPA physiology may be helpful in understanding this rationale. Acting primarily through the hypothalamus a fall in free cortisol stimulates the pituitary gland to produce increasing amounts of corticotropin (ACTH) while a rise in free cortisol inhibits ACTH secretion. Normally the HPA system is characterized by diurnal (circadian) rhythm. Serum levels of ACTH rise from a low point about 10 pm to a peak level about 6 am. Increasing levels of ACTH stimulate adrenocortical activity resulting in a rise in plasma cortisol with maximal levels occurring between 2 am and 8 am. This rise in cortisol dampens ACTH production and in turn adrenocortical activity. There is a gradual fall in plasma corticoids during the day with lowest levels occurring about midnight.

The diurnal rhythm of the HPA axis is lost in Cushing's disease, a syndrome of

YA 0243

adrenocortical hyperfunction characterized by obesity with centripetal fat distribution, thinning of the skin with easy bruisability, muscle wasting with weakness, hypertension, latent diabetes, osteoporosis, electrolyte imbalance, etc. The same clinical findings of hyperadrenocorticism may be noted during long-term pharmacologic dose corticoid therapy administered in conventional daily divided doses. It would appear, then, that a disturbance in the diurnal cycle with maintenance of elevated corticoid values during the night may play a significant role in the development of undesirable corticoid effects. Escape from these constantly elevated plasma levels for even short periods of time may be instrumental in protecting against undesirable pharmacologic effects.

During conventional pharmacologic dose corticosteroid therapy, ACTH production is inhibited with subsequent suppression of cortisol production by the adrenal cortex. Recovery time for normal HPA activity is variable depending upon the dose and duration of treatment. During this time the patient is vulnerable to any stressful situation. Although it has been shown that there is considerably less adrenal suppression following a single morning dose of prednisolone (10 mg) as opposed to a quarter of that dose administered every 6 hours, there is evidence that some suppressive effect on adrenal activity may be carried over into the following day when pharmacologic doses are used. Further, it has been shown that a single dose of certain corticosteroids will produce adrenocortical suppression for two or more days. Other corticoids, including methylprednisolone, hydrocortisone, prednisone, and prednisolone, are considered to be short acting (producing adrenocortical suppression for 1¼ to 1½ days following a single dose) and thus are recommended for alternate day therapy.

The following should be kept in mind when considering alternate day therapy:

1. Basic principles and indications for corticosteroid therapy should apply. The benefits of ADT should not encourage the indiscriminate use of steroids.
2. ADT is a therapeutic technique primarily designed for patients in whom long-term pharmacologic corticoid therapy is anticipated.
3. In less severe disease processes in which corticoid therapy is indicated, it may be possible to initiate treatment with ADT. More severe disease states usually will require daily divided high dose therapy for initial control of the disease process. The initial suppressive dose level should be continued until satisfactory clinical response is obtained, usually four to ten days in the case of many allergic and collagen diseases. It is important to keep the period of initial suppressive dose as brief as possible particularly when subsequent use of alternate day therapy is intended.
   Once control has been established, two courses are available: (a) change to ADT and then gradually reduce the amount of corticoid given every other day **or** (b) following control of the disease process reduce the daily dose of corticoid to the lowest effective level as rapidly as possible and then change over to an alternate day schedule. Theoretically, course (a) may be preferable.
4. Because of the advantages of ADT, it may be desirable to try patients on this form of therapy who have been on daily corticoids for long periods of time (e.g., patients with rheumatoid arthritis). Since these patients may already have a suppressed HPA axis, establishing them on ADT may be difficult and not always successful. However, it is recommended that regular attempts be made to change them over. It may be helpful to triple or even quadruple the daily maintenance dose and administer this every other day rather than just doubling the daily dose if difficulty is encountered. Once the patient is again controlled, an attempt should be made to reduce this dose to a minimum.
5. As indicated above, certain corticosteroids, because of their prolonged suppressive

YA 0244

effect on adrenal activity, are not recommended for alternate day therapy (e.g., dexamethasone and betamethasone).

6. The maximal activity of the adrenal cortex is between 2 am and 8 am, and it is minimal between 4 pm and midnight. Exogenous corticosteroids suppress adrenocortical activity the least, when given at the time of maximal activity (am).

7. In using ADT it is important, as in all therapeutic situations to individualize and tailor the therapy to each patient. Complete control of symptoms will not be possible in all patients. An explanation of the benefits of ADT will help the patient to understand and tolerate the possible flare-up in symptoms which may occur in the latter part of the off-steroid day. Other symptomatic therapy may be added or increased at this time if needed.

8. In the event of an acute flare-up of the disease process, it may be necessary to return to a full suppressive daily divided corticoid dose for control. Once control is again established alternate day therapy may be re-instituted.

9. Although many of the undesirable features of corticosteroid therapy can be minimized by ADT, as in any therapeutic situation, the physician must carefully weigh the benefit-risk ratio for each patient in whom corticoid therapy is being considered.


## HOW SUPPLIED

Prednisone Tablets USP, **10 mg** are supplied as white to off-white, round, biconvex, uncoated tablets, scored on one side and debossed with "A48" on the other side.

They are available as follows:

| | |
|---|---|
| Bottles of 100 (with child-resistant closure): | NDC 60219-1707-1 |
| Bottles of 500: | NDC 60219-1707-5 |
| Cartons of 100 (10 × 10 unit-dose tablets): | NDC 60219-1707-3 |

Prednisone Tablets USP, **20 mg** are supplied as white to off-white, round, biconvex, uncoated tablets, scored on one side and debossed with "AC72" on the other side.

They are available as follows:

| | |
|---|---|
| Bottles of 100 (with child-resistant closure): | NDC 60219-1708-1 |
| Bottles of 500: | NDC 60219-1708-5 |

Store at 20° to 25°C (68° to 77°F) [see USP Controlled Room Temperature]. Protect from moisture.

Dispense in a tight, child-resistant container as defined in the USP.


Manufactured by:
**Amneal Pharmaceuticals Pvt. Ltd.**
**Oral Solid Dosage Unit**
Ahmedabad 382213, INDIA

Distributed by:
**Amneal Pharmaceuticals LLC**
Bridgewater, NJ 08807

Rev. 08-2021-02

YA 0245

**PRINCIPAL DISPLAY PANEL**

**NDC 60219-1707-1**
**PredniSONE Tablets USP, 10 mg**
**100 Tablets**
**Bottle Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**



**NDC 60219-1707-5**
**PredniSONE Tablets USP, 10 mg**
**500 Tablets**
**Bottle Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**



**NDC 60219-1707-2**
**PredniSONE Tablets USP, 10 mg**
**10's Blister Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**

YA 0246

**NDC 60219-1707-2**
**predniSONE Tablet, USP**
Made in INDIA.
Distributed by:
**Amneal Pharmaceuticals LLC**
LOT:
EXP:
**10 mg**   Rx only

1. TEAR

2. PEEL BACK PAPER FROM HERE

**NDC 60219-1707-3**
**PredniSONE Tablets USP, 10 mg**
**100 (10 × 10) Unit-Dose Tablets**
**Carton Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**

YA 0247



NDC 60219-**1707**-3

## predni**SONE** Tablets, USP

**10 mg**

This unit-dose package is not child-resistant.
If dispensed for outpatient use, a tightly closed, child-resistant
container should be utilized.

