**In the Matter Of:**

*WOLKING v*

*LINDNER*

*JOY BOWERS GREENE, PHARM.D.*

*June 18, 2024*



WOLKING v Case 3:23-cv-00806-JFS    Document 57-15    Filed 07/12/24    Page 2 of 77 Joy Bowers Greene, Pharm.D.
LINDNER                                                                June 18, 2024

1

1              UNITED STATES DISTRICT COURT

2        FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

3                        - - -

4

   STACEY WOLKING and         :   CIVIL DIVISION
5  DARYL WOLKING, h/w         :
                              :
6        vs.                  :
                              :
7  HENRY LINDNER, M.D., and   :
   YOUNGS APOTHECARY, INC.,   :
8  d/b/a TUNKHANNOCK          :   NO. 3:23-cv-00806
   COMPOUNDING CENTER         :         MEM

9

10                       - - -

11

12              Tuesday, June 18, 2024

13                       - - -

14

15      LegalView (remote video) Deposition of

16  JOY BOWERS GREENE, Pharm.D, held on the above

17  date, beginning at 9:01 a.m., before Madalene

18  Foster Rohde, a Registered Professional

19  Reporter and Notary Public of the Commonwealth

20  of Pennsylvania.

21                       - - -

22

23

24

## Page 2

1  APPEARANCES:
2
3      CONOR LAMB, ESQ.
       KLINE & SPECTER, P.C.
4          1525 Locust Street
           Nineteenth Floor
5          Philadelphia, PA  19102
           215.772.1000
6          conor.lamb@klinespecter.com
7          Counsel for Plaintiffs
8
9      CONRAD BENEDETTO, ESQ.
       SUSAN KEESLER, ESQ.
10     McCORMICK & PRIORE, P.C.
           2001 Market Street, Suite 3810
11         Philadelphia, PA  19103
           215.972.0161
12         cbenedetto@mccormickpriore.com
           skeesler@mccormickpriore.com
13
           Counsel for Defendant Youngs
14         Apothecary, Inc. d/b/a Tunkhannock
           Compounding Center
15
16
       CIARA DeNAPLES, ESQ.
17     CIPRIANI & WERNER, P.C.
           415 Wyoming Avenue
18         Scranton, PA  18503
           570.347.0600
19         cdenaples@c-wlaw.com
20         Counsel for Defendant Henry Lindner,
           M.D.
21
22
       PRESENT:  JACOB FIGUEROA
23              Lexitas Legal
                Video Technician
24

## Page 3

1                   INDEX
2  WITNESS                              PAGE
3  JOY BOWERS GREENE, Pharm.D.
4      By Mr. Lamb                       5
5      By Mr. Benedetto                 87
6
7                   - - -
8
9              GREENE EXHIBITS
10 NO.          DESCRIPTION             PAGE
11
   Exhibit 1   May 17, 2024, report and  41
12             curriculum vitae
13
   Exhibit 2   Patient Rx History Report  41
14             and three prescriptions,
               Bates numbers YA0019 through
15             22
16
   Exhibit 3   Courtney Young transcript  76
17             excerpt
18
19                  - - -
20
21
22
23
24

## Page 4

1          (It was stipulated by and among
2   counsel that sealing, certification, and
3   filing be waived; and that all
4   objections, except as to the form of the
5   question, be reserved until the time of
6   trial.)
7                   - - -
8          THE COURT REPORTER:  Counsel,
9   usual stipulations?
10         MR. LAMB:  Yes.  For me at
11  least, yes.
12         MR. BENEDETTO:  Dr. Greene will
13  read and sign, please.
14                  - - -
15         VIDEO TECHNICIAN:  We are on
16  the record on June 18, 2024, at
17  approximately 9:01 a.m. Eastern Time for
18  the remote video deposition of Dr. Joy
19  Greene in the matter of Wolking versus
20  Lindner, et al.  My name is Jacob
21  Figueroa, I am a videographer on behalf
22  of Lexitas.
23         Will counsel please introduce
24  themselves for the record, who they

## Page 5

1   represent, beginning with the party
2   noticing this proceeding.
3          MR. LAMB:  Conor Lamb
4   representing the plaintiffs, the
5   Wolkings.
6          MR. BENEDETTO:  Conrad James
7   Benedetto from McCormick and Priore on
8   behalf of defendant, Youngs Apothecary.
9          MS. KEESLER:  Susan Keesler on
10  behalf of same.
11         MS. DeNAPLES:  Ciara DeNaples
12  on behalf of defendant Dr. Henry Lindner.
13         VIDEO TECHNICIAN:  Will the
14  court reporter please swear in the
15  witness.
16                  - - -
17         ...JOY BOWERS GREENE, Pharm.D.,
18  after having been duly sworn, was
19  examined and testified as follows:
20                  - - -
21              EXAMINATION
22                  - - -
23  BY MR. LAMB:
24      Q   Good morning, Dr. Greene.  I'm Conor

## Page 6

1  Lamb from Kline & Specter representing the
2  plaintiffs.  I want to thank you for spending
3  some time with us this morning.
4        Have you ever testified in a
5  deposition before?
6    A    I have not.
7    Q    Okay.  I'm going to go over just a
8  few I guess ground rules, you can call them,
9  but just ways to make sure that we communicate
10 effectively today.
11       One of the most important ones is I
12 see you nod your head a lot while people
13 speak, which is nice, but when you're actually
14 giving an answer in a deposition, can you try
15 to make sure you always give a verbal yes or
16 no or verbal answer because all of it is going
17 to be transcribed by the court reporter.  Do
18 you understand that?
19   A    Yes, I do.
20   Q    Okay.  The other thing is that when
21 we're doing these on Zoom, sometimes there
22 tends to be a delay, so if you could just be
23 extra sure to make sure you let me finish my
24 question before you start your answer, that

## Page 7

1  would be very helpful.  Do you agree to that?
2    A    Yes, I do.
3    Q    And, conversely, I'll try to make
4  sure that you finish your full answer before I
5  ask you the next question.
6        If any of my questions are not
7  clear, I'd also like you to ask me for
8  clarification before you answer, that's
9  totally fine.  Do you understand that?
10   A    Yes, I do.
11   Q    Have you ever testified in a trial
12 before?
13   A    I have not.
14   Q    Okay.  So I assume this is obvious,
15 but have you ever been recognized as an expert
16 by the court before?
17   A    Yes, I have.
18   Q    Okay.
19   A    And I provided full expert opinion
20 in that particular case.
21   Q    Which case was that?
22   A    It was a case with CVS.
23   Q    Do you know what the case was
24 called, like the case caption?

## Page 8

1    A    It was Huff/Staley case versus CVS
2  last fall.
3    Q    Okay.  What was the first name that
4  you said, the plaintiff?
5    A    Huff/Staley, H-U-F-F, slash,
6  S-T-A-L-E-Y.
7    Q    And so you didn't testify in a
8  deposition or trial but you were recognized as
9  an expert?
10   A    That is correct.  I provided a
11 verbal, and it was settled out of court.
12   Q    Okay.  Who did you provide your
13 expert opinion to?
14   A    I worked through a third party
15 company called Versed, and I was on the side
16 of the CVS Pharmacy chain.
17   Q    Did you write a report in that case?
18   A    I did not.  It was all provided
19 verbally.
20   Q    When you say it was provided
21 verbally, who did you provide it to?
22   A    To the attorneys for CVS.
23   Q    Okay.  That was just in a phone or
24 video call, it wasn't in an actual deposition?

## Page 9

1    A    Correct, it was in a phone call.
2    Q    Okay.  I see from your CV that you
3  opened and managed two pharmacies.  Is it fair
4  to say that the years of your pharmacy
5  experience at least in those two pharmacies
6  were 1998 to 2005?
7    A    That is correct.
8    Q    Since 2005 have you worked in a
9  pharmacy?
10   A    When I transitioned over to academia
11 in 2005, I did continue to PRN on the weekends
12 for another independent pharmacy in my home
13 town, and I did that off and on for a couple
14 of years.
15   Q    Do you know when that ended?
16   A    To the best of my recollection, it
17 would have ended around 2007.
18   Q    Okay.  Since 2007 have you worked in
19 a pharmacy?
20   A    I have not worked as a practicing
21 pharmacist, but I have retained my license as
22 a pharmacist, so I'm still a pharmacist.
23   Q    Have you dispensed any medications
24 since 2007?

Page 10

1    A    I have worked through academia and
2    volunteered in some community clinics
3    throughout my tenure at three universities,
4    so, yes, I have dispensed medications in
5    community clinics.
6    Q    When was the last time you did that?
7    A    I'm not sure I can recall.  It's
8    definitely within the last eight years, but
9    I'm not exactly sure of that date.
10   Q    Do you know if it was before or
11   after COVID?
12   A    It was before COVID.
13   Q    When you were in the two pharmacies
14   from 1998 to 2005, would it be fair to say
15   that those were general pharmacies in that
16   they dispensed most of the normal drugs?
17   A    That is true, they are independent
18   pharmacies which means we did many types of
19   services for patients, including a little
20   compounding, some clinical services.  One of
21   those pharmacies was inside of a doctor's
22   clinic, so I worked there closely with those
23   practicing physicians and providers.  The
24   other pharmacy was located right outside of a

Page 11

1    doctor's clinic, so very much community based
2    practice under an independent pharmacy
3    structure, meaning it's not a CVS or a
4    Walgreens type structure.
5    Q    Did you supervise any other
6    pharmacists at either of those pharmacies?
7    A    Yes, I did.  I was the pharmacist
8    manager for both of those pharmacies, so I
9    oversaw different pharmacists who worked with
10   me at different times during those years.
11   Q    Would it be fair to say that during
12   those years you were dispensing drugs every
13   day or almost every day?
14   A    Oh, every day, no questions.  And
15   we -- yes.
16   Q    To your knowledge is a pharmacist's
17   duty any different in North Carolina than it
18   is in Pennsylvania?
19   A    The duty of a pharmacist, I would
20   say, is mostly the same, depending on the
21   state requirements.  Some states have a little
22   more strict guidelines on what pharmacists can
23   and cannot do.  North Carolina is more of a
24   progressive state, I would say, in that

Page 12

1    regard, meaning that we have been able to
2    offer some clinical services from years ago,
3    whereas other states are not quite as
4    progressive.  But the duty of a pharmacist, I
5    would say, is pretty standard.
6    Q    Do you recognize the term
7    "babesiosis"?
8    A    Until this case, I had never heard
9    of babesiosis.  But I do recognize it this
10   morning.
11   Q    And have you ever dispensed
12   prednisone -- well, we'll do them one at a
13   time.  Have you ever dispensed prednisone?
14   A    Yes.
15   Q    Have you dispensed dexamethasone
16   before?
17   A    Yes.
18   Q    Were either of those drugs common
19   for you to dispense or something that you
20   regularly dispensed?
21   A    Prednisone is in the top 200 drug
22   list, so it is more common as long as -- also
23   as another type of prednisone, there's several
24   types.  Methylprednisolone is available in a

Page 13

1    Dosepak, that's very common.  And I did keep
2    dexamethasone in both of those pharmacies.  I
3    can't say if I think it was common back then,
4    but it was common enough that I kept it in the
5    pharmacy.
6    Q    I noticed on your CV, did you teach
7    a class called Top 200 Drugs?
8    A    Yes.  I taught that class at two
9    universities.
10   Q    So did you teach about prednisone in
11   that class?
12   A    That class was a first-year pharmacy
13   class, and so I taught the general expected
14   side effects of that medication, so counseling
15   points, yes, of prednisone, yes.
16   Q    And do you remember what any of the
17   expected side effects were that you taught
18   your students about for prednisone?
19   A    Yes.  It will make you have
20   increased appetite, make you feel moody, you
21   can have increased fluid retention, a puffy
22   face.  Those are some of the most common.  You
23   can also have headaches.  But those are the
24   most common.

Page 14

1  Q   Do you know whether gastrointestinal
2  issues are recognized as a side effect of
3  prednisone?
4  A   You want to take prednisone with
5  food in your stomach because it con make you
6  feel nauseous.  And that was something to
7  remember in your counseling, is to take it
8  with food.
9  Q   Was that something that you taught
10 your pharmacy students?
11 A   I would believe I would have.
12 Q   Have you ever heard of people
13 getting a bowel perforation from taking
14 prednisone?
15 A   I have not heard of that.
16 Q   What about, do you know what the
17 time "myopathy" means?
18 A   Yes.
19 Q   Have you ever heard of myopathy as a
20 possible side effect of prednisone?
21 A   It would not have been a side effect
22 that I would have taught in the Top 200 class,
23 because I would have taught from the top five
24 or so side effects that were listed in my

Page 15

1  resources.  So that would not be something
2  that I would have covered.
3  Q   Did you teach your students about
4  using FDA approved drug labeling to understand
5  side effects of drugs?
6  A   That question is a little tricky
7  because many times we are going off of
8  experience as well.  We share in the classroom
9  things that we have seen that can be uncommon.
10 But, yes, we would also share about what the
11 FDA recommended.
12 Q   What about in your own practice of
13 dispensing medications, would you use the FDA
14 approved labeling?
15 A   Well, one in five prescriptions that
16 are written are written for off-label use.
17 And so it does make it complicated because you
18 think about 20% of the prescriptions that you
19 fill every day, that's the estimated number of
20 prescriptions that are written for off-label
21 use.
22 Q   My question is just did you use,
23 even if it was only for the other 80%, use the
24 FDA?

Page 16

1  A   Yes, I did.
2  Q   Okay.  And correct me if I'm wrong,
3  but would the information in an FDA approved
4  label that has to do with adverse effects or
5  side effects, would that be applicable whether
6  the drug was being prescribed off label or
7  not?
8  A   Well, it depends because not
9  every -- not every patient is going to
10 experience every side effect, of course, that
11 the FDA has listed.  And you, based off your
12 experience with that medication, things that
13 you have seen more commonly, in conjunction
14 with what you have learned about the
15 medication is what you would share with
16 patients.  Deciding on if you're taking a
17 medication for one use versus another would
18 not necessarily change the side effect
19 profile.
20 But there might be something else to
21 consider such as other medications that you're
22 taking.  You would also consider past medical
23 history.  If a complicated patient comes into
24 your pharmacy and you know that they have

Page 17

1  experienced major medical issues throughout
2  their life, then that would, that maybe would
3  change the way you would counsel that patient.
4  Because not every side effect that -- not
5  every symptom that a patient experiences can
6  be connected to that medication.
7  Q   I'm just going to ask you a little
8  bit about your knowledge of the dosing of
9  corticosteroids.  And I understand that the
10 dosing can vary based on the patient and their
11 conditions.
12 So for you in your experience as a
13 pharmacist for outpatients, do you recall what
14 some of the larger dosing regimens that you
15 remember dispensing when it came to
16 prednisone?
17 A   I cannot recall those specifics.  I
18 do know --
19 Q   As you sit -- go ahead, sorry.
20 A   I just want to say, I had several
21 patients who visited my pharmacy who suffered
22 from lupus and also MS.  And I do have
23 recollection of talking to them about their
24 steroid doses.  But I cannot remember those

1  doses.
2      Q     Do you know whether you have ever
3  dispensed a prescription that instructed a
4  patient to take up to 100 milligrams of
5  prednisone per day?
6      A     I cannot recall if I have.
7      Q     Have you ever seen that or heard of
8  it in your pharmacy practice or in your
9  teaching?
10     A     I have heard of that in my pharmacy
11  practice or teaching, yes.
12     Q     And what type of medical condition
13  have you heard a patient receive the
14  instruction to take up to 100 milligrams of
15  prednisone a day?
16     A     When someone is having a lupus or an
17  MS flareup, those dosages can be reasonable
18  under the supervision of their physician or
19  provider to help them get through excruciating
20  pain and experience that they're feeling.
21     Q     Does that include when they're an
22  outpatient?
23     A     Yes, that includes an outpatient.
24     Q     And are lupus and MS the only two

1  conditions you have heard of for that dosing?
2      A     There are other chronic conditions
3  that are more -- they're rare for many
4  patients, they may not be a very common
5  condition.  But myositis is one, that is where
6  you have this chronic muscle pain.  And other
7  conditions that can be autoimmune, autoimmune
8  disorders are very tricky in treatment and
9  symptom management.
10            But the most common that I would say
11  from my personal experience would be MS and
12  lupus.  And I distinctly remember having
13  patients in both of those pharmacies that I
14  managed who would come in suffering from those
15  conditions.
16     Q     Other than those two, do you
17  remember any specific cases of a condition
18  where someone was instructed to take up to 100
19  milligrams of prednisone a day?
20     A     I cannot recall.
21            MR. BENEDETTO:  Objection.
22  BY MR. LAMB:
23     Q     Sorry.  You can answer.  I didn't
24  catch your answer on the transcript.

1      A     I do not recall.
2      Q     When a pharmacist dispenses
3  prednisone, do they need to know what the
4  patient's diagnosis is?
5      A     It depends.  It's important to note
6  that pharmacists are not allowed to diagnose.
7  Pharmacists are not considered primary care
8  providers.  Pharmacists are healthcare
9  professionals, but not providers.  And so
10  understanding a diagnosis is not something
11  that a pharmacist would have access to.  The
12  pharmacist in a community pharmacy does not
13  access to the medical record.  So a
14  pharmacist, it would be very rare for a
15  pharmacist to understand a diagnosis and even
16  what the physician is treating, because they
17  do not have privy, they're not privy to that
18  information.
19     Q     I noticed in your CV that you have
20  done some work related to antibiotic
21  resistance; is that right?
22     A     Yes, many, many years ago.
23     Q     Is the antibiotic resistance
24  something that you have taught your pharmacy

1  students about?
2      A     It's something I've mentioned to my
3  pharmacy students.  Other faculties have
4  covered that in the curriculum, but I
5  definitely have mentioned it in the Top 200
6  Drug class to understand the importance of
7  finishing the full course of therapy when you
8  have an antibiotic prescription.  The patients
9  often do not finish their course of therapy
10  and they leave extra tablets in the cabinet,
11  and that aids in antibiotic resistance.
12     Q     Okay.  When you prepared your report
13  or beforehand or any time in this case, have
14  you spoken to Courtney Young about the facts
15  of what occurred?
16     A     I have not.
17     Q     Have you spoken to anyone that works
18  for Tunkhannock Compounding Center about what
19  happened?
20     A     I have not.
21     Q     I'm going to ask you a little bit
22  about your report.
23     A     I have a copy in front of me.
24     Q     Okay, great.  At the top of Page 4

Page 22

1   you wrote that "Most pharmacists have little
2   to no knowledge about the condition,
3   babesiosis, and even fewer pharmacists have
4   knowledge about chronic babesiosis."
5       A    That was my opinion, yes.
6       Q    Right.  So what does the term
7   "chronic babesiosis" mean to you?
8       A    I had never heard of either of these
9   conditions.  And my point in that particular
10  sentence is to say that this is a condition
11  that most pharmacists would not be aware of.
12  And when I think about what this condition may
13  mean, which again I'm no expert in parasitic
14  infections, I would concur that this means
15  that babesiosis is long-standing, that it has
16  the symptoms and the condition itself has not
17  been treatable, has not been treated
18  successfully.  And that the patient is
19  suffering from those symptoms chronically.
20      Q    You read Dr. Lindner's deposition
21  transcript; correct?
22      A    Reviewed that, yes.
23      Q    Did you see where Dr. Lindner
24  testified that "chronic babesiosis" was a term

Page 23

1   of his own invention?
2       A    I read that he -- what I took from
3   his testimony was that he considered himself
4   an expert in babesiosis and he had experience
5   with his daughter with this term he used for
6   chronic babesiosis, and that she had a
7   terrible struggle with the symptoms and
8   quality of life.
9       Q    Did you see where he testified that
10  "chronic babesiosis" was a term of his own
11  invention?
12      A    I cannot recall reading that exact
13  sentence.  So I'm afraid I do not, can't
14  recall.
15      Q    Do you believe that there is a
16  chronic form of babesiosis?
17           MR. BENEDETTO:  Objection to
18      form.
19           You can answer, Joy.
20      A    I do not believe that my training as
21  a pharmacist -- I'm trained to be a medication
22  expert, I'm not trained to be a disease
23  expert.  And I do not feel that my
24  qualifications of a Pharm.D. degree give me

Page 24

1   the authority to make that decision, to even
2   know if that is or is not a real condition.  I
3   never said in my letter that I believed that
4   it was or that I believed it wasn't.  I
5   basically stated what I believed were
6   testimony facts from the case so far.
7       Q    Did you see the discussion in the
8   deposition transcripts about the specific
9   Babesia parasite that is called Babesia
10  odocoilei?  And for the court reporter, that's
11  O-D-O-C-O-I-L-E-I.
12      A    I do remember, I do remember reading
13  some of that, yes.
14      Q    Had you ever heard of that
15  particular parasite before this case?
16      A    I am not a parasite expert, and I'm
17  not an infectious disease expert, so all of
18  this information, as I stated, the term
19  babesiosis, anything related to it, was
20  brand-new for me.
21      Q    You write in your report that
22  Dr. Young regarded Dr. Lindner as an expert in
23  the treatment of chronic babesiosis; correct?
24      A    That was my understanding from her

Page 25

1   testimony, based off of the conversations she
2   testified having with him regarding his
3   daughter's experience.
4       Q    As part of her duty of care as a
5   pharmacist, did Dr. Young have an obligation
6   to find out whether chronic babesiosis was a
7   recognized medical condition?
8       A    It depends.
9       Q    What does it depend on?
10      A    That question depends on the nature
11  of her relationship with Dr. Lindner regarding
12  how much she trusted his professional opinion,
13  the conversations that they had had regarding
14  that condition.  Do I believe that she had an
15  obligation to find out more about that disease
16  state?  I would say as a practicing
17  pharmacist, that was not her responsibility.
18  She is unable to diagnose, and as a
19  pharmacist, you must have some entrustability
20  with the practitioners that you serve
21  alongside with.  And if you don't have
22  entrustability, you would doubt their clinical
23  judgment, then you can refuse to fill a
24  prescription.

Page 26

1  But as far as a practicing
2  pharmacist, having the responsibility or the
3  duty to look up disease states, I'm not sure
4  how you could practice pharmacy with those
5  time constraints if 20% of medications that
6  come to your pharmacy are written for
7  off-label use.  And now you have 20% of your
8  prescriptions that you need to start looking
9  into, researching, finding out if this
10  medication is going to be adequate for that
11  particular disease state, I don't believe the
12  practice of pharmacy could exist.
13      Q     What about in a case where the
14  diagnosis is not of a recognized disease
15  state, in other words, does the pharmacist
16  have a duty to verify that it is an actual
17  disease as opposed to a diagnosis that's not
18  recognized by the medical community?
19         MR. BENEDETTO:  Objection to
20     form.
21         You can answer, Joy.
22      A     In my opinion, thinking about
23  pharmacy as I have experienced it, I don't see
24  how I could even be sure of that.  Because

Page 27

1  when a prescription comes to a pharmacist in a
2  community setting, it may say, it could be for
3  cephalexin and it could say one tablet twice a
4  day for 14 days.  I have no idea what that
5  diagnosis is.  It could be an ear infection,
6  it could be something to treat acne.  The
7  prescriber is not required by law to put on a
8  prescription what the medication is for or
9  what their diagnosis is of that patient.
10         So I would say that 80, just
11  thinking about my experience, probably 80 to
12  90 percent of the prescriptions that I filled
13  every day, I did not know what the patient was
14  taking that medication for.  For example, many
15  diabetes medications, they are FDA approved
16  for diabetes, but they're often used in other
17  disease states.  So when I fill that
18  prescription, it's not my job or role to say
19  to the patient, "What is your diagnosis?"
20  It's my job to be the medication expert and
21  say, "This is metformin.  You want to make
22  sure you take this with food."
23         And one of the questions that we're
24  taught is to ask open-ended questions to your

Page 28

1  patients.  But as far as diagnosis and me
2  understanding what it's written for, I would
3  say most of the prescriptions that I filled I
4  had no idea in written format exactly what the
5  disease state was being treated.
6      Q     In cases where you did know what the
7  diagnosis was -- and I understand that's a
8  minority of cases from what you just said --
9  but in cases where you did know what the
10  diagnosis was, did you ever have a situation
11  where you did not recognize the diagnosis,
12  where it was a term that was unfamiliar to
13  you?
14      A     I may need you to give me an example
15  of what you're asking.  I'm not sure I'm clear
16  on the question.
17      Q     Well, let's just turn it into a
18  hypothetical.
19      A     Okay.
20      Q     My name is Conor Lamb, so let's say
21  that you had a patient that came in and you
22  knew that they had been diagnosed with Conor
23  Lamb's disease.  Have you ever heard of a
24  disease called Conor Lamb's disease?

