UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACEY WOLKING and DARYL WOLKING, H/W : | |
| : | |
| Plaintiffs, : | |
| : | |
| v. : | Civil No. 3:23-cv-00806-MEM |
| : | |
| HENRY LINDNER, M.D. and YOUNGS APOTHECARY, INC., d/b/a Tunkhannock Compounding Center : | |
| : | |
| Defendants. : | |

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT YOUNGS APOTHECARY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs, Stacey and Daryl Wolking, by and through their undersigned counsel, respectfully request that this Honorable Court deny the motion of Defendant Youngs Apothecary, Inc., d/b/a Tunkhannock Compounding Center ("TCC"), and state as follows:

I.   **PROCEDURAL HISTORY**

Plaintiffs concur with Defendant's statement of the procedural history.

II.   **COUNTER-STATEMENT OF FACTS**

Plaintiffs dispute most of the facts contained in Defendant's statement under Local Rule 56.1, and have submitted their own responsive statement.

1

It is undisputed that on the four dates alleged in the Complaint, TCC dispensed corticosteroids to Ms. Wolking in the amounts alleged, accompanied by the instructions provided by Dr. Lindner that are described in the Complaint.  *See* Def. LR 56.1 Stmt. ¶ 13; Pl. LR 56.1 Stmt. ¶ 13.  Brian Bryk was the TCC pharmacist who dispensed the drugs on the first, third, and fourth occasions, and Courtney Young did so on the second occasion.  *See* Def. Ex. E.

The primary factual disputes concern whether these quantities and dosages of corticosteroids were unreasonable on the face of the prescriptions, and the conduct of TCC's pharmacists before dispensing them.  As is set forth in Plaintiffs' statement under Local Rule 56.1, the face of the prescriptions showed that they were inadequate, meaning unreasonably excessive and dangerous.  That danger stems from the properties of corticosteroids, which is a pharmacological fact that is disputed in this case.  *See* Pl. LR 56.1 Stmt ¶ 25.  It is also contested how much TCC's pharmacists should have known about corticosteroids, and what actions they did and did not take when they saw these prescriptions.  Plaintiffs contend that the TCC pharmacists behaved like shipping clerks, not trained professionals with a duty to protect their patients.  However, Plaintiffs recognize their obligation to prove this at trial.  Considering these factual disputes in a light most favorable to Plaintiffs, as the Court is required to do at this stage, it is evident that Defendant's motion should be denied.

## III. COUNTER-STATEMENT OF QUESTIONS INVOLVED

Plaintiffs contend that there is no question about the duty that applies in this case: the one described in *Riff v. Morgan Pharmacy*, 508 A.2d 1247 (Pa. Super. Ct. 1986). The sole question is whether TCC's pharmacists breached that duty by failing to take the actions described in the Complaint, such as challenging Dr. Lindner or refusing to fill the prescriptions.

Plaintiffs contend that the answer is in the affirmative, but that this is a fact-intensive question to be decided by a jury at trial, not at the summary judgment stage.

## IV. LEGAL STANDARD

As this Court has observed, summary judgment is appropriate only where the moving party carries its burden to show that there is no genuine issue as to any material fact. *See L.H. v. Pittston Area Sch. Dist.*, 130 F. Supp. 3d 918, 923 (M.D. Pa. 2015) (internal quotation marks and citations omitted), *aff'd*, 666 F. App'x 213 (3d Cir. 2016). In deciding whether the material facts are disputed, the court must consider all evidence and inferences therefrom in the light most favorable to the non-moving party. *Id*. Where the non-moving party is a plaintiff in a negligence case, summary judgment "is not commonly interposed, and even less frequently granted," because of the competence of juries in applying the reasonable person standard. Wright & Miller, 10A Fed. Prac. & Proc. Civ. § 2729 (4th ed.); *Barron v. Honeywell, Inc., Micro Switch Div.*, 69 F.R.D. 390, 392 (E.D. Pa. 1975).

3

Defendant has failed to meet its burden here. In fact, Defendant's brief and its statement under Local Rule 56.1 refers mostly to disputed facts. Below, Plaintiffs emphasize just some of the multiple material factual disputes with respect to Defendant's duty and breach.

