UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY WOLKING and DARYL WOLKING, H/W | : : : | |
| Plaintiffs, | : : | |
| v. | : : | Civil No. 3:23-cv-00806-MEM |
| HENRY LINDNER, M.D. and YOUNGS APOTHECARY, INC., d/b/a Tunkhannock Compounding Center | : : : : : | |
| Defendants. | : : | |

**PLAINTIFF'S STATEMENT OF MATERIAL FACTS**
**REQUIRED BY LOCAL RULE 56.1**

Plaintiffs, Stacey and Daryl Wolking, by and through their undersigned counsel, provide the following statement of material facts, as to which there exists a genuine issue to be tried, responding to the numbered paragraphs set forth in Defendant's Statement:

1. Disputed. This case concerns claims for damages caused to Plaintiffs not only as a result of Dr. Lindner's conduct, but also as a result of the negligence of Defendant Youngs Apothecary, d/b/a Tunkhannock Compounding Center ("TCC"). *See, e.g.*, Compl. ¶¶ 71-74, 95-101.

1

2. Disputed. The evidence does not show that Ms. Wolking received corticosteroids from "several" pharmacies from August to October 2022, but instead from two pharmacies: TCC and Harris Teeter. *See* Def. Exs. E-F. Between those two pharmacies, TCC dispensed approximately 72.2% of the total milligrams of corticosteroids during that period, and Harris Teeter dispensed approximately 27.8%. *See* Pl. Ex. E at 155:1-12.

3. Undisputed.

4. Disputed. Ms. Wolking did not testify that all of her symptoms resolved – only those she attributed to Lyme. Others persisted. *See* Def. Ex. A at 75:19-22.

5. Disputed as to the nature of the treatment, and the cause and extent of symptoms. *See*, *e.g.*, Def. Ex. A at 27:6-10 (referring to Ms. Wolking reporting a "biotoxin illness"); 29:2-25 (discussing her report of fatigue, cold hands and feet, weight gain, depression, dry skin, and mental slowness); *see also* Def. Ex. H (demonstrating primarily email communication, not what is typically meant by "telemedicine").

6. Disputed as to the foundation for, and date of, Dr. Lindner's diagnosis, and disputed as to the existence of "chronic babesiosis." *See* Def. Ex. B at 114-16 (alluding to Dr. Lindner's testimony that he diagnosed Ms. Wolking in January of 2022 and explaining some of the reasoning behind the diagnosis); Pl. Ex. G at 4 (explaining that babesiosis is an acute infection, and that the organism named by Dr.

Lindner "has not caused human disease"); Def. Ex. M at 4 ("Dr. Lindner diagnosed his daughter with chronic babesiosis, a medical diagnosis he states he invented. . . . [which] is not a medical diagnosis recognized by the Infectious Disease Society of America (IDSA) or the Centers for Disease Control (CDC)."); Pl. Ex. H at 2 (describing disagreement between Plaintiffs' and Defendant's experts about the existence of chronic babesiosis).

    7.    Disputed as to the existence of babesia parasites in Ms. Wolking and the nature of the treatment, which is better described as including both antimicrobial medications and corticosteroids, some of which are not indicated for babesiosis. *See* Pl. Ex. G at 4-5.

    8.    Disputed as to the existence of babesia parasites in Ms. Wolking. *See* Pl. Ex. G at 4 ("[T]he organism implicated . . . had not previously been reported in humans . . . . [and] has not caused human disease."); 5 ("Ms. Wolking had no infectious illness.").

    9.    Disputed as to the foundation for Dr. Lindner's diagnosis. *See* Def. Ex. B at 115-16.

    10.    Undisputed.

    11.    Disputed as to the existence of an inflammatory reaction caused by babesia parasites. *See* Pl. Ex. G at 5 ("Ms. Wolking had no infectious illness.").

    12.    Undisputed.

13. Disputed. The dispensing of the prescriptions was not simultaneous, and the dexamethasone dispensed on August 16, 2022 by TCC contained instructions as well. *See* Def. Ex. D at 2 (showing instructions for Ms. Wolking to take up to four tabs daily).

14. Undisputed.

15. Disputed as to the quantity of corticosteroids and as to the existence of chronic babesiosis. *See* Def. Ex. H; Def. Ex. K. at 3; Def. Ex. M at 4 ("Dr. Lindner diagnosed . . . chronic babesiosis, a medical diagnosis he states he invented . . . . [which] is not a medical diagnosis recognized by the Infectious Disease Society of America (IDSA) or the Centers for Disease Control (CDC).").

16. Disputed. A reasonable jury could conclude that all of the information shared by Dr. Lindner with the TCC pharmacists about the condition of his babesiosis patients provided TCC with knowledge and/or warning of their side effects. *See* Pl. Ex. D at 285-86 (describing that Dr. Lindner explained what was wrong with his patients and "they came to understand my approach to the treatment of this disease"); 288 (describing how thoroughly he discussed babesiosis with Courtney Young).

17. Disputed that Ms. Wolking testified about a single perforation. *See* Def. Ex. A at 124:3-18 (recalling the surgeon "explaining that there was a couple of

4

different perforations" and that "she said she's seen many perforations, but nothing ever like that").

19. Disputed. In the portion of the transcript cited by Defendant, the physician discussed was a hospitalist, not a surgeon. *See* Def. Ex. A at 126:3. Ms. Wolking did not describe one clear opinion expressed by her treating physicians at the time of her surgery, instead recalling multiple conversations that gave her a general impression. *Id*. at 126:15-22; 127:2-3 ("I can't remember any one specific conversation where he said those exact words."). Ms. Wolking testified that her surgeon expressed an opinion about the cause of her injuries one month later. *Id*. at 124:10-18.

