# EXHIBIT A

**In the Matter Of:**

*WOLKING v*

*LINDNER*

*COURTNEY YOUNG*

*November 15, 2023*



1  BY MR. LAMB:

2  Q.    As we sit here today, is there

3  anything to Youngs Apothecary, Incorporated,

4  that does not include Tunkhannock Compounding

5  Center?

6  A.    No.

7  Q.    For the rest of this deposition, I

8  will probably just use the name Tunkhannock

9  Compounding Center or Tunkhannock.

10        When I'm doing that, I'm obviously

11 referring to Youngs Apothecary as well

12 because you told me -- is it fair to say that

13 those terms are interchangeable?

14 A.    Yes.

15 Q.    Does Tunkhannock Compounding Center

16 accept health insurance from patients?

17 A.    No, we --

18 Q.    You don't accept -- sorry, go ahead.

19 A.    We do not.  We offer a claim -- form

20 for self-reimbursement, if they choose to do

21 so.

22 Q.    On my end, that got a little garbled

23 by the video.

24        Go ahead and repeat it, if you don't

1  mind, Ms. Young.

2  A.    No, we do not take insurance and bill

3  insurance at the pharmacy, but we offer

4  patients a compounded claim form that they

5  can then send to the insurance company for

6  reimbursement themselves, if they choose to

7  do so.

8  Q.    Why don't you take insurance?

9          MR. BENEDETTO:  Objection of the

10 form.

11         You can answer.

12         THE WITNESS:  Most of our

13 prescriptions are compounded prescriptions,

14 and most of them are not covered under

15 insurance as much as we found.  So, it was

16 not beneficial for us to pay to bill

17 insurances when the prescriptions were not

18 covered anyway.

19 BY MR. LAMB:

20 Q.    That practice, as you've described it,

21 has that been the same since you started

22 working there; therefore, before you owned

23 it, since you started working there in 2016?

24 A.    Correct.

1  please correct it.
2         Are you the pharmacist in charge at
3  Tunkhannock Compounding Center?
4  A.    Yes.
5  Q.    Have you been the pharmacist in charge
6  since you bought the pharmacy in 2020?
7  A.    Yes.
8  Q.    I want to ask you some more questions
9  about prednisone and dexamethasone.
10        First of all, do you agree with me
11  that those are both considered
12  corticosteroids?
13  A.    Yes.
14  Q.    Were you taught about corticosteroids
15  as a class of drugs when you were in pharmacy
16  school?
17  A.    Yes.
18  Q.    What were the important things that
19  you remember being taught about them?
20            MR. BENEDETTO:  Objection of
21  form.
22            You can answer, Courtney.
23            THE WITNESS:  Honestly, I can't
24  remember specifically at this time.  It's a

1  little while ago.

2  BY MR. LAMB:

3  Q.    I'm going to read you a very simple

4  statement.  I would like you to tell me if

5  you agree or disagree with it.

6        There is no upper limit on prednisone

7  dosing.

8        Do you agree with that statement or

9  disagree with it?

10              MR. BENEDETTO:  Objection of the

11  form.

12              You can answer.

13              THE WITNESS:  I agree.

14  BY MR. LAMB:

15  Q.    You agree that there is no upper limit

16  on prednisone dosing; do I have that right?

17  A.    I agree it's in what I have read

18  recently about prednisone.

19  Q.    Can you tell me where you have read

20  that there is no upper limit on prednisone

21  dosing?

22  A.    In the package insert for prednisone.

23  Q.    Can you describe where that package

24  insert comes from?

1  them that?

2  A.    Yes, either over the phone or when

3  they pick up a prescription.

4  Q.    The answer to the question of whether

5  they have any questions, how is that

6  recorded?

7  A.    I don't know.

8  Q.    Have you ever done this with one of

9  your patients?

10 A.    Yes.

11 Q.    How did you record their answer?

12 A.    I just counselled them.  I didn't

13 really record the conversation.

14 Q.    Well, if you ask a patient if they

15 have any questions and they say no, is there

16 more counselling that takes place than that?

17 A.    No.

18 Q.    If that happens, if the patient says

19 they don't have any questions, is there

20 anywhere that you record that piece of

21 information in the patient's file?

22           MR. BENEDETTO:  Objection of

23 form.

