UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| STACEY WOLKING and DARYL WOLKING, H/W | : | Civil No. 3:23-cv-00806-JFS |
| Plaintiffs | : | |
| v. | : | JURY TRIAL DEMANDED |
| HENRY LINDNER, M.D. and YOUNGS APOTHECARY, INC., d/b/a Tunkhannock Compounding Center | : | |
| Defendants | : | |

**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION *IN LIMINE* TO PRECLUDE OPINIONS BY DR. STEPHEN SMITH <u>WHICH WERE NOT INCLUDED IN HIS REPORT</u>**

Plaintiffs, Stacey and Daryl Wolking, by and through their undersigned counsel, respectfully submit this brief in support of their motion *in limine* to preclude defense expert Dr. Stephen Smith from offering opinions beyond those contained in his report.

**I.    PROCEDURAL HISTORY**

Plaintiffs filed the Complaint in this case on May 16, 2023. Two of the six counts named Defendant Youngs Apothecary, Inc., doing business as Tunkhannock Compounding Center ("TCC"): Count Five alleged negligence, and Count Six alleged loss of consortium. The case was initially assigned to Judge Mannion.

1

Expert reports were due for all parties on April 26, 2024. Plaintiffs provided their five expert reports to TCC on that date, but TCC did not provide any reports to Plaintiffs. Instead, after TCC had already received Plaintiffs' reports, TCC requested a 30-day extension to disclose their reports. Judge Mannion denied the request, and called TCC's maneuver a "machination" that "unfairly prejudices the plaintiff." *See* Doc. No. 55 at 1. He then sanctioned TCC by precluding them from filing any supplemental reports, since their failure to abide by the original deadline provided them with three weeks during which TCC had Plaintiffs' reports, but Plaintiffs had nothing from TCC.

Plaintiffs' experts filed supplemental reports on various dates in the first half of June 2024, in compliance with Judge Mannion's order. On June 18, 2024, after Plaintiffs' supplemental reports were disclosed, TCC's expert Dr. Stephen Smith was deposed.

In August 2024, Judge Mannion ruled on two summary judgment motions filed by TCC, denying the more comprehensive motion because Plaintiffs had established a genuine dispute of material fact concerning whether TCC breached its duty to Ms. Wolking. *See* Doc. 62 at 11-18. The case was then transferred to this Court, which scheduled a trial to begin on April 28, 2025, and established March 28, 2025 as the deadline for motions *in limine* and jury instructions. *See* Doc. 71.

## II. STATEMENT OF FACTS

This case involves the decisions of two TCC pharmacists – Brian Bryk and Courtney Young – to dispense massive quantities of prednisone and dexamethasone to Ms. Wolking, which perforated her bowel, nearly caused her death, and inflicted the tremendous pain and suffering alleged in the Complaint.

The drugs at issue were prescribed by Dr. Henry Lindner, who directed Ms. Wolking to take them in response to inflammation caused by antimalarial drugs that she was taking, also at Lindner's direction. Lindner prescribed the antimalarials after diagnosing Ms. Wolking with babesiosis. TCC did not dispense any antimalarials to Ms. Wolking. TCC did, however, dispense the massive quantities of corticosteroids described in the Complaint, even though corticosteroids are not recommended or approved for the treatment of babesiosis.

At times during Ms. Wolking's treatment by Lindner, she would complain about how poorly she felt, and he directed her to increase her doses of corticosteroids. Ms. Wolking filled the corticosteroid prescriptions written by Lindner at both TCC and at a Harris Teeter chain pharmacy closer to her home. Lindner instructed her to fill larger doses at TCC, in order to avoid the scrutiny that could come with a more mainstream retail pharmacy like Harris Teeter. *See* Ex. A at 2. Ms. Wolking did what Lindner asked and obtained most of her larger doses of corticosteroids from TCC during this period.

3

TCC has retained two experts in this case. One is a pharmacist who opined that TCC was not negligent, and who offered no opinion about Harris Teeter. The other is an infectious diseases specialist, Dr. Stephen Smith. His report contained one clear opinion: that tafenoquine caused Ms. Wolking to suffer neutropenic enterocolitis, which resulted in her bowel perforation.[1] *See* Ex. B at 18-19.

Dr. Smith also used his report to respond to various contentions of Plaintiffs' experts (which he could read because TCC did not disclose its expert reports on time). In one passing comment, he raised a question about Harris Teeter in the following manner:

> None of plaintiff's experts is critical of Harris-Teeter Pharmacy. These experts do not explain why they are solely critical of TCC's handling of Dr. Lindner's prescriptions but not critical of Harris-Teeter's filling of similar/same prescriptions during this same period.

