## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| STACEY WOLKING and DARYL WOLKING, W/H | CIVIL ACTION 3:23-cv-00806-MEM |
| Plaintiffs, | |
| v. | **BRIEF IN SUPPORT OF THE RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION *IN LIMINE* TO PRECLUDE OPINIONS BY DR. STEPHEN SMITH WHICH WERE NOT INCLUDED IN HIS REPORT** |
| HENRY LINDNER, M.D., and YOUNGS APOTHECARY, INC. d/b/a TUNKHANNOCK COMPOUNDING CENTER | |
| Defendants. | |

Defendant, Youngs Apothecary, Inc. ("Youngs") d/b/a Tunkhannock Compounding Center ("TCC") (collectively as a defendant, "Tunkhannock"), by its undersigned counsel, hereby files Brief in Support of its Response in Opposition to Plaintiffs' Motion *in Limine* to Preclude Opinions by Dr. Stephen Smith Which Were Not Included In His Report.

### I.   FACTUAL AND PROCEDURAL HISTORY

*See* the Factual History in the *Daubert* Motion and Memorandum filed as to plaintiffs' expert, Paul Auwaerter, M.D., filed by Tunkhannock, which it hereby incorporates by reference as if fully set forth herein at length.

II.    **QUESTION PRESENTED**

**Question 1:** Should Dr. Smith be precluded from offering opinions on matters beyond the scope of his expert report at trial?

**Suggested Answer:**    No.

**Question 2:** Is Dr. Smith qualified to offer an opinion about Plaintiffs' experts' methodology as to their causation opinions?

**Suggested Answer:**    Yes.

III.    **ARGUMENT**

    A. **Dr. Smith's opinions on matters within his expertise, that were in fact included in his report, are permissible at trial and thus should not be precluded. Even if the Court were to find that these opinions beyond the scope of his report, it is well established that testimony of an expert on matters within the expert's expertise, but outside of his report, are permissible at trial.**

There is no rule of law or statute which prohibits an expert from testimony beyond the scope of his report. *Kelly v. GAF Corp.,* 115 F.R.D. 257, 258 (E.D. Pa.1987); *see also Bowersfield v. Suzuki Motor Corp.*, 151 F. Supp. 2d 625, 631 (E.D. Pa. 2001). Testimony of an expert on matters within the expert's expertise, but outside of the expert's report, is not only permissible at trial, but the exclusion of such testimony at trial may be reversible error. *See DeMarines v. KLM Royal Dutch Airlines,* 580 F.2d 1193 (3d Cir.1978); *see also Fritz v. Consolidated Rail Corp.*, 1992 WL 962285 (E.D. Pa. April 23, 1992); *Kelly*, 115 F.R.D. at 258.

Further, the Federal Rules of Civil Procedure provide the exclusive method for discovering an expert's testimony, but it does not state that an expert report is the only method of discovery, and it does not state that such a report restricts the expert's testimony at trial. Fed. R. Civ. P. 26(b)(4); *Kelly* 115 F.R.D. at 258. "In the art or science that the expert is qualified to express an opinion, there is no rule which requires that the expert confine his testimony to his report." *Fritz*, 1992 WL 962285 at *3; *see also McElroy v. Cessna Aircraft Co*., 506 F. Supp. 1211, 1216 (W.D. Pa. 1981). An expert may testify beyond the scope of his report absent surprise or bad faith. *Kelly*, 115 F.R.D. at 258; *McElroy,* 506. F. Supp at 1216.

In *Fritz,* the Court permitted defense expert, Dr. Hoffman, to testify at trial beyond the scope of his written report and address issues of whether the surgery on the plaintiff was proper. *Fritz, 1992 WL 962285* at *3. The plaintiff in that case underwent two surgeries, and the plaintiff's doctor stated that the second surgery was required because of the first surgery. *Id.* The trial deposition of the plaintiff's expert, Dr. Kalko, and the cross-examination of the plaintiff's other expert, Dr. Khavarian, at trial indicated that the issue of the appropriateness of surgery had been raised prior to the testimony of the defense experts. *Id.* The plaintiff in *Fritz* moved for a new trial and, upon review, the Court found that the testimony of Dr. Hoffman was within his expertise, that there was no bad faith, and that, given the prior testimony of the plaintiff's experts, there was no prejudicial surprise;

therefore, the Court did not err by allowing Dr. Hoffman to testify beyond the scope of his written report. *Id.*

Here, Plaintiffs are not moving to preclude Dr. Smith's opinion that the tafenoquine, in part or in all, and/or with the other non-steroid prescriptions, Artemisia, Atovaquone, and Azithromycin, prescribed by Dr. Lindner, *and not corticosteroids*, caused Ms. Wolking severe neutropenia, resulting in her enterocolitis and perforation in the jejunum. *See Deposition Transcript of Dr. Smith,* attached as <u>Exhibit A</u>, P. 66:2- 67:11. Rather, Plaintiffs seek to preclude Dr. Smith's testimony, which includes a critique of Plaintiffs' experts, for not having taken into consideration when formulating their causation opinions against Tunkhannock, that Ms. Wolking had received a significant amount of corticosteroids, which were prescribed by Dr. Lindner, but dispensed by another pharmacy – Harris Teeter – in the days leading up to her hospitalization on October 7, 2022. *Id.* at P. 171:6 – 172:15; *see also* Plaintiff's Motion.