(Actual Size)

**Rx only**

**100 [10 × 10] Unit-Dose Tablets**

**amneal®**

---

NDC 60219-**1707**-3

## predni**SONE** Tablets, USP

**10 mg**

---

**Each tablet contains:**
Prednisone, USP.................................................................10 mg

**Usual Dosage:** See package insert for complete prescribing information.

**Store at 20° to 25°C (68° to 77°F) [see USP Controlled Room Temperature].**
**PROTECT FROM MOISTURE.**

Keep this and all medications out of the reach of children.

Mfg. Lic. No. G/29/16124

Manufactured by: **Amneal Pharmaceuticals Pvt. Ltd.**
                 **Oral Solid Dosage Unit**
                 Ahmedabad 382213, INDIA

Distributed by:  **Amneal Pharmaceuticals LLC**
                 Bridgewater, NJ 08807

Rev. 07-2019-00

---

**10 mg**  NDC 60219-**1707**-3  predni**SONE** Tablets, USP

**amneal**

---

N  3  60219 17073  5

---

**NDC 60219-1708-1**
**PredniSONE Tablets USP, 20 mg**
**100 Tablets**
**Bottle Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**

YA 0248



**NDC 60219-1708-5**
**PredniSONE Tablets USP, 20 mg**
**500 Tablets**
**Bottle Label**
**Rx Only**
**Amneal Pharmaceuticals LLC**





# PREDNISONE
prednisone tablet

## Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:60219-1707 |
|---|---|---|---|
| Route of Administration | ORAL | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|

YA 0249

| | | | |
|---|---|---|---|
| **PREDNISONE** (UNII: VB0R961HZT) (PREDNISONE - UNII:VB0R961HZT) | | PREDNISONE | 10 mg |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| **LACTOSE MONOHYDRATE** (UNII: EWQ57Q8I5X) | |
| **MAGNESIUM STEARATE** (UNII: 70097M6I30) | |
| **MICROCRYSTALLINE CELLULOSE 102** (UNII: PNR0YF693Y) | |
| **SODIUM STARCH GLYCOLATE TYPE A POTATO** (UNII: 5856J3G2A2) | |
| **STARCH, CORN** (UNII: O8232NY3SJ) | |

## Product Characteristics

| | | | |
|---|---|---|---|
| **Color** | white (white to off-white) | **Score** | 2 pieces |
| **Shape** | ROUND | **Size** | 6mm |
| **Flavor** | | **Imprint Code** | A48 |
| **Contains** | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:60219-1707-1 | 100 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 06/24/2020 | |
| 2 | NDC:60219-1707-5 | 500 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 06/24/2020 | |
| 3 | NDC:60219-1707-3 | 10 in 1 CARTON | 06/24/2020 | |
| 3 | NDC:60219-1707-2 | 10 in 1 BLISTER PACK; Type 0: Not a Combination Product | | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA213386 | 06/24/2020 | |

# PREDNISONE
prednisone tablet

## Product Information

| | | | |
|---|---|---|---|
| **Product Type** | HUMAN PRESCRIPTION DRUG | **Item Code (Source)** | NDC:60219-1708 |
| **Route of Administration** | ORAL | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|

**YA 0250**

| PREDNISONE (UNII: VB0R961HZT) (PREDNISONE - UNII:VB0R961HZT) | PREDNISONE | 20 mg |
|---|---|---|

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| **LACTOSE MONOHYDRATE** (UNII: EWQ57Q8I5X) | |
| **MAGNESIUM STEARATE** (UNII: 70097M6I30) | |
| **MICROCRYSTALLINE CELLULOSE 102** (UNII: PNR0YF693Y) | |
| **SODIUM STARCH GLYCOLATE TYPE A POTATO** (UNII: 5856J3G2A2) | |
| **STARCH, CORN** (UNII: O8232NY3SJ) | |

## Product Characteristics

| | | | |
|---|---|---|---|
| Color | white (white to off-white) | Score | 2 pieces |
| Shape | ROUND | Size | 9mm |
| Flavor | | Imprint Code | AC72 |
| Contains | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:60219-1708-1 | 100 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 06/24/2020 | |
| 2 | NDC:60219-1708-5 | 500 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 06/24/2020 | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA213386 | 06/24/2020 | |

## Labeler - Amneal Pharmaceuticals NY LLC (123797875)

Revised: 12/2023

Amneal Pharmaceuticals NY LLC

YA 0251

**DEXAMETHASONE- dexamethasone tablet**
**Amneal Pharmaceuticals NY LLC**

----------

**Dexamethasone Tablets, USP**
**(4 mg and 6 mg)**
**Rx Only**

## DESCRIPTION

Dexamethasone Tablets, USP, for oral administration, are supplied in two potencies, 4 mg and 6 mg containing 4 mg and 6 mg of dexamethasone, USP respectively. Inactive ingredients are corn starch, lactose monohydrate, magnesium stearate, pregelatinized starch and sodium starch glycolate type A.

The molecular weight for dexamethasone is 392.46 g/mol. It is designated chemically as (11β,16α)-9-fluoro-11,17,21-trihydroxy-16-methylpregna-1,4-diene-3,20-dione. The molecular formula is $C_{22}H_{29}FO_5$ and the structural formula is:



Dexamethasone, USP, a synthetic adrenocortical steroid, is a white to practically white crystalline powder. It is stable in air. It is practically insoluble in water.

Meets USP Dissolution Test 2.

## CLINICAL PHARMACOLOGY

Glucocorticoids, naturally occurring and synthetic, are adrenocortical steroids that are readily absorbed from the gastrointestinal tract. Glucocorticoids cause varied metabolic effects. In addition, they modify the body's immune responses to diverse stimuli. Naturally occurring glucocorticoids (hydrocortisone and cortisone), which also have sodium-retaining properties, are used as replacement therapy in adrenocortical deficiency states. Their synthetic analogs including dexamethasone are primarily used for their anti-inflammatory effects in disorders of many organ systems.

At equipotent anti-inflammatory doses, dexamethasone almost completely lacks the sodium-retaining property of hydrocortisone and closely related derivatives of hydrocortisone.

## INDICATIONS AND USAGE

**Allergic states**

YA 0252

Control of severe or incapacitating allergic conditions intractable to adequate trials of conventional treatment in asthma, atopic dermatitis, contact dermatitis, drug hypersensitivity reactions, perennial or seasonal allergic rhinitis, and serum sickness.

### Dermatologic diseases

Bullous dermatitis herpetiformis, exfoliative erythroderma, mycosis fungoides, pemphigus, and severe erythema multiforme (Stevens-Johnson syndrome).

### Endocrine disorders

Primary or secondary adrenocortical insufficiency (hydrocortisone or cortisone is the drug of choice; may be used in conjunction with synthetic mineralocorticoid analogs where applicable; in infancy mineralocorticoid supplementation is of particular importance), congenital adrenal hyperplasia, hypercalcemia associated with cancer, and nonsuppurative thyroiditis.

### Gastrointestinal diseases

To tide the patient over a critical period of the disease in regional enteritis and ulcerative colitis.

### Hematologic disorders

Acquired (autoimmune) hemolytic anemia, congenital (erythroid) hypoplastic anemia (Diamond-Blackfan anemia), idiopathic thrombocytopenic purpura in adults, pure red cell aplasia, and selected cases of secondary thrombocytopenia.

### Miscellaneous

Diagnostic testing of adrenocortical hyperfunction, trichinosis with neurologic or myocardial involvement, tuberculous meningitis with subarachnoid block or impending block when used with appropriate antituberculous chemotherapy.

### Neoplastic diseases

For the palliative management of leukemias and lymphomas.