Page 29

1         MR. BENEDETTO:  Objection to
2     form.
3      A     May you, would you please help me
4  understand?  How would I have known that you
5  were diagnosed with it?
6      Q     Well, there could be many ways, but
7  you testified that there might have been 10 or
8  20 percent of cases where you know what the
9  diagnosis was.  So I don't care how you found
10  out, maybe the patient told you, maybe one of
11  the doctors that you worked closely with told
12  you, but you know that the patient has been
13  diagnosed with Conor Lamb's disease.
14      A     Okay.
15      Q     So what my question really is, is if
16  you as a pharmacist don't recognize Conor
17  Lamb's disease, you never heard of it, you
18  don't know whether it exists, do you have any
19  obligation to find out if it's real before you
20  dispense the medication?
21         MR. BENEDETTO:  Objection to
22     form.
23         You can answer, Joy.
24      A     I'd like to provide a little bit of

Page 30

1   a different type of answer, if that's okay
2   with you --
3      Q   Sure.
4      A   -- with the medical. My approach to
5   that particular situation would depend, again,
6   on who wrote the prescription and did I know
7   that practitioner. And did I know that that
8   practitioner had an expertise in a particular
9   area.
10      For example, if a special pediatric
11   cardiologist writes a prescription for a
12   patient, and this would be something that
13   could happen, and it was a rare cardiac
14   condition that I had never heard of, if I saw
15   that prescription came from a pediatric
16   cardiologist through a healthcare system that
17   I had respect for, I would feel comfortable
18   filling that prescription because of the
19   specialty of that particular cardiology
20   facility, and especially if I had experience
21   working with that cardiologist before.
22      Many times in my career, I have been
23   faced with prescriptions that did not fit the
24   typical patient, because there are many

Page 31

1   atypical symptoms and atypical patients who
2   have struggled and are grasping for answers.
3      So I would not say that I could
4   answer that question yes or no across the
5   board. If someone has Conor Lamb disease and
6   I know that the clinic that I work in has a PA
7   or physician who I know personally and
8   professionally, and I have had conversations
9   with that particular provider about their
10   education and Conor Lamb's disease, then I
11   could see a hypothetical situation that I
12   would feel comfortable filling that
13   prescription because of the entrustability
14   that I have built over the years with that
15   provider.
16      Because I also would like to add, as
17   I am in the landscape of pharmacy where I by
18   myself may fill 300 prescriptions a day in an
19   eight-hour period with one or two technicians,
20   and I have many, many patients to serve that
21   day, all of which are very important, equally
22   important, I can't imagine I would have the
23   life space in the pharmacy at that particular
24   moment to do a deep dive into Conor Lamb

Page 32

1   disease. I may not have the resources
2   available in my pharmacy. It would take me
3   more than 30 minutes or the amount of time --
4   it would take me hours to be able to
5   effectively look at the literature, find the
6   literature, review it, look at the statistical
7   analysis of the literature, and then make a
8   clinical decision on do I think that that
9   disease is valid and should I fill this
10   prescription or not.
11      Q   Thank you. There's just one small
12   part of your answer I want to follow up on.
13   You said something that part of your decision
14   would be whether you had spoken to the
15   prescriber about their specialty and knowledge
16   of the particular diagnosis in this silly
17   hypothetical we're calling Conor Lamb's
18   disease.
19      So my followup is, does the
20   pharmacist's obligation include an obligation
21   to find out whether the prescriber is actually
22   knowledgeable about that particular disease?
23      A   It depends on the situation. This
24   is all hypothetical. For example, with the

Page 33

1   pediatric cardiologist, I would use my
2   clinical judgment based off of understanding
3   that that is from a clinic, that is from a
4   physician who has a specialty area. So it
5   depends on the situation, it depends on what
6   condition we're talking about and the
7   professional understanding that I have of that
8   particular physician or practice or healthcare
9   system.
10      Q   With a pharmacist's duty of care,
11   does it apply to each individual prescription
12   that they dispense?
13      A   There is a list actually on the
14   Pennsylvania Board of Pharmacy website that
15   talks about the responsibilities of a
16   pharmacist and the standards of practice. And
17   they give examples of different practice sites
18   that it applies to. And I would say that it
19   covers most all practice sites that would be
20   filling prescriptions. There are practice
21   sites where pharmacists don't fill
22   prescriptions.
23      Q   Right. My question is not so much
24   about the sites. It's about each individual

| Page 34 | Page 36 |
|---------|---------|

**Page 34**

1  time that a pharmacist dispenses a
2  prescription, does their duty of care apply to
3  each one of those prescriptions?
4      A    Yes.
5      Q    So I want to look at the four
6  prescriptions that are identified in the
7  Complaint in this case.  I just want to look
8  at them one by one.
9          So let's start with the first one,
10  which Brian Bryk dispensed on August 4th of
11  2022.  Does your report state what his duty of
12  care was when he dispensed that prescription?
13      A    In my report I gave a historical
14  context of those prescriptions.  And so I was
15  giving a summary of what those four, as we
16  were discussing the quantities of those
17  steroid prescriptions.  I don't know if I -- I
18  don't believe there's anything listed in that
19  section that outlines right there about the
20  duty of the pharmacist.  I was listing those
21  prescriptions out.
22      Q    Well, anywhere in the report do you
23  state what Brian Bryk's duty was when he
24  dispensed that prescription?

**Page 36**

1  he filled that prescription.  I would need to
2  read it more carefully to see how I described
3  what he -- based off testimony, his testimony,
4  I discussed the knowledge of babesiosis,
5  chronic babesiosis.  So I'm unsure if I'm
6  answering your question correctly.
7      Q    Does the report state what the duty
8  of either pharmacist was with respect to
9  Stacey Wolking?
10      A    I would need to read it more
11  carefully to see if I specifically answered
12  that question.
13      Q    Do you see the section that is, it
14  says "Opinions" and then it says, "1. Duty,"
15  toward the bottom of Page 4?
16      A    Yes, that's what I was referring to
17  when I mentioned about documentation -- on
18  Page 4, I'm sorry.
19      Q    What about the bottom of Page 4, it
20  says "Duty" next to a 1?
21      A    Yes.
22      Q    Okay.  Let's just take that
23  section --
24      A    Okay.

**Page 35**

1          MR. BENEDETTO:  Objection to
2      form.
3      A    I'm looking through my report to see
4  if I used the word "duty" in the report
5  itself.  I discuss the responsibilities as
6  pharmacists, which I could say is very similar
7  to the duty of pharmacists.  And I mentioned
8  that they did not fulfill their duty about
9  documentation regarding the recordkeeping of
10  the conversations that happened, that they
11  testified had occurred between TCC and
12  Dr. Lindner.  So I do use the word "duty" on
13  Page 5.
14      Q    Right.  Although my question wasn't
15  whether you used the word "duty."  My question
16  was whether you state in the report what Brian
17  Bryk's duty was when he dispensed the
18  prescription that was dated August 4th of
19  2022?
20          MR. BENEDETTO:  Objection to
21      form.
22          You can answer.
23      A    Okay.  I do not believe I
24  specifically outlined what his duty was when

**Page 37**

1      Q    -- one paragraph at a time.
2      A    Okay.
3      Q    So the paragraph starting "A
4  compounding pharmacy," is there anything in
5  that paragraph that states what the duty of
6  these pharmacists was with respect to Stacey
7  Wolking?
8      A    They are preparing medications, I
9  did say they have to prepare medications.  I
10  do explain that they are not FDA approved
11  often.  They focus on formulating medicines
12  that are not commercially available.
13          I'm just not sure I'm clear on what
14  you're getting at, I apologize.
15      Q    Well, you used the caption "Duty"
16  above this paragraph with a 1 next to it.
17      A    Right.  So what is the pharmacist's
18  duty, right, exactly, that they have a
19  responsibility in adhering to the law, to the
20  Board of Pharmacy law, making sure the labels
21  are correct, all the things that are listed in
22  the standards of practice under the State
23  Board of Pharmacy for Pennsylvania.
24      Q    Does it state anywhere in your

Page 38

1    report what these pharmacists' duty was?
2         MR. BENEDETTO:  Objection to
3      form.
4    BY MR. LAMB:
5         Q    You just named some things that I
6    think you were saying were included in duty.
7    My question is in the report, in this section
8    that is captioned "Duty," does it say what
9    either pharmacist's duty was with respect to
10   Stacey Wolking?
11        MR. BENEDETTO:  Objection to
12     form.
13        A    I don't believe I have outlined the
14   duty of the pharmacist.  I am discussing -- I
15   am trying to help explain that the pharmacy,
16   their rationale is when I'm reading their
17   report, what I believe from a compounding
18   pharmacist, independent pharmacist's side how
19   they approached this particular case.  I do
20   not believe I have outlined in this section
21   what the duty of the pharmacist is here.
22   Although I did reference the counseling duty
23   at the end of that section, which is the
24   regulation of refusal to counsel.

Page 39

1         Q    Was the duty of care that's
2    applicable to Brian Bryk and Courtney Young,
3    is it any different for them because they work
4    in a compounding pharmacy as opposed to, say,
5    a CVS or Walgreens?
6         A    When I'm thinking about the duty of
7    a pharmacist, I'm thinking about the standards
8    of practice.  So I'm thinking about they are
9    dispensing their prescriptions in a new and
10   clean container, the label is correct, they
11   have done their prospective drug review,
12   providing patient counseling.  And I have made
13   the assumption based off what I have reviewed,
14   the records of the prescriptions, looking at
15   the attachments that were provided based off
16   of their computer screen, that they have
17   upheld their duty in practicing pharmacy.
18        And I'm providing a rationale.  The
19   duty of a pharmacist is the same as a
20   practicing pharmacist no matter what
21   prescription is being filled, and no matter
22   what patient they are serving.  But often the
23   duties of a pharmacist are things that might
24   not be applicable for my opinion letter,

Page 40

1    meaning the prescription itself had a
2    signature and they reviewed the prescription
3    to make sure that it was signed, that they
4    could have identified the patient correctly.
5    Those things did not feel pertinent to explain
6    in this section.
7         Q    Of all the things you mentioned that
8    are included in a duty or the standards of
9    practice, I think was the term you used, my
10   question is simply whether those are the same
11   inside of a compounding center like
12   Tunkhannock Compounding Center versus what you
13   would think of as a normal retail pharmacy
14   like CVS, do the same standards of practice
15   apply?
16        A    They do apply, they're the same,
17   yes.
18        Q    Okay.
19        MR. LAMB:  And just for the
20     record clarity, I'm going to mark your
21     report and CV as Exhibit 1.  And Exhibit
22     2 I'm going to pull up on the screen.
23          - - -
24        (May 17, 2024, report and

Page 41

1    curriculum vitae, marked Greene Exhibit
2    1.)
3          - - -
4        (Patient Rx History Report and
5    three prescriptions, Bates numbers YA0019
6    through 22, marked Greene Exhibit 2.)
7          - - -
8    BY MR. LAMB:
9         Q    Do you recognize what I have on the
10   screen here, Exhibit 2?
11        A    Yes, I do, yes.
12        Q    And it has, it's a PDF with four
13   pages and it has a history of Stacey Wolking's
14   prescriptions and then it has the three
15   prescriptions themselves.  Is that right?
16        A    Yes, I have seen this, yes.
17        Q    Now, I'm going to start with the
18   prescription on Page 2 of Exhibit 2.  It has a
19   Date Written of August 4, 2022.  Do you see
20   that?
21        A    Yes.
22        Q    And do you see where further down in
23   the instructions it says "Up to 10 tabs po
24   daily as directed"?

Page 42

1    A    Yes.
2    Q    Do you know what po means?
3    A    By mouth.
4    Q    Okay.  Now, just a little further
5 above that it says that the prescription is
6 for 500 tablets of 10 milligram prednisone
7 tablets; correct?
8    A    Right.
9    Q    So these instructions, if someone
10 was to take up to ten tablets of 10 milligram
11 prednisone tablets, that would be up to 100
12 milligrams a day of prednisone; correct?
13    A    That's correct.
14    Q    Now, I know you mentioned a couple
15 of conditions earlier like MS and lupus where
16 you had seen that dose.  For patients that
17 don't have either of those two conditions, do
18 you know whether there's any risk of harm to a
19 patient who takes 100 milligrams of prednisone
20 in a day?
21        MR. BENEDETTO:  Objection to
22    form.
23        You can answer, Joy.
24    A    Based on my experience as a

Page 43

1 pharmacist and what I understand about steroid
2 dosing in rare conditions, there are other
3 conditions besides MS and lupus where high
4 doses of steroid treatment is used because
5 many other options have been tried and have
6 failed.  And quality of life for patients is
7 so important.  So there are conditions where
8 you could fill 100 milligrams of prednisone,
9 in fact, for MS you can even get as high as
10 1,000 milligrams per day for a treatment of a
11 flareup, even oral medications.
12    Q    And I just want you to carefully
13 listen to my question.  My question was not
14 whether there are other conditions where that
15 number might be used.  My question was, is
16 there any risk of harm to a patient who takes
17 100 milligrams of prednisone in a day?
18        MR. BENEDETTO:  Objection to
19    form.
20        You can answer.
21    A    That's a difficult question to
22 answer, Mr. Lamb.  Regarding steroid dosing,
23 short-term high doses in many patients I have
24 seen from my experience have not been harmful.

Page 44

1    Q    Have you ever seen -- sorry, go
2 ahead.
3    A    I was going to say I even have some
4 personal experience with that, taking high
5 doses of prednisone for a rare condition,
6 short term.  And as a pharmacist I've had a
7 practicing physician say to me, you know, when
8 you have to take high doses of steroids for
9 short therapy, you know, for a week, three
10 weeks, however many weeks, your body can in
11 many cases bounce back.
12        And even for my son, he had to take
13 very high doses of dexamethasone as a little
14 boy really to save his life, quite frankly.
15 He was in a very serious situation and was
16 dosed high-dose dexamethasone for a short term
17 and it prevented his airways from closing up.
18        So there are situations where you
19 think about the risk versus the benefit, and
20 short-term steroid high doses in not all cases
21 is that dangerous, and it's overseen by the
22 provider who has written that prescription.
23    Q    Although my question still is
24 whether you're aware that there are risks.  I

Page 45

1 understand you're talking about this sort of
2 risk/reward calculation that a practitioner
3 has to use.  My question is just whether, are
4 you aware that there are risks if a patient is
5 to take 100 milligrams of prednisone per day?
6        MR. BENEDETTO:  Objection to
7    form.
8    A    Any medication -- I think there is
9 risk to any medications that you take.
10    Q    In any dosage?
11    A    Sometimes.  Any medication you take,
12 there's going to be some risk involved.  Even
13 antibiotic that you take, you might not know
14 that you're going to have an allergic reaction
15 to it, and you may take it the first time.  It
16 may be something simple like amoxicillin,
17 you've never had it before, and so when you
18 that medication, you could end up in the
19 hospital with an anaphylactic reaction.
20        So that's the reason why I believe
21 the FDA has package inserts and patient
22 counseling is required, because there are
23 risks with any medication that you take.
24    Q    Have you ever read the FDA approved

Page 46

1   package insert for prednisone?
2       A    I have skimmed it.  I have not read
3   it word for word, but I have skimmed it.
4       Q    Do you recall that it says the
5   lowest effective dose should be maintained?
6       A    I do not recall that.  I'll take
7   your word for it.
8       Q    Going back to Page 2 of Exhibit 2,
9   it's a prescription for 500 tablets, so if a
10  patient did take 10 tablets a day with a
11  bottle of 500 tablets, they could take 10
12  tablets a day for 50 days; is that correct?
13          MR. BENEDETTO:  Objection to
14      form.
15      A    Yes.
16      Q    Do you know whether with prednisone
17  the risk of an adverse outcome increases with
18  the duration of the therapy or how long
19  they're taking the prednisone?
20      A    I think it's dependent on the
21  instructions for how that prednisone will be
22  taken.  Many times prednisone is tapered up
23  and down.  And as that prescription says up to
24  ten tablets, that would say to me the

Page 47

1   pharmacist who would see that prescription,
2   that would imply that they would not be taking
3   necessarily 10 tablets every day, but that
4   would be the maximum they would be taking.
5   And so --
6       Q    When you -- oh, sorry, go ahead.
7       A    I want to say that steroid dosing is
8   tricky.  And as the prescriber is instructing
9   the patient on how to take that medication,
10  titrating it up and down would affect what you
11  could expect to see regarding side effects.
12      Q    When Brian Bryk dispensed this
13  prescription that's dated August 4th of 2022,
14  did the standard of care require him to look
15  at the instructions?
16      A    Yes.  He had to put that into the
17  prescription processing database.  You need to
18  look and make sure that everything was written
19  according to the legal requirements.
20      Q    Now, once he has looked at those
21  instructions, in this case to take up to ten
22  tabs per day, did the standard of care require
23  him to consider whether it was safe for a
24  patient to take 100 milligrams of prednisone

Page 48

1   that day?
2       A    I would say that he would use his
3   clinical judgment.  And, again, prednisone
4   does not have dosing guidelines that are
5   standard for every patient's condition.  So
6   this is one of those tricky medications where
7   you might not know as a pharmacist what was
8   being treated, therefore you could not -- you
9   may not know if the dosage was reasonable or
10  not.  As opposed to something like Lipitor.
11  Something like Lipitor, you have a standard
12  dose and it's treated for one thing.  And very
13  rarely are you going to go outside those
14  normal dosages.
15          So, yes, the standards of care
16  apply, but in this particular situation with
17  prednisone, the dosages are so different based
18  off of what is being treated.  So having the
19  understanding from the provider that you're
20  dispensing the prescription, so this is
21  Dr. Lindner, thinking about what the TCC
22  pharmacist understood about Dr. Lindner's
23  approach to therapy would play very strongly
24  in clinical judgment of this prescription.

Page 49

1       Q    So do I understand you to be saying
2   that Brian Bryk under the standard of care had
3   an obligation to exercise clinical judgment
4   with respect to this prescription dated
5   August 4th?
6       A    I would say that he would have used
7   his clinical judgment and all of the
8   circumstances surrounding his knowledge of
9   what Ms. Wolking may be suffering from, and
10  his entrustability with Dr. Lindner to
11  understand his treatment approach.
12      Q    So his exercise of clinical
13  judgment, should it have included his
14  consideration of whether it's safe for a
15  patient to take 100 milligrams of prednisone
16  in a day?
17          MR. BENEDETTO:  Objection to
18      form.
19          You can answer, Joy.
20      A    I think the part of your question
21  that is giving me a check in my spirit is the
22  word "safe."  The safety guidelines for
23  prednisone are not clearcut as far as how you
24  define "safe."  If you think of safety meaning

Page 50

1 is this medication going to cause the patient
2 harm, if that's what you're asking, if safe
3 means is going to cause harm, I think we can't
4 ignore the harm versus benefit of how the
5 patient may already be living in such pain and
6 decreased quality of life.
7        There are situations in medicine
8 that you make decisions based off of can be
9 life or death, can be quality of life, that
10 may not be deemed necessarily safe, but
11 they're necessary.
12        I mean, I read in Ms. Wolking's
13 testimony that one of her providers was
14 considering giving her a dose of chemotherapy,
15 a dose of chemotherapy because she had had
16 such a terrible struggle with her medical
17 history. And so I think we have to define
18 "safe" and we have to weigh out the benefits
19 versus those risks.
20     Q   Okay. I'm going to describe how I'm
21 defining "safe" based on some of what you just
22 said, and you just tell me whether it's an
23 acceptable definition.
24        What I mean is whether the harm that

Page 51

1 could be caused to a patient from a certain
2 quantity of prednisone outweighs the benefit
3 that they would receive from that prednisone.
4 That's what I meant by "safe." Is that a
5 reasonable way to use that term in this
6 context?
7     A   I just want to make sure I'm
8 answering your question correctly and making
9 sure I understand it correctly.
10     Q   Right. So right now I'm just asking
11 you if you agree that that's what we can mean
12 by the word "safe" in this context, whether
13 the benefit of the drug outweighs the harm
14 that could be caused by the drug?
15     A   Okay. We can move forward with that
16 definition, yes.
17     Q   Okay. So when Brian Bryk exercised
18 clinical judgment about this prescription
19 that's dated August 4th of 2022, did the
20 standard of care require him to consider
21 whether it was safe for Stacey Wolking to take
22 100 milligrams of prednisone in a day?
23     A   I would say that that would be
24 something he would consider. The safety

Page 52

1 meaning the benefits outweigh the risks, and
2 this would also include his professional
3 interactions with the prescriber and
4 understanding and trusting him as the
5 prescriber.
6     Q   And you're anticipating my next
7 question. So that if he's going to exercise
8 clinical judgment about this particular
9 prescription, what does he have to do to get
10 the information needed to exercise that
11 clinical judgment?
12     A   It depends on the history that he
13 has with his understanding of this patient's
14 possible medical history, maybe the patient
15 profile, any notes that were possibly taken
16 when he, when TCC began to fill prescriptions
17 for the patient. It also depends on his
18 professional relationship with the prescriber.
19 Does he know this prescriber? Has this
20 prescriber proven him or herself as a
21 trustworthy prescriber? Had they had
22 discussions about this particular patient?
23 All of those things come into play.
24     Q   You read Brian Bryk's deposition

Page 53

1 transcript in this case; right?
2     A   I reviewed that, yes.
3     Q   Are you aware of any evidence that
4 he spoke to Dr. Lindner about Stacey Wolking
5 before dispensing this prescription?
6     A   My recollection of his testimony is
7 he could not remember a lot of those details
8 or he could not recall those, many of those
9 details, when it comes to his testimony.
10     Q   One of the things you've said about
11 prednisone in particular is that the dosing
12 can vary greatly from patient to patient in
13 terms of what's safe. Is that right?
14     A   It can vary patient to patient based
15 off of their, the condition that's being
16 treated.
17     Q   So if Brian Bryk were exercising
18 clinical judgment about this prescription that
19 we're talking about that was written August
20 4th of 2022, would he need information about
21 Stacey Wolking in particular?
22     A   He would need to have what they have
23 collected as far as a past medical
24 prescription history, very common for a

Page 54

1  community pharmacist to take a medication
2  history, patient fill out a simple form and
3  they provide a little bit of information about
4  their name, address, birthday, drug allergies,
5  and correct medications that they're taking.
6  And that information would typically be stored
7  in their computer system. But it would be
8  limited information about all of her medical
9  history. They do not have access to the
10 electronic medical record, doctor's notes,
11 discussions, discharge notes, thing like that.
12 Most community pharmacists do not have access
13 to those types of documents. So I would not
14 know exactly what he would have collected from
15 the community as far as those forms, but there
16 would be some information.
17      Q    And you have reviewed Ms. Wolking's
18 patient profile at Tunkhannock Compounding
19 Center; right?
20      A    I reviewed those, yes.
21      Q    As well as her prescription history
22 at Tunkhannock Compounding Center?
23      A    Yes.
24      Q    And then you reviewed the deposition

Page 55

1  transcripts of Brian Bryk, Henry Lindner, the
2  Tunkhannock 30(b)(6) deposition, as well as
3  Ms. Wolking; correct?
4       A    Yes.
5       Q    Based on all of the information that
6  you've reviewed, if you received this
7  prescription that was dated August 4th of
8  2022, and had the same information that was
9  available to Brian Bryk, would you have
10 dispensed this prescription?
11      A    I believe that's a hypothetical
12 question that I'm not sure I can answer,
13 honestly, like I don't know that I can -- I
14 know a lot more information right now on the
15 case looking in retrospect than I would have
16 had when the prescription arrived to me.
17      What I can tell you is I would have
18 leaned on my experience with what I knew about
19 Dr. Lindner's prescribing history and
20 treatments of other patients. That would be a
21 big factor for me. And my opinion on what I
22 would have done, hypothetically, is have had a
23 phone conversation with the physician to
24 double-check and make sure I understand that

Page 56

1  this is a mail order prescription. My
2  understanding in reading all of those
3  documents is that the understanding was this
4  would be a tapered type of dosing strategy
5  that would be led by Dr. Lindner. And that he
6  would be working with Ms. Wolking as he is the
7  physician and she is his patient, and he would
8  be directing her on this tapering up and down
9  of prednisone based off of symptoms.
10      And if that were my understanding,
11 and I entrusted Dr. Lindner to handle that and
12 to be responsible for her dosing, because it
13 does say "up to" and it does say "as
14 directed," and many prescriptions come through
15 a pharmacy that say "as directed," then I
16 would lean on all of those factors to make my
17 decision at the moment. But I don't believe I
18 can say here today under oath if I would fill
19 it or if I would not. I don't feel
20 comfortable giving an answer for that.
21      I hope that my explanation of how I
22 would come to that decision is helpful in
23 answering that question.
24      Q    Are you aware of any evidence that

Page 57

1  Brian Bryk had a phone conversation with
2  Dr. Lindner like the one you just described?
3       A    Not from his testimony, but from
4  Courtney Young's testimony, she testified that
5  there were conversations, one conversation,
6  more conversations. And there had been a
7  history of understanding the treatment
8  approach that Dr. Lindner had based off of his
9  daughter, Valerie, and her suffering with a
10 similar type of rare condition. So it was
11 understanding there of the treatment approach,
12 and Dr. Young testified that there had been
13 conversations had and she understood his
14 treatment approach.
15      Q    We are going to get to Courtney
16 Young. But right now we're still on the first
17 prescription that Brian Bryk dispensed. So
18 are you aware of any time that Brian Bryk
19 spoke to Dr. Lindner about that prescription
20 for Stacey Wolking?
21      MR. BENEDETTO:  Objection to
22 form.
23      A    Pharmacists work closely together in
24 a community pharmacy and it's very common for

Page 58

1  pharmacists to discuss with one another
2  situations with patient care.  And if I recall
3  correctly, although, like I stated, my
4  recollection of Dr. Bryk's testimony is he
5  could not recall, there were details missing.
6  But in -- and I know we are going to get to
7  Dr. Young, but to answer your question
8  thoroughly -- Dr. Young in my recollection
9  mentioned that she felt she had conversations
10  with Dr. Bryk about this particular patient.
11         And as pharmacists lean on each
12  other, and one pharmacist may have a
13  conversation and they share it with the other
14  pharmacist.  And Courtney Young as the manager
15  of that pharmacy and the supervisor of that
16  pharmacy testified she had conversation, my
17  recollection, with Dr. Bryk.
18      Q    Okay.  Just before we get to
19  Courtney Young, though, you're not aware of
20  any evidence that Brian Bryk spoke to
21  Dr. Lindner about Stacey Wolking, are you?
22      A    As I received the information from
23  reviewing it that he had had a conversation,
24  based off testimony of Courtney Young, with

Page 59

1  Courtney Young and possibly Dr. Lindner.  The
2  details were fuzzy.
3      Q    Okay.  I'm going to go to the next
4  page of Exhibit 2, which is a prescription
5  dated August 15th of 2022 for 200 tablets of
6  the 4 milligram dexamethasone tablets.  Do you
7  see that on your screen?
8      A    Yes, sir, I do.
9      Q    Now, this prescription, the evidence
10  shows, was dispensed by Courtney Young.  When
11  she dispensed this prescription, did she have
12  her own duty of care with respect to this
13  prescription?
14      A    Yes, she does, she did have her own
15  duty of care.
16      Q    And here this prescription, the
17  instructions say take "Up to four tabs by
18  mouth daily in divided doses as directed."
19  Correct?
20      A    That's correct.
21      Q    Do you know how to convert doses of
22  dexamethasone into an equivalent dose of
23  prednisone?
24      A    Yes.