### A. The Pharmacist's Duty in Pennsylvania

Defendant's arguments concerning the pharmacist's duty are muddled. On the one hand, TCC acknowledges that the Pennsylvania Superior Court's published opinion in *Riff* defines the duty of a pharmacist in Pennsylvania. Def. Br. at 5. On the other hand, TCC argues that Plaintiffs seek to impose a duty on pharmacists that does not exist. This is incorrect. Pennsylvania law imposes upon Defendant the duty described in *Riff*, and Plaintiffs have asked this Court – through the language in their Complaint and in their response to Defendant's Motion to Dismiss – to apply that law. *See* Dkt. 1, 14. Though Defendant does not openly challenge the law as explained in *Riff*, the effect of granting its motion would be to weaken the law dramatically. Such a ruling would essentially say that factual disputes about the dangerousness of drugs and the specific conduct of pharmacists are immaterial, which is another way of granting pharmacists permission to dispense dangerous drugs under virtually any circumstances, despite the risks.

Contrary to the result that Defendant seeks, *Riff* states what the law in Pennsylvania actually requires: that pharmacists exercise the care, skill, and

intelligence which ordinarily characterize the profession. 508 A.2d at 1251. One particular duty is to "remedy inadequacies on the face of a physician's prescriptions." Def. Br. at 5.

The *Riff* opinion describes inadequacies as those that are "obvious," and that pose "a substantial risk of serious harm to the plaintiff." 508 A.2d at 1252. Defendant acknowledges that a serious risk of substantial harm could be presented by the dosage instructions on the pill bottle, for example. Def. Br. at 5. That sole example reveals why summary judgment is inappropriate in this case: the question whether a set of dosage instructions is obviously inadequate on its face, and presents a serious risk of substantial harm, is largely a factual one. Once that question is answered, others are presented, such as whether the pharmacist warned the patient or notified the prescribing physician, or otherwise satisfied their duty.

Since 1986, *Riff* has been widely cited,[1] and Defendant acknowledges that *Riff* remains good law. Def. Br. at 5. In fact, the court in *Forish v. Paul*, relied upon

---

[1] *See, e.g.*, *Joyce v. Boulevard Physical Therapy & Rehab. Ctr., P.C.*, 694 A.2d 648, 656 (Pa. Super. Ct. 1997) ("[B]oth the doctor and the pharmacist are vital to our medical system and that both independently owe a duty of care to the patient."); *Walton v. Giant Eagle, Inc.*, No. 11CV0759, 2011 WL 2601202, at *2 (W.D. Pa. June 30, 2011) (citing *Riff* for the proposition that "there is authority under Pennsylvania law for holding pharmacists liable under a negligence theory for dispensing harmful products."); *Carista v. Valuck*, 2016 OK CIV APP 66, 394 P.3d 253, 256 n. 2 (Okla. Civ. App. Sept. 19, 2016) (vacating dismissal of negligence claim against pharmacy for causing overdose death from painkillers, and collecting cases including *Riff*).

heavily in Defendant's brief, looked to *Riff* to define the duty of a pharmacist, and echoed *Riff*'s admonition that "[a] pharmacy is not . . . merely a warehouse for drugs." 2 Pa. D. & C. 4th 413, 415-16 (Pa. Ct. Comm. Pl. 1989). The other case relied upon by Defendant quoted *Forish*'s citation to *Riff*. *See Gabriel v. Giant Eagle, Inc.*, 124 F. Supp. 3d 550, 563 (W.D. Pa. 2015). Thus, it is evident that Defendant acknowledges the applicability of *Riff* to this case.

      Defendant's problem is that *Riff* requires the development of a factual record, and currently the material facts are disputed. Unable to identify many material, undisputed facts, Defendant attempts to convert the factual question of breach into the legal question of duty, by pointing to separate duties in *Forish* and *Gabriel*, which are not at issue in this case. *Forish* dealt drug interactions, not overdoses, which was a question that went beyond the face of the prescriptions. 2 Pa. D. & C. 4th at 417-18. *Gabriel* dealt with identity theft. 124 F. Supp. 3d at 563-64. Neither involved the duty to act in response to facially inadequate prescriptions, which is the duty that Plaintiffs allege. Accordingly, this Court should follow *Riff*, and Defendant's motion should be denied.

---

## B. Whether TCC's Pharmacists Breached Their Duty

TCC's pharmacists breached their duty on multiple occasions, but the facts essential to that judgment should be found first by a jury, as they were in *Riff*. The present case is even more suited for trial than *Riff* because there are multiple categories of complex factual disputes here.

### 1. The factual determinations in *Riff*.

In *Riff*, the plaintiff was suffering migraine headaches and her doctor prescribed suppositories of a drug called Cafergot. 508 A.2d at 1249. The prescription called for twelve suppositories, and the doctor instructed her to take one every four hours. *Id*. The plaintiff took five or six during a two-day period, causing her to overdose, become hospitalized, and suffer permanent nerve damage in her foot. *Id*. at 1249.