19. Disputed. Defendant's own Exhibit E shows that Courtney Young filled the prescription on only one of the four occasions described in the complaint, while Brian Bryk did so on the other three. *See* Def. Ex. E (showing the dispensing pharmacist's initials in the "RPh" column). With respect to Young's testimony, it is disputed whether a conversation ever occurred between her and Dr. Lindner about Ms. Wolking. Dr. Lindner testified that he does not recall that conversation. *See* Pl. Ex. D at 298:2-13. He also testified that the TCC pharmacists never questioned his corticosteroid prescriptions for a babesiosis patient. *Id.* at 291:6-12. Young admitted there is no record of any conversation. *See* Def. Ex. G at 79:20-80:1; Pl. Ex. B at 20:22-21:6; *see also id.* at 39:18-24 ("I honestly don't remember if it was

5

me that spoke with him. . . . I don't remember exactly the date, the time, if it was this exact prescription."). Defendant's own Exhibit G shows that, even if a conversation between Young and Dr. Lindner took place, Young admits that they did not discuss potential risks or negative side effects that the corticosteroids posed to Ms. Wolking. *See* Def. Ex. G at 80:2-9. In other words, the conversation was immaterial. Furthermore, Young does not recall speaking to Dr. Lindner about Ms. Wolking between August 8, and October 4, 2022, even though three of the four occasions on which TCC dispensed corticosteroids in increasingly large amounts occurred during that period. *Id.* at 121:12-21.

20.   Disputed. Brian Bryk does not recall speaking to Young about Ms. Wolking before dispensing the three prescriptions he dispensed. *See* Pl. Ex. C at 14-15. Furthermore, Bryk could not recall a single source of his information about babesiosis, *id*. at 34-35, or whether he researched the use of corticosteroids to treat babesiosis. *Id*. at 36:4-7. Bryk also had no memory of speaking to either of the Wolkings, and thus it is disputed whether he offered them counseling. *Id*. at 16:22-17:3. Plaintiffs dispute whether Ms. Wolking ever received counseling from anyone at TCC, and there is no documentary evidence that it ever took place. *See* Pl. Ex. A at 33:11-24; Pl. Ex. B at 45:4-8; 47:16-19.

21.   Disputed. The transcript pages cited by Defendant are not included in its exhibit. Those pages show that Young did not recall if she or Dr. Lindner initiated

the conversation that took place, and she did not express a clear concern that the quantity was too high. *See* Pl. Ex. A at 76-77.

22. Disputed as to whether the conversation took place, *see* Pl. Ex. D at 291:6-12, 298:2-13, and disputed as to the materiality of Defendant's contention that a conversation "carried through," even as TCC dispensed more and more corticosteroids in increasingly dangerous amounts. Plaintiff's expert testified to the opposite, that the pharmacists had an affirmative duty with respect to each prescription, particularly as the total amount of corticosteroids grew in such a short time. *See* Pl. Ex. F at 96-98.

23. Undisputed.

24. Disputed. Courtney Young testified that she knew Dr. Lindner's patients were receiving antimalarial medications, which TCC did not dispense. Pl. Ex. A at 75:9-11.

25. Disputed. There are upper limits to corticosteroid dosing, even if there is not one universally agreed-upon maximum dose. *See* Def. Ex. M at 4 ("Dr. Lindner believes there is no upper limit to corticosteroid dosing. This corticosteroid treatment approach lacks scientific merit or published evidence to support."); Def. Ex. N at 5 ("The medical literature does not establish a specific "maximum dose" for either medication, but that does not mean no amount is too much, or that there is no standard of care with respect to dosing. As noted above, the standard of care

7

requires physicians to seek the lowest possible effective dose because of the toxicities associated with these drugs."); Pl. Ex. H at 1 ("The initial dosing recommendation for corticosteroids contained in the official FDA approved product labeling provides a useful benchmark when it comes to evaluating the reasonableness of the prescription."). Further disputed to the extent that Defendant contends these prescriptions were facially reasonable. *See* Pl. Ex. H at 1 ("There are multiple factors important to assessing whether a prescription is reasonable on its face. These may include instructions to the patient, dosage, total quantity dispensed, and any therapeutic duplication. In addition, information known about the patient is instrumental in making this determination.").

26. To the extent that this is a factual allegation, disputed. The reports of Plaintiffs' experts apply the duty described in *Riff*. *See*, *e.g.*, Def. Ex. L at 5 ("During 40 years of teaching pharmacy students about their legal and professional obligations, I have always stressed that they have a professional duty to use their knowledge . . . [and] should not blindly follow the instructions of prescribers. . . . I have cited in classes and continuing education lectures the Pennsylvania case of Riff v Morgan Pharmacy that demonstrates that the courts have also adopted this reasoning when looking at the duties of a pharmacist.").

27. Disputed, and calls for legal conclusions to which no response is required.

                         Respectfully submitted,

                         **KLINE & SPECTER, P.C.**

BY: *Conor Lamb*
                         SHANIN SPECTER, ESQUIRE
                         PA Attorney I.D. No. 40928
                         CONOR LAMB, ESQUIRE
                         PA Attorney I.D. No. 304874
                         1525 Locust Street, 19th Floor
                         Philadelphia, PA 19102
                         Telephone: (215) 772-1000
                         Facsimile: (215) 402-2359
                         Shanin.Specter@klinespecter.com
                         Conor.Lamb@klinespecter.com