24           THE WITNESS:  No, not over the

1              THE WITNESS:  I'm not sure if it
2    was multiple.  I can't remember.
3    BY MR. LAMB:
4    Q.     What was your conversation with
5    Dr. Lindner about Stacey Wolking, the one
6    that you're referring to?
7    A.     That he was -- again, my recollection
8    of it is that he was treating her for
9    babesiosis.  She needed steroids to be able
10   to take the anti-malarials, which were not
11   from our pharmacy.  So, I didn't know exactly
12   what the treatment course was.  And that he
13   wasn't sure what she was going to need.
14          So, he needed stuff on hand because he
15   wasn't sure what the treatment course was
16   exactly going to be until she started taking
17   them.  But she needed probably more than just
18   a few that she was going to get possibly
19   somewhere else.  Again, I'm not 100 percent
20   sure of the exact conversation, but that was
21   my recollection of it.
22   Q.     When did the conversation take place?
23             MR. BENEDETTO:  Objection to the
24   form.

1                THE WITNESS:  I don't remember.
2     BY MR. LAMB:
3     Q.    Are you confident that it was before
4     this prescription was filled on August 8,
5     2022?
6     A.    Yes.
7     Q.    Was the conversation in person?
8     A.    No.
9     Q.    How did it occur?
10    A.    It would have been over the phone, I
11    believe, but I don't believe it was in
12    person.
13    Q.    Would you guys have corresponded by
14    e-mail or text message to set up that phone
15    call?
16    A.    No, I don't believe so.
17    Q.    Did you call him or did he call you?
18    A.    I can't remember.
19    Q.    Is there anything about this
20    prescription from August 8, 2022 for Stacey
21    Wolking that would have made you reach out to
22    him?
23              MS. DENAPLES:  Object to form.
24              THE WITNESS:  If anything, it was

1  the quantity prescribed.  I just wanted to

2  have a conversation with him about why he

3  needed the quantity that he wrote for.

4  BY MR. LAMB:

5  Q.    What about the quantity would have

6  made you reach out to Dr. Lindner?

7              MS. DENAPLES:  Object to form.

8              THE WITNESS:  I felt like it was

9  a higher quantity.  Not that it was.  That's

10 just what I felt.

11 BY MR. LAMB:

12 Q.    Why did you feel that way?

13             MR. BENEDETTO:  Objection to the

14 form.

15             THE WITNESS:  It just was a

16 higher quantity than maybe that I would have

17 saw at Rite Aid.  Dealing with insurance

18 companies, I know an insurance company

19 wouldn't cover that quantity.  I just wanted

20 to have a conversation with him about it.

21 BY MR. LAMB:

22 Q.    Am I right that by this point of

23 August 8, 2022 you had been working at

24 Tunkhannock Compounding Center for around six

1  though, based on what you just said?
2           MR. BENEDETTO:  Same objection.
3           THE WITNESS:  It's possible.
4  BY MR. LAMB:
5  Q.    You're saying that you don't remember
6  whether it was you that called him or him
7  that called you to talk about Stacey Wolking
8  and this prescription?
9  A.    No.
10 Q.    It's also possible that you did not
11 reach out to him initially, but that he
12 reached out to you to talk about Stacey
13 Wolking?
14          MS. DENAPLES:  Object to form.
15          THE WITNESS:  It could have been.
16 I do not remember.  He also could have called
17 on another patient and I might have brought
18 it up.  Again, I do not remember.
19 BY MR. LAMB:
20 Q.    Are there any notes from this
21 conversation about Stacey Wolking and the
22 August 8th prescription, any notes or record,
23 written record, of that conversation of any
24 kind?

1  A.    No.

2  Q.    In that conversation, did you and

3  Dr. Lindner talk about any potential side

4  effects that Stacey Wolking could experience

5  or risks to her from that prescription?

6  A.    To me specifically, no.

7  Q.    I'm asking if you and Dr. Lindner

8  talked about that in the conversation?

9  A.    No.

10 Q.    In your initial description of that

11 conversation from a few minutes ago, you

12 talked about your knowledge that Stacey

13 Wolking was getting anti-malerial medications

14 from Dr. Lindner; is that correct?

15 A.    Yes.

16 Q.    Did he explain that to you in this

17 conversation before filling the August 8th

18 prescription?

19 A.    I can't remember.

20 Q.    Do you know whether you talked to

21 Dr. Lindner about Stacey Wolking before this

22 phone conversation you and I have been

23 talking about?

24            MR. BENEDETTO:  Objection of the