*Id.* at 14. Dr. Smith did not comment further on Harris Teeter's corticosteroids, presumably because his opinion was that corticosteroids did not cause the injury.

As noted above, Dr. Smith was only permitted to file one expert report, because of TCC's non-compliance with the Court's deadlines. Nonetheless, during Dr. Smith's deposition, TCC's counsel asked him to respond further to each of Plaintiffs' experts. Plaintiffs' counsel objected to this line of questioning, since it

---

[1] Plaintiffs are not challenging the admissibility of this opinion by Dr. Smith.

effectively allowed Dr. Smith to supplement his report by adding new opinions. *See* Ex. C at 127, 134. This effectively undermined Judge Mannion's order.

Dr. Smith went on to elaborate on the comment from his report about Harris Teeter, which is quoted above. He suggested that if one believed that corticosteroids caused Ms. Wolking's injuries, then either the corticosteroids from Harris Teeter or the corticosteroids from TCC could have been responsible. In response to a leading question asked by TCC's counsel, he argued, "there's no way to distinguish which steroids she took." *Id*. at 171-72. He then presented his own analysis of when Ms. Wolking received various corticosteroid prescriptions, and claimed that "the majority of the steroids that Ms. Wolking was on when she developed her bowel problem, regardless of etiology of the bowel problem, the majority was from Harris Teeter and not from TCC." *Id.* at 181-82.

Dr. Smith's testimony was plainly argument, not expert opinion,[2] and it was intended to suggest that Harris Teeter dispensed enough corticosteroids to Ms. Wolking to cause her injuries on its own. While Dr. Smith did not come out and state this, he argued that the dose needed to cause the injuries could have been

---

[2] From pages 171 to 182 of Exhibit C, Dr. Smith speculates as to which corticosteroids Stacey took – those from Harris Teeter or those from TCC. He brings no expertise to bear. He simply chooses a date range at random and discusses the prescriptions filled during that date range. This is not a medical opinion arrived at through the use of reliable principles and methods. It is the type of argument a lawyer can make.

5

relatively low, because there is some dose of corticosteroids above which the risk of injury does not increase. *Id.* at 155-56. However, Dr. Smith admitted there was "no data on that." *Id.* at 156. At the same time, he reinforced his original, opposite conclusion: that corticosteroids did not cause the injury at all. *Id.* at 182.

To the extent that Dr. Smith was offering a separate opinion that Harris Teeter had dispensed enough corticosteroids to cause the injuries on its own, he never explained whether he believes it is possible to hold two inconsistent causation opinions – that either tafenoquine or some amount of Harris Teeter's corticosteroids caused the bowel perforation – to a reasonable degree of medical certainty, as required by Pennsylvania law. Furthermore, his CV reveals no special expertise with respect to corticosteroids. *See* Ex. B at 21-33. His experience does not suggest he would be familiar with the doses at which corticosteroids would cause these injuries, since he testified that he could not remember treating anyone who ever suffered a perforated bowel caused by corticosteroids, nor had he published anything on the subject. *See* Ex. C at 39; *id.* at 40 ("Q: Have you ever published any written work that deals with the effects of corticosteroids? A. Not to my memory. Q. Have you ever published any written work that deals with the causes of bowel perforations? A. No, I don't think so.").

In sum, today it remains unclear whether Dr. Smith holds one opinion (that tafenoquine caused the injuries), two opinions (that either tafenoquine or some

6

amount of corticosteroids from Harris Teeter caused the injuries), or more. Because he did not include the additional opinions in his original report – despite having a three-week advantage to consider the reports of Plaintiffs' experts – it is also unclear what these opinions are based on, and to what degree he believes in them.

### III.  QUESTIONS PRESENTED

Should Dr. Smith be precluded from offering additional opinions that were not included in his report?

**Suggested Answer:**     Yes.

Is Dr. Smith qualified to offer an opinion about whether corticosteroids from Harris Teeter caused Ms. Wolking's injuries, and is such an opinion reliable?

**Suggested Answer**:     No.

### IV.  ARGUMENT

Judge Mannion specifically denied TCC the opportunity to supplement their expert reports, which were disclosed three weeks late. His sanction would be removed, and his order subverted, if Dr. Smith were allowed to testify to the opinions that are implicit in his deposition testimony, and that were not contained in his original report. In any event, Dr. Smith is not qualified to offer those opinions, nor are they reliable under Federal Rule of Evidence 702.