First and foremost, Dr. Smith's critique is clearly in his report, proving notice to Plaintiffs as to his anticipated testimony:

> None of plaintiff's experts is critical of Harris-Teeter Pharmacy. These experts do not explain why they are solely critical of TCC's handling of Dr. Lindner's prescriptions but not critical of Harris-Teeter's filling of similar/same prescriptions during this same period.

*See Dr. Smith's Report,* attached as <u>Exhibit B.</u> However, even if this Court were to find that Dr. Smith's testimony at his deposition as to this issue was outside of his report, Dr. Smith's opinions as to the critique is reliable and within his expertise. Dr. Smith expounded on this critique at his deposition, basing his critique on his comprehensive review of Ms. Wolking's prescription history from *both* pharmacies, Harris Teeter and Tunkhannock, and her emails with her prescribing physician, Dr. Lindner, indicating not only her use of the corticosteroids, but also indicating when she began to run low on her corticosteroids and her need for more. *See Exhibit A*, P. 172:20 - 179:2. In fact, based on Dr. Smith's in-depth review of her prescriptions and emails to Dr. Lindner, Ms. Wolking had received 4,200 milligrams of prednisone equivalent from Harris Teeter between September 26, 2022 and October 5, 2022 compared to the 2,800 milligrams of prednisone equivalent she received from Tunkhannock, leading him to reasonably conclude that the majority of corticosteroids which Ms. Wolking took from September 26, 2022 to her hospital admission on October 7, 2022 were from Harris Teeter. *Id.*

Like the defense expert in *Fritz*, Dr. Smith's opinion, which criticizes Plaintiffs' experts for having failed to acknowledge or consider the amount of corticosteroids that were dispensed by another pharmacy and taken by Ms. Wolking as a potential cause for her injury, is clearly within his expertise. Dr. Smith is currently board certified in infectious diseases. *Id.* at P.15:19-20. During

Dr. Smith's career and practice, he has prescribed corticosteroids, including prednisone and dexamethasone. *Id.* at P. 32:8 – 33:20. Further, he has previously treated a patient with neutropenic enterocolitis, which is what he opines that Ms. Wolking suffered from. *Id.* at P. 21:11-23. As a basis for his opinion that tafenoquine, in part or in all, and/or with the other non-steroid drugs that Ms. Wolking took, he cites to a case report in his expert report related to the causal link between doses of tafenoquine (even lower doses than what Ms. Wolking received) and neutropenia. *See* <u>Exhibit B.</u> He further testified that **<u>corticosteroids do not cause neutropenia</u>**, and that Ms. Wolking's medical records, including her initial vital signs and the pattern exhibited in her white blood cell count from the time of her admission to after surgery, indicate that her neutropenia was caused by tafenoquine and/or the other non-steroid drugs as opposed to corticosteroids. *Id.* at p. 111:10- 115:13. Further, he testified that there is no data or studies suggesting that corticosteroids increase the rates of a perforation in the jejunum and none of Plaintiffs' experts cited any data or articles supporting the same. *Id.* at P. 121:19-22; P. 123: 8-10; P. 185: 4-16. Therefore, in further support of his opinion, he testified that **<u>regardless of the amounts of corticosteroids that were filled by Harris Teeter or Tunkhannock, the corticosteroids did not cause Ms. Wolking's neutropenia, rather it was caused by tafenoquine, in part or in all, and/or with the other non-steroid drugs</u>**. *Id.* at p 182: 6-12.

6

Similar to the facts in *Fritz,* there was indeed prior cross examination of Plaintiffs' experts relating to whether the corticosteroids by Harris Teeter pharmacy could have caused Ms. Wolking's injuries. *See Dr. Auwaerter's Deposition,* attached as <u>Exhibit C</u>, P. 89:4 – 90:3; P. 98:19 – 99:2 (admitting that he could not identify which corticosteroids from which pharmacy Ms. Wolking was taking at the time of her perforation occurred); *see also Dr. Williams' Deposition*, attached as <u>Exhibit D</u>, P. 109:14 – 110:13; 117:17 – 118:10 (admitting that he cannot eliminate the corticosteroids Ms. Wolking was taking from Harris Teeter because Dr. Williams did not know which pill bottles she was taking her corticosteroids from). Therefore, there is clearly no prejudicial surprise to Plaintiffs as to Dr. Smith's critique of plaintiffs' experts' opinion in discounting the corticosteroids prescribed by Harris Teeter when formulating their causation opinion against Tunkhannock, as this opinion was elicited at his deposition, and, therefore, Plaintiffs know the precise matters to which Dr. Smith would attest at trial. Moreover, there was no bad faith on part of Tunkhannock as Plaintiffs suggest – Tunkhannock complied with Judge Mannion's Order and did not file any supplemental expert reports. The Order certainly did not preclude Dr. Smith from testifying to the contents of his report or his observations based on documents produced in discovery and, even if this Court were to find that his critique of Plaintiffs' experts was beyond the scope of his expert report, the Order did not

7

preclude Dr. Smith from testifying to matters outside the scope of his report. As previously discussed, the prevailing case law permits an expert to testify beyond the scope of his report at trial so long as it within the expert's expertise absent surprise or bad faith.