### Nervous system

Acute exacerbations of multiple sclerosis, cerebral edema associated with primary or metastatic brain tumor, craniotomy, or head injury.

### Ophthalmic diseases

Sympathetic ophthalmia, temporal arteritis, uveitis, and ocular inflammatory conditions unresponsive to topical corticosteroids.

### Renal diseases

To induce a diuresis or remission of proteinuria in idiopathic nephrotic syndrome or that due to lupus erythematosus.

### Respiratory diseases

Berylliosis, fulminating or disseminated pulmonary tuberculosis when used concurrently with appropriate antituberculous chemotherapy, idiopathic eosinophilic pneumonias, symptomatic sarcoidosis.

YA 0253

**Rheumatic disorders**

As adjunctive therapy for short-term administration (to tide the patient over an acute episode or exacerbation) in acute gouty arthritis, acute rheumatic carditis, ankylosing spondylitis, psoriatic arthritis, rheumatoid arthritis, including juvenile rheumatoid arthritis (selected cases may require low-dose maintenance therapy). For the treatment of dermatomyositis, polymyositis, and systemic lupus erythematosus.

## CONTRAINDICATIONS

Systemic fungal infections (see **WARNINGS,** *Fungal infections*).

Dexamethasone tablets are contraindicated in patients who are hypersensitive to any components of this product.

## WARNINGS

### General

Rare instances of anaphylactoid reactions have occurred in patients receiving corticosteroid therapy (see **ADVERSE REACTIONS**).

Increased dosage of rapidly acting corticosteroids is indicated in patients on corticosteroid therapy subjected to any unusual stress before, during, and after the stressful situation.

### Cardio-renal

Average and large doses of corticosteroids can cause elevation of blood pressure, sodium and water retention, and increased excretion of potassium. These effects are less likely to occur with the synthetic derivatives except when used in large doses. Dietary salt restriction and potassium supplementation may be necessary. All corticosteroids increase calcium excretion.

Literature reports suggest an apparent association between use of corticosteroids and left ventricular free wall rupture after a recent myocardial infarction; therefore, therapy with corticosteroids should be used with great caution in these patients.

### Endocrine

Corticosteroids can produce reversible hypothalamic-pituitary adrenal (HPA) axis suppression with the potential for glucocorticosteroid insufficiency after withdrawal of treatment. Adrenocortical insufficiency may result from too rapid withdrawal of corticosteroids and may be minimized by gradual reduction of dosage. This type of relative insufficiency may persist for months after discontinuation of therapy; therefore, in any situation of stress occurring during that period, hormone therapy should be reinstituted. If the patient is receiving steroids already, dosage may have to be increased.

Metabolic clearance of corticosteroids is decreased in hypothyroid patients and increased in hyperthyroid patients. Changes in thyroid status of the patient may necessitate adjustment in dosage.

YA 0254

**Infections**

*General*

Patients who are on corticosteroids are more susceptible to infections than are healthy individuals. There may be decreased resistance and inability to localize infection when corticosteroids are used. Infection with any pathogen (viral, bacterial, fungal, protozoan or helminthic) in any location of the body may be associated with the use of corticosteroids alone or in combination with other immunosuppressive agents. These infections may be mild to severe. With increasing doses of corticosteroids, the rate of occurrence of infectious complications increases. Corticosteroids may also mask some signs of current infection.

*Fungal Infections*

Corticosteroids may exacerbate systemic fungal infections and therefore should not be used in the presence of such infections unless they are needed to control life-threatening drug reactions. There have been cases reported in which concomitant use of amphotericin B and hydrocortisone was followed by cardiac enlargement and congestive heart failure (see **PRECAUTIONS, Drug Interactions,** *Amphotericin B injection and potassium-depleting agents*).

*Special Pathogens*

Latent disease may be activated or there may be an exacerbation of intercurrent infections due to pathogens, including those caused by *Amoeba*, *Candida*, *Cryptococcus*, *Mycobacterium*, *Nocardia*, *Pneumocystis*, *Toxoplasma*.

It is recommended that latent amebiasis or active amebiasis be ruled out before initiating corticosteroid therapy in any patient who has spent time in the tropics or any patient with unexplained diarrhea.

Similarly, corticosteroids should be used with great care in patients with known or suspected Strongyloides (threadworm) infestation. In such patients, corticosteroid-induced immunosuppression may lead to Strongyloides hyperinfection and dissemination with widespread larval migration, often accompanied by severe enterocolitis and potentially fatal gram-negative septicemia.

Corticosteroids should not be used in cerebral malaria.

*Tuberculosis*

The use of corticosteroids in active tuberculosis should be restricted to those cases of fulminating or disseminated tuberculosis in which the corticosteroid is used for the management of the disease in conjunction with an appropriate antituberculous regimen.

If corticosteroids are indicated in patients with latent tuberculosis or tuberculin reactivity, close observation is necessary as reactivation of the disease may occur. During prolonged corticosteroid therapy, these patients should receive chemoprophylaxis.

*Vaccination*

**Administration of live or live, attenuated vaccines is contraindicated in patients receiving immunosuppressive doses of corticosteroids. Killed or**

YA 0255

**inactivated vaccines may be administered. However, the response to such vaccines cannot be predicted.** Immunization procedures may be undertaken in patients who are receiving corticosteroids as replacement therapy, e.g., for Addison's disease.

*Viral Infections*

Chickenpox and measles can have a more serious or even fatal course in pediatric and adult patients on corticosteroids. In pediatric and adult patients who have not had these diseases, particular care should be taken to avoid exposure. The contribution of the underlying disease and/or prior corticosteroid treatment to the risk is also not known. If exposed to chickenpox, prophylaxis with varicella zoster immune globulin (VZIG) may be indicated. If exposed to measles, prophylaxis with immune globulin (IG) may be indicated (see the respective package inserts for VZIG and IG for complete prescribing information). If chickenpox develops, treatment with antiviral agents should be considered.

## Ophthalmic

Use of corticosteroids may produce posterior subcapsular cataracts, glaucoma with possible damage to the optic nerves, and may enhance the establishment of secondary ocular infections due to bacteria, fungi, or viruses. Consider referral to an ophthalmologist for patients who develop ocular symptoms or use corticosteroid-containing products for more than 6 weeks. The use of oral corticosteroids is not recommended in the treatment of optic neuritis and may lead to an increase in the risk of new episodes. Corticosteroids should not be used in active ocular herpes simplex.

## PRECAUTIONS

### General

The lowest possible dose of corticosteroids should be used to control the condition under treatment. When reduction in dosage is possible, the reduction should be gradual.

Since complications of treatment with corticosteroids are dependent on the size of the dose and the duration of treatment, a risk/benefit decision must be made in each individual case as to dose and duration of treatment and as to whether daily or intermittent therapy should be used.

Kaposi's sarcoma has been reported to occur in patients receiving corticosteroid therapy, most often for chronic conditions. Discontinuation of corticosteroids may result in clinical improvement.

### Cardio-renal

As sodium retention with resultant edema and potassium loss may occur in patients receiving corticosteroids, these agents should be used with caution in patients with congestive heart failure, hypertension, or renal insufficiency.

### Endocrine

Drug-induced secondary adrenocortical insufficiency may be minimized by gradual

YA 0256

reduction of dosage. This type of relative insufficiency may persist for months after discontinuation of therapy; therefore, in any situation of stress occurring during that period, hormone therapy should be reinstituted. Since mineralocorticoid secretion may be impaired, salt and/or a mineralocorticoid should be administered concurrently.