Page 60

1      Q    What's the ratio that you use to
2  convert?
3      A    There are different references that
4  I would say the medical acceptance is between
5  five to six milligrams of prednisone to one
6  milligram of dexamethasone.
7      Q    Okay.  So if we were using six as
8  the conversion, if a patient took four of
9  these 4 milligram dexamethasone tablets a day,
10  would you agree that that would be 96
11  milligrams of prednisone equivalent per day?
12  I think --
13      A    Although --
14      Q    I'm trying to do six times 16, I
15  think that's 96.
16      A    Although the equivalence is
17  valuable, dexamethasone is its own medication.
18  So dexamethasone has its own package insert.
19  It doesn't necessarily need to be quantified
20  with prednisone because dexamethasone is
21  longer-acting, and dexamethasone is going to
22  act differently in your system than
23  prednisone.  So although it's valuable just so
24  you have the benchmark, when I would dispense

Page 61

1  dexamethasone in my pharmacy or when I'm going
2  to, if I were to instruct students about
3  dexamethasone, there would be a particular
4  reason why I would be -- why the prescriber
5  would be using dexamethasone instead of
6  prednisone.  So although that information is
7  valuable, it's not always clinically relevant,
8  because dexamethasone is its own medication,
9  with its own side effects, and has been proven
10  by the FDA just as prednisone has.
11      Q    I appreciate that.  The reason I was
12  asking was I was trying to understand if in
13  your view the instructions for this August
14  15th prescription are similar to the
15  instructions for the August 4th prescription
16  as far as the dosage.  So we don't have to
17  convert it if you don't want to, but I'm
18  trying to get that, whether these instructions
19  on August 15th describe a similar amount of
20  corticosteroids to the ones on August 4th?
21      A    Dexamethasone is used often in
22  different ways than prednisone because it is,
23  dexamethasone is long-acting.  And I will --
24      Q    Sorry, that's not my question, is

## Page 62

1  not how they're used.  I'm just asking you
2  whether the actual dosage of corticosteroid is
3  similar in amount to the one on the August 4th
4  prescription?
5        MR. BENEDETTO:  Objection to
6     form.
7        You can answer, Joy.
8     A    I'm not sure that I would even think
9  about that as a practicing pharmacist, that
10 this prescription is similar as far as dosage
11 to the one before, because my mindset would be
12 this is a different medicine that will work
13 differently in the body, based off of its
14 half-life, based off of what it would be used,
15 even used to treat.  So I'm not sure I feel
16 that I can answer that question because my
17 approach would be different when I would see
18 this prescription versus prednisone.
19    Q    Okay.  I'm going to ask you a
20 hypothetical question here.
21    A    Okay.
22    Q    Let's say that the patient was
23 taking ten tablets of prednisone a day from
24 the first prescription we looked at, the

## Page 63

1  August 4th prescription.
2     A    Let me get it correct, ten tablets a
3  day.
4     Q    Right.  So they're taking 100
5  milligrams of prednisone a day.  Are you with
6  me so far?
7     A    Yes, sir.
8     Q    If the patient were to take those
9  ten tablets and then in the same day take four
10 of these 4 milligram dexamethasone tablets,
11 would that total amount of corticosteroid in
12 one day present any risk of harm to that
13 patient?
14       MR. BENEDETTO:  Objection to
15    the form.
16    A    In my experience I would not expect
17 to see both of those prescriptions being taken
18 simultaneously.
19    Q    Why not?
20    A    I would not expect to see that.  I
21 would expect to see one or the other in my
22 experience.  And what I would do in that
23 situation, what I believe I would do -- again
24 it's hypothetical -- is I would call the

## Page 64

1  physician to double-check about those dosages,
2  those prescriptions.
3     Q    And that's if you were being asked
4  to dispense the second of these prescriptions,
5  the August 15th prescription; right?
6     A    What I would assume -- again,
7  hypothetical -- it's very hard to say exactly,
8  right, I'm just giving you my opinion -- I
9  would see dexamethasone and I would think that
10 the patient is no longer -- I would think
11 this, they must no longer be taking the
12 prednisone because now we're needing to use a
13 longer-acting medication for this patient.
14 And also I would again have the perspective of
15 understanding this practitioner that I have
16 worked with for many, many years and their
17 approach to therapy.
18       But I would see this as not
19 duplicate therapy because it's a different
20 medication, it has a longer-acting effect.
21 And I would assume what I would do is I would
22 call and have a conversation and say, "I've
23 gotten this prescription for dexamethasone,
24 are you switching medications for the patient?

## Page 65

1  Should I mark the other prescription
2  inactive?"
3        That would be what I have feel that
4  I would do in that situation, because the
5  medications --
6     Q    Would the standard of care require
7  you to make that phone call?
8     A    The standard of care is listed in,
9  if you're thinking about what is listed in the
10 standard of practice for the Pennsylvania
11 Board of Pharmacy, I can't say that it would
12 require me to do that because it allows me to
13 use my clinical judgment.  And pharmacists are
14 given the authority due to training and being
15 medication experts to use clinical judgment,
16 clinical discernment as part of the healthcare
17 team.
18       So nowhere are you going to find
19 that I would be required, when you look at
20 what the law says, it is a pharmacist's
21 attempt to identify potential drug therapy
22 problems, the words used in this statute say
23 that "The reason that a prospective drug
24 review exists is to attempt to identify the

Page 66

1  potential drug therapy problems that might
2  result from therapeutic duplication."
3       So there are so many variables
4  included, that an attempt to do that and
5  making a strong effort to do that is what most
6  pharmacists do with the time they have and the
7  lack of information that they have available
8  to them to make those clinical decisions in
9  conjunction with the prescriber, who is the
10  one ultimately prescribing the medication and
11  directing the practice of how that medication
12  will be used.  So --
13       Q    Okay.  My understanding is that
14  you've been retained in this case to express
15  an expert opinion about whether these
16  pharmacists complied with the standard of
17  care.  Is that correct?
18       A    Sure.  I mean, I'm looking at all
19  the facts that I --
20       Q    Okay.  So my question is not whether
21  there is something published in a Pennsylvania
22  standard of practice or in the PDR statute
23  about making that phone call.  My question is
24  whether in your expert opinion the standard of

Page 67

1  care would require the pharmacist to make the
2  phone call that you described, if they
3  received this second prescription for
4  dexamethasone 11 days after the first
5  prescription for prednisone?
6       MR. BENEDETTO:  Objection to
7  form.
8       You can answer.
9       A    And I'm respectfully trying to
10  explain that not everything is, quote/unquote,
11  required.  Who is requiring it?  Would you say
12  that the standard of practice is requiring it?
13  I would say the standard of practice says that
14  we attempt as pharmacists to identify drug
15  therapy issues and try to use the information
16  we have at our fingertips.
17       Do I think that the right decision
18  would be to verify with the practitioner?  I
19  think that's the right decision.  Do I think
20  that the pharmacist is required by state law,
21  which is the governing body for their license?
22  So I don't think we can take out the state
23  Board of Pharmacy because they are the ones
24  who have written the laws for standards of

Page 68

1  practice.
2       So what they tell us is what we
3  learn when we pass our -- we have two license
4  exams -- we pass our license exam, we have to
5  understand the law and what is required.  It
6  is an attempt with the limited information
7  that we have to ensure patient safety.
8  Therapeutic duplication would be a warning
9  that we would look at.  We would say, okay,
10  this is a long-acting ortho steroid
11  prescription and we just filled prednisone,
12  which is a short-acting.  One would think in
13  their mind, I wonder what's going on here?
14       And then as that pharmacist in the
15  same building as the practitioner, if I
16  understood that there was a certain protocol
17  that was typically used, I would understand
18  the treatment rationale of that particular
19  physician.
20       And depending on how confident TCC
21  felt with Dr. Lindner prescribing and
22  initiating this treatment plan to his patient,
23  I would make a decision in that moment, do I
24  call and do I verify that.

Page 69

1       My expert opinion is that it is wise
2  for a pharmacist to call and to double-check.
3  That is my expert opinion.  The required, I'm
4  not sure it's required.  I think what would
5  happen is that the Board of Pharmacy were to
6  come into my pharmacy and do an audit on these
7  two prescriptions and say to me, "Why did you
8  fill that second prescription?"  I would want
9  to have provided documentation as to my
10  rationale because as a pharmacist, I have to
11  give an account for why did I fill that
12  prescription.  And so the documentation piece,
13  in my expert opinion, what I stated in my
14  opinion letter, is very important when
15  situations like this arise.
16       Q    So let's give a hypothetical and
17  just talk about Courtney Young in this case.
18       A    Okay.
19       Q    When she received this prescription
20  that was written on August 15th of 2022, when
21  she received that --
22       A    Yes.
23       Q    -- what does the standard of care
24  require, if anything, before she dispenses

Page 70

1  that prescription, what does it require her to
2  do?
3       A    She needs to make sure that
4  everything is on the prescription that's
5  needed to be there:  The patient name, the
6  drug name, all of the things that are listed
7  by law for a prescription to be legal.  The
8  directions, if it's an electronic
9  prescription, we have electronic signature.
10 If there are any refills, then she would, what
11 she would need to do is make sure she's
12 filling this prescription for the correct
13 patient.  She would want to make sure that it
14 actually is for Stacey Wolking.  She would use
15 a clean container and she would affix the
16 label to that container.  And this is a mail
17 order, so she understands that mail order
18 pharmacy oftentimes a higher quantity is
19 dispensed because it's going to be mailed, and
20 many patients like to have a longer day supply
21 or a longer quantity because of not being able
22 to come to the pharmacy in person and it being
23 mailed.
24       So the quantity would need to be

Page 71

1  there, the directions for use, those types of
2  things as far as when you're asking me about
3  the prescription itself.
4       Q    In addition to everything that you
5  just mentioned, does the standard of care
6  require her to do anything because there was
7  this other prednisone prescription 11 days
8  earlier, does that then require her to do
9  anything before dispensing this prescription
10 for August 15th?
11      MR. BENEDETTO:  Objection.
12      You can answer, Joy.
13      A    I have printed off the Pennsylvania
14 Board of Pharmacy Standards of Practice right
15 here, I'm happy to, you know, find that and
16 bring that up to you.  But if you look on
17 these standards of practice, you will see in
18 Section 5 Subsection C, "A pharmacist may
19 decline to fill or refill a prescription if
20 the pharmacist's professional judgment
21 exercised in the interest of the safety of the
22 patient, the pharmacist believes the
23 prescription should not be filled or
24 refilled."

Page 72

1       So the state statute says that the
2  pharmacist will exercise their professional
3  judgment in the interest of the safety of the
4  patient, which is why these situations are not
5  always black and white.  The professional
6  judgment exercised, which is given by the
7  Board of Pharmacy, in the interest of the
8  safety of the patient contains many variables.
9  Professional judgment is not just looking at a
10 package insert to say, is babesiosis listed in
11 the dexamethasone package insert?  No.  It's
12 not going to be there.  But so, there's not
13 going to be many autoimmune and rare
14 conditions listed.
15      There's not a document that we as
16 pharmacists go to that says, oh, here it is,
17 only use 16 milligrams a day forever more in
18 steroid dosing.  Because steroids are used,
19 they're life-changing, life-saving medications
20 in many cases.  And there is professional
21 judgment to be exercised, and that
22 professional judgment involves the history
23 that the practicing physician has with the
24 pharmacy.  There is teamwork, there is the

Page 73

1  healthcare team working together.  It also
2  involves the professional judgment of the
3  pharmacist, what does Dr. Young understand
4  about this patient.
5       Q    I'm going to ask this again because
6  I'm not sure if it's getting through, you're
7  not answering my question.  My question is not
8  in general what is permitted, what is not.  My
9  question in general is not what does the
10 exercise of professional judgment entail.
11      My question is, for this particular
12 prescription that's dated August 15th, when
13 Courtney Young dispensed it, knowing that her
14 pharmacy had just dispensed 500 tablets of
15 prednisone 11 days earlier -- are you with me
16 so far, when she dispenses this knowing that
17 they had this previous prescription?
18      A    Yes.
19      Q    Does the standard of care in your
20 expert opinion, did it require her to do
21 anything before dispensing it?
22      MR. BENEDETTO:  Objection to
23 form.  Asked and answered.
24      Go ahead, Joy, you can answer

Page 74

1  the question.
2      A    I think it requires her to use her
3  professional judgment to make a decision, do I
4  fill this prescription or not?  And in that
5  professional judgment, which is what I was
6  trying to explain, that is the key to
7  answering that question.  Does it require her
8  to do anything?  Yes, it requires her to use
9  and exercise her professional judgment.
10     Q    And in exercising her professional
11  judgment, is she required in your opinion to
12  speak with Dr. Lindner about this prescription
13  dated August 15th?
14          MR. BENEDETTO:  Objection to
15     form.  Asked and answered.
16          Go ahead, Joy, you can answer.
17     A    When I think about a prescription
18  coming to the pharmacy, there may have already
19  been a conversation that's happened, they may
20  have already discussed this patient at a
21  previous time.  And so this prescription was
22  somewhat even expected because of this
23  condition being treated.  So it is not
24  required at that moment that for the standards

Page 75

1  of practice that Dr. Young make a phone call
2  or even at that moment.  Because they work in
3  the same building, they may have already had a
4  previous conversation about this patient
5  before the prescriptions even arose.
6          May I take a moment to expand or
7  unless you would like for me not to expand.
8      Q    I'm sure I'm going to give you an
9  opportunity here with a few more questions,
10  so, you know, I want you to get it out, but
11  you might just wait until I ask the next
12  question.
13     A    Sure.
14     Q    You write in your report that
15  Courtney Young believed that the first
16  prescription, the one for prednisone, had been
17  discontinued.  Where did you get that from in
18  the materials that you reviewed that she
19  believed it had been discontinued?
20     A    I do not have that pulled up on my
21  computer at the moment, but in my recollection
22  she was asked about that.  And my
23  recollection, she, I think I remember her
24  saying that she felt the other medication,

Page 76

1  this was going to be a change of therapy.
2          - - -
3          (Courtney Young transcript
4      excerpt marked Greene Exhibit 3.)
5          - - -
6  BY MR. LAMB:
7      Q    Okay.  I'm going to show you what
8  I'm going to mark as Exhibit 3, and for the
9  record, this is Page 98 of the transcript of
10  Courtney Young's deposition transcript from
11  November 15th of 2023.  You see here where the
12  question is "Why would a prescription for
13  prednisone be therapeutically duplicative with
14  a prescription for dexamethasone?"  And she
15  answers "They're both corticosteroids."
16     A    Right.  "My understanding was that
17  the prednisone was discontinued and he was
18  starting dexamethasone."  Yes.
19     Q    Okay.  And then the next question
20  is, "How did you achieve that understanding?"
21  And she answers, "I knew that he had switched
22  steroids for other patients.  So, again, I
23  don't remember a conversation necessarily, but
24  that was my understanding of the

Page 77

1  prescription."
2          Then the next question is about
3  whether she spoke to Dr. Lindner between
4  August 8th and August 15th, and she can't
5  remember.
6          So my question to you is, is it your
7  understanding that Courtney Young's belief
8  that the prednisone was being discontinued is
9  based on her knowledge about other patients
10  besides Stacey Wolking?
11     A    My understanding was her, it was her
12  understanding of his treatment approach.
13     Q    And by treatment approach you mean
14  to all patients, not particularly Stacey
15  Wolking?
16          MR. BENEDETTO:  Objection to
17     form.
18     A    That it was her experience filling
19  prescriptions for Dr. Lindner that it was
20  common for him to stop prednisone and start
21  dexamethasone.
22     Q    Is there anywhere in the materials
23  that you can identify where it shows that
24  Ms. Young knew that Stacey Wolking in

Page 78

1  particular was having her prednisone
2  discontinued?
3      A    Not that I can recall.
4            MR. LAMB:  We've been going an
5  hour and a half, I'm fine, but does
6  anyone need a five- or ten-minute break
7  before we get going?
8            MR. BENEDETTO:  I'd like to
9  take a five-minute break, but no more.
10           MR. LAMB:  Okay.  We can go off
11  the record.
12           VIDEO TECHNICIAN:  The time is
13  10:28 a.m., we are going off the record.
14           - - -
15           (Short recess.)
16           - - -
17           VIDEO TECHNICIAN:  The time is
18  10:34 a.m., we are back on the record.
19  BY MR. LAMB:
20      Q    Okay.  Dr. Greene, I just want to
21  look at the third of these prescriptions.  I'm
22  sharing my screen with you now, and we have
23  the fourth page of Exhibit 2 on the screen.
24  Do you see that?

Page 79

1      A    Yes, sir.
2      Q    Okay.  And this is a prescription
3  written on September 26, 2022, for 300 of the
4  4 milligram dexamethasone tablets; correct?
5      A    300, yes.
6      Q    And this was dispensed by Brian
7  Bryk; correct?
8      A    I'm looking to see where I see
9  Dr. Bryk.
10      Q    You know what, if we go up to
11  Page 1.
12      A    Yes, there it is, yes.
13      Q    Okay.
14      A    I didn't see on the prescription
15  part.  Yes.
16      Q    So this was dispensed by Brian Bryk.
17  And the instructions for this one are "Up to
18  10 tabs per day by mouth."  Correct?
19      A    "As directed."
20      Q    Correct.
21      A    As directed by the physician.
22      Q    Right.  And it's ten tabs per
23  day; right?
24      A    Up to, yes, that's correct.

Page 80

1      Q    We talked earlier about some
2  conditions you are familiar with that are
3  treated with different levels of
4  corticosteroids.  Have you ever heard of a
5  condition where an outpatient is prescribed up
6  to 200 -- I'm sorry, up to 40 milligrams of
7  dexamethasone per day?
8      A    Yes.
9      Q    What conditions are those?
10      A    That would be a condition like
11  multiple myeloma where you can take oral
12  dexamethasone.  Multiple sclerosis, MS, is
13  commonly treated outpatient, 30 to 40
14  milligrams, even higher in some cases that you
15  can find literature for to support.
16      Q    Of the dexamethasone?
17      A    Yes, yes, dexamethasone, 30 to 40
18  milligrams per day for short term, short term.
19      Q    You're good at anticipating my next
20  question, so that was going to be my question.
21  What is short term as you define it?
22      A    I would not be able to give you the
23  exact time frame for short term because I'm
24  not a practicing physician and I'm not a

Page 81

1  disease state expert.  But when you look for
2  MS common flareup prescriptions, you can see
3  it could be a week, three weeks, even longer.
4  But it's always under the direction of that
5  prescriber.
6            As a pharmacist you would trust the
7  prescriber to work with his or her patient in
8  that dosage adjustment based off of the
9  medical history that the pharmacist does not
10  always have access to and very rarely has
11  access to, and the conversations that have
12  happened between the prescriber and the
13  patient.  Because the patient will contact the
14  prescriber with the symptoms and then the
15  prescriber works out those dosages.
16           So I can't give you a clearcut
17  answer on what short term would be, because
18  it's going to be based off of the prescriber's
19  experience in treating that disease.
20      Q    When you said you had heard of
21  situations where someone was instructed to
22  take up to 40 milligrams of dexamethasone a
23  day, is that in like a published literature
24  anywhere or was it more from your practical

Page 82

1  background?  Where did you get that
2  information from?
3       A    I do have some published data on,
4  especially using very high doses of
5  prednisone, even up to 1200 milligrams per day
6  of prednisone.  I have it on my screen, I'm
7  happy to share that with you.  That is
8  ambulatory setting, not a hospital setting.
9            And then when you look into the
10  literature for other ways to treat MS and
11  multiple myeloma, you will see 30 to 40
12  milligrams of dexamethasone per day for one
13  week, two weeks.
14           Would you like for me to find some
15  of those for you?
16      Q    Possibly.  I don't need you to do
17  that right now.  I'm just asking about your
18  knowledge at the moment.
19      A    And even the --
20      Q    I'm sorry.  Let me just get the
21  question out.  Do you know of any situations
22  in the literature where someone was instructed
23  to take up to 40 milligrams a day for 30 days?
24      A    I haven't looked that closely so I

Page 83

1  have not researched that for 30 days.  I think
2  it would be disease dependent and symptom
3  dependent and also weighing that with the
4  patient's quality of life.  But that would be
5  a physician's responsibility and not a
6  pharmacist to determine that course of
7  therapy, because pharmacists are not disease
8  experts in that way and they're not
9  prescribers.
10      Q    Was it reasonable for Brian Bryk to
11  dispense this particular prescription that was
12  dated September 26, 2022?
13           MR. BENEDETTO:  Objection to
14      form.
15           You can answer, Joy.
16      A    Again, I'm looking at this from the
17  back end, and I have a lot of data to review
18  in thinking about this.  I can't speak on his
19  behalf.  My assumption would be that he would
20  have used his clinical and professional
21  judgment based off of what he knew about
22  treating this rare condition.  And I'm not
23  sure I can answer that because I'm not in that
24  situation.

Page 84

1       Q    Again, I just want to make clear,
2  I'm not asking you to make an assumption.  I'm
3  asking you in your expert opinion based on all
4  the material that you have reviewed in this
5  case, was it reasonable for Brian Bryk to
6  dispense this prescription that we're looking
7  at on the screen?
8            MR. BENEDETTO:  Objection.
9       A    It depends, in my opinion, my expert
10  opinion, it would depend on all the
11  circumstances around this prescription.  It
12  would depend on my knowledge of the mail order
13  prescription and understanding how many
14  tablets the patient may need.  It would be
15  based off my understanding of Dr. Lindner's
16  approach to therapy.  I would have to use my
17  clinical judgment.
18      Q    Although, again, I'm sorry, I'm not
19  asking your clinical judgment as a dispensing
20  pharmacist.  You've been retained to express
21  an expert opinion about these pharmacists in
22  this case.
23           So based on all of the list of
24  things that you put in your report that you

Page 85

1  reviewed, all the things that you reviewed in
2  this case, are you able to state an opinion
3  about whether it was reasonable for Brian Bryk
4  to dispense this prescription dated September
5  26th?
6            MR. BENEDETTO:  Objection.
7            You can answer, Joy.
8       A    Brian Bryk did not give us a lot of
9  his rationale and data in his testimony.  So
10  it is difficult for me to look at his
11  testimony to see if I felt that it was
12  reasonable for him to dispense a medication.
13  So all I have to go on is what I think this
14  duty of my pharmacist would be, and all of
15  that is based around many factors.  I don't
16  believe it's clearcut.  I do not know
17  everything that he understood, he was very
18  vague in many of his answers.
19           If a pharmacist, if we look at it as
20  this situation, if a pharmacist entrusted
21  Dr. Lindner to handle the titrating of a
22  medication up and down based off symptoms and
23  if I trusted the prescriber to oversee as the
24  prescription says, it's up to ten tablets,

Page 86

1 it's as directed.
2     As I lean on that prescriber to do
3 his job, which is writing the prescription,
4 the authority to do that, and managing the
5 complex case of this patient, which is not my
6 responsibility as a pharmacist, if I had
7 deemed that it were appropriate to fill this
8 based off all those variables, then I would
9 document my rationale behind that. And if my
10 clinical judgment said yes, I would fill it
11 and I would document my rationale to support
12 why I filled it.
13     Q   Thank you. I know in this
14 deposition I have asked you a couple times
15 what you would do and I've also asked you some
16 hypothetical questions, so I think that is, I
17 want to make sure we're keeping the type of
18 question straight.
19     This question is not what you would
20 do or hypothetically what a pharmacist would
21 do. I'm asking you based on everything you've
22 reviewed in this case, in your opinion was
23 Brian Bryk within the standard of care when he
24 dispensed this prescription that's dated

Page 87

1 September 26th? And if you can't say, that's
2 fine. I'm just asking you, do you have an
3 opinion as to whether he was within the
4 standard of care?
5     MR. BENEDETTO: Objection to
6     form. Asked and answered.
7     You can answer, Joy.
8     A   I do not feel he gave me enough
9 information through his testimony for me to
10 answer that question.
11     MR. LAMB: Okay, thank you. I
12     don't have any more questions right now.
13     Counsel for Tunkhannock may have some
14     questions for you.
15     - - -
16     EXAMINATION
17     - - -
18 BY MR. BENEDETTO:
19     Q   Joy, settling else you would like to
20 testify to regarding your conclusions and
21 expert opinion in this case?
22     A   The letter that was written by
23 Dr. Johns, the Pharm.D., he stated on Page --
24     MR. LAMB: I'm sorry, Doctor,

Page 88

1     can I just interrupt very quickly and put
2     a standing objection on the record to the
3     discussion of the supplemental reports.
4     And I'll just leave it at that. Go right
5     ahead. Sorry for the interruption.
6     MR. BENEDETTO: Conor, your
7     objection is noted.
8 BY MR. BENEDETTO:
9     Q   Go ahead, Dr. Greene.
10     A   Okay. Page 2, he made an assumption
11 that I clearly supported a claim that chronic
12 babesiosis is a legitimate medical condition.
13 And I would like to say that I did not claim
14 an opinion either way on that disorder, but
15 instead that there are many rare conditions
16 that the medical community does not have
17 definitive guidelines for treating.
18     When you think about 20% of all
19 prescriptions that are written are written for
20 off-label use, our medical system, although
21 wonderful, is not perfect. We don't
22 understand every condition, there's not a cure
23 or treatment that is effective for every
24 condition.

Page 89

1     And often you have a patient like
2 Ms. Wolking, and it breaks me heart for her to
3 have lived for years and years with terrible
4 symptoms that multiple specialists could not
5 help her with. And she has a medical history
6 that's complicated and not straightforward to
7 treat.
8     The other thing I'd like to address
9 from this opinion from Dr. Johns is that the
10 duty of the pharmacist is independent of the
11 prescribing provider, and that Drs. Young and
12 Bryk should have conducted an independent
13 investigation into the appropriateness of
14 dispensing corticosteroids to Ms. Wolking.
15 And I would like to respectfully submit that a
16 community pharmacist is not charged with the
17 role by the State Board of Pharmacy or any
18 federal guidelines to conduct independent
19 investigations on patient's diagnoses, on
20 information that is provided only to a
21 practicing practitioner. The pharmacist's
22 role is not that. It is not the duty of a
23 pharmacist to conduct independent
24 investigation.