These facts alone were not enough to resolve the case. Expert testimony about how Cafergot was normally and safely used, and the normal practices of reasonable pharmacists, played a critical role in proving the additional facts required for the determination that the pharmacy breached its duty. *Id*. at 1250, 1253. For example, the plaintiff needed to establish whether the doctor's instruction to take one suppository every four hours was excessive. Experts testified that a patient should normally take only one or two Cafergot suppositories total, and no more than five in a week. *Id*. at 1250. Just like in the present case, such testimony called into question

7

both the total quantity dispensed by the pharmacy, as well as the doctor's instructions accompanying the drugs, which the pharmacy had passed through to the patient. Facts about the quantities and instructions are disputed here, as discussed below.

Another critical factual question in *Riff* concerned the knowledge of pharmacists about the drug in question. For a prescription to appear to be inadequate on its face, a pharmacist would have to understand the properties and safe dosing of that drug. In *Riff*, "[e]xperts testified that the toxic propensities of Cafergot suppositories were well known in the pharmacological community, and that instructions as to proper dosage and warnings are listed in the standard reference books which all pharmacists are required by law to maintain." *Id*. at 1250. Plaintiffs will offer similar testimony here. *See* Def. Ex. M at 6 ("The normal doses for corticosteroids are listed in common reference materials and easy for any pharmacist to find."). Defendant's pharmacists, in contrast, have claimed that their knowledge of corticosteroids was limited. *See, e.g.*, Pl. Ex. A at 19:14-24 (revealing that Young could not recall what she was taught about corticosteroids in pharmacy school); Pl. Ex. C at 25:19-22 (failing to recall being taught about limits on dosing).

The *Riff* experts further testified that the pharmacists, when they saw that the doctor's instructions were facially inadequate because they called for a potentially toxic dose of the drug, had a duty to act. In *Riff* that duty was described as a duty to discuss the risks with the patient or to bring the dangerous instructions to the

8

prescribing physician's attention. 508 A.2d at 1252.[2] The *Riff* court vehemently rejected the idea that the pharmacy could simply trust the doctor's expertise, without applying the professional judgment of its own pharmacists:

> The statement by the appellant that "its function and duty was to supply the medication" is incorrect. . . . The appellant would seem to argue that a pharmacy is no more than a warehouse for drugs and that a pharmacist has no more responsibility than a shipping clerk who must dutifully and *unquestioningly* obey the written orders of omniscient physicians. Such is not the case.

*Id.* at 1251 (emphasis in original).

Although Defendant does not explicitly make the same argument here, granting Defendant's motion would reward the same conduct. Dr. Lindner knew that TCC's pharmacists would behave like shipping clerks, which is why he instructed Ms. Wolking to fill her large corticosteroid prescriptions there. *See* Pl. Ex. I ("I want you to purchase some more 4mg Dex bottles from the Tunkhannock Cmpd. Ctr. If we get anymore from the local pharmacy they'll start asking questions and possibly complain to my medical board."). To the extent that Defendant even attempted to identify evidence to the contrary, it is disputed, as is explained below.

---

[2] *Riff* does not hold that these are the pharmacist's only two options. In fact, *Riff* expressly disclaims that the court had the ability, in one opinion, to fully "delineate the precise bounds of a medical professional's responsibilities." 508 A.2d at 1253. The court did say that the pharmacist's degree of care should increase as the potential harm of the drugs in question becomes more dangerous. *Id*. at 1251. Here, the potential harm of the massive doses of corticosteroids dispensed by Defendant was much greater than it was in *Riff*. Because that potential harm is disputed, a jury should decide the exact degree of care required.

**2. There are at least two clear categories of material factual disputes.**

The question whether TCC breached its duty depends on at least two categories of complex material factual disputes. The first concerns whether there were obvious inadequacies on the face of the prescriptions; the second concerns what actions (if any) the TCC pharmacists took before dispensing the drugs.

**a. Obvious inadequacies**

It is disputed whether, as a matter of pharmacology, these prescriptions were obviously inadequate because the quantities of drugs – the overall quantities, as well as the dosing instructions – actually endangered Ms. Wolking. *See* Pl. LR 56.1 Stmt. ¶ 25. Plaintiff's expert pharmacologist opined that she was placed at an "extremely high" risk, and that the risk increased each time TCC dispensed the drugs. *See* Def. Ex. K at 2.