#### A. Opinions beyond those contained in the report should be precluded.

The opinions that Dr. Smith offered during his deposition, albeit implicitly, were not contained in his original report and should be precluded because they

violate Judge Mannion's order as well as the federal rules. Under Federal Rule of Civil Procedure 26(a)(2), Dr. Smith's original report should have contained "a complete statement of all opinions" that he held. As another federal court has written:

> The interest served by requiring the disclosure of expert opinions is self evident. It is to prevent unfair surprise at trial and to permit the opposing party to prepare for the expert's cross examination. By "locking" the expert witness into what Fed.R.Civ.P. 26(a)(2)(B) calls "a complete statement of all opinions to be expressed and the basis and reasons therefor," the opposing party knows exactly what she is facing and can decide whether to take the deposition of the expert and how to prepare for cross examination and rebuttal.

*Coles v. Perry*, 217 F.R.D. 1, 4 (D.D.C. 2003).

There was no reason here why Dr. Smith should have left out of his original report any additional opinions he had about corticosteroids and Harris Teeter. He knew that the causal role of corticosteroids was addressed extensively in Plaintiffs' expert reports, because he was in possession of them when he wrote his own report. Thus, Dr. Smith either negligently or intentionally failed to include all of his opinions in his original report. Either way, his new opinions should be precluded under Rule 37(c)(1), particularly in light of Judge Mannion's order.

Normally, if Dr. Smith arrived at new opinions, he would have a duty to supplement his report under Rule 26(e). This duty to supplement "extends both to information included in the report and to information given during the expert's deposition." Fed. R. C. P. 26(e)(2). However, TCC could not supplement Dr.

8

Smith's original report because of Judge Mannion's order. The proper course of action would have been for TCC's counsel to respect Judge Mannion's order by only asking questions that related to Dr. Smith's original report. Instead, TCC's counsel intentionally elicited new opinions from him. *See* Ex. C at 171-82.

If the Court allowed these new opinions to reach the jury, not only would it effectively discard Judge Mannion's original order and reward TCC's attempt to circumvent it, it would prejudice Plaintiffs a second time, because they did not have the ability to prepare to question Dr. Smith about these new opinions in advance of the deposition, nor could they supplement their own expert reports in response to Dr. Smith's new opinions. As noted above, Plaintiffs' supplements were due before Dr. Smith's deposition, and Plaintiffs adhered to that deadline.

Other courts have found that where one party seeks to introduce new opinions into the case after the deadlines their opposing parties used to make key decisions, the new opinions should be precluded. *See, e.g.*, *Petrone v. Werner Enterprises, Inc.*, 105 F.4th 1043, 1057 (8th Cir. 2024) (affirming preclusion where expert had the information and could have written a proper report on time); *Goodman v. Staples The Off. Superstore, LLC*, 644 F.3d 817, 827 (9th Cir. 2011) (affirming exclusion of late-produced expert opinions when opposing party had already made litigation decisions); *Martinez-Serrano v. Quality Health Servs. Of Puerto Rico, Inc.*, 568 F.3d

9

278, 283 (1st Cir. 2009) (affirming preclusion where new opinion "amounted to the propagation of a brand-new theory, not merely a refinement of an existing theory").

This Court should reach the same result. In addition to all of the reasons discussed above, it is not even possible now to review Exhibit C and determine exactly which opinions Dr. Smith holds, how he arrived at them, and to what degree of certainty he believes in them. These deficiencies might have been cured had Dr. Smith followed the requirement of stating these opinions in a written report. But he did not, so any testimony beyond his report should be precluded.

**B. Dr. Smith is not qualified to offer the new opinions.**

In any event, to the extent that Dr. Smith's new opinion is that Plaintiffs cannot prove whether the corticosteroids that injured Ms. Wolking came from TCC or Harris Teeter, that testimony is not admissible under Federal Rule of Evidence 702.[3] "The proponent of the expert bears the burden of establishing the reliability and admissibility of the expert's testimony by a preponderance of the evidence." *Bardo v. Norfolk S. Ry. Co.*, 459 F. Supp. 3d 618, 624 (M.D. Pa. 2020) (internal quotation marks and citation omitted). TCC cannot carry its burden here with respect to Dr. Smith, because he is not qualified and his opinion is not reliable.

---

[3] Plaintiffs note another basis of preclusion: Dr. Smith has not stated that he holds an opinion concerning Harris Teeter's corticosteroids to a reasonable degree of medical certainty, which is required in Pennsylvania and in this Court sitting in diversity. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 750 (3d Cir. 1994).