Therefore, based on the foregoing, Dr. Smith's opinions criticizing the Plaintiffs' experts for failing to acknowledge or consider the corticosteroids dispensed by Harris Teeter as a cause or contributive cause for Ms. Wolking's injury, is permissible at trial and should not be precluded.

### B. Dr. Smith is qualified to offer this opinion as it is within his expertise and it is reliable in accordance with F.R.E. 702.

Dr. Smith's opinion criticizing Plaintiffs' experts for failing to acknowledge or consider the corticosteroids dispensed by Harris Teeter as a cause or contributive cause for Ms. Wolking's injury is reliable and clearly comports with the Federal Rules of Evidence, which provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion or otherwise." Fed. R. Evid. 702. "Relying on the language of Rule 702 and the liberal thrust of the Federal Rules of Evidence, the Supreme Court held in *Daubert* that expert testimony need be based only on a reliable and scientifically valid methodology that fits with the facts of a case."

*Heller v. Shaw Industries,* 167 F.3d 146, 152 (3d Cir. 1999); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 592-93 (1993). "The Court in *Daubert* cautioned that these were guideposts and not required factors in each case." *Id.* The factors are as follows: (1) whether the methodology can and has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the known or potential rate of error of the methodology; and (4) whether the technique has been generally accepted in the proper scientific community. *See Daubert,* 509 U.S. at 593–94. "The Court in *Daubert* made clear that its listing of these factors should not obscure the fact that the district court's gatekeeper role is a flexible one, and that the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted." *Heller,* 167 F.3d at 152; *see also* Daubert, 509 U.S. at 594 & n. 12.

As discussed above, Dr. Smith is clearly qualified to render this critique as his specialized knowledge in infectious diseases and his experience in prescribing corticosteroids in his practice, his ability to review and analyze medical records and vitals, including white blood cell count and how that may indicate neutropenia, his knowledge of tafenoquine and/or other non-steroid drugs' causal link to neutropenia which is supported by case reports, will certainly assist the trier of fact to understand the evidence or to determine the fact in issue – whether the

corticosteroids prescribed by Dr. Lindner and dispensed by Tunkhannock or Harris Teeter caused Ms. Wolking's injury, or whether some other drugs – tafenoquine and/or other non-steroid drugs – caused Ms. Wolking's injury.

Further, Tunkhannock's expert is not required to prove that any alternative cause was the actual cause to be admissible at trial. *See Viking Yacht Co. v. Composites One LLC,* 613 F. Supp. 2d 637, 641 (D.N.J. 20009). In other words, Dr. Smith is not required to prove that the corticosteroids dispensed by Harris Teeter was the actual cause of Ms. Wolking's injury for his opinion to be admissible at trial – he was merely offering testimony criticizing Plaintiffs' experts' analysis and methodology for formulating their opinions that it was Tunkhannock's corticosteroids that caused Ms. Wolking's injury, without considering the corticosteroids dispensed by Harris Teeter, which were arguably taken the same time leading up to Ms. Wolking's hospitalization based on Dr. Smith's review of the records. Therefore, given that Dr. Smith is clearly qualified to render the aforementioned opinion, and his opinion is reliable in accordance with F.R.E. 702, Dr. Smith should be permitted to testify to his opinions at trial.

## IV.  **CONCLUSION**

Based on the foregoing, the Court should deny plaintiffs' Motion *in Limine.* Dr. Smith should be permitted to testify at trial, regardless of whether they are

allegedly beyond the scope of his report, as he is qualified, and he is qualified to render an opinion as to causation.

Respectfully submitted,

By:  /s/ Conrad James Benedetto
Philip D. Priore, Esquire
Attorney ID: 38987
Conrad James Benedetto, Esquire
Attorney ID: 312404
Susan C. Keesler, Esquire
Attorney ID: 312977
**MCCORMICK & PRIORE, P.C.**
2 Commerce Square
2001 Market Street, Suite 3810
Philadelphia, PA 19103
(T) 215-972-0161
(F) 215-972-5580
ppriore@mccormickpriore.com
cbenedetto@mccormickpriore.com
Attorneys for Defendant,
Youngs Apothecary, Inc. d/b/a
Tunkhannock Compounding Center

Dated: April 7, 2025