## Gastrointestinal

Steroids should be used with caution in active or latent peptic ulcers, diverticulitis, fresh intestinal anastomoses, and nonspecific ulcerative colitis, since they may increase the risk of a perforation.

Signs of peritoneal irritation following gastrointestinal perforation in patients receiving corticosteroids may be minimal or absent.

There is an enhanced effect due to decreased metabolism of corticosteroids in patients with cirrhosis.

## Musculoskeletal

Corticosteroids decrease bone formation and increase bone resorption both through their effect on calcium regulation (i.e. decreasing absorption and increasing excretion) and inhibition of osteoblast function. This, together with a decrease in the protein matrix of the bone secondary to an increase in protein catabolism, and reduced sex hormone production, may lead to inhibition of bone growth in pediatric patients and the development of osteoporosis at any age. Special consideration should be given to patients at increased risk of osteoporosis (e.g., postmenopausal women) before initiating corticosteroid therapy.

## Neuro-psychiatric

Although controlled clinical trials have shown corticosteroids to be effective in speeding the resolution of acute exacerbations of multiple sclerosis, they do not show that they affect the ultimate outcome or natural history of the disease. The studies do show that relatively high doses of corticosteroids are necessary to demonstrate a significant effect (see **DOSAGE AND ADMINISTRATION**).

An acute myopathy has been observed with the use of high doses of corticosteroids, most often occurring in patients with disorders of neuromuscular transmission (e.g., myasthenia gravis), or in patients receiving concomitant therapy with neuromuscular blocking drugs (e.g., pancuronium). This acute myopathy is generalized, may involve ocular and respiratory muscles, and may result in quadriparesis. Elevation of creatinine kinase may occur. Clinical improvement or recovery after stopping corticosteroids may require weeks to years.

Psychic derangements may appear when corticosteroids are used, ranging from euphoria, insomnia, mood swings, personality changes, and severe depression, to frank psychotic manifestations. Also, existing emotional instability or psychotic tendencies may be aggravated by corticosteroids.

## Ophthalmic

Intraocular pressure may become elevated in some individuals. If steroid therapy is continued for more than 6 weeks, intraocular pressure should be monitored.

YA 0257

## Information for Patients

Patients should be warned not to discontinue the use of corticosteroids abruptly or without medical supervision. As prolonged use may cause adrenal insufficiency and make patients dependent on corticosteroids, they should advise any medical attendants that they are taking corticosteroids and they should seek medical advice at once should they develop an acute illness including fever or other signs of infection. Following prolonged therapy, withdrawal of corticosteroids may result in symptoms of the corticosteroid withdrawal syndrome including myalgia, arthralgia, and malaise.

Persons who are on corticosteroids should be warned to avoid exposure to chickenpox or measles. Patients should also be advised that if they are exposed, medical advice should be sought without delay.

## Drug Interactions

*Aminoglutethimide:* Aminoglutethimide may diminish adrenal suppression by corticosteroids.

*Amphotericin B injection and potassium-depleting agents:* When corticosteroids are administered concomitantly with potassium-depleting agents (e.g., amphotericin B, diuretics), patients should be observed closely for development of hypokalemia. In addition, there have been cases reported in which concomitant use of amphotericin B and hydrocortisone was followed by cardiac enlargement and congestive heart failure.

*Antibiotics:* Macrolide antibiotics have been reported to cause a significant decrease in corticosteroid clearance (see **Drug Interactions,** *CYP 3A4 Inducers, CYP 3A4 Inhibitors and CYP 3A4 Substrates*).

*Anticholinesterases:* Concomitant use of anticholinesterase agents and corticosteroids may produce severe weakness in patients with myasthenia gravis. If possible, anticholinesterase agents should be withdrawn at least 24 hours before initiating corticosteroid therapy.

*Anticoagulants, oral:* Co-administration of corticosteroids and warfarin usually results in inhibition of response to warfarin, although there have been some conflicting reports. Therefore, coagulation indices should be monitored frequently to maintain the desired anticoagulant effect.

*Antidiabetics:* Because corticosteroids may increase blood glucose concentrations, dosage adjustments of antidiabetic agents may be required.

*Antitubercular drugs:* Serum concentrations of isoniazid may be decreased.

*Cholestyramine:* Cholestyramine may increase the clearance of corticosteroids.

*Cyclosporine:* Increased activity of both cyclosporine and corticosteroids may occur when the two are used concurrently. Convulsions have been reported with this concurrent use.

*Dexamethasone suppression test (DST):* False-negative results in the dexamethasone suppression test (DST) in patients being treated with indomethacin have been reported. Thus, results of the DST should be interpreted with caution in these patients.

*Digitalis glycosides:* Patients on digitalis glycosides may be at increased risk of arrhythmias due to hypokalemia.

YA 0258

*Ephedrine:* Ephedrine may enhance the metabolic clearance of corticosteroids, resulting in decreased blood levels and lessened physiologic activity, thus requiring an increase in corticosteroid dosage.

*Estrogens, including oral contraceptives:* Estrogens may decrease the hepatic metabolism of certain corticosteroids, thereby increasing their effect.

*CYP 3A4 Inducers:* Dexamethasone is metabolized by CYP 3A4. Drugs which induce cytochrome P450 3A4 (CYP 3A4) enzyme activity *(e.g., barbiturates, phenytoin, carbamazepine, rifampin)* may enhance the metabolism of corticosteroids and require that the dosage of the corticosteroid be increased.

*CYP 3A4 Inhibitors:* Concomitant administration of dexamethasone with erythromycin, a moderate CYP 3A4 inhibitor, has the potential to result in increased plasma concentrations of dexamethasone. Ketoconazole, a strong CYP3A4 inhibitor, has been reported to decrease the metabolism of certain corticosteroids by up to 60%, leading to increased risk of corticosteroid side effects. In addition, ketoconazole alone can inhibit adrenal corticosteroid synthesis and may cause adrenal insufficiency during corticosteroid withdrawal. Co-administration with other drugs which strongly inhibit CYP 3A4 *(e.g., itraconazole, clarithromycin, ritonavir, cobicistat-containing products)* may lead to increased plasma concentrations of corticosteroids and potentially increase the risk for systemic corticosteroid side effects. Consider the benefit of co-administration versus the potential risk of systemic corticosteroid effects, in which case patients should be monitored for systemic corticosteroid side effects.

*CYP 3A4 Substrates:* Dexamethasone is a moderate inducer of CYP 3A4. Co-administration with other drugs that are metabolized by CYP 3A4 *(e.g., indinavir, erythromycin)* may increase their clearance, resulting in decreased plasma concentration.

*Nonsteroidal anti-inflammatory agents (NSAIDS):* Concomitant use of aspirin (or other nonsteroidal anti-inflammatory agents) and corticosteroids increases the risk of gastrointestinal side effects. Aspirin should be used cautiously in conjunction with corticosteroids in hypoprothrombinemia. The clearance of salicylates may be increased with concurrent use of corticosteroids.

*Phenytoin:* In post-marketing experience, there have been reports of both increases and decreases in phenytoin levels with dexamethasone co-administration, leading to alterations in seizure control.

*Skin tests:* Corticosteroids may suppress reactions to skin tests.

*Thalidomide:* Co-administration with thalidomide should be employed cautiously, as toxic epidermal necrolysis has been reported with concomitant use.

*Vaccines:* Patients on corticosteroid therapy may exhibit a diminished response to toxoids and live or inactivated vaccines due to inhibition of antibody response. Corticosteroids may also potentiate the replication of some organisms contained in live attenuated vaccines. Routine administration of vaccines or toxoids should be deferred until corticosteroid therapy is discontinued if possible (see **WARNINGS, Infections, Vaccination**).