Page 90

```
1              In the landscape of pharmacy
2   practice, a pharmacist may fill hundreds of
3   prescriptions a day.  And if 20% of those
4   prescriptions are written for off-label use,
5   and there is not a requirement for the
6   diagnosis to be included on the prescription,
7   a pharmacist is working with limited
8   information available to them.  They are not
9   able to dive into the medical chart, they are
10  not privy to the conversations between the
11  patient and the practitioner, the provider.
12             And pharmacists are not providers,
13  they are professionals.  They do not have
14  prescribing rights, aside from a collaborative
15  agreement which is not the case here for TCC.
16  The pharmacists have very limited information.
17  And I completely disagree that a pharmacist
18  has any duty to conduct an independent
19  investigation into the medical conditions of
20  patients.  The pharmacist is charged with
21  doing their very best to ensure safety with
22  the information they have provided to them.
23             This is a difficult situation.  This
24  is not clearcut.  And I did not read in any of
```

Page 92

```
1   all the questions I have.
2             MS. DeNAPLES:  No questions on
3   behalf of Dr. Lindner.
4             MR. LAMB:  No more for me,
5   either.  We can go off the record.
6   Thanks, Dr. Greene.
7             THE WITNESS:  Thank you.
8             VIDEO TECHNICIAN:  The time is
9   10:49 a.m., we are going off the record.
10            - - -
11  (Witness excused.)
12  (Whereupon the deposition
13  adjourned at 10:49 a.m.)
14            - - -
15
16
17
18
19
20
21
22
23
24
```

Page 91

```
1   those documents where I felt that the
2   pharmacist had any bad intention to harm
3   Ms. Wolking.  And that they stand, have good
4   standing with the Board of Pharmacy.  I
5   believe they were doing the best that they
6   could do with the information they had at
7   their discretion.
8        Q    And you were asked whether the
9   pharmacists, Dr. Young and Dr. Bryk, complied
10  with their duty of care and the standard of
11  care in terms of how and when and why they
12  dispensed the medication.  Is it fair to say
13  that your responses and your expert opinion is
14  based on the information that you have today
15  and based on those materials you list in your
16  report and that you talked about today;
17  correct?
18       A    That is correct.
19       Q    And you were not in their shoes then
20  when they dispensed the medication, and your
21  expert opinions are based on that material
22  that you have in your possession today?
23       A    That is correct.
24            MR. BENEDETTO:  Okay.  That's
```

Page 93

```
1              CERTIFICATE
2        I HEREBY CERTIFY that the
3   proceedings, evidence, and objections are
4   contained fully and accurately in the
5   stenographic notes taken by me upon the
6   deposition of JOY BOWERS GREENE, Pharm.D.,
7   taken on June 18, 2024, and that this is a
8   true and correct transcript of same.
9
10
11  MADALENE FOSTER ROHDE
12  Registered Professional Reporter
13
14
15
16
17
18       (The foregoing certification of this
19  transcript does not apply to any reproduction
20  of the same by any means unless under the
21  direct control and/or supervision of the
22  certifying reporter.)
23
24
```

## Page 94

1      I have read the foregoing transcript of
2  my examination given on June 18, 2024, and it
3  is true, correct, and complete, to the best of
4  my knowledge, recollection, and belief, except
5  for the list of corrections, if any, attached
6  on a separate sheet herewith.
7
8
   -------      ----------------------------
9  Date              JOY BOWERS GREENE, Pharm.D.
10
11
   Sworn to and subscribed
12 before me this      day
   of              , 2024
13
14
   ---------------------------
15 Notary Public
16
17
18
19
20
21
22
23
24

## Page 95

1  READ/SIGN DEPOSITION OF:  Joy B. Greene
   DATE OF DEPOSITION:   June 18, 2024
2  IN THE MATTER OF:  Wolking v Lindner
3      DO NOT WRITE ON THE DEPOSITION ITSELF
4  Page Line  Changes or corrections and reason
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
   I have inspected and read my deposition and
22 have listed all changes and corrections above,
   along with my reason therefor.
23
24 DATE:_____  SIGNATURE:_____

## Page 96

1              LAWYER'S NOTES
2  _____
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____

---

**1**

---

**1** 36:14,20 37:16 40:21 41:2 79:11

**1,000** 43:10

**10** 29:7 41:23 42:6,10 46:10,11 47:3
  79:18

**100** 18:4,14 19:18 42:11,19 43:8,17
  45:5 47:24 49:15 51:22 63:4

**10:28** 78:13

**10:34** 78:18

**10:49** 92:9,13

**11** 67:4 71:7 73:15

**1200** 82:5

**14** 27:4

**15th** 59:5 61:14,19 64:5 69:20 71:10
  73:12 74:13 76:11 77:4

**16** 60:14 72:17

**17** 40:24

**18** 4:16

**1998** 9:6 10:14

---

**2**

---

**2** 40:22 41:6,10,18 46:8 59:4 78:23
  88:10

**20** 29:8

**20%** 15:18 26:5,7 88:18 90:3

**200** 12:21 13:7 14:22 21:5 59:5 80:6

**2005** 9:6,8,11 10:14

**2007** 9:17,18,24

**2022** 34:11 35:19 41:19 47:13 51:19
  53:20 55:8 59:5 69:20 79:3 83:12

**2023** 76:11

**2024** 4:16 40:24

**22** 41:6

**26** 79:3 83:12

**26th** 85:5 87:1

---

**3**

---

**3** 76:4,8

**30** 32:3 80:13,17 82:11,23 83:1

**30(b)(6)** 55:2

**300** 31:18 79:3,5

---

**4**

---

**4** 21:24 36:15,18,19 41:19 59:6 60:9
  63:10 79:4

**40** 80:6,13,17 81:22 82:11,23

**4th** 34:10 35:18 47:13 49:5 51:19
  53:20 55:7 61:15,20 62:3 63:1

---

**5**

---

**5** 35:13 71:18

**50** 46:12

**500** 42:6 46:9,11 73:14

---

**8**

---

**80** 27:10,11

**80%** 15:23

**8th** 77:4

---

**9**

---

**90** 27:12

**96** 60:10,15

**98** 76:9

**9:01** 4:17

---

**A**

---

**a.m.** 4:17 78:13,18 92:9,13

**academia** 9:10 10:1

**acceptable** 50:23

**acceptance** 60:4

**access** 20:11,13 54:9,12 81:10,11

**account** 69:11

**achieve** 76:20

**acne** 27:6

**act** 60:22

**actual** 8:24 26:16 62:2

**add** 31:16

**addition** 71:4

**address** 54:4 89:8

**adequate** 26:10

**adhering** 37:19

**adjourned** 92:13

**adjustment** 81:8

**adverse** 16:4 46:17

**affect** 47:10

**affix** 70:15

**afraid** 23:13

**agree** 7:1 51:11 60:10

**agreement** 90:15

**ahead** 17:19 44:2 47:6 73:24 74:16
  88:5,9

**aids** 21:11

**airways** 44:17

**allergic** 45:14

**allergies** 54:4

**allowed** 20:6

**alongside** 25:21

**ambulatory** 82:8

**amount** 32:3 61:19 62:3 63:11

**amoxicillin** 45:16

**analysis** 32:7

**anaphylactic** 45:19

**answering** 36:6 51:8 56:23 73:7
  74:7

**answers** 31:2 76:15,21 85:18

**antibiotic** 20:20,23 21:8,11 45:13

**anticipating** 52:6 80:19

**apologize** 37:14

**Apothecary** 5:8

**appetite** 13:20

**applicable** 16:5 39:2,24

**applies** 33:18

**apply** 33:11 34:2 40:15,16 48:16

**approach** 30:4 48:23 49:11 57:8,11,
  14 62:17 64:17 77:12,13 84:16

**approached** 38:19

**appropriateness** 89:13

**approved** 15:4,14 16:3 27:15 37:10

45:24

**approximately** 4:17

**area** 30:9 33:4

**arise** 69:15

**arose** 75:5

**arrived** 55:16

**assume** 7:14 64:6,21

**assumption** 39:13 83:19 84:2 88:10

**attachments** 39:15

**attempt** 65:21,24 66:4 67:14 68:6

**attorneys** 8:22

**atypical** 31:1

**audit** 69:6

**August** 34:10 35:18 41:19 47:13
    49:5 51:19 53:19 55:7 59:5 61:13,15,
    19,20 62:3 63:1 64:5 69:20 71:10
    73:12 74:13 77:4

**authority** 24:1 65:14 86:4

**autoimmune** 19:7 72:13

**aware** 22:11 44:24 45:4 53:3 56:24
    57:18 58:19

---

**B**

**Babesia** 24:9

**babesiosis** 12:7,9 22:3,4,7,15,24
    23:4,6,10,16 24:19,23 25:6 36:4,5
    72:10 88:12

**back** 13:3 44:11 46:8 78:18 83:17

**background** 82:1

**bad** 91:2

**based** 11:1 16:11 17:10 25:1 33:2
    36:3 39:13,15 42:24 48:17 50:8,21
    53:14 55:5 56:9 57:8 58:24 62:13,14
    77:9 81:8,18 83:21 84:3,15,23 85:15,
    22 86:8,21 91:14,15,21

**basically** 24:5

**Bates** 41:5

**began** 52:16

**beginning** 5:1

**behalf** 4:21 5:8,10,12 83:19 92:3

**belief** 77:7

**believed** 24:3,4,5 75:15,19

**believes** 71:22

**benchmark** 60:24

**Benedetto** 4:12 5:6,7 19:21 23:17
    26:19 29:1,21 35:1,20 38:2,11 42:21
    43:18 45:6 46:13 49:17 57:21 62:5
    63:14 67:6 71:11 73:22 74:14 77:16
    78:8 83:13 84:8 85:6 87:5,18 88:6,8
    91:24

**benefit** 44:19 50:4 51:2,13

**benefits** 50:18 52:1

**big** 55:21

**birthday** 54:4

**bit** 17:8 21:21 29:24 54:3

**black** 72:5

**board** 31:5 33:14 37:20,23 65:11
    67:23 69:5 71:14 72:7 89:17 91:4

**body** 44:10 62:13 67:21

**bottle** 46:11

**bottom** 36:15,19

**bounce** 44:11

**bowel** 14:13

**BOWERS** 5:17

**boy** 44:14

**brand-new** 24:20

**break** 78:6,9

**breaks** 89:2

**Brian** 34:10,23 35:16 39:2 47:12 49:2
    51:17 52:24 53:17 55:1,9 57:1,17,18
    58:20 79:6,16 83:10 84:5 85:3,8
    86:23

**bring** 71:16

**Bryk** 34:10 39:2 47:12 49:2 51:17
    53:17 55:1,9 57:1,17,18 58:10,17,20
    79:7,9,16 83:10 84:5 85:3,8 86:23
    89:12 91:9

**Bryk's** 34:23 35:17 52:24 58:4

**building** 68:15 75:3

**built** 31:14

---

**C**

**cabinet** 21:10

**calculation** 45:2

**call** 6:8 8:24 9:1 63:24 64:22 65:7
    66:23 67:2 68:24 69:2 75:1

**called** 7:24 8:15 13:7 24:9 28:24

**calling** 32:17

**caption** 7:24 37:15

**captioned** 38:8

**cardiac** 30:13

**cardiologist** 30:11,16,21 33:1

**cardiology** 30:19

**care** 20:7 25:4 29:9 33:10 34:2,12
    39:1 47:14,22 48:15 49:2 51:20 58:2
    59:12,15 65:6,8 66:17 67:1 69:23
    71:5 73:19 86:23 87:4 91:10,11

**career** 30:22

**carefully** 36:2,11 43:12

**Carolina** 11:17,23

**case** 7:20,21,22,23,24 8:1,17 12:8
    21:13 24:6,15 26:13 34:7 38:19 47:21
    53:1 55:15 66:14 69:17 84:5,22 85:2
    86:5,22 87:21 90:15

**cases** 19:17 28:6,8,9 29:8 44:11,20
    72:20 80:14

**catch** 19:24

**caused** 51:1,14

**center** 21:18 40:11,12 54:19,22

**cephalexin** 27:3

**certification** 4:2

**chain** 8:16

**change** 16:18 17:3 76:1

**charged** 89:16 90:20

**chart** 90:9

**check** 49:21

**chemotherapy** 50:14,15

**chronic** 19:2,6 22:4,7,24 23:6,10,16
    24:23 25:6 36:5 88:11

**chronically** 22:19

**Ciara** 5:11

**circumstances** 49:8 84:11

**claim** 88:11,13

**clarification** 7:8

**clarity** 40:20

**class** 13:7,8,11,12,13 14:22 21:6

classroom 15:8

clean 39:10 70:15

clear 7:7 28:15 37:13 84:1

clearcut 49:23 81:16 85:16 90:24

clinic 10:22 11:1 31:6 33:3

clinical 10:20 12:2 25:22 32:8 33:2
48:3,24 49:3,7,12 51:18 52:8,11
53:18 65:13,15,16 66:8 83:20 84:17,
19 86:10

clinically 61:7

clinics 10:2,5

closely 10:22 29:11 57:23 82:24

closing 44:17

collaborative 90:14

collected 53:23 54:14

comfortable 30:17 31:12 56:20

commercially 37:12

common 12:18,22 13:1,3,4,22,24
19:4,10 53:24 57:24 77:20 81:2

commonly 16:13 80:13

communicate 6:9

community 10:2,5 11:1 20:12 26:18
27:2 54:1,12,15 57:24 88:16 89:16

company 8:15

Complaint 34:7

completely 90:17

complex 86:5

complicated 15:17 16:23 89:6

complied 66:16 91:9

compounding 10:20 21:18 37:4
38:17 39:4 40:11,12 54:18,22

computer 39:16 54:7 75:21

con 14:5

conclusions 87:20

concur 22:14

condition 18:12 19:5,17 22:2,10,12,
16 24:2 25:7,14 30:14 33:6 44:5 48:5
53:15 57:10 74:23 80:5,10 83:22
88:12,22,24

conditions 17:11 19:1,2,7,15 22:9
42:15,17 43:2,3,7,14 72:14 80:2,9
88:15 90:19

conduct 89:18,23 90:18

conducted 89:12

confident 68:20

conjunction 16:13 66:9

connected 17:6

Conor 5:3,24 28:20,22,24 29:13,16
31:5,10,24 32:17 88:6

Conrad 5:6

consideration 49:14

considered 20:7 23:3

constraints 26:5

contact 81:13

container 39:10 70:15,16

context 34:14 51:6,12

continue 9:11

conversation 55:23 57:1,5 58:13,
16,23 64:22 74:19 75:4 76:23

conversations 25:1,13 31:8 35:10
57:5,6,13 58:9 81:11 90:10

conversely 7:3

conversion 60:8

convert 59:21 60:2 61:17

copy 21:23

correct 8:10 9:1,7 16:2 22:21 24:23
37:21 39:10 42:7,12,13 46:12 54:5
55:3 59:19,20 63:2 66:17 70:12 79:4,
7,18,20,24 91:17,18,23

correctly 36:6 40:4 51:8,9 58:3

corticosteroid 62:2 63:11

corticosteroids 17:9 61:20 76:15
80:4 89:14

counsel 4:2,8,23 17:3 38:24 87:13

counseling 13:14 14:7 38:22 39:12
45:22

couple 9:13 42:14 86:14

court 4:8 5:14 6:17 7:16 8:11 24:10

courtney 21:14 39:2 57:4,15 58:14,
19,24 59:1,10 69:17 73:13 75:15
76:3,10 77:7

covered 15:2 21:4

covers 33:19

COVID 10:11,12

cure 88:22

curriculum 21:4 41:1

CV 9:2 13:6 20:19 40:21

CVS 7:22 8:1,16,22 11:3 39:5 40:14

## D

daily 41:24 59:18

dangerous 44:21

data 82:3 83:17 85:9

database 47:17

date 10:9 41:19

dated 35:18 47:13 49:4 51:19 55:7
59:5 73:12 74:13 83:12 85:4 86:24

daughter 23:5 57:9

daughter's 25:3

day 11:13,14 15:19 18:5,15 19:19
27:4,13 31:18,21 42:12,20 43:10,17
45:5 46:10,12 47:3,22 48:1 49:16
51:22 60:9,11 62:23 63:3,5,9,12
70:20 72:17 79:18,23 80:7,18 81:23
82:5,12,23 90:3

days 27:4 46:12 67:4 71:7 73:15
82:23 83:1

death 50:9

Deciding 16:16

decision 24:1 32:8,13 56:17,22
67:17,19 68:23 74:3

decisions 50:8 66:8

decline 71:19

decreased 50:6

deemed 50:10 86:7

deep 31:24

defendant 5:8,12

define 49:24 50:17 80:21

defining 50:21

definition 50:23 51:16

definitive 88:17

degree 23:24

delay 6:22

Denaples 5:11 92:2

depend 25:9 30:5 84:10,12

**dependent** 46:20 83:2,3

**depending** 11:20 68:20

**depends** 16:8 20:5 25:8,10 32:23
33:5 52:12,17 84:9

**deposition** 4:18 6:5,14 8:8,24 22:20
24:8 52:24 54:24 55:2 76:10 86:14
92:12

**describe** 50:20 61:19

**details** 53:7,9 58:5 59:2

**determine** 83:6

**dexamethasone** 12:15 13:2 44:13,
16 59:6,22 60:6,9,17,18,20,21 61:1,3,
5,8,21,23 63:10 64:9,23 67:4 72:11
76:14,18 77:21 79:4 80:7,12,16,17
81:22 82:12

**diabetes** 27:15,16

**diagnose** 20:6 25:18

**diagnosed** 28:22 29:5,13

**diagnoses** 89:19

**diagnosis** 20:4,10,15 26:14,17 27:5,
9,19 28:1,7,10,11 29:9 32:16 90:6

**differently** 60:22 62:13

**difficult** 43:21 85:10 90:23

**directed** 41:24 56:14,15 59:18
79:19,21 86:1

**directing** 56:8 66:11

**direction** 81:4

**directions** 70:8 71:1

**disagree** 90:17

**discernment** 65:16

**discharge** 54:11

**discontinued** 75:17,19 76:17 77:8
78:2

**discretion** 91:7

**discuss** 35:5 58:1

**discussed** 36:4 74:20

**discussing** 34:16 38:14

**discussion** 24:7 88:3

**discussions** 52:22 54:11

**disease** 23:22 24:17 25:15 26:3,11,
14,17 27:17 28:5,23,24 29:13,17
31:5,10 32:1,9,18,22 81:1,19 83:2,7

**disorder** 88:14

**disorders** 19:8

**dispense** 12:19 29:20 33:12 60:24
64:4 83:11 84:6 85:4,12

**dispensed** 9:23 10:4,16 12:11,13,
15,20 18:3 34:10,12,24 35:17 47:12
55:10 57:17 59:10,11 70:19 73:13,14
79:6,16 86:24 91:12,20

**dispenses** 20:2 34:1 69:24 73:16

**dispensing** 11:12 15:13 17:15 39:9
48:20 53:5 71:9 73:21 84:19 89:14

**distinctly** 19:12

**dive** 31:24 90:9

**divided** 59:18

**Doctor** 87:24

**doctor's** 10:21 11:1 54:10

**doctors** 29:11

**document** 72:15 86:9,11

**documentation** 35:9 36:17 69:9,12

**documents** 54:13 56:3 91:1

**dosage** 45:10 48:9 61:16 62:2,10
81:8

**dosages** 18:17 48:14,17 64:1 81:15

**dose** 42:16 46:5 48:12 50:14,15
59:22

**dosed** 44:16

**Dosepak** 13:1

**doses** 17:24 18:1 43:4,23 44:5,8,13,
20 59:18,21 82:4

**dosing** 17:8,10,14 19:1 43:2,22 47:7
48:4 53:11 56:4,12 72:18

**double-check** 55:24 64:1 69:2

**doubt** 25:22

**Drs** 89:11

**drug** 12:21 15:4 16:6 21:6 39:11
51:13,14 54:4 65:21,23 66:1 67:14
70:6

**drugs** 10:16 11:12 12:18 13:7 15:5

**due** 65:14

**duly** 5:18

**duplicate** 64:19

**duplication** 66:2 68:8

**duplicative** 76:13

**duration** 46:18

**duties** 39:23

**duty** 11:17,19 12:4 25:4 26:3,16
33:10 34:2,11,20,23 35:4,7,8,12,15,
17,24 36:7,14,20 37:5,15,18 38:1,6,8,
9,14,21,22 39:1,6,17,19 40:8 59:12,
15 85:14 89:10,22 90:18 91:10

---

**E**

**ear** 27:5

**earlier** 42:15 71:8 73:15 80:1

**Eastern** 4:17

**education** 31:10

**effect** 14:2,20,21 16:10,18 17:4
64:20

**effective** 46:5 88:23

**effectively** 6:10 32:5

**effects** 13:14,17 14:24 15:5 16:4,5
47:11 61:9

**effort** 66:5

**eight-hour** 31:19

**electronic** 54:10 70:8,9

**end** 38:23 45:18 83:17

**ended** 9:15,17

**ensure** 68:7 90:21

**entail** 73:10

**entrustability** 25:19,22 31:13 49:10

**entrusted** 56:11 85:20

**equally** 31:21

**equivalence** 60:16

**equivalent** 59:22 60:11

**estimated** 15:19

**et al** 4:20

**evidence** 53:3 56:24 58:20 59:9

**exact** 23:12 80:23

**exam** 68:4

**EXAMINATION** 5:21 87:16

**examined** 5:19

**examples** 33:17

**exams** 68:4

**excerpt** 76:4

**excruciating** 18:19

**excused** 92:11

**exercise** 49:3,12 52:7,10 72:2 73:10 74:9

**exercised** 51:17 71:21 72:6,21

**exercising** 53:17 74:10

**Exhibit** 40:21 41:1,6,10,18 46:8 59:4 76:4,8 78:23

**exist** 26:12

**exists** 29:18 65:24

**expand** 75:6,7

**expect** 47:11 63:16,20,21

**expected** 13:13,17 74:22

**experience** 9:5 15:8 16:10,12 17:12 18:20 19:11 23:4 25:3 27:11 30:20 42:24 43:24 44:4 55:18 63:16,22 77:18 81:19

**experienced** 17:1 26:23

**experiences** 17:5

**expert** 7:15,19 8:9,13 22:13 23:4,22, 23 24:16,17,22 27:20 66:15,24 69:1, 3,13 73:20 81:1 84:3,9,21 87:21 91:13,21

**expertise** 30:8

**experts** 65:15 83:8

**explain** 37:10 38:15 40:5 67:10 74:6

**explanation** 56:21

**express** 66:14 84:20

**extra** 6:23 21:10

---

**F**

**face** 13:22

**faced** 30:23

**facility** 30:20

**fact** 43:9

**factor** 55:21

**factors** 56:16 85:15

**facts** 21:14 24:6 66:19

**faculties** 21:3

**failed** 43:6

**fair** 9:3 10:14 11:11 91:12

**fall** 8:2

**familiar** 80:2

**FDA** 15:4,11,13,24 16:3,11 27:15 37:10 45:21,24 61:10

**federal** 89:18

**feel** 13:20 14:6 23:23 30:17 31:12 40:5 56:19 62:15 65:3 87:8

**feeling** 18:20

**felt** 58:9 68:21 75:24 85:11 91:1

**fewer** 22:3

**Figueroa** 4:21

**filing** 4:3

**fill** 15:19 25:23 27:17 31:18 32:9 33:21 43:8 52:16 54:2 56:18 69:8,11 71:19 74:4 86:7,10 90:2

**filled** 27:12 28:3 36:1 39:21 68:11 71:23 86:12

**filling** 30:18 31:12 33:20 70:12 77:18

**find** 25:6,15 29:19 32:5,21 65:18 71:15 80:15 82:14

**finding** 26:9

**fine** 7:9 78:5 87:2

**fingertips** 67:16

**finish** 6:23 7:4 21:9

**finishing** 21:7

**first-year** 13:12

**fit** 30:23

**five-** 78:6

**five-minute** 78:9

**flareup** 18:17 43:11 81:2

**fluid** 13:21

**focus** 37:11

**follow** 32:12

**followup** 32:19

**food** 14:5,8 27:22

**forever** 72:17

**form** 4:4 23:16,18 26:20 29:2,22 35:2,21 38:3,12 42:22 43:19 45:7 46:14 49:18 54:2 57:22 62:6 63:15 67:7 73:23 74:15 77:17 83:14 87:6

**format** 28:4

**forms** 54:15

**formulating** 37:11

**forward** 51:15

**found** 29:9

**fourth** 78:23

**frame** 80:23

**frankly** 44:14

**front** 21:23

**fulfill** 35:8

**full** 7:4,19 21:7

**fuzzy** 59:2

---

**G**

**gastrointestinal** 14:1

**gave** 34:13 87:8

**general** 10:15 13:13 73:8,9

**give** 6:15 23:24 28:14 33:17 69:11,16 75:8 80:22 81:16 85:8

**giving** 6:14 34:15 49:21 50:14 56:20 64:8

**good** 5:24 80:19 91:3

**governing** 67:21

**grasping** 31:2

**great** 21:24

**greatly** 53:12

**Greene** 4:12,19 5:17,24 41:1,6 76:4 78:20 88:9 92:6

**ground** 6:8

**guess** 6:8

**guidelines** 11:22 48:4 49:22 88:17 89:18

---

**H**

**H-U-F-F** 8:5

**half** 78:5

**half-life** 62:14

**handle** 56:11 85:21

**happen** 30:13 69:5

**happened** 21:19 35:10 74:19 81:12

**happy** 71:15 82:7

**hard** 64:7

**harm** 42:18 43:16 50:2,3,4,24 51:13 63:12 91:2

**harmful** 43:24

**head** 6:12

**headaches** 13:23

**healthcare** 20:8 30:16 33:8 65:16 73:1

**heard** 12:8 14:12,15,19 18:7,10,13 19:1 22:8 24:14 28:23 29:17 30:14 80:4 81:20

**heart** 89:2

**helpful** 7:1 56:22

**Henry** 5:12 55:1

**high** 43:3,9,23 44:4,8,13,20 82:4

**high-dose** 44:16

**higher** 70:18 80:14

**historical** 34:13

**history** 16:23 41:4,13 50:17 52:12,14 53:24 54:2,9,21 55:19 57:7 72:22 81:9 89:5

**home** 9:12

**honestly** 55:13

**hope** 56:21

**hospital** 45:19 82:8

**hour** 78:5

**hours** 32:4

**Huff/staley** 8:1,5

**hundreds** 90:2

**hypothetical** 28:18 31:11 32:17,24 55:11 62:20 63:24 64:7 69:16 86:16

**hypothetically** 55:22 86:20

---

I

**idea** 27:4 28:4

**identified** 34:6 40:4

**identify** 65:21,24 67:14 77:23

**ignore** 50:4

**imagine** 31:22

**imply** 47:2

**importance** 21:6

**important** 6:11 20:5 31:21,22 43:7 69:14

**inactive** 65:2

**include** 18:21 32:20 52:2

**included** 38:6 40:8 49:13 66:4 90:6

**includes** 18:23

**including** 10:19

**increased** 13:20,21

**increases** 46:17

**independent** 9:12 10:17 11:2 38:18 89:10,12,18,23 90:18

**individual** 33:11,24

**infection** 27:5

**infections** 22:14

**infectious** 24:17

**information** 16:3 20:18 24:18 52:10 53:20 54:3,6,8,16 55:5,8,14 58:22 61:6 66:7 67:15 68:6 82:2 87:9 89:20 90:8,16,22 91:6,14

**initiating** 68:22

**insert** 46:1 60:18 72:10,11

**inserts** 45:21

**inside** 10:21 40:11

**instruct** 61:2

**instructed** 18:3 19:18 81:21 82:22

**instructing** 47:8

**instruction** 18:14

**instructions** 41:23 42:9 46:21 47:15,21 59:17 61:13,15,18 79:17

**intention** 91:2

**interactions** 52:3

**interest** 71:21 72:3,7

**interrupt** 88:1

**interruption** 88:5

**introduce** 4:23

**invention** 23:1,11

**investigation** 89:13,24 90:19

**investigations** 89:19

**involved** 45:12

**involves** 72:22 73:2

**issues** 14:2 17:1 67:15

---

J

**Jacob** 4:20

**James** 5:6

**job** 27:18,20 86:3

**Johns** 87:23 89:9

**Joy** 4:18 5:17 23:19 26:21 29:23 42:23 49:19 62:7 71:12 73:24 74:16 83:15 85:7 87:7,19

**judgment** 25:23 33:2 48:3,24 49:3,7, 13 51:18 52:8,11 53:18 65:13,15 71:20 72:3,6,9,21,22 73:2,10 74:3,5, 9,11 83:21 84:17,19 86:10