Further, if the drugs did create a substantial risk of serious harm, it is disputed whether the pharmacists should have recognized that risk as obvious on the face of the prescriptions. Plaintiffs contend that the TCC pharmacists should have considered the "instructions to the patient, dosage, total quantity dispensed, and any therapeutic duplication," as well as what TCC knew about Ms. Wolking's prior prescriptions. Pl. Ex. H at 1. Defendant disputes this, but both of Plaintiffs' pharmacy experts wrote that the pharmacists should have recognized the danger. *See* Def. Ex. L at 4 ("The pharmacists did not seem to recognize or acknowledge that

corticosteroids in such massive doses are extremely dangerous."); Def. Ex. M at 6 ("Both pharmacists should have known the significant health risk posed by the extremely high corticosteroid doses.").

Defendant's motion should be denied solely because of these disputes.

### b. The conduct of TCC's pharmacists

A second category of material factual disputes concerns the conduct of Defendant's pharmacists before dispensing the corticosteroids. Plaintiffs alleged that the pharmacists failed to take multiple possible actions in response to the facially inadequate prescriptions, and that they failed to do so each of the four times they dispensed the drugs. *See* Compl. ¶ 98. Numerous places in the record support these allegations: for example, there is evidence that neither of the pharmacists spoke to Dr. Lindner, to each other, or to Ms. Wolking before dispensing these obviously dangerous prescriptions. *See* Pl. LR 56.1 Stmt. ¶¶ 19-20.

Defendant argues that one of its pharmacists took some actions, on one occasion. *See* Def. Br. at 10. That contention is itself disputed. While Defendant claims that Young spoke to Dr. Lindner before August 8, 2022, Dr. Lindner testified that he did not believe he ever had a conversation with her about Stacey Wolking specifically. *See* Pl. Ex. D, Feb. 21, 2024 Lindner Dep. Tr. at 298:2-13. He also testified that Defendant's pharmacists never questioned his corticosteroid prescriptions for a babesiosis patient. *Id.* at 291:6-12. Young admitted that there is

11

no record of any conversation. *See* Pl. Ex. A at 79:20-80:1; Pl. Ex. B at 20:22-21:6; *see also id.* at 39:18-24 ("I honestly don't remember if it was me that spoke with him. . . . I don't remember exactly the date, the time, if it was this exact prescription.").

An additional factual dispute concerns the outcome of any Young-Lindner conversation (if it ever took place). Young claims that it occurred before the August 8, 2022 prescription, but she did not dispense that prescription. Brian Bryk did. Defendant's statement under Local Rule 56.1 offers vague assertions about Bryk at paragraph 20, but it does not address specifically whether Young relayed any information to him from Dr. Lindner about Ms. Wolking before August 8, 2022. Bryk testified that, before that date, he had no recollection of speaking to Young or Dr. Lindner about Stacey Wolking, and he also had no recollection of speaking to them about Ms. Wolking before dispensing any of the prescriptions at issue in this case. *See* Pl. Ex. C at 15:16-24. It is unclear what material information Bryk could have discussed with Young, since she admitted that she and Lindner did not even discuss the potential negative side effects of these massive corticosteroid doses on Ms. Wolking. *See* Pl. Ex. A at 80:2-9

Based upon this factual record, a reasonable jury could easily conclude that Young never spoke to Lindner; that even if she did the conversation did not justify TCC dispensing the drugs on all four occasions; and/or that even if she did, she did

not relay any of the information to Bryk, who dispensed most of the drugs. These possibilities, considered in the light most favorable to Plaintiffs, further demonstrate why Defendant has failed to carry its burden.

## V. CONCLUSION

Pharmacists perform an essential but dangerous job, and the many material factual disputes discussed above go to the heart of their responsibilities. With so many questions unanswered about whether these pharmacists even understood their responsibilities, much less performed them, granting summary judgment in this case would mean that in almost any factual scenario, pharmacists would be licensed to place their patients in danger. That is not what *Riff*, the other cases cited herein, or the statutes and public policies discussed in those cases intended. Defendant's motion should be denied.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

BY: *Conor Lamb*
SHANIN SPECTER, ESQUIRE
PA Attorney I.D. No. 40928
CONOR LAMB, ESQUIRE
PA Attorney I.D. No. 304874
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 402-2359
Shanin.Specter@klinespecter.com
Conor.Lamb@klinespecter.com

## **CERTIFICATE OF SERVICE**

    I, Conor Lamb, Esquire, hereby certify that I served a true and correct copy of the foregoing Plaintiffs' Brief in Opposition to Defendant, Youngs Apothecary, Inc.'s Motion for Summary Judgment via electronic service with the Clerk's E-file system on the 19th day of July, 2024, upon all counsel of record.

*Conor Lamb*
CONOR LAMB