10

The first requirement of Rule 702 is that the proffered expert must be an expert in the relevant subject matter. *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994). The relevant subject matter for a causation witness such as Dr. Smith is "expert medical testimony on the injury itself and the relationship between the injury and the alleged cause." *Niklaus v. Vivadent, Inc., U.S.A.*, 767 F. Supp. 94, 96 (M.D. Pa. 1991), *aff'd sub nom. Niklaus v. Patterson Dental Supply Co.*, 986 F.2d 1409 (3d Cir. 1993).

Here, TCC will be unable to prove that Dr. Smith is qualified with respect to any causation opinion concerning corticosteroids. The injury that Dr. Smith addresses – the bowel perforation caused by corticosteroids – is one that he could not remember ever having treated. *See* Ex. C at 39. Neither his report, his CV, nor his deposition testimony establishes that he has ever studied whether prolonged and high corticosteroid doses can cause the injuries alleged here, and even more specifically, whether the quantity dispensed by TCC was enough to injure this particular patient.

While Dr. Smith may be qualified to discuss matters within the expertise of infectious diseases, TCC has not shown how his experience fits the question of the causal effect of high-dose corticosteroids. *See Paoli*, 35 F.3d at 743 ("[E]ven if an expert's proposed testimony constitutes scientific knowledge, his or her testimony will be excluded if it is not scientific knowledge *for purposes of the case*.")

(emphasis in original); *Surace v. Caterpillar, Inc.*, 111 F.3d 1039, 1055 (3d Cir. 1997) (affirming that otherwise credentialed expert did not qualify under Rule 702 because his expertise did not match the subject area of his proffered opinion).  The proper experience for this case would more commonly be found among endocrinologists and toxicologists, who study steroids and the effects of various drugs.  TCC did not retain an expert from either specialty, despite having three weeks during which it was in possession of Plaintiffs' expert reports, which included an endocrinologist and a toxicologist.  Dr. Smith is not a catch-all substitute for experts who have the proper experience, but who TCC chose not to hire.

Even if Dr. Smith were qualified, there is nothing in his report, his CV, or his deposition testimony showing that his opinion is the product of reliable principles and methods.  "[A]n inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." *Paoli*, 35 F.3d at 742.  "[T]he district court acts as a gatekeeper to ensure that the expert's opinion [is] based on the methods and procedures of science rather than on subjective belief or unsupported speculation."  *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 290 (3d Cir. 2012) (internal quotation marks and citation omitted).

Here, Dr. Smith provided nothing to distinguish his comments about Harris Teeter from "subjective belief or unsupported speculation."  Dr. Smith did not explain any methodology that he used to form an opinion with respect to

12

corticosteroids. Instead, he simply critiqued the opinions of Plaintiffs' experts without explaining how he arrived at his own vague conclusion that gastrointestinal injuries can be caused by a relatively low level of corticosteroid use. *See* Ex. C at 155-56. When Plaintiffs' counsel asked him for a citation in support of his contention that the risk of injury did not increase past a certain dose of corticosteroids, he was unable to provide it. *Id.* at 37-38.

In addition to the fact that his testimony was vague, Dr. Smith never connected his assertions about corticosteroids to the facts of this case. For example, he makes no attempt to address why – if low levels of corticosteroids could have caused Ms. Wolking's injuries – she tolerated high doses of corticosteroids for months, only to become hospitalized when those doses began to approach and exceed 1,000 milligrams per day. Dr. Smith's failure to address such facts further demonstrates that his opinion is too unreliable for the jury to hear. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered."); *Paoli*, 35 F.3d at 743 ("[T]he requirement of reliability, or 'good grounds,' extends to each step in an expert's analysis all the way through the step that connects the work of the expert to the particular case.").

For all of these reasons, any of Dr. Smith's opinions that was not contained in his original report should be precluded. There is ample evidence cited above that Dr. Smith's supplemental testimony would present, at best, argumentative and half-formed opinions, not ones that meet the law's requirements. Accordingly, an evidentiary hearing is unnecessary in these circumstances. *See Oddi v. Ford Motor Co.*, 234 F.3d 136, 155 (3d Cir. 2000) (noting that trial courts retain the discretion whether or not to hold a hearing).

V.   **CONCLUSION**

For all of these reasons, any testimony by Dr. Smith that goes beyond his report must be precluded.

Respectfully submitted,

**KLINE & SPECTER, P.C.**

BY: *Conor Lamb*
SHANIN SPECTER, ESQUIRE
PA Attorney I.D. No. 40928
CONOR LAMB, ESQUIRE
PA Attorney I.D. No. 304874
1525 Locust Street, 19th Floor
Philadelphia, PA 19102
Telephone: (215) 772-1000
Facsimile: (215) 402-2359
Shanin.Specter@klinespecter.com
Conor.Lamb@klinespecter.com

Date: March 28, 2025