**Carcinogenesis, Mutagenesis, Impairment of Fertility**

No adequate studies have been conducted in animals to determine whether

YA 0259

corticosteroids have a potential for carcinogenesis or mutagenesis. Steroids may increase or decrease motility and number of spermatozoa in some patients.

## Pregnancy

*Teratogenic Effects*

Corticosteroids have been shown to be teratogenic in many species when given in doses equivalent to the human dose. Animal studies in which corticosteroids have been given to pregnant mice, rats, and rabbits have yielded an increased incidence of cleft palate in the offspring. There are no adequate and well-controlled studies in pregnant women. Corticosteroids should be used during pregnancy only if the potential benefit justifies the potential risk to the fetus. Infants born to mothers who have received substantial doses of corticosteroids during pregnancy should be carefully observed for signs of hypoadrenalism.

## Nursing Mothers

Systemically administered corticosteroids appear in human milk and could suppress growth, interfere with endogenous corticosteroid production, or cause other untoward effects. Because of the potential for serious adverse reactions in nursing infants from corticosteroids, a decision should be made whether to discontinue nursing or to discontinue the drug, taking into account the importance of the drug to the mother.

## Pediatric Use

The efficacy and safety of corticosteroids in the pediatric population are based on the well-established course of effect of corticosteroids, which is similar in pediatric and adult populations. Published studies provide evidence of efficacy and safety in pediatric patients for the treatment of nephrotic syndrome (patients > 2 years of age), and aggressive lymphomas and leukemias (patients > 1 month of age). Other indications for pediatric use of corticosteroids, e.g., severe asthma and wheezing, are based on adequate and well-controlled trials conducted in adults, on the premises that the course of the diseases and their pathophysiology are considered to be substantially similar in both populations.

The adverse effects of corticosteroids in pediatric patients are similar to those in adults (see **ADVERSE REACTIONS**). Like adults, pediatric patients should be carefully observed with frequent measurements of blood pressure, weight, height, intraocular pressure, and clinical evaluation for the presence of infection, psychosocial disturbances, thromboembolism, peptic ulcers, cataracts, and osteoporosis. Pediatric patients who are treated with corticosteroids by any route, including systemically administered corticosteroids, may experience a decrease in their growth velocity. This negative impact of corticosteroids on growth has been observed at low systemic doses and in the absence of laboratory evidence of hypothalamic-pituitary-adrenal (HPA) axis suppression (i.e. cosyntropin stimulation and basal cortisol plasma levels). Growth velocity may therefore be a more sensitive indicator of systemic corticosteroid exposure in pediatric patients than some commonly used tests of HPA axis function. The linear growth of pediatric patients treated with corticosteroids should be monitored, and the potential growth effects of prolonged treatment should be weighed against clinical benefits obtained and the availability of treatment alternatives. In order to minimize the potential growth effects of corticosteroids, pediatric patients should be *titrated* to the

YA 0260

lowest effective dose.

## Geriatric Use

Clinical studies did not include sufficient numbers of subjects aged 65 and over to determine whether they respond differently from younger subjects. Other reported clinical experience has not identified differences in responses between the elderly and younger patients. In general, dose selection for an elderly patient should be cautious, usually starting at the low end of the dosing range, reflecting the greater frequency of decreased hepatic, renal, or cardiac function, and of concomitant disease or other drug therapy. In particular, the increased risk of diabetes mellitus, fluid retention and hypertension in elderly patients treated with corticosteroids should be considered.

## ADVERSE REACTIONS

### (listed alphabetically, under each subsection)

The following adverse reactions have been reported with dexamethasone or other corticosteroids:

*Allergic reactions:* Anaphylactoid reaction, anaphylaxis, angioedema.

*Cardiovascular:* Bradycardia, cardiac arrest, cardiac arrhythmias, cardiac enlargement, circulatory collapse, congestive heart failure, fat embolism, hypertension, hypertrophic cardiomyopathy in premature infants, myocardial rupture following recent myocardial infarction (see **WARNINGS, Cardio-renal**), edema, pulmonary edema, syncope, tachycardia, thromboembolism, thrombophlebitis, vasculitis.

*Dermatologic:* Acne, allergic dermatitis, dry scaly skin, ecchymoses and petechiae, erythema, impaired wound healing, increased sweating, rash, striae, suppression of reactions to skin tests, thin fragile skin, thinning scalp hair, urticaria.

*Endocrine:* Decreased carbohydrate and glucose tolerance, development of cushingoid state, hyperglycemia, glycosuria, hirsutism, hypertrichosis, increased requirements for insulin or oral hypoglycemic agents in diabetes, manifestations of latent diabetes mellitus, menstrual irregularities, secondary adrenocortical and pituitary unresponsiveness (particularly in times of stress, as in trauma, surgery, or illness), suppression of growth in pediatric patients.

*Fluid and electrolyte disturbances:* Congestive heart failure in susceptible patients, fluid retention, hypokalemic alkalosis, potassium loss, sodium retention, tumor lysis syndrome.

*Gastrointestinal:* Abdominal distention, elevation in serum liver enzyme levels (usually reversible upon discontinuation), hepatomegaly, increased appetite, nausea, pancreatitis, peptic ulcer with possible perforation and hemorrhage, perforation of the small and large intestine (particularly in patients with inflammatory bowel disease), ulcerative esophagitis.

*Metabolic:* Negative nitrogen balance due to protein catabolism.

*Musculoskeletal:* Aseptic necrosis of femoral and humeral heads, loss of muscle mass, muscle weakness, osteoporosis, pathologic fracture of long bones, steroid myopathy, tendon rupture, vertebral compression fractures.

*Neurological/Psychiatric:* Convulsions, depression, emotional instability, euphoria,

YA 0261

headache, increased intracranial pressure with papilledema (pseudotumor cerebri) usually following discontinuation of treatment, insomnia, mood swings, neuritis, neuropathy, paresthesia, personality changes, psychic disorders, vertigo.

*Ophthalmic:* Exophthalmos, glaucoma, increased intraocular pressure, posterior subcapsular cataracts, vision blurred.

*Other:* Abnormal fat deposits, decreased resistance to infection, hiccups, increased or decreased motility and number of spermatozoa, malaise, moon face, weight gain.

**To report SUSPECTED ADVERSE REACTIONS, contact Amneal Pharmaceuticals at 1-877-835-5472 or FDA at 1-800-FDA-1088 or www.fda.gov/medwatch**.

## OVERDOSAGE

Treatment of overdosage is by supportive and symptomatic therapy. In the case of acute overdosage, according to the patient's condition, supportive therapy may include gastric lavage or emesis.

## DOSAGE AND ADMINISTRATION

### For oral administration

The initial dosage varies from 0.75 mg to 9 mg a day depending on the disease being treated.

*It Should Be Emphasized That Dosage Requirements Are Variable And Must Be Individualized On The Basis Of The Disease Under Treatment And The Response Of The Patient.*

After a favorable response is noted, the proper maintenance dosage should be determined by decreasing the initial drug dosage in small decrements at appropriate time intervals until the lowest dosage that maintains an adequate clinical response is reached.

Situations which may make dosage adjustments necessary are changes in clinical status secondary to remissions or exacerbations in the disease process, the patient's individual drug responsiveness, and the effect of patient exposure to stressful situations not directly related to the disease entity under treatment. In this latter situation it may be necessary to increase the dosage of the corticosteroid for a period of time consistent with the patient's condition. If after long-term therapy the drug is to be stopped, it is recommended that it be withdrawn gradually rather than abruptly.