**June** 4:16

---

K

**keeping** 86:17

**Keesler** 5:9

**key** 74:6

**Kline** 6:1

**knew** 28:22 55:18 76:21 77:24 83:21

**knowing** 73:13,16

**knowledge** 11:16 17:8 22:2,4 32:15 36:4 49:8 77:9 82:18 84:12

**knowledgeable** 32:22

---

L

**label** 16:4,6 39:10 70:16

**labeling** 15:4,14

**labels** 37:20

**lack** 66:7

**Lamb** 4:10 5:3,23 6:1 19:22 28:20 31:5,24 38:4 40:19 41:8 43:22 76:6 78:4,10,19 87:11,24 92:4

**Lamb's** 28:23,24 29:13,17 31:10 32:17

**landscape** 31:17 90:1

**larger** 17:14

**law** 27:7 37:19,20 65:20 67:20 68:5 70:7

**laws** 67:24

**lean** 56:16 58:11 86:2

**leaned** 55:18

**learn** 68:3

**learned** 16:14

**leave** 21:10 88:4

**led** 56:5

**legal** 47:19 70:7

**legitimate** 88:12

**letter** 24:3 39:24 69:14 87:22

**levels** 80:3

**Lexitas** 4:22

**license** 9:21 67:21 68:3,4

**life** 17:2 23:8 31:23 43:6 44:14 50:6,9
   83:4

**life-changing** 72:19

**life-saving** 72:19

**limited** 54:8 68:6 90:7,16

**Lindner** 4:20 5:12 22:23 24:22 25:11
   35:12 48:21 49:10 53:4 55:1 56:5,11
   57:2,8,19 58:21 59:1 68:21 74:12
   77:3,19 85:21 92:3

**Lindner's** 22:20 48:22 55:19 84:15

**Lipitor** 48:10,11

**list** 12:22 33:13 84:23 91:15

**listed** 14:24 16:11 34:18 37:21 65:8,9
   70:6 72:10,14

**listen** 43:13

**listing** 34:20

**literature** 32:5,6,7 80:15 81:23
   82:10,22

**lived** 89:3

**living** 50:5

**located** 10:24

**long** 12:22 46:18

**long-acting** 61:23 68:10

**long-standing** 22:15

**longer** 64:10,11 70:20,21 81:3

**longer-acting** 60:21 64:13,20

**looked** 47:20 62:24 82:24

**lot** 6:12 53:7 55:14 83:17 85:8

**lowest** 46:5

**lupus** 17:22 18:16,24 19:12 42:15

   43:3

                **M**

**made** 39:12 88:10

**mail** 56:1 70:16,17 84:12

**mailed** 70:19,23

**maintained** 46:5

**major** 17:1

**make** 6:9,15,23 7:3 13:19,20 14:5
   15:17 24:1 27:21 32:7 40:3 47:18
   50:8 51:7 55:24 56:16 65:7 66:8 67:1
   68:23 70:3,11,13 74:3 75:1 84:1,2
   86:17

**making** 37:20 51:8 66:5,23

**managed** 9:3 19:14

**management** 19:9

**manager** 11:8 58:14

**managing** 86:4

**mark** 40:20 65:1 76:8

**marked** 41:1,6 76:4

**material** 84:4 91:21

**materials** 75:18 77:22 91:15

**matter** 4:19 39:20,21

**maximum** 47:4

**Mccormick** 5:7

**meaning** 11:3 12:1 40:1 49:24 52:1

**means** 10:18 14:17 22:14 42:2 50:3

**meant** 51:4

**medical** 16:22 17:1 18:12 20:13 25:7
   26:18 30:4 50:16 52:14 53:23 54:8,10
   60:4 81:9 88:12,16,20 89:5 90:9,19

**medication** 13:14 16:12,15,17 17:6
   23:21 26:10 27:8,14,20 29:20 45:8,
   11,18,23 47:9 50:1 54:1 60:17 61:8
   64:13,20 65:15 66:10,11 75:24 85:12,
   22 91:12,20

**medications** 9:23 10:4 15:13 16:21
   26:5 27:15 37:8,9 43:11 45:9 48:6
   54:5 64:24 65:5 72:19

**medicine** 50:7 62:12

**medicines** 37:11

**mentioned** 21:2,5 35:7 36:17 40:7
   42:14 58:9 71:5

**metformin** 27:21

**Methylprednisolone** 12:24

**milligram** 42:6,10 59:6 60:6,9 63:10
   79:4

**milligrams** 18:4,14 19:19 42:12,19
   43:8,10,17 45:5 47:24 49:15 51:22
   60:5,11 63:5 72:17 80:6,14,18 81:22
   82:5,12,23

**mind** 68:13

**mindset** 62:11

**minority** 28:8

**minutes** 32:3

**missing** 58:5

**moment** 31:24 56:17 68:23 74:24
   75:2,6,21 82:18

**moody** 13:20

**morning** 5:24 6:3 12:10

**mouth** 42:3 59:18 79:18

**move** 51:15

**multiple** 80:11,12 82:11 89:4

**muscle** 19:6

**myeloma** 80:11 82:11

**myopathy** 14:17,19

**myositis** 19:5

                **N**

**named** 38:5

**nature** 25:10

**nauseous** 14:6

**necessarily** 16:18 47:3 50:10 60:19
   76:23

**needed** 52:10 70:5

**needing** 64:12

**nice** 6:13

**nod** 6:12

**normal** 10:16 40:13 48:14

**North** 11:17,23

**note** 20:5

**noted** 88:7

**notes** 52:15 54:10,11

**noticed** 13:6 20:19

**noticing** 5:2

**November** 76:11

**number** 15:19 43:15

**numbers** 41:5

---

**O**

**O-D-O-C-O-I-L-E-I** 24:11

**oath** 56:18

**objection** 19:21 23:17 26:19 29:1,21
35:1,20 38:2,11 42:21 43:18 45:6
46:13 49:17 57:21 62:5 63:14 67:6
71:11 73:22 74:14 77:16 83:13 84:8
85:6 87:5 88:2,7

**objections** 4:4

**obligation** 25:5,15 29:19 32:20 49:3

**obvious** 7:14

**occurred** 21:15 35:11

**odocoilei** 24:10

**off-label** 15:16,20 26:7 88:20 90:4

**offer** 12:2

**oftentimes** 70:18

**open-ended** 27:24

**opened** 9:3

**opinion** 7:19 8:13 22:5 25:12 26:22
39:24 55:21 64:8 66:15,24 69:1,3,13,
14 73:20 74:11 84:3,9,10,21 85:2
86:22 87:3,21 88:14 89:9 91:13

**opinions** 36:14 91:21

**opportunity** 75:9

**opposed** 26:17 39:4 48:10

**options** 43:5

**oral** 43:11 80:11

**order** 56:1 70:17 84:12

**ortho** 68:10

**outcome** 46:17

**outlined** 35:24 38:13,20

**outlines** 34:19

**outpatient** 18:22,23 80:5,13

**outpatients** 17:13

**outweigh** 52:1

**outweighs** 51:2,13

**oversaw** 11:9

**oversee** 85:23

**overseen** 44:21

---

**P**

**PA** 31:6

**package** 45:21 46:1 60:18 72:10,11

**pages** 41:13

**pain** 18:20 19:6 50:5

**paragraph** 37:1,3,5,16

**parasite** 24:9,15,16

**parasitic** 22:13

**part** 25:4 32:12,13 49:20 65:16 79:15

**party** 5:1 8:14

**pass** 68:3,4

**past** 16:22 53:23

**patient** 16:9,23 17:3,5,10 18:4,13
22:18 27:9,13,19 28:21 29:10,12
30:12,24 39:12,22 40:4 41:4 42:19
43:16 45:4,21 46:10 47:9,24 49:15
50:1,5 51:1 52:14,17,22 53:12,14
54:2,18 56:7 58:2,10 60:8 62:22 63:8,
13 64:10,13,24 68:7,22 70:5,13 71:22
72:4,8 73:4 74:20 75:4 81:7,13 84:14
86:5 89:1 90:11

**patient's** 20:4 48:5 52:13 83:4 89:19

**patients** 10:19 16:16 17:21 19:4,13
21:8 28:1 31:1,20 42:16 43:6,23
55:20 70:20 76:22 77:9,14 90:20

**PDF** 41:12

**PDR** 66:22

**pediatric** 30:10,15 33:1

**Pennsylvania** 11:18 33:14 37:23
65:10 66:21 71:13

**people** 6:12 14:12

**percent** 27:12 29:8

**perfect** 88:21

**perforation** 14:13

**period** 31:19

**permitted** 73:8

**person** 70:22

**personal** 19:11 44:4

**personally** 31:7

**perspective** 64:14

**pertinent** 40:5

**Pharm.d.** 5:17 23:24 87:23

**pharmacies** 9:3,5 10:13,15,18,21
11:6,8 13:2 19:13

**pharmacist** 9:21,22 11:7,19 12:4
17:13 20:2,11,12,14,15 23:21 25:5,
17,19 26:2,15 27:1 29:16 33:16 34:1,
20 36:8 38:14,18,21 39:7,19,20,23
43:1 44:6 47:1 48:7,22 54:1 58:12,14
62:9 67:1,20 68:14 69:2,10 71:18,22
72:2 73:3 81:6,9 83:6 84:20 85:14,19,
20 86:6,20 89:10,16,23 90:2,7,17,20
91:2

**pharmacist's** 11:16 32:20 33:10
37:17 38:9,18 65:20 71:20 89:21

**pharmacists** 11:6,9,22 20:6,7,8
22:1,3,11 33:21 35:6,7 37:6 54:12
57:23 58:1,11 65:13 66:6,16 67:14
72:16 83:7 84:21 90:12,16 91:9

**pharmacists'** 38:1

**pharmacy** 8:16 9:4,9,12,19 10:24
11:2 13:5,12 14:10 16:24 17:21 18:8,
10 20:12,24 21:3 26:4,6,12,23 31:17,
23 32:2 33:14 37:4,20,23 38:15 39:4,
17 40:13 56:15 57:24 58:15,16 61:1
65:11 67:23 69:5,6 70:18,22 71:14
72:7,24 73:14 74:18 89:17 90:1 91:4

**phone** 8:23 9:1 55:23 57:1 65:7
66:23 67:2 75:1

**physician** 18:18 20:16 31:7 33:4,8
44:7 55:23 56:7 64:1 68:19 72:23
79:21 80:24

**physician's** 83:5

**physicians** 10:23

**piece** 69:12

**plaintiff** 8:4

**plaintiffs** 5:4 6:2

**plan** 68:22

**play** 48:23 52:23

**po** 41:23 42:2

**point** 22:9

**points** 13:15

**possession** 91:22

**possibly** 52:15 59:1 82:16

**potential** 65:21 66:1

**practical** 81:24

**practice** 11:2 15:12 18:8,11 26:4,12
33:8,16,17,19,20 37:22 39:8 40:9,14
65:10 66:11,22 67:12,13 68:1 71:14,
17 75:1 90:2

**practicing** 9:20 10:23 25:16 26:1
39:17,20 44:7 62:9 72:23 80:24 89:21

**practitioner** 30:7,8 45:2 64:15 67:18
68:15 89:21 90:11

**practitioners** 25:20

**prednisone** 12:12,13,21,23 13:10,
15,18 14:3,4,14,20 17:16 18:5,15
19:19 20:3 42:6,11,12,19 43:8,17
44:5 45:5 46:1,16,19,21,22 47:24
48:3,17 49:15,23 51:2,3,22 53:11
56:9 59:23 60:3,11,20,23 61:6,10,22
62:18,23 63:5 64:12 67:5 68:11 71:7
73:15 75:16 76:13,17 77:8,20 78:1
82:5,6

**prepare** 37:9

**prepared** 21:12

**preparing** 37:8

**prescribed** 16:6 80:5

**prescriber** 27:7 32:15,21 47:8 52:3,
5,18,19,20,21 61:4 66:9 81:5,7,12,14,
15 85:23 86:2

**prescriber's** 81:18

**prescribers** 83:9

**prescribing** 55:19 66:10 68:21
89:11 90:14

**prescription** 18:3 21:8 25:24 27:1,8,
18 30:6,11,15,18 31:13 32:10 33:11
34:2,12,24 35:18 36:1 39:21 40:1,2
41:18 42:5 44:22 46:9,23 47:1,13,17
48:20,24 49:4 51:18 52:9 53:5,18,24
54:21 55:7,10,16 56:1 57:17,19 59:4,
9,11,13,16 61:14,15 62:4,10,18,24
63:1 64:5,23 65:1 68:11 69:8 69:8,
12,19 70:1,4,7,9,12 71:3,7,9,19,23
73:12,17 74:4,12,17,21 75:16 76:12,
14 77:1 79:2,14 83:11 84:6,11,13
85:4,24 86:3,24 90:6

**prescriptions** 15:15,18,20 26:8
27:12 28:3 30:23 31:18 33:20,22
34:3,6,14,17,21 39:9,14 41:5,14,15
52:16 56:14 63:17 64:2,4 69:7 75:5
77:19 78:21 81:2 88:19 90:3,4

**present** 63:12

**pretty** 12:5

**prevented** 44:17

**previous** 73:17 74:21 75:4

**primary** 20:7

**printed** 71:13

**Priore** 5:7

**privy** 20:17 90:10

**PRN** 9:11

**problems** 65:22 66:1

**proceeding** 5:2

**processing** 47:17

**professional** 25:12 33:7 52:2,18
71:20 72:2,5,9,20,22 73:2,10 74:3,5,
9,10 83:20

**professionally** 31:8

**professionals** 20:9 90:13

**profile** 16:19 52:15 54:18

**progressive** 11:24 12:4

**prospective** 39:11 65:23

**protocol** 68:16

**proven** 52:20 61:9

**provide** 8:12,21 29:24 54:3

**provided** 7:19 8:10,18,20 39:15 69:9
89:20 90:22

**provider** 18:19 31:9,15 44:22 48:19
89:11 90:11

**providers** 10:23 20:8,9 50:13 90:12

**providing** 39:12,18

**published** 66:21 81:23 82:3

**puffy** 13:21

**pull** 40:22

**pulled** 75:20

**put** 27:7 47:16 84:24 88:1

### Q

**qualifications** 23:24

**quality** 23:8 43:6 50:6,9 83:4

**quantified** 60:19

**quantities** 34:16

**quantity** 51:2 70:18,21,24

**question** 4:5 6:24 7:5 15:6,22 25:10
28:16 29:15 31:4 33:23 35:14,15
36:6,12 38:7 40:10 43:13,15,21 44:23
45:3 49:20 51:8 52:7 55:12 56:23
58:7 61:24 62:16,20 66:20,23 73:7,9,
11 74:1,7 75:12 76:12,19 77:2,6
80:20 82:21 86:18,19 87:10

**questions** 7:6 11:14 27:23,24 75:9
86:16 87:12,14 92:1,2

**quickly** 88:1

**quote/unquote** 67:10

### R

**rare** 19:3 20:14 30:13 43:2 44:5
57:10 72:13 83:22 88:15

**rarely** 48:13 81:10

**ratio** 60:1

**rationale** 38:16 39:18 68:18 69:10
85:9 86:9,11

**reaction** 45:14,19

**read** 4:13 22:20 23:2 36:2,10 45:24
46:2 50:12 52:24 90:24

**reading** 23:12 24:12 38:16 56:2

**real** 24:2 29:19

**reason** 45:20 61:4,11 65:23

**reasonable** 18:17 48:9 51:5 83:10
84:5 85:3,12

**recall** 10:7 17:13,17 18:6 19:20 20:1
23:12,14 46:4,6 53:8 58:2,5 78:3

**receive** 18:13 51:3

**received** 55:6 58:22 67:3 69:19,21

**recess** 78:15

**recognize** 12:6,9 28:11 29:16 41:9

**recognized** 7:15 8:8 14:2 25:7
26:14,18

**recollection** 9:16 17:23 53:6 58:4,8,
17 75:21,23

**recommended** 15:11

**record** 4:16,24 20:13 40:20 54:10
76:9 78:11,13,18 88:2 92:5,9

**recordkeeping** 35:9

**records** 39:14

**reference** 38:22

**references** 60:3

**referring** 36:16

**refill** 71:19

**refilled** 71:24

**refills** 70:10

**refusal** 38:24

**refuse** 25:23

**regard** 12:1

**regarded** 24:22

**regimens** 17:14

**regularly** 12:20

**regulation** 38:24

**related** 20:20 24:19

**relationship** 25:11 52:18

**relevant** 61:7

**remember** 13:16 14:7 17:15,24
  19:12,17 24:12 53:7 75:23 76:23 77:5

**remote** 4:18

**report** 8:17 21:12,22 24:21 34:11,13,
  22 35:3,4,16 36:7 38:1,7,17 40:21,24
  41:4 75:14 84:24 91:16

**reporter** 4:8 5:14 6:17 24:10

**reports** 88:3

**represent** 5:1

**representing** 5:4 6:1

**require** 47:14,22 51:20 65:6,12 67:1
  69:24 70:1 71:6,8 73:20 74:7

**required** 27:7 45:22 65:19 67:11,20
  68:5 69:3,4 74:11,24

**requirement** 90:5

**requirements** 11:21 47:19

**requires** 74:2,8

**requiring** 67:11,12

**researched** 83:1

**researching** 26:9

**reserved** 4:5

**resistance** 20:21,23 21:11

**resources** 15:1 32:1

**respect** 30:17 36:8 37:6 38:9 49:4
  59:12

**respectfully** 67:9 89:15

**responses** 91:13

**responsibilities** 33:15 35:5

**responsibility** 25:17 26:2 37:19
  83:5 86:6

**responsible** 56:12

**result** 66:2

**retail** 40:13

**retained** 9:21 66:14 84:20

**retention** 13:21

**retrospect** 55:15

**review** 32:6 39:11 65:24 83:17

**reviewed** 22:22 39:13 40:2 53:2
  54:17,20,24 55:6 75:18 84:4 85:1
  86:22

**reviewing** 58:23

**rights** 90:14

**risk** 42:18 43:16 44:19 45:9,12 46:17
  63:12

**risk/reward** 45:2

**risks** 44:24 45:4,23 50:19 52:1

**role** 27:18 89:17,22

**rules** 6:8

**Rx** 41:4

**S**

**S-T-A-L-E-Y** 8:6

**safe** 47:23 49:14,22,24 50:2,10,18,21
  51:4,12,21 53:13

**safety** 49:22,24 51:24 68:7 71:21
  72:3,8 90:21

**save** 44:14

**sclerosis** 80:12

**screen** 39:16 40:22 41:10 59:7
  78:22,23 82:6 84:7

**sealing** 4:2

**section** 34:19 36:13,23 38:7,20,23
  40:6 71:18

**sentence** 22:10 23:13

**September** 79:3 83:12 85:4 87:1

**serve** 25:20 31:20

**services** 10:19,20 12:2

**serving** 39:22

**setting** 27:2 82:8

**settled** 8:11

**settling** 87:19

**share** 15:8,10 16:15 58:13 82:7

**sharing** 78:22

**shoes** 91:19

**short** 44:6,9,16 78:15 80:18,21,23
  81:17

**short-acting** 68:12

**short-term** 43:23 44:20

**show** 76:7

**shows** 59:10 77:23

**side** 8:15 13:14,17 14:2,20,21,24
  15:5 16:5,10,18 17:4 38:18 47:11
  61:9

**sign** 4:13

**signature** 40:2 70:9

**signed** 40:3

**silly** 32:16

**similar** 35:6 57:10 61:14,19 62:3,10

**simple** 45:16 54:2

**simply** 40:10

**simultaneously** 63:18

**sir** 59:8 63:7 79:1

**sit** 17:19

**sites** 33:17,19,21,24

**situation** 28:10 30:5 31:11 32:23
  33:5 44:15 48:16 63:23 65:4 83:24
  85:20 90:23

**situations** 44:18 50:7 58:2 69:15
  72:4 81:21 82:21

**skimmed** 46:2,3

**slash** 8:5

**small** 32:11

**son** 44:12

**sort** 45:1

**space** 31:23

**speak** 6:13 74:12 83:18

**special** 30:10

**specialists** 89:4

**specialty** 30:19 32:15 33:4

**specific** 19:17 24:8

**specifically** 35:24 36:11

**specifics** 17:17

**Specter** 6:1

**spending** 6:2

**spirit** 49:21

**spoke** 53:4 57:19 58:20 77:3

**spoken** 21:14,17 32:14

**Stacey** 36:9 37:6 38:10 41:13 51:21
53:4,21 57:20 58:21 70:14 77:10,14,
24

**stand** 91:3

**standard** 12:5 47:14,22 48:5,11 49:2
51:20 65:6,8,10 66:16,22,24 67:12,13
69:23 71:5 73:19 86:23 87:4 91:10

**standards** 33:16 37:22 39:7 40:8,14
48:15 67:24 71:14,17 74:24

**standing** 88:2 91:4

**start** 6:24 26:8 34:9 41:17 77:20

**starting** 37:3 76:18

**state** 11:21,24 25:16 26:11,15 28:5
34:11,23 35:16 36:7 37:22,24 67:20,
22 72:1 81:1 85:2 89:17

**stated** 24:5,18 58:3 69:13 87:23

**states** 11:21 12:3 26:3 27:17 37:5

**statistical** 32:6

**statute** 65:22 66:22 72:1

**steroid** 17:24 34:17 43:1,4,22 44:20
47:7 68:10 72:18

**steroids** 44:8 72:18 76:22

**stipulated** 4:1

**stipulations** 4:9

**stomach** 14:5

**stop** 77:20

**stored** 54:6

**straight** 86:18

**straightforward** 89:6

**strategy** 56:4

**strict** 11:22

**strong** 66:5

**strongly** 48:23

**structure** 11:3,4

**struggle** 23:7 50:16

**struggled** 31:2

**students** 13:18 14:10 15:3 21:1,3
61:2

**submit** 89:15

**Subsection** 71:18

**successfully** 22:18

**suffered** 17:21

**suffering** 19:14 22:19 49:9 57:9

**summary** 34:15

**supervise** 11:5

**supervision** 18:18

**supervisor** 58:15

**supplemental** 88:3

**supply** 70:20

**support** 80:15 86:11

**supported** 88:11

**surrounding** 49:8

**Susan** 5:9

**swear** 5:14

**switched** 76:21

**switching** 64:24

**sworn** 5:18

**symptom** 17:5 19:9 83:2

**symptoms** 22:16,19 23:7 31:1 56:9
81:14 85:22 89:4

**system** 30:16 33:9 54:7 60:22 88:20

**T**

**tablet** 27:3

**tablets** 21:10 42:6,7,10,11 46:9,10,
11,12,24 47:3 59:5,6 60:9 62:23 63:2,
9,10 73:14 79:4 84:14 85:24

**tabs** 41:23 47:22 59:17 79:18,22

**takes** 42:19 43:16

**taking** 14:13 16:16,22 27:14 44:4
46:19 47:2,4 54:5 62:23 63:4 64:11

**talk** 69:17

**talked** 80:1 91:16

**talking** 17:23 33:6 45:1 53:19

**talks** 33:15

**tapered** 46:22 56:4

**tapering** 56:8

**taught** 13:8,13,17 14:9,22,23 20:24
27:24

**TCC** 35:11 48:21 52:16 68:20 90:15

**teach** 13:6,10 15:3

**teaching** 18:9,11

**team** 65:17 73:1

**teamwork** 72:24

**TECHNICIAN** 4:15 5:13 78:12,17
92:8

**technicians** 31:19

**ten** 42:10 46:24 47:21 62:23 63:2,9
79:22 85:24

**ten-minute** 78:6

**tenure** 10:3

**term** 12:6 22:6,24 23:5,10 24:18
28:12 40:9 44:6,16 51:5 80:18,21,23
81:17

**terms** 53:13 91:11

**terrible** 23:7 50:16 89:3

**testified** 5:19 6:4 7:11 22:24 23:9
25:2 29:7 35:11 57:4,12 58:16

**testify** 8:7 87:20

**testimony** 23:3 24:6 25:1 36:3 50:13
53:6,9 57:3,4 58:4,24 85:9,11 87:9

**therapeutic** 66:2 68:8

**therapeutically** 76:13

**therapy** 21:7,9 44:9 46:18 48:23
64:17,19 65:21 66:1 67:15 76:1 83:7
84:16

**thing** 6:20 48:12 54:11 89:8

**things** 15:9 16:12 37:21 38:5 39:23
40:5,7 52:23 53:10 70:6 71:2 84:24
85:1

**thinking** 26:22 27:11 39:6,7,8 48:21
65:9 83:18

**time** 4:5,17 6:3 10:6 12:13 14:17
21:13 26:5 32:3 34:1 37:1 45:15
57:18 66:6 74:21 78:12,17 80:23 92:8

**times** 11:10 15:7 30:22 46:22 60:14 86:14

**titrating** 47:10 85:21

**today** 6:10 56:18 91:14,16,22

**told** 29:10,11

**top** 12:21 13:7 14:22,23 21:5,24

**total** 63:11

**totally** 7:9

**town** 9:13

**trained** 23:21,22

**training** 23:20 65:14

**transcribed** 6:17

**transcript** 19:24 22:21 53:1 76:3,9, 10

**transcripts** 24:8 55:1

**transitioned** 9:10

**treat** 27:6 62:15 82:10 89:7

**treatable** 22:17

**treated** 22:17 28:5 48:8,12,18 53:16 74:23 80:3,13

**treating** 20:16 81:19 83:22 88:17

**treatment** 19:8 24:23 43:4,10 49:11 57:7,11,14 68:18,22 77:12,13 88:23

**treatments** 55:20

**trial** 4:6 7:11 8:8

**tricky** 15:6 19:8 47:8 48:6

**true** 10:17

**trust** 81:6

**trusted** 25:12 85:23

**trusting** 52:4

**trustworthy** 52:21

**Tunkhannock** 21:18 40:12 54:18,22 55:2 87:13

**turn** 28:17

**type** 11:4 12:23 18:12 30:1 56:4 57:10 86:17

**types** 10:18 12:24 54:13 71:1

**typical** 30:24

**typically** 54:6 68:17

**U**

**ultimately** 66:10

**unable** 25:18

**uncommon** 15:9

**understand** 6:18 7:9 15:4 17:9 20:15 21:6 28:7 29:4 43:1 45:1 49:1, 11 51:9 55:24 61:12 68:5,17 73:3 88:22

**understanding** 20:10 24:24 28:2 33:2,7 48:19 52:4,13 56:2,3,10 57:7, 11 64:15 66:13 76:16,20,24 77:7,11, 12 84:13,15

**understands** 70:17

**understood** 48:22 57:13 68:16 85:17

**unfamiliar** 28:12

**universities** 10:3 13:9

**unsure** 36:5

**upheld** 39:17

**usual** 4:9

**V**

**vague** 85:18

**Valerie** 57:9

**valid** 32:9

**valuable** 60:17,23 61:7

**variables** 66:3 72:8 86:8

**vary** 17:10 53:12,14

**verbal** 6:15,16 8:11

**verbally** 8:19,21

**verify** 26:16 67:18 68:24

**Versed** 8:15

**versus** 4:19 8:1 16:17 40:12 44:19 50:4,19 62:18

**video** 4:15,18 5:13 8:24 78:12,17 92:8

**view** 61:13

**visited** 17:21

**vitae** 41:1

**volunteered** 10:2

**W**

**wait** 75:11

**waived** 4:3

**Walgreens** 11:4 39:5

**warning** 68:8

**ways** 6:9 29:6 61:22 82:10

**website** 33:14

**week** 44:9 81:3 82:13

**weekends** 9:11

**weeks** 44:10 81:3 82:13

**weigh** 50:18

**weighing** 83:3

**white** 72:5

**wise** 69:1

**Wolking** 4:19 36:9 37:7 38:10 49:9 51:21 53:4,21 55:3 56:6 57:20 58:21 70:14 77:10,15,24 89:2,14 91:3

**Wolking's** 41:13 50:12 54:17

**Wolkings** 5:5

**wonderful** 88:21

**word** 35:4,12,15 46:3,7 49:22 51:12

**words** 26:15 65:22

**work** 20:20 31:6 39:3 57:23 62:12 75:2 81:7

**worked** 8:14 9:8,18,20 10:1,22 11:9 29:11 64:16

**working** 30:21 56:6 73:1 90:7

**works** 21:17 81:15

**write** 8:17 24:21 75:14

**writes** 30:11

**writing** 86:3

**written** 15:16,20 26:6 28:2,4 41:19 44:22 47:18 53:19 67:24 69:20 79:3 87:22 88:19 90:4

**wrong** 16:2

**wrote** 22:1 30:6

**Y**

**YA0019** 41:5

**years** 9:4,14 10:8 11:10,12 12:2
20:22 31:14 64:16 89:3

**Young** 21:14 24:22 25:5 39:2 57:12,
16 58:7,8,14,19,24 59:1,10 69:17
73:3,13 75:1,15 76:3 77:24 89:11
91:9

**Young's** 57:4 76:10 77:7

**Youngs** 5:8

---

### Z

**Zoom** 6:21

Joy B. Greene, PharmD
2825 Finch Farm Road
Trinity, NC 27370
jgreene@highpoint.edu

May 17, 2024

Susan Keesler, Esquire
McCormick & Priore, P.C.
2001 Market Street
Suite 3810
Philadelphia, PA 19103



EXHIBIT

Greene 1   6/18/24 mfr

Re: Wolking v. Lindner MD, and Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding Center

Dear Ms. Keesler,

You have asked me to render my opinion regarding a case involving Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding Center (which I will refer to as 'TCC' throughout this document). After reviewing the materials, my opinion and conclusions are included in this document.