In the treatment of acute exacerbations of multiple sclerosis, daily doses of 30 mg of dexamethasone for a week followed by 4 mg to 12 mg every other day for one month have been shown to be effective (see **PRECAUTIONS, Neuro-psychiatric**).

In pediatric patients, the initial dose of dexamethasone may vary depending on the specific disease entity being treated. The range of initial doses is 0.02 to 0.3 mg/kg/day in three or four divided doses (0.6 to 9 mg/m$^2$bsa/day).

*For the purpose of comparison, the following is the equivalent milligram dosage of the various corticosteroids:*

| | |
|---|---|
| *Cortisone, 25* | *Triamcinolone, 4* |
| *Hydrocortisone, 20* | *Paramethasone, 2* |
| *Prednisolone, 5* | *Betamethasone, 0.75* |
| *Prednisone, 5* | *Dexamethasone, 0.75* |
| *Methylprednisolone, 4* | |

*These dose relationships apply only to oral or intravenous administration of these compounds. When these substances or their derivatives are injected intramuscularly or into joint spaces, their relative properties may be greatly altered.*

*In acute, self-limited allergic disorders or acute exacerbations of chronic allergic disorders,* the following dosage schedule combining parenteral and oral therapy is suggested:

<u>Dexamethasone Sodium Phosphate Injection, 4 mg per mL:</u>

First Day

1 mL or 2 mL, intramuscularly

<u>Dexamethasone Tablets, 0.75 mg:</u>

Second Day

4 tablets in two divided doses

Third Day

4 tablets in two divided doses

Fourth Day

2 tablets in two divided doses

Fifth Day

1 tablet

Sixth Day

1 tablet

Seventh Day

No treatment

Eighth Day

Follow-up visit

This schedule is designed to ensure adequate therapy during acute episodes, while minimizing the risk of overdosage in chronic cases.

In *cerebral edema*, dexamethasone sodium phosphate injection is generally administered initially in a dosage of 10 mg intravenously followed by 4 mg every six hours intramuscularly until the symptoms of cerebral edema subside. Response is usually noted within 12 to 24 hours and dosage may be reduced after two to four days and gradually discontinued over a period of five to seven days. For palliative management of patients with recurrent or inoperable brain tumors, maintenance therapy with either

YA 0263

dexamethasone sodium phosphate injection or dexamethasone tablets in a dosage of 2 mg two or three times daily may be effective.

*Dexamethasone suppression tests*

1.  Tests for Cushing's syndrome Give 1 mg of dexamethasone orally at 11:00 p.m.

Blood is drawn for plasma cortisol determination at 8:00 a.m. the following morning. For greater accuracy, give 0.5 mg of dexamethasone orally every 6 hours for 48 hours. Twenty-four hour urine collections are made for determination of 17-hydroxycorticosteroid excretion.

2.  Test to distinguish Cushing's syndrome due to pituitary ACTH excess from Cushing's syndrome due to other causes.

Give 2 mg of dexamethasone orally every 6 hours for 48 hours. Twenty-four hour urine collections are made for determination of 17-hydroxycorticosteroid excretion.


## HOW SUPPLIED

Dexamethasone Tablets USP, **4 mg,** are supplied as white to off-white, round shaped, uncoated, flat tablet with beveled edges, scored on one side and product identification "E3" debossed on the other side.

They are available as follows:

Bottles of 100 with child-resistant closure:                    NDC 60219-2043-1

Dexamethasone Tablets USP, **6 mg,** are supplied as white to off-white, round shaped, uncoated, flat tablet with beveled edges, scored on one side and product identification "E7" debossed on the other side.

They are available as follows:

Bottles of 100 with child-resistant closure:                    NDC 60219-2044-1

*Storage*

Store at 20° to 25°C (68° to 77°F) [see USP Controlled Room Temperature].

Protect from moisture.

Dispense in a tight, light-resistant, child-resistant container as defined in the USP.

Manufactured by:
**Amneal Pharmaceuticals Pvt. Ltd.**
**Oral Solid Dosage Unit**
Ahmedabad 382213, INDIA

Distributed by:
**Amneal Pharmaceuticals LLC**
Bridgewater, NJ 08807

Rev. 12-2021-01


## PRINCIPAL DISPLAY PANEL

YA 0264

**NDC 60219-2043-1**
**Dexamethasone Tablets USP, 4 mg**
**Rx only**
**100 Tablets**
**Amneal Pharmaceuticals LLC**



**NDC 60219-2044-1**
**Dexamethasone Tablets USP, 6 mg**
**Rx only**
**100 Tablets**
**Amneal Pharmaceuticals LLC**



## DEXAMETHASONE
dexamethasone tablet

### Product Information

| Product Type | HUMAN PRESCRIPTION DRUG | Item Code (Source) | NDC:60219-2043 |
|---|---|---|---|
| Route of Administration | ORAL | | |

### Active Ingredient/Active Moiety

**YA 0265**

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| **DEXAMETHASONE** (UNII: 7S5I7G3JQL) (DEXAMETHASONE - UNII:7S5I7G3JQL) | DEXAMETHASONE | 4 mg |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|
| **LACTOSE MONOHYDRATE** (UNII: EWQ57Q8I5X) | |
| **MAGNESIUM STEARATE** (UNII: 70097M6I30) | |
| **SODIUM STARCH GLYCOLATE TYPE A** (UNII: H8AV0SQX4D) | |
| **STARCH, CORN** (UNII: O8232NY3SJ) | |

## Product Characteristics

| | | | |
|---|---|---|---|
| **Color** | white (white to off-white) | **Score** | 2 pieces |
| **Shape** | ROUND | **Size** | 6mm |
| **Flavor** | | **Imprint Code** | E3 |
| **Contains** | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:60219-2043-1 | 100 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 09/01/2021 | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA215106 | 09/01/2021 | |

# DEXAMETHASONE

dexamethasone tablet

## Product Information

| | | | |
|---|---|---|---|
| **Product Type** | HUMAN PRESCRIPTION DRUG | **Item Code (Source)** | NDC:60219-2044 |
| **Route of Administration** | ORAL | | |

## Active Ingredient/Active Moiety

| Ingredient Name | Basis of Strength | Strength |
|---|---|---|
| **DEXAMETHASONE** (UNII: 7S5I7G3JQL) (DEXAMETHASONE - UNII:7S5I7G3JQL) | DEXAMETHASONE | 6 mg |

## Inactive Ingredients

| Ingredient Name | Strength |
|---|---|

YA 0266

| | |
|---|---|
| **LACTOSE MONOHYDRATE** (UNII: EWQ57Q8I5X) | |
| **MAGNESIUM STEARATE** (UNII: 70097M6I30) | |
| **SODIUM STARCH GLYCOLATE TYPE A** (UNII: H8AV0SQX4D) | |
| **STARCH, CORN** (UNII: O8232NY3SJ) | |

## Product Characteristics

| | | | |
|---|---|---|---|
| **Color** | white (white to off-white) | **Score** | 2 pieces |
| **Shape** | ROUND | **Size** | 6mm |
| **Flavor** | | **Imprint Code** | E7 |
| **Contains** | | | |

## Packaging

| # | Item Code | Package Description | Marketing Start Date | Marketing End Date |
|---|---|---|---|---|
| 1 | NDC:60219-2044-1 | 100 in 1 BOTTLE, PLASTIC; Type 0: Not a Combination Product | 09/01/2021 | |

## Marketing Information

| Marketing Category | Application Number or Monograph Citation | Marketing Start Date | Marketing End Date |
|---|---|---|---|
| ANDA | ANDA215106 | 09/01/2021 | |

## Labeler - Amneal Pharmaceuticals NY LLC (123797875)

Revised: 12/2023

Amneal Pharmaceuticals NY LLC

YA 0267

FROM:       Carl Gainor, Ph.D., J.D.
TO:         Conor Lamb, Esq.