I received my Doctor of Pharmacy degree from the University of North Carolina at Chapel Hill in 1998. Since that time, I have opened and managed two independent pharmacies, served as founding faculty of three schools of pharmacy, developed curricula at three schools of pharmacy, networked with more than 1,500 pharmacists in the roles of Assistant Director, Director, and Associate Dean for Experiential Education. I hold the appointment of Professor at the Fred Wilson School of Pharmacy at High Point University and have been a licensed pharmacist for nearly 26 years. I have spent over 19 years of my career in pharmacy education. I have authored many peer-reviewed articles and spoken across the country providing presentations to my peers. My Curriculum Vitae and fees have been provided.

Documents that have been reviewed:

- Complaint
- Deposition transcript for Courtney Young PharmD and exhibits
- Deposition transcript for Brian Bryk PharmD and exhibits
- Deposition transcript for Henry Lindner MD and exhibits
- Deposition transcript for Tunkhannock Compounding Center 30(b)(6) and exhibits
- Deposition transcript of Plaintiff Stacy Wolking and exhibits
- Plaintiff's prescription history relevant to Tunkhannock Compounding Center

1

- Patient profile of Plaintiff Stacey Wolking
- The opinion of Thomas Johns, PharmD
- The opinion of Mark Dershwitz, PhD
- The opinion of Carl Gainor, Ph.D., J.D.
- 49 Pa. Code § 27.19 - Prospective drug review and patient counseling
- Pennsylvania State Board of Pharmacy Compounding Regulations

**Summary of Ms. Stacy Wolking's Background:**

Many people suffer from rare and debilitating conditions that are not successfully treated with traditional medicine. In these cases, people desperately seek out medical help from general physicians and specialists.  Unfortunately, many times, they are unsuccessful in finding an effective treatment plan. This often leads patients to seek out less traditional methods of treatment.  I believe Stacey Wolking is one of those patients.  Sadly, Ms. Wolking has suffered from multiple conditions that led her to many physicians and specialists. A few examples found in her medical history include (prior to August 2022):

- Ms. Wolking contracted Lyme disease and was treated for Lyme disease by Dr. Stewart.
- Dr. Stewart treated Ms. Wolking's menopause symptoms (hormone therapy).
- Ms. Wolking was diagnosed with Rheumatoid Arthritis (RA) by Dr. Pinto.
- Ms. Wolking was treated by Dr. Satchi (a gastroenterologist) for severe gastrointestinal pain.
- Ms. Wolking testified to suffering from a variety of symptoms that affected the quality of her life (at least 20 symptoms).
- Ms. Wolking's symptom presentation has been perplexing to her providers. She was advised by Dr. Pinto to find the root cause of her ailments and recommended she see an infectious disease specialist.

According to her testimony, Ms. Wolking was referred to Dr. Lindner by a friend, and, on their recommendation, she contacted him for help with her menopause problems. He treated her for menopause symptoms including prescribing progesterone and estrogen therapy.

Ms. Wolking had a long-standing patient/physician relationship with Dr. Lindner. At one of her annual appointments, she discussed her ongoing symptoms and struggles, and Dr. Lindner proposed she may have Babesiosis (a rare disease caused by a tick-borne protozoa). Dr. Lindner knew of Ms. Wolking's medical history of Lyme disease (a tick-borne illness), and his own daughter had suffered with Chronic Babesiosis. Due to his daughter's condition, Dr. Lindner understood Chronic Babesiosis, and became a self-proclaimed expert in the treatment for this rare condition. His experience led him to believe that antimalarials coupled with high doses of corticosteroids were necessary for disease management and patient relief.

2

In August of 2022, Ms. Wolking began treatment for Chronic Babesiosis with high quantities of corticosteroids being dispensed by TCC. The following prescriptions were prescribed by Dr. Lindner, filled at TCC and dispensed to Ms. Stacey Wolking between August 8th 2022 and October 4th 2022.

August 8th:    Prednisone 10mg  #500 tablets
Instructions:  "Up to 10 tabs po daily as directed"
Filled by Brian Byrk

August 16th:   Dexamethasone 4mg  #200 tablets
Instructions:  "Take up to 4 tabs po daily in divided doses as directed"
Filled by Courtney Young

September 27th:  Dexamethasone 4mg  #300 tablets (#100 tablets were filled)
Instructions:  "Up to 10 tabs po daily as dire"
Filled by Brian Byrk

October 4th:   Dexamethasone 4mg  #200 tablets were filled (remainder of the Rx above)
Instructions:  "Up to 10 tabs po daily as dire"
Filled by Brian Byrk

It is important to note that these medications were filled mail order and shipped to Ms. Wolking.

**Summary of Dr. Lindner and TCC:**

In August of 2022, Dr. Lindner's practice was in the same shopping center as TCC (when the corticosteroids were dispensed to Ms. Wolking). Courtney Young, PharmD was the pharmacist manager and owner of TCC at that time.  Dr. Lindner had a longstanding professional relationship with TCC. He met Dr. Young back in 2016 when Dr. Young was a staff pharmacist at TCC. Years later Dr. Young purchased TCC and Dr. Lindner continued to have an entrusting, professional relationship with Dr. Young.  In August of 2022, Brian Bryk, PharmD was a staff pharmacist at TCC. As recorded in the testimony of Dr. Lindner and Dr. Young, often, Dr. Lindner would have conversations with Dr. Young and Dr. Bryk about his daughter's Chronic Babesiosis. Over the years, Dr. Young and Dr. Byrk became familiar with Dr. Lindner's approach to treating Chronic Babesiosis with high doses of corticosteroids that were titrated up and down based on a patient's symptoms. It was understood that Dr. Lindner would oversee the doses and advise the patient throughout treatment. Dr. Young testified to understanding that the treatment of babesiosis is "Very dependent on the patient and their symptoms at the time. And, often it was cyclical, meaning that things would maybe get worse for a time, get better for a time, get worse for a time while he was treating patients."

3

It is my opinion that most pharmacists have little to no knowledge about the condition, Babesiosis, and even fewer pharmacists have knowledge about Chronic Babesiosis. Due to the rarity of this condition, I surmise this topic is not taught in the curricula at schools of pharmacy. Dr. Young testified to researching Babesiosis online to find out more information and noted there was not much information available. She also testified to lacking access to major medical journals in her pharmacy.

Dr. Young testified to speaking with Dr. Lindner about Chronic Babesiosis more than once, but there is no documentation regarding these conversations. Dr. Young testified that she felt it was reasonable to fill the high quantity of corticosteroids as Dr. Lindner had experience in treating Chronic Babesiosis. Dr. Young understood Ms. Wolking would be treated under the care of Dr. Lindner's treatment approach. Like Ms. Wolking, Dr. Young also regarded Dr. Lindner as an expert in the treatment of Chronic Babesiosis.

On August 8th, 2022, #500 tablets of Prednisone were dispensed and mailed to Ms. Wolking from TCC. Eight days later, (on August 16th 2022), a prescription for Dexamethasone 4 mg tablets was sent to TCC to be filled for Ms. Wolking (prescribed by Dr. Lindner). Dr. Young testified that she recognized this was a duplication of therapy. Because she understood Dr. Lindner's treatment plan of Babesiosis, and trusted him as an expert, she believed the previous prescription for Prednisone had been discontinued. Dr. Young testified that she did not document any of her conversations with Dr. Lindner regarding his treatment approach. There is also no documentation regarding her assumption as to why she believed the Prednisone prescription had been discontinued.

Regarding Dr. Young's and Dr. Byrk's interaction with Ms. Wolking, Dr. Young testified that all patients at TCC are offered counseling on new medications. Dr. Young testified that when a new prescription is filled for mail order, all patients receive a phone call from someone at the TCC and are asked if they have questions about their new medication. If the patient says, "no," then no counseling is provided. TCC does not record a patient's response to their offer to counsel. Dr. Young does not remember the specific details in offering to counsel Ms. Wolking on her new prescription, but she states the pharmacy would have offered counseling because they offer counseling for every new prescription. Dr. Young testified that she does not have any documentation showing Ms. Wolking refused counseling and there are no notes in the computer system regarding the refusal of patient counseling.

Opinions:

1.  Duty:

    A compounding pharmacy is unique in how it functions. Compounding pharmacists often prepare medications that are not FDA-approved to address the specific medical needs of patients. The practice of compounding pharmacy focuses on formulating medicines that are not commercially available from a manufacturer.

4

Compounding pharmacists work with providers who often think outside the box in order to meet a patient's unique medical need.

TCC dispensed corticosteroids to Ms. Wolking. The dispensing pharmacists believed these medications addressed a rare, poorly understood condition, and they trusted Dr. Lindner's expertise in the management of Chronic Babesiosis. They trusted Dr. Lindner to adjust dosages as necessary, ensuring Ms. Wolking had sufficient medication on hand to treat her rare condition.

In healthcare, teamwork is essential, drawing on each other's expertise in complex cases. Rare conditions often lack standard treatment protocols, making research challenging for outpatient pharmacies like TCC. They trusted Dr. Lindner's expertise in Chronic Babesiosis, despite limited understanding themselves. Their confidence in him was reinforced by prior discussions and his daughter's treatment experience. The limited availability of online clinical information hindered their understanding of this rare condition. Trusting in Dr. Lindner's judgment, TCC filled prescriptions believing it was in Ms. Wolking's best interest. I do not believe they neglected their duty in dispensing the medication due to the unusual circumstances of this case. It is important to note that outpatient pharmacists operate with limited available patient information. Unable to access medical charts or treatment details, pharmacists rely on a provider's expertise in understanding their patient's needs. Outpatient pharmacists review prescriptions and use their clinical judgment to ensure they safely dispense the medication. They do not have access to individual patient-doctor discussions or a patient's tolerance to a medication, but they strive to accurately fill prescriptions based on the information available to them. And it is important to note that they compound, fill and ship out many prescriptions each day. Drs. Young and Byrk are in good standing with the Pennsylvania State Board of Pharmacy and no prior violations have been noted.

In terms of their responsibilities as pharmacists, it is my opinion that TCC did not fulfill their duty to adequately document their rationale for dispensing the unusually high quantities of corticosteroids prescribed. Such prescriptions, with their elevated quantities, should raise questions for any pharmacist, and documentation should be provided. Although Dr. Young testified to discussing Dr. Lindner's treatment plans for Chronic Babesiosis, there is no written record of these conversations. Additionally, there are no documented instances of counseling or refusal to counsel Ms. Wolking, which violates Pennsylvania State Board of Pharmacy regulations (49 Pa. Code § 27.19).

2. Cause:

Despite the lack of proper documentation, it is my opinion that TCC is not responsible for causing Ms. Wolking's injuries. Before consulting Dr. Lindner for Chronic Babesiosis, Ms. Wolking struggled with various symptoms and sought help

from multiple specialists, indicating multiple pre-existing health challenges. Dr. Lindner, drawing on his expertise and considering Ms. Wolking's medical history (especially with Lyme disease), explored the diagnosis during her yearly appointment. Federal law does not recognize pharmacists as healthcare providers, which restricts their ability to access and contribute effectively to a patient's health. Dr. Lindner diagnosed Ms. Wolking's condition and prescribed corticosteroid treatment to be filled at a pharmacy he trusted.  Drs. Young and Byrk trusted Dr. Lindner's clinical judgment and dispensed the prescriptions under the understanding that Dr. Lindner would oversee dosage adjustments. The prescriptions were filled with higher quantities with the intention of providing Ms. Wolking with an ample supply of medication, per Dr. Lindner's treatment plan. Trusting in Dr. Lindner's expertise, Drs. Young and Byrk dispensed the medication as directed. Ms. Wolking did not raise any concerns about the medication to TCC, and Dr. Young testified to TCC offering counseling with all new prescriptions.

I respectfully submit my opinion based on my extensive experience as a licensed pharmacist with over 19 years of experience in pharmacy education. Should any additional information become available, I reserve the right to amend my opinions.

All of my opinions are provided based on a reasonable degree of professional certainty in the field of pharmacy practice.

Sincerely,

*Joy B. Greene, PharmD*

Joy B. Greene, PharmD
Professor of Pharmacy Practice
High Point University
One University Parkway
High Point, NC 27268

# Joy Bowers Greene Pharm.D.
## Curriculum Vitae

<u>**Licensure**</u>     North Carolina  14453

Office:  336-841-9553
jgreene@highpoint.edu

## Education

**The University of North Carolina**                                    **Chapel Hill, NC**
Doctor of Pharmacy                                                       May 17, 1998

## Professional Appointments

**High Point University Fred Wilson School of Pharmacy**                 **High Point, NC**
**Clinical Professor of Pharmacy**                                      August 2014-present
**Assistant Dean for Experiential Education**

**IPPE-Community Pharmacy, IPPE-Hospital Pharmacy and APPEs**
- Preceptor and community pharmacy site recruitment
- Network with pharmacy practitioners within in the greater High Point area
- Schedule student rotation assignments
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition
- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the experiential program
- Review student evaluations of each preceptor/site

**Union University School of Pharmacy**                                  **Jackson, TN**
**Associate Professor of Pharmacy Practice**                            June 2011-July 2014
**Assistant Director of Experiential Education**

**IPPE-1, IPPE II (Community Pharmacy):**
- Preceptor and community pharmacy site recruitment
- Network with community pharmacy practitioners within in the Jackson/Memphis area
- Schedule student rotation assignments to community sites
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition
- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Community Pharmacy program
- Review student evaluations of each preceptor/site

**IPPE-2 (Hospital Pharmacy):**
- Preceptor and hospital pharmacy site recruitment
- Network with hospital pharmacy practitioners within the Jackson/Memphis area
- Schedule student rotation assignments to hospital sites
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition

- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Hospital Pharmacy program
- Review student evaluations of each preceptor/site

**Teaching Experience at Union University School of Pharmacy**

**Course Leader**

| | |
|---|---|
| Non-Prescription Drugs / Counseling | Fall 2011, 2012, 2013 |
| Non-Prescription Drugs Lab | Fall 2011, 2012, 2013 |
| IPPE Courses | Academic Years 2011-2014 |
| The Christ-Centered Pharmacist | Spring 2012, 2013 |

**Course Member/Co-coordinator**

| | |
|---|---|
| Pharmacotherapy I | Fall 2011, 2012, 2013 |
| Pharmacotherapy IV | Fall 2011, 2012, 2013 |
| Naplex Course Review | Spring 2012, 2013, 2014 |
| APhA Immunization Certificate Course | Spring 2013, 2014 |

# Wingate University School of Pharmacy                                        Wingate, NC
**Director of Introductory Pharmacy Practice Experience**                     August 2005-June 2011
**Assistant Professor**

**IPPE-1 (Community Pharmacy):**
- Preceptor and community pharmacy site recruitment
- Networked with 45-50 community pharmacy practitioners within in the greater-Charlotte area
- Personally visited 45-50 community pharmacy sites annually
- Communicated with preceptors via email, phone or mail at least 10 times per year
- Scheduled student rotation assignments to community sites
- Managed student or preceptor issues
- Developed/updated student and preceptor manuals yearly
- Served as Team Leader for  the IPPE-1 community course fall and spring semesters
- Provided preceptor development, assessment, and recognition
- Provided continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Community Pharmacy program
- Reviewed student evaluations of each preceptor/site

**IPPE-2 (Hospital Pharmacy):**
- Preceptor and hospital pharmacy site recruitment
- Networked with 30 hospital pharmacy practitioners within the WUSOP-approved zones
- Personally visited 30 hospital preceptors within the greater-Charlotte area annually
- Communicated with preceptors via email, phone or mail at least 10 times per year
- Scheduled student rotation assignments to hospital sites
- Managed student or preceptor issues
- Developed/updated student and preceptor manuals yearly
- Served as Team Leader for the IPPE-1 hospital  course during the fall semester
- Provided preceptor development, assessment, and recognition
- Provided continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Hospital Pharmacy program
- Reviewed student evaluations of each preceptor/site

Other administrative roles include:
- Co-chaired the Practice Experience Advisory Committee (PEAC)

- Member of the Dean's Advisory Council
- Development of a state-wide preceptor training program
- Participation in the ACPE accreditation process

## Teaching Experience at Wingate University School of Pharmacy

**Course Leader**

| | |
|---|---|
| Introductory Pharmacy Practice Experience -Community Practice | Fall 2005, Spring 2006 |
| | Fall 2006, Spring 2007 |
| | Fall 2007, Spring 2008 |
| | Fall 2008, Spring 2009 |
| | Fall 2009, Spring 2010 |
| | Fall 2010, Spring 2011 |
| Introductory Pharmacy Practice Experience -Hospital Practice | Spring 2006 |
| | Fall 2006, Spring 2007 |
| | Fall 2007, Spring 2008 |
| | Fall 2008, Spring 2009 |
| | Fall 2010, Spring 2011 |
| | Fall 2009 |
| Top 200 Drugs Part 1 | Fall 2005, Fall 2006, Fall 2007 |
| | Fall 2008, Fall 2009, Fall 2010 |
| Top 200 Drugs Part 2 | Spring 2007,  Spring 2008 |
| | Spring 2009, Spring 2010, Spring 2011 |
| Patient and Interprofessional Communications | Spring 2006, Fall 2006, Fall 2007 |
| | Fall 2008 |
| APhA Immunization Certificate Course | Spring 2010 Spring 2011 |

**Course Member**

| | |
|---|---|
| Community Health Outreach | Fall 2005 |
| PBL Pharmacotherapy Case Studies I | Spring 2007, Fall 2009 |
| | Spring 2010, Fall 2010, Spring 2011 |
| PBL Pharmacotherapy Case Studies II | Fall 2005, Fall 2007, Spring 2008 |
| Doctoral Candidate Seminar | Spring 2008, Spring 2011 |
| Immunizations and Smoking Cessations | Spring 2008, Spring 2009 |

## Oakboro Pharmacy                                        Oakboro, NC
**Pharmacist Manager**                                    Jan 2001-July 2005

- Approached by CEO of Stanly Memorial Hospital to open and manage a hospital-owned community pharmacy in the rural community of Oakboro.
- Responsible for selecting computer vendor, designing pharmacy layout, obtaining permits, DEA license, third party contracts, accounting concerns, DME billing, hiring technicians and assisting with marketing.
- Pharmacist manager responsibilities include filling prescriptions, drug interaction monitoring, counseling patients, third party billing, personnel concerns, teaching and mentoring UNC school of pharmacy and Wingate school of pharmacy students.
- Developed and instructed a pharmacy technician certification course for Stanly Memorial Hospital. All technicians completing this course passed the national exam.

**Preceptor**
**UNC School of Pharmacy**                                                1998-2004
- Responsible for introduction and advanced community pharmacy rotational experiences for fourth-year pharmacy students at UNC School of Pharmacy.
- Responsible for mentoring and teaching students.
- Teaching tools include proper monitoring of blood pressure, glucose meters, instruction of MDIs, how to use nebulizers, proper counseling techniques on variety of medications, and learn basic pharmacy principles.

**Preceptor**
**Wingate University School of Pharmacy**                                 2003-2004
- Responsible for teaching and mentoring first year pharmacy students for Wingate University School of Pharmacy.
- Preceptor responsibilities include completion of daily assignments, setting goals for students, positively mentoring students.
- Teaching responsibilities include teaching students how to counsel patients, interact with staff and patients, learn basic computer functions, understand laws of pharmacy, introduce to medications and their uses, basic filling of prescriptions, and insurance billing issues.
- Invited to guest lecture in the early practice experience discussion classes

**Moose Midland Pharmacy**                                        **Midland, NC**
**Pharmacist Manager**                                              1998 to 2001

**Diabetes Clinic Coordinator**

- Pharmacist Manager of a clinical, independent pharmacy in Cabarrus County, North Carolina. Responsible for setting up all third party contracts, filling prescriptions, counseling patients, teaching and mentoring UNC school of pharmacy and Campbell school of pharmacy students, worked closely with physicians for proper medication dosing for patients, proper billing to insurance companies, filing medicare claims, bookkeeping and personnel concerns.
- Alternative Medicine Consultant.  Attended various alternative medicine conventions focusing on the use of herbal and homeopathic medicine.  Consulted patients on the use of alternative medicines for certain disease states.  Alternative medications included probiotics, glucosamine and chondroitin, and fish oil.  Disease states included diabetes management, pediatric and geriatric care.
- Clinical Diabetes Specialist focusing on type 1 and type 2 diabetes management. Designed and implemented diabetes program for groups of patients currently receiving medication from Moose Pharmacy.  Patient's glucose levels were checked frequently in the pharmacy, and special group classes were held bimonthly. Pharmacist responsibilities included conducting all meetings, teaching patients and family (i.e.caregiver) about their disease state, proper use of their monitor,  chart review, group class instruction, instructing proper dietary habits, promoting exercise goals, insurance billing issues and evaluation of patient's overall well-being. Each session consisted of 15 patients. Hemoglobin A1c levels were taken by family practice physician before and after each 3 month session.  Consulted with physicians regarding drug therapy changes.  Overwhelming success rate with patients.
- Other services included assisting with hypertension clinic implementation and bone density screening for patients.  Also aided in developing a residency program for Moose Pharmacy in Concord.  Part of a development committee responsible for deciding resident responsibilities. Pharmacist resident curriculum includes assistance with clinical diabetes education classes at Moose Midland Pharmacy. Resident works one on one with Pharmacist Manager to learn all aspects of how to operate an out patient diabetes clinic.

**Med Outcomes**                                                      **West Virginia**
**Diabetes Core Curriculum Speaker**                                        July 1999

- Core speaker for McKesson Drug Company Diabetes Education Conference.
- Responsibilities include instructing pharmacists from across the US the importance of diabetes education and how to implement this education into their practice sites.
- Conference consisted of a 3 day diabetes certification program in Chicago
- Lectures focused on pharmacotherapy, educational techniques (including foot care, insulin injection technique and nutrition), overview of diabetes monitoring products, proper monitoring of diabetes patients, and proper billing to third party insurance companies for cognitive services.

## Delivered CE Programs

**APhA Immunizations Certificate Program**
Charlotte,  NC                                                            August 2010
Wingate, NC                                                              January 2010
Winston Salem, NC                                                      December 2009
Wilmington, NC                                                        September 2009

**The Power of Precepting**
Carolinas Health Care System Preceptor Training                            October 2009

**Tennessee Preceptor Training Program**                                        April 2012
                                                                          April 2013
                                                                          April 2014

**North Carolina Preceptor Training Program**                                October 2008
                                                                        October 2009
                                                                        October 2010
                                                                        October 2015

## Presentations
### Invited

**Know your Pharmacist**                                                    February 2016

Presented to pre-pharmacy students and their families during Family Weekend at High Point University on the topic of knowing your pharmacist.  Attendees were educated on the value a pharmacist brings to a patient's quality of life.

**Prayer Breakfast**                                                        August, 2015

Delivered the 2015 Prayer Breakfast Message to the Virginia Association of Pharmacists in Williamsburg, VA

**The Christ-Centered Pharmacist**                                            June 2015

Presented at the Annual Christian Pharmacists Fellowship International meeting on the topic of exemplifying Christian values while practicing as a pharmacist.  Approximately 175 pharmacists were in attendance.

**Pharmacy as a Career**                                                    February 2015

Invited to present to High School Science National Honor Society at High Point Christian Academy about the benefits of choosing pharmacy as a career.

**Prayer Breakfast**                                                        April 2014

Guest speaker at Trinity Christian Academy's Mother's Prayer Breakfast.