IN RE:      STACEY WOLKING and DARYL WOLKING, W/H v. YOUNGS
            APOTHECARY, INC. d/b/a TUNKHANNOCK COMPOUNDING
            CENTER

DATE:       6/3/2024

You had asked that I comment briefly on the Expert Report filed by Joy B. Greene, PharmD, on behalf of the Defendant in this case. Dr. Greene correctly notes that Babesiosis is a rare condition, and I believe she is correct in opining that it is not generally covered in a typical pharmacy school curriculum. If the pharmacists at Tunkhannock Compounding Center (TCC) were not familiar with the condition it was their professional duty to research the condition and the accepted medication therapy before filling prescriptions for Mrs. Wolking. The justification that there was "not much information available" or that the pharmacy "lacked access to major medical journals" is not a legitimate justification for providing unacceptably excessive doses of corticosteroids to the patient. A pharmacist should never dispense medications without adequate knowledge of the dangers posed by the drugs and doses that have been prescribed. It should also be noted that almost every major medical journal is available online as are most pharmacy reference sources, thus they are available to all pharmacies with internet availability, including TCC.

Dr. Greene also stated that the pharmacists at TCC "believed the previous prescription for Prednisone had been discontinued." There is no documentation to support such a belief, and pharmacists must always confirm treatment facts with the prescriber before filling prescriptions, especially when dangerously excessive doses of a drug are involved. Dr. Greene correctly notes that the pharmacists at TCC failed to document alleged conversations with the patient or prescriber.

Dr. Greene next notes that TCC is a compounding pharmacy, that being a pharmacy that frequently prepares compounded prescriptions that are not commercially available products. The professional standards for such pharmacies are no different from those of any other licensed pharmacy. Compounding



pharmacists must still assure that the prescriptions they are preparing and dispensing do not pose an unacceptable risk of harm to the patient. She notes that "teamwork is essential," and this correctly states the case law of Pennsylvania that all members of the health care team must be vigilant not only with respect to their own professional functions, but also the acts and omissions of the other professionals on the health care team. She again correctly notes that "outpatient pharmacists review prescriptions and use their clinical judgement to ensure they safely dispense the medication." Unfortunately, the pharmacists at TCC failed to perform their professional duties relative to the corticosteroid prescriptions they dispensed to Mrs. Wolking.

Dr. Greene next addresses the cause of Mrs. Wolking's injuries, and opines that the pharmacists at TCC were not responsible for causing the patient's injuries. This statement seems to contradict her prior opinions as to the duty of pharmacists. By providing the steroids that directly led to the serious and foreseeable drug-induced adverse events suffered by the Plaintiff, the pharmacists at TCC did, in fact, cause her injuries.

I would also take exception to Dr. Greene's statement that "Federal law does not recognize pharmacists as healthcare providers, which restricts their ability to access and contribute effectively to a patient's health." There is no question that Pennsylvania recognizes pharmacists as being part of the health care team, and their professional duties now include the administration of drugs, including vaccines, drug counseling, and even prescribing drugs under collaborative care agreements with physicians. It should also be noted that the Regulations implementing the Federal Controlled Substances Act state that "a corresponding responsibility rests with the pharmacist who fills the prescription" to assure that it is issued for a legitimate medical purpose by a prescriber acting in the usual course of his professional practice. The pharmacists at TCC had the duty and the ability to "access and contribute effectively to a patient's health."

In conclusion, it appears that Dr. Greene has not correctly stated the legal and professional duties of a pharmacist practicing in Pennsylvania. She has actually failed to state the professional duties of a pharmacist in Pennsylvania under the facts of this case. Should you desire any additional comments, please advise me.


/s/ Carl Gainor, Ph.D., J.D.

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACEY WOLKING and DARYL WOLKING, W/H | : |
| | : |
| Plaintiffs, | : Civil Action#3:23-cv-00806-MEM |
| | : |
| vs. | : |
| | : |
| HENRY LINDNER, M.D., AND YOUNGS APOTECARY, INC. D/B/A TUNKHANNOCK COUMPOUNDING CENTER | : JURY TRIAL DEMANDED |
| | : |
| Defendants. | : |

**EXPERT REPORT OF CARL GAINOR, Ph.D., J.D. SUBMITTED ON APRIL 24, 2024 ON BEHALF OF PLAINTIFFS**

<u>**Academic and professional credentials**</u>

I attended the University of Michigan for pre-pharmacy studies, and then completed my BS degree in pharmacy at the University of Pittsburgh. After graduation, I completed a residency in hospital pharmacy at the Veterans Administration Hospital facilities in Pittsburgh, PA, and then entered the graduate program at the University of Pittsburgh obtaining M.S. and Ph.D. degrees from the School of Pharmacy. After completion of my Ph.D., I entered the School of Law at the University of Pittsburgh, earning my J.D. degree. While attending graduate school, I gained practical work experience as a staff pharmacist at one of the University of Pittsburgh Medical Center hospitals. I am currently licensed to practice pharmacy in Pennsylvania and North Carolina.

I have been admitted to practice law in the Courts of Pennsylvania, in the U.S. Federal District Court for the Western District of Pennsylvania, and in the U.S. Supreme Court. I served as legal counsel to the Pennsylvania Pharmacists Association for 25 years, and I have presented over 500 lectures throughout the United States and Canada on legal aspects of health care.

-1-

My academic work involved concurrently teaching the pharmacy law course at various schools of pharmacy, including the University of Pittsburgh for over 40 years, where the course stressed pharmacy laws and regulations and the legal and professional obligations of pharmacists. Additionally, I taught at West Virginia University for over 15 years, the University of Arizona for over 20 years, Notre Dame of Maryland University for 9 years, and Belmont University for 8 years, and in all the courses I stressed the legal and professional duties of a pharmacist. More specificity on dates may be obtained from my CV which has been previously provided and is incorporated herein.

I have been qualified as an expert witness in several jurisdictions, and have never been disqualified in any jurisdiction.

**List of Cases and Publications:**
During the previous 4 years I have testified as an expert witness at trial or by deposition in the following cases:

United States of America v. Richard A Stehl, Case No. 2:18-CR-358-TFM-SMD on 12/03/2019 (Middle District of Alabama, Northern Division)

United States of America v. Shaffer Pharmacy, Inc., et at., Case No. 3:21 CV 22 on 01/28/2021 (Northern District of Ohio, Western Division)

In the previous 10 years I have contributed to one publication:

*The opioid abuse and misuse epidemic: implications for pharmacists in hospitals and health systems*, Am J Health Syst Pharm, 2014 Sept 15;71(18):1539-54.