**Allergies and You**                                                       April 2013

Invited by the wife of the President of Union University to deliver the keynote presentation at the Ladies' Auxiliary Luncheon at Union University.

**M & M**                                                                   April 2012

Invited by administration at Trinity Christian Academy to speak to their middle and high school students during their chapel hour.  Over 400 students were in attendance.

**Who's a Leader**                                                          April 2012

Asked by the students of Union University School of Pharmacy to serve as the guest speaker during their Phi Lambda Sigma induction dinner.  Students and faculty attended this dinner.

**Think, Act, BE Professional**                                             August 2009

Asked by the National Association of Pharmacy Technicians to deliver the key-note address at the 2009 National meeting in Nashville Tennessee.  Pharmacy technicians from all of the country attended this national meeting.

**The Field of Pharmacy**                              February 2009, 2008, 2007, 2006

Presented educational talk at Stanly Memorial Hospital to a group of High School Seniors interested in the field of pharmacy.  Discussed different aspects of pharmacy practice and included information on admission process for pharmacy school.  Students learned about job opportunities for pharmacists and job shortage in US.

**Medication Management**                                  April 2006, February 2006

Presented talk to a group of Senior citizens in Anson County about proper medication management.  Also provided a "brown bag" service for the group.  Discussed importance of adhering to medication administration schedule.  Included copies of medication charts for patients to use as a reminder to take their medications.

**Recommending the Use of Probiotics in Your Practice**                     October 2005

Presented educational talk at the 2005 annual NCAP meeting.  A focus on using Probiotic supplements for children and adults.  Disease states discussed included infectious diarrhea, immune system modulation and eczema.  Probiotic use, dosage forms found effective and safety in clinical trials were examined.  Overviewed how to recommend the use of probiotics to various patients.

**Alternative Medicines and You**                                                        August 2005

Presented a talk held at the Monroe Library to a group of people interested in alternative medicine treatments. Discussed most common supplements and herbs sold in the US. Supplements and herbs were defined by most common usage. Reviewed effectiveness, safety and precautions based on clinical trial information found in medical literature.

**Probiotics: Their Role in Treating Eczema**                                            August 2008

Presented educational talk to the American Association of Pharmacy Technicians. Talk focused around the safety and efficacy of using probiotics in the prevention and treatment of eczema.

**Women and Heart Disease**                                                           September 2008

Presented educational talk to a women's group at a local church regarding heart disease and how it affects women. Participants were provided tools for healthy living and prevention of heart disease.

## Poster/Podium

"Implementation of a Longitudinal Interprofessional Education Learning Experience." Presented at the annual AACP 2014 meeting in Grapevine TX

"North Carolina Pharmacy Based Immunization Initiatives". Presented at the AACP 2010 Annual Meeting Seattle. WA July 2010

"Longitudinal Progression from IPPE to APPE: Beyond Shadowing". AACP 2009 Annual Meeting. Boston Massachusetts July 2009

"NC Tars School of Pharmacy Initiative". NCAP 2008 Annual Meeting. Chapel Hill, NC October 2008

"Innovation at Wingate University School of Pharmacy Bridges the Quality Chasms in Pharmaceutical Education." AACP 2006 Annual Meeting. San Diego, CA, July 2006

"Development and Implementation of an Introduction to Clerkship Course." AACP 2006 Annual Meeting, San Diego, CA, July 2006.

"Development and Implementation of Basic Clinical Skills in Inpatient and Ambulatory Care Rotations." AACP 2006 Annual Meeting, San Diego, CA, July 2006.

## Publications

### Refereed Journals and Books
Book Chapters

Smith, LS, **Greene JB**. Gastroenterology. In: McGraw-Hill's NAPLEX Review Guide (SET 2). January 2011

Smith, LS, **Greene JB**. Probiotics in Gastrointestinal Disease. In: The American College of Clinical Pharmacy PSAP VI. January 2009

## Peer-Reviewed Journal Publications

Peyton L, **Greene JG**.  Irritable Bowel Syndrome: Current and Emerging Treatment Options.  P&T 2014;39(8):567-578

**Greene, JG,** Dolder C, Wallis ML.  The NC Tars Project:  Students leading the way to educate patients about proper use of antibiotics.  J Am Pharm Assoc. 2011;51:539-543

**Greene, JG,** Nuzum DS, Boyce EG.  Correlation of pre-pharmacy work experience in a pharmacy setting with performance in a top 200 drugs course.  Currents in Pharmacy Teaching and Learning.  2(2010) 180-185

Smith L, **Greene J,** Meade L, Spencer B.  Qualitative analysis of students' attitudes of duration of community pharmacy practice experiences.  Currents in Pharmacy Teaching and Learning. 1(2009) 110-114

**Greene, JG**.  Mitral Valve Prolapse, US Pharm. 2008:33(2):28-33

**Greene, JG**.  The Role of Probiotics in Treating Atopic Eczema, US Pharm. 2006:31(11):70-76

## Non-Peer Reviewed Journal Publications

**Greene, JG**   Ask the Pharmacist. High Point Enterprise  Jan 2016-present. (monthly column)

**Greene, JG**   Joytime Encouragement.  The Women's Journal (bimonthly journal). 2012-present

**Greene, JG.** Dispensing Spiritual Comfort.  Christianity and Pharmacy, 2013:16(1):13-15

**Greene, JG.** Ask the Pharmacist.  The Jackson Sun (Health Supplement).  2013 Jan-Dec. (monthly column)

**Greene, JG.** Know Your Medications; Ask the Pharmacist:  Wingate Today. 2008(3):65

**Greene, JG.** Cough and Cold Relief; Ask the Pharmacist:  Wingate Today. 2007(2):64

**Greene, JG**.  Passion of the Christ:  A Look at the Passionflower, Christianity and Pharmacy, 2006:9(2):24

# Television Appearances

**Mommy Matters**
Monthly to bimonthly appearances (2014-present) on Fox8 segment to educate the public about pertinent health issues for children.  Topics include (but are not limited to) proper sunscreen use, allergies, cough and cold, medication safety, immunizations and bug bites.

**WXII**
Appeared in February 2015 to discuss the value of feeling and expressing love, and how it relates to health.

# Honors and Achievements

**American Association of Pharmacy Technicians National Meeting Presenters Award**        2009, 2008
Received award at the National Association of Pharmacy Technicians meeting.  The following year, this same organization invited me to be their key-note speaker at their national meeting in Nashville, TN.  I was awarded the Teaching Award of Excellence at this meeting for my C.E. presentation "Think, Act BE a Professional"

**Spirit of Wingate Award**                                                                      2009
A recognition award given to an individual, initiative, or program that exemplifies the spirit of WUSOP.  This award for presented in honor of the WIN program sponsored by CPFI at the WUSOP.

**Wingate University School of Pharmacy**                                              2004 and 2005
**Preceptor of Distinction Award**
Received award for outstanding preceptor from Wingate University School of Pharmacy students.  Students nominate preceptors that go above and beyond what is expected of them.  Award presented at a banquet held in honor of all distinctive preceptors.

**SmithKline Beecham Pharmaceutical Care Student of 1998**                              1998
Received award for demonstrating excellent pharmaceutical care for patients during clinical clerkships.  This award is presented to one graduating Doctor of Pharmacy student at UNC Chapel Hill each year.

**Deans List**                                                              The University of North Carolina

## Certifications

| | |
|---|---|
| Medication Therapy Management Certificate | 2010 |
| OTC Advisor Certificate | 2008 |
| Pharmacy-Based Immunization Delivery Certificate | 2006 |
| Certificate of Diabetes Education | 1998 |
| CPR Certification | 1998-present |

## Professional Organizations

| | |
|---|---|
| American Association of Colleges of Pharmacy | 2005-present |
| American Pharmacists Association | 2015-present |
| Cabarrus County Association of Pharmacists | 1998-2001 |
| Christian Pharmacists Fellowship International | 2005-Present |
| North Carolina Association of Pharmacists | 2005-2010 |
| Stanly County Association of Pharmacists | 2001-2010 |
| Tennessee Pharmacist Association | 2012-2014 |

## Boards

| | |
|---|---|
| Christian Pharmacists Fellowship International  Board Member | 2015-present |

## Advising Roles

| | |
|---|---|
| Wingate University CPFI Faculty Advisor (Co-Chair) | 2005-2009 |
| Union University CPFI Faculty Advisor (Co-Chair) | 2011-2014 |

## Community Involvement

**Joytime Ministries, Inc.**                                                                      President
                                                                                              2012-present
*Joytime Ministries is a Christian ministry aimed at encouraging women in their walk with God.  Joytime was founded in 2012 in Jackson, TN and is established as a nonprofit organization.  Joytime Ministries consists of a radio and speaking ministry.  "Joytime" is a 60 second radio vignette that airs on 150 radio stations in the United States.  Joytime also airs in Canada and London, England. In addition to producing radio vignettes, a*

*few times a year, I travel for speaking engagements to encourage women in their spiritual journey.  I have worked with a variety of musical artists, including Dove-Award winning singer/song-writer Big Daddy Weave, I Am They, and Britt Nicole.  Through Joytime, I have written magazine articles on relevant topics for Christian women at a local and national level.*

**Wingate University School of Pharmacy Representative for NC Tars**                    2007-2010
*State-wide initiative to educate consumers about proper antibiotic use in an effort to raise awareness of antibiotic resistance.  This initiative is in conjunction with UNC School of Pharmacy, Campbell School of Pharmacy, NC Tars (North Carolina Taking Antibiotic Resistance Seriously) and the CDC.  This project stems from a service project conducted by P-2 students at Wingate University School of Pharmacy.  This initiative included state-wide education to patients in community pharmacies regarding the importance of taking antibiotics correctly. This two-year project was launched during the month of October, 2008.*

## Professional Appointments

**High Point University**

| | |
|---|---|
| Administrative Committee | 2014-present |
| Assessment Committee | 2014-2015 |
| Admissions Committee | 2014-2015 |
| Experiential Committee | 2014-present |
| Interprofessional Education Coordinator | 2016 |

**Union University School of Pharmacy**

| | |
|---|---|
| Professionalism Committee, Chair | 2011-2014 |
| Practice Experience Advisory Committee | 2011-2014 |
| Outcomes/Assessment Committee | 2011-2014 |
| Interprofessional Education Committee | 2012 |
| Faculty Development Committee | 2012-2014 |

**Wingate University School of Pharmacy**

| | |
|---|---|
| Professionalization Committee | 2010-2011 |
| Practice Experience Advisory Committee (co-Chair) | 2005-2011 |
| Dean's Faculty Advisory Committee | 2005-2011 |
| Outcomes Assessment Committee | 2005-2007 |
| Faculty Search Committee | 2006 |
| Faculty Affairs Committee | 2007-2011 |
| Publicity Committee (University Committee) | 2005-2011 |
| Continuing Professional Development Panelist | 2007 |
| North Carolina Association of Pharmacists Membership Committee | 2008-2010 |
| North Carolina Association of Pharmacists Awards Committee | 2008-2011 |

## Journal Reviewer

| | |
|---|---|
| Reviewer for the Annals of Pharmacotherapy | 2008-2015 |
| Reviewer for US Pharmacist | 2008-2013 |

# Joy Bowers Greene, PharmD

# Fee Schedule
June 19, 2023

**Retention Requirement**                                           **$2,700**
    *4-hour retainer required*
    *Payment Required in Advance*

**Additional time beyond 4 hours billed at:**                       **$675/hour**

    **Hourly Rate Applies to:**
    *Records review, Report writing, Telephone consultation*

    *\*Travel expenses billed separately*


**Deposition**                                                      **$3,500**
(Includes 30 mins of prep and 2 hours of deposition)
    *Payment Required in Advance*
**Additional time billed at:**                                      **$1,000/hour**

Cancellation/Rescheduling Fee (7 business days or less)             $3,500
Cancellation/Rescheduling Fee (greater than 7 business days)        $1,750


**Live Testimony\* – *Payment Required in Advance***
    **Full Day**                                 **$7,500**
    **Half Day**                                 **$4,500**

Cancellation/Rescheduling Fee (7 business days or less)             Full Fee
Cancellation/Rescheduling Fee (greater than 7 business days)        Half Fee

*\*Additional Charges May Apply for Travel and Other Expenses*



**O** 610.356.8840
**E** Referrals@versedexperts.com

# PATIENT Rx HISTORY REPORT

TUNKHANNOCK COMPOUNDING CENTER
230 WEST TIOGA STREET STE. P
TUNKHANNOCK, PA 18657 Ph. 570-996-0440

Printed 7/3/2023

Page 1   Prescriptions filled between 7/1/2022 and 10/31/2023

NCPDP #6002810          NPI #1831795558          FT9829461

**Patient:**  STACEY WOLKING
36937 BASSWOOD CT
PURCELLVILLE, VA 20132

**Birthdate:** 09/26/1962
**Age:** 60
**Misc. ID:**

**Phone:**  540-454-0630

| Rx number | Date dispensed | Quantity & Drug | | Doctor / DEA  phone | RPh |
|---|---|---|---|---|---|
| 155694 | 8/8/2022 | 500 PREDNISONE 10MG TAB 10MG TABLET | | Dr. LINDNER  HENRY MD | BTB |
| | Day supply 30 | NDC:  0060338533821     Ref# | | BL5564782          570 955-3495 | |
| 155853 | 8/16/2022 | 200 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER  HENRY MD | CFY |
| | Day supply 50 | NDC:                Ref# | | BL5564782          570 955-3495 | |
| 156272 | 9/27/2022 | 100 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER  HENRY MD | BTB |
| | Day supply 50 | NDC:                Ref# | | BL5564782          570 955-3495 | |
| 156272 | 10/4/2022 | 200 DEXAMETHASONE 4 MG TABLET | | Dr. LINDNER  HENRY MD | BTB |
| | Day supply 50 | NDC:                Ref# | | BL5564782          570 955-3495 | |

Pharmacist's signature _____          Date 7/3/2023

**EXHIBIT**

**Greene 2   6/18/24 mfr**

YA0019

# E-Prescription

Printed 8/4/2022 12:06:49 PM

**TUNKHANNOCK COMPOUNDING CENTER**
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA 18657 Ph. 570-996-0440 Fax

**New**

---

**Date Written** 8/4/2022

**Doctor** Lindner, Henry MD     **Phone** 5709553495

**Agent Name**     **SLN**

**Address** 230 West Tioga St Ste 5 Tunkhannock, PA 18657

**DEA** BL5564782
1073536116

**Name** WOLKING, STACEY     **Phone** 5407510798

**Address** 36937 BASSWOOD COURT PURCELLVILLE, VA 20132     **DOB** 9/26/1962
Gender F

℞   **Qty** 500 Tablet
predniSONE 10 mg oral tablet

**Instructions:**
Up to 10 tabs po daily as directed

**DAW** No     **Refills** 0

---

Patient email:
Doctor SPI:     6155893418002
Other Allergies:

Other Drugs:

Doctor note:     MED. NOTE: Patient will call

Pharmacy note:

Message ID:     918
Message key:     1N202208040936428A522A18A

EPCS Signature Validated ☐

YA0020

# E-Prescription

Printed 8/15/2022 10:11:57 AM

**TUNKHANNOCK COMPOUNDING CENTER**
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA 18657  Ph. 570-996-0440  Fax

**New**

---

Date Written  8/15/2022

Doctor  Lindner, Henry  MD

Agent Name

Address  230 West Tioga St Ste 5 Tunkhannock, PA 18657

Phone 5709553495

SLN

DEA  BL5564782
1073536116

Name  WOLKING, STACEY

Address  36937 BASSWOOD COURT PURCELLVILLE, VA
20132

Phone 5407510798

DOB 9/26/1962

Gender F

℞  Qty  200 Tablet

dexamethasone 4 mg oral tablet

Instructions:

Take up to 4 tabs po daily in divided doses as directed

DAW  No

Refills 1

---

Patient email:
Doctor SPI:          6155893418002
Other Allergies:

Other Drugs:

Doctor note:

Pharmacy note:

Message ID:          935
Message key:         1N202208150859360536DDDC9

EPCS Signature Validated  ☐

*$236.00*

*Mail when
we get
regular
priority OK
mail*

YA0021

# E-Prescription

Printed 9/26/2022 3:06:23 PM

**New**

TUNKHANNOCK COMPOUNDING CENTER
230 W. TIOGA STREET STE.#3
TUNKHANNOCK, PA 18657  Ph. 570-996-0440  Fax

---

**Date Written** 9/26/2022

**Doctor** Lindner, Henry  MD

**Agent Name**

**Address** 230 West Tioga St Ste 5 Tunkhannock, PA 18657

**Phone** 5709553495

**SLN**

**DEA** BL5564782
1073536116

---

**Name** WOLKING, STACEY

**Address** 36937 BASSWOOD COURT PURCELLVILLE, VA 20132

**Phone** 5407510798

**DOB** 9/26/1962
**Gender** F

℞  **Qty** 300 Tablet
dexamethasone 4 mg oral tablet

**Instructions:**
Up to 10 tabs po daily as dire

**DAW** No

**Refills** 1

---

Patient email:
Doctor SPI:            6155893418002
Other Allergies:

Other Drugs:

Doctor note:

Pharmacy note:

Message ID:        1010
Message key:       1N202209261344253AA7D06C3

EPCS Signature Validated  ☐

YA0022

98

1   A.     Our system does not have errors like a

2   Rite Aid system would or that I was familiar

3   with at Rite Aid, but that would be a

4   therapeutic duplication that you would have

5   to override in a different system, yes.

6   Q.     Why would a prescription for

7   prednisone be therapeutically duplicative

8   with a prescription for dexamethasone 8 days

9   later?

10  A.     They're both corticosteroids.  My

11  understanding was that the prednisone was

12  discontinued and he was starting

13  dexamethasone.

14  Q.     How did you achieve that

15  understanding?

16  A.     I knew that he had switched steroids

17  for other patients.  So, again, I don't

18  remember a conversation necessarily, but that

19  was my understanding of the prescription.

20  Q.     Did you speak to Dr. Lindner about

21  Stacey Wolking between August 8th of 2022 and

22  August 16th of 2022?

23  A.     I can't remember.

24  Q.     Did you have any written

**EXHIBIT**

Greene 3  6/18/24 mfr

# Joy Bowers Greene Pharm.D.
## Curriculum Vitae

**Licensure**    North Carolina  14453

Office:  336-841-9553
jgreene@highpoint.edu

## Education

**The University of North Carolina**                                    **Chapel Hill, NC**
Doctor of Pharmacy                                                        May 17, 1998

## Professional Appointments

**High Point University Fred Wilson School of Pharmacy**              **High Point, NC**
**Clinical Professor of Pharmacy**                                    August 2014-present
**Assistant Dean for Experiential Education**

**IPPE-Community Pharmacy, IPPE-Hospital Pharmacy and APPEs**
- Preceptor and community pharmacy site recruitment
- Network with pharmacy practitioners within in the greater High Point area
- Schedule student rotation assignments
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition
- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the experiential program
- Review student evaluations of each preceptor/site

**Union University School of Pharmacy**                                  **Jackson, TN**
**Associate Professor of Pharmacy Practice**                          June 2011-July 2014
**Assistant Director of Experiential Education**

**IPPE-1, IPPE II (Community Pharmacy):**
- Preceptor and community pharmacy site recruitment
- Network with community pharmacy practitioners within in the Jackson/Memphis area
- Schedule student rotation assignments to community sites
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition
- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Community Pharmacy program
- Review student evaluations of each preceptor/site

**IPPE-2 (Hospital Pharmacy):**
- Preceptor and hospital pharmacy site recruitment
- Network with hospital pharmacy practitioners within the Jackson/Memphis area
- Schedule student rotation assignments to hospital sites
- Manage student or preceptor issues
- Develop/update student and preceptor manuals yearly
- Provide preceptor development, assessment, and recognition

- Provide continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Hospital Pharmacy program
- Review student evaluations of each preceptor/site

**Teaching Experience at Union University School of Pharmacy**

**Course Leader**

| | |
|---|---|
| Non-Prescription Drugs / Counseling | Fall 2011, 2012, 2013 |
| Non-Prescription Drugs Lab | Fall 2011, 2012, 2013 |
| IPPE Courses | Academic Years 2011-2014 |
| The Christ-Centered Pharmacist | Spring 2012, 2013 |

**Course Member/Co-coordinator**

| | |
|---|---|
| Pharmacotherapy I | Fall 2011, 2012, 2013 |
| Pharmacotherapy IV | Fall 2011, 2012, 2013 |
| Naplex Course Review | Spring 2012, 2013, 2014 |
| APhA Immunization Certificate Course | Spring 2013, 2014 |

# Wingate University School of Pharmacy                  Wingate, NC
**Director of Introductory Pharmacy Practice Experience**          August 2005-June 2011
**Assistant Professor**

**IPPE-1 (Community Pharmacy):**
- Preceptor and community pharmacy site recruitment
- Networked with 45-50 community pharmacy practitioners within in the greater-Charlotte area
- Personally visited 45-50 community pharmacy sites annually
- Communicated with preceptors via email, phone or mail at least 10 times per year
- Scheduled student rotation assignments to community sites
- Managed student or preceptor issues
- Developed/updated student and preceptor manuals yearly
- Served as Team Leader for  the IPPE-1 community course fall and spring semesters
- Provided preceptor development, assessment, and recognition
- Provided continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Community Pharmacy program
- Reviewed student evaluations of each preceptor/site

**IPPE-2 (Hospital Pharmacy):**
- Preceptor and hospital pharmacy site recruitment
- Networked with 30 hospital pharmacy practitioners within the WUSOP-approved zones
- Personally visited 30 hospital preceptors within the greater-Charlotte area annually
- Communicated with preceptors via email, phone or mail at least 10 times per year
- Scheduled student rotation assignments to hospital sites
- Managed student or preceptor issues
- Developed/updated student and preceptor manuals yearly
- Served as Team Leader for the IPPE-1 hospital  course during the fall semester
- Provided preceptor development, assessment, and recognition
- Provided continual review and improvement of processes and outcomes to ensure sustained excellence of the IPPE-Hospital Pharmacy program
- Reviewed student evaluations of each preceptor/site

Other administrative roles include:
- Co-chaired the Practice Experience Advisory Committee (PEAC)

- Member of the Dean's Advisory Council
- Development of a state-wide preceptor training program
- Participation in the ACPE accreditation process

## Teaching Experience at Wingate University School of Pharmacy

**Course Leader**

| | |
|---|---|
| Introductory Pharmacy Practice Experience -Community Practice | Fall 2005, Spring 2006 |
| | Fall 2006, Spring 2007 |
| | Fall 2007, Spring 2008 |
| | Fall 2008, Spring 2009 |
| | Fall 2009, Spring 2010 |
| | Fall 2010, Spring 2011 |
| Introductory Pharmacy Practice Experience -Hospital Practice | Spring 2006 |
| | Fall 2006, Spring 2007 |
| | Fall 2007, Spring 2008 |
| | Fall 2008, Spring 2009 |
| | Fall 2010, Spring 2011 |
| | Fall 2009 |
| Top 200 Drugs Part 1 | Fall 2005, Fall 2006, Fall 2007 |
| | Fall 2008, Fall 2009, Fall 2010 |
| Top 200 Drugs Part 2 | Spring 2007,  Spring 2008 |
| | Spring 2009, Spring 2010, Spring 2011 |
| Patient and Interprofessional Communications | Spring 2006, Fall 2006, Fall 2007 |
| | Fall 2008 |
| APhA Immunization Certificate Course | Spring 2010 Spring 2011 |

**Course Member**

| | |
|---|---|
| Community Health Outreach | Fall 2005 |
| PBL Pharmacotherapy Case Studies I | Spring 2007, Fall 2009 |
| | Spring 2010, Fall 2010, Spring 2011 |
| PBL Pharmacotherapy Case Studies II | Fall 2005, Fall 2007, Spring 2008 |
| Doctoral Candidate Seminar | Spring 2008, Spring 2011 |
| Immunizations and Smoking Cessations | Spring 2008, Spring 2009 |

## Oakboro Pharmacy                                                    Oakboro, NC
**Pharmacist Manager**                                           Jan 2001-July 2005

- Approached by CEO of Stanly Memorial Hospital to open and manage a hospital-owned community pharmacy in the rural community of Oakboro.
- Responsible for selecting computer vendor, designing pharmacy layout, obtaining permits, DEA license, third party contracts, accounting concerns, DME billing, hiring technicians and assisting with marketing.
- Pharmacist manager responsibilities include filling prescriptions, drug interaction monitoring, counseling patients, third party billing, personnel concerns, teaching and mentoring UNC school of pharmacy and Wingate school of pharmacy students.
- Developed and instructed a pharmacy technician certification course for Stanly Memorial Hospital. All technicians completing this course passed the national exam.

**Preceptor**

**UNC School of Pharmacy**                                                                                      1998-2004

- Responsible for introduction and advanced community pharmacy rotational experiences for fourth-year pharmacy students at UNC School of Pharmacy.
- Responsible for mentoring and teaching students.
- Teaching tools include proper monitoring of blood pressure, glucose meters, instruction of MDIs, how to use nebulizers, proper counseling techniques on variety of medications, and learn basic pharmacy principles.

**Preceptor**

**Wingate University School of Pharmacy**                                                          2003-2004

- Responsible for teaching and mentoring first year pharmacy students for Wingate University School of Pharmacy.
- Preceptor responsibilities include completion of daily assignments, setting goals for students, positively mentoring students.
- Teaching responsibilities include teaching students how to counsel patients, interact with staff and patients, learn basic computer functions, understand laws of pharmacy, introduce to medications and their uses, basic filling of prescriptions, and insurance billing issues.
- Invited to guest lecture in the early practice experience discussion classes

**Moose Midland Pharmacy**                                                                        **Midland, NC**

**Pharmacist Manager**                                                                                        1998 to 2001

**Diabetes Clinic Coordinator**

- Pharmacist Manager of a clinical, independent pharmacy in Cabarrus County, North Carolina. Responsible for setting up all third party contracts, filling prescriptions, counseling patients, teaching and mentoring UNC school of pharmacy and Campbell school of pharmacy students, worked closely with physicians for proper medication dosing for patients, proper billing to insurance companies, filing medicare claims, bookkeeping and personnel concerns.
- Alternative Medicine Consultant.  Attended various alternative medicine conventions focusing on the use of herbal and homeopathic medicine.  Consulted patients on the use of alternative medicines for certain disease states.  Alternative medications included probiotics, glucosamine and chondroitin, and fish oil.  Disease states included diabetes management, pediatric and geriatric care.
- Clinical Diabetes Specialist focusing on type 1 and type 2 diabetes management. Designed and implemented diabetes program for groups of patients currently receiving medication from Moose Pharmacy.  Patient's glucose levels were checked frequently in the pharmacy, and special group classes were held bimonthly. Pharmacist responsibilities included conducting all meetings, teaching patients and family (i.e.caregiver) about their disease state, proper use of their monitor,  chart review, group class instruction, instructing proper dietary habits, promoting exercise goals, insurance billing issues and evaluation of patient's overall well-being. Each session consisted of 15 patients. Hemoglobin A1c levels were taken by family practice physician before and after each 3 month session.  Consulted with physicians regarding drug therapy changes.  Overwhelming success rate with patients.
- Other services included assisting with hypertension clinic implementation and bone density screening for patients.  Also aided in developing a residency program for Moose Pharmacy in Concord.  Part of a development committee responsible for deciding resident responsibilities. Pharmacist resident curriculum includes assistance with clinical diabetes education classes at Moose Midland Pharmacy. Resident works one on one with Pharmacist Manager to learn all aspects of how to operate an out patient diabetes clinic.