**Compensation:** I am being compensated for my work on this case at the rate of $ 300.00 per hour. The fee is not contingent on the content of this Report or the outcome of this case. `

**Materials reviewed:**
The following materials were reviewed relative to the preparation of this Report:
1. Complaint
2. Deposition transcripts of Courtney Young taken on April 03,2024 and November 15, 2023
3. Deposition transcript of Brian Bryk taken on Feb 02, 2024
4. Deposition transcript of Henry Lindner, M.D. taken on Feb 21, 2024

-2-

5. Package insert from Amneal Pharmaceuticals on prednisone
6. Patient prescription history report
7. Patient dispensing report with copy of one prescription

**Expert Opinion:** I offer the following Expert Opinions with a reasonable degree of professional certainty and based upon my over 40 years' experience working in the profession of pharmacy and teaching pharmacy law, including the legal and professional responsibilities of pharmacists, to thousands of pharmacy students. I reserve the right to amend or modify this Report should I be provided with additional documents, information, or facts relative to the issues in this matter.

Tunkhannock Compounding Center ("TCC") is a compounding pharmacy located in the same building in Tunkhannock, Pennsylvania, as the medical office of Dr. Henry Lindner. Dr. Linder had sent prescriptions to TCC for many years, including before Courtney Young became the sole owner of TCC. Young became the sole owner and pharmacist-in-charge of TCC in 2020, and during the times relevant to this case, she employed one other pharmacist, Brian Bryk.

Dr. Henry Lindner began treating Stacey Wolking, hereinafter, "SW", in or about 2021 for what he diagnosed as babesiosis, although that diagnosis was never confirmed with any clinical tests recognize by the CDC or the general medical community. His treatment plan was likewise not generally accepted by the CDC or the general medical community, especially since it involved prescribing massive doses of corticosteroids. By late 2022, SW was taking between 130 mg and 280 mg of prednisone per day, which was an extreme and quite dangerous dosage level. By late September, 2022 SW reported to her doctor that she was taking between 672 and 775 mg of prednisone, and on September 27, 2022 she reported to her doctor that she had taken 1,610 mg of prednisone in the previous 30 hours. On October 4, 2022 her husband reported that SW had consumed 1,848 mg of prednisone. These extreme dangerous doses continued into early October, 2022, with the doctor substituting an even more potent corticosteroid, dexamethasone, for the prednisone. Shortly thereafter SW was hospitalized with a small bowel perforation, admitted to hospice for a period of time, and ultimately discharged to a rehabilitation hospital where she remained until November 17, 2022.

In August of 2022 Dr. Lindner wrote to SW instructing her to have her

-3-

corticosteroid prescriptions filled at Tunkhannock Compounding Center, (TCC), as her local pharmacy might report the doctor to his medical board. In early August, 2022 TCC provided SW with 2,120 prednisone 5 mg tablets, which would be approximately 10,600 mg of prednisone. Eight days later TCC filled a second prescription for 200 dexamethasone 4 mg tablets. Dexamethasone is between 6 and 7 times as potent a corticosteroid as prednisone. In late September, 2022 and early October, 2022 TCC dispensed an additional 8,400 mg of prednisone to SW. During this same period, on September 27, 2022 TCC dispensed 100 tablets of dexamethasone 4mg with instructions to take up to 10 tablets per day. On October 5, 2022 TCC dispensed an additional 200 dexamethasone 4mg tablets with instructions to take up to 20 tablets per day, a dose that would be equivalent to approximately 480 mg of prednisone.

To help put the prior two paragraphs into perspective, the generally accepted starting dosage range of prednisone is between 5mg and 60 mg per day, with a slow tapering of the dose as soon as possible. Doses of the magnitude dispensed by TCC would generally never be seen in a retail pharmacy because it is simply not safe for patients outside of a hospital setting to be consuming hundreds of milligrams of prednisone per day for any length of time. In reviewing the deposition transcripts of the two pharmacists at TCC involved in filling these prescriptions, it appears that neither pharmacist requested or required some clinical documentation of the patient's diagnosis of a very rare disease. One of the pharmacists (Bryk) had no memory of speaking to the prescribing doctor about this patient, and the other pharmacist (Young) testified to a vague memory of such a conversation, but admitted there was no discussion of negative side effects, although there does not appear to be any documentation of even this conversation. The pharmacists did not seem to recognize or acknowledge that corticosteroids in such massive doses are extremely dangerous, nor is there any documentation that they even investigated whether such doses were ever appropriate outside a hospital setting. All competent pharmacists know that corticosteroids are a class of drugs that have multiple serious side effects, and that excessive doses or duration of therapy should be avoided unless absolutely necessary. By accepting the doctor's apparent belief that there is no upper limit on steroid dosing, the pharmacists at TCC failed to exercise their professional judgement, failed to investigate whether such doses were ever acceptable in a retail pharmacy setting, and failed to protect their patient from the foreseeable harm that such doses could cause.

-4-

During my 40 years of teaching pharmacy students about their legal and professional obligations, I have always stressed that they have a professional duty to use their knowledge and training when dispensing prescriptions, and it is my experience that these same duties are taught in every accredited pharmacy school. They are taught that they should not blindly follow the instructions of prescribers, but rather they should use their independent professional judgement when evaluating whether to fill or not fill a given prescription. I have cited in classes and continuing education lectures the Pennsylvania case of Riff v Morgan Pharmacy that demonstrates that the courts have also adopted this reasoning when looking at the duties of a pharmacist. There is no support in the professional literature or binding Pennsylvania case law that would contradict this duty. Pharmacy is a highly regulated profession that requires a pharmacist to follow both laws and regulations that have been adopted to protect patients from harm. In this case it appears that the pharmacists at TCC failed to question the appropriateness of Dr. Lindner's therapy, failed to evaluate the harm that might be caused by these extremely high doses of corticosteroids, and the result was serious harm to SW.

Should you have any additional questions, please feel free to contact me.


Sincerely yours,

Carl Gainor, Ph.D., J.D.

-5-

# ***CURRICULUM VITAE***

## CARL GAINOR, Ph.D., J.D.
6907 SE 12th Circle
Ocala, Florida 34480-6656

Telephone:    (352) 207-4800

**EDUCATION:**

| | |
|---|---|
| 1961-1963 | University of Michigan |
| 1963-1966 | University of Pittsburgh School of Pharmacy |
| | B.S. |
| 1967-1968 | M.S. |
| 1968-1972 | Ph.D. |
| 1972-1975 | University of Pittsburgh School of Law |
| | J.D. |

**POSITIONS HELD:**

| | |
|---|---|
| 1977-2022 | Assistant Professor, University of Pittsburgh |
| 1978-2001 | Continuing Education Lecturer to healthcare providers |
| 1994-2015 | Adjunct Professor, University of Arizona |
| 1999-2017 | Adjunct Professor, West Virginia University |
| 2010-2019 | Adjunct Professor, Notre Dame of Maryland University |
| 2012-2020 | Adjunct Professor, Belmont University |
| 1978-2003 | Legal Counsel to the Pennsylvania Pharmacists Association |
| 1976-1992 | Private law practice-Pittsburgh, Pennsylvania |
| 1970-1976 | Staff Pharmacist-Montefiore Hospital, Pittsburgh, Pennsylvania |
| 1966-1967 | Resident in Hospital Pharmacy, Veterans Administration Hospital |

**LICENSURE:**

| | |
|---|---|
| 1966 | Licensed to practice pharmacy in Pennsylvania |
| 1969 | Licensed to practice pharmacy in Michigan |
| 1975 | Licensed to practice pharmacy in Nevada |
| | Admitted to practice Law in the Supreme Court of Pennsylvania |
| | Admitted to practice Law in the U.S. Federal District Court |
| 1979 | Admitted to practice before the U.S. Supreme Court |
| 2004 | Licensed to practice pharmacy in North Carolina |