**Med Outcomes**                                           **West Virginia**
**Diabetes Core Curriculum Speaker**                        July 1999

- Core speaker for McKesson Drug Company Diabetes Education Conference.
- Responsibilities include instructing pharmacists from across the US the importance of diabetes education and how to implement this education into their practice sites.
- Conference consisted of a 3 day diabetes certification program in Chicago
- Lectures focused on pharmacotherapy, educational techniques (including foot care, insulin injection technique and nutrition), overview of diabetes monitoring products, proper monitoring of diabetes patients, and proper billing to third party insurance companies for cognitive services.

## Delivered CE Programs

**APhA Immunizations Certificate Program**
| | |
|---|---|
| Charlotte,  NC | August 2010 |
| Wingate, NC | January 2010 |
| Winston Salem, NC | December 2009 |
| Wilmington, NC | September 2009 |

**The Power of Precepting**
| | |
|---|---|
| Carolinas Health Care System Preceptor Training | October 2009 |

**Tennessee Preceptor Training Program**
April 2012
April 2013
April 2014

**North Carolina Preceptor Training Program**
October 2008
October 2009
October 2010
October 2015

## Presentations

### Invited

**Know your Pharmacist**                     February 2016

Presented to pre-pharmacy students and their families during Family Weekend at High Point University on the topic of knowing your pharmacist.  Attendees were educated on the value a pharmacist brings to a patient's quality of life.

**Prayer Breakfast**                     August, 2015

Delivered the 2015 Prayer Breakfast Message to the Virginia Association of Pharmacists in Williamsburg, VA

**The Christ-Centered Pharmacist**             June 2015

Presented at the Annual Christian Pharmacists Fellowship International meeting on the topic of exemplifying Christian values while practicing as a pharmacist.  Approximately 175 pharmacists were in attendance.

**Pharmacy as a Career**                                    February 2015

Invited to present to High School Science National Honor Society at High Point Christian Academy about the benefits of choosing pharmacy as a career.


**Prayer Breakfast**                                        April 2014

Guest speaker at Trinity Christian Academy's Mother's Prayer Breakfast.

**Allergies and You**                                       April 2013

Invited by the wife of the President of Union University to deliver the keynote presentation at the Ladies' Auxiliary Luncheon at Union University.

**M & M**                                                   April 2012

Invited by administration at Trinity Christian Academy to speak to their middle and high school students during their chapel hour.  Over 400 students were in attendance.

**Who's a Leader**                                          April 2012

Asked by the students of Union University School of Pharmacy to serve as the guest speaker during their Phi Lambda Sigma induction dinner.  Students and faculty attended this dinner.

**Think, Act, BE Professional**                             August 2009

Asked by the National Association of Pharmacy Technicians to deliver the key-note address at the 2009 National meeting in Nashville Tennessee.  Pharmacy technicians from all of the country attended this national meeting.

**The Field of Pharmacy**                      February 2009, 2008, 2007, 2006

Presented educational talk at Stanly Memorial Hospital to a group of High School Seniors interested in the field of pharmacy.  Discussed different aspects of pharmacy practice and included information on admission process for pharmacy school.  Students learned about job opportunities for pharmacists and job shortage in US.


**Medication Management**                          April 2006, February 2006

Presented talk to a group of Senior citizens in Anson County about proper medication management.  Also provided a "brown bag" service for the group.  Discussed importance of adhering to medication administration schedule.  Included copies of medication charts for patients to use as a reminder to take their medications.

**Recommending the Use of Probiotics in Your Practice**      October 2005

Presented educational talk at the 2005 annual NCAP meeting.  A focus on using Probiotic supplements for children and adults.  Disease states discussed included infectious diarrhea, immune system modulation and eczema.  Probiotic use, dosage forms found effective and safety in clinical trials were examined.  Overviewed how to recommend the use of probiotics to various patients.

**Alternative Medicines and You**                                          August 2005

Presented a talk held at the Monroe Library to a group of people interested in alternative medicine treatments. Discussed most common supplements and herbs sold in the US. Supplements and herbs were defined by most common usage. Reviewed effectiveness, safety and precautions based on clinical trial information found in medical literature.

**Probiotics:  Their Role in Treating Eczema**                           August 2008

Presented educational talk to the American Association of Pharmacy Technicians. Talk focused around the safety and efficacy of using probiotics in the prevention and treatment of eczema.

**Women and Heart Disease**                                          September 2008

Presented educational talk to a women's group at a local church regarding heart disease and how it affects women. Participants were provided tools for healthy living and prevention of heart disease.

## Poster/Podium

"Implementation of a Longitudinal Interprofessional Education Learning Experience." Presented at the annual AACP 2014 meeting in Grapevine TX

"North Carolina Pharmacy Based Immunization Initiatives". Presented at the AACP 2010 Annual Meeting Seattle. WA July 2010

 "Longitudinal Progression from IPPE to APPE: Beyond Shadowing". AACP 2009 Annual Meeting.  Boston Massachusetts July 2009

"NC Tars School of Pharmacy Initiative".  NCAP 2008 Annual Meeting.  Chapel Hill, NC October 2008

"Innovation at Wingate University School of Pharmacy Bridges the Quality Chasms in Pharmaceutical Education." AACP 2006 Annual Meeting.  San Diego, CA, July 2006

"Development and Implementation of an Introduction to Clerkship Course." AACP 2006 Annual Meeting, San Diego, CA, July 2006.

"Development and Implementation of Basic Clinical Skills in Inpatient and Ambulatory Care Rotations." AACP 2006 Annual Meeting, San Diego, CA, July 2006.

## Publications

### Refereed Journals and Books
Book Chapters

 Smith, LS, **Greene JB**. Gastroenterology.  In:  McGraw-Hill's NAPLEX Review Guide (SET 2).  January 2011

 Smith, LS, **Greene JB**. Probiotics in Gastrointestinal Disease.  In:  The American College of Clinical Pharmacy PSAP VI. January 2009

<u>Peer-Reviewed Journal Publications</u>

Peyton L, **Greene JG**.  Irritable Bowel Syndrome: Current and Emerging Treatment Options.  P&T 2014;39(8):567-578

**Greene, JG,** Dolder C, Wallis ML.  The NC Tars Project:  Students leading the way to educate patients about proper use of antibiotics.  J Am Pharm Assoc. 2011;51:539-543

**Greene, JG,** Nuzum DS, Boyce EG.  Correlation of pre-pharmacy work experience in a pharmacy setting with performance in a top 200 drugs course.  Currents in Pharmacy Teaching and Learning.  2(2010) 180-185

Smith L, **Greene J,** Meade L, Spencer B.  Qualitative analysis of students' attitudes of duration of community pharmacy practice experiences.  Currents in Pharmacy Teaching and Learning. 1(2009) 110-114

**Greene, JG**.  Mitral Valve Prolapse, US Pharm. 2008:33(2):28-33

**Greene, JG**.  The Role of Probiotics in Treating Atopic Eczema, US Pharm. 2006:31(11):70-76

<u>Non-Peer Reviewed Journal Publications</u>

**Greene, JG**   Ask the Pharmacist. High Point Enterprise  Jan 2016-present. (monthly column)

**Greene, JG**   Joytime Encouragement.  The Women's Journal (bimonthly journal). 2012-present

**Greene, JG.** Dispensing Spiritual Comfort.  Christianity and Pharmacy, 2013:16(1):13-15

**Greene, JG.** Ask the Pharmacist.  The Jackson Sun (Health Supplement).  2013 Jan-Dec. (monthly column)

**Greene, JG.** Know Your Medications; Ask the Pharmacist:  Wingate Today. 2008(3):65

**Greene, JG.** Cough and Cold Relief; Ask the Pharmacist:  Wingate Today. 2007(2):64

**Greene, JG**.  Passion of the Christ:  A Look at the Passionflower, Christianity and Pharmacy, 2006:9(2):24

## Television Appearances

**Mommy Matters**
Monthly to bimonthly appearances (2014-present) on Fox8 segment to educate the public about pertinent health issues for children.  Topics include (but not limited to) proper sunscreen use, allergies, cough and cold, medication safety, immunizations and bug bites.

**WXII**
Appeared in February 2015 to discuss the value of feeling and expressing love, and how it relates to health.

## Honors and Achievements

**American Association of Pharmacy Technicians National Meeting Presenters Award**          2009, 2008
Received award at the National Association of Pharmacy Technicians meeting.  The following year, this same organization invited me to be their key-note speaker at their national meeting in Nashville, TN.  I was awarded the Teaching Award of Excellence at this meeting for my C.E. presentation "Think, Act BE a Professional"

**Spirit of Wingate Award**                                                                                                2009
A recognition award given to an individual, initiative, or program that exemplifies the spirit of WUSOP.  This award for presented in honor of the WIN program sponsored by CPFI at the WUSOP.

**Wingate University School of Pharmacy**                                                               2004 and 2005
**Preceptor of Distinction Award**
Received award for outstanding preceptor from Wingate University School of Pharmacy students.  Students nominate preceptors that go above and beyond what is expected of them.  Award presented at a banquet held in honor of all distinctive preceptors.

**SmithKline Beecham Pharmaceutical Care Student of 1998**                                              1998
Received award for demonstrating excellent pharmaceutical care for patients during clinical clerkships.  This award is presented to one graduating Doctor of Pharmacy student at UNC Chapel Hill each year.

**Deans List**                                                                             The University of North Carolina

## Certifications

| | |
|---|---|
| Medication Therapy Management Certificate | 2010 |
| OTC Advisor Certificate | 2008 |
| Pharmacy-Based Immunization Delivery Certificate | 2006 |
| Certificate of Diabetes Education | 1998 |
| CPR Certification | 1998-present |

## Professional Organizations

| | |
|---|---|
| American Association of Colleges of Pharmacy | 2005-present |
| American Pharmacists Association | 2015-present |
| Cabarrus County Association of Pharmacists | 1998-2001 |
| Christian Pharmacists Fellowship International | 2005-Present |
| North Carolina Association of Pharmacists | 2005-2010 |
| Stanly County Association of Pharmacists | 2001-2010 |
| Tennessee Pharmacist Association | 2012-2014 |

## Boards

| | |
|---|---|
| Christian Pharmacists Fellowship International  Board Member | 2015-present |

## Advising Roles

| | |
|---|---|
| Wingate University CPFI Faculty Advisor (Co-Chair) | 2005-2009 |
| Union University CPFI Faculty Advisor (Co-Chair) | 2011-2014 |

## Community Involvement

**Joytime Ministries, Inc.**                                                                                          President
                                                                                                                       2012-present
*Joytime Ministries is a Christian ministry aimed at encouraging women in their walk with God.  Joytime was founded in 2012 in Jackson, TN and is established as a nonprofit organization.  Joytime Ministries consists of a radio and speaking ministry.  "Joytime" is a 60 second radio vignette that airs on 150 radio stations in the United States.  Joytime also airs in Canada and London, England. In addition to producing radio vignettes, a*

*few times a year, I travel for speaking engagements to encourage women in their spiritual journey. I have worked with a variety of musical artists, including Dove-Award winning singer/song-writer Big Daddy Weave, I Am They, and Britt Nicole. Through Joytime, I have written magazine articles on relevant topics for Christian women at a local and national level.*

**Wingate University School of Pharmacy Representative for NC Tars**          2007-2010
*State-wide initiative to educate consumers about proper antibiotic use in an effort to raise awareness of antibiotic resistance. This initiative is in conjunction with UNC School of Pharmacy, Campbell School of Pharmacy, NC Tars (North Carolina Taking Antibiotic Resistance Seriously) and the CDC. This project stems from a service project conducted by P-2 students at Wingate University School of Pharmacy. This initiative included state-wide education to patients in community pharmacies regarding the importance of taking antibiotics correctly. This two-year project was launched during the month of October, 2008.*

## Professional Appointments

**High Point University**
| | |
|---|---|
| Administrative Committee | 2014-present |
| Assessment Committee | 2014-2015 |
| Admissions Committee | 2014-2015 |
| Experiential Committee | 2014-present |
| Interprofessional Education Coordinator | 2016 |

**Union University School of Pharmacy**
| | |
|---|---|
| Professionalism Committee, Chair | 2011-2014 |
| Practice Experience Advisory Committee | 2011-2014 |
| Outcomes/Assessment Committee | 2011-2014 |
| Interprofessional Education Committee | 2012 |
| Faculty Development Committee | 2012-2014 |

**Wingate University School of Pharmacy**
| | |
|---|---|
| Professionalization Committee | 2010-2011 |
| Practice Experience Advisory Committee (co-Chair) | 2005-2011 |
| Dean's Faculty Advisory Committee | 2005-2011 |
| Outcomes Assessment Committee | 2005-2007 |
| Faculty Search Committee | 2006 |
| Faculty Affairs Committee | 2007-2011 |
| Publicity Committee (University Committee) | 2005-2011 |
| Continuing Professional Development Panelist | 2007 |
| North Carolina Association of Pharmacists Membership Committee | 2008-2010 |
| North Carolina Association of Pharmacists Awards Committee | 2008-2011 |

## Journal Reviewer

| | |
|---|---|
| Reviewer for the Annals of Pharmacotherapy | 2008-2015 |
| Reviewer for US Pharmacist | 2008-2013 |

Joy B. Greene, PharmD
2825 Finch Farm Road
Trinity, NC 27370
jgreene@highpoint.edu

May 17, 2024

Susan Keesler, Esquire
McCormick & Priore, P.C.
2001 Market Street
Suite 3810
Philadelphia, PA 19103

Re: Wolking v. Lindner MD, and Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding Center

Dear Ms. Keesler,

You have asked me to render my opinion regarding a case involving Youngs Apothecary, Inc. d/b/a Tunkhannock Compounding Center (which I will refer to as 'TCC' throughout this document). After reviewing the materials, my opinion and conclusions are included in this document.

I received my Doctor of Pharmacy degree from the University of North Carolina at Chapel Hill in 1998. Since that time, I have opened and managed two independent pharmacies, served as founding faculty of three schools of pharmacy, developed curricula at three schools of pharmacy, networked with more than 1,500 pharmacists in the roles of Assistant Director, Director, and Associate Dean for Experiential Education. I hold the appointment of Professor at the Fred Wilson School of Pharmacy at High Point University and have been a licensed pharmacist for nearly 26 years. I have spent over 19 years of my career in pharmacy education. I have authored many peer-reviewed articles and spoken across the country providing presentations to my peers. My Curriculum Vitae and fees have been provided.

Documents that have been reviewed:

- Complaint
- Deposition transcript for Courtney Young PharmD and exhibits
- Deposition transcript for Brian Bryk PharmD and exhibits
- Deposition transcript for Henry Lindner MD and exhibits
- Deposition transcript for Tunkhannock Compounding Center 30(b)(6) and exhibits
- Deposition transcript of Plaintiff Stacy Wolking and exhibits
- Plaintiff's prescription history relevant to Tunkhannock Compounding Center

1

- Patient profile of Plaintiff Stacey Wolking
- The opinion of Thomas Johns, PharmD
- The opinion of Mark Dershwitz, PhD
- The opinion of Carl Gainor, Ph.D., J.D.
- 49 Pa. Code § 27.19 - Prospective drug review and patient counseling
- Pennsylvania State Board of Pharmacy Compounding Regulations

**Summary of Ms. Stacy Wolking's Background:**

Many people suffer from rare and debilitating conditions that are not successfully treated with traditional medicine. In these cases, people desperately seek out medical help from general physicians and specialists.  Unfortunately, many times, they are unsuccessful in finding an effective treatment plan. This often leads patients to seek out less traditional methods of treatment.  I believe Stacey Wolking is one of those patients.  Sadly, Ms. Wolking has suffered from multiple conditions that led her to many physicians and specialists. A few examples found in her medical history include (prior to August 2022):

- Ms. Wolking contracted Lyme disease and was treated for Lyme disease by Dr. Stewart.
- Dr. Stewart treated Ms. Wolking's menopause symptoms (hormone therapy).
- Ms. Wolking was diagnosed with Rheumatoid Arthritis (RA) by Dr. Pinto.
- Ms. Wolking was treated by Dr. Satchi (a gastroenterologist) for severe gastrointestinal pain.
- Ms. Wolking testified to suffering from a variety of symptoms that affected the quality of her life (at least 20 symptoms).
- Ms. Wolking's symptom presentation has been perplexing to her providers. She was advised by Dr. Pinto to find the root cause of her ailments and recommended she see an infectious disease specialist.

According to her testimony, Ms. Wolking was referred to Dr. Lindner by a friend, and, on their recommendation, she contacted him for help with her menopause problems. He treated her for menopause symptoms including prescribing progesterone and estrogen therapy.

Ms. Wolking had a long-standing patient/physician relationship with Dr. Lindner. At one of her annual appointments, she discussed her ongoing symptoms and struggles, and Dr. Lindner proposed she may have Babesiosis (a rare disease caused by a tick-borne protozoa). Dr. Lindner knew of Ms. Wolking's medical history of Lyme disease (a tick-borne illness), and his own daughter had suffered with Chronic Babesiosis. Due to his daughter's condition, Dr. Lindner understood Chronic Babesiosis, and became a self-proclaimed expert in the treatment for this rare condition. His experience led him to believe that antimalarials coupled with high doses of corticosteroids were necessary for disease management and patient relief.

2

In August of 2022, Ms. Wolking began treatment for Chronic Babesiosis with high quantities of corticosteroids being dispensed by TCC. The following prescriptions were prescribed by Dr. Lindner, filled at TCC and dispensed to Ms. Stacey Wolking between August 8th 2022 and October 4th 2022.

August 8th:    Prednisone 10mg  #500 tablets
Instructions:  "Up to 10 tabs po daily as directed"
Filled by Brian Byrk

August 16th:    Dexamethasone 4mg  #200 tablets
Instructions:  "Take up to 4 tabs po daily in divided doses as directed"
Filled by Courtney Young

September 27th:  Dexamethasone 4mg  #300 tablets (#100 tablets were filled)
Instructions:  "Up to 10 tabs po daily as dire"
Filled by Brian Byrk

October 4th:    Dexamethasone 4mg  #200 tablets were filled (remainder of the Rx above)
Instructions:  "Up to 10 tabs po daily as dire"
Filled by Brian Byrk

It is important to note that these medications were filled mail order and shipped to Ms. Wolking.

**Summary of Dr. Lindner and TCC:**

In August of 2022, Dr. Lindner's practice was in the same shopping center as TCC (when the corticosteroids were dispensed to Ms. Wolking). Courtney Young, PharmD was the pharmacist manager and owner of TCC at that time.  Dr. Lindner had a longstanding professional relationship with TCC. He met Dr. Young back in 2016 when Dr. Young was a staff pharmacist at TCC. Years later Dr. Young purchased TCC and Dr. Lindner continued to have an entrusting, professional relationship with Dr. Young.  In August of 2022, Brian Bryk, PharmD was a staff pharmacist at TCC. As recorded in the testimony of Dr. Lindner and Dr. Young, often, Dr. Lindner would have conversations with Dr. Young and Dr. Bryk about his daughter's Chronic Babesiosis. Over the years, Dr. Young and Dr. Byrk became familiar with Dr. Lindner's approach to treating Chronic Babesiosis with high doses of corticosteroids that were titrated up and down based on a patient's symptoms. It was understood that Dr. Lindner would oversee the doses and advise the patient throughout treatment. Dr. Young testified to understanding that the treatment of babesiosis is "Very dependent on the patient and their symptoms at the time. And, often it was cyclical, meaning that things would maybe get worse for a time, get better for a time, get worse for a time while he was treating patients."

3

It is my opinion that most pharmacists have little to no knowledge about the condition, Babesiosis, and even fewer pharmacists have knowledge about Chronic Babesiosis. Due to the rarity of this condition, I surmise this topic is not taught in the curricula at schools of pharmacy. Dr. Young testified to researching Babesiosis online to find out more information and noted there was not much information available. She also testified to lacking access to major medical journals in her pharmacy.

Dr. Young testified to speaking with Dr. Lindner about Chronic Babesiosis more than once, but there is no documentation regarding these conversations. Dr. Young testified that she felt it was reasonable to fill the high quantity of corticosteroids as Dr. Lindner had experience in treating Chronic Babesiosis. Dr. Young understood Ms. Wolking would be treated under the care of Dr. Lindner's treatment approach. Like Ms. Wolking, Dr. Young also regarded Dr. Lindner as an expert in the treatment of Chronic Babesiosis.

On August 8th, 2022, #500 tablets of Prednisone were dispensed and mailed to Ms. Wolking from TCC. Eight days later, (on August 16th 2022), a prescription for Dexamethasone 4 mg tablets was sent to TCC to be filled for Ms. Wolking (prescribed by Dr. Lindner). Dr. Young testified that she recognized this was a duplication of therapy. Because she understood Dr. Lindner's treatment plan of Babesiosis, and trusted him as an expert, she believed the previous prescription for Prednisone had been discontinued. Dr. Young testified that she did not document any of her conversations with Dr. Lindner regarding his treatment approach. There is also no documentation regarding her assumption as to why she believed the Prednisone prescription had been discontinued.

Regarding Dr. Young's and Dr. Byrk's interaction with Ms. Wolking, Dr. Young testified that all patients at TCC are offered counseling on new medications. Dr. Young testified that when a new prescription is filled for mail order, all patients receive a phone call from someone at the TCC and are asked if they have questions about their new medication. If the patient says, "no," then no counseling is provided. TCC does not record a patient's response to their offer to counsel. Dr. Young does not remember the specific details in offering to counsel Ms. Wolking on her new prescription, but she states the pharmacy would have offered counseling because they offer counseling for every new prescription. Dr. Young testified that she does not have any documentation showing Ms. Wolking refused counseling and there are no notes in the computer system regarding the refusal of patient counseling.

Opinions:

1. Duty:

    A compounding pharmacy is unique in how it functions. Compounding pharmacists often prepare medications that are not FDA-approved to address the specific medical needs of patients. The practice of compounding pharmacy focuses on formulating medicines that are not commercially available from a manufacturer.

Compounding pharmacists work with providers who often think outside the box in order to meet a patient's unique medical need.

TCC dispensed corticosteroids to Ms. Wolking. The dispensing pharmacists believed these medications addressed a rare, poorly understood condition, and they trusted Dr. Lindner's expertise in the management of Chronic Babesiosis. They trusted Dr. Lindner to adjust dosages as necessary, ensuring Ms. Wolking had sufficient medication on hand to treat her rare condition.

In healthcare, teamwork is essential, drawing on each other's expertise in complex cases. Rare conditions often lack standard treatment protocols, making research challenging for outpatient pharmacies like TCC. They trusted Dr. Lindner's expertise in Chronic Babesiosis, despite limited understanding themselves. Their confidence in him was reinforced by prior discussions and his daughter's treatment experience. The limited availability of online clinical information hindered their understanding of this rare condition. Trusting in Dr. Lindner's judgment, TCC filled prescriptions believing it was in Ms. Wolking's best interest. I do not believe they neglected their duty in dispensing the medication due to the unusual circumstances of this case. It is important to note that outpatient pharmacists operate with limited available patient information. Unable to access medical charts or treatment details, pharmacists rely on a provider's expertise in understanding their patient's needs. Outpatient pharmacists review prescriptions and use their clinical judgment to ensure they safely dispense the medication. They do not have access to individual patient-doctor discussions or a patient's tolerance to a medication, but they strive to accurately fill prescriptions based on the information available to them. And it is important to note that they compound, fill and ship out many prescriptions each day. Drs. Young and Byrk are in good standing with the Pennsylvania State Board of Pharmacy and no prior violations have been noted.

In terms of their responsibilities as pharmacists, it is my opinion that TCC did not fulfill their duty to adequately document their rationale for dispensing the unusually high quantities of corticosteroids prescribed. Such prescriptions, with their elevated quantities, should raise questions for any pharmacist, and documentation should be provided. Although Dr. Young testified to discussing Dr. Lindner's treatment plans for Chronic Babesiosis, there is no written record of these conversations. Additionally, there are no documented instances of counseling or refusal to counsel Ms. Wolking, which violates Pennsylvania State Board of Pharmacy regulations (49 Pa. Code § 27.19).

2. Cause:

Despite the lack of proper documentation, it is my opinion that TCC is not responsible for causing Ms. Wolking's injuries. Before consulting Dr. Lindner for Chronic Babesiosis, Ms. Wolking struggled with various symptoms and sought help

from multiple specialists, indicating multiple pre-existing health challenges. Dr. Lindner, drawing on his expertise and considering Ms. Wolking's medical history (especially with Lyme disease), explored the diagnosis during her yearly appointment. Federal law does not recognize pharmacists as healthcare providers, which restricts their ability to access and contribute effectively to a patient's health. Dr. Lindner diagnosed Ms. Wolking's condition and prescribed corticosteroid treatment to be filled at a pharmacy he trusted.  Drs. Young and Byrk trusted Dr. Lindner's clinical judgment and dispensed the prescriptions under the understanding that Dr. Lindner would oversee dosage adjustments. The prescriptions were filled with higher quantities with the intention of providing Ms. Wolking with an ample supply of medication, per Dr. Lindner's treatment plan. Trusting in Dr. Lindner's expertise, Drs. Young and Byrk dispensed the medication as directed. Ms. Wolking did not raise any concerns about the medication to TCC, and Dr. Young testified to TCC offering counseling with all new prescriptions.

I respectfully submit my opinion based on my extensive experience as a licensed pharmacist with over 19 years of experience in pharmacy education. Should any additional information become available, I reserve the right to amend my opinions.

All of my opinions are provided based on a reasonable degree of professional certainty in the field of pharmacy practice.

Sincerely,

*Joy B. Greene, PharmD*

Joy B. Greene, PharmD
Professor of Pharmacy Practice
High Point University
One University Parkway
High Point, NC 27268

6